**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

TRAVELERS INDEMNITY COMPANY,
*et al.,*
                                    Plaintiffs,

v.                                                                    Civil Action No. 12-CV-3040 (KBF)

NORTHROP GRUMMAN CORPORATION *et al.,*
                                    Defendants,

and

CENTURY INDEMNITY COMPANY,                         ECF CASE
Eventual successor in interest to
INSURANCE COMPANY OF
NORTH AMERICA,
                         Nominal Defendant.

---

**CENTURY INDEMNITY COMPANY'S MEMORANDUM OF LAW IN OPPOSITION**
**TO NORTHROP GRUMMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON DUTY TO DEFEND**


**White and**
**Williams** LLP
Guy A. Cellucci
Shane R. Heskin
One Penn Plaza, Suite 4110
New York, NY 10119
(212) 244-9500 (phone)
(215) 399-9603 (direct fax)

*Attorneys for Century Indemnity Company,*
*as successor to CCI Insurance Company,*
*as successor to Insurance Company*
*of North America*

February 1, 2013

# TABLE OF CONTENTS

Page(s)

STATEMENT OF UNDISPUTED FACTS ....................................................................4

    I.    Site History ................................................................................................4

        A.  The Bethpage Facility and NWIRP Sites.................................4

        B.  The Community Park Site...........................................................5

    II.    Regulatory History ....................................................................................6

        A.  The Bethpage Facility Site.........................................................6

        B.  The Bethpage NWIRP Site ......................................................13

        C.  The Bethpage Community Park Site.........................................14

    III.   Claims History ..........................................................................................15

    IV.   The Century Policies.................................................................................17

STANDARD ...........................................................................................................17

ARGUMENT ...........................................................................................................18

    I.    Timely Notice Is a Condition Precedent to Coverage. ............................18

    II.   Grumman Was Late Twice When it Failed to Give Century Notice of Groundwater Contamination in the 1970s and When it Failed to Give Notice of PCB Contamination in 2001. .........................................................................................................19

    III.   New York Law Requires that Defense Costs be Allocated on Pro Rata Basis.............................................................................................22

CONCLUSION.........................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Am. Home Assur. Co. v. Int'l Ins. Co.,*
   661 N.Y.S.2d 584 (N.Y. 2002) ................................................................. 18

*Am. Home Assurance Co. v. Republic Ins. Co.,*
   984 F.2d 6 (2d Cir.1993) ........................................................................ 22

*Argo Corp. v. Greater N.Y. Mut. Ins. Co.,*
   827 N.E.2d 762 (N.Y. 2005) ................................................................... 18

*Atlantic Cas. Inc. Co. v. C.A.L. Constr. Corp.,*
   No. 06 CV 4036, 2008 WL 2946060 (E.D.N.Y. July 30, 2008) ............................. 22

*Brady v. Town of Colchester,*
   863 F.2d 205 (2d Cir. 1988) ................................................................... 17

*Christiania General Ins. Corp. of N.Y. v. Great Am. Ins. Co.,*
   979 F.2d 268 (2d Cir. 1992) ................................................................... 19

*City of Utica v. Genesee Mgmt., Inc.,*
   934 F.Supp. 510 (N.D.N.Y.1996) ............................................................. 22

*Consolidated Edison Co. of New York v. Allstate Ins. Co.,*
   774 N.E.2d 687 (N.Y. 2002) ............................................................ 22, 23

*Consolidated Edison Co. of New York v. Fyn Paint & Lacquer Co., Inc.,*
   2005 WL 139170 (E.D.N.Y. 2005) ..................................................... 23, 24

*Continental Cas. Co. v. Rapid-American Corp.,*
   80 N.Y.2d 640 (1993) .......................................................................... 24

*Crucible Materials Corp. v. Aetna Cas. & Sur. Co.,*
   228 F.Supp.2d 182 (N.D.N.Y. 2001) ............................................... 19, 20, 21

*Deutsche Bank Trust Co. Americas v. Royal Surplus Lines Ins. Co.,*
   No. 06C-09-261, 2011 WL 765552 (Del. Super. Ct. Feb. 25, 2011) ....................... 24

*Freishtat v. Liveperson, Inc.,*
   No. 07 Civ. 6838, 2010 WL 1558345 (S.D.N.Y. Apr. 19, 2010) ........................... 17

*Generali-U.S. Branch v. Caribe Realty Corp.,*
   1994 WL 903279 (N.Y. Sup. Ct. 1994) ....................................................... 24

*Goodwin Bowler Associates., Ltd. v. Eastern Mut. Ins. Co.*,
  687 N.Y.S.2d 126 (1st Dep't 1999).................................................................22

*Illinois Nat. Ins. Co. v. Tutor Perini Corp.*,
  2012 WL 5860478, *6-7 (S.D.N.Y. 2012) .................................................18

*In re Prudential Lines, Inc.*,
  158 F. 3d 65 (2nd Cir. 1998).........................................................................24

*LILCO v. Allianz Underwriters Ins. Co.*,
  24 A.D.3d 172 (1st Dep't 2005) ...................................................................19

*Maryland Cas. Co. v. W.R. Grace & Co.*,
  No. 88 Civ. 4337, 1994 WL 157962 (S.D.N.Y. Apr. 29, 1994)..................18

*Mt. McKinley Ins. Co., et al. v. Corning Inc.*,
  No. 602454/02 (N.Y. Sup. Ct. New York Co. Sept. 7, 2012)......................24

*New York v. Blank,*
  27 F.3d 783 (2d Cir.1994).............................................................................22

*NL Industries, Inc. v. Commercial Union Ins. Co.*,
  926 F.Supp. 446, *reconsideration granted in part*, 935 F.Supp. 513 (D.N.J. 1996) ...............24

*Olin Corp. v. Certain Underwriters at Lloyd's*,
  468 F.3d 120 (2d Cir. 2006)..........................................................................24

*Olin Corp. v. Ins. Co. of N. Am.*,
  743 F. Supp. 1044 (S.D.N.Y. 1990).......................................................19, 24

*Paramount Ins. Co. v. Rosedale Gardens,*
  293 A.D.2d 235 (1st Dep't 2002) .................................................................19

*Power Authority v. Westinghouse Elec. Corp.*,
  117 A.D.2d 336 (1st Dep't 1986) ............................................................18, 22

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*,
  73 F.3d 1178 (2d Cir. 1995)..........................................................................23

*Sybron Transition Corp. v. Security Ins. of Hartford,*
  258 F.3d 595 (7th Cir. 2001) .........................................................................23

*Transportation Ins. Co. v. AARK Const. Group, Ltd.*,
  526 F.Supp.2d 350 (E.D.N.Y. 2007) ...........................................................18

*U.S. Underwriters Ins. Co. v. A & D Maia Constr., Inc.*,
  160 F.Supp.2d 565 (S.D.N.Y. 2001).............................................................22

**RULES**

Fed. R. Civ. P. 56(a) ..................................................................................................................17

Nominal Defendant and Crossclaim Defendant Century Indemnity Company, eventual successor in interest to Insurance Company of North America ("Century") respectfully submit this memorandum of law, together with its other supporting papers, in opposition to Northrop Grumman Systems Corporation's ("Grumman") Motion for Partial Summary Judgment on Duty to Defend (the "Motion").

## PRELIMINARY STATEMENT

Under well-settled, controlling New York law, notice provisions are strictly construed, and even relatively short delays have been deemed late. *Grumman is over thirty years late.* The indisputable record demonstrates that Grumman has been aware of widespread contamination at and around the Bethpage site since, at least, the early 1970s. In support of its motion, Grumman asserts that it provided notice of the Community Park claim in 2005—more than thirty years after it had abandoned contaminated wells due to "peculiar tastes" and "sweet paint" odors—and more than thirty years after the EPA, Department of Health, Department of Environmental Conservation, Bureau of Public Water Supply, Bureau of Water Pollution Control, and the New York Attorney General's Office had taken action to investigate the "serious problem of industrial waste contamination [that] was evident at the Grumman Aerospace Corporation."[1] It is also nearly thirty years after initial estimates projected that it would take at least $500,000 to conduct a preliminary investigation of the pollution problem and convert to a public water supply, nearly thirty years after remedial efforts had already been undertaken, and nearly thirty years after Grumman was aware that "the levels of carcinogens in Grumman's wells represent[ed] a

---

[1] Ex. 1 to the Declaration of Shane R. Heskin, Chronological Record of the Bureau of Water Resources' Investigation of Groundwater Contamination ("Chronological Record"), at 4, 17, 56, 62.

significant cancer hazard" and that its industrial pollution had increased the cancer risks in groundwater by 10 to 100 times the normal risk.[2]

In an attempt to avoid the consequences of its own inaction, Grumman will undoubtedly attempt to micro-analyze the Bethpage site by claiming that the constituents of concern (COCs) at the Community Park are distinct from the legacy contamination that it failed to advise its insurers of back in the 1970s. This argument fails because Grumman would be late—*twice.* First, many of the COCs (i.e., chlorinated VOCs or their breakdown products) now at issue with respect to the Community Park claim are the very same COCs that were at issue in the 1970s. But, second, in addition to failing to give timely notice of this widespread groundwater contamination back in the 1970s, Grumman also failed to give timely notice of PCB contamination found on nearby property at least as far back as 1995, and widespread PCB contamination found at the Community Park in at least 2001. Among other things, Grumman informed the State that PCBs were found on its own property in 1995 but did nothing to investigate it; Grumman then warned the State *six years later* that PCBs exceeding regulatory levels had also been found at the Community Park in July 2001—but not its insurers. As a result, the Community Park was closed in *May 2002.*[3] *Five months later,* and *over a year after* it had discovered widespread PCB contamination at the Community Park, Grumman wrote a letter to Travelers on October 10, 2002. *Nearly three years later,* Grumman attempted to notify Century of a claim in June 2005—but sent it to the wrong address.

According to Grumman itself, these dangerous levels of PCBs originated from many of the same legacy operations of Grumman prior to the 1970s that were previously subject to a

---

[2] *Id.* at 21-22, 40, 56, 60.
[3] *See* Ex. 2 to Heskin Dec., Town of Oyster Bay Bethpage Community Park Investigation Sampling Report, dated Dec. 23, 2003, at 2-7.

Record of Decision entered back in 1995.[4]  In particular, *three years before* it even attempted to inform Century of the Community Park claim, Grumman told the State that the contamination found at the Community Park resulted from leaks and spills from Grumman's autoclave operations, historical discharges from its sludge wastewater, contaminated fill from its recharge basins, leaching of contaminants from sludge drying beds, the disposal of contaminated rags (and possibly oil) into an onsite pit, and ignition of waste oil and jet fuel on the Community Park property.[5]  Despite these detailed representations to the State back in 2002, Grumman stated in its purported June 2005 notice letter to Century that "we have no immediate knowledge of the specific involvement of the Grumman Corporation."[6]  Notice is late as a matter of law.

The plain language of the Century primary policies discovered to date requires that Grumman provide "written notice" of an *accident* "as soon as practicable."  In addition, the Century primary policies require written notice to include "reasonably obtainable information respecting the time, place and circumstances of the accident," as well as "the names and addresses of the injured and of available witnesses."  Having failed to comply with this material condition of coverage, well established New York law dictates that Grumman has forfeited any entitlement to coverage.  Century thus respectfully asks the Court to deny Grumman's motion on the basis that Grumman failed to provide timely notice of an "accident" under the policies as a matter of law, or alternatively, on the basis that Grumman failed to meet its burden of demonstrating that there are no disputed issues of fact as to whether it has complied with the condition precedent of providing prompt written notice of an "accident."[7]

---

[4] *See* Ex. 3 to the Heskin Dec., Letter from Larry Leskovjan to the New York State Department of Environmental Conservation ("NYDEC"), dated May 24, 2002.

[5] *See id.*; *see also* Ex. 2 at 2-5.

[6] *See* Ex. 4 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Jun. 14, 2005.

[7] Although Century believes that the current record is sufficient to hold as a matter of law that notice is late, Century respectfully reserves its right to cross move for summary judgment upon a more fully developed record.

Finally, even if a duty to defend did exist (which it does not), well-established New York law requires that Grumman share the cost of defense for uninsured periods by allocating defense costs over all years in which the property damage is alleged to have occurred.[8]

## STATEMENT OF UNDISPUTED FACTS

### I. Site History

The former Bethpage Facility is located on approximately 600 acres in Bethpage, Town of Oyster Bay. The initial plant opened by at least 1937 and was used by Grumman to develop and manufacture various aircraft, satellites and lunar modules for the government. Within this property, the Navy also owned a 105 acre Naval Weapons Industrial Reserve Plant ("NWIRP Site"), which was established by at least 1941. The Bethpage Community Park is located on the northeast boundary of the former Bethpage facility, to the east of the NWIRP Site, and was donated to the Town of Oyster Bay by Grumman in 1962.[9]

### A. The Bethpage Facility and NWIRP Sites

From at least 1943 to 1949, Grumman disposed of chromic acid wastes directly on the ground in open seepage bins, i.e., an open pit.[10] Between 1950 and 1978, drums containing liquid cadmium were stored at the NWIRP Site on an unbermed, uncovered concrete pad.[11] In addition, by at least 1969, Grumman stored drummed waste from other facilities on a cinder covered surface over an onsite cesspool. A cover was eventually added in 1983.[12] Surface water was also controlled through several onsite recharge basins (an unlined open pit where wastewaters were allowed to settle into the ground).[13] Prior to 1984, certain plant production

---

[8] In further support, Century also relies upon and incorporates herein the legal arguments made by The Travelers Entities ("Travelers") in their opposition.
[9] See Ex. 5 to the Heskin Dec., Proposed Remedial Action Plan for OU3, dated May 12, 2012 at 3.
[10] See Ex. 6 to the Heskin Dec., Record of Decision for OU2, Mar. 2001 at 5.
[11] See id. at 6.
[12] See id.; Ex. 7 to the Heskin Dec., Initial Assessment of NWIRP and Calverton, Dec. 1986 at 2-18, 2-20.
[13] See id.

lines discharged their rinse waters directly into these recharge basins. These rinse waters were directly exposed to chemicals used in the production processes, and as of 1976, approximately 1.8 million gallons per week of untreated wastewater were discharged directly into these recharge basins.[14]  Adjacent to these recharge basins were sludge drying beds used to dewater (i.e., dry out) various sludges generated from the Grumman Facility.[15]  Between the early 1950s and 1969, fixtures, tools and metallurgic wastes were stored on the NWIRP Site. Cutting oils dripped from these wastes, causing, among other things, visible oil stains on the ground.[16]

### B.    The Community Park Site

Grumman used the Community Park Site to dry out and bury its toxic waste sludges.[17] After running out of space to bury its hazardous wastes, Grumman donated the Community Park property to the Town of Oyster Bay and began sending its sludges to the Syosset and Old Bethpage landfills.[18]  Grumman also used portions of the Community Park to dry sludges produced from industrial wastewater treatment. In addition, Grumman informed the State on July 24, 2001 that the Community Park should be investigated for PCBs as a result of Grumman finding PCB exceedances on the Community Park property. As a result, the Community Park was closed down in May 2002. Grumman then represented to the State on May 24, 2002, July 25, 2002, and December 2003 that it believed that PCBs now found at the Community Park came from its autoclave operations.[19]  Among other things, leaks and spills from these operations were

---

[14] *See id.*

[15] *See id.*

[16] *See* at 2-20.

[17] *See* Ex. 8 to the Heskin Dec., Jasinkonis Dep. Tr., dated Oct. 5, 1995 at 62-63 ("Q. That sludge that was dumped in this field you've just told me about, what happened to the sludge in that field? A. Dumped and then buried, with clean fill."). Inexplicably, despite Grumman's recent representations to the Court that it had completed its document production, this deposition transcript involving a deposition Grumman defended was never produced by Grumman. Rather, Century had to obtain this transcript from a third-party subpoena.

[18] *See id.* at 81 ("Q. When Grumman first started using the Syosset landfill, do you remember why that happened? A. Yes. We had no place on Grumman property to put it.").

[19] *See* Ex. 3 to the Heskin Dec., Letter from Larry Leskovjan to NYDEC, dated May 24, 2002; Ex. 25 to the Heskin Dec., Letter from Larry Leskovjan to NYDEC, dated Jul. 25, 2002; Ex. 2 to Heskin Dec., Town of Oyster Bay

captured by the floor drainage system and discharged into recharge basins through a storm water system. These recharge basins were periodically scraped and allowed to dry directly on the ground. Grumman further stated that soils from these recharge basins were used as fill on the Community Park property. Grumman also represented to the State that it believed that the PCBs are attributable to its burial of "spent rags" and possibly used oil that was discarded into an onsite pit at the Community Park. An area of the Community Park was also used as a fire training area where waste oil and jet fuel were ignited and extinguished.[20]

## II.   **Regulatory History**

### A.      **The Bethpage Facility Site**

By at least 1956, hexavalent chromium was detected in the wastewater contained in onsite recharge basins at concentrations above allowable limits.[21] Grumman began regularly sampling its onsite wells in 1962,[22] and as early as 1970, the Nassau County Department of Health had met with Grumman to "discuss procedures for routine water quality surveillance."[23] Between 1964 and 1975, Grumman had replaced thirteen wells "due to problems of deterioration and odor," and abandoned a number of other onsite wells due to peculiar tastes and a "sweet paint" odor in groundwater.[24] Although it abandoned certain contaminated wells, Grumman continued to blend and use in its system other wells that it knew were contaminated.[25] As early as 1975, the Department of Health noted that the "large amount of pumping at Grumman might

---

Bethpage Community Park Investigation Sampling Report, dated Dec. 23, 2003.
[20] *See* Ex. 2 to the Heskin Dec., Town of Oyster Bay Bethpage Community Park Investigation Sampling Report, dated Dec. 23, 2003, at 2-7; Ex. 3 to the Heskin Dec., Letter from L. Leskovjan to the NYDEC, dated May 24, 2002.
[21] Ex. 6 to the Heskin Dec., Record of Decision for OU2, Mar. 2001, at 6.
[22] *See* Ex. 9 to the Heskin Dec., Health Department Memorandum, Summary of Groundwater Quality-Grumman Aerospace Corporation, dated Nov. 5, 1975 ("Summary of Groundwater Quality") at 1.
[23] *See* Ex. 1 to the Heskin Dec., Chronological Record at 1.
[24] *See id.* at 4; Ex. 9 to the Heskin Dec., Summary of Groundwater Quality at 1.
[25] *See* Ex. 1 to the Heskin Dec., Chronological Record at 4.

be drawing contaminated water into the [M]agothy [A]quifer as evidenced by the sewage and/or industrial waste pollution now apparent in most of the wells."[26]

By at least 1975, Grumman's own sampling results had "determined the presence of three hydrocarbons in their well water.  The hydrocarbons detected were methane, ethylene and either methyl propane or propadiene."[27]  In addition, Grumman had detected tri-chlorethlylene, tetra-chloroethylene, di-chloroethlyene and vinyl chloride.[28]  These primary contaminants can be collectively described as "chlorinated VOCs or their breakdown products, including PCE, TCE and DCE."[29]  The Health Department noted that the presence of these chemicals indicated "direct contamination of water supplies by industrial wastes."[30]  The problems of groundwater contamination were so severe in 1975 that Grumman expressed "deep concern that immediate action be taken to determine the cause of the contamination problem and to take corrective action."[31]  The Department of Health was also urged to make the groundwater problem at Grumman a "high priority project" and to seek public funding.[32]  Intensive investigation was also urged to determine "the extent of future implications of contamination in the Grumman Area," because "the problem of industrial waste contamination might be spreading."[33]

By at least 1976, the "apparent spread of contamination" had grown "from the south thereby indicating a more immediate threat to the use of adjacent municipal sources."[34]  As a result, numerous federal, state and local governmental agencies had been alerted that a "serious problem of industrial waste contamination was evident at the Grumman Aerospace

---

[26] *See id.* at 5.
[27] *See id.* at 7.
[28] *See id.* at 11, 13, 14.  The presence of vinyl chloride was believed to have been discharged by Hooker Chemical, an upgradient chemical company.
[29] *See* Ex. 10 to the Heskin Dec., Letter from Jonathan Sokol to Robert Russell, dated February 3, 2012 at 3.
[30] *See* Ex. 9 to the Heskin Dec., Summary of Groundwater Quality at 1.
[31] *See* Ex. 1 to the Heskin Dec., Chronological Record at 4.
[32] *See id.* at 8.
[33] *See id.* at 15.
[34] *See id.* at 14.

Corporation."[35]  Among the agencies involved were the U.S. Geological Survey, New York Department of Environmental Conservation, Bureau of Public Water Supply, Bureau of Water Pollution Control, the New York Attorney General, and the U.S. Environmental Protection Agency.[36]  The EPA flew in by helicopter and took samples to Edison, New Jersey for testing, and told Grumman "don't drink the water."[37]  The cost estimates to investigate the nature and extent of the pollution problem and to convert to public water were at least $500,000 by 1976.[38] It was also noted that abatement of the groundwater contamination might not be possible.[39]

By 1977, health concerns prompted the Health Department to issue a press release alerting the local communities, and bottled water was supplied by Bethpage State Park.[40]  In response to a letter to the Governor noting "the existence of highly dangerous chemicals in public and private water supplies serving the Bethpage and Hicksville Communities," a public hearing was held in early 1977.[41]  It was noted that "after approximately seven hours of testimony, it became disturbingly apparent that contaminants are present in public water supplies and that no conclusive testing program was in effect or planned."[42]  In order to meet these needs, the required sampling soon outgrew the capacity of local agencies, and thus, the EPA and other federal and state agencies were urged to "intensify their laboratory support of the Department."[43] It was agreed that Grumman would "assume the cost for analysis of well samples using a

---

[35] See id. at 17.
[36] See id. at 4, 17, 56, 62.
[37] See id. at 20, 30; Ex.11 to the Heskin Dec., Notes of Geraghty & Miller, dated Dec. 9, 1976 at 4.
[38] See Ex. 1 to the Heskin Dec., Chronological Record at 21-22.
[39] See id.
[40] See id. at 63.
[41] See id. at 48.
[42] Id.
[43] Id. at 62.

commercial laboratory and the service of Geraghty & Miller, groundwater consultants would be offered to the Department."[44]

Prior to offering these services, Geraghty & Miller had already interpreted the available groundwater data and informed Grumman that, in a best-case scenario, contamination from "basins, lagoons, spills, etc. have created a slug of contaminated ground water in the shallow aquifer underlying at least part of the plant," which "probably also extends vertically a short but unknown distance into the Magothy Formation."[45] Geraghty & Miller also advised that the "slug may spread both laterally and vertically beneath the property"; "potable water may further deteriorate"; "neighboring wells may become contaminated over the long term"; and "further contamination may take place from sources not presently detected."[46] It further advised that even if Grumman took immediate action, it would be costly, the investigation may be inconclusive, abatement of existing groundwater conditions may not be possible, and the only course of action may remain converting to an offsite public water supply.[47]

CERCLA became effective on December 11, 1980. But even before then, the Bethpage Facility was identified by the State as an Active Hazardous Waste Site on January 18, 1980.[48] In this report, it was noted that the Grumman Facility has "one sludge drying bed to handle 1300 tons/yr of waste water treatment plant sludge" and that "heavy metal sludges had been previously placed in 24 unlined lagoons."[49] The Bethpage Facility was also identified in the NYDEC's "first report 'Hazardous Waste Disposal Sites in New York State issued in June 1980."[50] On March 18, 1982, Grumman was placed on notice by the EPA that it was a Potential Responsible

---

[44] *Id.* at 59.
[45] *See* Ex. 12 to the Heskin Dec., Memorandum from Geraghty & Miller to John Ohlmann, dated Jun. 25, 1976.
[46] *Id.*
[47] *Id.*
[48] *See* Ex. 13 to the Heskin Dec., Active Hazardous Waste Assessment, dated Jan. 18, 1980.
[49] *Id.*
[50] *Id.*

Party concerning the release of hazardous waste at the Old Bethpage Landfill as a result of its disposal of hazardous waste sludge that it had previously allowed to dry in unlined lagoons at the Grumman Facility.[51]   On November 16, 1982, the State also filed a Notice of Claim against Grumman due to its discharging of "a variety of industrial wastes and sludges, including a variety of metal hydroxides" at the Old Bethpage Landfill.[52]

The Bethpage Facility was eventually added to the New York State Department of Environmental Conservation's Registry of Inactive Hazardous Waste Sites in 1983 "based on the detection of a substantial regional plume of volatile organic contaminants, including trichloroethylene (TCE), detected in groundwater beneath Grumman-owned parcels of the integrated Bethpage Facility."[53]   On December 6, 1983, the State also filed a Notice of Claim for "the present and future costs of response, removal and remediation and for damages to the natural resources of the State of New York at and around the [Bethpage Facility]."[54]   Although the Bethpage Facility was initially classified as a Class 2a site (based on insufficient data), the Bethpage Facility was reclassified as a Class 2 site in 1987, meaning the site posed a significant threat to human health and/or the environment, and that action was required.[55]   In October 1990, Grumman entered into a Consent Order with the State, which Grumman voluntarily agreed to conduct a remedial investigation and study.   Based on investigations conducted between 1990 and September 1994, the State divided the remedial programs into two operable units,[56] OU1 (contaminated soils), and OU2 (the regional contaminated groundwater plume).

---

[51] *See* Ex. 14 to the Heskin Dec., Letter from Michael Bonchonsky to Robert Bradshaw, dated Mar. 18, 1982.
[52] *See* Ex. 15 to the Heskin Dec., Letter from William Sullivan, Jr. to Grumman, dated Nov. 16, 1982.
[53] *See* Ex. 6 to the Heskin Dec., Record of Decision for OU2, Mar. 2001, at 8; Ex. 10 to the Heskin Dec., Letter from Jonathan Sokol to Robert Russell, dated February 3, 2012 at 2.  The NWIRP Site (owned by the Navy) was initially considered part of the Bethpage Facility but was later registered separately in 1993.
[54] *See* Ex. 16 to the Heskin Dec., Letter from Langdon Marsh to Grumman, dated Dec. 6, 1983.
[55] *See* Ex. 6 to the Heskin Dec., Record of Decision for OU2, Mar. 2001 at 8.
[56] "An operable unit represents a portion of a remedial program for a site that for technical or administrative reasons can be addressed separately to investigate or mitigate a release threat of release or exposure pathway resulting from

By 1994, Grumman was aware that its environmental response costs at the Bethpage Facility would exceed $25 million.[57]  In its own Environmental Closure Cost Summary for the Grumman Facilities, Grumman's consultant estimated that the environmental closure costs for the Bethpage facility would be $27.4 million, including $12.7 million for groundwater remediation.  At the same time, the Navy's groundwater costs were estimated at $65 million.[58]  Also in 1994, the annual payment to the Bethpage Water District was $170,000 for Well Number 1 and $110,000 for Well Number 2.[59]  In addition, Grumman evaluated options to coordinate the remediation of the Ruco vinyl chloride plume with the Grumman VOC plume.[60]  The Grumman groundwater IRM was described as seven extraction wells (4 existing production wells and 3 new extraction wells).  The estimated costs for this alternative (per discussions with Grumman and Geraghty & Miller personnel) were $17,205,400.[61]  In March 1995, the State issued a Record of Decision for OU1, addressing the remedy for certain impacted onsite soils.[62]

By at least 1995, Grumman was also aware that PCBs were present in onsite soil immediately adjacent to the Community Park.[63]  It declined to further investigate the nature and extent of this PCB contamination because the levels did not exceed commercial use thresholds.[64]  In June 1999, Grumman considered selling portions of its property, and thus, initiated the first phase of a "PCB Investigation/Delineation Program" to "investigate the extent of PCB concentrations present in the surface and subsurface soil in the grass areas located north and

the site contamination." Ex. 5 to the Heskin Dec., Proposed Remedial Action Plan (OU3), dated May 12, 2012 at 4.
[57] *See* Ex. 17 to the Heskin Dec., Environmental Closure Costs-Grumman Facilities in New York, dated Oct. 31, 1994.
[58] *Id.*
[59] *See* Ex. 18 to the Heskin Dec., Environmental Invest. and Remediation Cost Projections, dated Mar. 7, 1994.
[60] *See* Ex. 19 to the Heskin Dec., Supplemental Feasibility Study, dated Sept. 1996.
[61] *See id.*
[62] *See* Ex. 20 to the Heskin Dec., Record of Decision for OU1, Mar. 28, 1995.
[63] *See* Ex. 21 to the Heskin Dec., Letter from Steven Bates to John Ohlmann, dated Dec. 27, 1995.
[64] *See id.*

south of the access road leading from Stewart Avenue to the former Plant 24 building."[65]  This area is directly adjacent to the Community Park property, and would later become part of OU3. As a result of this investigation, Grumman discovered PCB concentrations exceeding regulatory standards for commercial use, and thus, implemented further rounds of testing between October 1999 and April 2001.[66]  During this testing, Grumman "determined that some of the testing [Grumman had] done was on the Park property because the fence separating the two properties was located several feet into the Park property."[67]  As a result, Grumman "notified the Town, [and] the State and requested their cooperation in doing investigations."[68]

In March 2001, the State issued a Record of Decision addressing the remedy for OU2.  In its decision, the State found that the contaminated "groundwater plumes emanating from the Bethpage Facility total more than 2,000 acres in an area over 700 feet deep in places."[69]  The primary groundwater contaminants "are chlorinated VOCs or their breakdown products, including PCE, TCE and DCE. … The highest concentrations of VOCs in groundwater were detected in samples from on-site wells, where the most contaminated well was found to have concentrations of 58,000 ppb (the drinking water standard is 5 ppb)."[70]  The State also found that "the plumes emanating from the Bethpage Facility have impacted or threatened three public water supply well fields operated by the Bethpage Water District (BWD)."[71]  Since then, "more affected and potentially affected water districts have been identified, including Aqua NY and South Farmingdale."[72]  The constituents of concern also included PCBs.[73]

---

[65]*See* Ex. 22 to the Heskin Dec., Plant 24 Access Road, PCB Investigation/Delineation Program, Report of Findings, dated Jul. 2001 at 3-1.
[66] *See id.* at 3-3.
[67] *See* Ex. 23 to the Heskin Dec., Cofman Dep. Tr., dated Feb. 1, 2007, at 182.
[68] *Id.*; Ex. 24 to the Heskin Dec., Letter from Larry Leskovjan to Steve Kaminski, dated Jul. 24, 2001.
[69] *See* Ex. 10 to the Heskin Dec., Letter from Jonathan Sokol to Robert Russell, dated Feb. 3, 2012, at 3.
[70] *Id.*
[71] *Id.*
[72] *Id.*

In May 2005, Grumman entered into a consent order with the State agreeing to investigate and remediate the contaminated groundwater caused by sources from OU3.[74] Operable Unit 3 "consists of the Former Grumman Settling Ponds, the Grumman Access Road, some adjacent property and impacted groundwater which is not addressed by OU2."[75] In May 2012, the State issued a proposed remedial action plan addressing the remedy for OU3.[76] The primary constituents of concern in soils are PCBs, TCE and its breakdown products, toluene, chromium, and cadmium, and the primary constituents of concern in groundwater are TCE and its breakdown products.[77] In the proposed remedial action plan, it is noted that "[g]roundwater migration from the OU3 area has resulted in a significant off-site groundwater plume which has impacted both the Upper Glacial and Magothy Formations. As the OU3 groundwater plume leaves the site, as a distinct plume, it becomes comingled with the larger OU2 Grumman/NWIRP groundwater plume."[78]

### B.    The Bethpage NWIRP Site

In 1986, an initial assessment study of the NWIRP site concluded that a significant risk to human health and/or the environment existed in each of these areas:  (1) the former storage area, (2) the recharge basins, and (3) the former scrap yard.[79] As a result, a remedial investigation was initiated in 1991.  This investigation revealed that contaminated groundwater had reached the residential neighborhoods to the east and a significant concentration of TCE was found in an onsite well.  In addition, high levels of PCBs were also discovered.[80] After further investigation in 1992, it was determined that the levels of PCBs indicated "that PCB contamination is wide

---

[73] See Ex. 5 to the Heskin Dec., Proposed Remedial Action Plan for OU3, dated May 12, 2012 at 6-8.
[74] See Ex. 10 to the Heskin Dec., Letter from Jonathan Sokol to Robert Russell, dated Feb. 3, 2012 at 3.
[75] Ex. 5 to the Heskin Dec., Proposed Remedial Action Plan for OU3, dated May 12, 2012 at 4.
[76] See id.
[77] See Ex. 10 to the Heskin Dec., Letter from Jonathan Sokol to Robert Russell, dated Feb. 3, 2012 at 3.
[78] See Ex. 5 to the Heskin Dec., Proposed Remedial Action Plan for OU3, dated May 12, 2012 at 8.
[79] See Ex. 7 to the Heskin Dec., Initial Assessment of NWIRP and Calverton, Dec. 1986 at ii.
[80] See Ex. 40 to the Heskin Dec., Record of Decision for NWIRP Sites 1,2, and 3, Dated May 1995 at 6.

spread" over most of the former storage area.[81]  Unacceptable levels of PCB concentrations were also found at various locations in the area of the recharge basins.  The concentrations of PCBs were so severe in the former storage area that the Navy was required to take interim measures in July 1993 to protect onsite workers.[82]  A Record of Decision was entered for NWIRP Sites 1, 2, and 3 in May 1995.[83]  A Record of Decision for the remediation of OU2 for the contaminated groundwater plume was issued in March 2001.[84]

### C.    The Bethpage Community Park Site

In November 1994, the Navy performed an investigation to determine whether PCB contamination from the NWIRP Site had migrated and impacted downwind off-site locations.[85]  Of the seventeen samples taken, only one sample was taken at the Bethpage Community Park.  An additional five samples were taken on the Bethpage Community Park in 1998 by the Town of Oyster Bay.  None of these few samples exceeded regulatory levels.  At least by July 2001, Grumman discovered high levels of PCBs when conducting an investigation at an adjacent property.[86]  As a result, Grumman reported its findings to the State and Town of Oyster Bay, and initiated a site specific sampling program of the Community Park property.  Grumman submitted this proposal in October 2001, and revised it in February 2002.[87]  This sampling program was completed in March/May 2002, and the Community Park was closed down in May 2002 due to the detection of PCB concentrations posing a danger to human health and/or the environment.[88]

---

[81] See id. at 8.
[82] See id.
[83] See id.
[84] See Ex. 6 to the Heskin Dec., Record of Decision for OU2, Mar. 2001 at 5.
[85] See Ex. 2 to the Heskin Dec., Bethpage Community Park Sampling Report, dated Dec. 23, 2003 at 2-5.
[86] See Ex. 24 to the Heskin Dec., Letter from Larry Leskovjan to Steve Kaminski, dated Jul. 24, 2001.
[87] See Town of Oyster Bay Bethpage Community Park Investigation Sampling Report, dated Oct. 2001.  This document was reviewed and identified for copying by Century at its review of ARCADIS documents in Melville, New York on Jan. 7, 2012.  Grumman has not yet produced this document to Century.
[88] See Ex. 2 to the Heskin Dec., Bethpage Community Park Sampling Report, dated Dec. 23, 2003 at 2-7.

A public meeting was held on June 19, 2002 to discuss the contamination of the Community Park. Prior to this meeting, on May 24, 2002, Grumman sent a letter to the State demanding that the Navy be required to participate in all future meetings because it "remains a 'key player' for regulatory resolution of soil conditions at the Bethpage Community Park and the adjacent Northrop Grumman property."[89]   After the Community Park partially reopened in November 2002, additional sampling was proposed in April 2003 to further delineate the extent of both PCB and VOC contamination, and to determine whether groundwater was being adversely impacted by the site.  In December 2003, it was confirmed that the Community Park was a potential historical source of the VOCs found in groundwater.[90]   Due to the apparent public outcry, the Town of Oyster Bay proposed a more aggressive remediation plan than required by the governing regulations.  Accordingly, Grumman objected to the proposed remedial actions taken by the Town of Oyster Bay.[91]   On April 21, 2005, litigation ensued over whether Grumman could be held responsible for the alleged excessive remediation undertaken by the Town of Oyster Bay.  Grumman ultimately prevailed on summary judgment in May 2009.

## III.  Claims History

Grumman did not even attempt to give notice to Century of the Community Park claim until June 14, 2005 and November 21, 2005.[92]   Unfortunately, Century did not receive a copy of these notice letters because Grumman's broker sent them to the wrong address.[93]   But even if those letters were sent to the correct address (which they were not), they failed to apprise Century of material events indisputably known to Grumman at the time of the letters.  In its 2005 letters, Grumman represented that "we have no immediate knowledge of the specific

---

[89] *See* Ex. 3 to the Heskin Dec., Letter from Larry Leskovjan to NYDEC, dated May 24, 2002.
[90] *See* Ex. 2 to the Heskin Dec., Bethpage Community Park Sampling Report, dated Dec. 23, 2003 at 5-15.
[91] *See* Ex. 26 to the Heskin Dec., Letter from Larry Leskovjan to Steven Scharf, dated Jan. 13, 2006.
[92] *See* Ex. 4 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Jun. 14, 2005; Ex. 27 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Nov. 21, 2005.
[93] *See* Ex. 41 to the Heskin Dec., Century 30(b)(6) Tr. of Jens Fog, dated Jan. 30, 2012 at p. 65.

involvement of the Grumman Corporation."[94]   Yet on May 24, 2002, Grumman had represented to the State and federal government that it believed that numerous specific involvement by Grumman had resulted in the contamination at Bethpage Community Park.[95]   None of these activities was disclosed to its insurers.   Nevertheless, Grumman continued to send numerous follow up correspondence to the incorrect address on June 8, 2006 and February 26, 2007.[96] None of these letters was received by Century.[97]

The first letter that appears in Century's claims file is dated March 8, 2007, but no "date received" stamp appears on the letter, it appears to be an electronic imaged copy, and it was sent to the incorrect address.[98]   In this letter, Grumman disclosed for the first time that it had already "spent $36,387,569 in costs associated with environmental claims for this site."[99]   Grumman then sent another letter to the wrong address on January 7, 2009 (which was never received),[100] claiming that it had spent $5,224,603.01 in defense costs since 2006.[101]   Grumman finally sent information by e-mail on May 29, 2008, February 6, 2012, and March 19, 2012, but continued to send hard copies of the letters to the wrong address.[102]   On March 26, 2012 and May 21, 2012, Century responded to these letters noting that the claims were subject to a pending declaratory judgment action, and reserved all of its rights, including specifically late notice.[103]

---

[94] See Ex. 4 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Jun. 14, 2005; Ex. 27 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Nov. 21, 2005.
[95] See Ex. 3 to the Heskin Dec., Letter from Larry Leskovjan to NYDEC, dated May 24, 2002.
[96] See Ex. 28 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Jun. 8, 2006; Ex. 29 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Feb. 26, 2007.
[97] See Ex. 41 to the Heskin Dec., Century 30(b)(6) Tr. of Jens Fog, dated Jan. 30, 2012 at p. 65.
[98] See Ex. 30 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Mar. 8, 2007.
[99] See id.
[100] See Ex. 41 to the Heskin Dec., Century 30(b)(6) Tr. of Jens Fog, dated Jan. 30, 2012 at p. 93.
[101] See Ex. 31 to the Heskin Dec., Letter from Brad Bartholomew to Robert Russell, dated Jan. 7, 2009.
[102] See Ex. 32 to the Heskin Dec., E-Mail from Brad Bartholomew to Robert Russell, dated May 29, 2008; Ex. 33 to the Heskin Dec., E-Mail from Brad Bartholomew to Robert Russell, dated Feb. 6, 2012; Ex. 34 to the Heskin Dec., E-Mail from Brad Bartholomew to Robert Russell, dated Mar. 19, 2012.
[103] See Ex. 35 to the Heskin Dec., Letter from Seth Park to Jonathan Sokol, dated Mar. 26, 2012; Ex. 36 to the Heskin Dec.,  Letter from Jens Fog to Brad Bartholomew and Jonathan Sokol, dated May 21, 2012.

## IV.    The Century Policies

Century was not provided with a copy of any primary policy until April 19, 2012, and was not provided with a copy of certain other primary policies until after the commencement of this action.[104]  To date, Century still has not received a copy of the alleged primary policies covering the periods 1951-54, and 1962-68.  It is undisputed, however, that the primary policies found to date expressly require Grumman to provide "written notice" of an *accident* "as soon as practicable."[105]  Along with this prompt written notice, the Century policies require Grumman to include "reasonably obtainable information respecting the time, place and circumstances of the accident," as well as "the names and addresses of the injured and of available witnesses."[106] Each Century policy also requires Grumman to provide written notice of a claim or suit and to immediately forward to Century every demand, notice, summons or other process received by Grumman or its representatives.[107]

## STANDARD

Summary judgment "may not be granted unless the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Freishtat v. Liveperson, Inc.*, No. 07 Civ. 6838, 2010 WL 1558345, at *1 (S.D.N.Y. Apr. 19, 2010); *see also* Fed. R. Civ. P. 56(a).  Summary judgment must be denied if there is any record evidence from any source from which a reasonable inference in the nonmoving party's favor can be drawn, or if reasonable minds can differ as to the importance of that evidence.  *See, e.g., Brady v. Town of Colchester*, 863 F.2d 205 (2d Cir. 1988).  In the insurance context, because "timely notice of

---

[104] *See* Ex. 37 to the Heskin Dec., E-Mail from Brad Bartholomew to Robert Russell, dated Apr. 19, 2012.
[105] *See* Ex. 38 to Heskin Dec., Exemplar Century Primary Policy for the period 1954-62; *see also* Scanlon Dec., Exs. 1-7.
[106] *See id.*
[107] *See id.*

occurrence and suit are conditions precedent to the duty to defend" summary judgment on the duty to defend issue is inappropriate prior to a "judicial determination of whether timely notices… were provided to the insurers." *Maryland Cas. Co. v. W.R. Grace & Co.,* No. 88 Civ. 4337, 1994 WL 157962 (S.D.N.Y. Apr. 29, 1994).

## ARGUMENT

### I.   Timely Notice Is a Condition Precedent to Coverage.

Under controlling New York law, timely notice is a condition precedent to coverage. *See Illinois Nat. Ins. Co. v. Tutor Perini Corp.,* 2012 WL 5860478, *6-7 (S.D.N.Y. 2012) (Forrest, J.) ("In the absence of a valid excuse, an insured's failure to provide timely notice of a claim to an insurer is a complete defense.") (citing *Am. Home Assur. Co. v. Int'l Ins. Co.,* 661 N.Y.S.2d 584 (N.Y. 2002) ("[A]bsent a valid excuse, a failure to satisfy the notice requirements vitiates the policy and the insurer need not show prejudice before it can assert the defense of noncompliance."); *Transportation Ins. Co. v. AARK Const. Group, Ltd.,* 526 F.Supp.2d 350, 358 (E.D.N.Y. 2007) ("Under New York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy.")). Importantly, a "court may resolve the question of timely notice on summary judgment if: '(1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered a valid excuse for the delay.'" *Id.*   No showing of prejudice is required. *See id.* The purpose of New York's late notice law is as follows:

> Strict compliance with the contract protects the carrier against fraud or collusion; gives the carrier an opportunity to investigate claims while evidence is fresh; allows the carrier to make an early estimate of potential exposure and establish adequate reserves and gives the carrier an opportunity to exercise early control of claims, which aids settlement.[108]

---

[108] *Argo Corp. v. Greater N.Y. Mut. Ins. Co.,* 827 N.E.2d 762, 764 (N.Y. 2005); *see also Power Authority v. Westinghouse Elec. Corp.,* 117 A.D.2d 336 (1st Dep't 1986).

In determining when notice is due, well-established New York law holds that a policyholder must give notice of an accident or occurrence whenever a "reasonable possibility" of a claim exists. *See, e.g., LILCO v. Allianz Underwriters Ins. Co.,* 24 A.D.3d 172, 173 (1st Dep't 2005); *Paramount Ins. Co. v. Rosedale Gardens,* 293 A.D.2d 235, 239-40 (1st Dep't 2002); *Christiania General Ins. Corp. of N.Y. v. Great Am. Ins. Co.,* 979 F.2d 268, 276 (2d Cir. 1992); *Olin Corp. v. Ins. Co. of N. Am.,* 743 F. Supp. 1044, 1054 (S.D.N.Y. 1990).

## II.    Grumman Was Late Twice When it Failed to Give Century Notice of Groundwater Contamination in the 1970s and When it Failed to Give Notice of PCB Contamination in 2001.

In support of its motion, Grumman argues that the accident for which it seeks coverage may include the accidental consequences of its intentional waste discharges.[109] Even assuming Grumman is correct on its interpretation of the term accident, at a minimum, Grumman was required to provide notice of an accident in the 1970s once it became aware that its intentional industrial discharges had resulted in the allegedly "accidental" or unintended consequences of widespread groundwater pollution at and around the Bethpage facility. In a case rife with complex notions, this one is simple.

The facts and legal analysis in *Crucible Materials Corp. v. Aetna Cas. & Sur. Co.,* 228 F.Supp.2d 182, 192-95 (N.D.N.Y. 2001) are especially instructive. In *Crucible,* the insured attempted to excuse its late notice by micro-analyzing the remediation required. Specifically, the insured asserted that although it knew of heavy metals discharges in 1981, it was only seeking coverage for the remediation of VOCs in groundwater that it allegedly first discovered in 1988. As the Court should do here, the district court found that the insured was late—*twice*:

> Although plaintiff feigns ignorance to this type of contamination until 1988, there is ample evidence showing that Crucible knew about potential groundwater contamination beginning in 1983. Specifically, in October of 1983, the WDNR

---

[109] *See* Memo of Law in Support of Grumman's Motion for Partial Summary Judgment at 17-19.

reported that several drums of hazardous wastes were found open and/or leaking. Although the *exact* contents of these containers is unclear, the WDNR report states that VOCs' were among the wastes stored at the Main Plant site. Furthermore, the record also shows that the WDNR conducted another inspection of the Main Plant in 1984. In its inspection report, the WDNR stated that soil and groundwater contamination at the Main Plant was a potential hazard to the environment. Although the scope of contamination was unknown at that time, this report clearly shows that Crucible knew that the site's groundwater had been contaminated.

In addition to the above evidence, there is further compelling proof that Crucible knew about groundwater contamination at the Main Plant site prior to 1988. For example, in 1985, Crucible certified to the EPA that hazardous wastes were discharged into the environment during Trent Tube's forty year history. Specifically, it stated that approximately 100 gallons of TCE spilled onto the ground from surface tank. Furthermore, in 1986, the WDNR reported numerous spills of VOCs and deemed the site to be environmentally significant. Finally, in 1986, the EPA also determined that the location was environmentally significant.

In light of the preceding, the court finds that Crucible should have known about the possibility of a claim prior to 1988 when it actually notified Travelers of an occurrence at the Main Plant location. In fact, the evidence shows that Crucible knew or should have known of a groundwater occurrence beginning in 1984, after the WDNR reported that groundwater contamination at the Main Plant was a potential hazard to the environment. Therefore, Crucible's obligation to notify Travelers of an occurrence accrued in January of 1984, which was over four years prior to when it actually notified the defendant.

The present facts are even more compelling. Here, Grumman indisputably knew of widespread groundwater contamination in the 1970s. It also knew of its potential strict liability for this groundwater contamination when CERCLA and its New York equivalent became effective in 1980. As in *Crucible*, Grumman knew the State considered the Grumman facility significant when the State identified the property as an Active Hazardous Waste Site in January 1980, and again identified the site in its very "first report 'Hazardous Waste Disposal Sites in New York State' issued in June 1980."[110]  Certainly by 1982, Grumman was further aware that contaminants from the sludge that it had shipped to an offsite landfill were hazardous, and that a claim had been asserted by the State for the costs of remediating that pollution. Grumman did

---

[110] *See* Ex. 39 to Heskin Dec., Memorandum from R.J. Fitzpatrick to E.B. Jacobs, dated Jan. 11, 1984.

not even attempt to provide notice to Century of this widespread plume of groundwater contamination even when it attempted to send notice of a claim in 2005. That is more than thirty years late because under New York law "the obligation to provide notice accrues when the circumstances known to the insured at that time would have suggested to a reasonable person the *possibility* of a claim—not the *actuality* of a claim."[111]

In addition, Grumman failed to give notice in 1995 when one of its former employees, Robert Jasinkonis, testified that Grumman buried these sludges all over the Community Park property.[112] At that time, Grumman was aware that the burial of these sludges could lead to a claim at the Community Park because Grumman had been sued at least twice for disposing of these very same materials at offsite landfills. Surely if these sludges resulted in a claim due to their disposal at licensed landfills presumably designed to accept these wastes, the burial of these same sludges in unlined pits at a park where children played—presented a reasonable possibility of a claim—as a matter of law.

For the same reasons, Grumman is more than four years late with respect to the PCBs found at the Community Park by at least July 2001, if not much sooner. Grumman knew that PCB releases had occurred on the NWIRP Site and Access Road by at least 1995.[113] Not only did it fail to tell its insurers back then, but it refused to further investigate the PCB contamination because it told the State that it believed the areas where PCB contamination were found would be used only for commercial purposes.[114] Only when it wanted to sell the property in 1999 did it begin to investigate the PCB contamination. After finding extensive PCB contamination on its

---

[111] *Crucible*, 228 F.Supp.2d at 195.
[112] *See* Ex. 8 to Heskin Dec., Jasinkonis Dep. Tr., dated Oct. 5, 1995 at 62-63 ("Q. That sludge that was dumped in this field you've just told me about, what happened to the sludge in that field? A. Dumped and then buried, with clean fill.").
[113] *See* Ex. 21 to the Heskin Dec., Letter from Steven Bates to John Ohlmann, dated Dec. 27, 1995.
[114] *See id.*

own property (the Access Road), and the Community Park property, Grumman finally warned the State and Town of Oyster Bay on July 24, 2001.[115] Yet again, Grumman failed to notify its insurers. Rather, Grumman did not notify Travelers of the PCB contamination until five months after the Community Park was closed down in October 2002, and did not even attempt to give Century notice until four years after the PCB contamination was definitively found at the Community Park in excess of regulatory levels—in June 2005. Notice is late as a matter of law.

Indeed, New York courts have held that even relatively short delays have been unreasonable as a matter of law. *See Power Auth., v. Westinghouse Elec. Corp.,* 117 A.D.2d 336, 340 (1st Dep't 1986) ("Relatively short periods of unexcused delay have been found unreasonable as a matter of law."); *New York v. Blank,* 27 F.3d 783, 795–96 (2d Cir.1994) (ten month delay unreasonable under New York law); *City of Utica v. Genesee Mgmt., Inc.,* 934 F.Supp. 510, 520–21 (N.D.N.Y.1996) (six months delay unreasonable); *Goodwin Bowler Associates., Ltd. v. Eastern Mut. Ins. Co.,* 687 N.Y.S.2d 126, 126 (1st Dep't 1999) (two month delay unreasonable); *Am. Home Assurance Co. v. Republic Ins. Co.,* 984 F.2d 6, 78 (2d Cir.1993) (unreasonable delay when 36 days had elapsed); *Atlantic Cas. Inc. Co. v. C.A.L. Constr. Corp.,* No. 06 CV 4036, 2008 WL 2946060, at *7–9 (E.D.N.Y. July 30, 2008) (delay of one month held to be unreasonable); *U.S. Underwriters Ins. Co. v. A & D Maia Constr., Inc.,* 160 F.Supp.2d 565, 569 (S.D.N.Y. 2001) ("It has been routinely held that, under New York law, an unexcused delay of one to two months in notifying the insurer is unreasonable as a matter of law.").

## III.    New York Law Requires that Defense Costs be Allocated on Pro Rata Basis.

Even if a duty to defend or reimburse defense costs did exist, Grumman must bear responsibility for its own fair share of defense costs attributable to uninsured years. In *Consolidated Edison Co. of New York v. Allstate Ins. Co.,* 774 N.E.2d 687 (N.Y. 2002), the

---

[115] *See* Ex. 24 to Heskin Dec., Letter from Larry Leskovjan to Steve Kaminski, dated Jul. 24, 2001.

Court of Appeals made abundantly clear that CGL policies provide coverage only for accidents or occurrences that occur *during the policy period.* Based on this fundamental principle, the Court affirmed the trial court's decision to allocate damages "based on the amount of the time the policy was in effect in comparison to the overall duration of the damage." *Id.* at 695.

New York law does not excuse an insured's responsibility for periods where insurance became "unavailable." Although insured's frequently cite *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178 (2d Cir. 1995) for this so-called exception, their reliance is misplaced because the *Stonewall* decision predates the New York high court's decision in *Con Edison.* Significantly, in reaching its decision in *Con Edison*, the New York Court of Appeals relied, in part, on the Seventh Circuit's decision in *Sybron Transition Corp. v. Security Ins. of Hartford*, 258 F.3d 595 (7th Cir. 2001), which expressly rejected the "unavailability" exception:

> The whole idea of a time-on-the risk calculation is that any given insurer's share reflects the ratio of its coverage (and thus the premiums it collected) to the total risk. The full risk is not affected by whether insurance is available later.

*Id.* at 600. The Seventh Circuit further explained that if coverage later becomes available then the full burden of that loss should not fall on an insurer that issued a policy before the full extent of the risk became known. The burden of the loss should fall on the policyholder:

> To require Security to pay extra because Sybron did not find it cost-effective to purchase coverage during 1986 to 1988 would be the economic equivalent of requiring Security to furnish free coverage during 1986-88 (for Sybron does not propose to pay the going premium retroactively). Why an underwriter who furnishes low-price coverage during a period before the magnitude of the risk became apparent should be required to furnish, for nothing, an additional period of high-price coverage escapes us. After all, it was Sybron, not Security, that created the risk of loss. And the consequences of that risk should fall on its creator, not on an underwriter unlucky enough to insure an early slice of the risk.

*Id.* Similar considerations arose in *Consolidated Edison Co. of New York v. Fyn Paint & Lacquer Co., Inc.*, 2005 WL 139170 *4 (E.D.N.Y. 2005), in which the United States District Court for the Eastern District of New York also rejected the "unavailability" exception:

> The [pro rata] approach is favored so that 'a single insurer underwriting a small proportion of the risk does not get saddled with the full loss ... a loss that may prove uncollectible from other companies.' [citations omitted]. Allocation of a loss to periods when the insured is self-insured and efficiency are also factors.

*Id.*, at \*13-\*14 (citing *In re Prudential Lines, Inc.*, 158 F. 3d 65, 84-85 (2nd Cir. 1998)). Applying New York law, the Second Circuit in *Olin* also confirmed that the allocation period extends so long as damage is continuing or progressing. *See Olin Corp. v. Certain Underwriters at Lloyd's*, 468 F.3d 120 (2d Cir. 2006).

Grumman also misapprehends the holding on allocation of defense costs in *Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 655-56 (1993). The Court did not endorse "all sums"; it simply held that the trial court did not err in failing to allocate defense costs where the factual record did not permit. Indeed, numerous courts have since held that allocation of defense costs is required under New York law. *See Mt. McKinley Ins. Co., et al. v. Corning Inc.*, No. 602454/02 (N.Y. Sup. Ct. New York Co. Sept. 7, 2012) (holding that New York law requires pro rata allocation of defense costs over uninsured years); *Deutsche Bank Trust Co. Americas v. Royal Surplus Lines Ins. Co.*, No. 06C-09-261, 2011 WL 765552 (Del. Super. Ct. Feb. 25, 2011) (allocating defense costs for claims of exposure to toxins by World Trade Center clean-up workers on a pro rata basis); *Generali-U.S. Branch v. Caribe Realty Corp.*, 1994 WL 903279 at \*2 (N.Y. Sup. Ct. 1994); *NL Industries, Inc. v. Commercial Union Ins. Co.*, 926 F.Supp. 446, 463, *reconsideration granted in part*, 935 F.Supp. 513 (D.N.J. 1996).

## CONCLUSION

Grumman was aware of widespread contamination at and around the Grumman facility in the early 1970s. CERCLA became effective in 1980. Grumman did not even attempt to provide notice of the Community Park claim until 2005, and even that information failed to inform Century of the widespread groundwater plume Grumman had known about for the past thirty

years. Thus, Grumman is at least thirty years late with respect to the groundwater contamination present at and around the Community Park even if Century had received the sparse information Grumman attempted to provide in 2005. Grumman is also at least four years late in providing notice of widespread PCB contamination at the Community Park, which was indisputably known to Grumman by at least July 2001. Thus, no matter how the contamination is dissected or micro-analyzed, notice is late as a matter of law. Century therefore respectfully asks the Court to deny Grumman's motion for summary judgment on the basis that it failed to provide timely written notice of an accident under the Century primary policies, or alternatively deny the motion on the basis that Grumman failed to meet its burden of demonstrating that there are no disputed issues of fact as to whether it has complied with the condition precedent of providing prompt written notice of an "accident."

Dated:  February 1, 2013

Guy A. Cellucci (*pro hac vice*)
Shane R. Heskin (#9984)
One Penn Plaza, Suite 4110
New York, NY 10119
(212) 244-9500 (phone)
(215) 399-9603 (direct fax)

*Attorneys for Century Indemnity Company,*
*as successor to CCI Insurance Company,*
*as successor to Insurance Company*
*of North America*