UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
:
TRAVELERS INDEMNITY CO., et al.,                    :
                                                    :
                              Plaintiffs,           :
                                                    :
                     -v-                            :
                                                    :
NORTHROP GRUMMAN CORP., et al.,                     :
                                                    :
                              Defendants,           :
                                                    :
and                                                 :
                                                    :
CENTURY INDEMNITY CO., eventual                     :
successor in interest to INSURANCE CO. OF           :
NORTH AMERICA,                                      :
                                                    :
                     Nominal Defendant.             :
------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 3, 2013
```

12 Civ. 3040 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Travelers[1] brought this action against Northrop Grumman[2] seeking (1)

declarations that certain insurance policies require it neither to indemnify nor to

defend Northrop Grumman against certain claims and (2) money damages for

certain defense costs already incurred.[3]  Travelers also named Century[4] as a

nominal defendant.

---

[1] The Court uses "Travelers" to refer to plaintiffs Travelers Indemnity Company, Travelers
Indemnity Company of Connecticut, formerly known as the Travelers Indemnity Company of Rhode
Island, Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety
Company, and Travelers Property Casualty Company of America, formerly known as Travelers
Indemnity Company of Illinois.
[2] The Court uses "Northrop Grumman" or "Grumman" to refer to Northrop Grumman Corporation,
successor in interest to Grumman Corporation, and Northrop Grumman Systems Corporation,
successor in interest to Grumman Aerospace Corporation.
[3] When referring to the various parties in this action the Court does not differentiate between
predecessors and successors in interest in this opinion because neither of the present motions turn

Travelers filed the action in New York State Court on March 15, 2012. Northrop Grumman timely removed it to this Court on April 17, 2012.  (Notice of Removal, ECF No. 1.)  On June 8, 2012, Northrop Grumman answered and asserted counterclaims and crossclaims against both Travelers and Century for declaratory relief and money damages in connection with the insurers' alleged duties to defend and indemnify.  (Answer, Counterclaim, & Crossclaim, ECF No.  11.)

Both Travelers and Century issued Northrop Grumman (or, more particularly, its predecessors) a number of general liability policies, catastrophe umbrella policies ("CUPs"), and excess liability policies.  (See Compl. Ex. A, ECF No. 1 (schedule of Travelers' policies); Answer, Counterclaim, & Crossclaim Ex. A, ECF No. 11 (schedule of policies).)  At issue in this lawsuit are policies Travelers issued over the period from 1968-1989, and that INA and IINA, predecessor companies to Century, issued over the period from 1951-1968.  (Compl. ¶ 19, Ex. A, ECF No. 1; Answer, Counterclaim, & Crossclaim 32, Ex. A, ECF No. 11.)

Northrop Grumman has been and remains subject to a number of claims and clean-up costs relating to sites across the east coast for environmental pollution that may have occurred during the years encompassed by the Travelers and Century policies.  Pursuant to a reservation of rights, Travelers has paid certain defense costs in connection with these claims.

on such distinctions.  Thus, for example, the Court uses "Northrop Grumman" to refer not only to, inter alia, Northrop Grumman Corporation, but also to refer to Grumman Corporation.
[4] The Court uses "Century" to refer to Century Indemnity Company, eventual successor in interest to Insurance Company of North America ("INA") and to Indemnity Insurance Company of North America ("IINA").

Northrop Grumman has sought coverage and defense costs relating to claims with respect to eighteen separate sites. (Answer, Counterclaim, & Crossclaim 33-34, ECF No. 11.) The Court bifurcated trial and discovery into two phases, by site. (July 26, 2012, Order, ECF No. 28; Dec. 10, 2012, Order, ECF No. 49.) The first phase (and the phase at issue here) includes the sites at (1) Aqua NY Water District in Merrick, New York; (2) Bethpage Facility, (3) Bethpage Naval Weapons Industrial Reserve Plant ("NWIRP"), (4) Bethpage Community Park, and (5) Bethpage Water District in Bethpage, New York; (6) Calverton NWIRP in Calverton, New York; (7) Massapequa Water District in Massapequa, New York; and (8) South Farmingdale Water District in South Farmingdale, New York. (July 26, 2012, Order, ECF No. 28; Dec. 10, 2012, Order, ECF No. 49.) Discovery has proceeded with respect to the Phase 1 sites, and a Phase 1 jury trial is scheduled for January 8, 2014.

Before the Court are two motions for partial summary judgment: (1) Travelers' motion for a declaration that fourteen policies in effect from 1972 to 1983 must be read to include a pollution exclusion codified in New York Insurance Law during that period (Travelers Mot. Partial Summ. J. 1, ECF No. 65);[5] and (2) Northrop Grumman's motion relating to Travelers' and Century's duty to defend against an action brought by the Town of Oyster Bay (Northrop Grumman Mot. Partial Summ. J., ECF No. 60).

---

[5] Travelers also moved for a declaration that certain policies in effect from 1985 to 1995 do not provide coverage for the pollution claims at issue in this case. That portion of the motion was resolved by consent of the parties. (See May 31, 2013, Order & Judgment, ECF No. 190.)

For the reasons set forth below, the Court grants in part and denies in part Travelers' motion, and grants in part and denies in part Northrop Grumman's motion.

## I.    FACTS RELEVANT TO THE MOTIONS

The following facts are undisputed unless otherwise noted.

Over the course of more than six decades, Northrop Grumman operated naval aircraft manufacturing and testing facilities in Bethpage and Calverton, New York. (See Northrop Grumman's Resp. Travelers' Local Rule 56.1 Statement Supp. Mot. Partial Summ. J. ¶ 4, ECF No. 87 ("DCSOF").)

### A.    The Sites

#### 1.    The Bethpage Facility Site

The parties (and the Court) refer to a large[6] tract of land located in Bethpage, New York, as the "Bethpage Facility."  (Id. ¶ 5.)  Starting in the 1930s, Grumman developed and manufactured, among other things, naval aircraft and amphibious craft at the site.  (Id. ¶¶ 5-6.)  The Bethpage Facility was added to the New York State Department of Environmental Conservation ("NYSDEC") Registry of Inactive Hazardous Waste Sites in the 1980s. (Answer, Counterclaim, & Crossclaim ¶ 50, ECF No. 11.)

#### 2.    The Bethpage NWIRP Site

Within the Bethpage Facility Site was an approximately 105-acre tract of land referred to as the Bethpage NWIRP.  (DCSOF ¶ 8.)  The Bethpage NWIRP site

---

[6] The parties dispute the precise size of the Bethpage Facility site, but there is material in the record suggesting that, at least in 1983, the sited consisted of approximately 600 acres.  (See Feb. 1, 2013, Pashler Decl. Ex. 8 at NGINS000751714, ECF No. 88.)

was established in the 1930s or 1940s[7] and was owned by the United States Navy, but operated by Grumman.  (Northrop Grumman Resp. Travelers' Local Rule 56.1 Counterstatement Opp'n Northrop Grumman's Mot. Partial Summ. J. ¶ 4, ECF No. 111 ("Defs.' Reply SOF").)  Travelers cites to (disputed) record material suggesting that this site was used for research, prototyping, testing, design engineering, fabrication, and primary assembly of military aircraft.  (Id. ¶ 5.)

### 3.   The Bethpage Community Park Site

The Bethpage Community Park is a smaller (somewhere between twelve and eighteen acres) tract of land located within the larger Bethpage Facility Site.  (Id. ¶ 7.)  The Park sits on what used to be "sludge drying beds," where Grumman placed wastewater treatment sludge generated from its plants.  (See Feb. 1, 2013, Pashler Decl. Ex. 17, at NGINS000007369-70, ECF No. 88.)  The parcel was donated to the Town of Oyster Bay in October 1962.  (Id.)

### 4.   The Calverton NWIRP Site

The Calverton NWIRP originally consisted of an approximately 6,000-acre tract of land in Suffolk County, Long Island.  (DCSOF ¶ 24.)  This site was owned by the Navy but operated by Grumman.  (Id. ¶ 23.)  Grumman ceased operating the Calverton NWIRP site in 1996.  (Id. ¶ 26.)

### B.   Various Suits and Claims

In the 1980s, the Bethpage Facility was added to the NYSDEC Registry of Inactive Hazardous Waste Sites.  (Answer, Counterclaim, & Crossclaim ¶ 50, ECF

---

[7] The parties dispute the precise date, and the Court need not resolve that dispute for purposes of this motion.

No. 11.)  A number of entities have conducted investigations into and/or brought claims against Northrop Grumman, alleging that it is liable for cleanup costs and other costs associated with groundwater contamination and environmental property damage at the Bethpage Facility and the Bethpage NWIRP.  Northrop Grumman has paid for certain remedial measures including the installation of a groundwater extraction and treatment system to abate contamination of public water supplies, and it continues to undertake testing and sampling of groundwater.

On April 21, 2005, the Town of Oyster Bay filed a lawsuit against Northrop Grumman for pollution at the Bethpage Community Park ("TOB Action").  (PCSOF ¶ 17.)  It is this action for which Northrop Grumman now seeks litigation coverage from Travelers and Century.

Northrop Grumman faces three additional potential actions.  First, the Navy has asserted a claim against Northrop Grumman in connection with the Bethpage NWIRP Facility.  Northrop Grumman and the Navy entered into a tolling agreement in April 2009.  Second, the Bethpage Water District has asserted claims against Northrop Grumman for contamination of wellfields that supply drinking water.  Third, in a letter dated July 16, 2008, the United States Department of Justice ("DOJ") stated that the Navy had requested that the DOJ commence a lawsuit against Northrop Grumman relating to the Calverton NWIRP.

## C.   Notice

Commencing in the 1970s, various inquiries and investigations were made with respect to groundwater contamination "in and around the Grumman plant."

(See Apr. 19, 2013, Hart Decl. Ex. 1, ECF No. 168.)  Travelers learned about these issues at the time and convened a meeting in December 1976 with Grumman.  (Id.) In internal memoranda drafted after this meeting, Travelers questioned whether the Navy or Grumman owned certain wells.  (Id. Ex. 2.)  Travelers also questioned whether Grumman could be the source of the pollution.  (Id.)  Additional subsequent Travelers memoranda referred to the water contamination as "in and around the Bethpage facility" and noted that some of the wells were owned by the Navy and some by Grumman.  (Id. Ex. 3.)  Travelers noted concern with respect to health risks to the 20,000 employees of the Bethpage facility.  (Id.; see also id. Exs. 5, 6.) Geraghty & Miller, Inc., an environmental consulting firm, prepared a memorandum for Grumman in June 1976 outlining the potential for extensive groundwater contamination in the Bethpage Water District.  (Feb. 1, 2013, Heskin Decl. Ex. 12, ECF No. 80.)  In January 1977, Travelers noted that Grumman had not received any claims yet.  (See Apr. 19, 2013, Hart Decl. Ex. 6, ECF No. 168.) But CERCLA became effective in 1980, and, by March 1982, the EPA had sent Grumman a letter concerning a public investigation into contaminants at "Old Bethpage."  (See Feb. 1, 2013, Heskin Decl. Ex. 14, ECF No. 80.)

A letter dated January 30, 1984, from insurance broker Frank Hall & Co. was addressed to Travelers at 339 Seventh Street, Garden City, New York.  (May 2, 2013, Cannella Decl. Ex. 1, ECF No. 180.)  The letter shows copyees Gregory Flemming (of INA) and J. Morgese.  (Id.)  This letter was produced from Century's files.  (Id.)  There is no evidence in the record that Travelers in fact received a copy

of this letter, and Travelers has stated that the address to which the letter was sent was an incorrect address.  (See Letter from Lynn Neuner to the Court 3 (May 2, 2013), ECF No. 180.)  The letter is captioned "Re: Grumman Corporation, New York State vs. Town of Oyster Bay, et al," and it states: "Enclosed is additional information on the above captioned for your file."  (May 2, 2013, Cannella Decl. Ex. 1, ECF No. 180.)  Enclosed with the letter is another letter from R. J. Fitzpatrick to E. B. Jacobs describing a claim by NYSDEC against Grumman concerning "any potential damage to the State's natural resources attributable to [Grumman's] on-site sludge drying bed, identified as site #130003."  (Id.)  The letter also contains attachments from NYSDEC, CERCLA, the Environment Reporter, and reports describing Grumman's sludge drying beds.  (Id.)  Nothing in the letter mentions groundwater contamination, and, indeed, the letter from Fitzpatrick indicates that "[l]eachate tests performed on sludge samples at that time indicated no leaching of contaminants was occurring."  (Id.)  Attachment four to the letter includes a site narrative describing the sludge treatment practices at "Grumman Aerospace — Bethpage Facility," and is dated April 15, 1980.  (Id.)

The copy of the 1984 letter from Century's files contains a variety of handwritten notes including "need date of event" and a claim number, as well as a circle around the words "Grumman Corporation" with an arrow to the handwritten notation "insured."  (Id.)  There is also the comment: "Steve, please speak to me." (Id.)

A Grumman Form 10-K for the fiscal year ended December 31, 1987, refers to a suit called "The State of New York v. The Town of Oyster Bay, et al." and describes the suit as relating to damage Grumman allegedly caused "to the environment at the Old Bethpage landfill." (Id. Ex. 7; see also id. Ex. 9 (10-K for the fiscal year ended December 31, 1988).)[8]  The 1987 10-K describes terms of a settlement reached.  (Id. Ex. 7.)  Other Grumman documents refer to issues with hazardous waste disposal at the "Bethpage Facility."  (See id. Ex. 8, at NGINS000398059.)  One document refers both to the Bethpage Facility and places a mark indicating that the issue relates to a landfill.  (Id. at NGINS000398061.)

In a 1995 deposition of a Grumman employee in the Town of Oyster Bay suit, the employee testified that sludge had been placed in the fields at the Bethpage Facility.  (Letter from Shane Heskin to the Court, Ex. 8, at 61, 63 (May, 2, 2013), ECF No. 176.)  In December 2003, engineers prepared a report for Northrop Grumman relating to pollution at the Bethpage Community Park.  (Id. Attach. 24, Ex. 2.)  Northrop Grumman sent this report to the Bureau of Solid Waste and Corrective Action, Division of Solid and Hazardous Materials, NYSDEC. (Id.)  The report provides a chronology of investigations at the Bethpage Community Park property going back to 1994.  (Id. at NGSINS000007370-72.)

The Town of Oyster Bay sent Northrop Grumman a "Notice of Intent to Sue for Violations of [RCRA] at the property known as the Bethpage Community Park." (Id. Attach. 2.)  The activities referred to in this letter involve those also at issue in the lawsuit filed by the Town of Oyster Bay in 2005.  (Compare id. Attach. 2, with

---

[8] The parties agree that claims relating to the Old Bethpage Landfill are not at issue in this case.

Jan. 4, 2013, Scanlon Decl. Ex. 14, ECF No. 61 (Complaint in TOB Action).)  That

lawsuit was filed on April 21, 2005.  (Jan. 4, 2013, Scanlon Decl. Ex. 14, ECF No. 61

(Complaint in TOB Action).)

On June 14, 2005, Aon, acting as claims consultant for Northrop Grumman,

sent ACE USA (a predecessor company to Century) a copy of the complaint in the

TOB Action and requested that a file be opened.  (Letter from Shane Heskin to the

Court Ex. 4 (May, 2, 2013), ECF No. 176.)  Century considers this letter the first

"notice" it received of a claim relating to the Bethpage Community Park.

**D.   The Policies**

**1.   The IINA and INA Policies**

IINA and INA, whose successor in interest was eventually Century, issued a

series of policies to Grumman during the 1950s and 1960s.  (See Jan. 4, 2013,

Scanlon Decl. Exs. 1-7, ECF No. 66 (IINA and INA policies covering the years from

1955 to January 1, 1962).)

**2.   The Travelers Policies**

Travelers issued numerous general and excess liability insurance policies[9] to

Grumman (and related entities) in effect from the period of January 1, 1968,

through January 1, 1995.  (DCSOF ¶ 27.)  The policies at issue on this motion are

those that, according to Travelers, were issued or renewed during the time when the

New York statutory pollution exclusion was in effect (September 1, 1971, through

September 1, 1982).  Those policies are:

---

[9] One issue on this motion is whether the fourteen policies constitute separate policies or are, in part, continuations of an earlier issued policy.  The Court uses the term "policies" here as a matter of convenience.

- TRNSL-932208-69 (Jan. 4, 2013, Pashler Decl. Ex. 11, ECF No. 67);

- T-CUP-932209-72 (id. Ex. 12, at TRAV002768);

- T-CUP-932209-73 (id., at TRAV002768);

- TR-NSL-107T519-8-74 (id. Ex. 14);

- TR-NSL-107T510-1-74 (id. Ex. 15);

- TR-NSL-107T519-8-77 (id. Ex. 16);

- TR-NSL-107T519-8-78 (id. Ex. 17);

- TR-NSL-162T582-2-78 (id. Ex. 18);

- TR-SLG-107T519-8-79 (id. Ex. 19);

- TR-SLG-107T519-8-80 (id. Ex. 20);

- TR-NSL-181T215-4-80 (id. Ex. 21);

- TREE-SLG-107T519-8-81 (id. Ex. 22); and

- TREE-SLG-107T519-8-82 (id. Ex. 23).

The first three policy numbers listed above, TRNSL-932208-69 (primary liability), T-CUP-932209-72, and T-CUP-932209-73 (both CUPs, as the policy numbers suggest), each refer to policies originally issued effective from January 1, 1969, "until cancelled."  (Id. Ex. 11, at TRAV000448; id. Ex. 12, at TRAV002728.) At the end of each of those policies are a series of endorsements.

Appended to TRNSL-932208-69, the primary liability policy, are "Premium Computation Endorsement[s]," which read: "The policy of which this endorsement forms a part is an entire contract issued for the period from January 1, [year one] to January 1, [year two]."  (Id. Ex. 11, at TRAV000474, 478, 480, 487.)  Each Premium

11

Computation endorsement also includes a heading that states "Pol. Expires Until Cancelled." (Id.)  The endorsements at issue here are those from January 1 of 1972 and 1973 through January 1 of 1973 and 1974, respectively.  The policy number, TRNSL-932208-69, does not change from endorsement to endorsement.

Appended to the T-CUP policies are "Renewal Certificate[s]," which read:

It is agreed that —

The policy period is amended to — Jan 1 [year one] to Jan 1 [year two]

The policy number for the period — Jan 1 [year one] to Jan 1 [year two] is amended to —

T-CUP-932209-[year one]

The premium for the period Jan 1 [year one] to Jan 1 [year two] shall be —

$22,000 . . . .

(See, e.g., id. Ex. 12, at TRAV002761, 2764, 2768, 2772.)  Those certificates also include a heading that states "Pol. Expires Until Cancellation." (Id.)  The Renewal Certificates at issue here are those from January 1 of 1972 and 1973 through January 1 of 1973 and 1974, respectively.

Other than the first three policy numbers listed above, each of the policies at issue contains a provision explicitly excluding from coverage "bodily injury or property damage" from pollution that is "expected or intended." (Id. Ex. 14, at TRAV000838; id. Ex. 15, at TRAV000765; id. Ex. 16, at TRAV001042; id. Ex. 17, at TRAV001217; id. Ex. 18, at TRAV002266;

id. Ex. 19, at TRAV001405; id. Ex. 20, at TRAV001501; id. Ex. 21, at TRAV002317; id. Ex. 22, at TRAV001674; id. Ex. 23, at TRAV001690.)

Travelers states that "[t]he fourteen Policies in effect from January 1, 1972 through January 1, 1983 that are the subject of [Travelers' motion for partial summary judgment] include six 'filing form' Policies, which were provided to Grumman for its use in the event it was required to show proof of insurance to any third party."[10]  (Mem. Law Supp. Travelers' Mot. Partial Summ. J. 11 n.7, ECF No. 67.)

## II.   DISCUSSION

### A.   Standard on Summary Judgment

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a

---

[10] Although only thirteen policy numbers are listed above, Travelers counts the 1972 and 1973 endorsements to TRNSL-932208-69 as separate policies notwithstanding their shared policy number.

genuine issue of material fact for trial.  Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 539 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts — i.e., "facts that might affect the outcome of the suit under the governing law" — will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

### B.   **Travelers' Motion for Partial Summary Judgment**

It is undisputed that Travelers issued Grumman a number of policies from 1968-1985.  At issue on this motion is whether the policies in effect from January 1, 1972, through January 1, 1983, must be read to include a statutory pollution

exclusion, then codified at New York Insurance Law § 46(a)(13)-(14) (the "New York

Pollution Exclusion").

### 1.    Legal Background

In 1971, New York State enacted the following statutory pollution exclusion

making pollution, other than that determined to be "sudden and accidental,"

uninsurable as a matter of law:

> Policies, except those covering nuclear facilities licensed by the
> atomic energy commission of the United States as meeting
> federal standards of radiological health and safety and nuclear
> facilities licensed by the state as meeting such federal
> standards, those purchased to satisfy the financial responsibility
> requirements of any federal law, and those issued to commercial
> or industrial enterprises providing insurance against the legal
> liabilities specified in this subdivision shall expressly exclude
> therefrom liability arising out of pollution or contamination
> caused by the discharge, dispersal, release or escape of any
> pollutants, irritants or contaminants into or upon land, the
> atmosphere or any water course or body of water unless such
> discharge, dispersal, release or escape is sudden and accidental.

N.Y. Ins. Law § 46(a)(13)-(14) (McKinney 1981) (emphasis added).[11]  The statute

took effect on September 1, 1971.  See 1971 N.Y. Sess. Laws 1968 (McKinney).  It

was repealed effective September 1, 1982.  See 1982 N.Y. Sess. Laws 2795

(McKinney).

The statute was intended to "prohibit commercial and industrial enterprises

from purchasing insurance to protect themselves against liability arising out of

their pollution of the environment, other than through sudden and accidental

circumstances."  (Feb. 22, 2013, Cannella Decl. Ex. 7, ECF No. 107 (Memorandum

---

[11] New York Insurance Law § 46(a)(13)-(14) was re-codified as New York Insurance Law §
1113(a)(13)-(14).

to the Governor).)  The statutory exclusion evinced a strong public policy that corporate polluters should pay the costs of their own pollution.  See Inc. Vill. of Cedarhurst v. Hanover Ins. Co., 611 N.Y.S.2d 417, 420-21 (N.Y. Sup. Ct. 1994); Borg-Warner Corp. v. Ins. Co. of N. Am., 577 N.Y.S.2d 953, 958-59 (N.Y. App. Div. 1992).

Insurance policies issued during the statute's effective period had the statutory pollution exclusion read into them — whether or not they contained an explicit exclusion.  See Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 156 (2d Cir. 2003); see also Travelers Indem. Co. v. Orange & Rockland Utils., Inc., 905 N.Y.S.2d 11, 13 (N.Y. App. Div. 2010) ("Between 1971 and 1982, a provision of the Insurance Law then in effect (former § 46) excluded liability for coverage for pollution other than claims based on 'sudden and accidental' discharges."); Am. Ins. Co. v. Fairchild Indus., Inc., 852 F. Supp. 1173, 1180 n.13 (E.D.N.Y. 1994), aff'd, 56 F.3d 435 (2d Cir. 1995) ("[A]lthough the 1971 policy does not contain the [pollution exclusion] clause, in 1971, the state of New York required that all insurance policies include the clause. Consequently, this Court finds that the exclusion applies to that policy as well.")

The Second Circuit has held that the repeal of the New York statutory pollution exclusion does not eliminate its applicability to policies issued or renewed between September 1, 1971, and September 1, 1982.  See Md. Cas. Co., 332 F.3d at 159 ("The general rule . . . is that contracts are interpreted in accordance with the law in effect at the time of their formation.")  In Maryland Casualty, the court

specifically addressed the question of whether the repeal of the statutory pollution exclusion eliminates its applicability to policies issued or renewed within the relevant timeframe.  The Second Circuit held that "the repeal of a statute has no impact upon contractual rights that were established when the statute was in force."  Id.; see also Char-Mo Investors, Inc. v. Mkt. Ins. Co., 44 N.Y.2d 793, 794-95 (N.Y. 1978); Travelers Indem. Co. v. Orange & Rockland Utils., Inc., 73 A.D.3d 576, 577 (N.Y. App. Div. 2010).[12]

A number of courts have held that an insurer's position in front of regulators or policyholders that appears to avoid the statutory pollution exclusion does not create an estoppel claim.  See Emp'rs Ins. of Wausau v. Duplan Corp., 1999 WL 777976, at *14-15 (S.D.N.Y. Oct. 20, 1999) ("[R]egulatory estoppel [in the context of the statutory pollution exclusion] has received almost universal disapproval" and has been rejected by a number of courts.); see also Ogden Corp. v. Travelers Indem. Co., 740 F. Supp. 963, 967-68 (S.D.N.Y. 1990) (finding no equitable or judicial estoppel with regard to the statutory pollution exclusion).

### 2.    Application of the Pollution Exclusion to the Disputed Policies

Northrop Grumman opposes Travelers' motion on the bases that (a) Northrop Grumman purchased the policies to satisfy "financial responsibility requirements of" a federal law, thereby placing the policies within the exemption of Section 46; (b)

---

[12] This requirement is consistent with New York Insurance Law § 3103(a), which provides that a policy that fails to include a provision otherwise imposed by law should be enforced as if the legally mandated provision were included.  See In re Sept. 11th Liab. Ins. Coverage Cases, 333 F. Supp. 2d 111, 125 (S.D.N.Y. 2004); Dana Woolfson LMT v. Gov't Emps. Ins. Co., 862 N.Y.S.2d 794, 795-96 (N.Y. Civ. Ct. 2008); Halali v. Evanston Ins. Co., 779 N.Y.S.2d 119, 120 (N.Y. App. Div. 2004).

the repeal of Section 46 and replacement with a different public policy requires that

this Court ignore Section 46 when construing the policies today; and (c) Travelers

has repeatedly ratified the Policies since 1982, when Section 46 was repealed.

Finally, Northrop Grumman also argues that four (or two, depending on how one

counts) of the policies at issue on this motion were not "issued or renewed" when the

statutory pollution exclusion was in effect.[13]   For the reasons set forth below, each

of these arguments fails.

### a.  Financial Responsibility Requirement Exemption

There can be no serious debate that the statutory pollution exclusion applies

to any and all policies issued or renewed between September 1, 1971, and

September 1, 1982, Md. Cas. Co., 332 F.3d at 159, unless they fall within one of the

three statutory exemptions: (1) those covering nuclear facilities licensed by the

atomic energy commission of the United States as meeting federal standards of

radiological health and safety of nuclear facilities or those licensed by the state as

meeting such standards, (2) those purchased to satisfy the financial requirements of

any federal law, and (3) those issued to commercial or industrial enterprises

providing  insurance against certain specified legal liabilities.  N.Y. Ins. Law §

46(a)(13)-(14) (McKinney 1981).

Here, Northrop Grumman argues that its policies were in fact purchased to

satisfy the financial responsibility requirements of federal law.  In particular,

---

[13] Northrop Grumman also requests, in the alternative, that the Court deny summary judgment to permit additional discovery under Federal Rule of Civil Procedure 56(d).  The Court agrees with Travelers that this is largely a legal motion and that deferring resolution to permit additional discovery is not appropriate here.

Northrop Grumman argues that the contracts between it and the federal government were subject to the Armed Services Procurement Regulations ("ASPR"), later renamed as the Defense Acquisition Regulations ("DAR").  See 32 C.F.R. §§ 1.102, 7.203-22 (1971).[14]  According to Northrop Grumman, these regulations required contractors working for the federal government to obtain insurance coverage for certain third-party liabilities.  32 C.F.R. § 7.203-22 (1971) (also referred to as "ASPR 7.203-22").  Northrop Grumman further asserts that ASPR 7.203-22 is specifically incorporated into various Grumman contracts applicable to both the Bethpage and Calverton facilities during the time period from 1971-82.[15]

A separate provision, 32 C.F.R. § 10.301(c)(1971), required contractors for the federal government to carry insurance "[w]here commingling of property, type of operations, circumstances of ownership, or conditions of the contract make insurance reasonably necessary for the protection of the Government."  Id.

As evidence of the applicability of these laws to Grumman, it is undisputed that during the 1970s Grumman had to submit copies of its insurance policies with Travelers to the U.S. Navy Insurance Branch for review and approval.  There is evidence in the record that, in July 1970, the Navy "approved" at least two of the policies at issue on this motion.  (See Feb. 1, 2013, Pierro Decl. Ex. A, ECF No. 82 (approving T-RNSL-932208-69 and T-CUP-932209-69).)[16]  In addition, a Navy audit

---

[14] Certain relevant regulations, including those cited above, from 1971 to 1982 are attached as exhibits 6a through 13b to the February 1, 2013, Declaration of John Scanlon (ECF No. 83).
[15] The procurement regulations applicable to government contactors define "insurance" as "protection against the risk of financial loss by the purchase of coverage."  32 C.F.R. § 10-301.1 (1982).
[16] The Navy only approved policies "to the extent applicable to the subject contracts."  (Feb. 1, 2013, Pierro Decl. Ex. A, ECF No. 82.)

was conducted in the mid-1970s.  (See id. Ex. C.)  The Navy stated that the

"contractor maintains required insurance under cost reimbursement type contracts

in sufficient limits and appears to comply with [ASPR 7-203.22]."  (Id. at

NGINS002304519.)

In 1982, an amendment to the law required that Travelers itself certify to the

EPA that Grumman met financial responsibility requirements applicable to

hazardous waste facilities.  (See Feb. 1, 2013, Scanlon Decl. Ex. 44, at

NGINS001976341, ECF No. 87 (certifying that policy number TREE-SLG-107T519-

8-82 met Grumman's "obligation to demonstrate financial responsibility under 40

CFR 264.147 or 265.147" for "sudden and non-sudden accidental occurrences"  at

the Bethpage and Calverton facilities); Hr'g Tr. 11:9-19, 44:14-19 (Apr. 25, 2013).)

The law and the certification relate only to one of the policies at issue on this

motion: TREE-SLG-107T519-8-82.

By its terms, ASPR 7.203-22(a) required Grumman to purchase insurance

with respect to specific categories of potential claims: "workmen's compensation

employer's liability, comprehensive general liability (bodily injury) and

comprehensive automobile liability (bodily injury and property damage)."  32 C.F.R.

§ 7.203-22(a) (1971).  Property damage due to pollution is not listed among the

various categories of required coverage.

Northrop Grumman argues that the Section 46 exemption applies to entire

policies purchased to satisfy any financial responsibility required by federal law.

Under its interpretation of the New York Pollution Exclusion, a general liability

policy purchased to satisfy, for example, the ASPR workmen's compensation employer's liability requirement, would fit within Section 46's exemption.   It would thus be irrelevant that the financial responsibility requirement for which a policy was purchased has nothing to do with environmental property damage.   Northrop Grumman supports its position by noting that such an interpretation comports with the practice of issuing general comprehensive liability policies that cover many types of liability, rather than separate policies for bodily injury or property damage. And, indeed, industry-approved forms for comprehensive general liability policies during the relevant period do provide coverage for both bodily injury and property damage.  (See Feb. 1, 2012, Scanlon Decl. Ex. 29, ECF No. 83 (1973 CGL Form).)

Finally, Northrop Grumman argues that the phrase "financial responsibility" should be interpreted according to its plain and ordinary meaning.  See, e.g., People ex rel. N.Y. C. & H. RR. Co. v. Woodbury, 208 N.Y. 421, 425 (1913).  It argues that the Court should not construe the phrase as a term of art, limited to statutes or regulations that specifically require regulated entities to meet "financial responsibility requirements."

For its part, Travelers argues that the term "financial responsibility" is a term of art and that the ASPR does not require that the required coverage be purchased to satisfy "financial requirements" of any federal law.  The Court agrees. While there may be no sure-fire way to distinguish between phrases used in their ordinary sense from those used as terms of art, the Court is persuaded "financial responsibility requirement" is used as a term of art for two reasons.  First, a

number of contemporaneous federal regulations use the exact phrase "financial responsibility" to describe the requirements they impose on regulated entities.  (See Feb. 22, 2013, Cannella Decl. Ex. 1, ECF No. 107 (citing 7 C.F.R. § 1483.103 (1971); 29 C.F.R. § 40.11 (1971); 32 C.F.R. § 818.2 (1971); 46 C.F.R. §§ 540.3-.4, 540.7, 542.3-.6 (1971); 50 C.F.R. § 253.6 (1971)).)  To read Section 46 in light of the language in regulations available to the New York State legislature at the time of its enactment comports with generally accepted canons of statutory construction. See, e.g., Erlenbaugh v. United States, 409 U.S. 239, 243 (1972) (The "rule of in pari materia — like any canon of statutory construction — is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context."); Pettus v. Morgenthau, 554 F.3d 293, 298 (2d Cir. 2009) (citing Nat'l Archives & Records Admin v. Favish, 541 U.S. 157, 169 (2004) ("We can assume Congress legislated against the [relevant] background of law, scholarship, and history . . . .")).[17]

   Perhaps more important than the fact that "financial responsibility" is consistently used in contemporaneous federal regulations is the problem raised by the "plain meaning" alternative suggested by Northrop Grumman.  The New York State legislature specifically carved out of the pollution exclusion insurance policies "purchased to satisfy the financial responsibility requirements of any federal law."

---

[17] Travelers also argues that the ASPR is a regulation and therefore does not constitute "federal law."  This argument lacks merit.  As an initial matter, Black's Law Dictionary defines "federal law" as "[t]he body of law consisting of the U.S. Constitution, federal statutes and regulations, U.S. Treaties and federal common law."  Black's Law Dictionary (9th ed. 2009).  More importantly, the Supreme Court has held that federal regulations constitute federal law.  See, e.g., Free v. Bland, 369 U.S. 663, 667-68 (1962).

N.Y. Ins. Law § 46(a)(13)-(14) (McKinney 1981) (emphasis added).  But under Northrop Grumman's interpretation, it is difficult to conceive how an insurance policy could be purchased to satisfy <u>any</u> requirements of federal law without also satisfying <u>financial responsibility</u> requirements of federal law.  In other words, Northrop Grumman's "plain meaning" interpretation would render the words "financial responsibility" mere surplusage.  <u>See</u> <u>Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.</u>, 131 S. Ct. 2188, 2196 (2011) (noting the "general reluctan[ce] to treat statutory terms as surplusage" (internal quotation marks and citations omitted)).

Moreover, to expand the exemption to include every policy purchased to satisfy any federal law — even if only a portion of the policy is required by federal law and even if the requirement is entirely unrelated to property damage resulting from pollution — would create a potentially gaping hole in the pollution exclusion that is out of all proportion from the stated purpose of the exception: "to make it clear that the [Section 46] is not to be read in contravention of such federal laws as the Water Quality Improvement Act" and to permit "The Nuclear Energy Liability Insurance Association and the Mutual Atomic Energy Liability Underwriters . . . to continue the sale of insurance on facilities meeting prescribed standards."  (Feb. 22, 2013, Cannella Decl. Ex. 7, ECF No. 107 (Memorandum to the Governor).)

Accordingly, while the ASPR did require certain government contractors to purchase certain types of insurance, for purposes of the New York Pollution Exclusion, the ASPR did not impose "financial responsibility requirements" on

Northrop Grumman to purchase the policies at issue here.   The New York legislature could easily have drafted Section 46 to exclude all policies purchased to satisfy any federal law, but it did not do so.

However, the Court does find that when 40 C.F.R. § 264.147 was amended in 1982 to require the owners or operators of hazardous waste facilities to "demonstrate <u>financial responsibility</u> for bodily injury and property damage to third parties caused by sudden accidental occurrences," Standards Applicable to Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities: Liability Requirements, 47 Fed. Reg. 16,544, 16,554 (Apr. 16, 1982) (emphasis added), that did impose a federal financial responsibility requirement for purposes of Section 46.  Accordingly, 40 C.F.R. § 264.147 brings policy number TREE-SLG-107T519-8-82 within the exemption, and the statutory pollution exclusion does not apply to that policy.

### b.  Repeal of the Statutory Pollution Exclusion

Northrop Grumman's second argument for disregarding the statutory pollution exclusion is that the repeal of the exclusion represented a change of public policy and, consequently, the ordinary rule of interpreting contracts under the law applicable at the time of their formation should not apply.  In so arguing, Northrop Grumman effectively asks the Court to directly disagree with the Second Circuit's holding in <u>Maryland Casualty Co. v. Continental Casualty Co.</u>, 332 F.3d 145 (2d Cir. 2003).  This, the Court will not do.

### c.  Ratification of the Policies or Estoppel from Applying the Exclusion

Third, Northrop Grumman argues that Travelers should be estopped from benefitting from the statutory exclusion because (1) it represented to regulatory authorities that the policies at issue complied with the requirements of Section 46; (2) it defended, under a reservation of rights, Northrop Grumman from lawsuits relating to pollution that (presumably) would otherwise have been excluded; (3) it was silent as to the applicability of the exclusion when it should have spoken up; and (4) it "may have" charged retrospective premiums to Grumman for pollution coverage.  Other courts have rejected similar arguments, and the Court sees no reason to depart from that authority here.  See Duplan Corp., 1999 WL 777976, at *14-15; see also Ogden Corp., 740 F. Supp. at 967-68.

### d.  Policy Renewals

Northrop Grumman argues that the endorsements of two of the policies at issue — TRNSL-932208-69 and T-CUP-932209-69 — are continuations of policies issued prior to September 1, 1972, and consequently do not fall within the effective timeframe for the statutory pollution exclusion.  The Court disagrees.

"New York law is clear that where an insurer has an absolute right to terminate a policy on its anniversary, each renewal does indeed represent a new policy."  Fidelity & Guarantee Ins. Underwriters, Inc. v. Jasam Realty Corp., 540 F.3d 133, 143 (2d Cir. 2008) (citing Moore v. Metro. Life Ins., Co., 352 N.Y.S.2d 433, 438 (1973).  Here, there is no doubt that the policies at issue (TRNSL-932208-69, T-CUP-932209-72, and T-CUP-932209-73) were renewals of policies.  In the case of

the general liability policy, each endorsement specifically states that the "Policy of

which this Endorsement forms a part is an entire contract issued" for the relevant

period.  Moreover each endorsement of the CUP is titled "renewal certificate" and

provides for a one-year policy period and a new policy number.  In the absence of

renewal, there is no evidence in the record that Travelers would have had any

obligation to provide any coverage for the subsequent period.  Under these

circumstances, no reasonable juror could find that these policies had not been

"renewed" after September 1, 1971.[18]  The statutory pollution exclusion therefore

applies to each.

* * *

Based on the Court's determinations above, the statutory pollution exclusion

applies to each of Travelers' Policies issued or renewed between September 1, 1971,

and September 1, 1982, with the exception of TREE-SLG-107T519-8-82, which was

purchased to satisfy the financial responsibility requirements of federal law.[19]

---

[18] At the oral argument of April 25, 2013, counsel for Travelers laid out with admirable clarity the reasons for treating each endorsement as a renewal.  (See Hr'g Tr. 23:1-27:3 (Apr. 25, 2013), ECF No. 192.)  The Court hereby adopts Travelers' reasoning for treating each endorsement and renewal certificate as a "renewal" for purposes of applying the statutory pollution exclusion.

[19] The Court therefore reads the New York Pollution Exclusion into the following policies:
- TRNSL-932208-69 (Jan. 4, 2013, Pashler Decl. Ex. 11, ECF No. 67 (the 1972 and 1973 endorsements));
- T-CUP-932209-72 (id. Ex. 12, at TRAV002768);
- T-CUP-932209-73 (id., at TRAV002768);
- TR-NSL-107T519-8-74 (id. Ex. 14);
- TR-NSL-107T510-1-74 (id. Ex. 15);
- TR-NSL-107T519-8-77 (id. Ex. 16);
- TR-NSL-107T519-8-78 (id. Ex. 17);
- TR-NSL-162T582-2-78 (id. Ex. 18);
- TR-SLG-107T519-8-79 (id. Ex. 19);
- TR-SLG-107T519-8-80 (id. Ex. 20);
- TR-NSL-181T215-4-80 (id. Ex. 21); and
- TREE-SLG-107T519-8-81 (id. Ex. 22).

C.   **Northrop Grumman's Motion for Partial Summary Judgment**

Northrop Grumman seeks a declaration that Travelers and Century each have a duty to defend it in the pending TOB Action.  That lawsuit seeks to hold Northrop Grumman liable for clean-up of environmental property damage at (and emanating from) the Bethpage Community Park.

Century asserts that, because Northrop Grumman's notice of the TOB claim was late as a matter of law, it has no duty to defend.  Century did not cross-move for a declaration of summary judgment in its favor on the duty to defend.

For its part, Travelers urges the Court to take notice of the fact that it has been paying a percentage of Northrop Grumman's defense costs under a reservation of rights for a number of years, and that no separate declaration of its duty to defend it therefore warranted.  In addition, Travelers argues that, as a practical matter, a ruling on this motion would be inefficient since Travelers intends to bring a dispositive motion shortly.

1.   **The Duty to Defend**

The law is clear — and no party seeks to argue otherwise — that the duty to defend is "exceedingly broad" under New York law.  See Cont'l Cas. Co. v. Rapid-Am. Corp., 80 N.Y.2d 640, 647 (1993).  "An insurer must defend whenever the four corners of the complaint suggest — or the insurer has actual knowledge of facts establishing — a reasonable possibility of coverage."  Id. at 648.

The duty to defend ("litigation coverage") is broader than the duty to indemnify ("liability coverage").  Id. (citing Seaboard Sur. Co. v. Gillette Co., 64 N.Y.2d 304, 310-11 (1984) (citation omitted); see also City of Johnstown v. Bankers

27

Standard Ins. Co., 877 F.2d 1146, 1148 (2d Cir. 1989).  The duty to defend extends

to any action in which coverage falls within the policy "whether or not the insurer

turns out ultimately to be liable for any judgment rendered."  Mendes & Mount v.

Am. Home Assurance Co., 97 A.D.2d 384, 385 (N.Y. App. Div. 1983).

     An insurer seeking to avoid its duty to defend bears a heavy burden that, in

practice, is seldom met.  City of Johnstown, 877 F.2d at 1148.  "A court applying

New York law, then, should only excuse an insurer from its duty to defend if it can

be concluded as a matter of law that there is no possible factual or legal basis on

which the insurer might eventually be held to indemnify the insured."  Id. at 1149.

     However, an insurer may avoid what would otherwise be a duty to defend if

timely notice of a claim or occurrence was not provided.  See Am. Ins. Co. v.

Fairchild Indus., Inc., 56 F.3d 435, 438 (2d Cir. 1995) ("If an insured fails to provide

timely notice as required by the particular policy, then, absent a valid reason for the

delay, the insurer is under no obligation to defend . . . ." (citing Allcity Ins. Co. v.

Jiminez, 576 N.Y.S.2d 87, 88 (1991))).  The burden is on the insured to show that a

delay was reasonable.  Id. (citations omitted).  "Under New York law, delays for one

or two months are routinely held 'unreasonable.'"  Id. at 440 (citing Am. Home

Assurance Co. v. Republic Ins. Co., 984 F.2d 76, 78 (2d Cir. 1993)); see also New

York v. Blank, 27 F.3d 783, 796 (2d Cir. 1994).

     "Under New York law, compliance with notice-of-occurrence provision in an

insurance policy is a condition precedent to an insurer's liability under the policy."

Commercial Union Ins. v. Int'l Flavors & Fragrances, 822 F.2d 267, 271 (2d Cir.

1987).  In determining whether late notice relieves an insurer of any obligation under a policy, a court must ask two questions: (1) when did the insured's obligation to give notice accrue, and (2) whether, in light of that determination, notice was timely.  See Olin Corp. v. Ins. Co. of N. Am., 743 F. Supp. 1044, 1053 (S.D.N.Y. 1990); Crucible Materials Corp. v. Aetna Cas. & Sur. Co., 228 F. Supp. 2d 182, 193 (N.D.N.Y. 2001).  The obligation to provide notice accrues when the facts or circumstances known to the insured at the time would have suggested the possibility of a claim.  Olin Corp., 743 F. Supp. at 1054.  The test of when an insured should have known is an objective one — based on a reasonable person standard.  Id.[20]

In Fairchild Industries, the Second Circuit found that notice was untimely based on circumstances in which negotiations and studies had been ongoing for years concerning a discharge basin, and failure to notify the insurer deprived it of the opportunity to participate with an eye towards reducing the costs of remediation.  Fairchild Industries, 56 F.3d at 440.

In Crucible, the court found that a history of investigations of environmental pollution commencing in 1981 made notice in 1988 untimely as a matter of law. Crucible, 228 F. Supp. 2d at 193-95.  There, the court noted that the insured knew of potential groundwater contamination beginning in at least 1983 — even though the nature and extent of the pollution was then unknown.  Id. at 194.

---

[20] New York has adopted the "no prejudice" rule: insurers need not demonstrate that they suffered prejudice due to a failure to receive timely notice.  See New York v. Blank, 27 F.3d 783, 796 (2d Cir. 1994) (citing Ogden Corp., 924 F.2d at 42-43).  The no prejudice rule does not apply to certain policies issued on or after January 17, 2009.  See N.Y. Ins. Law § 3420(a)(5); Sevenson Envtl. Servs., Inc. v. Sirius Am. Ins. Co., 883 N.Y.S.2d 423, 425 (N.Y. App. Div. 2009).

### 2.    Century's Duty to Defend

Century argues that Northrop Grumman's late notice precludes the Court from declaring that Century has a duty to defend in the TOB Action.  The Court agrees.  The facts in the record before this Court indicate that (1) Northrop Grumman was aware of groundwater pollution in the 1970s; (2) there were investigations throughout the 1980s; (3) Northrop Grumman noted the possibility of a claim by the Town of Oyster Bay in its Forms 10-K for the years ended 1987 and 1988; and (4) in a 1995 deposition, a Northrop Grumman employee noted awareness of pollution going back a number of years.  The only notice sent to Century occurred several months after it had finally been sued by the Town of Oyster Bay in 2005. This series of events, as a matter of law, renders Northrop Grumman's notice to Century untimely.

The sole piece of evidence to which Northrop Grumman can point in its favor is a document addressed to Travelers (at an address that Travelers asserts was incorrect), and which is in no way suggestive of intent to notify INA/Century of a potential claim.  (May 2, 2013, Cannella Decl. Ex. 1, ECF No. 180.)  No reasonable trier of fact could conclude that this single document, on which INA/Century was merely copied and which is designated simply as "[e]nclosed is additional information" constitutes timely, adequate notice.  (See id.)

Accordingly, Northrop Grumman's motion as to Century is denied.

### 3.    Travelers' Duty to Defend

Travelers has not asserted a late notice issue at this time.  Instead, Travelers asserts that there is no reason for a declaration of its duty to defend at this time

because it is about to make a more significant summary judgment motion.  The
Court disagrees that this is an appropriate basis on which to deny Northrop
Grumman's motion.  While Travelers' argument may be understandable from a
business perspective, as a matter of law, Northrop Grumman has sought a ruling,
and there is no legal basis upon which this Court should put this motion aside.

As stated above, the duty to defend is exceedingly broad.  It attaches if the
subject matter of the dispute could possibly fall within coverage.  Here, it can.  The
suit by the Town of Oyster Bay falls within the coverage of at least one or more
policies issued by Travelers.  Accordingly, Travelers has a duty to defend Northrop
Grumman as a matter of law.

With that said, however, the Court retains discretion in determining how the
costs of the duty to defend are allocated.  See, e.g., Consol. Edison Co. of N.Y. v.
Allstate Ins. Co., 98 N.Y.2d 208, 224-25 (2002).  The Court's ruling on the statutory
pollution exclusion as well as Northrop Grumman's concession with regard to the
absolute pollution exclusion, raise serious issues with respect to how many
Travelers' policies and to what time periods there may be coverage.  (The Court
notes that the statutory pollution exclusion does not prevent coverage for sudden
and accidental pollution, and there has not yet been a determination as to whether
the pollution issues here fall within that category.)  Moreover, the inactivity of the
TOB Action means that it is possible that the only effect of ordering Travelers to
pay the remainder of the defense costs would be to reallocate costs already
expended.  But it is also quite possible that, after additional motion practice or the

bench trial in January 2014, the Court would have to order Northrop Grumman to return those monies to Travelers.

In light of the open issues, the Court specifically exercises its discretion to rule that the current percentage of defense costs which Travelers has been paying (twenty-five percent) should not change until further order of the Court.

III.    CONCLUSION

For the reasons set forth above, Travelers' motion for partial summary judgment is GRANTED in part and DENIED in part, and Northrop Grumman's motion for partial summary judgment is also GRANTED in part and DENIED in part.

The Clerk of Court is directed to terminate the motions at ECF Nos. 60 and 65.

SO ORDERED.

Dated:       New York, New York
             July 3, 2013

_____
KATHERINE B. FORREST
United States District Judge