UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TRAVELERS INDEMNITY CO., et al.,          :

                  Plaintiffs,          :

              -v-          :

NORTHROP GRUMMAN CORP., et al.,          :

                 Defendants,          :

and          :

CENTURY INDEMNITY CO., eventual          :
successor in interest to INSURANCE CO. OF          :
NORTH AMERICA,          :

           Nominal Defendant. :

------------------------------------------------------------X

12 Civ. 3040 (KBF)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: OCT 3 1 2013
NOV 4, 2013

KATHERINE B. FORREST, District Judge:

      The instant action is an environmental insurance coverage dispute.[1]

Currently before the Court are three motions.  First, defendant Northrop Grumman

Corp. ("Northrop Grumman," "Northrop," or "Grumman")[2] has filed a motion for

reconsideration of this Court's Opinion and Order dated July 3, 2013 (the "Opinion"

or the "July 3 Opinion") (ECF No. 234).  (ECF No. 243.)  That Opinion determined,

---

[1] This Court has previously issued an Opinion & Order setting forth certain procedural aspects of the case.  (See Opinion & Order (the "Opinion" or the "July 3 Opinion"), ECF No. 234.)

[2] The Court uses "Northrop Grumman" or "Grumman" to refer to Northrop Grumman Corporation, successor in interest to Grumman Corporation, and Northrop Grumman Systems Corporation, successor in interest to Grumman Aerospace Corporation.

When referring to the various parties in this action the Court does not differentiate between predecessors and successors in interest in this opinion because neither of the present motions turn on such distinctions.  Thus, for example, the Court uses "Northrop Grumman" to refer not only to, inter alia, Northrop Grumman Corporation, but also to refer to Grumman Corporation.

<u>inter alia</u>, that Century Indemnity Co. ("Century")[3] had no duty to defend Northrop Grumman as to the Town of Oyster Bay Action ("TOB Action"), and that, while Travelers Indemnity Co. ("Travelers")[4] has a duty to defend, the in-place allocation of 25% of costs would remain undisturbed due to the circumstances of this case. Second, Travelers has filed a motion for partial summary judgment that the 1983 and 1984 environmental hazard policies it issued to Grumman do not cover the Bethpage Facility claim.  (ECF No. 250.)  Third, Travelers and Century (referred to jointly as "the Insurers") have brought a joint motion for partial summary judgment that they have neither a duty to defend nor indemnify Northrop Grumman with respect to Calverton.  (ECF No. 238.)[5]

## I.   THE MOTION FOR RECONSIDERATION[6]

On July 3, 2013, this Court granted in part and denied in part Travelers' motion for partial summary judgment requesting a declaration that 14 policies in effect from 1972 to 1983 must be read to include a pollution exclusion.  (July 3 Opinion 32.)  The Court also granted in part and denied in part a motion by Northrop Grumman relating to whether Travelers and Century each had a duty to defend Northrop in an action brought against it by the Town of Oyster Bay.  (<u>Id.</u>)

---

[3] Century is the successor to Insurance Company of North America ("INA").

[4] The Court uses "Travelers" to refer to plaintiffs Travelers Indemnity Company, Travelers Indemnity Company of Connecticut (formerly known as the Travelers Indemnity Company of Rhode Island), Travelers Casualty and Surety Company (formerly known as the Aetna Casualty and Surety Company), and Travelers Property Casualty Company of America (formerly known as Travelers Indemnity Company of Illinois).

[5] The Court heard oral argument on all motions on September 12, 2013.

[6] Local Rule 6.3 governs motions for reconsideration. Such motions must be based on an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.  <u>See</u> <u>Virgin Atl. Airways, Ltd. v. National Mediation Bd.</u>, 956 F.2d 1245, 1255 (2d Cir. 1992).

Northrop has moved for reconsideration with respect to aspects of the Court's decision relating to the Insurers' duties to defend.

A. The Allocation of Defense Costs

In its July 3 Opinion, the Court found that Travelers had a duty to defend Northrop Grumman in the TOB Action, but declined to change the financial arrangement regarding allocation of defense costs (which had been in place and complied with for several years) between Travelers and Northrop Grumman.  (July 3 Opinion 30–32.)

Northrop Grumman argues that this determination constitutes legal error. (See Mem. of L. in Supp. of Northrop Grumman Sys. Corp.'s Mot. to Reconsider ("NG Mot. to Recon.") 19–25, ECF No. 247.)  According to Northrop Grumman, once this Court determined that Travelers had a duty to defend (which it determined on pages 30–31 of the July 3 Opinion), New York Court of Appeals precedent dictates that Travelers must provide a complete defense, and this necessarily means that the Court may not allocate costs at this stage.  (NG Mot. to Recon. 21, citing Fieldston Prop. Owners Ass'n v. Hermitage Ins. Co., 16 N.Y.3d 257, 264–65 (2011).)

The Court overlooked none of the law to which Northrop Grumman cites in its motion for reconsideration, and Northrop Grumman does not suggest that there has been any intervening law that has altered the landscape.  This Court also does not view its prior decision on this issue as "clear error" or causing "manifest injustice."  See Virgin Atl. Airways, 956 F.2d at 1255.  As a result, the Court could deny the motion to reconsider on the basis that it was improvidently brought.

3

However, the Court has undertaken to step back from its prior ruling, re-review the cases cited by Northrop Grumman, and determine whether its initial decision should stand.  The Court undertakes this exercise cautiously, and explicitly states that such a step should not be cited for any precedential purpose.  Motions to reconsider are not "do-overs."  However, based on various circumstances unique to this case, in this instance the Court has undertaken such a review.

A review of the controlling case law supports this Court's prior decision to maintain the in-place allocation of costs between the parties.[7]

As an initial matter, the Court notes that the complaint in the TOB Action alleges occurrences outside of the policy periods covered by the Travelers' policies.[8]  These are uncovered occurrences—occurrences for which Travelers could not have a coverage obligation.  This is undisputed.

The TOB complaint alleges that Grumman conducted operations between 1930 and 1962 (Scanlon Decl. in Supp. of Summ. J. (Jan. 4 Scanlon Decl.) Ex. 14 ("TOB Compl.") ¶ 5, ECF No. 61), that those activities included disposal of hazardous materials at the park site at issue (Id. ¶ 15), and that the park property became contaminated as a result of those hazardous materials (Id. ¶¶ 18–19).  In its Answer, Northrop Grumman "admits that some of the environmental property damage for which NGSC seeks coverage likely occurred, in part, prior to 1968; and that INA provided insurance coverage to Grumman Corporation, its affiliates,

_____

[7] While the Court denies the motion to reconsider its July 3 Opinion, the Court does allow the parties leave to replead the issue of the in-place allocation of 25% at a further stage of the litigation on a more developed factual record.
[8] Travelers is the successor to Aetna Casualty; its obligations relate to policies provided by either insurer.

4

and/or predecessors prior to 1968." ("Answer, Counterclaim, and Crossclaim ("NG Ans.") ¶ 157, ECF No. 11.)

In addition, Northrop Grumman's counterclaim and crossclaim in this action assert that Travelers is in breach of its duties to defend and/or indemnify losses. (Id. ¶ 31–40.) Those claims clearly acknowledge a lengthy coverage period and the existence of additional policies covering occurrences at earlier points in time than those covered by the Travelers policies.  (See, e.g., id. ¶¶ 9–12 & Ex. A.)[9]

Thus, as a matter of admitted fact, there are occurrences at issue in the TOB Action not covered by a Travelers' policy.  Indeed, that is the entire point of Northrop Grumman's assertion that Century has a duty to defend in the TOB Action—and it has requested reconsideration on that very issue.

New York law provides that an insured is entitled to coverage of a claim unless the insurer meets the heavy burden of establishing that a claim is not covered.  See Frontier Insulation Contractors, Inc. v. Merchants Mutual Ins. Co., 91 N.Y.2d 169, 170, 175 (1997).  Such coverage typically includes a broad duty to pay the costs of defense associated with covered claims.  See id. at 178.

In Fieldston, the New York Court of Appeals reiterated the longstanding proposition that a duty to defend arises whenever the allegations in the complaint give rise to the reasonable possibility of recovery under the policy.  In that case, the court was answering the question of whether a policy's primacy on one claim (there, injurious falsehood), triggered a duty to defend the remaining two claims (as to

---

[9] While Northrop Grumman's counterclaims and cross-claims seek coverage for claims other than the TOB Action, they certainly encompass that action as well.

which there was not a primary coverage obligation).  16 N.Y.3d at 264.  The Court

found that the insurer did have such an obligation, and that this determination was

based on the duty to defend being broader than the duty to indemnify.  Id. at 265.  In

short, Fieldston concerned an "other insurance policy" issue, where there was a

debate as to which policy was primary when both policies covered the same time

period.  Notably, the court there also states the straightforward principle that the

duty to defend arises when there is a reasonable possibility of recovery under the

policy.  Id. at 264.

    None of these propositions is at odds with this Court's July 3 Opinion.  "When

more than one policy is triggered by a claim, pro rata sharing of defense costs may

be ordered."  Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 655

(1993).)[10]  Other New York courts have found that allocation of defense costs can be

appropriate.  See, e.g., Generali-U.S. Branch v. Caribe Realty Corp., No. 25499/91,

1994 WL 903279, at *2 (NY. Sup. Ct. Dec. 5, 1994) (citing Insurance Co. of North

Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir. 1980)).

    As Chief Judge Kaye stated in Consolidated Edison Co. of N.Y. v. Allstate

Ins. Co., 98 N.Y.2d 208, 224 (2002), "[p]ro rata allocation under these facts, while

not explicitly mandated by the policies, is consistent with the language of the

policies.  Most fundamentally, the policies provide indemnification for liability

incurred as a result of an accident or occurrence during the policy period, not

outside the policy period" (citing Forty-Eight Insulations, 633 F.2d at 1224).  While

---

[10] Rapid-American was in different procedural posture than the parties here.  The court there
affirmed the lower court's decision not to order pro rata sharing based on the fact that the insurer
there could later obtain contribution from other applicable policies.  Id. at 655–56.

Consolidated Edison was dealing with a post-verdict allocation of liability cost (and the duty to defend is broader than the duty to indemnify), it makes little sense to require a party to cover defense costs relating to coverage periods for which it cannot have any obligation.  There can be no doubt that if separate actions were brought as to the separate periods, Travelers would have no duty to defend those actions for periods as to which it had not provided coverage.  Taken to its logical conclusion, to hold otherwise would allow a party to incur potentially millions of dollars of defense costs when within the four corners of a complaint it simply could not—as pled—be responsible for all of the discovery costs and motion practice involved in litigating those other periods.

There is no doubt that in situations in which there remains ambiguity, the duty to defend, once found, would trigger an entire defense.  Here, however, there is no such ambiguity, based on the allegations in the TOB Action as well as Northrop Grumman's own claims.

B. Century's Duty to Defend

In the same July 3 Opinion, this Court also ruled that Century did not have a duty to defend in connection with the TOB Action because Northrop Grumman had not complied with the condition precedent of timely notice.  (July 3 Opinion 30.)  In making its determination, the Court relied upon various materials in the record, including: (1) documents referring to pollution at the Bethpage facility and various investigations in and around the facility in the 1970s, (2) a letter dated January 30, 1984 (the "January 1984 Letter"), attaching a letter dated December 6, 1983 (the

7

"December 1983 Letter"), (3) two Forms 10-K for Grumman's fiscal years ended 1987 and 1988 referring to a Town of Oyster Bay action, (4) 1995 deposition testimony from a former Grumman employee, (5) a December 2003 engineers' report relating to pollution at the Bethpage Community Park ("the Park"), and (6) a notice of intent to sue by the Town of Oyster Bay for violations relating to the Bethpage Community Park, and (7) the TOB Action (the complaint) itself.

The parties agree on one fact: in 2005, Northrop Grumman did provide Century with notice of the TOB Action. The issues raised on reconsideration relate to whether that was the first notice, and whether (in any event) Century has waived any late notice defense.

In particular, Northrop Grumman argues in this motion that:

1. The events in the 1970s were insufficient for a reasonable person to believe, based on the totality of the circumstances, that Grumman was responsible for pollution in the area of the Bethpage Community Park.  (NG Mot. to Recon. 9–10.)

2. Grumman did provide notice to Century of a potential occurrence and claim in the January 1984 Letter (which refers to the Old Bethpage Landfill), which attaches the December 1983 Letter (which refers more broadly to the Bethpage site).  (Id. at 10–11, 14–15.)

3. The two Forms 10-K for the fiscal years 1987 and 1988 relate to the Old Bethpage Landfill, not the Bethpage Community Park.  (Id. at 3.)

4. The 1995 deposition transcript excerpt to which this Court referred does not acknowledge contamination at the Bethpage Community Park. (Id. at 7–8.)

5. The 2003 engineers report did not trigger a duty to provide notice.

6. Northrop Grumman did not need to provide notice to Century prior to January 1984, when it provided such notice. Northrop has provided a variety of additional materials developed during the ongoing discovery in this case to support that assertion. (See id. at 13; Proffer of Evidence in Supp. of NGSC's Mot. to Reconsider ("Proffer"), ECF No. 247.) In part, these materials go to the question of whether a rational juror could find that the combination of the January 1984 cover letter attaching the December 1983 claim notice, referred, at least in part, to the Bethpage Community Park.

7. Century waived any late notice defense—and so it is irrelevant whether facts suggest Grumman should have notified it an occurrence or claim prior to 2005. (Mot. to Recon. 17–19.)

Century argues that the facts as they existed in the 1970s, both those to which this Court previously referred and the newly proffered evidence, support a determination that any reasonable policyholder would have recognized the possibility of a claim. (Century's Mem. of L. in Opp. to NG Mot. for Recon. ("Century Opp. to Mot. to Recon.") 9–10, ECF No. 260.)

The Court has allowed Northrop Grumman's newly proffered evidence to become part of the record on this motion for summary judgment. Northrop

Grumman submitted additional exhibits, including at least one declaration dated after the Court's July 3 Opinion had issued.  (See Proffer.)

      1.  <u>The 1984 Letter</u>

Century argues that it received formal notice of the TOB Action in 2005; and that prior to that date, it had not received notice of a claim or occurrence. (Century Opp. to Mot. to Recon. 1, 17; NG Mot. to Recon. 19.)  However, a series of events prior to 2005 related to the Bethpage Community Park, including a 2002 letter from Northrop Grumman to the New York State Department of Environmental Conservation ("NYSDEC") that provided additional information regarding cleanup at the Bethpage Community Park "as part of on-going settlement discussions" relating to the Park.  (Cannella Reply Decl. in Supp. of Travelers' and Century's Mot. for Partial Summ. J. ("Cannella Reply Decl.") Ex. 7, at NGINS001214002, ECF No. 347.)  That same letter states that the Navy and Town of Oyster Bay should both be considered potentially responsible parties with respect to the Bethpage Community Park restoration.  (<u>Id.</u> at NGSINS001214006.) In addition, on October 10, 2002, Aon (an insurance broker for Northrop Grumman) provided Travelers with information relating to contamination at the Park and formally requested indemnification.  (Cannella Reply Decl. Ex. 8, at TRAV007011.)

In short, there is little doubt that if the only notice that Century received was that date in 2005, such notice would be late as a matter of law.  There is no triable issue as to that fact on the current record.  Thus, it is of great importance to Northrop Grumman that the Court either find that the January 1984 Letter

(enclosing the December 1983 Letter) constitutes notice of claims relating to the Bethpage Community Park, or that Century has waived its late notice defense as a matter of law.  Otherwise, in short, Century has no duty to defend this claim.

In its July 3 Opinion, this Court carefully reviewed the January 1984 Letter and enclosures.  In that Opinion, the Court found that the letter was from insurance broker Frank Hall & Co., was addressed to Travelers, and shows an INA employee, Gregory Flemming, as a copyee.  (July 3 Opinion 7.)  The letter was produced from Century's files.  (Id.)  The subject line of the letter is "Re: Grumman Corporation, New York State vs. Town of Oyster Bay, et al."; the text of the letter states, "Enclosed is additional information on the above captioned for your file."  (Id. at 8.)

Enclosed with this letter was another letter, dated December 6, 1983.  (Id.)  In this second letter, R.J. Fitzpatrick of Grumman writes a memorandum to E.B. Jacobs of Grumman describing a claim by the NYSDEC against Grumman concerning "any potential damage to the State's natural resources attributable to [Grumman's] on-site sludge drying bed, identified as site #130003."  (Id.)  Attachment four to that memorandum includes a site narrative describing the sludge treatment practices at "Grumman Aerospace—Bethpage Facility," and is dated April 15, 1980.  (Id.)

In its July 3 Opinion, this Court found, "No reasonable trier of fact could conclude that this single document, on which INA/Century was merely copied and which is designated simply as '[e]nclosed is additional information' [referring to a different site] constitutes timely, adequate notice."  (Id. at 30.)  In so finding, the

11

Court relied on case law that provides that while the law is clear that the duty to defend is exceedingly broad, such a duty is triggered when the insurer has actual notice of facts establishing a reasonable possibility of coverage. (July 3 Opinion 27 (citing Rapid-American, 80 N.Y.2d at 647–48).) There is no dispute regarding—and indeed Northrop Grumman repeatedly refers on this motion to—the fact that the Old Bethpage landfill is geographically distinct from the Bethpage Community Park.

Northrop Grumman argues that the Court's ruling that the January 1984 Letter does not constitute sufficient notice should be reconsidered "because it imposes unnecessarily stringent requirements for notifying an insurer of an environmental claim or occurrence, misconceives the 1983 NYSDEC letter, and is inconsistent with the policy language and controlling law." (NG Mot. to Recon. 13–14.) According to Northrop Grumman, the December 1983 Letter from the NYSDEC attached to the January 1984 Letter expressly alleges Grumman's potential liability for investigative and remediation costs for damages to natural resources "at and around" the referenced site. (Id. at 14.) Since groundwater is the only natural resource near the Old Bethpage Landfill, Northrop Grumman argues, the 1983 Letter must necessarily have been referring to groundwater that is one of the issues raised with respect to the Bethpage Community Park in the TOB Action.

Northrop Grumman argues that the law does not require more than what this letter provided to have put Century on notice of a claim or occurrence that

12

could include the Bethpage Community Park.  Moreover, according to Northrop

Grumman, the policy language requires that:

> When an accident occurs written notice shall be given . . . .  Such notice shall
> contain particulars sufficient to identify the insured and also reasonably
> obtainable information respecting the time, place and circumstances of the
> accident . . . .  If a claim is made or suit is brought against the Insured, the
> Insured shall immediately forward to the company every demand, notice,
> summons or other process . . . .

(NG Mot. to Recon. 14–15 (quoting Jan. 4 Scanlon Decl. Ex. 1, at CEN 00000006)).

   Northrop Grumman argues that in New York, notice and proof of loss

requirements are liberally construed in favor of the insured, and that substantial—

not strict—compliance with the provision of such forms is all that is required.  (NG

Mot. to Recon. 15 (citing General Elec. Capital Corp. v. Royal Ins. Co. of Am., 205

613 N.Y.S.2d 392, 392 (App. Div. 1994)).)  Formal "magic words" are unnecessary.

(NG Mot. to Recon. 15 (citing Marino v. New York Tel. Co., No. 88 Civ. 5187 (PKL),

1992 WL 212184, at *13 (S.D.N.Y. Aug. 24, 1992)).)  Northrop Grumman also cites

Fulton Boiler Works, Inc. v. American Motorists Ins. Co., 828 F. Supp.2d 481, 496

(N.D.N.Y. 2011).

   The Court does not dispute these propositions.  However, Northrop Grumman

assumes they are sufficient to support its claim that that the January 1984 Letter

and the December 1983 Letter attached to it provided sufficient reference to the

Bethpage Community Park to constitute notice.  They are not.

   As stated, it is undisputed that claims and occurrences relating to the Old

Bethpage Landfill are not those relating to the Bethpage Community Park.  Indeed,

that is the basis for Northrop Grumman's argument that the Court misconstrued

the evidence relating to two Forms 10-K.  (See NG Mot. to Recon. 3.)  Northrop
Grumman argues that the Forms 10-K "neither refer nor allude to a possible claim
by the Town against Grumman for environmental occurrences at the Bethpage
Facility or Park."  (NG Mot. to Recon. 3.)

      This position is in tension with the argument that the January 1984 Letter
(with the December 1983 Letter attached) could provide sufficient "notice" of a claim
and occurrence at the Bethpage Community Park.  As set forth above, Northrop
Grumman argues that the December 1983 Letter—referring to "Site 130003" and
making a general statement related to damages "at and around" the referenced
site—is supportive of notice of possible contamination at the Bethpage Community
Park.  (Sept. 26, 2013 NG Letter in Further Supp. of Mot. to Reconsider 2, ECF No.
318 (referring to the "130003" reference in the 1983 Letter as the entire Bethpage
"facility complex and its environs, including the former Grumman property that had
become the Park in 1962." and arguing that "Century is thus wrong that the 1984
notice was insufficient to notify Century of one or more occurrences (including at
the Park) that later gave rise to the Town's claim").)

      Contrast this position with Northrop Grumman's position that this Court
erroneously found the Forms 10-K relevant to the Park in is July 3 Opinion.  The
1987 Form 10-K states, "The New York Department of Environmental Conservation
has re-classified the Company's principal facility in Bethpage, New York, as an
inactive hazardous waste site.  The Company has agreed in principle to conduct a
remedial Investigation/Feasibility Study to determine the extent, if any, a threat to

14

public health exists." (Cannella Reply Decl. Ex. 7.)  According to Northrop Grumman, this Form 10-K is limited to the Old Bethpage Landfill.

The NYSDEC letter discussed in the Form 10-K for 1987 notably also refers to "DEC Site No. 130003," changes the classification of the site from a 2a to a 2,[11] and states, "The reason for the change is as follows: Hazardous waste disposal confirmed, groundwater standards have been contravened."  (Cannella Reply Decl. Ex. 8, at NGINS000398059.)  Attachments to the NYSDEC letter indicate that there has been potential population exposure to contaminants. (Id., at NGINS000398062.)

Similarly, the 1988 Form 10-K again references the 1987 NYSDEC letter and the reclassification "of the company's principal facility in Bethpage, New York, as an inactive hazardous waste site" and adds, "It is not possible at this time to estimate the extent of the Company's responsibilities in the matter." (Cannella Reply Decl. Ex. 9.)  Again, Northrop Grumman argues that this Form 10-K is also limited to the Old Bethpage Landfill.

2.  The Newly Proffered Evidence

Northrop Grumman's arguments regarding the evidence to which this Court previously cited (in its July 3 Opinion) and its newly proffered evidence all seek to support one theme: Northrop Grumman cannot be tagged with having failed to provide notice of an occurrence at the Park (or a claim) when it simply had no idea one existed.  Northrop ignores the logical inconsistency between this position and

---

[11] A level 2 site is defined as "significant threat to the public health or environment – action required." (Cannella Reply Decl. Ex. 8, at NGSIN0003989063.)

its position that the 1983 and 1984 Letters provided notice of that as to which it was unaware. Northrop Grumman cannot have it both ways.

Northrop Grumman has proffered a number of additional exhibits in support of its position that it was not aware of an occurrence or claim relating to the Bethpage Community Park. (ECF No. 247.)

As support for not having a reasonable belief in an occurrence requiring notice, Northrop Grumman cites materials dated prior to 1983 to bolster its argument that it did not believe there was a reasonable possibility of a claim or occurrence at the Park at that time. (NG Mot. to Recon. 4–5 (citing Proffer Exs. 7, 10)). In addition, Northrop Grumman provides deposition excerpts for Steven Scharf (for the proposition that testing in the 1970s did not show leaching in the ground), Richard Walka (for the point that, until CERCLA was passed, drying sludge in the manner in which it had been dried was accepted practice, and in support of the argument that before CERCLA Grumman did not have reason to believe an occurrence or claim was possible), and Jean-Pierre Cofman (for the proposition that Grumman had no reason to believe that there was contamination at the Park until after 2000 or 2001). (Proffer Exs. 8–10.)[12]

---

[12] Northrop Grumman also includes excerpts from Gregory Fleming, the copyee on the 1984 Letter. He could not recall the meaning of handwriting on the document but did speculate (which, of course, would be inadmissible at trial) as to what it likely meant. (Proffer Ex. 15, at 26–27.) He testified that, at that time, the handwritten "C" or "FC" may have referred to a manual review of a claims file. He then speculated that this letter may have been a "first report" of a claim. (Id. at 28.) He testified clearly that he in fact had no recollection of the document. (Id. at 23 (prior to seeing the document at his deposition he had no recollection of seeing the document before).)

Northrop Grumman also proffers an excerpt of the deposition of Stephen Testa. He also did not recall seeing the 1984 Letter. (Proffer Ex. 16, at 44–45.) He was then asked about handwriting that he testified he did not recognize; he was then asked to interpret that handwriting. (Id. at 45, 47 ("I'm not sure what these dates are all being written and how they line up, or even who is writing

Additionally, Northrop Grumman includes a 1975 letter discussing contamination possibly emanating from the Hooker Plant (Heskin Decl. Ex. 9, ECF No. 80 (included in a binder handed up at oral argument on this motion)); a 1978 report from Geraghty & Miller providing results of a groundwater monitoring program and stating that water being "recharged" and subject to testing (not at the Bethpage Community Park) was of "generally better quality than that being pumped [out of the ground]" (Proffer Ex. 4 at NGINS 000768958); a letter dated in 1980 also referring to the Hooker Plant as the likely source of contamination (Proffer Ex. 9); a NYSDEC letter from 1980 stating that certain testing results are within regulations (Proffer Ex. 7, at NGINS000674669); and a 1980 report that states that the "site is considered a low priority for further EPA involvement at this time" (Proffer Ex. 8, at NGINS000619339).

Northrop Grumman further submits the declaration of Michael J. Tone, a former NYSDEC employee. (Proffer Ex. 17 ("Tone Decl.").) His declaration states that in 1981, NYSDEC undertook an investigation of contamination from a chemical plant (the "Hooker Plant"), adjacent to the western boundary of the Grumman Bethpage facility (versus the eastern side where the Park is located.) According to Tone, neither his White Plains NYSDEC office nor the Division of Environmental Enforcement conducted a study before 1984 similar to that conducted with respect to the Hooker Plant. (Id. ¶ 12.) He also states that, as of

---

them.").) Based on this speculation, Northrop argues that Testa's testimony is supportive of the 1984 Letter constituting a first report of a claim.

Neither the Testa nor the Flemming testimony would be admissible at trial in the manner in which it was here presented. Moreover, in any event, neither individual ties the "first report" of any incident to the Bethpage Community Park.

1983, the Grumman facility had not been classified as a Superfund (or "level 2") site; that did not happen until 1988. (Id. ¶ 13.)

Finally, Northrop Grumman also proffers a declaration from Michael Wolfert, a hydrogeologist. (Proffer Ex. 18.)  His declaration is submitted in support of Northrop Grumman's argument that it was reasonable for both Grumman and agency regulators to have believed that contamination under investigation in the 1970s relating to the groundwater originated with the Hooker Plant. (Id. ¶ 10.)

At the oral argument on this motion, Northrop Grumman conceded that it did not know about groundwater contamination at the Bethpage Community Park until the mid-2000s. (Hr'g Tr. 19, Sept. 12, 2013.)

### 3. Century's Arguments and Discussion

Century argues that the Court's original decision as to late notice should stand.  Century notes that at oral argument on this motion, Northrop Grumman conceded that it did not know about groundwater contamination at the Park until the mid-2000s. (Hr'g Tr. 19, Sept. 12, 2013.)  Thus, according to Century, Grumman simply could not have provided notice of an occurrence or claim as to something of which it was not itself even aware. (Sept. 16, 2013 Century Letter 1, ECF No. 310.)  As a logical proposition, this must be correct.  Under the case law, an insured party provides notice only after the insured is aware of a possible claim or is notified of a possible claim.  Indeed, how could anyone comply with the very

18

policy provision describing the content of the notice if the party providing the notice is not even aware of an occurrence or claim?  Plainly, this makes no sense.[13]

Northrop Grumman's proffer of new evidence supports this proposition.  The evidence that dates back to the 1970s and early 1980s demonstrates that Grumman's focus at the time was on the Old Bethpage Landfill and/or contamination that was on the western area of the Bethpage site—but as to which Grumman asserts it believed Hooker was responsible.  This evidence further confirms that there is no basis for a determination that Grumman believed in December 1983 to January 1984 that there had been an occurrence at the Bethpage Community Park or that a claim had been made with respect to the Bethpage Community Park.

Century has also submitted a NYSDEC letter dated October 31, 1986, which refers to the December 1983 Letter as a letter notifying Grumman of its "responsibility for the Hicksville/Bethpage property as an inactive hazardous waste site." (Sept. 16, 2013 Century Letter Ex. 4, at NGINS002362210.)  This letter also notes that an investigation on property adjacent to Grumman's (i.e., the Hooker Plant, per the handwritten notes on the document) may have groundwater contamination, and that monitoring wells might be required.  (Id.)

Century further argues that Northrop Grumman's admissions at oral argument that the 1984 Letter "wrongly" referred to the Old Bethpage Landfill also

---

[13] It is, of course, possible to be notified of a possible claim or occurrence that the Insured disagrees is legitimate or real.  That would still trigger a notice obligation.  Here, Northrop Grumman is not arguing it knew others thought there was a claim or occurrence and it simply did not believe them; it is arguing that it had no awareness of a claim or occurrence as to the Park at all.

indicate that—even if this Court were to find some basis in fact that Grumman believed a claim was being made with respect to the Park—the notice was plainly insufficient under the policy, if not also the case law.  The policy language relating to notice, as Northrop Grumman itself points out, requires that it provide its insurer with "reasonably obtainable information with respect the time, place and circumstances" of an occurrence or accident.  Furthermore, "If [a] claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process . . . ."  (Mem. of L. in Supp. of Travelers' and Century's Mot. for Partial Summ. J. ("Insurers' Mot.") App. B, at 1, ECF No. 247.)

Thus, Northrop Grumman could not have fulfilled the requirements of providing notice of an occurrence or of a claim unless it understood one had occurred or was being made.  It did not believe the 1984 Letter attached a "claim" about groundwater contamination at the Bethpage Community Park.  How could Century have intuited that as to which Grumman was not yet aware?

Century also argues that even if the 1984 Letter constitutes "substantial compliance" under New York law with the NYSDEC claim, it is not substantial compliance with a claim by the Town of Oyster Bay.  (Sept. 16, 2013 Century Letter 1.)

Based on the newly proffered evidence, this Court agrees that there is insufficient evidence on this record to find that Grumman knew of an occurrence at the Bethpage Community Park in the 1970s.  However, that same evidence, as well

20

as the additional pieces cited herein, supports the Court's determination that the same is true with respect to the Park in December 1983 or January 1984, and that Grumman did not believe that a claim had been made by the Town of Oyster Bay with respect to the Park in December 1983. Thus, there is no triable issue of fact as to whether Century received notice of an issue regarding the Park or a claim by the Town of Oyster Bay regarding the Park in January 1984. It did not and could not have.

These determinations, which alter the Court's prior rationale in its July 3 Opinion with respect to Northrop Grumman's duty to defend as to Century, bring us to 2002. In 2002, NYSDEC notified Northrop Grumman of a claim relating to the Bethpage Community Park. (May 2, 2013 Century Letter Attachment 1 (July 26, 2002 NYSDEC Letter), at NGSINS000011759, ECF No. 176.) On December 23, 2002, the Town of Oyster Bay notified Northrop Grumman of its intent to file suit with respect to groundwater contamination at the Bethpage Community Park. (Id. Attachment 2.) Despite the indisputable fact that as of 2002, Northrop Grumman was on notice of an occurrence at the Bethpage Community Park and a claim by the Town of Oyster Bay relating thereto, it did not provide notice to Century until 2005. Northrop Grumman prepared a "Town of Oyster Bay Bethpage Community Park, Investigation Sampling Program Field Report" in December 2003. (Id. Ex. 2.) A three-year delay constitutes inadequate notice as a matter of law. See, e.g., Eagle Ins. Co. v. Zuckerman, 753 N.Y.S.2d 128, 129 (App. Div. 2003); Travelers Indemnity Co. v. Worthy, 721 N.Y.S.2d 400, 401–02 (App. Div. 2001).

4. <u>Waiver of Notice</u>

In its motion for reconsideration, Northrop Grumman argues that, in any event, the timing of its notice to Century is irrelevant since Century waived its late notice defense as a matter of law. (NG Mot. to Recon. 17–19.) As an initial matter, this argument consumed all of a single paragraph in Northrop Grumman's initial motion papers on the duty to defend as to Century. (<u>See</u> Response of Northrop Grumman to Sur-Reply of Century 5, ECF No. 121.)

Waiver is an intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it; a waiver must be clear, unmistakable and without ambiguity. <u>See</u> <u>Professional Staff Congress-City Univ. of N.Y. v. New York State Pub. Employment Relations Bd.</u>, 857 N.E. 2d 1108, 1111 (N.Y. 2006); <u>see also</u> Gilbert Frank Corp. v. Federal Ins. Co., 70 N.Y.2d 966, 968 (1988) (waiver should not be lightly presumed). Waiver cannot be created by oversight or negligence. <u>Amerex Grp., Inc. v. Lexington Ins. Co.</u>, 678 F.3d 193, 201 (2d Cir. 2012).

However, waiver by an insurer may be inferred when an insurer disclaims coverage on grounds other than late notice. <u>See, e.g.,</u> <u>State of New York v. AMRO Realty Corp.</u>, 936 F.2d 1420, 1430 (2d Cir. 1990) (waiting 16 months to assert late notice defense despite availability of that defense constituted a waiver); <u>Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 96 (2d Cir. 2002).

Under New York law, inaction alone constitutes a waiver only when the insured has been prejudiced by the delay. <u>See</u> <u>Travelers Indem. Co. v. Orange &</u>

Rockland Utils., 905 N.Y.S.2d 11, 12 (App. Div. 2010) (finding that the lower court erred in finding a waiver based on the passage of time); Fairmont Funding, Ltd. v. Utica Mut. Ins. Co., 694 N.Y.S.2d 389, 391 (App. Div. 1999) ("Under the common-law rule, delay in giving notice of a disclaimer of coverage, even if unreasonable, will not estop the insurer to disclaim unless the insured has suffered prejudice from the delay.") (citations omitted); Vecchiarelli v. Continental Ins. Co., 716 N.Y.S.2d 524, 525 (App. Div. 2000) (same).

Northrop Grumman cites Long Island Lighting Co. v. Allianz Underwriters Ins. Co., 104 A.D.3d 581, 582 (N.Y. App. Div. 2013); Estee Lauder Inc. v. OneBeacon Ins. Group LLC, 62 A.D.3d 33, 35 (N.Y. App Div. 2009); and 151 E. 26th St. Assoc. v. QBE Ins. Co., 33 A.D.3d 452, 453 (N.Y. App. Div. 2006), for the proposition that inaction alone may waive a defense. (NG Mot. to Recon. 18.)  It has misapplied these three cases.

Long Island Lighting and 151 E. 26th St. are both single-page decisions with very little rationale.  In Long Island Lighting, the Appellate Division held that a determination on summary judgment of no duty to defend was premature "because issues of fact remain as to whether as to whether defendants waived their right to disclaim coverage" and found that a reasonable jury could conclude that the insurer had an obligation to provide a written disclaimer of coverage based on late notice. 104 A.D.3d at 581.  In 151 E. 26th St., the Appellate Division affirmed a denial of summary judgment, finding that the defendant insurer had waived its late notice defense by not raising it for three years; the court also noted the "unusual

circumstances presented" in that case.  33 A.D.3d at 453.  Neither case provides useful analysis that the Court can apply here.

In Estee Lauder, the court found that when an insurer asserts that no policy was in effect during the relevant period, and then also fails to assert an untimely notice defense (relying solely on lack of coverage), it can be deemed to have waived such defense.  62 A.D.3d at 38–39. There, the court found that in the event a trier of fact determined that a policy existed, failing to have disclaimed coverage under such policy at that late date (during a trial, for instance) would effect a waiver.  In this case, Century has not been able to locate the subject policies; however, it hardly waited until trial to assert its late notice defense; it included such a defense as to claims in its Answer.  (Answer to Crossclaims of Crossclaim-Defendant Century ("Century Ans.") 10–11, ECF No. 19.)

Northrop Grumman concedes that when Century answered its Counterclaims and Crossclaims, it specifically disclaimed coverage based on late notice of claim. (NG Mot. to Recon. 18.)  According to Northrop Grumman, however, Century's answer was insufficient to disclaim coverage based on late notice of occurrence or accident.  (Id.)  Northrop Grumman acknowledges that Century's Second Affirmative Defense does contain broad language.  (Id.)  That defense states:

> If any relevant Century policies are found to exist, there is or would be no coverage to the extent that the insured has failed to comply with all conditions precedent to coverage, including but not limited to the requirement that Century be given timely and adequate written notice of alleged claims and that the insured otherwise cooperate with Century.

(Century Ans. 10–11 (emphasis added).)  In this regard, Northrop Grumman's argument is, in essence, that while Century did not waive its late notice of claim defense, it did waive its late notice of occurrence defense.  This argument is unavailing. Century clearly intended to preserve all of its condition-precedent defenses; it so stated.  A waiver must be clear and unambiguous; that is the opposite of the facts here.  Moreover, as recited above, the law is clear that a finding of waiver must be based in part on prejudice to the insured.  See Fairmont Funding, 694 N.Y.S.2d at 391.

Northrop Grumman argues that a reasonable trier of fact could find that Century waived any form of late notice defense by taking no action after it was provided with notice of the TOB Action in 2005 and was asked to pay defense costs in 2009.  (NG Mot. to Recon. 19.)  In order to make such a determination, a trier of fact would have to be instructed to find and find prejudice to Northrop Grumman by any delay.  The record on this motion is silent as to any prejudice; a triable issue of fact on this issue has not been raised.

Century is entitled to raise its late notice defense, and it has done so. The Court finds that Northrop Grumman failed to comply with its condition precedent of timely notice of a claim or occurrence with respect to the TOB Action.  Century therefore has no duty to defend that action.  The Court denies the motion to reconsider its July 3 Opinion.

II.   THE TWO NEW MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Travelers has moved for partial summary judgment as to whether two environmental hazard policies cover the "Bethpage Facility Claim." The Court finds that, based on the undisputed facts, Northrop failed to comply with the notice requirements clearly set forth in either of the two policies.  Accordingly, neither policy covers the Bethpage Facility Claim.  Therefore, the Court grants Travelers' motion for partial summary judgment.

Separately, both Travelers and Century jointly move for partial summary judgment on the basis that Northrop failed to provide either with timely notice as to the "Calverton Site Claim."  The core of this dispute is whether certain activities including investigations and remediations occurring at the site previously were part of, or are separate from, the claim the Navy made in 2008 against Northrop for cleanup costs.

A. Standard on Summary Judgment

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing

26

all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations and citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

27

B.  <u>The Environmental Hazard Policies and the Bethpage Facility Claim</u>

Only a few undisputed facts are relevant to resolution of this motion.

Travelers issued an Environmental Hazard Policy to Grumman that covered the period from January 1, 1983 to January 1, 1984 at 12:01 a.m. (the "1983 EH Policy").  (Adams Decl. Ex. 1, at TRAV002358, ECF No. 251.)  The 1983 EH Policy number is TRL-EH-186T881-9-83.  (<u>Id.</u>)  The first page of the policy states "THIS IS A CLAIMS-MADE POLICY – PLEASE READ CAREFULLY." (<u>Id.</u>)

The 1983 EH Policy provides that it covers applicable bodily injury, property damage, or other economic loss which (1) arose out of an environmental hazard and (2) occurred in the policy territory, "**PROVIDED ALWAYS THAT** . . . Claim is first made against the **insured** and reported to The Travelers during the policy period, or during the extended reporting provision." (<u>Id.</u> at TRAV002361 (emphasis in original).)

The 1983 Policy defines the "Extended Reporting Provision" as follows:

> If The Travelers [or] the Insured first named in Item 1 of the Declarations Page <u>cancels or refuses to renew this policy</u>, and if the Insured first named in Item 1 of the Declarations Page pays, within 10 days of the termination date, a premium equal to 25% of the premium of this policy, The Travelers will consider any claim for damages sustained prior to the termination date of this policy, and made within 12 months of the termination date, to be a claim made during the policy period.

(<u>Id.</u> at TRAV002369 (emphasis added).)  For purposes of the Extended Reporting Provision, the termination date shall be the cancellation date if the policy is cancelled, or the expiration date if the policy is not renewed. (<u>Id.</u> at TRAV002364.) Northrop Grumman did not purchase the extended reporting period for the 1983 EH Policy.   On January 19, 1984, Travelers issued a second Environmental

Hazard Policy that covered the policy period from January 1, 1984 through January 1, 1985 at 12:01 a.m. (the "1984 EH Policy"). (Adams Decl. Ex. 2 (1984 EH Policy).) The 1984 EH Policy number is TRL-EH-186T881-9-84. This policy has the same language as that set forth above with respect to the 1983 EH Policy. Northrop Grumman did renew the policy and did not purchase the extended reporting period for the 1984 EH Policy.

In a letter dated December 6, 1983, the NYSDEC alleged that Northrop Grumman was subject to liability under CERCLA for response costs and damages to the "natural resources" of the State of New York at and around the Bethpage facility. (Adams Decl. Ex. 15, at CEN00001112.)[14] The letter is stamped "Received" by the Grumman legal department on December 13, 1983; it is stamped again by the Grumman Quality and Safety Department on December 15, 1983. (Adams Decl. Ex. 15, at CEN00001114.)

On January 11, 1984, R.J. Fitzpatrick of Grumman sent to E. B. Jacobs, Assistant Treasurer of Grumman, a copy of the December 6 letter, referring to it as a "letter of claim." On January 26, 1984, Jacobs of Grumman sent the December 6 NYSDEC notice of claim letter to Joseph A. Morgese of Frank B. Hall & Co., Grumman's insurance broker, requesting that the information be sent to Travelers. An employee of Frank Hall & Co., Magda Preisz, sent the letter with enclosures to

---

[14] This is the same December 1983 Letter discussed above in connection with Century's duty to defend.

Travelers at "339 Seventh Street" on January 30, 1984.[15]  (This is the January 1984 Letter.)

This chronology makes it clear that while Northrop Grumman received notice of the NYSDEC CERCLA claim in December 1983, it did not provide notice of that claim to Travelers until late January 1984 (at the earliest).  The question on this motion—the answer to which the Court finds dispositive—is whether the plain language of the 1983 EH Policy required that in order to have a claim covered by the policy, Northrop Grumman had to provide notice before the policy term ended, on January 1, 1984 at 12:01 a.m.  The 1983 EH Policy plainly so provided—as did the 1984 EH Policy.  Accordingly, Northrop Grumman failed to comply with the notice provisions of the 1983 EH Policy by receiving notice of a claim and not reporting that claim to Travelers before January 1, 1984.

Northrop argues that because it purchased the 1984 EH Policy, it received seamless coverage for all claims occurring and reported during the 1983 and 1984 periods.  It bases this argument, in part, on the fact that to find otherwise would mean that a party who cancelled or failed to renew the policy but paid for the extended reporting period, would receive more coverage than a party who had actually renewed the policy.  This is because once a party has paid the premium for the extended reporting period, they are able to report claims occurring during the prior policy period anytime during the next 12 months and still be covered.  A party that has simply renewed its policy, on the other hand, would be strictly required to

---

[15] The parties dispute whether the January 30, 1984 letter from Preisz to Travelers was itself received by Travelers.  There is no dispute that Travelers did not have an address at "339" Seventh Street in Garden City, New York.  The Court need not reach this issue to resolve the instant motion.

comply with the terms of the policy and report the claim within the same year it was notified of the claim. According to Northrop, this makes little business sense and would be inequitable. (See Northrop's Mem. of L. in Opp. to Travelers' Motion for Partial Summ. J. ("NG Opp. Bethpage") 11–15, ECF No. 291.) Northrop argues that the Extended Reporting Provision should "be read to allow a reasonable grace period of reporting 'eleventh hour' claims made against the policyholder toward the end of the claims-made period." (Id. at 15.)

Northrop's argument asks this Court to rewrite the clear and unambiguous language of the policy terms. There is no doubt that the policy makes it perfectly clear—and warns the policyholder in bold, capitalized letters—that it covers loss "**PROVIDED ALWAYS THAT** . . ." a claim is first made against the insured and reported to Travelers during the policy period. The phrase "provided always that" could not be less ambiguous. It does not provide room for a grace period of the type that Northrop understandably would like to have.

Prior cases have challenged whether claims-made and reported policies mean what they say, and courts have upheld their plain language. See, e.g., CheckRite Ltd. v. Illinois Nat'l Ins. Co., 95 F. Supp. 2d 180, 191 (S.D.N.Y. 2000) (claims-made and reported policies require that the insured report to its insurer within the policy period); National Waste Assocs., LLC v. Travelers Cas. & Sur. Co. of Am., 988 A.2d 402, 407 (Conn. Sup. Ct. 2008), aff'd, 988 A.2d 186 (Conn. 2010) (a precondition of coverage for a claims-made and reported policy is that the claim against the insured and the reporting of the claim to the insurer occur during the same policy period);

see also Executive Risk Indem., Inc. v. Starwood Hotels & Resorts Worldwide, Inc.,
951 N.Y.S.2d 13, 14 (App. Div. 2012).

Courts have routinely recognized that the hallmark of a claims-made and
reported policy is that the two requirements of making and reporting a claim occur
during the policy period.  See, e.g., Gs2 Eng'g & Envtl. Consultants, Inc. v. Zurich
Am. Ins. Co., No. 12 Civ. 2934 (CMC), 2013 WL 3457098, at *4 (D.S.C. July 9,
2013); Pennzoil-Quaker State Co. v. American Int'l Specialty Lines Ins. Co., 653 F.
Supp. 2d 690, 698 (S.D. Tex. 2009); Southern N.J. Rail Grp., LLC v. Lumbermens
Mut. Cas. Co., No. 06 Civ. 4946 (LAK) (AJP), 2007 WL 2296506, at *10 (S.D.N.Y.
Aug. 13, 2007).

Accordingly, by failing to report the Bethpage Facility claim to Travelers in
1983, the policy period in which a claim was made to Grumman, Grumman failed to
comply with the terms of its policy.  Therefore, the Court grants Travelers' motion
for partial summary judgment that the policies do not cover the Bethpage facility.

C. The Calverton Late Notice Issue

Travelers and Century together move for partial summary judgment that
they have no obligation to defend or indemnify Northrop Grumman for claims
arising from environmental contamination at the Calverton site.  (Insurers' Mot. 1.)
Both Insurers assert that Northrop Grumman provided late notice of the alleged
accident, occurrence or claim at Calverton.  (Id.)

According to the Insurers, the record evidence "conclusively" demonstrates
that Grumman knew of the existence of contamination at the Calverton site in the

1980s and 1990s, knew of its potential liability for cleanup costs relating to the site, and yet did not provide the Insurers with notice until 2008. (Id.) Northrop Grumman argues that while it knew of periodic spills and leaks on the site, it had no reason to believe that they were serious enough to constitute occurrences or to subject it to third-party claims, and therefore had no reason to provide notice before it did. (Northrop's Mem. of L. in Opp. to Insurers' Motion for Partial Summ. J. ("NG Opp. Calverton") 4, ECF No. 278.)  Northrop Grumman asserts that the only third-party claim it ever received was that from the Navy, with respect to which it provided the Insurers with timely notice. (Id. at 1.) In short, Northrop Grumman argues that the Insurers are pointing to isolated incidents in order to avoid paying a large liability. (Id.)

1. <u>Facts Relating to Calverton Motion</u>

The Navy acquired the Calverton site, a 6,000-acre property, in 1952, and constructed runways capable of handling combat aircraft.  Grumman began leasing the property from the Navy in 1954.  The Calverton site became a "government-owned, contractor-operated" ("GOCO") plant for the final assembly of Navy jets. (NG Opp. Calverton 3.)  Grumman installed electronic systems, tested engines, fueled and prepared jets, and trained personnel to respond to crashes.  (Id.) Grumman used spent fuel and waste solvents to feed simulated air crashes fires at the Fire Training Area on the site.  (Id.)

Grumman does not dispute that there were what it has characterized as isolated spills at various times on the site.  (NG Opp. Calverton 3–4; Cofman Decl. ¶¶ 13–20.)

The following documents establish that a reasonable person would have been on notice of an occurrence at Calverton, which is, at least in part, the subject of the Navy's CERCLA claim, not later than the mid-1990s.[16]

In December 1986, an Initial Assessment Study ("IAS") was performed at Calverton.  (Cannella Decl. in Supp. of Travelers' and Century's Mot. for Partial Summ. J. ("Cannella Decl.") Ex. 6, at NGINS00415422, ECF No. 239).  That study set forth its purpose as "identifying and assessing sites posing a potential threat to human health or to the environment due to contamination from past hazardous materials operations.  (Id. at NGINS000415423.)  That study states that "both surface and groundwater are potential contaminant migration pathways.  Surface water drains east from the swamp areas in the southern, developed part of the activity, in the Peconic River, and empties into the Great Peconic Bay."  (Id.)

The study finds that four areas at the Calverton site require further investigation: the Northeast Pond Disposal Area, the Fire Rescue Training Area, the Picnic Grounds Disposal Area, and the Fuel Calibration/Engine Run-Up Area.

---

[16] As the Second Circuit found with respect to Judge Sand's determination regarding the accrual of an occurrence, this is "generous."  Olin Corp. v. Insurance Co. of North Am., 966 F.2d 718, 724 (2d Cir. 1992).  In fact, there are sufficient facts to find that the occurrence had accrued and notice should have been provided several years earlier.  The law does not require that this Court find the first date—or find only one date—on which the obligation accrued to provide notice of an occurrence.  See id.  It is sufficient that the Court determine that the obligation to provide notice accrued on a date "not later than 'x'"—which is precisely what the Court has done here.  See id.

(Id. at NGINS000415424.)[17]  The study states that the Navy schedules

"Confirmation Studies" for those sites which have been determined by scientific and

engineering judgment to be potential hazards to human health or to the

environment." (Id. at NGINS000415425.)  The Northeast Pond Disposal Area (id. at

NGINS00415443), the Fire Rescue Training Area (id. at NGINS00415447), the

Picnic Grounds Disposal Area (id. at NGINS00415449), and the Fuel

Calibration/Engine Run-Up/Fuel Depot Areas (id. at NGINS00415452) were all

recommended for such Confirmation Studies.  (See also id. at NGINS00415459.)

As part of obtaining a permit under the Resource Conservation and Recovery

Act ("RCRA"), NYSDEC conducted a site investigation of Calverton in 1990 that

"revealed investigative and remedial activities being undertaken" at the Fire

Rescue Training Area and the Fuel Calibration Area. (Cannella Decl. Ex. 1 (Letter

re: Part 373 Permit Application).)  Grumman was notified that those two areas were

recommended for additional "corrective action" under RCRA on October 15, 1990.

(Id.)  A RCRA Facility Assessment Report provided to Grumman, which was

prepared in 1991 and revised in 1992, stated that a visual site inspection of three

areas indicated a need for further investigation: the Northeast Pond Disposal Area,

the Fire Rescue Training Area, and the Fuel Calibration Area. (Cannella Decl. Ex.

2, at NGSINS001881332.)[18]

---

[17] These are among the areas that are repeatedly discussed in connection with contamination going
forward.

[18] The same report notes contamination of groundwater at a lake on the site (the "McKay Lake") as
exceeding allowable limits.  The lake at Calverton received much attention over the years, and a
number of the documents Northrop Grumman has submitted in opposition to this motion relate to
cleanup efforts at the lake.  See, e.g., Scanlon Decl. Ex. 12.  The success of the Insurers' motion does
not, however, depend on the success or failure—or on Northrop Grumman's state of mind—with

In April 1992, the Environmental Protection Agency (EPA) issued Grumman a RCRA permit. (Cannella Decl. Ex. 3.) Receipt of a RCRA permit itself does not mean that a permittee has experienced a reportable occurrence. Rather, RCRA is a regime established by the EPA to allow disposal of hazardous waste to permittees subject to certain maintenance and corrective action requirements. 42 U.S.C. §§ 6921–6931. The permit requires that the permittee "[d]etermine the nature, extent, direction and rate of migration of hazardous waste," and "develop appropriate corrective action for any such releases." (Cannella Decl. Ex. 4.) It also requires that the permittee comply with land disposal restriction and also comply with other regulatory requirements. (Id.)

In a section of the materials provided to Grumman with its initial RCRA permit, the EPA enclosed a "Module III" which set forth "Corrective Action Requirements." It states that "corrective action" is required for all releases of hazardous waste. (Id. at NGINS002376830.) The corrective action process is staged and involves a RCRA Facility Assessment ("RFA") that includes a preliminary review ("PR"), a visual site inspection ("VSR"), and a sampling visit ("SV"). (Id.) If the RFA process concludes that there is a need for further investigative corrective action, there will be a request for further investigation ("RFI") in order to identify sufficient corrective measures to address the issue. (Id. at NGINS002376831.) Once an RFI is completed and a report prepared, corrective measures ("CM") may be imposed. (Id.) To determine appropriate CMs, a corrective measures study ("CMS")

---

respect to cleanup at the lake. The Insurer's motion focuses on occurrences at the Northeast Pond Area, the Fire Rescue Training Area and the Fuel Calibration Area. These areas were themselves subject to investigation and remediation efforts.

is prepared. The CMS "may be required if individual concentrations of hazardous constituents are at or below their action levels, but they still may pose a threat to human health or environment due to site-specific exposure conditions." (Id.) Thus, "corrective measures" is a term of art applicable where hazardous waste levels "may pose" a threat to human health or the environment.

In April 1992, Halliburton prepared a "Final Site Investigation" for the Navy relating to Calverton; this report was provided to Grumman. (Cannella Decl. Ex. 5.) Testing of certain groundwater found "significant volatile organic contamination in two monitoring wells . . . . Both of these wells are adjacent to the southern edge of the fuel calibration pad. . . . Elevated concentrations of lead were found in unfiltered aqueous samples collected at several of the monitoring wells." (Id. at NGINS00413306.) The report further stated that "[t]he results of sampling and analysis confirmed the presence of significant soil and groundwater contamination at the fuel calibration area of Site 6A. The primary contaminants found were chlorinated and non-chlorinated volatile organics and semi-volatile organics. Significant lead contamination of the groundwater was also observed." (Id. at NGINS00413309.) The report also stated that "chemical analysis of the seven monitoring wells sampled in the fuel depot area . . . indicate[s] significant volatile organic and lead contamination." (Id. at NGINS000413324.)

In April 1992, the Navy sent Grumman a letter inviting it to participate in the Navy's U.S. Restoration ("IR") Program as a member of the Technical Review Committee. (Cannella Decl. Ex. 6.) The purpose of the Committee would be to

37

actively participate in the development of the scope of work for continued Remedial Investigations for Calverton and assist in the selection of "remedial technologies" for identified issues.  (Id. at NGINS00415326.)  The attached report notes that the operation began in 1950 and continuing to 1992, and that hazardous waste was generated on the site by the manufacturer (Grumman).  (Id. at NGINS00415332). With respect to a study of the "ground water pathway," the report states that there is a "suspected release to ground water," and that the primary target population that could be impacted was 2800.  (Id. at NGINS000415333.)  It also states that there were both municipal and private wells groundwater wells within four miles. (Id. at NGINS000415333.) The report further notes that there are fisheries along the "surface water migration path" and that secondary target fisheries included the Peconic River and the Peconic Bay.  (Id. at NGINS000415335.) The same entry also notes that there are wetlands along the surface water migration path.  (Id.)

The report also states that numerous criteria indicate the "Suspected Release" of contaminants into groundwater.  For example, the report states that sources of supply are poorly contained, that the infiltration rate is high, that the subsurface is highly permeable or conductive, that drinking water is drawn from a shallow aquifer, that suspected contaminants are highly mobile in groundwater, and that analytical or circumstantial evidence suggest groundwater contamination. (Id. at NGINS000415338.) On the same page, the report notes that "contaminants identified include halogenated and non-halogenated volatile organic compounds, petroleum hydrocarbons, and metals including lead. Similar contaminants were

38

identified in individual site soils . . . .  Additionally, trace levels of halogenated volatile organic compounds were identified in Calverton drinking water production wells nos. 2 and 3." (Id.)

The Summary page of the report states that there is a "high possibility of a threat to nearby drinking water well(s) by a threat of migration of hazardous substance in ground water." (Id. at NGINS000415360 (emphasis added).) The report further states that 2800 people are served by the threatened wells—the same number of people the report earlier referred to as the primary target population that could be impacted. (Id.)  Finally, the report identifies the Peconic River, the Peconic Bay, tributaries to the Peconic River, and the Northeast Pond as areas in which fisheries, wetlands, and critical habitats might be threatened due to groundwater migration. (Id.)

In May 1992, the Navy notified Grumman that a preliminary assessment of the Calverton site had been performed, and invited Grumman to participate in the "RI phase." (Cannella Decl. Ex. 7, at NGINS001127214.)  The letter notes, "Participation or nonparticipation does not change the final liability for cleanup costs.  However, participation by the contractor may provide him a greater degree of control over the costs as well as an assurance that cost effective methods are being used." (Id.)  That same letter enclosed guidelines stating, "Absent special contractual provisions to the contrary, Navy policy is to require current GOCO contractors to pay for any and all cleanup costs associated with their operation of

Navy facilities." (Id., at NGINS001127215.)  On June 18, 1992, Grumman declined

to participate in the RI phase.  (Cannella Decl. Ex. 8, at NGINS001139453.)

In 1993, the NYSDEC determined that certain areas within the Calverton

site should be reclassified as "Class 2" sites, but that there was a potential political

issue because the site had been identified as the possible location for an

international airport.  (Cannella Reply Decl. Ex. 3, at NGINS000621212.)  The Fire

Rescue Area and the Fuel Calibration Area were specifically identified as areas

with significant contamination.  (Id. at NGINS000621214.)  A 1993 NYSDEC

Inactive Hazardous Waste Disposal Sites report lists Calverton as a Class 2 site,

and referenced the Fire Rescue Training Area and the Fuel Calibration Area as

subject to corrective action.  (Cannella Reply Decl. Ex. 4, at 1-275.)  The report also

notes that groundwater and drinking water are in contravention of standards and

that "contamination at this site has moved into the sole source aquifer, which is

used as a drinking water source."  (Id. at 1-276.)

On April 27, 1993, the NYSDEC noted that Calverton had been reclassified to

a Class 2 site due to "a significant threat" that was "due to the hazardous wastes

(known to have been disposed of at the site) contaminating the groundwater in

excess of New York State groundwater standards.  The site sits on a sole source

aquifer that is threatened."  (Cannella Reply Decl. Ex. 5, at NGINS000647479.)  The

document states that the site has been given "a priority status of I."  (Id.)

On February 10, 1994, Grumman notified the Navy that it intended to cease

operations at the Calverton site.  (Cannella Decl. Ex. 11.)

By July 14, 1994, John Ohlmann, then Assistant Director of Environmental Engineering at Grumman, had increased his estimate of combined cleanup costs: Bethpage and Calverton were together estimated to amount to $5,939,097 in actual costs for 1993; an additional $5,360,000 in anticipated costs in 1994; and an additional $4,450,000 in 1995.  (Cannella Decl. Ex. 10, at NGINS000368026.)

In October 1994, the Navy provided Grumman with tasks that it was required to complete before termination.  (Cannella Decl. Ex. 11.)  In a section entitled "Remediation Activities," the document states, "[w]hen Northrop Grumman vacates the facility the plant will be closed.  The Navy does not anticipate any action in this area subsequent to the plant being closed.  However, [Grumman] must continue any cleanup operation initiated until the effort is complete or action has been determined to be completed by NYSDEC and/or the EPA."  (Id. at NGINS000226730 (emphasis added).)

On December 14, 1994, Ohlmann reported to a distribution list on "Environmental Remediation."  (Cannella Decl. Ex. 12, at NGINS000372748.) Enclosed in that report were two forms filled out with respect to Calverton.  (Id. at NGINS00372760, NGINS00372762).  The reporting form notes that the McKay Lake has been contaminated with chromium and lead, and that it is unknown whether the costs are covered by insurance.  (Id., NGINS000372760– NGINS000372761.)  The form also states, "Calverton site is a GOCO facility also contaminated requiring groundwater/soil remediation – est. Navy cost $15,000,000. Potential claim against Northrop Grumman as GOCO operator for part of these

costs." (Id. at NGINS000372761.)  The second form relating to Calverton notes that the "project phase" has not been started, that the contaminated media are not known, that the potential for a decrease in property value was "high," that costs were anticipated to continue to 1998, and that it was "unknown" if those costs were covered by insurance.  (Id. at NGINS000372762–NGINS000372763.)

On January 24, 1995, Grumman sent the Navy an "Agreement to Assure Cleanup Liabilities Are Met After Termination of Lease – Calverton Facility." (Cannella Decl. Ex. 13 (emphasis added).)  That agreement states, "[P]lease be assured that Grumman will meet all the requirements of our Approved State RCRA Permit."  (Id. at NGINS000373588.)  The agreement also states that Grumman is in the process of "Phase I" and "Phase II" Environmental Assessment and notes that "[t]hese efforts, as well as future environmental assessments, will be coordinated with the [NYSDEC]."  (Id.)

On March 23, 1995, Ohlmann sent a memorandum to a distribution list at Grumman regarding "Environmental Remediation."  (Cannella Decl. Ex. 14, at NGINS000373411.)  This memorandum also contains two forms relating to Calverton.  The first form states a Navy estimate of $15,000,000 in cleanup costs and a potential claim against Grumman as a GOCO operator.  (Id. at NGINS000373424.)  The second form also notes that costs for Phase I and II assessments would continue through 1998.  (Id. at NGINS000373426.)

On June 15, 1995, Ohlmann sent another memorandum on "Environmental Remediation" to a distribution list at Grumman.  (Cannella Decl. Ex. 15.)  Again,

the memorandum contains two forms relating to Calverton, which state the $15 million estimated cost and potential claim against Grumman, as well as that Phase I and II <u>assessments are ongoing</u> and that costs relating to the assessments are expected to be incurred into 1998. (<u>Id.</u> at NGINS000373958–60.)

In August 1995, Halliburton provided the Navy and Grumman with a RCRA Facility Investigation report relating to Calverton.  (Cannella Decl. Ex. 16.)  The report contained conclusions with respect to the Northeast Pond Area, the Fire Training Rescue Area, and the Fuel Calibration / Engine Run-Up Area.  (<u>Id.</u>)

With respect to the Northeast Pond Area, the report concluded:

- Metals, including chromium . . . , hexavalent chromium . . . , copper . . . , lead . . . , silver . . . , nickel . . . , and zinc . . . were detected in a portion of the site soils (fill) at concentrations approximately 100 to 1000 times the corresponding background concentrations . . . .
- PCBs . . . , pesticides . . . , and other semivolatile organics . . . were detected throughout the fill material. . . .
- In general, [volatile organic compounds] were detected sporadically and at relatively low concentrations in the fill material. . . .
- Testing of the sediments in the Northeast Pond found 4,4 DDD . . . and other pesticides, PCBs . . . , lead . . . , and other metals, and PAHs . . . at concentrations which exceed [NYSDEC] sediment standards for protection of aquatic life. . . . [M]igration from the fill material to the sediments by groundwater transport cannot be ruled out. . . .
- Pesticides were detected throughout the pond sediments. . . .
- The extent of groundwater contamination is only partially characterized in both horizontal and vertical directions. . . .
- [U]nder a hypothetical future resident land use scenario, adverse risks to human health would be expected from both direct contact with the soils and domestic use of groundwater. . . .
- Based on the exceedence of NYS sediment and surface water standards, adverse impact to aquatic life and other pond inhabitants is possible.

(Id., NGINS0004200420053–NGINS0004200420055.)

With respect to the Fire Training Area, the report concludes:

- VOCs were detected at relatively high concentrations in the Fire Training Are soils . . . .
- PCBs . . . , pesticides . . . , and other semivolatile organics (including PAH and phthalates) were detected in several soil samples.
- Metals including antimony . . . , lead . . . , and selenium . . . were detected in the soil at concentration levels greater than background levels. . . .
- Based on the similarity between the chemicals found in the site soils and groundwater, it is likely that chemicals in the site soil have affected groundwater.
- Floating free product has been identified at the site. The location of the free product corresponds to the location of the most contaminated groundwater. . . .
- The baseline risk assessment found that adverse risks to current workers may be present with PCBs . . . in the surface soils . . . .  Under a hypothetical future residential land use scenario, much greater adverse risks to human health would be expected from both direct contact with the soils and domestic use of groundwater. . . . The primary contaminants of concern for future residents include solvents, PAHs, PCBs, arsenic and manganese.

(Id. at NGINS000420058–NGINS000420060). The report notes that "unacceptable

risks to current workers and to potential unrestricted future users of the site exist."

(Id. at NGINS000420060.)

With respect to the Fuel Calibration Area, the report concludes:

- Groundwater testing found VOCs including chloroethane . . ., trichloroethane . . . , toluene . . . , and xylenes at concentrations above Federal MCLs and/or NYS groundwater quality standards.  Semivolatile organics . . . were also found at levels exceeding Federal MCLs and/or NYS groundwater quality standards. . . .
- Under a hypothetical future residential land use scenario, adverse risks to human health would be expected from both direct contact with the soils and ingestion of groundwater.

(Id. at NGINS000420063–NGINS000420064.)  The report states that "unacceptable

risks to potential unrestricted future users of the site exist," and recommends that

contaminated soils should be addressed during a corrective measures study."  (Id. at

NGINS000420064–NGINS000420065.)

44

A Technical Review Committee meeting that Ohlmann of Grumman attended addressed contamination at Calverton. (Cannella Decl. Ex. 18, at NGINS002377553, NGINS002377561.) At that meeting, the NYSDEC asked if the Navy would be responsible for contamination found in the future. The Navy indicated that they, as the former landowner, would come back and address the newly discovered areas of contamination. The Navy and Grumman would work out the details internally. (Id. at NGINS002377555.)

In September 2002, the Navy and the NYSDEC issued a "Record of Decision" ("ROD") relating to the Northeast Pond Disposal Area. (Cannella Decl. Ex. 20.) The ROD notes, "Actual or threatened releases of hazardous substances from this site, if not addressed by implementing the response action described in this [ROD], present a current or potential threat to human health and the environment." (Id. at NGINS000646676.)

In January 2003, the Navy and the NYSDEC issued an ROD with respect to the Fuel Depot Area. (Cannella Decl. Ex. 21.) That ROD also notes, "Actual or threatened releases of hazardous substances from this site, if not addressed by implementing the response action described in this [ROD], present a current or potential threat to human health and the environment. (Id. at NAVCAL0022271.)

A 2004 RCRA Corrective Action document states that groundwater and surface soil at the Calverton site were above "appropriately protective risk-based 'levels.'" (Cannella Decl. Ex. 22, at NGINS000008730.)

45

On July 22, 2008, Northrop Grumman sent Travelers an email indicating that the Navy had incurred at least $21.3 million in cleanup costs associated with the Calverton site, and that Northrop Grumman intended to enter into a tolling agreement with the Navy regarding that claim unless it heard an objection from Travelers. (Cannella Decl. Ex. 24, at TRAV035648.) On July 23, 2008, Travelers responded that it deemed the email as tendering the matter to Travelers for coverage but requesting additional information including details of Northrop Grumman's involvement with the site. (Cannella Decl. Ex. 26, at TRAV035656.)

Northrop Grumman argues that several facts support its position that, until the mid-2000s, it did not reasonably believe a claim would be asserted against it, and that there had been no reportable occurrence of which it was aware at Calverton. As a threshold point to try and tie its argument together, Northrop Grumman focuses on the current assertions regarding spreading contamination referred to as the "Southern Area Plume." (NG Opp. Calverton 15, 22.) Northrop Grumman's argument that it did not know of an occurrence or possible claim is premised on a lack of knowledge with respect to this particular plume. That both ignores the factual evidence that the Southern Area and groundwater contamination had long been known (see facts recited above) and reads its own obligation far too narrowly in light of the ample evidence of significant contamination (recognized in 1986 as potentially migrating offsite to, for instance, the Peconic River).

46

Nonetheless, in support of its argument, Northrop Grumman has proffered the declaration of Michael Wolfert, a hydrogeologist who examined the Fuel Depot area (also referred to as Site 6A). (Wolfert Decl. ¶ 4, ECF No. 278.) He states that in 1994–1997, his firm performed sampling activities at McKay Lake on the Calverton site, and that the sampling did not reveal any actionable levels of contamination. (Id. ¶ 5.) He states further that even if contamination had been detected in the Lake, "it would not have contributed to the Southern Area Plume" due to difference in groundwater flow direction." (Id. ¶ 6.) Wolfert cites additional testing of the Lake in 1998 that determined that no further action was necessary at the Lake. (Id. ¶ 7.)

Wolfert also states that the directional flow of groundwater from the Northeast Pond Disposal Area cannot contribute to the Southern Area Plume. (Id. ¶ 8.) He acknowledges that testing of the Northeast Pond Disposal Area did detect some "constituents to be above New York State Standards." (Id.) He opines that this may have derived from landfill material intrusion from around wells in the vicinity, rather than from releases in the Northeast Pond Disposal Area itself. (Id.)

Wolfert also opines that the distance and directional flow of groundwater at the Fire Training Area precluded that groundwater from contributing to the Southern Area Plume. (Id. ¶ 9.) Similarly, Wolfert opines that the Fuel Depot Area is also sufficiently distant from the Southern Area Plume also precludes this area from contributing to it. (Id.)

47

Notably, Wolfert concedes that the Fuel Calibration area did contribute to the Southern Area Plume, but that the Plume was not identified "until after Northrop Grumman left the facility." (Id. ¶ 11.)[19]

Northrop Grumman has also submitted a declaration from an employee, John DeBois, Director of Contracts at the company. (DeBois Decl. ¶ 1, ECF No. 278.) He was the Manager of Contracts and Pricing in 1994 when Northrop Grumman notified the Navy that it intended to terminate its use of the Calverton site. (Id. ¶ 5.) In that position, he approved the lease amendments that set forth the activities that Northrop Grumman was required to complete prior to termination. (Id. ¶ 7; see also Cannella Decl. Ex. 13.) DeBois states, "It was understood that after Grumman completed the specific closure activities set forth in Attachment (1) to Amendment No. 3, Grumman's responsibilities at the Calverton site were completely terminated and it would have no further liability at the site." (DeBois Decl. ¶ 7.)

DeBois further points to certain language in the fourth amendment to the lease as confirming the end of any obligation Grumman had with respect to the Calverton site: "Grumman and the Navy 'hereby waive and release each other from all claims and requests for equitable adjustment, both known and unknown, arising from, or related to,' the Calverton lease." (Id. ¶ 10.) He states that this language "reflected the understanding" that Grumman would have no further obligation to

---

[19] Wolfert's declaration is necessarily a hindsight perspective, unlike the evidence shown by contemporaneous documents. Moreover, there is no evidence that a decisionmaker at Northrop Grumman—deciding whether to provide notice to the Insurers at the time—had access to any similar opinions by a hydrologist as to each area.

48

the Navy for any cleanup costs the Navy might incur in the future under its own

Installation Restoration ("IR") program or in response to liability under CERCLA.

(Id. at ¶ 11.)  He states that the first time that he heard that the Navy would

pursue Grumman for costs associated with cleanup at the site was when the Navy

threatened to file suit in July 2008.  (Id. ¶ 12.)

    Northrop Grumman has also submitted a declaration from John Cofman, a

retired employee whose responsibilities included oversight and design of

wastewater treatment facilities and chemical process operations starting in 1982.

(Cofman Decl. ¶ 1, ECF No. 278.)  He states that as part of its termination activities

in connection with the Calverton site, Grumman conducted various assessments.

(Id. ¶ 7.)  He states that after completion of the activities upon which Northrop

Grumman and the Navy agreed, "it was understood that Grumman had

satisfactorily performed the assessments and addressed the areas to be investigated

on the property."  (Id. ¶ 8.)  He also states, "Grumman did not participate in the

Navy's technical review committee for the site, nor did Grumman participate in the

Navy's Restoration Advisory Board," which he understood began meeting in 1998,

after  Northrop Grumman had left the site.  (Id. ¶ 9.)

    According to Cofman, "Grumman was not aware of off-site environmental

contamination or off-site injury to natural resources arising from operations at the

Calverton site at the time it vacated the site in 1996."  (Id. ¶ 10.)  He states that the

first notification of "any liability claim by the Navy against Grumman relating to

Calverton was on July 16, 2008, when Grumman received a phone call from the

Department of Justice concerning a threatened court action under CERCLA." (Id. ¶ 10.)

Cofman acknowledges that in the May 2012 ROD for Calverton, the Navy stated that the offsite volatile organic compound ("VOC") plume was caused by releases from the Fuel Calibration Area, and that the VOCs had migrated downgradient toward the Peconic River. (Id. ¶ 12.) He states, "Offsite contamination of groundwater attributed to releases at these locations was not identified by the . . . assessments Grumman conducted before it vacated the facility in 1996." (Id. ¶ 12.)

Cofman also states that while Grumman knew of spills at Calverton, they were considered minor events and "presented no third-party liability exposure at the time, and were promptly addressed under spill regulations and permit requirements." (Id. ¶ 14; see also id. ¶¶ 16–20.)

Cofman states that while Grumman did investigate McKay Lake prior to leaving the site, by the mid-1990s, the NYSDEC concurred that no further action needed to be taken with respect to the Lake. (Id. ¶ 28.)

Cofman recognizes that at the September 17, 1996 Technical Review Committee meeting (which Grumman personnel attended, as set forth above), the Navy agreed that it would be responsible for any contamination found in the future and that it would work out the details internally with Grumman. (Id. ¶ 29.) Cofman states that this was his understanding as well. (Id.) According to Cofman, based on the release language in the fourth amendment to the lease, as well as on

the fact that the Navy applied for and received its own RCRA permit after Grumman vacated the site, he believed that the Navy had taken any responsibility for the site. (Id. ¶ 31.) Finally, he states that none of the lease closure activities in which Northrop Grumman engaged prior to vacating the site revealed that the VOC groundwater plume identified in the Navy's 2012 ROD had migrated away from the southern boundary of the facility. (Id. ¶ 33.) He did not believe that "any liability claims by third parties were brought or potentially would be brought against Grumman for costs associated with any environmental contamination in the vicinity of the Calverton facility." (Id. ¶ 34.)[20]

Northrop Grumman also points to documents that it asserts support its reasonable belief that that the incidents at Calverton are unrelated—at least legally—to that which forms the basis for the Navy's claim in 2008. (Scanlon Decl. ("Scanlon Decl."), ECF No. 278.)

Northrop Grumman asserts that a 1995 RCRA Facility Investigation Addendum supports its view that there was basis for a reasonable belief that no claims would be made against it with respect to the Calverton site. (Scanlon Decl. Ex. 8.) This report contains mixed results as to contamination testing for various parts of the Calverton site. (See id.) It mentions that groundwater samples were collected at the Northeast Pond Disposal Area in March 1995. (Id. at NGINS000612787.) Testing of these samples revealed that for "metals and cyanide data, the majority of the chemical concentrations were the same, or decreased

---

[20] In addition, in depositions, a Northrop Grumman employee testified that he did not believe Grumman would be held liable for site wide remediation until 2008. (Scanlon Decl. Ex. 23 (Dep. of Peter D. Fahrenthold), at 596, ECF No. 278.)

slightly between the August 1994 and March 1995 sampling events." (Id.)

However, the document continues:

- Antimony was detected in three March 1995 samples only. Antimony was not detected in any August 1994 samples. . . . Two of the three results were greater than the Federal MCL of 6 ug/l.
- Lead was detected in all four August 94 samples and three March 1995 samples. The New York State Preliminary Remediation Goal (PRG) for lead is 15 ug/l. The August 1994 results ranged from 3.6 to 45.3 ug/l and the March 1995 results ranged from 2.0 to 110 ug/l.
- Manganese was detected in all samples during both sampling rounds. . . .
- Mercury was detected in two August 1994 samples and three March 1995 samples at low levels. . . .
- Silver and cyanide were detected in only one March 1995 sample. . . .
- Thallium was detected in one sample during August 1994 and 2 samples during March 1995. . . .
- Zinc was detected in all samples during both sampling rounds. . . .

Overall, a comparison of analytical results from the two rounds of groundwater sampling found no significant difference.

(Id. at NGINS000612788–NGINS000612790.)

With respect to the Fire Training Area, the report also notes:

Fourteen VOCs were detected in one or more samples collected during both sampling rounds. . . .
SVOCs were detected in samples from four of eleven monitoring wells in both August 1994 and March 1995. . . .
Pesticides were detected in five of eleven monitoring wells sampled in August 1994, but only one of eleven monitoring wells sampled in March 1995. . . .
PCBs were detected in samples from five out of eleven monitoring wells during both sampling rounds. . . .
Overall, a comparison of analytical results from the two rounds of groundwater sampling found no significant difference.

(Id. at NGINS000612791–NGINS000612792.)

Northrop Grumman offers Amendment No. 3 to the lease to show that it reasonably believed it had to accomplish only a discrete list of tasks before being relieved of all present and future obligations. (Scanlon Ex. 11.) However, that

document also stated that the "lessee [Grumman] indemnifies the U.S. Government of all liabilities associated with the performance of or resulting from A through CC." (Id. at LZIA-044.)  It is also clear from this document that the tasks identified had very little to nothing to do with the problems relating to contamination discussed in other documents.  For instance, with respect to the Fuel Depot Storage area, the only task listed was "[r]egrade and concrete repair including protective sealer coating to be applied based on weather."  (Id. at LZIA-044, task D.)  For the Fuel Depot, the only task listed was "[c]oncrete sealer coating of secondary containment structure."  (Id., task N.)  For the Fuel System Test Lab, the report notes, "Phase II Site Assessment sample borings indicate a high level of contamination of semivolatile organic compounds. . . . Lessee's financial responsibility will be assessed during the IR Program process."  (Id., task CC.)  The "[c]ompletion date" for that task is listed as "not applicable."  (Id.)

Northrop Grumman also points to a 1996 ROD for McKay Lake proposing that no further action be taken.  (Scanlon Decl. Ex. 12, at NGINS000418029.)

A January 1997 RCRA Facility Assessment for Calverton submitted by Northrop contains no assessment of the Fire Rescue Training Area, the Fuel Calibration Area, or the Northeast Pond Area.  (Scanlon Decl. Ex. 14.)  The assessment does, however, report on the "Southern Area."  (Id. at NGINS000638154.)  It states that, while certain contaminants were detected, no further action was recommended under the IR program.

A separate RCRA Facility Investigation report was prepared in January 1998. (Scanlon Decl. Ex. 15.)  With respect to the Fuel Calibration Area, that report noted, "Deep groundwater contamination (greater than 80 feet below ground surface) at the old fuel calibration pad and chlorinated-VOC contaminated groundwater south and east of this area will be addressed in the <u>Southern Area</u> investigation." (<u>Id.</u> at NGINS000978934 (emphasis added).)  The report also found that "a relatively small area . . . of fuel-type VOC contaminated groundwater is present at this area. . . . The contaminated groundwater has not migrated any significant distance . . . ." (<u>Id.</u>)  Furthermore, the report states, "Soil contamination has been identified at a depth which corresponds to the free floating product and contaminated groundwater." (<u>Id.</u>)  Finally, the report explains, "The free-product plume that was being addressed by Northrop Grumman still exists.  The Navy will proceed with an Interim Remedial Action to re-initiate free-product recovery at this site through an Action Memorandum (AM)." (<u>Id.</u>)

Notably, however, the report notes that, with respect to the Southern Area, "[a] relatively large (approximately 160 acres) but low concentration chlorinated <u>VOC groundwater plume is present in the Southern Area</u>.  The contamination extends to a maximum depth of 60 to 80 feet below the water table." (<u>Id.</u> at NGINS000978972 (emphasis added).)  It also states, "Water use at the gun club is a potential receptor pathway for this contaminated groundwater.  Also, the groundwater may discharge into the Peconic River." (<u>Id.</u>)

In September 1998, the fourth amendment to the lease, a two-page document containing the so-called "release" language, was executed. (Scanlon Decl. Ex. 17, at NAVCAL0051549.)  The amendment states that the tasks identified in the third amendment to the lease agreement have been "completed."  (Id.)  It also states, "The Lessee and the Government agree that this amendment represents the total adjustment to which the parties are entitled for all activities and responsibilities associated with the Lease Agreement . . . .  The parties hereby waive and release each other from all claims and requests for equitable adjustment, both known and unknown, arising from or relating to, [the lease]."  (Id. (emphasis added).)  Nothing in the fourth amendment discusses legal responsibilities either party may separately have under RCRA or CERCLA or to NYSDEC or the EPA.  The release language is limited to "lease" obligations to each other.

### 2. The Policies at Issue in the Calverton Motion

Both Travelers and Century issued policies to Northrop Grumman (or its predecessor companies) with provisions requiring notice of occurrence. (See Insurers' Mot. Apps. B & C.)[21]

Of the 25 Travelers policies at issue, 22 contain language requiring notice of an occurrence as soon as "practicable."  (See Insurers' Mot. App. B.)  Three of the policies state that notice shall be deemed given "as soon as practicable" if given

---

[21] Appendices B and C set forth the relevant policy numbers and language relating to notice of occurrences here at issue.  The Court recites on that language necessary to resolution of the instant motion.

within 30 days after the Insurance Manager or the Director of Insurance of the insured becomes aware of the occurrence. (See id., policies 14, 17, and 20.)[22]

Of the nine Century policies at issue, all contain language requiring notice of occurrence "as soon as practicable." (See Insurers' Mot. App. C.)

### 3.  Law Relating to Calverton Motion

In their joint motion, the Insurers assert that Northrop Grumman failed to provide timely notice of occurrence. As discussed above, compliance with notice provisions contained in the policies at issue is a condition precedent to coverage. See Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc., 822 F.2d 267, 271 (2d Cir. 1987); Argo Corp. v. Greater N.Y. Mut. Ins. Co., 4 N.Y.3d 332, 339 (2005). Untimely notice provides a complete defense to coverage. See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co., 748 F.2d 118, 121 (2d Cir. 1984).

An insurer need not show it was prejudiced by untimely notice in order to disclaim liability on that basis. See Olin Corp. v. American Re-Ins. Co., 74 F. App'x 105, 107 (2d Cir. 2003); Power Auth. v. Westinghouse Elec. Corp., 117 A.D.2d 336, 339 (App. Div. 1986). However, the purpose of notice provisions is to allow insurers to participate in any investigations, remedial action, settlement discussions and legal proceedings. Olin Corp. v. Insurance Co. of North Am., 966 F.2d 718, 723 (2d

---

[22] Northrop Grumman argues that summary judgment cannot be granted as to the two policies specifically referring the Director of Insurance, because the Insurers have "proffered no evidence that Grumman's Director of Insurance ever had any knowledge about the infrequent spills that happened at Calverton." (NG Opp. Calverton 13.) However, as Travelers points out, the full notice provision makes clear that Grumman must give notice as soon as practicable. The policy provides guidance that notice would be considered reasonable if given within 30 days of the Director learning of the occurrence; it does not require that notice be given to the Director. Put another way, it would be unreasonable to read the policy as providing that notice of an actual occurrence might not have to be given for years if the Director of Insurance was kept in the dark—or, perhaps, not at all if no one occupied such a position in the company.

Cir. 1992). This makes perfect sense since, if an insurer is required to cover certain costs, it ought fairly to have an opportunity to be heard as they are incurred.

To determine whether notice is timely as a matter of law, a court must ask whether the circumstances known to the insured <u>at the time</u> of the alleged occurrence were such that they would have suggested to a reasonable person the possibility of a claim. <u>Olin</u>, 966 F.2d at 723 (affirming a grant of summary judgment on the basis of untimely notice); <u>Commercial Union</u>, F.2d at 272. Put another way, the court must determine when an obligation to provide notice of an occurrence accrued.

An insured's failure to provide timely notice may be excused by proof that the insured lacked knowledge of the liability or had a reasonable belief in nonliability. <u>See</u> <u>Olin</u>, 966 F.2d 718, 724 (2d Cir. 1992) (citing <u>Security Mut. Ins. Co. v. Acker-Fitzsimons Corp.</u>, 31 N.Y.2d 436, 441 (1972)). The insured's belief in nonliability "'must be reasonable under all the circumstances, and it may be relevant on the issue of reasonableness, whether and to what extent, the insured inquired into the circumstances of the accident or occurrence.'" <u>Maryland Cas. Co. v. Efficient Solutions, Inc.</u>, 10 Civ. 266A (Sc), 2013 WL 885164, at * 4 (W.D.N.Y. Feb. 14, 2013) (quoting <u>St. James Mech., Inc. v. Royal & Sunalliance</u>, 845 N.Y.S. 83, 85 (App. Div. 2007)).

If proffered excuses plainly lack merit or none are advanced, the issue may decided as a matter of law. <u>Olin</u>, 966 F.2d at 724; <u>Tower Ins. Co. of N.Y. v. Alvarado</u>, 923 N.Y.S.2d 717, 719 (App. Div. 2011) ("[T]he issue of whether an

insured's excuse for delay is reasonable 'may be determined as a matter of law where the evidence, construing all the facts in favor of the insured, establishes that the belief was unreasonable or in bad faith.'") (citations omitted) (quoting McGovern-Barbash Assoc., LLC v. Everest Nat. Ins. Co., 914 N.Y.S. 2d 218, 221 (App. Div. 2010)); Efficient Solutions, 2013 WL 885614, at *4.  However, as with any summary judgment motion, this Court may not weigh the evidence and must construe all facts in favor of the non-movant.  If, in light of the record before the Court, a rational juror could find that Northrop Grumman's conduct is excused, that issue must go to the jury.  See Royal & Sunalliance, 845 N.Y.S. 2d at 85; Efficient Solutions, 2013 WL 885164, at *4.

The insured bears the burden of showing that delay is excusable.  Olin, 966 F.2d at 724; Courduff's Oakwood Rd. Gardens & Landscaping Co. v. Merchants Mut. Ins. Co., 922 N.Y.S.2d 212, 214 (App. Div. 2011).  Thus, to avoid summary judgment, the insured must both offer excuses and raise a triable issue as to merit.

Under New York law, a belief that a third party would pay cleanup costs is not a cognizable excuse.  U.S. Underwriters Ins. Co. v. Calandra, No. 07 Civ. 4933 (DLI)(ALC), 2010 WL 1049295, at *5 (E.D.N.Y. Mar. 19, 2010) ("Courts have consistently held that a belief in a third party's superseding liability is unreasonable as a matter of law, and thus cannot excuse failure to provide timely notice."); see also Efficient Solutions, 2013 WL 885164, at *5.

In Mt. Hawley Ins. Co. v. Abraham Little Neck Dev. Grp., Inc., 825 F. Supp. 2d 384 (E.D.N.Y. 2011), the court found that late notice was not excused by an

58

insured's delay of seven months in providing notice that had been based on a belief that its indemnification agreement with a third party meant that the third party would be responsible for any costs. Id. at 393. The Court found that when an insured learns of an occurrence that "may" lead to a claim, it must provide notice as soon as practicable; therefore, failure to provide notice based on a belief of indemnification, even if that belief were true, did not preclude summary judgment. Id. The court explained that that "[i]t is not for the insured to make a legal conclusion that it would not be liable for a claim asserted against it, just to determine whether the claim may be asserted." Id. (quoting In re St. James Mech., Inc., Bankr. No. 09-70124-reg, 2010 WL 3212037, at *6 (Bankr. E.D.N.Y. Aug. 9, 2010)); see also Efficient Solutions, 2013 WL 885164, at *5.

There are a number of cases that similarly stand for the proposition that a belief that a third party will ultimately pay costs, should pay costs, or is likely to pay costs does not relieve the insured of its obligation to notify of an insurer of an occurrence which "may" result in a claim. See, e.g., Eastern Baby Stores, Inc. v. Central Mut. Ins. Co., No. 07 Civ. 3890 (LAP), 2008 WL 2276527 (S.D.N.Y. June 2, 2008), aff'd, 337 F. App'x 10 (2d Cir. 2009); Philadelphia Indem. Ins. Co. v. Genesee Valley Improvement Corp., 834 N.Y.S. 2d 802, 804 (App. Div. 2007); Heydt Contracting Corp. v. American Home Assur. Co., 536 N.Y.S. 2d 770, 772–73 (App. Div. 1989).

An insured must make an objective assessment of the information available at the time and determine whether there is at least a "reasonable possibility" of a policy being implicated. See id. at *4.

4. Discussion

No party disputes that there was and is contamination at Calverton. To determine whether Northrop Grumman provided late notice of occurrence as a matter of law, this Court must determine whether there is a triable issue of fact as to any one of a number of questions.

First, the threshold question is whether there is a triable issue as to whether the circumstances at the time, not in hindsight, suggest a reportable occurrence prior to 2008, when the Navy threatened suit and all parties agree notice was provided. Northrop Grumman asserts that the circumstances at the time suggested only that there had been a series of isolated spills and incidents which had been dealt with appropriately, and that Northrop Grumman held a reasonable belief that none of the isolated incidents suggested a reporting obligation. In his declaration, Cofman asserts that the spills were isolated, dealt with appropriately at the time, and Grumman had no reason to believe it had a reporting obligation as to such minor incidents or that a third-party claim would be forthcoming. (See Cofman Decl. ¶¶ 13–20.)

Northrop Grumman also argues that, even to this day, it is not quite certain of the contours of the Navy's claim for indemnification. (See NG Opp. Calverton 22–24.) However, it concedes that part of it relates to the Southern Area Plume; it

60

argues, however, that none of the facts of which it was aware at the time it was at Calverton were suggestive of an occurrence such as the one now at issue.  (Id. at 10–11, 15.)

Second, if there were a reportable occurrence, the Court must determine whether there is a triable issue as to <u>when</u> it occurred—at least insofar as whether notice would be deemed untimely as a matter of law.  Put another way, the Court need not pinpoint precisely when a reporting obligation accrued, so long as the time that the Court determines it must have accrued <u>not later than</u> a time that would be untimely as a matter of law.  See <u>Olin</u>, 966 F.2d at 724.

Third, this Court must then ask if there is a triable issue as to whether Northrop Grumman's failure to provide notice is excused.  Here, Northrop asserts that there is a triable issue as to excuse—because it held a reasonable belief that any incidents were minor and no reasonable person would have believed that insurance policies would be implicated, and because it also believed that it had resolved all issues at Calverton prior to leaving the site, that it had a release from the Navy, and that therefore the Navy would not be seeking reimbursement for any additional costs.

The Court discusses each of these questions seriatim.

a. <u>Reportable Occurrence</u>

It is undisputed that, in 2008, Northrop Grumman was notified that the Navy had "requested that the US Department of Justice commence a federal CERCLA action against NG for the recovery of costs incurred or to be incurred by

the US in response to the release of hazardous substances at the Calverton Naval Weapons Industrial Reserve Plant in Calverton, NY." (Cannella Decl. Ex. 25, at CEN0000598; Cannella Decl. Ex. 26, at TRAV035657; see also Cannella Decl. Exs. 27, 31.)  The question before the Court is whether Northrop had an obligation to provide notice to the Insurers prior to that date.[23]

The documentary evidence in support of a reportable occurrence is clear and unequivocal. It leaves no triable issue as to whether a notice obligation as to a reportable occurrence had arisen by at least the mid-1990s.  By that time, there was significant evidence, based on scientific testing, that there were several areas in which groundwater was contaminated at the Calverton site.  (See, e.g., Cannella Decl. Ex. 5, at NGINS00413306, NGINS00413309; Cannella Decl. Ex. 6, at NGINS000415333, NGINS000415338, NGINS000415360; Cannella Reply Decl. Ex. 4, at 1-276; Cannella Reply Decl. Ex. 5, at NGINS000647479; Cannella Decl. Ex. 22, at NGINS000008730.)

By 1986, and continuing uninterruptedly until Northrop Grumman left Calverton, certain areas (including the Fire Training Area, the Northeast Pond Area, and the Fuel Calibration Area) were identified as contaminated, including groundwater contamination; and it was noted that the groundwater had a migration pathway to the Peconic River and Bay.  (See, e.g., Cannella Decl. Ex. 6, at

---

[23] Northrop Grumman argues that the release of hazardous substances is relevant only to the Southern Area Plume.  That argument is contrary to the evidence, which speaks in broad terms of "the release of hazardous substances at the Calverton Naval Weapons Industrial Reserve Plant in Calverton, NY" (Cannella Decl. Ex. 25, at CEN0000598; Cannella Decl. Ex. 26, at TRAV035657), and "discharges and/or releases of hazardous substances [that] have allegedly contaminated the soil and the groundwater at and in the vicinity of the [Calverton] site" (Cannella Decl. Ex. 31, at TRAV007376).  In any event, even if limited to the Southern Plume, there is still no triable issue based on the evidence cited above.

NGINS000415423, NGINS000415335, NGINS000415360; Cannella Decl. Ex. 16; Cofman Decl. ¶ 12.)

By 1994, Grumman was noting Navy estimates of cleanup costs in the amount of $15 million and that it was likely that given that Grumman was a GOCO, the Navy would make a claim against it for indemnification. (Cannella Decl. Ex. 9; Cannella Decl. Ex. 15, at NGINS000373958–60.)  In 1995, a report notes a serious threat of groundwater migration.  (Cannella Decl. Ex. 16.)

The investigation and identification of contamination continued unabated before and after Grumman left the site. The only area as to which remediation efforts appear to have been successful was McKay Lake—but the Lake was only one of several areas of concern.  (See, e.g., Cannella Decl. Ex. 6, at NGINS000415424.) Resolution of issues at McKay Lake did not mean that issues related to areas previously identified as having serious contamination were resolved.  Indeed, continuous separate reports indicated otherwise.  (See, e.g., Cannella Decl. Ex. 5, at NGINS00413306, NGINS00413309, NGINS000413324; Cannella Reply Decl. Ex. 3, at NGINS000621214.)

The Court then asks whether the facts on the ground at the time meant that a reasonable person could have believed that there was no occurrence as to which Grumman had a reporting obligation (that is, an occurrence that might implicate the insurance policies here at issue).  Before the Court on this motion is a declaration by Cofman that he was the person responsible for Environmental

Technology and Compliance during the relevant period and he did not think there was a reportable occurrence. (See, e.g., Cofman Decl. ¶¶ 10, 13, 16, 31.)

In light of the overwhelming and clear record evidence, the Court finds that Cofman's statements, notwithstanding his position at the time, are not those of a reasonable person, to the extent they suggest that Grumman did not have a notice obligation on or before 1995.[24]  No rational juror could look at the long litany of uninterrupted evidence and believe that there had not been a reportable occurrence.

Northrop Grumman argues that the occurrence as to which it is currently seeking indemnification relates to, the extent it understands it, to the Southern Area Plume—and that, at least as to that contamination, there was no occurrence on or before 1995.  This is contrary to any reasonable view of the evidence, and is insupportable.  For years after Grumman had declined to participate in the ongoing efforts at the site, the Navy investigated and remediated and made plans to remediate at the site.  Groundwater contamination flowing towards the Peconic River and Bay—which is south of the site—was stated as a concern in 1986 and was never eliminated as a concern.  (Cannella Decl. Ex. 6, at NGINS00415422.)  Thus, there is no basis in fact to suggest that the "Southern Area Plume" was a new development as to which Northrop Grumman could not have known and therefore could not have reported at the time.  In any event, there were sufficient indications—e.g., threats to habitats, wildlife, sole aquifers, a potential target human population of 2800—that any reasonable person would have had a belief

---

[24] Self-serving affidavits are accorded little weight on summary judgment.  See Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991)).

that the policies might be implicated.  The fact that the spills contributing to or causing such contamination were isolated does not overcome the repeated reports and testing demonstrating that it was scientifically understood that the contamination existed and posed serious threats to the area.  (See, e.g., Cannella Decl. Ex. 5, at NGINS00413306, NGINS00413309, NGINS000413324; Cannella Reply Decl. Ex. 3, at NGINS000621214.)[25]

### b.  Excusing Notice

Northrop Grumman argues that it has raised a triable issue as to "excuse" based on circumstances existing at the time.  Namely, Northrop argues that it had a reasonable belief that if there was contamination which needed to be addressed after it left the site, it had a release, and the Navy was going to take care of it.  Moreover, Northrop Grumman asserts that it could not have provided earlier notice, because it did not learn that it would be subject to a claim until 2008.  Northrop Grumman's arguments do not square with the law or facts.

It is important to debunk the assertion that completing the 29 tasks that Grumman and the Navy agreed it would complete before it left the site was the equivalent of doing all it would ever need to do to address contamination then known or that became known at the site.  The evidence is to the contrary.

First, at the time that Grumman obtained its RCRA permit, it was provided with explicit guidance regarding ongoing obligations with respect to contamination by hazardous waste.  (Cannella Decl. Exs. 1–4.)  Second, the CERCLA legal regime

---

[25] As this Court has indicated in note 19 supra, Wolfert's declaration, as a contemporary hydrologist, does not alter this outcome (for the reasons set forth in note 19).

provided that Grumman would be a potentially responsible person with respect to cleanup as a matter of law. (Adams Decl. Ex. 15, at CEN00001112.)  Third, in both 1986 and 1992, the Navy requested that Grumman participate with it in ongoing efforts to assess, plan for and cleanup contamination at Calverton.  (Cannella Decl. Exs. 5, 6.)  The Navy explicitly stated that "nonparticipation does not change the final liability for cleanup costs," but that participation "may provide [Grumman] a greater degree of control over the costs as well as an assurance that cost effective methods are being utilized." (Cannella Decl. Ex. 7, at NGINS001127214.) Grumman declined to participate.  (Cannella Decl. Ex. 8, at NGINS001139453.)  As the evidence recited above makes clear, the very process then undertaken by the Navy with respect to Calverton led in a straight line to the claim for payment in 2008.

Fourth, in 1995, in connection with the paperwork relating to its termination of its lease, Grumman assured the Navy that it would ensure that it would continue to fulfill its obligations with respect to environmental cleanup.  (Cannella Decl. Ex. 11, at NGINS000373588.)  Fifth, the minutes of the Technical Review Committee meeting, which Ohlmann of Grumman attended, refer to future cleanup costs, and include a statement that the Navy and Grumman would work it out internally. (Cannella Decl. Ex. 18, at NGINS002377555.)  Sixth, Cofman specifically references this meeting in his declaration and states that this was his understanding as well. (Cofman Decl. ¶ 29.)

Seventh, what has been referred to as a "broad release" is, in fact, a single sentence, with handwritten cross-outs that make it mutually beneficial (as opposed to running for the benefit of the Navy alone). (Scanlon Decl. Ex. 17, at NAVCAL0051549.) By its terms, it applies solely to Grumman's lease obligations; it does not address any state or other regulatory obligations. (Id.) Eighth, there is nothing in the record to suggest that when the Navy informed Grumman that it would be commencing a lawsuit for CERCLA cleanup costs, Grumman expressed any surprise at all—or asserted that the Navy was in any way precluded from doing so in light of the release.

In addition, it is clear that throughout the period just prior to Northrop Grumman's leaving the Calverton site, it was acutely aware that the costs of cleanup and assessment—which could lead to additional cleanup; Northrop could not assume that assessments would not lead to additional evidence of contamination requiring response—were projected into 1998, after Northrop Grumman would have left the site. (Cannella Decl. Ex. 12, at NGINS000372762–NGINS000372763; Cannella Decl. Ex. 15, at NGINS000373958–60.) In addition, and more importantly, Ohlmann explicitly stated to management—repeatedly and in words that could not be clearer—that the costs at Calverton for cleanup (not including assessment costs, which were separately referenced as in the millions), were projected by the Navy then to be $15 million, and that, because Northrop Grumman was a GOCO operator, it should expect a claim. (Cannella Decl. Ex. 9; Cannella Decl. Ex. 15, at NGINS000373958–60.) There is no doubt that these

words on this page provided any reasonable person with sufficient basis to believe that the policies at issue "may" be implicated.  See Mt. Hawley Ins. Co., 825 F. Supp. 2d at 393.

Taken together, on their face, the documents demonstrate that Grumman chose a particular path in connection with Calverton, which this Court will refer to as the "Ostrich Defense."  That is, it made a conscious determination to try and maintain ignorance and then use that ignorance as an excuse.  The law does not support the Ostrich Defense.  The circumstances at Calverton, prior to the invocation of the Ostrich Defense, were such that no reasonable juror could believe that all contamination had been fully and finally addressed.  Clearly, it had not. Studied and chosen ignorance, in this situation, does not excuse late notice as a matter of law.

As recited above, the law is clear that belief that a third party may have an obligation to cover a liability does not relieve an insured from providing timely notice of an occurrence that might implicate a policy.  See, e.g., Commercial Union Ins. Co., 822 F.2d at 271; Utica Mut. Ins. Co., 748 F.2d at 121; Argo Corp., 4 N.Y.3d at 339.  Thus, even an actual belief that the Navy would cover all future costs does not relieve Northrop Grumman of its independent obligations to provide notice. See, e.g., Efficient Solutions, 2013 WL 885164 at *5; Mt. Hawley, 825 F. Supp. 2d at 393; Eastern Baby Stores, Inc., 2008 WL 2276527.

Finally, of course, there is an independently dispositive reason why notice was untimely.  The evidence recited above reveals that in 2002 there were

68

additional communications with Grumman that indicated that efforts to cleanup Calverton were ongoing and serious; that groundwater contamination was implicated and there were threats to human health.  (Cannella Reply Decl. Ex. 7, at NGINS001214002.)  Northrop Grumman should have provided notice at this time—but, again, did not.

Northrop Grumman's proffer of the Cofman, DeBois, and Wolfert declarations to support its argument that its failure to provide notice should be an excuse is unavailing.  Cofman's declaration asserts that the incidents were minor and incidental, and that Grumman simply did not believe that a reportable occurrence existed.  As set forth above, this does not square with the facts; that declaration to oppose summary judgment cannot, in light of the contemporaneous record, change the outcome of this motion.

DeBois's declaration is similarly insufficient.  His claim that the release with the Navy resulted in Grumman holding a good faith belief that it was relieved of any future cleanup cost obligations is unsupported by the record.  As stated, the language of the release does not support the broad assertion as to what DeBois purportedly believed it covered.  If he genuinely held a belief that a single sentence—that was annotated to establish mutuality and that referenced only the lease and no RCRA, CERCLA, or other regulatory requirements—was sufficient, that was an unreasonable position. In any event, the law is clear that even such a belief as to a third parties' covering any costs, genuinely held, does not eliminate a reporting obligation as a matter of law.

In addition, of course, there are references in the record making it clear that Grumman in fact understood that the future could hold additional costs, including the various reports by Ohlmann to management (Cannella Decl. Exs. 9–10, 12, 14–15) and the Technical Committee meeting minutes in which the Navy and Northrop Grumman agreed they would work out costs "internally" (Cannella Decl. Ex. 18, at NGINS002377555.).  Finally, the Court notes that nothing in the record suggests that Grumman even believed that the release provided the absolution it now claims. Nowhere in the record is there a statement by Grumman to the Navy that the Navy cannot assert a claim in 1998 due to a controlling contractual release.

By the mid-1990s, Northrop Grumman was aware that there was sufficient contamination that might implicate its insurance policies.  It did not thereafter provide timely notice.  Its excuses fail as a matter of clear fact and law. Accordingly, the Court grants the Insurers' motion for summary judgment as to their duties to defend and indemnify with respect to Calverton.

<u>CONCLUSION</u>

For the reasons set forth above, Northrop Grumman's motion to reconsider the July 3 Opinion is DENIED; Travelers' motion for summary judgment is GRANTED as to whether that policy covers the Bethpage Facility Claim; and the Insurers' motion for summary judgment is GRANTED as to their duties to defend and indemnify with respect to Calverton.

70

The Clerk of the Court is directed to terminate the motions at ECF Nos. 238, 243, and 250.

SO ORDERED.

Dated:      New York, New York
            October 31, 2013

                                        _____
                                             KATHERINE B. FORREST
                                          United States District Judge