UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

TRAVELERS INDEMNITY CO., et al.,            :

              Plaintiffs,            :

          -v-            :

NORTHROP GRUMMAN CORP., et al.,            :            12 Civ. 3040 (KBF)

         Defendants,            :            <u>OPINION & ORDER</u>

and            :

CENTURY INDEMNITY CO., eventual            :
successor in interest to INSURANCE CO. OF            :
NORTH AMERICA,            :

       Nominal Defendant.            :
-------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: FEB 2 7 2014

KATHERINE B. FORREST, District Judge:

This is the Court's third summary judgment Opinion in this environmental

insurance coverage action. (<u>See</u> ECF Nos. 545 and 546.)

In April 2012, Travelers Indemnity Co. and various affiliated companies

(together, "Travelers") commenced the underlying declaratory judgment action as to

liability for environmental pollution, against Northrop Grumman Corp. and

Northrop Grumman Systems Corp. (together, "Northrop" or "Grumman"), and

Century Indemnity Co., eventual successor in interest to Insurance Company of

North America ("INA"), ("Century"), as nominal defendant.

This Opinion relates to Century's motion for summary judgment with respect

to two areas: the Bethpage Community Park and the Bethpage Facility. The Court

will not repeat the facts or the law set forth in detail in its prior decisions on the Bethpage Facility and Community Park; it discusses here only what is new or different between those motions and this one.

Century argues that as to both areas, notice was late and it is relieved of any coverage obligations. This Court agrees. For the reasons set forth below, Century's motion is GRANTED.

I.      FACTS

Century and Northrop incorporate by reference paragraphs 1–161 and 170–79 of the Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of Travelers' Motion for Summary Judgment Regarding the Bethpage Facility and Northrop's response thereto. Accordingly, the Court incorporates the "Facts" section of its February 25, 2014 Opinion & Order regarding the Bethpage Facility. (See ECF No. 545 at 2–28.)

II.     LEGAL STANDARDS

The Court incorporates the standard for summary judgment and other legal standards relating to late notice set forth in its February 25, 2014 Opinion & Order. (See ECF No. 545 at 28–29, 39–44.)

III.    THE POLICIES AT ISSUE

Century issued Comprehensive General Liability ("CGL") policies to Grumman for the period 1951–1962, and umbrella policies for the period 1951–1968.

Each of the CGL policies has the following provisions:

2

Notice of Accident.  When an accident occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable.  Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses.

Notice of Claim or Suit.  If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(Northrop Grumman's Responses to Century's "Rule 56.1 Statement of Undisputed Facts in Supp. of Mot. for Summ. J." ("NGC Century 56.1") ¶¶ 74–76; Walsh Decl. Ex. 1, at CEN00000006.)

The Century umbrella policy No. XPL-3506, which was in effect from January 1, 1951 through January 1, 1963, contains a notice of occurrence or accident provision that states, in relevant part:

Upon the happening of an occurrence or accident that appears reasonably likely to involve liability on the part of the company written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable.

(NGC Century 56.1 ¶ 77.)  The Century umbrella policy no. XBC-1177, which was in effect from January 1, 1963 through January 1, 1968, contains a Notice of Occurrence provision that states:

Upon the happening of an occurrence reasonably likely to involve the company hereunder, written notice shall be given as soon as practicable to the company or any of its authorized agents.

(Id.)

3

IV.   ANALYSIS

A.   Attachment of the Notice Obligation

Century argues that before and at least as of 1977, Grumman should have provided it with notice of an occurrence.  As the Court explained in its February 25, 2014 Opinion & Order, numerous facts show that there was an "occurrence or accident" prior to and in 1976.

For instance, in approximately 1973, Grumman's manager of environmental protection, John Ohlmann learned of taste and odor problems at a newly opened well at the Bethpage Facility.  (Northrop Grumman's Response to Travelers' "Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Supp. of Travelers' Mot. for Summ. Regarding Bethpage Facility" ("NGC 56.1") ¶ 71.)  In 1975, Grumman detected three hydrocarbons in their own analysis of the groundwater on-site.  (Id. ¶ 72.)  Samples collected from the Facility by the Bureau of Water Resources for the Nassau County Department of Health ("NCDOH") contained trichloroethylene ("TCE").  (Id. ¶ 74.)  The NCDOH made a preliminary determination that the "discharge of sanitary and industrial wastes at and in the vicinity of the Grumman Corporation is considered responsible for the degradation in quality of the Grumman Corporation wells."  (Id. ¶ 77.)  In May 1975, the Bureau of Water Resources prepared a "Preliminary Report, Groundwater Contamination, Grumman Aerospace Corporation."  (Cannella Decl. Ex. 1.)

In June 1976, Grumman's environmental consultant, Geraghty & Miller, advised that "the ground-water quality situation at Grumman [was] resulting from

4

one of two possibilities," both based on a "slug" of contamination that had gathered in the shallow aquifer underlying at least part of the Bethpage Facility. (Cannella Decl. Ex. 3, at NGINS001899582.) In material part, this proved correct. In 1976, Grumman had accumulated a number of news articles in its files that referred to groundwater contamination at the Bethpage Facility, linked it to Grumman, and discussed remediation efforts. (Cannella Decl. Ex. 6.)

In April 1977, water drawn from well #4, adjacent to plant #2, was found to have concentrations of 500 times the existing state standard in 1977. Plant #2 was a location in which TCE was known to have been heavily used. (See, e.g., NGC 56.1 ¶¶ 12–20; Calland Decl. Ex. 4, at 372:20–373:08.) On January 5, 1978, Geraghty & Miller advised Grumman that TCE and certain other chemicals were found to be present "in greater amounts, for at least one sampling, in recharge water than in" water pumped from the wells; Geraghty & Miller also stated that "excess amounts" were "probably derived from housekeeping practices (spills, cleanup of equipment, etc.) or some intermittent activity of an unknown kind." (Cannella Decl. Ex. 8, at NGINS000768972, NGINS000768975.) Additional readings from soil samples at various wells—even those upgradient from Hooker Chemical—were outside of concentrations deemed safe. (See Heskin Decl. Ex. 16, at NGINS000619195; Cannella Decl. Ex. 3, at NGINS001899582; Scanlon Decl. Ex. 5 (Langseth Decl.) ¶ 4.)

On November 22, 1977, Grumman received a claim relating to the groundwater in the Bethpage Water District ("BWD"). The BWD asserted that

Grumman was responsible for polluting its wells with TCE and demanded that Grumman pay damages. (Heskin Decl. Ex. 24, at BWD0022765–66.) On February 1, 1978, the BWD reiterated that it was pursuing a claim against Grumman "for ground water contamination." (Heskin Decl. Ex. 25.)

Grumman argues there are triable issues of fact as to whether it had a reasonable belief in nonliability prior to December 1983, such that late notice would be excused. Grumman bases the reasonableness of its belief on the following: (1) that many of its practices relating to the use, handling and storage of TCE were lawful, known by regulators and/or consistent with industry practice at the time; (2) that it had a good faith belief, which others shared (at least from time to time), that Hooker Chemical Corp. was the source of the contamination; and (3) that, after additional testing in 1977 to 1980, regulators believed that no additional investigation of the Bethpage Facility was warranted.

### 1.   Lawfulness of Grumman's practices

It is legally irrelevant that prior to the end of the 1970s, Northrop's use, handling and storage of contaminants was lawful and known to regulators. No provision of law existing at that time provided that a polluter could escape any legal liability because its practices had been lawful at the time they occurred or did not violate laws then in existence. Indeed, any other rule would leave no private party responsible for clean-up costs, inappropriately shifting the burden to taxpayers.

2.   <u>Sources of the contamination</u>

It is undisputed that Hooker Chemical Corp. was long believed to be a source of contamination in the groundwater below the Bethpage Facility. (<u>See, e.g.</u>, Cannella Decl. Ex. 1, at NDOH-0011464.)  However, the conclusion that it was reasonable for Grumman to believe that it therefore was not a source of the contamination does not follow ineluctably from that premise.  The law requires that this Court examine the totality of the circumstances when assessing whether there is a triable issue as to the reasonableness of Grumman's belief in nonliability.  <u>See, e.g.</u>, <u>Sparacino v. Pawtucket Mut. Ins. Co.</u>, 50 F.3d 141, 143 (2d Cir. 1995).  A totality of the circumstances reveals the following:

- Grumman knew that it regularly used TCE and other contaminants throughout its facilities. (<u>See, e.g.</u>, NGC 56.1 ¶¶ 5, 9, 10, 12, 14–18.)

- Grumman knew that it had recharge basins on its premises which were intended to allow contaminated water to leach back into the groundwater. (<u>Id.</u> ¶¶ 21–23, 28, 29.)

- Grumman knew that sludge that contained TCE was placed in sludge drying beds on its site. (<u>Id.</u> ¶¶ 36–38, 64, 65.)

- Grumman knew that there were odor and taste issues with a number of its wells. (<u>Id.</u> ¶¶ 68, 69, 71.)

- By the early 1970s, Grumman knew that a large 4,000-gallon tank had leaked "a lot" of TCE. (<u>Id.</u> ¶¶ 43, 44–46, 48.)

- In May 1975, the NCDOH prepared a "Preliminary Report, Groundwater Contamination, Grumman Aerospace Corporation," which stated that "[w]ater quality at the Grumman Aerospace Corporation has continued to decline to the extent that the most serious and severe instance of Magothy aquifer contamination in Nassau County is now evident" (Cannella Decl. Ex. 1, at NCDOH-00114550), and that "[p]robable contamination of groundwater by industrial sites is indicated with the detection of the Environmental Protection Agency of organic contaminants in the Hooker Chemical Corporation lagoons and sewer recharge basins of the Grumman Corporation" (id. at NCDOH-0011464).

- By 1978, Geraghty & Miller had conducted an extensive, three-day study of the groundwater in which they determined that, at least in some instances, the recharged water contained more contaminants than that which was pumped out of the ground (and the contamination that one might blame on Hooker Chemical Corp.).  (Cannella Decl. Ex. 8, at NGINS000768958, NGINS000768975.)

- Based on that same report, Grumman knew that an upgradient well was contaminated; because it was upgradient, Hooker Chemical Corp. could not have contaminated it.  (See Cannella Decl. Ex. 3, at NGINS001899582; Scanlon Decl. Ex. 5 (Langseth Decl.) ¶ 4.)

Grumman was cited along with Hooker as a potential source several times:

8

1. The NCDOH's May 1975 "Preliminary Report, Groundwater Contamination, Grumman Aerospace Corporation," stated that probable contamination of groundwater was indicated due to "organic contaminants in the Hooker Chemical Corporation lagoons and sewer recharge basins of the Grumman Corporation." (Cannella Decl. Ex. 1, at NCDOH-0011464.)

2. On November 30, 1976, the NCDOH issued a written "Synopsis of [the] Well Contamination Problem at Grumman Aerospace Corporation Facilities in Bethpage," which stated that "specific organic chemicals found in Grumman wells have been identified in [both] the recharge basins of the Hooker Chemical Company . . . and in the recharge basins on the Grumman property."  (Cannella Decl. Ex. 4, at NCDOH-002943.)

3. On December 13, 1976, Francis V. Padar of the NCDOH presented a comprehensive public statement in which he stated that Hooker was implicated "as the major, if not the total source, of the vinyl chloride and the chloroethylenes," but that the "Grumman industrial operations . . . use similar chemical compounds which may be contributing to the problem." (Calland Decl. Ex. 98, at NCDOH-0002993–94.)

Northrop argues that the facts in <u>Mount Vernon Fire Ins. Co. v. Abesol Realty Corp.</u>, 288 F. Supp. 2d 302 (E.D.N.Y. 2003), are similar to those here.  In <u>Abesol</u>, an insurer sought a declaration that it did not have a duty to defend or indemnify a property management firm for lead poisoning suffered by a tenant. <u>Id.</u> at 304.  The insurer argued that the insured had a duty to provide notice once it had

received an order to abate a lead nuisance. Id. at 311.  The court found that the insured lacked knowledge of the tenant's hospitalization for lead poisoning, and ruled that a question of fact remained as to whether the order to abate contained sufficient information to constitute an "occurrence" requiring notice to the insurer.

Those facts are far different from those here.  It is true that mere grousing, or minimal notification of a problem such as in Abesol, is not enough to trigger a notice requirement.  However, here, there were multiple instances in which concerns were expressed by Grumman, its employees, and the NYDOH regarding groundwater contamination prior to 1975.  By 1975, the NYDOH had stated that probable contamination of groundwater was indicated due to organic contaminants in Grumman's recharge basins.  (Cannella Decl. Ex. 1, at NCDOH-0011464.)  Further studies were undertaken and reports were obtained from an environmental consultant, all of which beat the drums of contamination exposure.  It cannot be said, as in Abesol, that Northrop lacked "sufficient information" regarding the contamination on its grounds.  See 288 F. Supp. 2d at 313.

Northrop also argues that the fact that its permit was renewed by the NYSDEC in 1980 was equivalent to giving it a clean bill of health at that time.  It was not.  There is no legal doctrine that stands for the proposition that, once a state agency issues a permit, it has made a factual finding that no claim could occur relating to any prior period.  If that were the law, then the burden on New York State would be tremendous—and no doubt there would be carve-outs, disclaimers,

and side letters between permittees and the state. This argument by Northrop is novel and not the law.

Was it nonetheless reasonable for Grumman to believe that if it could obtain a permit, it was being told that it had a clean bill of health? No. As there is no basis in law for such a position, it is not reasonable for Grumman to have made such an assumption. The history of contamination at the site, and the history of Grumman's own practices, meant that obtaining a permit could not be the basis for a broad statement as to future liability for any contamination. In addition, the permit related to prospective practices. It is entirely possible, given the decades during which Grumman had been engaged in practices that involved contaminants, that the damage was done. A prospective permit did not and does not relieve Grumman of past environmental obligations. On these facts, it was unreasonable for Grumman to have based a belief in nonliability on the fact that it was granted a permit.

3.    The NYSDEC letter

Grumman argues that the statement by the NYSDEC that was not contemplating litigation in the near future based on the data available about contamination at Grumman (Calland Decl. Ex. 124, at BWD0022747) demonstrates the reasonableness of its belief in nonliability and/or separately provides a basis for a belief in nonliability. (See also NGC Century 56.1 ¶¶ 36, 154, 158–169, 183; Calland Decl. Exs. 110, 119, 124.) Either use of the NYSDEC's statement is unavailing. The letter does not purport to suggest that Grumman had no liability

11

for contamination that may have occurred; it is, at most, a statement regarding what additional testing efforts needed then to occur before NYSDEC would pursue litigation. Those are far different things. In addition, the EPA letter cannot render a failure to provide notice to Travelers reasonable ex post facto; by the late 1970s, Grumman already owed notice to Travelers based on the series of reports and studies that had already been conducted and revealed contamination at its sites.

4.   Bethpage Community Park

Grumman similarly had notice obligations that it breached with regard to Bethpage Community Park. Grumman was aware of soil contamination at the Park by mid-2001. (See Northrop Grumman's Responses to "Travelers' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Supp. of Mot. for Summ. J. Regarding Community Park" ("NGC BCP 56.1") ¶ 37.) In July 2001, Grumman notified NYSDEC of its findings. (Id. ¶ 44.) In May through July 2002, Grumman had further communications with NYSDEC regarding the Park. (Id. ¶¶ 57–59.) On July 26, 2002, NYSDEC wrote to Grumman that Grumman and Navy shared responsibility for the BCP. (Id. ¶ 61.) In December 2002, the Town of Oyster Bay notified Grumman of its intent to file a citizen suit against it. (Id. ¶ 73.) Grumman received the Town's notice to sue a second time on January 3, 2003. (Id. ¶ 77.) That lawsuit would have been a citizen suit under the Resource Conservation and Recovery Act ("RCRA"), which would have been limited to prospective injunctive relief. (Id. ¶ 51.) Grumman did not tell Century about the Park until 2005, when it notified Century of a separate lawsuit that was filed on April 21, 2005. (Id. ¶¶ 52,

56–57.)  The passage of approximately three years constitutes late notice as a matter of law.  See, e.g., Am. Home Assurance Co. v. Republic Ins. Co., 984 F.2d 76, 78 (2d Cir. 1983) (collecting cases); Power Auth. v. Westinghouse Elec. Corp., 117 A.D.2d 336, 342–43 (N.Y. App. Div. 1st Dep't 1986) (delay of 53 days in giving notice was unreasonable); Gov't Emps. Ins. Co. v. Elman, 40 A.D.2d 994 (N.Y. App. Div. 2d Dep't 1972) (delay of 29 days in giving notice was unreasonable).

B.    The 1983 PRP Letter

Century argues that, even if Grumman was not obligated to have provided it with notice of an occurrence in the 1970s, it was certainly required to do so when it received the 1983 PRP Letter.  Century argues that, while it did receive the 1983 PRP Letter, that letter was insufficient to have constituted compliant notice.

Notice is a condition precedent to coverage.  Am. Ins. Co. v. Fairchild Indus., Inc., 56 F.3d 435, 438 (2d Cir. 1995).  In addition, an insured has an obligation to provide separate notice as to each policy under which it seeks coverage.  Sorbara Constr. Corp. v. AIU Ins. Co., 11 N.Y.3d 805, 806 (2008).

Here, there is no dispute that the notice on which Grumman relies as to Century is the 1983 PRP Letter.  That letter is, however, inadequate notice as a matter of law.

As an initial and entirely dispositive matter, Century only received the 1983 Letter because it was a copyee on a cover letter with attachments that was addressed to Travelers.  There is no dispute that Grumman did not separately send Century its own notice, referring to the policies Century had issued.  Such

13

inadvertent notice is insufficient.  See Sorbara, 11 N.Y.3d at 806 ("Each policy imposes upon the insured a separate, contractual duty to provide notice."); Roofing Consultants, Inc. v. Scottsdale Ins. Co., 709 N.Y.S.2d 782, 783 (App. Div. 4th Dep't 2000) ("Neither notice provided by another insured nor the insurer's actual knowledge of the claim satisfies the contractual obligation of an insured to give timely notice.") (citations omitted).

As a substantive matter, however, even if Grumman had sent the PRP letter directly to Century, the PRP letter is also inadequate as "notice" to Century.  First, the subject line of the cover letter refers to a different claim, covering a different area in Bethpage—the Old Bethpage Landfill. (NGC 56.1 ¶¶ 104, 170–71.)  That lawsuit concerned a sludge drying bed. (Id. ¶ 173.)  Second, the letter gives no indication that it is in fact a notice of a claim; instead it stated that the cover letter attached "additional information on the above captioned for your files." (Id. ¶ 171.)  Third, Century has proffered uncontradicted evidence that when the letter was found in its files, it was in the files of the Old Bethpage Landfill. (Id. ¶ 165.)[1]  Finally, the January 26, 1984 letter, which attached the January 11, 1984 letter

---

[1] Grumman argues that its failure to provide additional information relating to new developments in the NYSDEC action, including with respect to the 1987 site-wide remedial investigation/feasibility study and NYDEC's reclassification of the site to a "class 2" hazardous waste site, should be excused because Century sat on its hands after receiving a copy of the 1983 PRP Letter, sent to Century in 1984. This Court has found, however, that Grumman's notice as to the 1983 PRP Letter was late as a matter of law, and that the letter was does not meet the "substantial compliance" requirements for providing proper notice. As a result, the Court does not find that a failure to act on a letter that was inadequate then excuses additional failures by Grumman to provide required information and notices. Moreover, the notice provisions in Century's policies require notice of "any" claim, accident or occurrence. Thus, notice as to one would not be sufficient. Additionally, there is no issue of triable fact that Century waived a notice provision in any of its policies. See Gilbert Frank Corp. v. Fed. Ins. Co., 70 N.Y.2d 966, 968 (1988) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed.") (citations omitted).

and the 1983 PRP Letter, stated that the "site in question is no longer in use." (Cannella Decl. Ex. 22, at CEN 0001111.)

The 1983 Letter does refer to site #130003, which is the number NYSDEC had given to the Bethpage Facility in 1982. However, there is nothing in the record that shows that that number would have had any meaning to Century.

The breadth of the 1983 Letter also does not transform inadequate notice into adequate notice. Thus, the fact that the 1983 Letter refers to "damages to the natural resources of the State of New York at and around the referenced site," and "all investigative, removal and remedial work necessary at the site and its environs," and therefore may be read to capture groundwater contamination by TCE (see Cannella Decl. Ex. 22, at CEN 00001114), does not help with the facts that it comes years too late and then fails to seek coverage from Century under any Century policy.

Grumman argues that an insured's notice must be "substantially compliant," and that the 1983 Letter either meets this level or raises a triable issue as to whether it meets this level. See First Roumanian Am. Congregation v. GuideOne Mut. Ins. Co., 862 F. Supp. 2d 293, 310 (S.D.N.Y. 2012). That doctrine, however, refers to the form in which a proof of loss is given, and particularly to valuation issues. See id.; SR Intern. Business Ins. Co., Ltd. v. World Trade Center Props., LLC, 381 F. Supp. 2d 250, 259 (S.D.N.Y. 2005) ("The purpose of a proof of loss is that the insurer may be able intelligently to form some estimate of his rights and liabilities before he is obliged to pay.") (internal quotation marks omitted). The law

is clear that short delays in notice are frequently considered unreasonable as a matter of law. See Fairchild, 56 F.3d at 440. The delay here was six weeks—separately too long as a matter of law. In any event, if Travelers never received notice of the claim against Northrop, Northrop cannot be said to have "substantially" complied with its notice requirements.

Finally, even if copying Century on the 1984 letter satisfied Grumman's initial obligation to provide notice of a claim, Grumman breached its notice obligation by thereafter neglecting to tell Century that NYSDEC reclassified the Facility as a Class 2 Site, requiring a full-scale Remedial Investigation/Feasibility Study, in 1987. (NGC 56.1 ¶¶ 113–14.)

C.    Futility

Grumman argues that any failure to provide timely notice should be excused on the basis that Century refused to perform its duty to defend. Grumman has proffered no evidence that raises a triable issue of fact to support a reasonable inference that the reason it failed to provide notice of NYSDEC's subsequent demands was that Century had failed to defend it, or that providing further updates would be futile based on Century's handling of the Old Bethpage Landfill claim. Grumman's argument is unsupported by any facts. Indeed, the facts in the record are supportive of only the opposite inference: Grumman's provision of information relating to other claims in the 1990s and 2000s belie any notion that as a general matter Grumman believed it was futile to look to Century for coverage.

16

Grumman also argues that this Court's Opinion & Order dated October 31, 2013, determined that there was insufficient evidence in the record that Grumman knew of an occurrence at the Bethpage Community Park in the 1970s. According to Grumman, the evidence to which this Court referred in making that statement included evidence before the Court on this motion with respect to the Bethpage Facility, including information that the contamination was believed to derive from Hooker, the Geraghty & Miller reports, and other materials. (See ECF No. 382 at 16–18.) One piece of evidence that was not before the Court, however, was the letter sent by the Bethpage Water District ("BWD") on November 22, 1977, which asserted that Grumman was responsible for polluting its wells with TCE and demanded that Grumman pay damages. (Heskin Decl. Ex. 24.) Grumman excuses the fact that it did not provide Century with notice of this letter on the basis that the BWD "dropped the subject" and did not assert a claim against Grumman until 1989. (Northrop Grumman's Mem. of L. in Opp. to Century's Mot. 7.) The fact that the BWD "dropped the subject" does not, of course, excuse Grumman from giving Travelers notice. See Sorbara, 11 N.Y.3d at 806.

Finally, Grumman claims that, even if Century were successful in showing that Grumman had failed to provide it with timely notice, Century has not met its burden of showing the Grumman knew or had reason to know that any liabilities related to the Bethpage Facility would "likely" exhaust the primary coverage and impact the excess policies Century provided. (See NGC Century 56.1 ¶ 77.) This

assertion attempts to place a burden on Century that it does not carry and is also unsupported by the record.

First, as a matter of law, after Century has asserted a valid late notice defense, which it has, the burden is on Grumman to show that notice was timely. See Green Door Realty Corp. v. TIG Ins. Co., 329 F.3d 282, 287 (2d Cir. 2003) ("An insured has the burden of proving reasonableness of delayed notice and must exercise reasonable care and diligence and keep itself informed of accidents out of which claims for damages may arise."); Long Island Lighting Co. v. Allianz Underwriters Ins. Co., 805 N.Y.S.2d 74, 75 (App. Div. 1st Dep't 2005) ("We reject plaintiff's [insured's] argument that there was a reasonable possibility that the subject policies, both excess, would not be reached by the Syosset claim, where plaintiff offers no evidence that the timing of its notice was the deliberate determination to that effect.").

Furthermore, the record does not support Northrop's assertion. The attachment point for Century's excess policies was $100,000 in cases of property damage. (See Walsh Decl. Ex. 8, at NGINS000001666.) The November 22, 1977 letter from the BWD—regardless of whether it ever in fact pursued the claim— indicated that Grumman would be liable "minimally" for "hundreds of thousands of dollars." (Heskin Decl. Ex. 24, at BWD0022765.) In addition, a Grumman internal memorandum dated in 1976 estimated potential costs at approximately $500,000 to investigate the groundwater issue and convert it to public water. (Heskin Decl. Ex.

43, at 21–22.)  The record thus contains ample evidence that Grumman knew that liabilities would indeed exhaust the policies.

V.    CONCLUSION

For the reasons set forth above, Century's motion for summary judgment as to the Bethpage Community Park and the Bethpage Facility is GRANTED

The Clerk of the Court is directed to terminate the motion at ECF No. 387.

SO ORDERED.

Dated:      New York, New York
            February 27 2014

                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge

19