UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
:
TRAVELERS INDEMNITY CO., et al.,          :
:
              Plaintiffs,                 :
:
              -v-                         :
:
NORTHROP GRUMMAN CORP., et al.,           :        12 Civ. 3040 (KBF)
:
              Defendants,                 :        OPINION & ORDER
:
and                                       :
:
CENTURY INDEMNITY CO., eventual           :
successor in interest to INSURANCE CO. OF :
NORTH AMERICA,                            :
:
              Nominal Defendant.          :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 02/27/2014

KATHERINE B. FORREST, District Judge:

      This action was commenced in April 2012 by Travelers Indemnity Co. and

various affiliated companies (together, 'Travelers') against Northrop Grumman Corp.

and Northrop Grumman Systems Corp. (together, 'Northrop' or 'Grumman'), and

Century Indemnity Co. ('Century'), eventual successor in interest to Insurance

Company of North America ('INA'), as nominal defendant.  Together, Travelers and

Century issued insurance policies to Northrop spanning a period from 1950 to 1985.

Pending before the Court are various motions for summary judgment by Travelers

and Century.  This Opinion relates to Travelers' motion for summary judgment with

respect to the Bethpage Community Park ('BCP') (ECF No. 387).  The Court deals

with the other motions in separate Opinions.

For the reasons set forth below, Travelers' motion as to the Bethpage Community Park is GRANTED.

The facts to which this Court refers in connection with its decisions herein are undisputed by competent evidence unless otherwise noted.

I.    FACTS

A. Facts Relevant to This Motion

Northrop concedes that, around 1948, it began constructing disposal 'impoundments' or pits within the parcel of land that became the BCP for disposing of toxic waste.  (Northrop Grumman's Responses to 'Travelers' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1' ('NGC 56.1') ¶ 135.) Northrop states that it used these disposal areas to contain two kinds of wastes: (1) sludge from the industrial wastewater treatment plant and (2) waste oils that may have contained small amounts of residual and used TCE, other solvents, and/or PCBs.  (Id.)  Northrop asserts that while it certainly knew it was placing these contaminants in the designated disposal area, it believed that it was complying with applicable law and did not intend or expect that the materials would contaminate the soil or groundwater.  (Id. ¶¶ 136-37.)  Because Northrop believed that its disposal practices on the site contained the contaminants, it did not intend or expect them to create environmental harm or environmental releases.  (Id. ¶ 137.)

Northrop states that, in the pre-1962 time period, it used TCE for many manufacturing purposes.  (Id. ¶ 149.)  Grumman recycled TCE on the premises.  (Id. ¶ 150.)  However, a former employee testified at his deposition that Grumman

placed only waste oil and used paint-booth rags into the area that would ultimately become the BCP. (Id. ¶ 151.) Northrop concedes that the liquid waste described by this former employee most likely contained waste oils from which small amounts of TCE could no longer be reclaimed, still bottoms also containing small amounts of TCE, or sludge resulting from the TCE distillation process relating to Grumman's recycling efforts. (Id. ¶ 152.) In addition, one area of what became the BCP was used as a fire training area, which involved placing waste oil and possibly TCE or other solvent residues into a four-foot-deep "impoundment" and igniting them for training exercises approximately three times per year. (Id. ¶ 153.) Grumman's practices with respect to TCE conformed to guidance documents published by a variety of entities. (Id. ¶ 154.)

According to Northrop, representatives of the New York State Department of Health (NYSDOH) told them that, after the sludge placed onto the site dried, a certain chemical "should not be soluble." (Id. ¶ 138.) Neither NYSDOH nor the Nassau County Department of Health ("NCDOH") objected to the method of placing the sludge in the "impoundments." (Id. ¶ 139.) Moreover, based on its own tests, Grumman believed the sludge to be inert and non-toxic. (Id. ¶ 140.)

In 1962, Grumman donated this 18-acre parcel from its Bethpage, Long Island facility (the "Bethpage Facility" or "BF") to the Town of Oyster Bay. (Id. ¶ 164.) After Grumman donated the land, the Town undertook a substantial excavation and building project that included bringing in substantial amounts of fill. (Id. ¶ 166.) Among the recreational facilities that the Town established on the site was an

ice rink.  (Id.)  Northrop concedes that the fill used by the Town's contractor was non-toxic material.  (Id. ¶ 167.)

In addition, according to Northrop, an important series of Freon releases by the Town, in connection with an ice rink they had erected on the BCP, occurred "before 1986." (Northrop Grumman's Mem. of L. in Opp. to Travelers' Mot. ("NGC Opp.") 8 (citing NGC 56.1. ¶¶ 178-79).)  A former Town employee testified that Freon was abruptly and accidentally released into the environment at the rink on the BCP during the 1970s and 1980s.  (NGC 56.1 ¶¶ 168-74.)  The employee testified that the releases were atmospheric and not onto the ground (Freon is a gas at ambient temperature).  (Id. ¶ 175.)  He testified that the first such release occurred in 1974, the second in 1977, the third in 1980, and the fourth in 1984.  (Id. ¶¶ 170-74.)

NCG has proffered two reports in which proposed experts—neither of whom is a percipient witness—opine that Freon was not only released into the atmosphere but also onto the ground in the form of liquid before it could volatize (and turn into a gas).  (Id. ¶ 175.)  They also opine that these releases have substantially contributed to the plume of groundwater contamination that is emanating from the BCP and that Northrop is being compelled to clean up.  (Id. ¶ 176.)  One of the experts, Dr. David Langseth, has opined that "leaks and spills from the former TOB ice skating rink . . . are substantially commingled with [volatile organic compounds] attributable to NGC releases." (Id. ¶ 177; Scanlon Decl. Ex. 5 (Langseth Decl.), Ex. B (Langseth Rebuttal Report), at 10.)  Another proposed expert, this time for Travelers, Michael Scott, has opined that as much as 50% of the mass of VOCs at

the BCP "represents Freon 12 and Freon 22 . . . which are unrelated to the disposal activities conducted by Northrop Grumman." (NGC 56.1 ¶ 180; Scanlon Decl. Ex. 118, at 33.)

On December 13, 1983, Grumman's legal department received a letter from the New York State Department of Environmental Conservation ("NYSDEC"), asserting "a claim by the State of New York . . . for all costs, damages and claims recoverable now and in the future under" the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). (Id. ¶ 184.) The letter stated that:

> [U]nless, in a timely fashion, all investigative, removal and remedial work necessary at the site (Site #130003–Grumman Aerospace Corp. Bethpage) and its environs is performed and unless the State is reimbursed for all damages to its natural resources and for all past, present and future response, removal and remediation costs, this claim will not have been satisfied.

(Id.) This letter has been referred to as the "1983 Potentially Responsible Person Letter" or "1983 PRP Letter."

The Town built the ice rink in 1986. (See Travelers' Reply to Grumman's Response to Travelers' Statement ("Travelers' Reply 56.1") ¶¶ 23.)

The NYSDEC Record of Decision ("ROD") provides that Grumman must undertake remedial efforts with respect to its acts on the BCP site, and that the Town is responsible for addressing the Freon contamination. (See id. ¶ 1.)

Northrop cites testimony from a former Grumman employee, Arthur Gibson, who worked at Grumman from 1976 to 1995, for the factual point that Site No. 130003, referenced in the letter, encompassed the entire Bethpage "facility." (NGC

56.1 ¶ 186.)  It is undisputed that by the time that Gibson commenced work for Grumman, the Bethpage facility no longer included the BCP site.  There is no indication in the cited material that Gibson was asked whether the BCP—even though it was no longer part of Grumman's Bethpage operations—was nonetheless part of what he would call the "facility."

The 1983 PRP letter initiated a formal, adversarial administrative process against Grumman for environmental contamination at the Bethpage facility.  (Id. ¶ 187.)

On January 30, 1984, Grumman's broker, Frank B. Hall, sent the 1983 PRP Letter to an address at which Travelers does not and has never conducted business.  (Id. ¶ 196.)  Grumman had provided this address to Hall.  (Id.)  Travelers has no record of receiving this letter.  (See id. ¶ 199.)  Northrop has stated in response that in this litigation Travelers has produced other letters that had been sent to the same erroneous address and that somehow made their way into Travelers' files.  (Id. ¶ 197.)[1]

A 1990 Order on Consent by Grumman encompassed Grumman's agreement to perform a remedial investigation/feasibility study ("RI/FS") at the Bethpage facility.  (Id. ¶ 189.)  The Order states: "From approximately 1937 to the present, Respondent or its predecessor in interest . . . operated facilities on real property at Stewart Avenue, Bethpage, Town of Oyster Bay, County of Nassau."  (Id.)  An

---

[1] Northrop cites inadmissible testimony from Gibson, who met with representatives of Travelers in the late 1980s and speculates that Travelers was aware of the NYSDEC claim.  (Id. ¶ 200.)  Gibson does not testify that Travelers actually stated that it was aware of the claim or that it had in fact received the 1983 PRP Letter.

accompanying map includes the area of the Bethpage facility that extends to the BCP.  (Id.)  The Order requires that Northrop address both on and off-site contamination "attributable to Respondent's Site."  (Id.)  In 2005, Northrop agreed to conduct a remedial investigation.  (Id. ¶ 192.)  Investigation of the BCP site is ongoing.  (Id. ¶ 193.)

Gibson testified that in a meeting in 1989 with Travelers, Travelers told him that Grumman should handle the NYSDEC Administrative Action on its own and that Travelers would not later defend itself on the basis that Grumman needed to obtain Travelers' prior approval before incurring any costs.  (Id. ¶ 204.)  In a letter from Travelers to Grumman dated October 1989, Travelers acknowledged that NYSDEC was in the final stages of conducting an RI/FS and that NYSDEC might file a civil suit, and stated that "[t]he material submitted to date, as well as your description of the facts . . . clearly does not constitute such a suit."  (Id. ¶ 205.)

In December 1994, Grumman sent a letter to Travelers requesting coverage for the NYSDEC Administrative Action "at the Bethpage facility."  (Id. ¶ 206.)

In May 2001, Grumman determined that soil samples on the fringe of the BCP property returned test results showing concentrations of PCBs that exceeded certain recommended clean-up standards.  (Id. ¶ 37.)[2]  A former Grumman employee, Larry Leskovjan, testified that in mid-2001, Grumman did not know that the Park was contaminated beyond this finding.  (Id.)  This same former employee testified that based on the agencies already involved in issues relating to the

---

[2] Here, as in other situations where Northrop disputes Travelers' version of the facts but concedes a subset of those facts or certain related facts, the Court views those other facts as undisputed and recites only those facts.

Bethpage facility, it was not something that Grumman "could just ignore." (Id. ¶ 41.) In July 2001, Grumman notified NYSDEC of its findings with respect to the BCP and stated that further investigation was warranted. (Id. ¶ 44.) In October 2002, Grumman notified Travelers of its correspondence with NYSDEC regarding PCBs in the Park. (Id. ¶ 46.) In May 2002, Grumman sent its broker, Aon, a letter enclosing a newspaper article regarding pollution at the BCP; the letter stated, "Enclosed is a newspaper article about possible contamination to [BCP] from our old manufacturing operations. The park is now closed." (Id. ¶ 52.) Grumman sent Aon a letter on the next day in which it stated that the same article referred to some residential housing possibly being implicated. (Id. ¶ 53.)

In May through July 2002, Grumman had further communications with NYSDEC regarding the Park. (Id. ¶¶ 57–59.) At least one of those communications involved settlement discussions regarding the Park. (Id. ¶ 59.) On July 26, 2002, NYSDEC wrote to Grumman that Grumman and the Navy shared responsibility for "this newly identified area" (the BCP), and that Grumman and the Navy needed to undertake a corrective measures study ("CMS"). (Id. ¶ 61.) In August 2002, Northrop provided its broker, Aon, with three pieces of correspondence from NYSDEC requesting that it conduct a CMS at the BCP. (Id. ¶ 208.) Aon forwarded this correspondence to Travelers in October 2002. (Id.) In March 2003, Travelers responded by denying coverage for the CMS. (Id. ¶ 209.)

In October 2002, Grumman sent Travelers a letter describing the elevated PCB levels in the BCP, stating that the Town had closed the Park, and included

correspondence with NYSDEC about the Park.  (Id. ¶ 54.)  In response to this letter, Travelers requested that Grumman provide it with (1) any settlement agreement entered into with respect to the Park, (2) copies of all correspondence received from NYSDEC or any other third party with regard to the Park, (3) any environmental reports documenting the nature and extent of contamination at the Park, and (4) a brief summary of operations performed at the Park by Grumman.  (Id. ¶ 68.) Grumman did not respond to this request, aside from the previously discussed communications.  (Id. ¶ 69.)

On March 5, 2003, Travelers advised Grumman that "coverage [was] not afforded" for "claims for the reimbursement of response costs," because the "claims were neither first made against Grumman nor reported to Travelers during the policy period," and because Grumman's liability arose out of "property damage," which was contained within the policy's pollution exclusion.  (Statement of Undisputed Material Facts in Support of Travelers' Mot. for Summ. J. ("Travelers 56.1") ¶ 72; Cannella Decl. Ex. 38, at TRAV003243, TRAV003245.)

In December 2002, the Town of Oyster Bay notified Grumman of its intent to file a citizen suit against it.  (NGC 56.1 ¶ 73.)  The letter from the Town referred to violations that "have occurred or are occurring at the Park Facility and Access Road Facility, and have contributed and/or continue to contribute to the handling, storage or disposal of hazardous wastes that may present an imminent and substantial endangerment to human health and the environment."  (Id. ¶ 76.)  On January 3, 2003, Grumman received the Town's notice to sue a second time when the Town

copied Grumman on a letter to various environmental regulators that attached the earlier notice to sue.  (Id. ¶ 77.)  Grumman did not inform Travelers of the December 2002 letter.  (Id. ¶ 78.)  The citizen suit sought prohibitory and mandatory injunctive relief on the ground that Northrop "failed to comply with the permit, closure, post closure, financial assurance, monitoring, compliance monitoring, and/or corrective action requirements" of the Resource Conservation and Recovery Act ("RCRA").  (Id. ¶ 218.)

In October 2002 and February 2003, Travelers wrote to Grumman and stated that it waived its late notice defense in connection with the NYSDEC Administrative Action at the Bethpage Facility.  (Id. ¶ 210.)  In April 2005, the Town of Oyster Bay served Northrop with a lawsuit relating to the BCP.  (Id. ¶ 215.)  On June 14, 2005, Northrop forwarded to Travelers the complaint in that action.  (Id. ¶ 214.)  The action by the TOB seeks monetary damages.  (Id. ¶ 219.)  Northrop has prevailed on summary judgment in the TOB action, but final judgment has not yet been entered.  (Id. ¶ 216.)

> ### B.  Travelers' Motion

Travelers argues that Northrop's claims for coverage at the BCP are barred based on the following four arguments: (1) the policies from 1972–1983 contain a statutory pollution exclusion unless discharges are "sudden and accidental"; (2) the policies for 1983 and 1985 contain exclusions for pollution that is "expected or intended"; (3) Northrop gave late notice to Travelers; and (4) coverage for claims by

the NYSDEC is barred by the six-year statute of limitations for breach-of-contract claims.

## II.   TRAVELERS' POLICIES AT ISSUE

The Court incorporates by reference its prior discussion of the Travelers policies at issue found in its February 25, 2014 Opinion & Order related to the Bethpage Facility.  (See ECF No. 545 at 26-28.)

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

The law is clear that on summary judgment a court may not weigh the evidence or make credibility findings.  See Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005).  The Court must draw any competing inferences in favor of the nonmoving party.  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).  A court can only grant summary judgment when, notwithstanding these legal principles, the moving party is able to demonstrate that, based on admissible evidence, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Here, Travelers, as the moving party, bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If Travelers has proffered facts showing that it is entitled to judgment as a matter of law, Northrop must come forward with specific facts showing a genuine issue of material fact for trial.  See Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to

the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

IV.     APPLICABLE LEGAL PRINCIPLES

The Court incorporates by reference its prior discussion of the applicable legal principles found in its February 25, 2014 Opinion & Order.  (See ECF No. 545 at 30-44.)

V.      ANALYSIS

A.  Analysis of the Statutory and Policy Pollution Exclusions

There is no disputed issue of fact as to whether, throughout the relevant period before 1962, Grumman intentionally disposed of contaminants on the site that became the BCP.  (See, e.g., NGC 56.1 ¶ 135.)  Its own discharges, dispersals, and releases of these contaminants were not sudden and not accidental.  The recitation of the facts as set forth above, and in Grumman's own words, makes it clear that its disposal practices in that area of the site were planned and spanned a number of years.

Thus, using any definition of "sudden," the releases were not.  Using any definition of the word "accidental," the releases were not.  Nor were the releases unintentional or unexpected.

As Northrop acknowledges in its papers on this motion, the statutory pollution exclusion presumes exclusion unless a policyholder can show that the discharge was sudden and accidental.  (See NGC 56.1 ¶ 1; N.Y. Ins. Law § 46(13) & (14).)  There is no provision in the New York insurance laws for concurrent causation by a third party that revives coverage that does not otherwise exist.

It is therefore of no legal moment that in the 1970s and 1980s some amount of Freon may have been released onto the soil and contaminated the groundwater.  (See NGC 56.1 ¶ 10.)[3]  That contamination, even if itself sudden and accidental, consisted of sudden and accidental events that occurred after Grumman had transferred the property to the third party responsible for doing those acts, the Town.  The issue before the Court on this motion is whether Grumman's acts of discharge is admitted disposal and discharge of contaminants onto what became the BCP site were sudden and accidental.  They were not.

The cases that Northrop cites in support of this point are inapposite.  In each case, it was the policyholder who engaged in a mixture of acts, some sudden and accidental and some not.  In that limited context, and based in some cases solely on allegations and not a developed factual record, courts found an immediate denial of

---

[3] The Court also notes that the experts' opinions that the Freon must have also been on the soil before vaporizing (see NGC 56.1 ¶¶ 175–76) is speculation.  The only percipient testimony is that of a former employee who testified that the Freon releases were atmospheric.  (See id. ¶ 175.)  Thus, there is no factual linkage between the Freon atmospheric releases and the contamination at the site.

contractual rights was not appropriate.  <u>See</u> <u>State of New York v.</u> <u>Blank</u>, 27 F.3d

783, 791 (2d Cir. 1994); <u>Petr-All Petroleum Corp. v. Fireman's Ins. Co. of Newark</u>,

188 A.D.2d 139, 142‑43 (N.Y. App. Div. 4th Dep't 1993).  There is no legal principle

that later, post-policy period acts by a third party can restore coverage where

coverage does not exist.

      It is also irrelevant that Grumman believed that what it was doing was

lawful or consistent with industry practice, that the materials were no longer toxic,

or that it its method of disposal (lined pits) would prevent the materials from

spreading pollution.  (<u>See</u> NGC 56.1 ¶¶ 136‑37.)  The statutory pollution exclusion

provides for a total exclusion on coverage—unless and until the policyholder can show

that its discharge, dispersal or release was sudden and accidental.  Believing in the

legality of one's act does not change its temporal nature and render that which

occurs over years "sudden," nor does it render that which is planned somehow

"accidental."  In each of these instances, Grumman's subjective beliefs can at most

lead to an inference that it did not "intend" to pollute.  However, the law does not

require that it "intend" to cause property damage through contamination; the law

requires that the act that eventuates in the property damage be sudden and that it

be accidental.  (<u>See</u> NGC 56.1 ¶ 1; N.Y. Ins. Law § 46(13) & (14).)  Here, Grumman

fails to raise a triable issue as to those facts that matter.  To find otherwise would

be to read a requirement of "intent to pollute" into the New York insurance law that

does not exist.  The purpose of the statutory pollution exclusion was to hold those

found to have polluted responsible for their actions. It is responsibility, not state of mind, that the statutory exclusion addresses.

The policies in 1983-1985, which use the terms "expected or intended" (see Travelers 56.1 ¶ 2), do not require a different outcome. In both situations, the legal focus is on the act of discharge into whatever container was being used. See Olin Corp. v. Ins. Co. of N. Am., 762 F. Supp. 548, 556-57 (S.D.N.Y. 1991). Whether the waste was discharged into a metal drum that was never expected to leak, a buried tank that was never expected to leak, or a lined pit that was never expected to leak, the outcome is the same. The waste was intentionally placed in the container (here, the pit); that practice went on for years; and there was a leak, not on one day, but over time. That is enough for the exclusion to apply. There is nothing unique about a lined pit that creates a legal distinction from a metal drum in this context. In both cases, one may assume that whoever placed the material in the container was hoping it would remain there forever. That was not to be in Grumman's case.

### B. Analysis of Travelers' Assertion of Late Notice

As set forth above, each of the policies at issue on this motion required immediate notice of any claim. Grumman concedes that it learned of some contamination at the BCP at least by May 2001. (See NGC 56.1 ¶¶ 37, 41, 44.) Grumman also does not dispute that, on July 26, 2002, NYSDEC wrote to Grumman that Grumman and the Navy shared responsibility for "this newly identified area" (the BCP), and that Grumman and the Navy needed to undertake a corrective measures study. (Id. ¶¶ 61, 208.) Grumman first communicated with

Travelers through its broker, Aon, in August 2002; Aon forwarded this correspondence to Travelers in October 2002.  (See id. ¶ 208.)  It is undisputed that Travelers responded to this communication with a request for additional information to which Grumman did not respond.

In December 2002, the Town of Oyster Boy notified Grumman of its intent to file a lawsuit relating to the BCP; Grumman does not dispute that it did not communicate this notification to Travelers.  (Id. ¶¶ 73, 78.)  In March 2003, Travelers denied coverage for a corrective measures study.  (Id. ¶ 209.)  In April 2005, the Town sued Grumman for contamination at the Park (though the lawsuit pursued a CERCLA theory, not RCRA, as the 2002 letter from the Town had previewed).  (Id. ¶ 215.)  Grumman notified Travelers about this suit six weeks later.  (Id. ¶ 214.)

Travelers argues that the lapse of time between Grumman's first awareness of PCB contamination at the Park in the spring of 2001 and its communication with Travelers in October 2002 constitutes late notice as a matter of law.  In addition, Travelers argues that the additional lapse of time between December 2002 (when the Town first notified Grumman of its intent to bring a lawsuit with respect to the BCP) and June 2005 (when it sent Travelers a copy of a complaint the Town filed on the BCP issues) also constitutes late notice as a matter of law.  More narrowly, Travelers argues that the delay even between April 2005 (when Grumman was sued) and June 2005 (when the complaint was sent to Travelers) is itself late notice as a matter of law.

Northrop has a host of responses to Travelers' arguments, none of which is availing.

As an initial matter, Northrop argues that there is a triable issue of fact as to whether it provided Travelers with notice of its responsibility for contamination at the BCP in 1984.  While acknowledging that the 1983 PRP Letter was enclosed with a cover letter from its broker to Travelers, and that it was sent to the wrong address (see NGC 56.1 ¶ 196), Northrop argues that it may nonetheless have been received—and that there is at least there is a triable issue as to the answer to that question.  In addition, while Travelers argues that the 1983 PRP Letter does not, in any event, put it on notice of any claims at the BCP, Northrop argues that there is at least a triable issue as to this question as well.  Thus, the battle as to the impact of the 1983 PRP Letter on this motion, if any, is one that is being waged on two fronts: receipt and content.  Neither is availing for Grumman.  The undisputed facts in the record—rather than conjecture or speculation—leave no triable issue on either question.

No party disputes that in January 1984, Grumman's broker Frank B. Hall sent the 1983 PRP Letter to the wrong address.  (See NGC 56.1 ¶¶ 195–99.)  There is also no dispute that at the time of this lawsuit, Travelers did not have a copy of that letter in its files; and there is also no dispute that no Travelers witness has testified that he or she ever saw the letter.  (See id. ¶ 199.)

Northrop asks this Court to draw an "inference" that at least raises a triable issue of fact as to whether Travelers received this letter based on two points: that other letters addressed to the same erroneous address had made their way into

Travelers' files, and that at a 1989 meeting, the subjective view of a former
Grumman employee (as to which he testified more than two decades later) was that
Travelers seemed to be aware of the NYSDEC claim.  (See id. ¶¶ 197, 200.)  The
latter point is, of course, inadmissible speculation as to Travelers' knowledge.

The former point asks this Court to draw an inference that, because some
other letters addressed to the wrong address had been received, the 1983 PRP
Letter must have been received.  This is not a reasonable inference; it is asking the
Court to use sheer speculation as the basis for a triable issue of fact.  Such an
inference might be appropriate if, for instance, there was a record from the U.S.
Postal Service that the 'wrong' address had in some way actually been routinely and
consistently converted (and thereby delivered) to the 'right' address for Travelers.  It
may well be the case that numerous letters were misdirected to the wrong address
and never made their way to Travelers.  If Northrop were allowed to argue its
version of speculation at trial, it would only be fair to allow Travelers to do the
same.  Together, it is clear that all this is asking a jury to do is to decide between
competing versions of speculation—not to draw reasonable inferences based on a
series of facts.[4]

Without a factual basis on which to ground receipt of the 1983 PRP Letter,
there is no triable issue in the record as to whether Northrop provided notice of the

---

[4] Additionally, Travelers proffers evidence that it received notice of and provided a defense of at least
seven other lawsuits for Grumman from 1983 to 1990.  (See Reply Cannella Decl. (Bethpage Facility)
Ex. 1, at TRAV004340, TRAV005070, TRAV004646, TRAV005960, TRAV004822, TRAV004287,
TRAV004089.)  No reasonable juror could find on this record that Travelers was attempting to shirk
its duties with regard to defending Grumman for lawsuits due to property damage.

BCP claim to Travelers prior to 2002.  It did not. On this basis alone, Travelers is entitled to summary judgment on the issue of late notice.[5]

However, even if this Court were to determine that the issue of receipt of the 1983 PRP Letter did raise a triable issue, summary judgment would nonetheless be appropriate as to notice based on the issue of content.  First, there is the question as to whether the 1983 Letter even references the BCP.  In the absence of a triable issue on this point, summary judgment would be warranted.

Northrop makes two primary arguments that seek to raise triable issues on this point:  (1) that the letter refers not only to "Site #130003—Grumman Aerospace Corp. Bethpage" but also to "its environs"; and (2) that Site #130003 to which the 1983 Letter refers necessarily included the 18-acre parcel that had become the BCP.  (See NGC 56.1 ¶ 184.)  Neither of these arguments is availing.

First, no rational juror could reach a determination that NYSDEC was referring to the BCP when it referred to Site #130003 in light of the fact that there is not a shred of evidence in the record that pollution at the BCP was even discovered until 2001.  (See id. ¶ 37.)  Grumman could not have given notice as to that which no one even understood.

---

[5] Northrop argues that New York law liberally construes notice requirements in favor of the insured and only requires "substantial" rather than "strict" compliance with notice provisions of insurance contracts.  See First Roumanian Am. Congregation v. GuideOne Mut. Ins. Co., 862 F. Supp. 2d 293, 310 (S.D.N.Y. 2012).  That doctrine, however, refers to the form in which a proof of loss is given, and particularly to valuation issues.  See id. at 310; SR Intern. Business Ins. Co., Ltd. v. World Trade Center Props., LLC, 381 F. Supp. 2d 250, 259 (S.D.N.Y. 2005) ("The purpose of a proof of loss is that the insurer may be able intelligently to form some estimate of his rights and liabilities before he is obliged to pay.") (internal quotation marks omitted).  The law is clear that short delays in notice are frequently considered unreasonable as a matter of law.  See Fairchild, 56 F.3d at 440.  In any event, if Travelers never received notice of the claim against Northrop, Northrop cannot be said to have "substantially" complied with its notice requirements.

Second, the 1984 cover letter enclosing the 1983 PRP Letter also refers on its face to the Old Bethpage Landfill, not to the BCP or even the Bethpage Facility. (See Scanlon Decl. Ex. 81, at CEN00001112.)  Grumman argues that the reference to site #130003 in the attached materials would nevertheless have eliminated any confusion, because that is the reference number for the Bethpage Facility, not the Old Bethpage Landfill.  Northrop cites testimony by a former employee, Gibson, whose tenure spanned the period 1976-1995, that a reference to "site #130003" encompassed the entire Bethpage Facility.  (See NGC 56.1 ¶ 186.)

However, this ignores the plain fact that, by the time this individual commenced work at Grumman, the 18-acre parcel had long been transferred to the Town (see NGC 56.1 ¶ 164), and could not have been part of what in the present tense was referred to as the "Bethpage facility."  This reading is further confirmed by the 1990 Order on Consent, which refers to Grumman's operations at the subject site as "1937 to the present."  (NGC 56.1 ¶ 189 (emphasis added).)  There of course were no Grumman operations on the 18-acre parcel after its transfer in 1962.  Moreover, the #130003 designation itself was given to the Bethpage Facility by NYSDEC in June 1980.  (NGC 56.1 ¶ 207; Calland Decl. Ex. 139, at CEN00001121.)  That is also long after the transfer of the 18-acre parcel.  Thus, the fact that both the 1983 PRP Letter refers to the Facility and "its environs" and the 1990 Consent Order refer to "off-site" contamination cannot be understood as implicating the BCP.  There is no evidence in the record that the phrase "environs" meant anything more than a general, non-specific placeholder.  The same is true for the phrase "off-site."

Grumman was required, as a matter of law, to provide written notice of Travelers of any claim relating to the BCP.  Thus, the alleged statement by Grumman in 1989 (see id. ¶ 204) would be ineffective as noncompliant with the requirement for a writing.  It is not true, simply because this gentleman believed that his description of the NYSDEC Administrative Action at the Bethpage facility was old news (even if it were admissible, which it is not), that Travelers received the 1983 PRP Letter (since it could have obtained knowledge at any time prior to the 1989 meeting or at the meeting itself), or that such awareness extended to claims relating to the BCP.[6]

Northrop argues that in any event, it has raised a triable issue as to whether notice should be excused on the basis that Travelers had waived such notice or that such notice would have been futile.  These arguments run counter to the explicit requirements of each of the policies at issue, which require that Grumman 'immediately forward to the company every demand, notice, summons or other process' it received.  (See Travelers 56.1 ¶ 4.)

Northrop also contests that it owed notice to Travelers regarding the December 2002 and January 2003 notices that the Town of Oyster Bay intended to

---

[6] Northrop also argues that the 1984 letter enclosing the 1983 PRP letter must have provided notice of its claim with regard to the Park because, if the 1983 PRP letter did not relate to the BCP, then NYSDEC would have sent a second PRP letter to Northrop with regard to the pollution at the BCP (which Northrop then would have forwarded to Travelers).  Northrop's speculation as to a possible chain of events is too conjectural to raise a triable issue as to whether Travelers had received notice at the time.  The 1983 letter refers simply to "Site #130003," and the cover letter refers to the Old Bethpage Landfill.  (Scanlon Decl. Ex. 81, at CEN00001112.)  Explicit notice of every claim must be given immediately pursuant to the Travelers policies.  Travelers cannot be expected to have understood the NYSDEC claim to relate to the BCP on the basis of speculation today about what would have or should have happened if that letter had not constituted notice.

sue Grumman for violations at the Park.  Northrop argues that, even if NYSDEC had asserted a new claim in 2002 concerning the Park, it was excused from notifying Travelers of it, because, by that time, "Travelers had repeatedly informed NG that Travelers would not defend administrative proceedings." (NGC Opp. 23-24 (citing NGC 56.1 ¶¶ 211-12).) Northrop also argues that it was excused from notifying Travelers because the Town's 2002 letter referred to an intent to commence a citizen suit pursuant to RCRA, distinct from the CERCLA theory that the Town ultimately pursued in 2005.  (NGC 56.1 ¶¶ 73, 79.)  RCRA provides for citizen suits limited to prospective injunctive relief to address alleged permit violations.  (See NGC 56.1 ¶ 73.)  Northrop argues that Travelers stated that it would not cover such claims for equitable relief.  (See Scanlon Decl. Ex. 85, at TRAV004484.)

It is true that "an insurer's across-the-board denial of coverage may excuse the insured party from providing notice of each individual claim." Texaco A/S (Denmark) v. Commercial Ins. Co., 160 F.3d 124, 129 (2d Cir. 1998); see also H.S. Equities v. Hartford Accident & Indem. Co., 661 F.2d 264, 270-71 (2d Cir. 1981) ("[A] repudiation of liability by an insurer on the ground that the loss is not covered by the policy operates as a waiver of the notice requirements contained in the policy.").

However, Northrop does not raise a triable issue of fact as to whether Travelers had indeed repudiated liability in the "blanket" and "across-the-board" manner contemplated by Texaco, 160 F.3d at 129, and H.S. Equities, 661 F.2d at 270-71.  Rather, Travelers had only declined coverage on two prior occasions, in 1989

and 1994, in both cases based on an individual review of the claim.  (See Scanlon Decl. Ex. 85, at TRAV004484; Scanlon Decl. Ex. 88, at TRAV013985.)  Furthermore, Travelers did not deny all claims outright, but rather stated that, "[n]otwithstanding its position on defense," it would "investigate the facts and circumstances of these matters in order to determine the extent of its indemnity obligations."  (Scanlon Decl. Ex. 85, at TRAV004484 (emphasis added).)  The Court is mindful that both letters to Travelers stated that Travelers would not cover "any claim for equitable relief," which would include RCRA.  (See Scanlon Decl. Ex. 85, at TRAV004484; Scanlon Decl. Ex. 88, at TRAV013985.)  However, under these circumstances, where Travelers agreed to continue to investigate its duty to indemnify Grumman, ongoing notice was required.  See Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307, 329 (2d Cir. 2000) (finding that an insurer had "never categorically denied that it had a duty to provide indemnification and therefore did not thereby waive notice"); Nat'l R.R. Passenger Corp. v. Steadfast Ins. Co., No. 06 Civ. 6072 (PAC)(GWG), 2009 WL 562610, at *13–14 (S.D.N.Y. Mar. 5, 2009) (explaining that a "specific denial of coverage" did not "prevent[] an insurer from requiring notice when a new claim arises, based on new allegations and new defendants, that is outside the scope of the insurer's prior denial").

Furthermore, even accepting as true for purposes of this motion that Travelers had denied coverage across the board, that would nonetheless not relieve

Grumman of its contractual obligations to continue to provide notice of that as to which it intended to assert coverage.[7]

## VI.    CONCLUSION

For the reasons set forth above, Travelers' motion for summary judgment as to the Bethpage Community Park is GRANTED.

The Clerk of the Court is directed to terminate the motion at ECF No. 344.

SO ORDERED.

Dated:        New York, New York
              February 27, 2014

_____
                    KATHERINE B. FORREST
                    United States District Judge

---

[7] Travelers has separately moved for summary judgment with respect to coverage of the NYSDEC claim regarding BCP on the basis of the statute of limitations.  According to Travelers, once it declined coverage in 2003, Grumman had six years within which to assert that Travelers was in breach of its policy obligations.  Grumman argues that no breach could occur until Travelers' duties to defend and/or indemnify had fully matured, a demand had then been made, and a new declination had occurred.  This is incorrect. The law is clear that a policyholder may sue an insurer for breach of contract once the insurer has declined coverage.  See, e.g., Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd., 77 F.3d 16, 21 (2d Cir. 1996).  At that point, there is no reasonable basis to assume that the insurer has any intent to assume any contractual obligations.