```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/07/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                            :

TRAVELERS INDEMNITY CO., et al.,       :
                                            :

              Plaintiffs,           :
                                            :

              -v-                  :
                                            :

NORTHROP GRUMMAN CORP., et al.,    :       12 Civ. 3040 (KBF)
                                            :

              Defendants,        :       <u>CORRECTED</u>
                                            :      <u>OPINION & ORDER</u>
and                                       :
                                          :

CENTURY INDEMNITY CO., eventual     :
successor in interest to INSURANCE CO. OF :
NORTH AMERICA,                  :
                                          :

              Nominal Defendant.   :
                                          :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      This environmental insurance coverage action was commenced in April 2012

by Travelers Indemnity Co. and various affiliated companies (together, "Travelers")

against Northrop Grumman Corp. and Northrop Grumman Systems Corp.

(together, "Northrop" or, during discussions of historical points, "Grumman"), and

Century Indemnity Co. ("Century"), eventual successor in interest to Insurance

Company of North America ("INA"), as nominal defendant.  Together, Travelers and

Century issued insurance policies to Northrop spanning a period from 1950 to 1985.

      Pending before the Court are various motions for summary judgment by

Travelers and Century.  This Opinion relates to Travelers' motion for summary

judgment with respect to an area that it refers to as the Bethpage Facility ("BF") (ECF No. 358).  The Court deals with the other motions in separate Opinions.

In this motion, Travelers argues that the statutory pollution exclusions effective for its policies issued between 1972 and January 1, 1983, along with pollution exclusions included in policies it issued between 1983 and 1985, are applicable to precisely the type of coverage claims that Northrop asserts with respect to the Bethpage Facility.

In addition, Travelers argues that summary judgment is separately warranted based on both late notice and violation of the so-called "voluntary payments" provisions in each of the policies at issue.

For the reasons set forth below, Travelers' motion as to the Bethpage Facility is GRANTED.

I.    FACTS[1]

The area known here as the Bethpage Facility encompasses a 600-acre parcel of land on which Grumman commenced manufacturing operations in the 1930s. (Northrop Grumman's Response to Travelers' "Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Supp. of Travelers' Mot. for Summ. J. Regarding Bethpage Facility" ("NGC 56.1") ¶ 4.)  For purposes of this motion, it does not include the 18-acre parcel that Grumman donated to the Town of Oyster

---

[1] The facts to which this Court refers in connection with its decisions herein are undisputed by competent evidence unless otherwise noted.  Most facts are drawn directly from those that Grumman concedes in its Response to Travelers' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1.  The Court cites Travelers' Rule 56.1 Statement if Grumman did not address or object to the fact proffered by Travelers.

2

Bay in 1962. The Bethpage Naval Weapons Industrial Reserve Plant ("NWIRP") was located on the grounds of the Bethpage Facility but operated by Grumman.

Grumman manufactured and tested airplanes, weapons and satellites at the Bethpage Facility. In connection with its operations, it used and stored contaminants such as trichloroethylene ("TCE"), a liquid used as a degreaser for metal parts. (Id. ¶ 5.) TCE is "toxic by inhalation, by prolonged or repeated contact with the skin or mucous membrane, or when taken by mouth." (Calland Decl. Ex. 39, at Feenstra 005746; see also Calland Decl. Ex. 60, at Feenstra 005828.)

There is a large plume of groundwater contamination below the Bethpage Facility, and now extending beyond its boundaries. (NGC 56.1 ¶ 2.) More than 2000 acres on Long Island are now impacted. (Id.) This lawsuit concerns whether insurance policies issued by Travelers and Century (or Century's predecessor, INA), cover liabilities that Northrop has and may have relating to clean-up and remediation.

Grumman's use and storage of volatile organic compounds ("VOCs"), including TCE, at the Bethpage Facility, occurred particularly at plants #1, #2, #3, #5, and #12. (Id. ¶¶ 5, 8, 214, 215.) Grumman concedes that it began using TCE at the BF in the 1940s. (Id. ¶ 9.)[2] Grumman used TCE primarily as a cleaning solvent for metal parts. (Id. ¶ 10.) In particular, plants #1, #2, and #3 each contained vapor degreasers that used TCE. (Id. ¶ 12.)

_____

[2] Here, as in other situations where Northrop disputes Travelers' version of the facts but concedes a subset of those facts or certain related facts, the Court views those other facts as undisputed and recites only those facts.

At least eight TCE degreasers operated in plant #2 from the 1960s through the mid-1990s.  (Id.)  At least six TCE degreasers operated at plant #3 at various times spanning the 1960s through the 1980s.  (Id.)  Plant #5 had at least one TCE degreaser between the 1960s and had two in the 1970s.  (Id. ¶ 14.)  In addition, plant #2 also used degreasers outfitted with spray wands that used TCE.  (Id. ¶ 13.)  Spray wands were used to degrease large parts, such as wings of planes.  (Id.)  To perform his task with a spray wand, a Grumman operator would stand on a platform along the side of the degreaser.  (Id.)

Grumman's operations included painting airplanes.  It had paint shops on the grounds of the Bethpage Facility for this purpose.  (Id. ¶ 15.)  TCE was used to clean the paint guns used in the paint booths.  (Id.)  To do this, the paint gun would be aimed at the paint curtain and discharged.  (Id.)  A "waterfall" in a paint shop was intended to keep sprayed paint from escaping.  (Id. ¶ 16.)  Water circulated through a closed system and cascaded down the sides of the paint shop to catch paint overspray; water also circulated through troughs on the floor of the paint shop and then back through the waterfalls.  (Id. ¶ 17; see also Calland Decl. Ex. 3, at 146:04–21.)  The paint shop consisted of one room and three waterfalls.  (NGC 56.1 ¶ 17.)  Grumman's practice was to clean each spray booth re-circulating tank weekly; the water residue would be pumped to the tank truck and taken to Grumman's on-site waste treatment plant.  (Calland Decl. Ex. 42, at Feenstra 000101; Calland Decl. Ex. 48, at Feenstra 000113.)  Sludges collected in the bottom of the tank were pumped into big vats.  (NGC 56.1 ¶ 18.)

Sludges from both the paint booths and the paint shop were treated in plant #2; "remaining sludge" was cleaned from the floor of the paint booths using rags. (Id. ¶ 18.)  Smaller parts were also cleaned at plant #2 using rags and TCE.  (Id. ¶ 20.)

John Cofman, a Northrop Grumman employee, testified that plant #2 had a system to distill TCE, which was dirty with oil because it had been used in degreasers and for cleaning, so that the company could reuse the TCE.  (Calland Decl. Ex. 4, at 372:20–373:08.)  According to a schematic, Grumman used concrete foundations for TCE storage tanks.  (Calland Decl. Ex. 63.)

On September 8, 1948, Fred J. Biele of Grumman received a letter "recommend[ing] that tests be made of [sludge] to determine whether same is in fact insoluble in water such as rain water and therefore will not pollute the ground water of the Island."  (Calland Decl. Ex. 43, at Dewling 000946.)  On November 5, 1949, Biele sent a letter to Stanley T. Barker of NYSDOH notifying him that Grumman was "having tests made to determine the chromium strength of the discolored paint liquor," and that samples had been taken for analysis.  (Calland Decl. Ex. 48, at Feenstra 000113.)  On November 21, 1949, Grumman received a permit to discharge sewage or wastes into New York state waters "in a manner which will not contaminate any ground or surface water supplies or injure fish life." (Calland Decl. Ex. 49, at Feenstra 000116.)

Grumman dug "recharge basins" directly into the ground throughout the Bethpage Facility, which it used at least in part to dispose of wastewaters.  (NGC

5

56.1 ¶ 21.)  The discharge basins were designed to allow the wastewater to infiltrate back into the ground and return it to groundwater.  (Id. ¶ 22.)  There were at least a dozen recharge basins across the Bethpage Facility at various points in its operational history.  (Id. ¶ 23.)

The volume of discharge water was significant.  For instance, during the period before 1974, there were five million gallons of wastewater per week coming out of plant #3.  (Id. ¶ 25.)

When the discharge basins became clogged and water could no longer percolate into the ground, Grumman would use bulldozers to scrape the basins.  (Id. ¶ 28.)  The scrapings obtained from these discharge basins were then used to fill in other low-lying areas on the premises of the Bethpage Facility.  (Id. ¶ 29.)

Until 1949, Grumman also used wastewaters containing chromium, a contaminant, generated through manufacturing operations at the Bethpage Facility, in recharge basins.  (Id. ¶¶ 30, 198–200.)  In December 1947, the New York State Department of Health ("NYSDOH") contacted Grumman regarding a detection of chromium in the local municipal water supply well.  (Id. ¶ 31.)  In its letter, the NYSDOH stated that it required Grumman to take action to prevent chromium wastes from being discharged into the waters of the State without proper treatment for the removal of chromium.  (Id.)  Three off-site wells were subsequently and permanently closed—one at which the chromium had been detected and two others.  (Id. ¶ 32.)

6

In 1949, Grumman built an Industrial Wastewater Treatment Facility ("IWTF") or Industrial Wastewater Treatment Plant ("IWTP") at plant #2 to remove chromic acid wastes from industrial wastewater.  (Id. ¶ 33.)  The IWTF did not treat wastewater for TCE contamination.  (Id. ¶ 34.)  Before 1981, water treated at the IWTF to remove chromium was directed to plant #2 recharge basins.  (Id. ¶ 35.)

One byproduct of the water treatment at the IWTF was sludge containing hexavalent chromium, which was further treated to become trivalent chromium; the sludge containing the trivalent chromium was then pumped into covered holding tanks outside of the IWTF.  (Id. ¶¶ 36, 37.)  This sludge was then further transported to areas within the 18-acre parcel that was transferred to the Town of Oyster Bay in 1962 and that became the Bethpage Community Park.  (Id. ¶ 38.)

Grumman contends that state and county regulators were aware of and had approved its sludge drying process and the location of its sludge disposal areas. (Id.)  Grumman also contends that regulators considered the sludge non-toxic.  (Id. ¶ 39.)

Starting in 1970, Grumman used a 4,000-gallon aboveground tank at plant #2 to store TCE.  (Id. ¶ 43.)  At some point, Grumman discovered that the tank was leaking and replaced the tank.  (Id. ¶¶ 44, 48.)  Grumman does not know the number of years that TCE had been leaking before it was discovered, but Grumman knew that it had unexplained "loss" of TCE for an estimated two or three years prior to discovery of the leak.  (Id. ¶¶ 44–46.)  Grumman replaced that leaking tank after it had already discharged "a lot" of TCE.  (Id. ¶ 48.)  A former Grumman

employee testified that when the tank was removed, the tank was "rotted out on the bottom."  (Travelers' Reply to Grumman's Response to Travelers' Rule 56.1 Statement ("Travelers' Reply 56.1") ¶ 3; Cannella Decl. Ex. 77, at 62:25–63:2.)[3]

Grumman sprayed waste oil on dirt roads within the Bethpage Facility in order to control dust.  (NGC 56.1 ¶ 49.)  The Town of Oyster Bay also sprayed oil for dust control purposes during the same period.  (Id.)  "There could have been any number of contaminants in" the waste oil.  (Id. ¶ 50 (emphasis removed).)

Starting in the early 1950s and continuing to 1982, Grumman maintained a drum marshaling area east of plant #3.  (Id. ¶ 51.)  Various solvents, including cyanide wastes and cadmium, were in these drums.  (Id. ¶ 52.)  The ground under the drums was cinder-covered.  (Id.)  Grumman kept the drums on the site until they could be treated or disposed of, including off-site.  (Id.)  By 1981, Grumman had added a "bermed concrete pad" and stored "drums on skids."  (Id. ¶ 53.)

Grumman also stored halogenated and non-halogenated waste solvents on a 100-foot-by-100-foot storage area from the early 1950s through 1969.  (Id. ¶ 60.)[4]

Three autoclaves for heating and hardening parts were installed before the mid-1960s; at least one was installed as early as 1955.  (Id. ¶ 61.)  Two of the three

---

[3] Northrop submitted a declaration from a proposed metallurgy expert, Jean Bigoney.  (See ECF No. 448; Bosset Decl. Ex. A (Bigoney Report).)  In her declaration, she expresses her opinion that the 4,000-gallon TCE tank leaked because of a fabrication defect.  (Bigoney Report 6.)  The Court has precluded the testimony of Bigoney and her expert declaration based on a failure to have the required indicia of reliability.  (ECF No. 529.)  Bigoney's opinion is based on speculation and ipse dixit.  As this Court stated in its decision, she has not observed the tank in question, whether in person, photographs or recreations; does not know the type or thickness of the metal used or the weld methods or weld joint types used to construct the tank; and has not analyzed alternate tanks or attempted to reconstruct the accident.  (See ECF No. 529, at 16–19.)

[4] Waste solvents are divided into "halogenated" and "non-halogenated" solvents.  (See Cannella Decl. Ex. 59, at NGINS000010542.)

autoclaves used Therminol as a heat transfer fluid; 97–98% of Therminol consisted of PCBs.  (Id. ¶ 62; Amended Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Travelers 56.1") ¶ 62.)[5]  PCB-containing fluid was released into the storm water system via floor drains in plant #3; the piping in the floor drains led to releases to the storm drains, which led to leaching pools that Grumman had constructed, and which ultimately led to the recharge basins.  (NGC 56.1 ¶ 63.)

In 1962, Grumman transferred an 18-acre parcel of land to the Town of Oyster Bay.  (Id. ¶¶ 64, 65.)  After 1962, Grumman therefore no longer owned the 18-acre parcel and performed no operations on the parcel.[6]  Grumman then created four new sludge-drying beds at plant #3.  (Id.)  It dug these new drying beds directly in the ground.  (Id. ¶ 65.)

In approximately 1973, Grumman's manager of environmental protection, John Ohlmann, learned of taste and odor problems at a newly-opened well at the Bethpage Facility, and reported these issues to NCDOH.  (Id. ¶ 71.) One former Grumman employee testified that after he would drink the water he would burp, and that his burp smelled like TCE.  (Travelers 56.1 ¶ 68; NGC 56.1 ¶ 68.)  This employee reported his experience to his supervisor in the 1970s.  (Id. ¶ 69.)

In 1975, Grumman detected "in their own analysis [of the groundwater on-site] . . . the presence of three hydrocarbons . . . methane, ethylene and either methyle propane or propadiene."  (Id. ¶ 72; Cannella Decl. Ex. 43, at

---

[5] By 1977, however, Grumman was using non-PCB heat transfer fluids.  (NGC 56.1 ¶ 62.)
[6] This timing has relevance to whether the designation of the Bethpage Facility as "Site #130003" included this 18-acre parcel.  As discussed below, that designation occurred two decades after that parcel had been transferred to a third party.

NGINS000210674.)  Samples collected by the Bureau of Water Resources from wells

8 and 14 in August 1975 contained TCE, tetra-chloroethylene, dichlorethylene, and

vinyl chloride.  (NGC 56.1 ¶ 74.)  The NCDOH made a preliminary determination

that the "discharge of sanitary and industrial wastes at and in the vicinity of the

Grumman Corporation is considered responsible for the degradation in quality of

Grumman Corporation wells."  (Id. ¶ 77.)

In May 1975, the Bureau of Water Resources for the NCDOH prepared a

"Preliminary Report, Groundwater Contamination, Grumman Aerospace

Corporation."  (Cannella Decl. Ex. 1.)  In the "Summary and Conclusions," the

report states:

> Water quality at the Grumman Aerospace Corporation has continued to
> decline to the extent that the most serious and severe instance of Magothy
> aquifer[7] contamination in Nassau County is now evident. . . .
>
> The discharge of sanitary and industrial wastes at and in the vicinity of the
> Grumman Corporation is considered responsible for the degradation in
> quality of the Grumman Corporation wells. . . .

(Id. at NCDOH-0011455.  A portion of the report labeled "Sources of

Contamination" states:

> Grumman Aerospace Corporation wells are located within the large, as yet
> unsewered portion of Sewer District No. 3 in the Town of Oyster Bay.  As a
> result, all industrial and domestic wastes in the vicinity are discharged after
> treatment on site to surface or subsurface disposal systems which are
> considered potential sources of pollution to the groundwater.

(Id. at NCDOH-0011463.)  In its "Discussion of Results," the report states:

> Probable contamination of groundwater by industrial sites is indicated with
> the detection of the Environmental Protection Agency of organic

---

[7] The Magothy aquifer is the name of the aquifer directly below the Bethpage Facility and reaching
into other parts of Long Island.  See Cannella Decl. Ex. 1, at NCDOH-0011455, NCDOH-0011459.)

contaminants in the Hooker Chemical Corporation lagoons and sewer recharge basins of the Grumman Corporation.

(Id. at NCDOH-0011464.)  This report was shared with Grumman.  (See, e.g., NGC 56.1 ¶ 76.)

Hooker Chemical Corp. was a business unrelated to Grumman and had a facility adjacent to the northwest piece of the Bethpage Facility.  In 1975 and 1976, Hooker Chemical Corp. was also considered a source of the groundwater contamination.  (Cannella Ex. 1, at NCDOH-0011464; NGC 56.1 ¶ 77.)

A November 5, 1975 "Summary of Groundwater Quality" states that a "most serious instance of Magothy aquifer contamination is now evident at the Grumman Aerospace Corporation." (Calland Decl. Ex. 86, at NGINS000619195.)

In June 1976, a groundwater consulting firm hired by Grumman, Geraghty & Miller, sent Grumman a memorandum that stated that it had "interpreted from the available data the ground-water quality situation at Grumman as resulting from one of two possibilities." (Cannella Decl. Ex. 3, at NGINS001899582.)  The first was a "slug" of contamination that had gathered in the shallow aquifer underlying at least part of the Bethpage Facility and that was moving southeast, "following the regional pattern of the ground-water flow." (Id.)  The second possibility was "the same as the first" except that the "water has moved vertically downward and affected water quality in portions of the intermediate and deep aquifers on the site." (Id.)

On August 6, 1976, Michael J. Alarcon of the NCDOH sent Harry F. Smith of EPA a "description of the problem of ground-water contamination at the Grumman

Aerospace Corporation, accompanied by a proposal for a water quality study in the

Bethpage area of Nassau County"; that letter was intended "to determine what

possible means are available to obtain Federal financing" through the EPA.

(Calland Decl. Ex. 92, at NCDOH-0002710.)

On November 30, 1976, the NCDOH issued a written "Synopsis of [the] Well

Contamination Problem at Grumman Aerospace Corporation Facilities in

Bethpage." (Cannella Decl. Ex. 4.)  The paper states that practices at both Hooker

Chemical Corporation and Grumman may be contributors to the pollution:

> The specific organic chemicals found in Grumman wells have been identified
> in the recharge basins of the Hooker Chemical Company which is located
> adjacent and to the east of the Grumman Plant.  Some of these chemicals
> have also been found in the recharge basins on the Grumman property.  The
> present preliminary indication is that the primary source of the chemicals is
> the Hooker waste discharges with the possible implication of Grumman
> discharges.

(Id. at NCDOH-0002943.)  The paper also stated that sampling results showed TCE

at wells no. 1, 5, 8, 14, and in a Grumman basin, and tetra chloroethylene at wells

no. 5, 8, 14, and in the basin.  (Calland Decl. Ex. 95, at NCDOH-028205.)

On December 13, 1976, Francis V. Padar of the NCDOH presented a

comprehensive public statement on the presence of trace organic chemicals in

groundwaters, in which he stated that the Hooker Chemical Company was

implicated at that time "as the major, if not the total source, of the vinyl chloride

and the chloroethylenes." (Calland Decl. Ex. 98, at NCDOH-0002993–NCDOH-

0002994.)  However, Padar stated that the "Grumman industrial operations . . . use

similar chemical compounds which may be contributing to the problem."  (Id. at

NCDOH-0002994.)  That statement also noted that the "general groundwater movement is southerly at a rate of movement in the Bethpage area of one to two feet per day."  (Id. at NCDOH-0002996.)

In December 1976, Grumman attended a meeting at which 11 local, state and federal agencies were represented regarding the contamination of the well water. (NGC 56.1 ¶ 82.)  NYSDOH was one of the agencies with a representative at the meeting.  (Id. ¶ 83.)  There were a number of news articles in November and December 1976, which Grumman clipped and maintained in its files, discussing the groundwater contamination issue at Grumman's wells.  (Cannella Decl. Ex. 6.)[8]

In 1977, the New York State Department of Environmental Conservation ("NYSDEC") requested that Grumman test water on its site; it suggested that Grumman have the samples tested for, inter alia, TCE.  (Id. ¶ 87.)  Samples reflected a presence of TCE.  (Id. ¶ 88.)  In one instance, water that had been "recharged" and returned to the ground was found to have a higher level of TCE than water pumped from the ground.  (Id.)  Grumman's study concluded that the instance in which water that had been recharged had a higher level of TCE was derived from "housekeeping practices" and stated that the "[s]olution to the problem of excess concentrations of certain compounds in the recharge water lies in modifying selected housekeeping procedures."  (Id. ¶ 90.)  The same study

---

[8] Northrop has objected to the admissibility of these news articles on hearsay grounds.  (NGC 56.1 pp. 2–3.)  The Court does not refer to or rely on these articles for the truth of statements contained in them.  Rather, the Court refers to them for the fact that the articles appeared and Grumman clipped and maintained them; that is, Grumman was aware of the news articles. This Court is not of the view that a news article itself triggers a duty to investigate; however, it is appropriately considered in the context of overall facts and circumstances as to the reasonableness of an insured's position on certain matters, including the reasonableness of its view as to non-liability.

distinguished housekeeping practices such as "spills, cleanup of equipment, etc." from Grumman's production operations.  (Id.)

On January 5, 1978, Geraghty & Miller provided Grumman with the results of a three-day "intensive monitoring program" it had performed at the Bethpage Facility.  (Cannella Decl. Ex. 8, at NGINS000768958.)[9]  Among the chemicals for which Geraghty & Miller tested was TCE.  TCE and certain other chemicals were found to be present "in greater amounts, for at least one sampling, in recharge water than in" water pumped from the wells.  (Id. at NGINS000768972.) In addition, the report stated that:

> There was no apparent single source in the plant as all of the outfalls yielded one or more of these constituents in greater-than-pumped quantity . . . . These occasional excess amounts suggest that these compounds are not being contributed through production operations.  They are probably derived from housekeeping practices (spills, cleanup of equipment, etc.) or some intermittent activity of an unknown kind.

(Id. at NGINS000768975.)  At least one of the wells with elevated levels (well no. 16) was upgradient from Hooker Chemical's plant: the water flow was southeast, but Hooker was to the west of Grumman.  (See Cannella Decl. Ex. 3, at

---

[9] One of Northrop's proposed experts, Dr. Langseth, opined that one "anomalous spike" related to Outfall 005, which supported Plant 02, "is evidence of a sudden spill."  (Id. ¶ 90; see Scanlon Decl. Ex. 5 (Langseth Decl.), Ex. B (Langseth Rebuttal Rep.), at 13.)  Langseth does not, however, walk through each of the various practices that he identified in which TCE was found—including the spray guns used to clean metal parts, washing floors, and disposal of rags (all of which are not part of "production" but rather housekeeping)—and distinguish among (and reject) various possible causes for the contamination.  (See Scanlon Decl. Ex. 5 (Langseth Decl.), Ex. A (Langseth Rep.), at 18–32.)  Rather, he simply assumes, because there was one "anomalous spike" related to plant #2, that the "most likely explanation" was an "accidental TCE spill" there.  (Langseth Rebuttal Rep. 13–14.)  Langseth's opinion is therefore no more than speculation and is inadmissible.  His opinion is also contrary to Grumman's own submission to NYSDEC in 1990 under penalty of perjury, as well as other testimony by an individual with knowledge (Cofman), that no sudden accidents occurred.  (See infra.)

NGINS001899582; Scanlon Decl. Ex. 5 (Langseth Decl.) ¶ 4.)  Thus, the

contamination in that well could not have come from Hooker.

On January 26, 1979, as part of an environmental permitting process,

Grumman presented the results of the three-day study to NYSDEC. (Cannella Decl.

Ex. 11, at NGINS000619272.)  The report "discuss[es] the control technologies by

which Grumman proposes to reduce or eliminate contaminants from" certain

sources, including TCE.  (Id. at NGINS000619272.)  Specifically, Grumman set

forth various ways to reduce the listed chemicals in its "effluents."  (Id. at

NGINS000619273.)  The report continues, "[a]s discussed in our first report, several

sources of potential discharge exist in our plants. . . .  The sources we listed

previously are: 1. Well water supply; 2. Paint booth wastes (water curtain type); 3.

Open plant drains and sinks."  (Id.)  In terms of paint booth wastes, the report

states that the water curtains are "a possible source of organic chemical

contamination," that Grumman had "performed several analyses of the waste

waters" from the curtains, and that in al cases "the treated effluents were within

discharge standards."  (Calland Decl. Ex. 116, at NGINS000619273.)  In terms of

open plant drains and sinks, the report states:

> As previously mentioned, there are times when trichloroethylene, 1,1,1-
> trichloroethane and methyl ethyl ketone have been found in the discharge in
> greater amounts than introduced.  The fact that the occurrences have been
> temporary, rather than continuous, points to a housekeeping problem within
> our production plants.  To correct this problem and prevent future
> discharges, Grumman has embarked on a comprehensive course of action
> designed to eliminate spills and dumps throughout the plant facilities and to
> restrict, through various control measures, the use of chemicals within the
> plant . . . .

(Cannella Decl. Ex. 11, at NGINS000619275–76.)

The report lists several courses of action, including:

1. <u>Chemical Waste Collection System</u>

Grumman has revised its formal chemical waste collection system throughout the major production plants and laboratories.  This revision provides for an easy, more positive method of collection of waste organic materials such as solvents and cleaners. . . . Through company-wide employee training and appropriate management controls, this policy should minimize if not eliminate unauthorized dumping. . . .

2. <u>Control of Access to Chemicals</u> . . .

3. <u>Training of Employees</u>

. . . Grumman's Training Department has developed several training courses . . . .  Through the application of these programs, we are confident that housekeeping problems with chemical discharges will be eliminated.

(<u>Id.</u> at NGINS000619276–77.)  The report then summarizes, "The additional technologies described above . . . will substantially eliminate the problem of intermittent spills of chemicals within our plants." (<u>Id.</u> at NGINS000619278.)

In 1979, the EPA gave NYSDOH a mandate to assess water supply programs and to assess surface disposal sites, including Grumman's Bethpage Facility.  (NGC 56.1 ¶ 95.)  The NYSDOH found that Grumman's "ground-water pollution potential" was "slightly higher than average."  (<u>Id.</u> ¶ 97.)  The NYSDOH then took and tested sludge samples.  (<u>Id.</u> ¶ 98.)

In 1979, Grumman agreed to perform a "sludge leachability test" for NYSDEC.  (<u>Id.</u> ¶ 100.)  By 1980, NYSDEC and NYDOH had reviewed the results of

testing.  (Id. ¶ 94.)  The results were sent to the EPA, which deemed the Bethpage Facility a "low priority for further EPA involvement at [that] time."  (Id.)

In June 1980, the NYSDEC, in cooperation with the NYSDOH, published a report naming Grumman's Bethpage Facility as among active hazardous waste disposal sites and assigning it the "Site Code 130003."  (Id. ¶ 93; see also Cannella Exs. 15, 16.)  Notably, this was more than 18 years after the 18-acre parcel that became the Bethpage Community Park had been transferred to the Town of Oyster Bay.  (See NGC 56.1 ¶ 65.)  There is no indication that the Site Code intended to capture and name as a hazardous waste disposal site what was then being used as a community park.  This is further confirmed by the fact that the report describes the Bethpage Facility as an "active industrial site."  (Id. ¶ 93; see also Cannella Ex. 15, at NGINS002895607; Ex. 16.)  The Bethpage Community Park was not an active industrial site.

The June 1980 report addresses a number of hazardous waste sites in New York State.  (Cannella Decl. Ex. 15.)  A summary at the beginning of the report states, "Vigorous state programs are needed to bring about remedial action or to recover the costs of needed remedial actions at uncontrolled hazardous waste sites from the responsible parties."  (Id. at NGINS002895565.) The State identifies three courses of action: to negotiate with the responsible party, to take administrative action to order responsible parties to clean up an old dump site, and/or to go to court.  (Id. at NGINS002895567.)  The report recommends support of a federal "Superfund" to assist in remediating certain sites.  (Id. at NGINS002895569–70.)

In September 1980, the Bethpage Facility was listed in a NYSDEC Registry of Hazardous Waste Disposal Sites. (Cannella Decl. Ex. 16.) The report states that the wastes are from, <u>inter alia</u>, "metal cleaning operations." (<u>Id.</u> at C-1-3.)

A NYSDEC 1983 report also lists Site 130003 as a Hazardous Waste Disposal Site. (NGC 56.1 ¶ 103.)

On December 6, 1983, the NYSDEC sent Grumman a "potentially responsible person" letter (the "PRP Letter"). (<u>Id.</u> ¶ 104.) The PRP Letter initiated a formal, adversarial proceeding against Grumman for environmental contamination at the Bethpage Facility "and its environs." (<u>Id.</u>) Grumman sent the letter to its broker; in late January 1984, the broker subsequently sent the letter to "Travelers" at an address that was not a business or other address for Travelers. (Travelers 56.1 ¶ 163.) A January 20, 1984 letter from Travelers to J.A. Morgese of Frank B. Hall and Co. regarding "New York State v. Town of Oyster Bay, et al." (a lawsuit related to the Old Bethpage Landfill) set forth the address that Grumman's broker later used to send the 1983 PRP Letter to Travelers. (<u>See</u> NGC 56.1 ¶ 162; Calland Decl. Ex. 139, at TRAV00570.) However, there is no record evidence that Travelers ever received the 1984 letter enclosing the 1983 PRP Letter. (Travelers 56.1 ¶ 164.) No Travelers witness has any recollection of seeing the 1984 letter or the 1983 PRP Letter. (<u>Id.</u> ¶ 167.) The 1984 letter also does not appear in Grumman's files. (NGC 56.1 ¶ 165.) No Grumman witness recalls having seen this letter prior to this litigation. (Travelers 56.1 ¶ 168; NGC 56.1 ¶ 168.) A claims handler at INA (a

predecessor company to Century) did receive a copy of the letter, which is how it came to be part of the materials in this litigation.  (NGC 56.1 ¶ 165.)

The 1984 cover letter refers to "Grumman Corporation, <u>New York State v. Town of Oyster Bay, et al.</u>"  (Travelers 56.1 ¶ 170.)  The lawsuit to which the letter's caption refers is related to the Old Bethpage Landfill.  (<u>Id.</u>)  The lawsuit relating to the Old Bethpage Landfill concerned a sludge drying bed no longer in use.  The text of the cover letter also states, "[E]nclosed is additional information on the above captioned for your files."  (<u>Id.</u> ¶ 171.)  The complaint in the Old Bethpage Landfill lawsuit was sent to Grumman on December 9, 1983.  (Cannella Ex. 19, at NGINS002909700.)  It was reported to the Grumman board on January 19, 1984. (Cannella Ex. 21, at NGINS001892952.)  The Old Bethpage Landfill claim concerned sludge taken from a sludge drying bed at the Bethpage Facility to the Old Bethpage Landfill.

The body of the 1983 PRP Letter references Site 130003. (NGC 56.1 ¶ 170.) The letter also refers to a claim for damages to natural resources "at and around" the Bethpage Facility and its "environs."  (<u>Id.</u>)  An excerpt from NYSDEC's June 1980 registry attached to the PRP Letter referred to a "sludge drying bed." (Travelers 56.1 ¶ 172; Cannella Decl. Ex. 22, at CEN00001121.)

In a memorandum dated January 11, 1984, Grumman states that the 1983 PRP Letter covers damage "attributable to GAC's on-site sludge drying bed, identified as site #130003."  (Travelers 56.1 ¶ 173.)  On January 24, 1984, a letter authored by a Grumman insurance manager states that the "site in question is no

longer in use." (Id. ¶ 174.)  In its Board of Directors meeting minutes and its 10-K, Grumman described the 1983 PRP Letter as "related to a disposal site which was located within the property boundaries of [the] . . . facility in Bethpage, New York." (Id. ¶ 175.)

A letter from Arthur Gibson, Grumman's former employee, dated April 10, 1984, refers to Site 130003 as "the GAC sludge beds."  (NGC 56.1 ¶ 178.)  At his deposition, Gibson stated that he believed at the time he wrote the letter that Site 130003 "pertained to the sludge beds but [was] not limited to the sludge beds."  (Id.) An Initial Assessment Study performed in 1986 also states that the 1983 PRP Letter related to the "sludge drying beds."  (Travelers 56.1 ¶ 179.)

John Ohlmann, John Ball (a Grumman lawyer), and David Miller (Grumman's environmental consultant) attended a meeting with NYSDEC on December 11, 1986.  (NGC 56.1 ¶ 105.)  In a memorandum dated December 12, 1986 that summarized the meeting, Ohlman and Ball wrote to Dean Cassell of Grumman that NYSDEC had requested a field investigation that "could be the first step leading to a very serious and expensive liability of Grumman for possible clean-up costs, if it were determined Grumman contributed contaminants to the groundwater and a cleanup of some kind was required."  (Id. ¶ 107.)  The memorandum noted that the possible clean-up costs could "conceivably be in the 10–20 million dollar range" and that the NYSDEC request could be the "opening gun of a long drawn-out controversy about the matter."  (Id. ¶ 108.)  At this time,

Grumman did not provide Travelers with notice of this field investigation or its views as to potential monetary exposure.

Beginning in 1986, the U.S. Geological Survey ("USGS") and NCDOH conducted a cooperative study of the groundwater near Bethpage. (Id. ¶ 109.) By 1987, the USGS and NCDOH study identified a plume of contaminated groundwater partially beneath the Bethpage Facility. (Id. ¶ 110.) At this time, Grumman did not provide Travelers with notice of this finding.

Gibson, a former Grumman employee, has stated that, as Grumman accumulated data following receipt of the 1983 PRP Letter and various studies were conducted thereafter, Grumman realized that plant #2 on the Bethpage Facility was a likely source of TCE contamination. (Id. ¶ 111.) However, Grumman continued to believe that Hooker Chemical Corp. also contributed to the contamination. (Id.) There is no evidence in the record that Grumman notified Travelers of this finding with respect to plant #2 at or even near the time at which the finding was made.

On December 6, 1987, NYSDEC reclassified the Bethpage Facility as a "Class 2 Site," or a site posing a "[s]ignificant threat to the public health or environment" and *requiring* remedial action; it also noted that groundwater standards had been contravened. (Id. ¶ 113.) On the same day, NYSDEC informed Grumman that a "full scale [Remedial Investigation/Feasibility Study] is required at the Grumman Bethpage Site." (Id. ¶ 114.) Grumman did not notify Travelers of this reclassification or the full-scale investigation and study at any time in any way in 1987 or 1988. As set forth in its Form 10-K, by the end of 1987, Grumman had

agreed to do the requested investigation and study.  (Id. ¶ 117.)  Grumman

estimated that the work involved would cost hundreds of thousands of dollars.  (Id.

¶ 119.)

In July 1988, Geraghty & Miller provided a remedial investigation/feasibility

study ("RI/FS") work plan for the Bethpage Facility.  (Cannella Decl. Ex. 38.)  In a

section entitled "Ground-Water Contamination," the work plan states:

> Beginning in the early 1940s (during World War II) Bethpage plant waste
> waters (containing chromic acid wastes) were discharged on-site.  In the late
> 1940s Nassau County Department of Health (NCDH) reported the presence
> of hexavalent chromium in a well south of the Grumman facility.  Grumman
> began studying the problem in the late 1940s and implemented a chromic
> acid waste treatment process . . . .

(Id. at NGINS000674266–67.)  In a section entitled "Environmental and Health

Concerns," the report states:

> The three primary contaminant transport routes at the Grumman facility
> capable of affecting the environment and raising health concerns are soil,
> ground water, and surface water. . . .
>
> In the past, the south recharge basins . . . were used for the discharge of
> treated waste waters from the Plant 02 Industrial Waste Treatment Plant.
> These discharges were monitored under a state discharge permit.
>
> Potential sources of soil contamination at the site have been identified from a
> review of the site history data.

(Id. at NGINS000674267–68.) In terms of TCE handling, the report states:

> The Plant 02 waste trichloroethylene storage/recycling facility had been in
> operation from 1940s to late 1970s.  Waste trichloroethylene was transferred
> by drums from the degreasing tanks to the TCE recycling facility at Plant 02.
> The recycled TCE was held in a bulk tank for re-use in Plant 02 (Ohlmann,
> 1988.)

(Id. at NGINS000674279.) The report bases its recommendations upon analytical data from 1970 onwards.  (See, e.g., id. at NGINS000674281, NGINS000674346 (showing test results for trichloroethylene dating from the mid-1970s).)  A "Chronological Record of the Bureau of Water Resources' Investigation of Groundwater Contamination, East Central Nassau County" was included as an appendix to the Geraghty & Miller work plan.  (Id. at NGINS000674402.)  That chronology sets forth issues dating from 1973 relating to contamination of drinking wells on site.  (Id.)

Grumman submitted the Geraghty & Miller work plan to NYSDEC.  (NGC 56.1 ¶ 122.)  Grumman did not provide written notice to Travelers that these communications in 1987–88 had occurred or that negotiations with NSYDEC were ongoing.  (Id. ¶ 124.)

A former Grumman employee has testified that, at a meeting with Travelers in 1989, representatives of Travelers and Grumman discussed the NYSDEC request orally. (Id. ¶¶ 124, 180.)

On October 25, 1990, Grumman entered into a consent order with NYSDEC that required Grumman to conduct the investigation and study at the Bethpage Facility.  (Id. ¶ 125.)  In 1990 or the immediate years thereafter, Grumman did not inform Travelers that it had entered into this consent order.

NYSDEC issued Records of Decision ("RODs") in 1995 and 2001 relating to the Bethpage Facility.  (Id. ¶ 127.)  These RODs set forth remedial measures Grumman was required to implement to cure findings of environmental conditions

in or around the Bethpage Facility.  (Id.)  Among other things, the RODs found that

groundwater plumes in and around the Bethpage Facility contained TCEs and

other chlorinated VOCs.  (Id. ¶ 128.)  The RODs refer to the TCE storage tank

outside of plant #2, the plant #2 recharge basins, the former drum marshaling area

at plant #3, the plant #3 recharge basins, and the salvage storage area at plant #3.

(Id. ¶ 129.)  A Grumman presentation dated 2002 states that the "[g]roundwater

problem is due to the discharge of [TCE] during the 40's, 50's, 60's, and 70's."  (Id. ¶

130.)[10]  Grumman did not provide Travelers with the RODs when they were issued.

In 1990, Grumman submitted an appendix to NYSDEC titled "Information on

Reported Spills, Leaks and Releases at the Grumman Aerospace Corporation and

U.S. Naval Weapons Industrial Reserve Plant, Bethpage, New York."  (NGC 56.1 ¶¶

135, 136; Cannella Decl. Ex. 43, at NGINS000210735.)  The appendix included a

certification, signed under penalty of perjury, stating that:

> I certify under the penalty of law that I have personally examined and am
> familiar with the information submitted in this document and all

---

[10] In opposition to this motion, and as discussed at various points in this Opinion, Northrop has
submitted a declaration from a proposed expert, Dr. David E. Langseth.  Dr. Langseth has opined
that at least some of the TCE contamination found in the soil and groundwater at the Bethpage
Facility was likely caused or must have been caused by sudden and accidental events, and that this
TCE contamination has commingled with the other TCE contamination.  (Id. ¶ 130; see Langseth
Rep.)  This opinion is based on Langseth's speculation as to how the contamination occurred.  While
Langseth has experience in environmental pollution, his opinions require a factual basis, and this
they lack.  The Court therefore finds it inadmissible and disregards it.  Among the events to which
Langseth refers are a storage tank leak that another expert opines was due to a fabrication defect,
overflows from a waste solvent pump, indoor floods, and a forklift that punctured a drum.  (See
Langseth Rep. 73–77.)  Given the routine nature of Grumman's practices in each of the areas in
which these events occurred, none could reasonably be characterized as "sudden and accidental."
Rather, and as Grumman's own employees testified, they were all part of ordinary occurrences and
experienced as a part of normal operations.  (See NGC 56.1 ¶¶ 313, 314.)  For example, it is natural
to expect that storage tanks sometimes leaked, that that a forklift would accidentally puncture a
drum, and that "fires triggered the sprinkler system, the sprinkler system malfunctioned, or a water
pipe broke."  (See Langseth Rep. 76 ("[The forklift puncture] was most likely not the only such
incident . . . .  This is confirmed by [deposition testimony] that accidents related to handling liquids,
such as tipping buckets or running into things with fork trucks, occurred in the plants.").)

attachment[s] and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment.

(NGC 56.1 ¶ 136.)  The appendix identifies a few isolated spills, but there is no evidence that any involved TCE.  (Travelers 56.1 ¶¶ 138, 139.)  Steven Scharf, the NYSDEC designee, testified that he was not aware of any explosions, fires, abrupt releases, or accidents at the Bethpage Facility, nor did NYSDEC have any record of any reports of the same.  (Id. ¶¶ 134, 135; Travelers 56.1 ¶¶ 134, 135.)

In a 2012 letter from Northrop to Travelers, Northrop estimated that it had spent $40,600,000 to date, but stated that those estimates did "not take into account all potential cost[] contingencies."  (NGC 56.1 ¶ 140.)  Grumman did not obtain Travelers' consent prior to incurring the specific costs that comprised this $40 million-plus.  Among these costs were those related to the installation of a soil vapor extraction system and an on-site containment system that Grumman continues to operate to this day.  (Id. ¶¶ 142, 143.)  The soil vapor extraction system was specifically "designed to remove the TCE in unsaturated soils" in a TCE "source area which was found adjacent to Plant 2."  (Id. ¶ 142.)

By the mid-1990s, Grumman had entered into an informal "handshake agreement" with the U.S. Navy relating to allocation of costs regarding the Bethpage Facility remediation and cleanup.  (Id. ¶ 144.)  Grumman did not inform Travelers of this agreement when it occurred or even in the immediate years thereafter.

Grumman merged with Northrop in 1994. (See id. ¶ 147.) In 1999, Northrop initiated an effort "to assess the potential for significant cost recovery of company environmental remediation expenses from applicable insurance coverage." (Id.) In 2009 and early 2010, Northrop worked with outside legal counsel to evaluate and pursue insurance recoveries for environmental liabilities. (Id. ¶ 153.)

On February 1, 2012, Northrop sent a letter to Travelers requesting coverage for the Bethpage Facility. (Id. ¶ 157.)

## II.   TRAVELERS' POLICIES AT ISSUE

Travelers issued a series of primary and excess liability policies to NGC's predecessors effective from January 1, 1968 through January 1, 1985. (Northrop Grumman's Responses to Travelers' "Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Supp. of Travelers' Mot. for Summ. J. Regarding the Community Park" ("NGC BCP 56.1") ¶ 109.) All of the policies at issue on this motion require Grumman to provide Travelers with immediate written notice of a claim. They each contain the following language:

> If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(NGC 56.1 ¶ 184.) All of the Travelers primary policies provide:

> No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

26

(Travelers 56.1 ¶ 185; NGC 56.1 ¶ 185.)  The Travelers Catastrophic Umbrella

policies provide:

> Written notice shall be given by or on behalf of the insured to the company or
> any of its authorized agents as soon as practicable whenever (a) bodily injury
> or property damage takes place, or (b) an act or omission takes place
> resulting in other injury or damage, which appears reasonably likely to
> involve this policy.

(Id. ¶ 186.)  The Travelers primary policies at issue prohibit the insured from

voluntarily assuming obligations or expenses without Travelers' consent:

> The insured shall not, except at his own cost, voluntarily make any payment,
> assume any obligation or incur any expense other than for first aid to others
> at the time of the accident.

(Id. ¶ 188.)  The Travelers policies in effect from January 1, 1968 through January

1, 1972 do not contain any pollution exclusions.  (NGC BCP 56.1 ¶ 110.)

All insurance policies in effect in New York between January 1, 1972 and

January 1, 1983, with the exception of Policy No. TREE-SLG-107T519-8-82,

incorporate New York State's statutory pollution exclusion:

> Policies . . . issued to commercial or industrial enterprises providing
> insurance against the legal liabilities specified in this subdivision shall
> expressly exclude therefrom liability arising out of pollution or contamination
> caused by the discharge, dispersal, release or escape of any pollutants,
> irritants or contaminants into or upon land, the atmosphere or any water
> course or body of water unless such discharge, dispersal, release or escape is
> sudden and accidental.

(Travelers 56.1 ¶ 181 (quoting N.Y. Ins. Law § 46(13) & (14) (McKinney 1981)).)

The Travelers policies in effect between January 1, 1983 and January 1, 1985,

contain a different form of pollution exclusion:

> This insurance does not apply to bodily injury or property damage arising out
> of any emission, discharge, seepage, release or escape of any liquid, solid,

> gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable.

(Travelers 56.1 ¶ 182).  Travelers' Policy No. TREE-SLG-107T519-8-82 contains this form of pollution exclusion.  (NGC 56.1 ¶ 183.)

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

The mere fact that submissions on summary judgment are extensive (even requiring a small moving truck) does not mean that there is a genuine issue for trial.  Such extensive submissions may mean that the record is simply a large one.  The facts material to resolution of the motion may nonetheless be undisputed by competent evidence.  The size of submissions may also be tactical—meant by the non-movant to convey a sense that "there must be something that would preclude summary judgment in here!"  Or the size may be due to something else entirely.

On this motion, the Court has carefully reviewed the parties' submissions, aided by their additional submission of DVDs with documents hyperlinked to the text of the submissions, allowing for easier reference.  The submissions are—to put it mildly—extensive.  But they do not contain a triable issue of fact that precludes granting Travelers' motion.

In reviewing the submissions of the parties, the Court has been careful to keep in the forefront the legal principles that on such a motion, it may not weigh the evidence or make credibility findings.  See Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005).  If there are competing inferences to be drawn from the evidence presented on the motion, the Court must draw any competing inferences in

favor of the nonmoving party—here, Northrop.  Dickerson v. Napolitano, 604 F.3d

732, 740 (2d Cir. 2010).  This Court can only grant summary judgment when,

notwithstanding these legal principles, the moving party is able to demonstrate that

based on admissible evidence, "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Of course, contested facts unnecessary to resolution of this motion do not

create triable issues.  Here, the record is full of such facts.  That this Court has not

considered such facts is due to their legal irrelevance to resolution of the motion.

As the moving party, Travelers bears the burden of demonstrating "the

absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986).  If Travelers has proffered facts showing that it is entitled to judgment

as a matter of law, Northrop must come forward with specific facts showing a

genuine issue for trial.  See Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d

670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).

"[A] party may not rely on mere speculation or conjecture as to the true nature of

the facts to overcome a motion for summary judgment," as "[m]ere conclusory

allegations or denials cannot by themselves create a genuine issue of material fact

where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir.

2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show

that there is a genuine issue of material fact for trial, the non-moving party cannot

rely on mere allegations, denials, conjectures or conclusory statements, but must

present affirmative and specific evidence showing that there is a genuine issue for trial.").

## IV.   APPLICABLE LEGAL PRINCIPLES

### A.   Pollution Exclusions

Whether summary judgment is appropriate based on the statutory or policy-based pollution exclusions depends on the legal interpretation of both the phrase "sudden and accidental" and "expected or intended," as well as whether there is a triable issue of fact as to Grumman's actions as measured against those legal standards.

#### 1.   Burden of Proof

As the policyholder, Northrop Grumman bears the burden to show that any releases were "sudden and accidental," because the phrase "unless such discharge, dispersal, release or escape is sudden and accidental" functions as an exception from the statutory exclusion applicable to the Travelers policies issued between January 1, 1972 and January 1, 1983. See Northville Indus. Corp. v. Nat'l Union Fire Ins. Co., 89 N.Y.2d 621, 634 (1997).

For Travelers' policies issued between January 1, 1983 and January 1, 1985, Travelers bears the burden to show that any releases were not "expected or intended," because the phrase "if such emission, discharge, seepage, release or escape is either expected or intended" modifies the exclusion for pollution itself. See Northville, 89 N.Y.2d at 634.

The burden of obtaining summary judgment on insurance coverage is a high one and is borne by the movants.  Travelers has the burden of showing that the statutory and policy exclusions clearly and unmistakably bar coverage on the undisputed facts.  See Belt Painting Corp. v. TIG Ins. Co., 100 N.Y.2d 377, 383 (2003).

2.    "Sudden and Accidental"

New York courts have repeatedly held that the "sudden and accidental" pollution exclusion is "unambiguously plain and operative."  See Powers Chemco, Inc. v. Fed. Ins. Co., 74 N.Y.2d 910, 911 (1989); Technicon Elecs. Corp. v. Am. Home Assur. Co., 74 N.Y.2d 66, 71 (1989) ("Technicon II"); see also Northville, 89 N.Y.2d at 631.

In order to avoid summary judgment as to coverage despite the statutory exclusion, a policyholder must raise a triable issue of fact as to whether its release of any contaminants was both sudden *and* accidental.  Powers Chemco, 74 N.Y.2d at 911; New York v. AMRO Realty Corp., 936 F.2d 1420, 1427 (2d Cir. 1991). The Second Circuit has described this double requirement as "invoked only when the discharge is both sudden *and* accidental; if the discharge is either non-sudden or non-accidental, there will be no coverage."  Id.

The statutory language and interpreting case law make clear that the factual question as to "what" must be sudden and accidental relates to the discharge, dispersal, or release of "any" pollutants, contaminants or irritants.  N.Y. Ins. Law §

46(13) & (14); see also Travelers Indem. Co. v. Orange & Rockland Utils., Inc., 73

A.D.3d 576, 577 (N.Y. App. Div. 1st Dep't 2010).[11]

Courts have held that the word "sudden" has—as one would reasonably

expect based on its plain-language meaning—a temporal element.  Northville, 89

N.Y.2d at 632; see also Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 158 (2d Cir.

2003); Ogden Corp. v. Travelers Indem. Co., 924 F.2d 39, 42 (2d Cir. 1991);

Technicon Elecs. Corp. v. Am. Home Assur. Co., 533 N.Y.S.2d 91, 99 (App. Div. 2d

Dep't 1988) ("Technicon I"), aff'd, 74 N.Y. 2d 66 (1989).  To be sudden, an event

must occur "abruptly, precipitantly or . . . in a short time."  Northville, 89 N.Y.2d at

632.  Discharges that occur over a period of time are, definitionally, not "sudden."

See, e.g., Ogden Corp., 924 F.2d at 42; AMRO Realty, 936 F.2d at 1428.

In Northville, a company engaged in the distribution and sale of gasoline

maintained both above- and belowground storage tanks as well as networks of

connecting pipes.  89 N.Y. 2d at 629–30.  In 1986 and 1987, the company noticed

---

[11] Northrop argues that a discharge, dispersal, or release must be into an area in which
contamination is expected or intended, and that, if the waste is placed into a disposal area that is
considered secure, then it is not discharged, dispersed, or released onto the ground.  Thus, the policy
exclusion would not bar accidental seepage or escape of chemicals from a clay-lined impoundment
expected to contain waste.  In support of this argument, Northrop cites Textron, Inc. v. Aetna Cas. &
Sur. Co., 754 A.2d 742, 750–51 (R.I. 2000) (stating that, where the insured used clay-lined ponds to
treat waste, whether releases were expected or intended was "a matter for fact-finding at trial and
not for summary judgment"), Queen City Farms, Inc. v. Central Nat'l Ins. Co., 882 P.2d 703, 719
(Wash. 1994) (finding that the correct focus was not on initial disposal into a pit, but leakage from
the pit), and Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co., 480 N.W.2d 368, 373–74 (Minn. 1992)
(explaining that "discharge, dispersal, release or escape" are terms that "carry the connotation of the
issuance of a substance from a state of containment; none of the terms is normally used to describe
the placement of a substance into an area of confinement").  None of these decisions, however, was
interpreting the New York insurance laws.  Furthermore, other courts interpreting the same
language have found that, in the context of the entire policy, placing waste in a secured area did
indeed qualify as a "discharge."  See, e.g., Broderick Inv. Co. v. Hartford Accident & Indem. Co., 954
F.2d 601, 607 (10th Cir. 1992) (finding that placing waste into containment ponds is a "discharge . . .
into or upon the land").

that there had been a "fortuitous release" of gasoline from two of its facilities that had migrated underneath the neighboring properties.  Id. at 630.  Owners of the neighboring properties sued; the insurers denied coverage based on the "sudden and accidental" pollution exclusion.  Id.  The court stated that "there is no allegation in the underlying complaints against plaintiff . . . that the gasoline discharges were anything but unintentional and unknown to plaintiff before they were discovered in 1986 and 1987."  Id. at 631.  The insurers did not dispute that the leakage was "accidental," but did dispute that it was "sudden."  Id.  Plaintiffs argued that because the leakage went undiscovered, whether it was "sudden" should at least create a triable issue of fact.  The court disagreed, stating that "*sudden*—as an abrupt happenstance—in the pollution exclusion clause exception also conforms to the commonsense meaning of the term and the reasonable expectations of a business person."  Id. at 633.  The court adhered to the rationale expressed by other courts that one cannot call "sudden" a process that occurs incrementally, no matter how unexpected or unintended the process.  Id.

Moreover, the court found that an onset is not "sudden" simply because a leakage event must commence at some point in time.  See id. ("[T]he sudden discharge element of the pollution exclusion exception cannot be established merely by showing that the release of the pollutant had its onset at some particular point in time, and in that sense, the discharge cannot be said to have begun 'abruptly.'").

In addition to being sudden, in order for a policyholder to overcome the statutory pollution exclusion on a motion for summary judgment, it must also and

separately raise a triable issue as to whether the discharge, dispersal or release was "accidental."  N.Y. Ins. Law § 46 (13) & (14); see also Powers Chemco, 74 N.Y.2d at 911.  Case law has interpreted "accidental" as meaning neither intentional nor purposeful.  Id.; AMRO Realty, 936 F.2d at 1427–28; Technicon I, 533 N.Y.S.2d at 101.  The law is clear that "accidental" includes an incident occurring "by chance." Northville, 89 N.Y.2d at 632.

As a matter of law, it is of no moment whether the damage was unintentional or accidental; the question is whether the act of discharge, dispersal or release was unintentional or accidental.  See id. at 632–33; see also Technicon II, 74 N.Y.2d at 74–75.  Where a discharge itself was deliberate, it was not accidental.  AMRO Realty, 936 F.2d at 1427.  "Disposing" of something connotes a deliberate and intentional activity.  See id. at 1428 (the fact that certain of the policyholder's employees did not know where drains led or where waste would end up made no difference, because its disposal was intentional and not accidental); see also EAD Metallurgical, Inc. v. Aetna Cas. & Surety Co., 905 F.2d 8, 11 (2d Cir. 1990). Lacking the specific intent to pollute does not make an intentional act of discharge "accidental."  AMRO Realty, 936 F.2d at 1428.

While the statute uses the word "any" in reference to an excluded discharge, case law has held that the discharge must be sufficient to have "some potentially damaging environmental effect."  Northville, 89 N.Y.2d at 634.

    3.    <u>"Expected or Intended"</u>

Neither the word "expected" nor the word "intended" is defined in the 1983–1985 Travelers' policies.  As with contract construction generally, the Court can give terms their plain and ordinary meaning unless some other meaning is, from the context, intended.  Both words have plain and ordinary meanings and the Court finds no basis to vary from those meanings here.  They are used in the disjunctive in the policy:  if a discharge is expected *or* it is intended, it is excluded from coverage.  Put another way, an unexpected *or* an unintended discharge is covered.

According to the <u>Merriam-Webster Online Dictionary</u>, the term "expect" means "to think that something will probably or certainly happen," and "intend" means "to plan or want to do (something)" or to have something "as a purpose or goal."  "Expect," <u>Merriam-Webster Online Dictionary</u>, http://www.merriam-webster.com/dictionary/expect (last visited Jan. 22, 2014); "Intend," <u>Merriam-Webster Online Dictionary</u>, http://www.merriam-webster.com/dictionary/intend (last visited Jan. 22, 2014).

The provision of the policies containing this exclusionary language also defines the "act" to which it refers to be the "emission, discharge, seepage, release or escape."  (NGC 56.1 ¶ 182.)  Put another way, the focus of the exclusion is on the act relating to the discharge, not whether it was expected or intended that the act would result in damage.  <u>See</u> <u>Olin Corp. v. Ins. Co. of N. Am.</u>, 762 F. Supp. 548, 561 (S.D.N.Y. 1991), <u>aff'd</u>, 966 F.2d 718 (2d Cir. 1992); <u>see also</u> <u>Emerson Enters., LLC v. Kenneth Crosby New York, LLC</u>, 768 F. Supp. 2d 484, 491 (W.D.N.Y. 2011)

("Moreover, the terms 'expected or intended' modify the initial 'emission, discharge, seepage, release or escape' of pollutants, not the subsequent damage caused.").

At least one court has interpreted this language in the context of Travelers' policies and found that non-accidental pollution was expected or intended.  See id. at 491–92.

In City of Johnstown, N.Y. v. Bankers Standard Ins. Co., 877 F.2d 1146 (2d Cir. 1989), the Second Circuit warned against taking the "expected or intended" exclusion too far, at least when an interpreting an occurrence provision.  There, the state of New York had sued the City of Johnstown for the costs of studying and cleaning up wastes seeping from a City landfill into surrounding groundwaters.  Id. at 1147.  The City gave notice of the suit to various insurers who had issued the City various policies over the years; the insurers disclaimed coverage on a number of bases, including that the pollution was intended or expected.  Id.  at 1147–48.  In particular, the insurers argued that the City had had prior notice that pollutants from the landfill were leaking into the groundwater.  Id. at 1149.  The district court agreed with the insurers that they had no duty to defend; the Second Circuit reversed.  Id. at 1147.

In its decision, the Second Circuit used broad language in defining how "expected or intended" should be interpreted.  Id. at 1150.  The court noted that, while an "intentional" act may cause damages, it may still be considered "accidental" under New York law so long as the "total situation could be found to constitute an accident."  Id. at 1150 (quoting McGroarty v. Great Am. Ins. Co., 368

N.Y.S.2d 485, 490 (1975)).  The court noted that insurance is intended to provide coverage against "mishaps," and ordinary negligence and taking a calculated risk do not amount to an "expectation" that would preclude coverage.  Id. at 1150.  The court reiterated that "expected" or "intended" excludes only those acts which are not accidental—and that courts have focused on whether an act is intentional, not the resulting damage.  Id.

The Second Circuit stated, "Recovery will be barred only if the insured intended the damages or if it can be said that the damages were, in a broader sense, 'intended' by the insured because the insured knew that the damages would flow directly and immediately from its intentional act."  Id. at 1150 (citations omitted).  The court specifically stated that its decision was based on what the insurers could show "at this stage" of the litigation and was because the damages alleged in the underlying CERCLA action were "not accidental."  Id. at 1151.  The "total situation" of the case, which involved the City allowing others to dump hazardous wastes in a landfill, did not rise to the level of intentional.  877 F.2d at 1150–52.

Importantly, City of Johnstown is distinguishable from AMRO Realty, a Second Circuit case decided two years later.  City of Johnstown is inapposite to the instant circumstances because the court there was interpreting an occurrence provision.  That is an important distinction, because in occurrence provisions, the "expected or intended language focuses on the damage or accident for which the insured seeks indemnification," whereas in pollution exclusions, those words modify

the "discharge" itself.  Agway, Inc. v. Travelers Indem. Co., No. 93 Civ. 557, 1993 WL 771008, at *16 (N.D.N.Y. Dec. 9, 1993) (emphasis added).[12]

As set forth above, in AMRO Realty, which governs these circumstances, the Second Circuit stated that, if the disposal or discharge was intentional, the pollution exclusion is triggered.  See 936 F.2d at 1427–28.  There, a manufacturer had disposed of hazardous manufacturing waste in several places on the site in question, including a parking lot, sinks that discharged into septic systems, and drains that discharged through sewage pipe into a drainage ditch.  Id. at 1427.  The manufacturer's intentional disposal of waste—even without knowing that it would be released into the environment—was sufficient to trigger the pollution exclusion. Id. at 1428.

4.   Concurrent Causation

Under New York law, when multiple releases of pollutants are at issue, so long as at least one release was not sudden or accidental and contributed substantially to the contamination, coverage is not automatically barred by the pollution exclusion.  See, e.g., New York v. Blank, 27 F.3d 783, 791 (2d Cir. 1994) (finding that insurers had a duty to defend a CERCLA action when the underlying complaint did not foreclose the possibility that the "property damage was caused, even if in part, by the 'sudden and accidental' discharge of pesticides"); Petr-All

---

[12] The relevant policies in City of Johnstown defined an "occurrence" as follows: "An accident, including continuous or repeated exposure to the same event, that results, during the policy period, in loss or damage to your property or in bodily injury, personal injury, or property damage. Such injury or damage must be neither expected nor intended by the insured."  877 F.2d at 1149 (emphasis added).  The exclusion at issue here states that insurance does not apply "if such emission, discharge, seepage, release or escape is either expected or intended."  (Travelers 56.1 ¶ 182 (emphasis added).)

<u>Petroleum Corp. v. Fireman's Ins. Co.</u>, 188 A.D.2d 139, 142–43 (N.Y. App. Div. 4th Dep't 1993) (finding that, if leaks occurred abruptly but continued for a period of time, they could fall within the "sudden and accidental" exception).  Northrop refers to this as the "concurrent causation rule."  (Northrop Grumman's Mem. of L. in Opp. to Travelers' Mot. ("NGC Opp.") 29.)

B.    <u>Notice</u>

Travelers also asserts receipt of late notice as a total defense to Northrop's claims for coverage with respect to the Bethpage Facility. The parties' dispute in this regard is less as to the applicable legal standards and more as to whether notice was timely provided, was futile and/or otherwise waived.

Timely notice is a condition precedent to coverage.  <u>Am. Ins. Co. v. Fairchild Indus., Inc.</u>, 56 F.3d 435, 438 (2d Cir. 1995).  In <u>Fairchild</u>, an insured party, Fairchild, appealed from the district court's directed verdict in favor of the insurer on the ground that the insured's notice of claim was untimely as a matter of law. <u>Id.</u> at 438.  The Second Circuit affirmed, stating that an "assertion of possible liability, no matter how baseless, is . . . all that is needed to trigger a notice of claim provision." <u>Id.</u> at 439, 441.  The court explained that it was clear long before notice was given that Fairchild and NYSDEC were negotiating over the remediation of a contaminated basin and a plume.  <u>Id.</u> at 440–41.  A memorandum that the areas in question would "most likely" be reclassified to a level 2 hazardous waste site was sufficient for Fairchild to know that NYSDEC was asserting liability and was enough to trigger the notice-of-claim provision.  <u>Id.</u> at 441.  Because Fairchild gave

notice only after reclassification had already been ordered, its notice was late as a matter of law.  Id.  The court stated that timely notice allows for a prompt investigation and early control of the direction a claim might lead; notice of a claim focuses on the actions (that is, a claim) made by third parties—and it may be triggered by a third parties' unreasonable and even sanctionable assertion of liability.  Id. at 439.

When an insurance policy requires immediate notice of a claim, courts have held even short delays to be unreasonable.  See M.Z. Discount Clothing Corp. v. Meyninger, 23 F. Supp. 2d 270, 272 (E.D.N.Y. 1998).  Some courts have held delays of fewer than 54 days to be untimely as a matter of law.  See Am. Home Assur. Co. v. Republic Ins. Co., 984 F.2d 76, 78 (2d Cir. 1993) (collecting eight cases in which delays of fewer than 54 days had been held untimely as a matter of law).

Under New York law, an insurer need not demonstrate prejudice to successfully invoke a defense of late notice.  See AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus., Inc., 84 F.3d 622, 624–25 (2d Cir. 1996); Argo Corp. v. Greater N.Y. Mut. Ins. Co., 4 N.Y.3d 332, 339–40 (2005).

The insured bears the burden of showing any delay was reasonable under the circumstances.  Security Mut. Ins. Co. v. Acker-Fitzsimmons Corp., 31 N.Y.2d 436, 441 (1972); see also State of New York v. Ludlow's Sanitary Landfill, Inc., 50 F. Supp. 2d 135, 138 (N.D.N.Y. 1999).  In Ludlow's, SMC had been disposing of various wastes by having Ludlow's haul them to a landfill site that Ludlow's operated.  Id. at 136.  SMC had used a contaminant that was in the fill that Ludlow's hauled

away, but had ceased using the particular chemical in 1972. Id. In February 1983, the NYSDEC investigated the Ludlow's landfill and sent a letter to SMC regarding its use of chemicals in fill that had been sent there. Id. In December 1983, the NYSDEC sent SMC a PRP letter. Id. SMC then hired counsel and began an investigation. Id. It did not provide notice to its insurers until October 1984. Id. at 137. The insurers declined coverage on the basis of a 10-month delay in providing notice; SMC responded by stating that it had a bona fide belief that it was not the responsible party at the site. Id. at 137. The court agreed that notice was untimely, relying in part on the fact that SMC had known shortly after receiving the PRP letter that New York State viewed it as one of two primary contributors of industrial waste to the landfill. Id. at 139.

A delay may be found unreasonable as a matter of law when no excuse for the delay is offered or the proffered excuse is meritless. See Olin, 966 F.2d at 724.

A good faith belief in non-liability is not a defense to a failure to provide notice of a claim. Fairchild, 56 F.3d at 439; but see Reynolds Metal Co. v. Aetna Cas. & Sur. Co., 259 A.D.2d 195, 201 (N.Y. App. Div. 3d Dep't 1999).

In the context of the question when notice of an occurrence is due, however, a good faith belief in non-liability may excuse some delay. Argentina v. Otsego Mut. Fire Ins. Co., 86 N.Y.2d 748, 750 (1995); Reynolds, 259 A.D.2d at 199–200 ("[A]n insured's good-faith belief in non-liability, when reasonable under the circumstances, may excuse a delay in notifying an insurer of an occurrence or potential claim."). Whether or not a policyholder has a good faith belief in non-

liability is normally a question of fact.  Id. at 200; see also Argentina, 86 N.Y.2d at 750.

In Reynolds, the plaintiff sued its insurers for coverage related to environmental actions by the NYSDEC, the EPA, and Mohawk Tribe.  259 A.D.2d at 197.  In December 1983, it had received a letter similar to that which Grumman here received, naming it as a "potentially responsible party."  Id. at 198.  Plaintiff had been aware of issues with respect to its Massena site; the letter made no specific reference to another area, but referred to "its environs," including "the natural resources of the State of New York at and around the referenced site."  Id. at 199.  Plaintiff did not understand this language to be referring to damage to the St. Lawrence River or property of third parties.  It did not provide immediate notice to its insurers and later claimed that based upon its good faith belief in non-liability, it was not obligated to.  Id. at 199.  The court there agreed.  Id. at 201.

In this regard, the court found persuasive the fact that when it received the PRP letter in 1983, Reynolds was unaware of any releases to the contaminated river and believed that any contamination came from other confirmed sources.  Id. at 202–03.  In 1985, plaintiff needed to obtain a new permit from the NYSDEC for the landfill and to build a new lagoon.  Id. at 202.  As a condition of granting this new permit, the NYSDEC required that Reynolds enter into a consent order.  Id. Reynolds entered into a consent order in which it agreed to conduct an investigation if any inactive hazardous waste sites were discovered; but no specific remediation was ordered and no investigation was required.  Id. at 203.  Shortly after entering

42

into the consent order, Reynolds received another "potentially responsible party" letter from the EPA.  Id.  This letter referred specifically to the St. Lawrence-Grasse River System.  Id.  Reynolds sent this second PRP letter to its insurers.  Id.  The insurers asserted a late notice defense on the basis that the first PRP letter encompassed the damage to the St. Lawrence River—and thus failure to provide notice of that letter to the insurers meant that the 1987 notice was untimely.  Id.  In the context that Reynolds found itself in—that is, not knowing of the contamination in December 1983 that eventually resulted in the second PRP letter in 1987—the Court found that a good faith belief in non-liability could excuse delay and reversed a grant of summary judgment.  Id. at 204–05.

Each policy imposes a separate contractual duty on the insured to provide notice.  Sorbara Constr. Corp. v. AIU Ins. Co., 11 N.Y.3d 805, 806 (2008).  The fact that an insurer may have actual notice from another source does not relieve the insured of its separate contractual obligation to provide notice.  See Ocean Partners, LLC v. North River Ins. Co., 810 N.Y.S.2d 430, 430 (2006); Travelers Ins. Co. v. Volmar Constr. Co., 752 N.Y.S.2d 286, 290 (2002); Sorbara Constr. Corp. v. AIU Ins. Co., 41 A.D.3d 245, 246 (App. Div. 1st Dep't 2007).

An insurer can waive—or be found to have waived—the notice provisions of its policy under certain circumstances.  For instance, waiver of the notice provision can occur if an insurer unequivocally and across the board denies any coverage obligation.  See Jacobson v. Metro. Prop. & Cas. Ins. Co., 672 F.3d 171, 176–78 (2d Cir. 2012); see also H.S. Equities, Inc. v. Hartford Acc. and Indem. Co., 661 F.2d

264, 270 (2d Cir. 1981).  If, however, an insurer has not categorically denied

coverage, the insured must comply with notice requirements.  See Olin Corp. v. Ins.

Co. of N. Am., 221 F.3d 307, 329 (2d Cir. 2000) (notice requirements were not

waived, because the insurer never categorically denied the duty to indemnify).  An

insured bears the burden of proving a denial of coverage by presenting sufficient

facts that a trier of fact may determine whether and when such denial occurred. Cf.

Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, N.J., 160 F.3d 124, 129–

30 (2d Cir. 1998) (a fact issue as to whether an insurer had denied coverage

required reversal of summary judgment).

V.     ANALYSIS

    A.     Pollution Exclusions

Travelers argues that Grumman's practices spanning decades require a

determination that the "sudden and accidental" statutory pollution exclusion or the

"expected or intended" policy-based exclusion preclude coverage with respect to the

Travelers policies issued between January 1, 1972 and January 1, 1983.  This Court

agrees.

    1.     Lawfulness and Knowledge of Contamination

Northrop spends a tremendous amount of space arguing two points: (1) the

lawfulness of their practices during at least the bulk of the relevant period, and (2)

that the pollutant potential of a primary contaminant at issue, TCE, was not

understood at the time of Grumman's practices.  Thus, taking these two points

together, Grumman argues that it did not and could not reasonably know its

operations, versus those of Hooker Chemical Corp., were polluting the groundwater. For purposes of this motion, the Court accepts as true the facts that Grumman has proffered in this regard.  They do not change the outcome of this motion.

First, the law is clear that for the period from 1972 to January 1983, whether a discharge was "sudden *and* accidental" is based on whether the discharge, dispersal, or release was sudden and accidental. Here, it clearly was not.  The lawfulness of Grumman's acts in discharging or disposing of its wastes is not at issue.  Rather the relevant question is whether the act of discharge or disposal was intended, and it was.  (See, e.g., NGC ¶¶ 21–23 (discussing the use of recharge basins); ¶ 29 (discussing the use of scrapings from discharge basins to fill in areas on the Facility); ¶¶ 43–48 (discussing the storage of TCE in a tank that leaked); ¶¶ 49–50 (discussing spraying of waste oil on roads in the Facility).)

The statutory pollution exclusion focuses on responsibility for what results from a discharge; the law does not require that the entity held responsible has acted contrary to law.  If an unlawful act were required, then the statute would contain a provision excluding otherwise lawful actions from the scope of the statute—but it does not.  See Marx v. Gen. Revenue Corp., 133 S. Ct. 1166, 1175 (2012) (discussing the "expressio unius" canon of statutory interpretation, by which Congress is assumed to act intentionally when it excludes something from a statute).

This is consistent with the case law.  For instance, in Northville, the insured's business involved the lawful storage and distribution of gasoline; the insured did not raise the lawfulness of its acts as a defense.  See 89 N.Y.2d at 629–

30.  The court found that the defendant insurers were not obligated to defend or indemnify against the insured's liability for discharges of that gasoline.  Id. at 635. Similarly, in AMRO Realty, the Second Circuit found that where the discharge was deliberate (waste was placed into containers), that was sufficient to eliminate any "accident"; there, disposing of waste was found to be an intentional and deliberate act.  AMRO Realty, 936 F.2d at 1427–28; see also Technicon II, 74 N.Y.2d at 75.

The Travelers policies issued between January 1, 1983 and January 1, 1985 contain specific language that this Court must interpret according to its plain meaning.  The policies provide that excluded from coverage is "any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either expected or intended."  (Travelers 56.1 ¶ 182.)  The lawfulness of an act is therefore not at issue; the issue is whether the act of discharge was expected or intended.

Similarly, the pollution exclusions do not require that Grumman understood that TCE or PCBs would contaminate the soil or groundwater.  The statute does not require an "intent to pollute" or even "knowing pollution."  In AMRO Realty, the Court found that a lack of knowledge that the insured's acts were contaminating also did not make the release "accidental."  936 F.2d at 1428.

Grumman knew what it was doing with respect to its operations as set forth extensively in the fact section above.  It intended to use TCE in its spray guns, and it intended for sludge containing TCE to be sent to the recharge basins, for the water containing TCE to be wiped up with rags, and for TCE to be placed into

drums for recycling.  All of these acts are undisputed and indisputably intended.  In addition, Grumman's own witnesses testified that they expected that welds on drums would fail and that spills would occur.  (See NG 56.1 ¶¶ 313–14.)  Moreover, the Geraghty & Miller report referred to Grumman's practices that led to contamination of TCE as "housekeeping" practices.  (NGC 56.1 ¶ 90.)

This case is not like that in City of Johnstown.  That case was in a far different procedural posture, involving a dispute of the duty to defend and indemnify—not ultimate coverage liability after the full development of a factual record.  There, it is certainly true that faced with a city being left on the hook financially to remediate a landfill, the Second Circuit used broad language to state that an insured had to intend injuries or damage and that it was not enough that an insured took a calculated risk.  877 F.2d at 1150.  However, that case was prior to the Second Circuit's decision in AMRO Realty, which found that a pollution exclusion is triggered when a disposal or discharge is intentional.  936 F.2d at 1427–28.  City of Johnstown was also prior to the Court of Appeals' decision in Northville, which found that the relevant question was whether the act of discharge, dispersal, or release was unintentional or accidental, not the damage.  89 N.Y.2d at 632–33.  Furthermore, as set forth above, the Second Circuit in City of Johnstown was interpreting a policy that stated that "injury or damage must be neither expected nor intended," not that an emission must be neither expected or intended.  See 877 F.2d at 1149.

2.   "Sudden and Accidental"

Grumman regularly used TCE in its operations starting at least in the 1940s. (See, e.g., NGC 56.1 ¶¶ 5, 8, 214, 215.)  Grumman's practices involved TCE on the ground, sprayed by wands, discharged into basins, and kept in drums.  (See, e.g., id. ¶¶ 13, 21, 52.)  All of these practices, as an external consultant stated in a 1978 report, involved "housekeeping" matters.  (NGC 56.1 ¶ 90; Cannella Decl. Ex. 8, at NGINS000768975 (Geraghty & Miller report); see also Cannella Decl. Ex. 11, at NGINS000619275–77 (Special Report submitted to NYSDEC).)   Put another way, it was the way that Grumman operated; Grumman's activities with respect to TCE were normal protocol. As a result, there was nothing "accidental" about normal discharges of TCE.

Northrop argues that, even if its practices (or some of them) caused non-sudden or non-accidental contamination, there is a triable issue as to whether that contamination merged with groundwater contamination caused by a third party, Hooker Chemical Corp.  (NGC Opp. 24.)  The fact that Hooker Chemical Corp. may have contributed to contamination at the Bethpage Facility does not relieve Grumman of responsibility, nor create coverage for Grumman that otherwise does not exist.  There is no triable issue as to whether Grumman itself contributed to the contamination on the site: Grumman's own documents, and its admissions in its reply to Travelers' Rule 56.1 Statement, are clear that its long-term, historical practices created contamination.  (See, e.g., NGC 56.1 ¶¶ 5, 8, 13, 14, 18, 20–23, 25, 28–31, 33–38, 214, 215.)

Northrop next argues that at least some of its own contamination was sudden and accidental and, again, that it therefore merged with the non-sudden and non-accidental contamination.  In this regard, it relies on its proposed experts, Drs. Bigoney and Langseth Bigoney.  By a separate Memorandum Decision & Order, this Court has determined that the opinion proffered by Dr. Bigoney does not meet the standards set forth in <u>Daubert v. Merrill</u>, and has precluded her opinion.  (ECF No. 529.)

Dr. Langseth's opinion is similarly flawed.  He has proffered reports in which he opines that certain discharges of TCE were "likely" sudden and accidental.  In particular, Dr. Langseth opines that a leak in a TCE storage tank at plant #2, known as tank 10, was "sudden" because the TCE-contaminated water "would have spurted out of the tank . . . in a sufficient amount within a short time to have contaminated all of the groundwater that requires remediation" at the BF.  (NGC Opp. 28.)[13]  Notably, the phrase "would have" is not based on fact—Dr. Langseth has no idea if the water with TCE actually "spurted out" in such a manner.[14] Rather, the tank was installed in 1970, and, for a period of some time, Grumman employees noticed discrepancies between fill records and the actual amount of TCE in the tank.  (NGC 56.1 ¶ 310.)  Grumman apparently inspected the tank for leaks but did not find any.  (<u>Id.</u>)  Once it had discovered the leak, Grumman replaced the tank.  (<u>Id.</u>)  In the absence of these two, precluded experts, Northrop has not

---

[13] Langseth's report states that the plant #2 area was "a major source" of contamination at the Facility.  (Langseth Rep. 63.)
[14] Langseth's report names various possible phenomena that "could" have occurred.  (<u>See</u> Langseth Rep. 74.)

proffered facts that raise a triable issue as to whether any discharges were sudden or accidental.

William Kovarik, a former Grumman employee, provides the only percipient testimony related to tank 10. (See id. ¶ 310.) The parties disagree on the import of Kovarik's testimony. Kovarik testified at his deposition that, "in the early '70s, we had a problem that we were losing degreaser fluid," and "nobody knew why [they] were losing it." (Cannella Reply Decl. Ex. 77 (Kovarik Dep.), at 62:15–62:21.) Kovarik testified as follows:

> I don't know how it was found, but the big tank in the back [tank 10] was on a sandy bottom, and somehow they found out that the tank itself was leaking. It rotted out on the bottom of the tank. . . . And it leaked right into the ground. I don't know how many years that could have been leaking. It could have been leaking for years, but I don't know.

(Id. at 62:22–63:9.) In response to the question, "Did you ever learn how much TCE they thought had leaked out over that period of time?", Kovarik responded, "There had to be a lot of it because they were complaining for quite a while, quite a few—I think about two, three years that they were losing it." (Cannella Decl. Ex. 77, at 147:7–13; see also Scanlon Decl. Ex. 5 (Langseth Decl.), Ex. A (Langseth Rep.), at 73.) Later, Kovarik was asked, "[D]o you remember how soon they replaced the tank after the leak was discovered?" (Calland Ex. 13 (Kovarik Dep.), at 177:3–5.) Kovarik responded, "I really couldn't tell you because I don't know . . . when they found it." (Id. at 177:06–08.)[15]

---

[15] Langseth also states that the release rate was most likely exceeding 250 gallons per week, perhaps higher, an amount that "should lead to suspicion of a leak." (Langseth Rep. 73.)

According to Travelers, this testimony reflects that the tank had leaked "for years" and could not have been sudden and accidental.  (Travelers 56.1 ¶ 48.) Northrop disputes this, and argues that Kovarik was speculating as to the amount of time for which the tank was leaking, stating merely that "[i]t could have been leaking for years, but I don't know."  (Kovarik Dep. 63:8–9.)  It is true that Kovarik does not testify conclusively as to the exact amount of time during which the tank was leaking, but that is immaterial to resolution of the present motion.  It is clear from Kovarik's testimony that the tank leaked over time.  It is undisputed that the loss of degreaser fluid occurred "in the early '70s—not at any one particular moment—and the bottom was rotted when the tank was replaced.  Thus, this leak was in any event not "abrupt," and not sudden and accidental under the meaning of sudden and accidental under New York law.  See Northville, 89 N.Y.2d at 633.

In Northville, an analogous case, the plaintiff discovered that a release of its gasoline into groundwater had occurred, thus affecting neighboring properties.  89 N.Y.2d at 629–30.  The plaintiff brought a declaratory judgment action against the defendant insurers to establish their obligation to defend lawsuits by the owners of those neighboring properties.  Id. at 630.  The insurance policies contained a pollution exclusion that contained an exception for "sudden and accidental" pollution.  Id.  The plaintiff there argued that "sudden" was at least ambiguous, and essentially meant "happening accidentally."  Id. at 632.  However, the Court of Appeals disagreed with this meaning of "sudden," explaining the need to give meaning both to "sudden" and to "accidental" in the contract.  Id. at 632–33.

Rather, the Court of Appeals explained that "sudden" has a "<u>temporal</u> element" and refers to an "<u>abrupt</u> happenstance." <u>Id.</u> at 633.  The court explained that it would be improper to refer to something as "sudden" where it is a "process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process." <u>Id.</u> at 633.

At oral argument, Northrop argued that at least the initial release of TCE-contaminated water from tank 10 (even if not the entire leak from beginning to end) was "sudden" within the meaning of the exception.  That cannot be.  Every release has some instant of commencement.  To read the word "sudden" to incorporate the initiation of every release would be to render that word meaningless.  The <u>Northville</u> court confronted and dismissed precisely this question:

> [T]he sudden discharge element of the pollution exclusion exception cannot be established merely by showing that the release of the pollutant had its onset at some particular point in time and, in that sense, the discharge could be said to have begun "abruptly." . . . "[S]ince every dispersal of pollution begins with the abrupt entry of molecules of the offending substance into the surrounding environment, [under such a] strained construction of the exception, the suddenness requirement would be rendered meaningless."

89 N.Y.2d at 633 (citation omitted).  Thus, according to the <u>Northville</u> court, the temporal aspect of "sudden" is only met by a "discharge, abruptly or within a short timespan, of a significant quantity of the pollutant sufficient to have some potentially damaging environmental effect." <u>Id.</u> at 634.  There is no triable issue of fact as to whether such a discharge occurred at tank 10.[16]

---

[16] Similarly, it simply is not the case that the "discovery" of the discrepancy made that long-term leakage "sudden <u>and</u> accidental," as required.  <u>Ogden</u>, 924 F.2d at 41 (emphasis added); <u>AMRO Realty</u>, 936 F.2d at 1427 (same).

Northrop argues that this Court must accept Langseth's testimony as to the sudden and accidental nature of the leak from tank 10 because, in a situation involving a "latent" harm or injury, it is impossible to proffer evidence that does not rely, at least to some extent, on inference and assumption.  It is true that no percipient witnesses were present to see the leaking itself; indeed, the tank was underground.  However, Travelers has in fact proffered percipient testimony. Kovarik, a former Grumman employee, testified that the bottom of the tank was "rotted out" and that he "was there" at the time that the tank was removed and replaced.  (Cannella Ex. 77, at 62:25–63:2, 67:14–16.)  That percipient testimony conflicts with Langseth's version of events.  Moreover, there is also no percipient testimony to support Langseth's view of events.  For example, while there is evidence in the record from a percipient witness about rotting in the bottom of the tank, there is no evidence in the record about the size of any hole in the tank.  In this situation—involving the speculation of an expert witness on the one hand and the percipient testimony of a witness present at the time on the other, directly conflicting with that speculative opinion—the Court must dismiss Langseth's opinion as conjectural and implausible.

Langseth also opined that "welds on the degreasers occasionally failed, resulting in substantial abrupt releases of TCE."  (NGC 56.1 ¶ 313.)[17]  One Grumman employee noted that such equipment was expected to fail.  (Id.)  There were also spills of fluid containing PCBs in autoclaves during frequent

---

[17] Here, too, Langseth's report relies on speculation.  (See Langseth Rep. 75 (quoting a Grumman employee who "said that such weld failures probably happened more often than he personally witnessed").)

maintenance; Grumman has characterized these as "unavoidabl[e]." (Id. ¶ 314.)  At various times, water on floors picked up contaminants before falling through drains. (Id. ¶ 315.)  In the drum marshaling area near plant #3, Grumman used forklifts to pick up drums; on at least one occasion, a forklift punctured a drum that released fluid containing TCE.  (Id. ¶ 316.)[18]  On this record, all the TCE-related events are so routine as to be akin to a bread baker spilling flour onto the floor, or an Italian restaurant where water with pasta boils over.  In the context of their operations, such occurrences were expected and routine—not sudden and accidental, as the law has interpreted those words.

Dr. Langseth cannot make a triable issue of "fact" out of his speculation that these events were sudden and accidental.  There is no evidence in the record that the leakage from the storage tank at plant #2 occurred in the colorful manner he describes, involving water spurting out of a tank.  (See NGC Opp. 28.)  Similarly, there is no evidence that the other incidents to which he refers in fact contained TCE or occurred in the manner he describes.  Dr. Langseth is not a percipient witness; he cannot ex post facto opine on the temporal nature of that which he did not see, nor the state of mind of employees present at the time, to whom he has not spoken.  The Court also notes that Langseth's use of the word "accident" (see, e.g., Langseth Rep. 75 (describing "accidental leaks")) goes to the ultimate issue of whether an exception to the pollution exclusion was met in this case.  Thus, the

---

[18] Northrop argues that the forklift puncturing a drum of fluid containing a TCE in the drum marshaling area should be considered a "sudden and accidental" event.  (NGC 56.1 ¶ 132.)  There is evidence that the drum contained TCE.  (See Calland Decl. Ex. 3 (Cofman Dep.), at 174:4–175:2.)  However, that same testimony indicates that moving drums was part of normal operations at the drum marshaling area.  (See id. at 174:4–10.)

Court could certainly not allow Langseth to testify without giving the jury cautionary instructions as to the use of this word.  If courts accepted opinions stating whether exclusions to insurance policies applied, then parties would submit such opinions routinely—thus defeating the legislative intent to confine "sudden and accidental" to an exception to the exclusion, rather than the rule.

Rather, it is clear from Grumman's own recitation of its day-to-day operations—which involved active use of TCE—that all of these events were to be expected in one way or another.  Grumman's own Response to Travelers' Statement of Undisputed Material Facts concedes as much.  (See, e.g., NGC 56.1 ¶ 314 (describing "[a]ccidental leaks and spills" and "frequent maintenance, during which spills unavoidably occurred").)

Courts in New York have recognized that spillages occurring as a part of routine operations are not sudden and accidental.  See Emp'rs Ins. Co. of Wausau v. Duplan Corp., 899 F. Supp. 1112, 1121 (S.D.N.Y. 1995); Redding-Hunter, Inc. v. Aetna Cas. & Sur. Co., 206 A.D.2d 805, 807–08 (N.Y. App. Div. 3d Dep't 1994) ("[Waste discharges which are a concomitant of normal business activities are not 'sudden' within the meaning of the exclusion . . . ."); Technicon I, 141 A.D.2d at 126.[19]

---

[19] Northrop argues that the Court must read Redding-Hunter and Employers Insurance, decided in 1994 and 1995, in light of Northville, decided by the Court of Appeals in 1997.  However, Northville is not at odds with those cases.  The Court of Appeals stated there that its definition of "sudden" as "an abrupt happenstance"—incorporating not only a temporal element but also a surprise element— "conforms to the commonsense meaning of the term and the reasonable expectations of a business person." 89 N.Y.2d at 633.  Thus, Northville reaffirmed, rather than overturned, the principle that discharges occurring as part of "normal business activities," Redding-Hunter, 206 A.D.2d at 808, are not "sudden and accidental."

All of the other leakages occurred in the context of routine operations in which leakage or spillage was known to occur and to be likely.  As the evidence that Grumman itself cites in its Rule 56.1 Statement states, welds were known to fail and cause leakage on degreasing equipment prone to frequent use; such weld failures were expected; water picking up floor contaminants was part of routine operations; using forklifts with prongs to pick up drums was routine.  (See NGC 56.1 ¶¶ 313–15; Langseth Rep. 62 (explaining that "the plume evolution over time has been affected by pumping and recharge that occurred as part of normal facility operations"), 76.)  In short, none of the alleged "sudden and accidental" events is both sudden and accidental, as the law would require for the pollution exclusion not to apply.

On this record, Northrop has failed to raise a triable issue as to whether a "sudden and accidental" discharge occurred at tank 10, or anywhere else in the Facility.

### 3.   "Expected or Intended"

Nor do these events place Grumman's discharges of contaminants outside the "expected" or "intended" category.  Again, the discharge or dispersal of TCE was expected and intended, the use of TCE into discharge basins was intended, that it leached into the ground was expected, and that it was on the floor after routine operations was expected and intended—as were a host of Grumman's related activities involving TCE.  (See, e.g., NGC 56.1 ¶¶ 20–22.)  The analysis with respect

to whether the contamination was sudden and accidental applies as well to the question of whether the contamination was expected or intended.

Indeed, the testimony of Steven Scharf, a NYSDEC designee, further confirms that the contamination was considered routine.  Scharf testified that he was not aware of any explosions, fires, abrupt releases, or accidents at the Bethpage Facility, nor did NYSDEC have any record of any reports of such events.  (Id. ¶¶ 134, 135; Travelers ¶¶ 134, 135.)

In addition, as set forth above, in 1990, Grumman submitted an appendix to NYSDEC titled "Information on Reported Spills, Leaks and Releases at the Grumman Aerospace Corporation and U.S. Naval Weapons Industrial Reserve Plant, Bethpage, New York."  (NGC 56.1 ¶¶ 135, 136; Cannella Decl. Ex. 43, at NGINS000210735.)  The appendix included a certification, signed under penalty of perjury, stating that:

> I certify under the penalty of law that I have personally examined and am familiar with the information submitted in this document and all attachment[s] and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the information is true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment.

(NGC 56.1 ¶ 136.)  That appendix identifies only a few isolated spills.  (Travelers 56.1 ¶¶ 138, 139.)

B.   Analysis of Travelers' Assertion of Late Notice

Travelers' primary policies provide, "If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every

57

demand, notice, summons or other process received by him or his representative."
(NGC 56.1 ¶¶ 184, 380 (emphasis added).)  Certain policies also require that the
insured give written notice to Travelers "as soon as practicable" in the event of
property damage.  (NGC 56.1 ¶¶ 186, 376–79.)[20]

Travelers argues that Grumman failed to provide timely notice with respect
to the Bethpage Facility.  There are three potentially relevant time periods: (1)
whether there was a claim or property damage as to which Grumman should have
provided notice prior to 1983; (2) whether Grumman should have and did provide
Travelers with notice of NYSDEC's claim in December 1983/January 1984; and (3)
whether, if Grumman did not fulfill its notice obligation in December 1983/January
1984, there is nonetheless sufficient evidence of Travelers' knowledge of the
NYSDEC claim based on its attendance at an August 1989 meeting in which the
Bethpage Facility claim was discussed and based on a internal memorandum
reflective of its knowledge of such claim.[21]

There is no triable issue that notice was due as to an occurrence by the late
1970s, and that Grumman was subject to a claim at least as early as December
1983, when the PRP letter initiated a formal proceeding against Grumman.
However, according to Northrop, the 1983 PRP Letter should have put the world on
notice of a claim at the Bethpage Facility.  Thus, Grumman concedes that notice
was due not later than what would be acceptable as to the 1983 PRP Letter.

---

[20] This Court also addresses the timeliness of notice in connection with its Opinion & Order with
respect to the Bethpage Community Park.
[21] Northrop argues both that Travelers was aware of a site-wide investigation at the site due to the
August 1989 meeting, and that that Travelers waived its late-notice defense by failing to raise a
notice issue after that meeting.

Grumman argues that (1) it had a reasonable belief as to non-liability that excused late notice at least until receipt of the 1983; (2) that it sent the 1983 Letter to an address that Travelers provided and that since a policyholder must only "substantially comply" with the notice requirements, it has fulfilled it obligation; and (3) that Travelers knew in fact about the Bethpage Facility claim and cleanup efforts.

1.   Pre-1983 Events

As an initial matter, a number of facts demonstrate that Grumman may have had an obligation to provide Travelers with notice by the late 1970s, based on "property damage" and acts resulting in "injury or damage," as outlined in Travelers' policies.  (NGC 56.1 ¶ 186.)  For instance, in 1978, Geraghty & Miller provided Grumman a report in which they noted that it may be a source of contamination and that such contamination could be due to "housekeeping practices."  (Cannella Decl. Ex. 8, at NGINS000768975.)  In 1976, Grumman had accumulated a number of news articles in which the groundwater contamination at the Bethpage Facility was commented on and remediation mentioned. (Cannella Decl. Ex. 6.)  Grumman itself referred to contamination as resulting at least in part from its own housekeeping efforts; and in 1979, it told NYSDEC that it would implement certain training to "reduce" such "contaminants."  (Canella Decl. Ex. 11, at NGINS000619272.)  As set forth above, as to claims, the law in the Second Circuit does not provide that late notice may be excused by a reasonable belief in non-liability.  See Fairchild, 56 F.3d at 438 (explaining that under New York law,

"compliance with the provisions of an insurance contract is a condition precedent to an insurer's liability").  However, the Court acknowledges the <u>Reynolds</u> decision.  Under either application of the law, late notice here is not excusable.

It is certainly true, and undisputed, that Hooker Chemical Corp. was considered to be a source of contamination in the 1970s.  However, in light of the extensive contamination, the history of Grumman's own testing efforts and results, and the reports from its own environmental consultants, there is no triable issue as to whether it was reasonable for Grumman to assert a belief in non-liability to excuse late notice: a belief in non-liability was unreasonable based on the factual record.

    2. <u>The 1983 Letter</u>

Whether or not Grumman's efforts in sending the 1983 Letter constitute compliant notice, or otherwise excuse late notice, requires that this Court address (1) whether there is a triable issue of fact as to whether notice was received, and, if so, (2) whether the content of the notice was sufficient.  Because there is no triable issue of fact as to whether Travelers received notice, the Court need not reach the question of whether its content was sufficient.[22]

---

[22] Northrop argues that New York law liberally construes notice requirements in favor of the insured and only requires "substantial" rather than "strict" compliance with notice provisions of insurance contracts.  <u>See</u> <u>First Roumanian Am. Congregation v. GuideOne Mut. Ins. Co.</u>, 862 F. Supp. 2d 293, 310 (S.D.N.Y. 2012).  That doctrine, however, refers to the form in which a proof of loss is given, and particularly to valuation issues.  <u>See</u> <u>id.</u> at 310; <u>SR Intern. Business Ins. Co., Ltd. v. World Trade Center Props., LLC</u>, 381 F. Supp. 2d 250, 259 (S.D.N.Y. 2005) ("The purpose of a proof of loss is that the insurer may be able intelligently to form some estimate of his rights and liabilities before he is obliged to pay.") (internal quotation marks omitted).  The law is clear that short delays in notice are frequently considered unreasonable as a matter of law.  <u>See</u> <u>Fairchild</u>, 56 F.3d at 440.  In any event, if Travelers never received notice of the claim against Northrop, Northrop cannot be said to have "substantially" complied with its notice requirements.  In addition, because this Court does not reach

There is no basis in the record to find a triable issue as to Travelers' receipt of the 1983 Letter: it was indisputably sent to the wrong address; no Travelers witness recalls ever seeing it, not does any Grumman witness.  (See Travelers 56.1 ¶¶ 163, 164, 167; NGC 56.1 ¶ 165.)  The letter exists only because it was found in Century's "Old Bethpage Landfill" files.  (NGC 56.1 ¶ 165; Hr'g Tr. 88–89, Jan. 23, 2014.)

That Travelers received other mail addressed to the same erroneous address does not create a triable issue as to this particular letter.  (NGC 56.1 ¶ 164.)  There is no showing of the denominator of letters sent to this address compared to those received; if only .01% were received, that could hardly create a triable issue.  Similarly, if 99% of all letters sent to that address were received, there would likely not be a triable issue.  The record does not contain sufficient proof to make any such determination.

In a footnote, Northrop argues that Travelers should be precluded from relying on its non-receipt due to the wrong address because, if the letter was in fact not received, Travelers "materially contributed" to that error by providing the wrong address.  (NGC Opp. 30 n.16.)  However, none of the cases that Grumman cites occurred in the context of an insurance coverage dispute, and each of the cases involved intentional behavior.  See Ixe Banco, S.A. v. MBNA Am. Bank, N.A., No. 07 Civ. 0432 (LAP), 2009 WL 3124219, at *4–6 (S.D.N.Y. Sept. 29, 2009) (requiring that a party "deliberately or arbitrarily frustrated" another party's efforts); Bank of N.Y. v. Tyco Int'l Group, S.A., 545 F. Supp. 2d 312, 324 n.81 (S.D.N.Y. 2008);

---

the question of whether the content of the notice is sufficient, Grumman's argument that the 1983 PRP Letter is broad enough to cover claims at the Bethpage Facility, and not just the Old Bethpage Landfill, is irrelevant to the outcome of this motion.

<u>Kooleraire Serv. & Installation Corp. v. Board of Educ.</u> 28 N.Y.2d 101, 106 (1971); <u>Holland v. Ryan</u>, 762 N.Y.S.2d 740, 742 (App. Div. 4th Dep't 2003).  There are no facts before this Court to suggest that Travelers provided an erroneous address to Grumman in order to avoid coverage obligations.[23]  Indeed, the letter in which Travelers provided the wrong address related to another matter entirely (the Old Bethpage Landfill), and was one in which the parties had ongoing and active communications already regarding coverage for that site.  (<u>See</u> Cannella Decl. ¶¶ 170–71.)

      3.    <u>Events Post-1983</u>

If this Court determines that notice was not timely as of December 1983/January 1984, the final question is whether notice was required as to other claims, and whether notice in 2012 was adequate.

It is undisputed that the Bethpage Facility was reclassified as a "Class 2 Site" or that NYSDEC and other regulators were involved in a site-wide investigation of the Bethpage Facility by 1986 and 1987 (<u>see</u> NGC 56.1 ¶¶ 104, 107, 113), and that Grumman believed that this was the <u>opening</u> volley in a potentially very expensive effort.  (<u>Id.</u> ¶ 108.)  Yet Grumman points to no facts suggestive of additional written notice to Travelers after 1984 until 2012.  In <u>Fairchild</u>, the Second Circuit found that failure to notify an insurer of various communications between NYSDEC and the insured—even before reclassification to a 'Class 2' site—

---

[23] Additionally, Travelers proffers evidence that it received notice of and provided a defense of at least seven other lawsuits for Grumman from 1983 to 1990.  (<u>See</u> Reply Cannella Decl. Ex. 1, at TRAV004340, TRAV005070, TRAV004646, TRAV005960, TRAV004822, TRAV004287, TRAV004089.)  No reasonable juror could find on this record that Travelers was attempting to shirk its duties with regard to defending Grumman for lawsuits due to property damage.

triggered a late notice defense.  See 56 F.3d at 437–38, 441.  Classification as a

'Class 2' site means that remediation will be required.  See id. at 441.

Grumman argues that Travelers knew in fact about the NYSDEC

proceedings. It cites an oral communication at the 1989 meeting with Travelers at

which the Bethpage Facility issues were discussed, after which Travelers sent a

confirming memorandum.[24]  (See NGC 56.1 ¶ 180.)  It also cites a series of internal

Travelers memoranda in which there is discussion of the NYSDEC proceedings.

(See id.)  The fact that Travelers may have known about the NYSDEC proceedings

in fact does not eliminate Grumman's notice obligations. See Fairchild, 56 F.3d at

438; Commercial Union Ins. Co. v. Int'l Flavors & Fragrances, Inc., 822 F.2d 267,

271 (2d Cir. 1987).

In addition, the 1989 oral communication at a meeting cannot constitute

adequate notice of a claim that existed at least by 1986 or 1987.  A two-year delay in

the context of this type of matter is untimely as a matter of law.  See Fairchild, 56

F.3d at 440 ("Under New York law, delays for one or two months are routinely held

'unreasonable.'").  Moreover, any oral statements by Travelers do not constitute

waiver of the written notice provision in the policies.  A waiver is not lightly to be

presumed; it is the intentional relinquishment of a known right.  See, e.g., Capitol

Records, Inc. v. Naxos of Am., Inc., 372 F.3d 471, 482 (2d Cir. 2004).  Conduct

constituting a waiver must therefore be knowing and "clear."  Chicago Ins. Co. v.

Kreitzer & Vogelman, 265 F. Supp. 2d 335, 343 (S.D.N.Y. 2003).  Here, Grumman

---

[24] Travelers argues that this memorandum related to the Bethpage Water District, separate from the Bethpage Facility.  For purposes of this motion, the Court accepts Grumman's inference that it related to the Bethpage Facility.

has not proffered a single fact supporting an inference that Travelers specifically and intentionally waived its right to receive written notice (along with the other information that the notice provision requires).

Nor can Travelers' own memoranda—also two years after when notice should have been provided—cure that untimely notice. The insured is to provide written notice either "immediately" or as "soon as practicable"; two years is neither.[25]

Northrop's argument that Travelers' inaction following prior notice relieved it of further notice obligations is also unavailing. The clear language of the policy requires notice of "any" claim. In addition, the law provides that a policyholder is only relieved of a notice obligation when an insurer unequivocally refuses to fulfill its contractual obligations. See, e.g., Jacobson, 672 F.3d at 176–78. There are no facts here supporting any inference of unequivocal repudiation.

As a variation on this argument, Northrop argues that a reasonable jury could conclude that, when Travelers was orally briefed on the Bethpage Facility claim and failed then or even reasonably thereafter to assert a late notice defense, its conduct constituted a waiver. As support for this proposition, Northrop cites unremarkable New York law that an insurer who fails to timely assert a late notice defense may waive that defense. (See NGC Opp. 37.) See, e.g., Estee Lauder Inc. v. OneBeacon Ins. Grp., LLC, 62 A.D.3d 33, 35 (N.Y. App. Div. 1st Dep't 2009). Those cases are inapposite, however. Northrop's argument, taken to its logical conclusion, would convert oral notice into the equivalent of written notice, shifting the burden

---

[25] Grumman has not proffered any facts supportive of impracticability.

onto the insurer to request written notice or waive its right to a timeliness defense. This is not the law.  This Court could not instruct the jury that it is.

Finally, Northrop argues in its opposition to Travelers' Bethpage Community Park motion that, even if NYSDEC had asserted a new claim in 2002 concerning the Park, it was excused from notifying Travelers of it, because, by that time, "Travelers had repeatedly informed NG that Travelers would not defend administrative proceedings."  (Northrop Grumman's Mem. of L. in Opp. to Travelers' Mot. for Summ. J. Regarding the Community Park ("NGC BCP Opp.") 23–24 (citing NGC BCP 56.1 ¶¶ 211–12).)  Northrop also argues that it was excused from notifying Travelers because the Town of Oyster Bay's 2002 letter referred to an intent to commence a citizen suit pursuant to RCRA, distinct from the CERCLA theory that the Town ultimately pursued in 2005.  (NGC BCP 56.1 ¶¶ 73, 79.) RCRA provides for citizen suits limited to prospective injunctive relief to address alleged permit violations.  (See NGC BCP 56.1 ¶ 73.)  Northrop argues that Travelers stated that it would not cover such claims for equitable relief.  (See Scanlon Decl. Ex. 85, at TRAV004484.)

It is true that "an insurer's across-the-board denial of coverage may excuse the insured party from providing notice of each individual claim."  Texaco A/S (Denmark) v. Commercial Ins. Co., 160 F.3d 124, 129 (2d Cir. 1998); see also H.S. Equities v. Hartford Acc. & Indem. Co., 661 F.2d 264, 270–71 (2d Cir. 1981) ("[A] repudiation of liability by an insurer on the ground that the loss is not covered by the policy operates as a waiver of the notice requirements contained in the policy.").

However, Northrop does not raise a triable issue of fact as to whether Travelers had indeed repudiated liability in the "blanket" and "across-the-board" manner contemplated by <u>Texaco</u>, 160 F.3d at 129, and <u>H.S. Equities</u>, 661 F.2d at 270–71.  Rather, Travelers had only declined coverage on two prior occasions, in 1989 and 1994, in both cases based on an individual review of the claim.  (<u>See</u> Scanlon Decl. Ex. 85, at TRAV004484; Scanlon Decl. Ex. 88, at TRAV013985.) Furthermore, Travelers did not deny all claims outright, but rather stated that, "[<u>n]otwithstanding its position on defense</u>," it would "investigate the facts and circumstances of these matters in order to determine the extent of its indemnity obligations."  (Scanlon Decl. Ex. 85, at TRAV004484.)  The Court is mindful that both letters to Grumman stated that Travelers would not cover "any claim for equitable relief," which would include RCRA.  (<u>See</u> Scanlon Decl. Ex. 85, at TRAV004484; Scanlon Decl. Ex. 88, at TRAV013985.)   However, under these circumstances, where Travelers agreed to continue to investigate its duty to indemnify Grumman, ongoing notice was required.  <u>See</u> <u>Olin Corp.</u>, 221 F.3d at 329 (finding that an insurer had "never categorically denied that it had a duty to provide indemnification and therefore did not thereby waive notice"); <u>Nat'l R.R. Passenger Corp. v. Steadfast Ins. Co.</u>, No. 06 Civ. 6072 (PAC)(GWG), 2009 WL 562610, at *13–14 (explaining that a "specific denial of coverage" did not "prevent[] an insurer from requiring notice when a new claim arises, based on new allegations and new defendants, that is outside the scope of the insurer's prior denial").

C.    Analysis of Voluntary Payments

As set forth above, the Travelers primary policies at issue prohibit the

insured from voluntarily assuming obligations or expenses without Travelers'

consent:

> The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.

(NGC 56.1 ¶ 188.)

It is undisputed that Grumman spent millions of dollars with respect to

remediation and clean-up efforts relating to the Bethpage Facility.  (NGC 56.1 ¶¶

140, 142, 143.)  Grumman argues that on its face, the provision relates only to final

remedies.  The provision does not contain such language.  The language of the

policy is clear and prohibitory—"the insured shall not"—and leaves no room for

doubt.  Grumman has failed to raise a triable issue as to whether it made voluntary

payments without Travelers' consent.

Northrop argues that Travelers' conduct in refusing to participate in the

process or to provide a defense eliminated the prohibition on voluntary payments—

in effect, that Travelers waived its right to insist on compliance with this provision.

This argument also lacks merit.  As a threshold matter, there is no evidence that

Travelers had received any notice, written or oral, prior to 1989.  By that time,

millions of dollars in payments had been made.  However, more than that, as set

forth above, for a party to waive a contractual right, conduct must be knowing and

intentional.  See Capitol Records, 372 F.3d at 482; Chicago Ins. Co., 265 F. Supp. 2d

67

at 343. There is no evidence in the record supportive of such an inference. For instance, there were many points in time—specifically and generally—when Grumman made payments; there is no evidence that Travelers was made aware of the purpose or amounts and waived its rights with respect thereto.[26]

## VI.   CONCLUSION

For the reasons set forth above, Travelers' motion for summary judgment as to the Bethpage Facility is GRANTED.

The Clerk of the Court is directed to terminate the motion at ECF No. 358 and to remove the Opinion & Order at ECF No. 545 from the docket.

SO ORDERED.

Dated:      New York, New York
            March 6 , 2014

                                      _____
                                      KATHERINE B. FORREST
                                      United States District Judge

---

[26] Grumman argues that at the 1989 meeting, someone from Travelers told them orally to resolve the NYSDEC issues as it deemed in its best interests. This, however, is hearsay and inadmissible. In addition, even if accepted, it is insufficient to constitute a knowing waiver of multiple voluntary payments. Furthermore, any waiver of policy provisions had to be in writing. (See Travelers 56.1 ¶ 187; see also Cannella Decl. Ex. 42; Reply Cannella Decl. Ex. 14.)