UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
TRAVELERS INDEMNITY CO., et al.,

                  Plaintiffs,

                -v-

NORTHROP GRUMMAN CORP., et al.,

                  Defendants,

and

CENTURY INDEMNITY CO., eventual
successor in interest to INSURANCE CO.
OF NORTH AMERICA,

                  Nominal Defendant.

----------------------------------------------------------------X

12 Civ. 3040 (KBF)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 1 3 2014

KATHERINE B. FORREST, District Judge:

      This is the Court's final summary judgment opinion in the first phase of this environmental insurance coverage action.

      In April 2012, Travelers Indemnity Co. and various affiliated companies (together, "Travelers") commenced the underlying declaratory judgment action as to liability for environmental pollution against Northrop Grumman Corp. and Northrop Grumman Systems Corp. (together, "Northrop" or "Grumman") and Century Indemnity Co. ("Century"), eventual successor in interest to Insurance Company of North America ("INA"), as nominal defendant. Together, the Court refers to Travelers and Century as "the Insurers."

This opinion relates to the Insurers' motion for summary judgment with respect to claims arising from four areas: the Bethpage ("BWD"), Aqua New York ("AWD"), South Farmingdale ("SFWD"), and Massapequa ("MWD") Water Districts. (ECF No. 355.) The Court will not repeat the facts or the law set forth in detail in its prior opinions granting summary judgment to Travelers and Century with regard to the Bethpage Facility and Community Park. (ECF Nos. 552, 553, and 554.)

The Insurers argue that they owe no coverage for any claims arising from contamination to the BWD, AWD, SFWD, and MWD, because, inter alia, Grumman failed to provide notice timely notice of the Water Districts' claims, the pollution exclusions in the Travelers policies preclude coverage, and Grumman breached its obligations under the policies by agreeing to pay for remediation. The Court agrees. For the reasons set forth below, the Insurers' motion is GRANTED with respect to the AWD, SFWD, and MWD; it is DENIED with respect to remaining BWD claims.[1]

I.    FACTS

The Court incorporates the "Facts" sections of its March 7, 2014 opinions regarding the environmental contamination at the Bethpage Facility and the Bethpage Community Park. (See ECF No. 552 at 2–28; ECF No. 553 at 2–10.)

The Water Districts are responsible for providing drinking water for residents who live near the Bethpage Facility in Nassau County, Long Island.

---

[1] As set forth in detail below, the Court entered orders on June 24 and August 1, 2013, declaring that Century has no duty to defend or indemnify Grumman for the BWD claim and that Grumman is not entitled to coverage from Travelers for monies paid or to be paid pursuant to the BWD settlement agreements. (ECF Nos. 225, 255.) The Insurers' motion is therefore nonjusticiable with respect to the BWD.

(Northrop Grumman's Resp. to the Insurers' "Statement of Undisputed Material Facts Pursuant to Local Rule 56.1" (NGC 56.1) ¶ 1.)  The Water Districts draw water exclusively from the sole source aquifer below Long Island.  (Id. ¶ 2.) Portions of the service areas and certain supply wells of the SFWD, the former AWD,[2] and the MWD are generally downgradient from the Bethpage Facility and Community Park.  (Id. ¶ 4.)

On November 22, 1977, the BWD wrote a letter to Grumman that stated, "Currently available evidence indicates that . . . contamination has arisen by virtue of discharge of waste products from your company into the ground water supply." (Id. ¶¶ 6, 7.)  Grumman responded that it was not responsible for the contamination and requested anything suggesting otherwise, and counsel for the BWD later stated that they "did not have sufficient material to frame any pleadings."  (Id. ¶¶ 242, 243.)

A 1986 study by the Nassau County Department of Health ("NCDOH") and the United States Geological Survey found that "[g]round water in some areas" of east-central Nassau County had "already been contaminated," and that a "groundwater plume was found to be sinking and moving south southeast."  (Id. ¶ 12; Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Insurers 56.1") ¶ 12.)  In 1987, the BWD notified Grumman that the levels of trichloroethylene ("TCE") contamination in its water supply exceeded drinking water standards.  (NGC 56.1 ¶ 13.)

---

[2] The AWD was known as the New York Water Services Corporation prior to 2006.  (NGC 56.1 ¶ 5.)

On June 14, 1989, Grumman advised Travelers, but not Century, of a claim by the BWD. (Id. ¶ 15.)[3] On August 16, 1989, Grumman and Travelers met to discuss the BWD's claim. (Id. ¶ 16.) On October 24, 1989, Travelers wrote to Grumman, "Travelers will investigate the facts and circumstances of the [BWD] matter in order to determine the extent of its indemnity obligations, if any." (Id. ¶ 19.) Travelers also stated that it had "no obligation to reimburse or pay for any legal fees incurred or to be incurred by Grumman in these matters unless and until such a suit is initiated." (Id. ¶ 186; St. John Decl. Ex. 55, at NGINS000403699.)

On May 22, 1990, Grumman entered into a settlement with the BWD that obligated Grumman to contribute approximately $1.7 million for remedial measures at BWD well #6. (NGC 56.1 ¶ 21.) Travelers made numerous requests for information to Grumman regarding the BWD and stated that it had not received responses from Grumman on several occasions. (Id. ¶ 28–61.)

On October 30, 2000, Larry Leskovjan, an Environmental Manager at Grumman, wrote to other Grumman employees about a "recent discovery that the contaminant plume has progressed much more closely to the South Farmingdale Water District supply wells than expected." (Id. ¶ 74.) Leskovjan wrote that the data "strongly suggest that this plume originated from Northrop Grumman property," and that the worst-case cost would be $26 to $28 million. (Id.)

In late 2000, NYSDEC issued a Proposed Remedial Action Plan ("PRAP") with respect to the contaminated groundwater plume originating at the Bethpage

_____

[3] Grumman's corporate representative admitted that Grumman did not notify Travelers of the BWD claim until 1989. (NGC 56.1 ¶ 18.)

Facility. (Id. ¶ 75.) The Water Districts told NYSDEC that they supported the agency's position that the costs of a groundwater containment remedy should be imposed jointly on Grumman and the Navy. (Id. ¶ 199.)

In November 2000, Grumman met with the SFWD to discuss the upcoming Record of Decision ("ROD") and the potential contamination of SFWD wells. (Id. ¶ 85.) According to Gary Loesch, an environmental consultant for the SFWD and the AWD, the SFWD expressed a belief that Grumman and the Navy should be required to pay for wellhead treatment, and that, if the ROD was finalized, Grumman and the Navy would pay the cost of treatment and subsequent operating and maintenance cost. (Id. ¶ 86; Insurers ¶ 86; Hultman Decl. Ex. 79, at 39:05–21.)

In November 2000, Grumman also met with the AWD. (NGC 56.1 ¶ 91.) At that meeting, Grumman "knew that contamination emanating from its Bethpage facility . . . was expected to eventually contaminate the drinking water supplies of both" the AWD and the SFWD. (Id.; Hultman Decl. Ex. 80, at 31:08–20.)

On December 4, 2000, Grumman's consultants Carlo San Giovanni and Michael F. Wolfert of ARCADIS Geraghty & Miller, Inc. wrote to Leskovjan to summarize the results of meetings with the Water Districts. (Insurers' Reply to Grumman's Response to the Insurers' "Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1" ("Insurers Reply 56.1") ¶ 2.) They wrote, "Funding for well head or other treatment for a public supply well(s) will be provided if . . . it appears reasonably certain that one or more public supply wells

will be impacted by TVOCs attributable to the Northrop Grumman and NWIRP sites." (Hultman Reply Decl. Ex. 3, at NGINS001726946.)

At a December 13, 2000 NYSDEC meeting that Grumman attended, NYSDEC advised that, "[i]f it's determined . . . that treatment must be implemented at other supply wells to ensure that no groundwater contamination ever enters a water supply, then the department . . . will . . . institute a program by which Northrop Grumman and the Navy will supply those wells with treatment." (Id. ¶ 76.) Two downgradient water suppliers, the SFWD and the MWD, voiced concerns at the meeting about the migration of the plume toward their wells. (Id. ¶ 77.) Grumman did not notify the Insurers of the 2000 meetings. (NGC 56.1 ¶ 96; Insurers 56.1 ¶ 96.)

In January 2001, Grumman held a series of meetings with the SFWD, the AWD, and the MWD. (NG 56.1 ¶ 78.) Leskovjan wrote in an email that the Water Districts were concerned about groundwater contamination "as a result of recently developed information that indicates [Grumman's] groundwater plume extends much farther than anticipated." (Id. ¶ 79.) Leskovjan testified that it was his "understanding in 2001 that Northrop Grumman potentially might be responsible for costs associated with insuring a clean water supply" to the Water Districts. (Id. ¶ 80; Insurers 56.1 ¶ 80; Hultman Decl. Ex. 81, at 189:09–15.)

On January 11, 2001, Loesch, the SFWD and AWD consultant, sent a letter to Steven M. Scharf of NYSDEC through which both the SFWD and the AWD submitted comments on the PRAP to NYSDEC. (NGC 56.1 ¶ 87.) Loesch stated

that "it is likely that at some future date, the plume will most probably impact Well Sites 3 and 6 in SFWD." (Hultman Decl. Ex. 31, at NGINS000615007.) He then asked, "in order to provide [a] financial guarantee, why shouldn't NYSDEC require both PRPs, or at a minimum, Northrop Grumman, to provide a letter of credit that would be sufficient to cover all anticipated future costs?" (Hultman Decl. Ex. 31, at NGINS000615007.) Loesch testified that this letter "[a]bsolutely" "helped put Northrop Grumman on notice that South Farmingdale considered it to be a responsible party," and that it "similarly put Northrop Grumman on notice that Aqua believed Northrop Grumman to be a responsible party and thus financially liable for remediation costs." (Insurers Reply 56.1 ¶ 3; Hultman Reply Decl. Ex. 10, at 62:14–63:13.)

On January 17, 2001, the MWD wrote to NYSDEC with regard to the PRAP and stated that the downgradient spread of the plume could threaten the MWD. (NGC 56.1 ¶ 101.) The letter recommended that a committee "be establis[h]ed to work with NYSDEC, Northrop-Grumman and the Navy" "to investigate off-site groundwater contamination," to "define potential impacts to public water supply wells," to "evaluat[e] data resulting from this investigation," and "to formulate and evaluate alternatives to remediate groundwater and protect public water supply." (Id.; Hultman Decl. Ex. 33, at NGINS002391322.) NYSDEC immediately forwarded the letter to Grumman's consultant. (NGC 56.1 ¶ 101.)

On February 2, 2001, Grumman's consultants San Giovanni and Wolfert wrote in a letter to Scharf of NYSDEC, "The capital and annual operation and

maintenance costs for well head treatment would be borne by Northrop Grumman/Navy for the time period that the treatment is required, whether this be more or less than 30 years." (NGC 56.1 ¶ 81; Insurers 56.1 ¶ 81; Hultman Decl. Ex. 35, at NGINS000179913.) Grumman argues that the letter was referring to a potential agency-imposed remedy. (NGC 56.1 ¶ 200.) The treatment to which this letter referred applied to any "well field that may be impacted by the groundwater plume," whether located at the AWD, the SFWD, or the MWD. (See NGC 56.1 ¶¶ 81, 88, 102; Hultman Decl. Ex. 35, at NGINS000179913.)

Minutes from a February 21, 2002 Technical Advisory Committee meeting attended by Grumman and Water District representatives state, "Grumman and the Navy have agreed to provide treatment, promptly, for these wells should that become necessary." (Insurers Reply Decl. ¶ 4; Hultman Reply Decl. Ex. 4, at NGINS001311672.)

Grumman did not notify the Insurers of the SFWD's views regarding Grumman's responsibility for payment in 2000 or of Grumman's February 2, 2001 and February 21, 2002 commitments to pay for wellhead treatment. (NGC 56.1 ¶ 89; Insurers 56.1 ¶ 89.) Grumman's outside counsel, Jonathan Sokol, had no recollection of conveying information about the SFWD to Travelers. (NGC 56.1 ¶ 90; Insurers 56.1 ¶ 90.) Sokol also stated, "[A]t least from the best of my recollection, also of this date, I don't think there was really a claim by South Farmingdale Water District." (NGC 56.1 ¶ 188; Hultman Decl. Ex. 68, at 188:01–04.)

In March 2001, NYSDEC issued a ROD to select a remedy for the contaminated groundwater emanating from the Bethpage Facility. (NGC 56.1 ¶ 82.) The ROD, among other things, required the installation and operation of monitoring wells and implemented a "public water supply contingency plan." (Id. ¶ 83.) The ROD provided that, "if Northrop Grumman/NWIRP reaches a cash settlement with an affected Water District, then each settling District will be responsible for its respective monitoring and implementation of, as necessary, wellhead treatment, or comparable alternative measures." (NGC 56.1 ¶ 208; Hultman Decl. Ex. 36, at NGINS000010565.) Grumman argues that, through their various communications with NYSDEC leading up to the ROD, "the Water Districts were expressing their opinions to NYSDEC, in the context of the NYSDEC Administrative Action against Grumman, and they were urging that certain remedies be adopted by the agency, which was pursuing active CERCLA claims against Grumman. The Water Districts were not asserting claims on their own behalf directly against Grumman." (Northrop Grumman's Mem. of L. in Opp. to Insurers' Mot. ("NGC Opp.") 7.)

In January 2003, the U.S. Navy issued its own ROD for the regional groundwater plume. (NGC 56.1 ¶ 214.) The Navy stated that it would, inter alia, install borings to monitor water quality; install outpost monitoring wells; and use wellhead treatment or comparable alternative measures as necessary for well fields that became affected in the future. (NGC 56.1 ¶ 215.)

On January 28, 2005, the MWD asked NYSDEC, in a letter copied to Grumman, to act promptly in installing monitoring wells upgradient from one of its well fields, "since there [were] no longer any unimpacted upgradient outpost monitoring wells between the eastern portion of the plume and [the MWD's] supply wells." (NGC 56.1 ¶ 103.)

In March 2005, the MWD, through its environmental consultant, wrote to NYSDEC and noted the expanding contaminated groundwater footprint; the MWD "again requested that the Navy and Northrop Grumman Corporation be required to investigate, delineate and remediate this contamination." (NGC 56.1 ¶ 104.) On April 28, 2005, NYSDEC sent this letter to Grumman and the Navy. (Id. ¶ 105.) Grumman did not notify the Insurers of these communications. (Id. ¶ 106.) Stanley Carey of the MWD testified that he did not believe that "the MWD ever advised Grumman that it was contemplating instituting suit as a result of the groundwater contamination"; that he could not recall telephoning or emailing someone at Grumman directly, aside from copying it in emails; and that he did not recall "specifically request[ing] something from Grumman." (NGC 56.1 ¶ 227; St. John Decl. Ex. 4, at 84:14–21, 110:01–111:03.)

In October 2006, the AWD discovered actual contaminants in its wells. (NGC 56.1 ¶ 94; Hultman Decl. Ex. 49, at NGINS001322427.) On March 5, 2007, Loesch wrote on behalf of the AWD to NYSDEC stating, "By copy of this letter, we are putting the Navy and Northrop Grumman on notice of our findings, and we request

that DEC require prompt action by the Navy / Northrop Grumman to provide both a temporary and permanent remedy." (NGC 56.1 ¶ 94.)

The agenda for a March 30, 2007 AWD-Navy-Grumman meeting refers to discussion of "the immediate need for temporary emergency treatment" at a site and the "[s]tatus and time frame for the Navy / Northrop Grumman to provide capital and operation and maintenance funding to Aqua New York to implement emergency VOC funding." (Id. ¶ 95; Insurers 56.1 ¶ 95; Hultman Decl. Ex. 50, at NGINS002922021.) Grumman did not notify the Insurers of these discussions. (NGC 56.1 ¶ 96; Insurers 56.1 ¶ 96.) Matthew Snyder of the AWD testified, "[A]ll the water suppliers . . . felt that the DEC should take lead and put pressure . . . to make sure that the water suppliers are protected. . . . So that is why we tried to go through Steve Scharf at the DEC for these matters." (NGC 56.1 ¶ 234; St. John Decl. Ex. 23, at 62:12–21.) Snyder also stated that he "was dealing only with the Navy." (NGC 56.1 ¶ 236; St. John Decl. Ex. 23, at 97:02–06.)

On April 23, 2009, Grumman's broker, Brad Bartholomew of Aon, forwarded correspondence to the Insurers relating to contamination at the AWD. (NGC 56.1 ¶ 96; Hultman Decl. Ex. 51, at TRAV027183.) Bartholomew wrote, "The attached will serve as an update on the status of the Bethpage Grumman environmental claim." (NGC 56.1 ¶ 96; Hultman Decl. Ex. 51, at TRAV02178.) The attachments to the April 2009 email were from January 2009; they did not refer to any earlier meetings or communications. (Hultman Decl. Ex. 51, at TRAV027178–84.) One of the attachments was a January 9, 2009 letter from the Navy to Grumman and the

AWD. (NGC 56.1 ¶ 238; Hultman Decl. Ex. 51, at TRAV027182.) In that letter, the Navy stated that it intended to comply with the NYSDEC contingency plan and that funding would be "equitably shared among all the potentially responsible parties – which includes NGC, the Navy and perhaps others." (Id. at TRAV027183.)

On June 11, 2010, counsel for Grumman sent a letter "to put Travelers [and Century] on notice of certain recent developments involving claims relating to the Bethpage Facility." (NGC 56.1 ¶ 106; Hultman Decl. Ex. 55, at ARSW003589.) Under the heading "Massapequa Water District Claim," Grumman's counsel wrote, "Enclosed plea[se] find a letter from counsel for the [MWD] to NYSDEC, dated June 7, 2010, alleging that groundwater contamination is migrating from the Bethpage facility towards the public water supply wells operated by the MWD and requesting that the NYSDEC take further action against Northrop Grumman and the U.S. Navy." (Id. at ARSW003590.) Grumman did not send the Insurers the earlier correspondence between the MWD and NYSDEC dating back to 2001, and did not disclose to the Insurers that it had already agreed to pay for the MWD's remediation costs.

On February 1, 2012, Sokol, Grumman's outside counsel, wrote a letter to Gail Dalton and Brittany Lehr of Travelers. (Hultman Decl. Ex. 58, at NGINS000010315.) In the letter, Sokol disclosed to Travelers that Grumman had entered into agreements with the BWD "[i]n the 1990s," and demanded coverage for $5,417,785 for those settlements. (NGC 56.1 ¶ 69; Hultman Decl. Ex. 58, at NGINS000010319–20.) Sokol also discussed correspondence between the MWD and

NYSDEC related to concerns about groundwater impacts as well as a "claim" made by the AWD and a "similar claim" asserted by the SFWD. (Id. at NGINS000010319.)

This Court entered an order on June 24, 2013, declaring that Century has no duty to defend or indemnify Grumman for the BWD claim, and entered an order on August 1, 2013, declaring that Grumman is not entitled to coverage from Travelers for monies paid or to be paid pursuant to the BWD settlement agreements. (Id. ¶¶ 72, 73; see ECF Nos. 225, 255.)

II.     APPLICABLE LEGAL PRINCIPLES

The Court incorporates the legal principles for summary judgment, pollution exclusions, and late notice that are set forth in its March 7, 2014 opinion regarding the Bethpage Facility. (See ECF No. 552 at 28–44.)

III.    THE POLICIES AT ISSUE

The Court incorporates the descriptions of the Travelers and Century primary and excess liability policies set forth in its March 7, 2014 opinions regarding Travelers' motion with respect to the Bethpage Facility and Century's motion with respect to the Bethpage Facility and Bethpage Community Park. (See ECF No. 552 at 26–28; ECF No. 554 at 2–3.)

IV.     ANALYSIS

A.      Justiciability of the Insurers' Motion

Northrop first argues that the insurers' motion is non-justiciable. "The federal judicial power extends only to actual cases and controversies; federal courts

13

are without jurisdiction to decide abstract or hypothetical questions of law." E.I. Dupont de Nemours & Co. v. Invista B.V., 473 F.3d 44, 47 (2d Cir. 2006). The Declaratory Judgment Act permits declaratory relief in "a case of actual controversy." Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 752 (2d Cir. 1996) (quoting 28 U.S.C. § 2201(a)). "[A] court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Cont'l Cas. Co. v. Coastal Sav. Bank, 77 F.2d 734, 737 (2d Cir. 1992).

　　　1.　　The BWD

The Insurers' motion is nonjusticiable with respect to the BWD because of this Court's orders of June 24, 2013 and August 1, 2013. These orders declare that Century has no duty to defend or indemnify Grumman for the BWD claim and that Grumman is not entitled to coverage from Travelers for the BWD settlement agreements. (NGC 56.1 ¶¶ 72, 73; see ECF Nos. 225, 255.) Grumman is seeking no further coverage for the BWD claim or for the settlement agreements that it reached with the BWD in the 1990s. In the case of future litigation regarding that claim and those agreements, the Insurers may make arguments based on res judicata and this Court's prior Orders as necessary.

After the Insurers filed this motion, the BWD filed a lawsuit against Grumman alleging damage from radium and perchlorate emanating from the

Bethpage Facility. (St. John Decl. Ex. 82.) In a footnote, the Insurers state that the newly filed BWD lawsuit is part of their motion, because the Insurers seek a declaration that Grumman is not entitled to coverage for past and future claims asserted by the BWD. (See Reply Mem. of L. in Supp. of Insurers' Mot. ("Insurers Reply") 3 n.1.) However, the Insurers' motion does not address the notice that Grumman claims to have given them about the suit, and the Insurers have not yet responded to Grumman's demand for a defense against the suit. Under the circumstances, any declaration regarding this recently filed lawsuit would not be ripe. See, e.g., Travelers Prop. Cas. Co. of Am. v. N.Y. Radiation Therapy Mgmt. Servs., Inc., No. 09 Civ. 694 (NRB), 2009 WL 2850691, at *2 (S.D.N.Y. Aug. 31, 2009) (dismissing a declaratory judgment lawsuit pending resolution of the state lawsuit); Md. Cas. Co. v. W.R. Grace & Co., No. 88 Civ. 2613 (JSM), 1996 WL 109068, at *5–6 (S.D.N.Y. Mar. 12, 1996) (same).

For these reasons, there is no case or controversy to adjudicate with respect to the BWD.[4]

### 2. The AWD, MWD, and SFWD

However, the situation is different with respect to the other three water districts. In its answer, Northrop admits twice that a "ripe and justiciable controversy exists between Travelers and NGSC regarding their respective rights and obligations." (ECF No. 11 ¶¶ 141, 148.) In its counterclaims, Northrop seeks a declaration that the Insurers are obligated to defend and indemnify it for claims

---

[4] Because the Court's prior orders are dispositive, the Court does not reach the Insurers' argument that Grumman violated its duty to cooperate with Travelers with respect to the BWD claim. (See Mem. of L. in Supp. of Insurers' Mot. for Summ. J. ("Insurers Mot.") 22–25.)

involving the four Water Districts. (ECF No. 11 ¶¶ 13, 21, 27.) Additionally, in February 2012, Grumman wrote to Travelers listing "claims" made by the AWD and SFWD in relation to groundwater impacts from the Bethpage regional groundwater plume and outlining correspondence with the MWD related to the same. (Hultman Decl. Ex. 58, at NGINS000010319.)

Furthermore, as previously outlined and as discussed further below, Grumman identified potential contamination affecting the Water Districts as early as 2000 and 2001, met with the Water Districts regarding that possibility, and committed to paying for remediation costs on several occasions in 2000–02. Even before the plume had affected the Water Districts, Grumman was aware of contamination and had committed to pay for remediation. Grumman had thus triggered the requirement to provide notice to the Insurers and created a justiciable "case or controversy" within the meaning of Article III.

With respect to the AWD, MWD, and SFWD, this case therefore presents "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Olin Corp. v. Consol. Alum. Corp., 5 F.3d 10, 17 (2d Cir. 1993) (emphasis in original); see Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005) (finding that a declaratory judgment was appropriate where a party conceded "an actual and continuing controversy between the parties in its amended answer") (internal quotation marks omitted).

B.   Grumman's Late Notice of the Water Districts' Claims

The policies at issue on this motion require Grumman to provide notice of "claims" and "suits." A "claim" is "a demand by a third party against the insured for money damages or other relief owed." Windham Solid Waste Mgmt. Dist. v. Nat'l Cas. Co., 146 F.3d 131, 134 (2d Cir. 1998) (quoting Home Ins. Co. v. Spectrum Info. Techs., Inc., 930 F. Supp. 825, 846 (E.D.N.Y. 1996)). The term "claim" means "an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer." Garfield Slope Housing Corp. v. Public Serv. Mut. Ins. Co., 973 F. Supp. 326, 334 (E.D.N.Y. 1997) (quoting Am. Ins. Co. v. Fairchild Indus., Inc., 56 F.3d 435, 439 (2d Cir. 1995)).

The policies require Grumman to notify the Insurers of a claim "immediately." (NGC 56.1 ¶ 119.) "Compliance with the notice requirements set forth in an insurance contract is a condition precedent to recovery under New York law, and failure by the insured to comply with such requirements relieves the insurer of liability." Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co., 748 F.2d 118, 121 (2d Cir. 1984).

Grumman owed notice to the Insurers with respect to the AWD and SFWD as early as November 2000, when Grumman met with both Water Districts. (See NGC 56.1 ¶ 91.) The SFWD expressed a belief that Grumman should be required to pay for wellhead treatment and would pay the cost of treatment and subsequent operating and maintenance costs. (Id. ¶ 86.) At that time, Grumman "knew that

contamination emanating from its Bethpage facility ... was expected to eventually contaminate the drinking water supplies of both" the AWD and the SFWD. (Id.)

Grumman owed notice to the Insurers with respect to the MWD as early as January 2001, when it held a series of meetings with the AWD, the MWD, and the SFWD. (See id. ¶ 78.) During those meetings, the Water Districts were concerned about groundwater contamination due to Grumman's groundwater plume, and Grumman understood that it "potentially might be responsible for costs associated with insuring a clean water supply" to the Water Districts. (Id. ¶ 80.) That same month, the Water Districts stated to NYSDEC that it should "require both PRPs, or at a minimum Northrop Grumman, to provide a letter of credit that would be sufficient to cover all anticipated future costs." (Id. ¶ 87.) On February 2, 2001, Grumman's consultants stated to NYSDEC that Grumman would bear the "capital and annual operation and maintenance costs for well head treatment" for all Water Districts "for the time period that the treatment is required." (NGC 56.1 ¶ 81.)

Grumman argues that the AWD, MWD, and FWD never asserted a "claim" against Grumman within the meaning of the policies. (NGC Opp. 16.) However, it is irrelevant that those three Water Districts have not filed common-law or statutory claims against Grumman. "A claim may be made without the institution of a formal proceeding. . . . [V]irtually any assertion of an exposure to liability within the risks covered by an insurance policy is a claim." Fairchild, 56 F.3d at 439.[5] The record is clear that all three Water Districts demanded that Grumman

---

[5] Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 216 (2d Cir. 1999), which states that "for an assertion or notice to the insured to be a claim it must be made by the party

18

pay for cleanup of their wells, and that Grumman was aware of the Water Districts'

views as to Grumman's liability as of 2000 and 2001. Thus, it is irrelevant that the

Water Districts participated "as interested parties in the development of the

administrative record in the NYSDEC Administrative Action" rather than through

filing their own lawsuits. (NGC Opp. 16.)

Despite having notice obligations to Insurers as early as 2000 and 2001,

Grumman did not provide notice to the Insurers until a decade later. On April 23,

2009, Grumman's broker forwarded correspondence to the Insurers relating to

contamination at the AWD. (NGC 56.1 ¶ 96.) On June 11, 2010, Grumman's

counsel wrote to the Insurers regarding the MWD claim. (Hultman Decl. Ex. 55, at

ARSW003590.) Finally, on February 1, 2012, Grumman's outside counsel wrote to

Travelers regarding the SFWD claim. (Hultman Decl. Ex. 58, at

NGINS000010319.)

In addition to arguing that it was not obliged to inform Travelers of any

"claim" that occurred, Grumman also reiterates several arguments that it

previously made in opposition to Travelers' and Century's prior motions regarding

the Bethpage Facility and Bethpage Community Park. The Court has already

analyzed and rejected each of these arguments.

First, Grumman claims that it "provided the insurers with timely notice of

the NYSDEC Administrative Action in January 1984" through a December 6, 1983

NYSDEC letter that named Grumman a potentially responsible party, "and the

---

whose rights allegedly have been violated," does not conflict with this principle. The Water Districts
clearly stated their own belief on several occasions that Grumman would be financially responsible
for remediation at the Water Districts.

insurers did nothing to assist Grumman for over two decades." (NGC Opp. 16 (citing NGC 56.1 ¶¶ 158, 166–74).) However, as the Court has explained in its opinion related to the Bethpage Facility, Grumman indisputably forwarded the 1983 NYSDEC letter to the wrong address for Travelers in 1984, and no Travelers witness recalls ever seeing it. (See ECF No. 552 at 60–62.) Moreover, the 1984 letter is inadequate notice as a matter of law; it refers a different claim related to the Old Bethpage Landfill, and cannot constitute notice of the three Water District claims, which were not asserted until 2000 and 2001. (See ECF No. 554 at 13–16.)

Grumman also asserts that "a reasonable jury could find that the insurers waived their late-notice defenses to coverage for the NYSDEC Administrative Action and any indirect demands that the AWD, MWD, and SFWD supposedly made on Grumman in connection with that proceeding." (NGC Opp. 17–18.) However, the policies state that their terms may not be waived or changed except by written endorsement. (NGC 56.1 ¶ 120; Insurers 56.1 ¶ 120; Maxwell Decl. Ex. 1, at TRAV000443.) There was no such waiver by written endorsement here. Nor does the record as a whole support an inference of waiver, which is not lightly to be presumed; waiver is the "intentional relinquishment of a known right." Capitol Records, Inc. v. Naxos of Am., Inc., 372 F.3d 471, 482 (2d Cir. 2004). (See ECF No. 552 at 63–65.) Any Travelers correspondence in October 2002 and February 2003 with regard to the Bethpage Facility (see NGC 56.1 ¶ 187) cannot serve as a waiver of a late-notice defense for the Water District claims, because Travelers was unaware of their existence in 2002 and 2003. Similarly, the letters that Grumman's

broker sent to Travelers and ACE in February and March 2007 regarding the ROD for groundwater contamination at the Bethpage Facility (see NGC 56.1 ¶ 188) could not have served either as notice or as a basis for wavier, because they never referred to the three Water District claims.

Finally, Grumman argues that notice would have been futile, because "Century had effectively disclaimed coverage for Grumman environmental claims by repeatedly telling Grumman that Century would not defend or indemnify the company against any such claim." (NGC Opp. 18 (citing NGC 56.1 ¶¶ 176–79).) However, the record supports exactly the opposite inference: Grumman's provision of information relating to other claims in the 1990s and 2000s belie the notion that Grumman believed that it was futile to look to Century for coverage. (See ECF No. 554 at 16.) See Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307, 329 (2d Cir. 2000) (finding that an insurer did not provide a "blanket denial," because the insured continued to provide the insurer with notice and the insured and insurer continued to negotiate over liability).

For these reasons, the Insurers are entitled to a declaration barring coverage for claims at the Water Districts because Grumman provided late notice of those claims.

C.    The Travelers Policies' Pollution Exclusions

For the same reasons as those set forth in the Court's prior opinions, the pollution exclusions in the Travelers policies preclude coverage for contamination at the Water Districts arising from the Bethpage Facility and the Bethpage

Community Park. The Travelers policies in effect from January 1, 1972 to January 1, 1983, with the exception of Policy No. TREE-SLG-107T519-8-82, "exclude . . . liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutants, irritants or contaminants . . . unless such discharge, dispersal, release or escape is <u>sudden and accidental</u>." (ECF No. 552 at 27 (emphasis added).) The Travelers policies in effect between January 1, 1983 and January 1, 1985, as well as Policy No. TREE-SLG-107T519-8-82, exclude liability for "property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either <u>expected or intended</u>." (<u>Id.</u> at 28 (emphasis added).)

As the Court outlined in its prior opinions, Grumman intentionally undertook acts that discharged contaminants. (<u>See</u> ECF No. 552 at 45–47; ECF No. 553 at 14–15.) It regularly used and stored contaminants, including TCE, in connection with its operations at the Facility and at the Park. (<u>See</u> ECF No. 552 at 2–9; ECF No. 553 at 2–5.) Those operations are believed to have caused the groundwater contamination impacting or threatening the Water Districts. (NGC 56.1 ¶ 109; Travelers 56.1 ¶ 109.) For example, Leskovjan of Grumman testified that it was his view that "[m]anufacturing operations at the Bethpage facility have resulted in contamination of groundwater beneath the site." (NGC 56.1 ¶ 109; Hultman Decl. Ex. 81, at 71:16–23.) Leskovjan also wrote in a memorandum that contamination "might migrate off-site." (NGC 56.1 ¶ 109; Hultman Decl. Ex. 23, at

22

NGINS000380485.) The March 2001 NSYDEC ROD states that an off-site groundwater plume emanating from the site had impacted or threatened three water supply wellfields operated by the BWD, and that groundwater contamination had migrated into the Bethpage regional aquifer. (Hultman Decl. Ex. 36, at NGNIS000010548, NGINS000010560–61.) Finally, the March 2013 NYSDEC ROD describes the "continued off-site migration of impacted groundwater" from the Bethpage Facility site and the "significant off-site groundwater plume" caused by this migration. (Hultman Decl. Ex. 62, at 14.)

The practices causing contamination at the Bethpage Facility and Community Park and thereby affecting the Water Districts were not "sudden and accidental" events within the meaning of the pollution exclusion. Grumman's practices involved TCE on the ground, sprayed by wands, discharged into basins, and kept in drums; all of these practices involved normal protocol and housekeeping matters, not "accidental" contamination. (See ECF No. 552 at 48–55; ECF No. 553 at 12–14.) See, e.g., Northville Indus. Corp. v. Nat'l Union Fire Ins. of Pittsburgh, Pa., 89 N.Y.2d 621, 635 (1998) (finding that "leakages" that "occurred continuously over a period of many years" were not "sudden and accidental"). Nor did unexpected or unintended events cause the contamination. The record reflects that Grumman expected or intended the discharge or dispersal of TCE, the use of TCE in discharge basins, its leaching into the ground, and its presence on the floor after routine operations. See Emerson Enters., LLC v. Hartford Acc. & Indem. Co., 531 F. App'x 152, 154 (2d Cir. 2013) (finding that, even if damage itself was neither

expected nor intended, it arose from an expected and intended discharge).  (See ECF No. 552 at 56–57; ECF No. 553 at 15.)

For these reasons, the insurers are entitled to a declaration barring coverage for claims at the Water Districts under the Travelers policies containing pollution exclusions.

D.     Grumman's Breach of Obligations

The Insurers' policies state, 'The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident."  (NGC 56.1 ¶ 125; Insurers 56.1 ¶ 125; Maxwell Decl. Ex. 1, at TRAV000442.)  An insurer may deny coverage where the insured assumes financial obligations without the insurer's participation or consent.  See, e.g., Sunham Home Fashions, LLC v. Diamond State Ins. Co., 813 F. Supp. 2d 411, 417 (S.D.N.Y. 2011); Vigilant Ins. Co. v. Bear Stearns Cos., 10 N.Y.3d 170, 177–78 (2008).

Here, Grumman breached the policies when it agreed in 2001, without notice to or consent from the Insurers, to pay remediation costs at each of the Water Districts that the plume might affect.  In a February 2, 2001 letter to NYSDEC, Grumman's consultants stated that Grumman would bear the "capital and annual operation and maintenance costs for well head treatment" for all Water Districts "for the time period that the treatment is required."  (NGC 56.1 ¶ 81.)  Grumman argues that the letter "merely provid[es] comments on what NYSDEC was proposing to, and ultimately did, include in the ROD it issued."  (NGC Opp. 24

24

(citing NGC 56.1 ¶¶ 200, 201).) However, Grumman does not dispute that it committed to pay for wellhead treatment on this occasion as well as on two other occasions: in December 2000, when Grumman's consultants stated that Grumman would provide "[f]unding for well head or other treatment for a public supply well," and in February 2002, when Grumman "agreed to provide treatment" for contaminated wells. (Insurers Reply 56.1 ¶¶ 2, 4.) In so doing, Grumman violated the plain language of the policies, which state that Grumman shall not "assume <u>any</u> obligation." (NGC 56.1 ¶ 81.)

Therefore, Grumman is not entitled to coverage from the Insurers for any Water District claims due to its violations of the voluntary payment provisions of the policies through its commitments to pay for treatment. <u>See</u> <u>Sunham Home Fashions</u>, 813 F. Supp. 2d at 417; <u>Vigilant Ins. Co.</u>, 10 N.Y.3d at 177–78.

V.    CONCLUSION

For the reasons set forth above, the insurers' motion for summary judgment is GRANTED with respect to the Aqua New York, South Farmingdale, and Massapequa Water Districts, and DENIED with respect to the Bethpage Water District.[6]

The Clerk of Court is directed to terminate the motion at ECF No. 355.

The parties shall write to the Court regarding their views as to whether, having reviewed the Court's full opinions, they intend to move for Rule 54(b)

---

[6] Because Grumman's late notice and breach of obligations under the policies are dispositive, the Court does not reach the Insurers' alternative argument that the SFWD, AWD, and MWD did not suffer injury during the policy periods. (<u>See</u> Insurers' Mot. 21–22.)

certification or whether they intend to proceed to Phase II of the litigation, no later than **Monday, March 24, 2014**.

SO ORDERED.

Dated:     New York, New York
            March 13, 2014

KATHERINE B. FORREST
United States District Judge