Originally filed under seal at Docket 112 on Feb. 22, 2013 In Support Of Travelers' Reply Memorandum Of Law In Further Support Of Its Motion For Partial Summary Judgment, Filed February 22, 2023.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVELERS INDEMNITY COMPANY, TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, formerly known as TRAVELERS INDEMNITY COMPANY OF RHODE ISLAND, TRAVELERS CASUALTY AND SURETY COMPANY, formerly known as THE AETNA CASUALTY AND SURETY COMPANY, and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, formerly known as TRAVELERS INDEMNITY COMPANY OF ILLINOIS,

Plaintiffs,

vs.

NORTHROP GRUMMAN CORPORATION, successor in interest to GRUMMAN CORPORATION, NORTHROP GRUMMAN SYSTEMS CORPORATION, successor in interest to GRUMMAN AEROSPACE CORPORATION,

Defendants,

*and*

CENTURY INDEMNITY COMPANY, eventual successor in interest to INSURANCE COMPANY OF NORTH AMERICA,

Nominal Defendant.

CASE NO.: 1:12-cv-03040-KBF

**DECLARATION OF MEGHAN E. CANNELLA, ESQ.**

**ECF CASE**

**DECLARATION OF MEGHAN E. CANNELLA, ESQ.**

MEGHAN E. CANNELLA, ESQ., declares the following pursuant to 28 U.S.C. § 1746:

1. I am associated with the firm Simpson Thacher & Bartlett LLP, counsel for Plaintiffs and Counterclaim Defendants The Travelers Indemnity Company; The Travelers Indemnity Company of Connecticut, formerly known as The Travelers Indemnity Company of Rhode Island; Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company; and Travelers Property Casualty Company of America, formerly known as The Travelers Indemnity Company of Illinois (collectively "Travelers") in the above-captioned case. I am fully familiar with the facts set forth in this Declaration, either from personal knowledge or on the basis of the documents that have been provided to me.

2. I submit this Declaration in support of Travelers' Reply Memorandum of Law in Further Support of its Motion for Partial Summary Judgment, filed February 22, 2013.

3. Attached hereto as Exhibit 1 is a chart entitled "Examples of C.F.R. Provisions That Expressly Impose A 'Financial Responsibility' Requirement."

4. Attached hereto as Exhibit 2 is a chart entitled "Excerpts From The Legislative History Of The New York Pollution Exclusion Demonstrating The Narrow Scope Of The Exception."

5. Also attached hereto are true and accurate copies of the exhibits listed in the table below:

| **Ex. No.** | **Description** |
|---|---|
| 3 | Orange & Rockland's Memorandum of Law in Opposition To Plaintiff's Motion for Partial Summary Judgment, *Travelers Indem. Co. v. Orange & Rockland Utils., Inc.*, Index No. 603601/02 (N.Y. Sup. Ct. Dec. 3, 2008) |
| 4 | *Consol. Edison Co. of N.Y., Inc. v. Am. Home Assur. Co.*, No. 600527/01, slip op. (N.Y. Sup. Ct. Nov. 6, 2003) |

| Ex. No. | Description |
|---|---|
| 5 | *Hartford Acc. & Indem. Co. v. Chenango Indus. Inc.*, No. 90-1462, slip op., Vol. 8 Mealey's Lit. Rep. Ins. #12 (N.Y. Sup. Ct. Sept. 10, 1993) |
| 6 | *Occidental Chem. Corp. v. Hartford Acc. & Indem. Co.*, No. 41009/80, Vol. 10, Mealey's Lit. Rep. Ins. #46 (N.Y. Sup. Ct. Sept. 25, 1996) |
| 7 | NYLS' Governor's Bill Jacket, L. 1971, Chapter 765, obtained from New York Legislative Service, Inc. |
| 8 | NYLS' Governor's Bill Jacket, L. 1971, Chapter 766, obtained from New York Legislative Service, Inc. |
| 9 | N.Y. Senate Debate on S. 7042, L. 1971, Chapter 766, obtained from New York Legislative Service, Inc. |

6. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22nd day of February, 2013
New York, New York

*/s/ Meghan E. Cannella*
Meghan E. Cannella

# EXHIBIT 1

**Examples Of C.F.R. Provisions That Expressly Impose A "Financial Responsibility" Requirement**

| Provision | Relevant Excerpt |
|---|---|
| 46 C.F.R. § 540.3 (1971) | "**Proof of financial responsibility, when required.** No person in the United States may arrange, offer, advertise, or provide passage on a vessel unless a Certificate (Performance) has been issued to or covers such person." |
| 46 C.F.R. § 540.4 (1971) | "**Procedure for establishing financial responsibility.** (a) In order to comply with section 3 of Public Law 89-777 (80 Stat. 1357, 1358) enacted November 6, 1966, there must be filed an application on Form FMC-131 for a Certificate of Financial Responsibility for Indemnification of Passengers for Nonperformance of Transportation . . . ." |
| 46 C.F.R. § 540.7 (1971) | "**Evidence of financial responsibility.** Where satisfactory proof of financial responsibility has been given or a satisfactory bond has been provided, a Certificate (Performance) covering specified vessels, shall be issued evidencing the Commission's finding of adequate financial responsibility to indemnify passengers for nonperformance of water transportation. The period covered by the Certificate (Performance) shall be indeterminate, unless a termination date has been specified thereon." |
| 46 C.F.R. § 542.3 (1971) | **"Proof of financial responsibility, when required.** (a) No vessel over 300 gross tons, including any barge of equivalent size, shall use any port or place in the United States or the navigable waters of the United States on or after April 3, 1971, for any purpose unless a Certificate has been issued covering such vessel. (b) Vessels subject to the provisions of this part shall be presumed to be of the gross tonnage denoted in their certificates of registry or other marine documents acceptable to the Commission; provided, however, that if such a vessel has more than one gross tonnage, the higher one will apply." |
| 46 C.F.R. § 542.4 (1971) | "**Procedure for establishing financial responsibility.** (a) Either owners or operators of vessels subject to § 542.3 must file an application on Form FMC-224 for a Certificate of Financial Responsibility (Oil Pollution) . . . ." |

| Provision | Relevant Excerpt |
|---|---|
| 46 C.F.R. § 542.5 (1971) | "**Methods of establishing financial responsibility; forms and requirements.** (a) Every applicant must establish acceptable evidence of financial responsibility to meet his liability to the United States under the [Water Quality Improvement Act of 1970] in the amount of $100 per gross ton, or $14 million, whichever is lesser: *Provided, however,* That if an applicant is, or for purposes of the rules of this part becomes, responsible for more than one vessel subject to this part, financial responsibility need only be established in an amount necessary to meet the maximum liability to which the largest vessel of such vessels (fleet) could be subjected. Evidence of such responsibility may be established by any one, or any combination, of the following methods: . . . " |
| 46 C.F.R. § 542.6 (1971) | "**Issuance of Certificate of Financial Responsibility.** (a) Where evidence of financial responsibility has been established, a separate Certificate covering each vessel shall be issued evidencing the Commission's finding of adequate financial responsibility to meet the liability to the United States to which such vessel could be subjected under section 11 of the [Water Quality Improvement Act of 1970] for the cost of removal of a discharge of oil into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . ." |
| 29 C.F.R. § 40.11 (1971) | "**Cancellation of insurance, review of financial responsibility, change of ownership.** (a) Any insurance policy or liability bond required by the [Farm Labor Contractor Registration Act of 1963] or this part shall provide that it shall not be canceled, rescinded, or suspended, nor become void for any reason whatsoever during such period in which the insurance or liability bond is required by the [Farm Labor Contractor Registration Act of 1963] to be effective, except by the expiration of the term for which it is written, or until the company or the named insured, in the case of an insurance policy, or the 'surety' or the 'principal,' in the case of a liability bond, shall have first given thirty (30) days' notice in writing . . . ." |

| Provision | Relevant Excerpt |
|---|---|
| 7 C.F.R. § 1483.103 (1971) | "**Financial responsibility.** [Commodity Credit Corporation] reserves the right if it does not have adequate information as to the financial ability of the offeror to meet the obligations he would incur in this subpart (a) to refuse to consider an offer to purchase CCC wheat for export or (b) to refuse to consider an offer or to register a sale to export wheat for an export payment. If a prospective offeror is in doubt as to whether CCC has adequate information as to his financial responsibility, he should either submit a financial statement to the ASCS Commodity Office prior to making an offer to purchase CCC wheat for export (see § 1483.187), or communicate with such office or with the office specified in § 1483.185 prior to making an offer to export wheat for an export payment under this subpart to determine whether such a statement is desired in his case. When satisfactory financial responsibility has not been established, CCC reserves the right to consider an offer only upon submission by the offeror of a certified or cashier's check, a bid bond, or other security, acceptable to CCC, assuring that if the offer is accepted the offeror will comply with the applicable provisions of this subpart and will furnish a performance bond or other performance security acceptable to CCC." |
| 32 C.F.R. § 818.2 (1971) | "**Financial responsibility of member.** Air Force military members are expected to discharge their financial obligations in a proper and timely manner. A 'just financial obligation' means one in which there is no reasonable dispute as to the facts or the law, or one reduced to judgment that conforms to the Soldiers' and Sailors' Civil Relief Act (50 U.S.C. Appendix 501, et seq.), if applicable. 'In proper and timely manner' means a manner which the immediate commander determines is in good faith." |
| 50 C.F.R. § 253.6 (1971) | "**Financial responsibility.** (a) State agencies are required to account for each approved project. Cost accounting records, consistent with generally accepted accounting standards, shall be maintained for each project separately. (b) State agencies are responsible for the financial management of the project. Appropriate internal controls will, therefore, be adopted and installed to insure that the project is accomplished in the most efficient and economical manner." |

# EXHIBIT 2

**Excerpts From The Legislative History Of The New York Pollution Exclusion Demonstrating The Narrow Scope Of The Exception**

| Citation | Relevant Excerpt | Cross Reference to Cannella Declaration Exhibit No., *infra* |
|---|---|---|
| Memorandum of the New York State Insurance Department to the Governor, dated July 15, 1971, Bill Jacket L. 1971, ch. 765, at 3. | "Excepted from the flat proscription, by the chapter amendment, are policies covering nuclear facilities licensed by the Atomic Energy Commission of the United States as meeting federal standards of radiological health and safety and nuclear facilities licensed by the state as meeting such federal standards, and policies purchased to satisfy the financial responsibility requirements of any federal law. The exceptions were added to make it clear that the law is not to be read in contranvension [sic] of such federal laws as the Water Quality Improvement Act of 1970 (P.L. 91-224). Thus The Nuclear Energy Liability Insurance Association and The Mutual Atomic Energy Liability Underwriters will be able to continue the sale of insurance on facilities meeting prescribed standards, a practical necessity for the financing of such operations." | 7 |
| Memorandum of the Department of Commerce, dated June 24, 1971, Bill Jacket, L. 1971, ch. 765, at 7. | "The [New York Pollution Exclusion] seriously adversely affects nuclear energy liability protection. However, this severe defect would be rectified by passage of [the exception]. . . . [The New York Pollution Exclusion] so severely adversely affects nuclear energy protection that we do oppose its passage unless [the exception], which rectifies the problem of [the New York Pollution Exclusion], is passed at the same time." | 7 |

| Citation | Relevant Excerpt | Cross Reference to Cannella Declaration Exhibit No., *infra* |
|---|---|---|
| Memorandum of the Power Authority of the State of New York to Counsel to the Governor, dated June 21, 1971, Bill Jacket, L. 1971, ch. 765, at 9-10. | The New York Pollution Exclusion "would conflict with the Atomic Energy Act of 1954 which requires that all licensees of nuclear plants carry insurance without any exclusion for release of pollutants into the air or water by means not sudden or accidental. The Nuclear Energy Liability Insurance Association (NELIA) and the Mutual Atomic Energy Liability Underwriters (MAELU) have agreed to issue such coverage to the Authority for the nuclear plant the Authority is now constructing near Oswego, New York . . . . Owners and operators of nuclear power plants would not be able to obtain Government insurance without the underlying coverage provided by NELIA and MAELU. If this bill became law in its present form it would prohibit NELIA and MAELU from issuing policies in a form satisfactory to the Atomic Energy Commission. Without such insurance which is now available they could not operate the nuclear facilities they are presently constructing . . . . [The exception] was introduced to cure the defects of [the New York Pollution Exclusion]. [The exception] would exclude . . . policies 'covering nuclear facilities licensed by the Atomic Energy Commission of the United States as meeting federal standards of radiological health and safety and nuclear facilities licensed by the state as meeting such federal standards, and except those purchased to satisfy the financial responsibility requirements of any federal law.' Thus this bill would permit owners and operators of facilities licensed by the Atomic Energy Commission to purchase insurance which will enable them to operate nuclear facilities." | 7 |

| Citation | Relevant Excerpt | Cross Reference to Cannella Declaration Exhibit No., *infra* |
|---|---|---|
| Letter of New York State Atomic and Space Development Authority to Counsel to the Governor, dated June 16, 1971, Bill Jacket, L. 1971, ch. 766, at 2-3. | "It is our understanding that the effect of the [exception to the New York Pollution Exclusion] is to permit persons licensed by the U.S. Atomic Energy Commission . . . and persons licensed by the State Departments of Labor or Health or by the New York City Department of Health under regulatory radiation control programs compatible with the Federal program to continue to obtain nuclear liability insurance (e.g., insurance of the type offered by Nuclear Energy Liability Insurance Association and Mutual Atomic Energy Liability Underwriters) without the addition to such insurance policies of the exclusion specified in the last sentence of subdivisions 13 and 14 of section 46 of the Insurance law . . . If [the New York Pollution Exclusion] is approved, it is essential that the [exception] also be approved in order that: (1) Persons licensed by the U.S. Atomic Energy Commission to operate production or utilization facilities (e.g., reactors and fuel reprocessing plants) can continue to utilize insurance policies issued by NELIA and MAELU as proof of financial protection under the Price-Anderson provisions of the Atomic Energy Act of 1954, as amended. Otherwise such licensees will be faced with substantial difficulties and may have to commit substantial sums of money in order to satisfy the financial protection requirements. (2) Other persons licensed by the AEC and by State agencies under the State's compatible radiation control program can continue to obtain standard NELIA and MAELU policies to cover their activities. Otherwise even though these activities fully comply with Federal or State requirements pertaining to effluents from their operations, such licensees will be faced with a potential gap in their insurance coverage. Such a gap would greatly discourage the expansion of atomic energy activities within the State, and the location of new activities within the State, all in complete negation of the State's statutory public policy since 1959 of encouraging the maximum development and use of atomic energy for peaceful and productive purposes, consistent with the public health and safety. Moreover, there is no reason known to the Authority why such a gap should exist which would deprive both the licensee and any members of the affected public of the benefits of insurance protection even in situations where the licensee is conducting his activities in accordance with all pertinent requirements." | 8 |

| Citation | Relevant Excerpt | Cross Reference to Cannella Declaration Exhibit No., *infra* |
|---|---|---|
| Letter of State of New York Department of Commerce to Counsel to the Governor, dated June 24, 1971, Bill Jacket, L. 1971, ch. 766, at 11-12. | "As you know, [the New York Pollution Exclusion] prohibits the sale by New York State insurers of liability insurance covering liability arising out of 'pollution or contamination . . .' unless the discharge is 'sudden and accidental.' We understand that the drafters of [the New York Pollution Exclusion] were not informed as to the availability of such coverage for special activities and were not informed as to the need for such coverage in the field of nuclear energy liability protection. In the nuclear energy field, it has been basic national policy, which New York state has endorsed repeatedly, that protection against potential damage be provided to the public, including protection against financial loss, whether that loss be due to dramatic 'sudden' events or by events over a longer course of time, including leakage or slow discharge or release. Such protection is mandated by Federal statute for nuclear facilities (the Price-Anderson Act, 42 USC 2210). Inadvertently, it appeared that [the New York Pollution Exclusion] would have resulted in denying such protection provided by Federally approved nuclear energy liability insurance policies for facilities in New York State. [The exception] corrects this inadvertent oversight and provides for a continuation of such financial protection of the public in New York State against damage that might result from leakage of slow discharge of nuclear materials from nuclear facilities, including larger facilities such as those licensed by the U.S. Atomic Energy Commission and smaller facilities such as universities, hospitals, factories, etc., where atomic energy activities are authorized under State jurisdiction as meeting the same high standards of radiation protection as Federal standards, in a regulatory program compatible with the Federal regulatory program." | 8 |

| Citation | Relevant Excerpt | Cross Reference to Cannella Declaration Exhibit No., *infra* |
|---|---|---|
| Recommendation of Department of Environmental Conservation, dated June 18, 1971, Bill Jacket, L. 1971, ch. 766, at 13. | "Purpose of bill: To exclude nuclear facilities licensed by the Federal Atomic Energy Commission and the state from the provisions in [the New York Pollution Exclusion] which prohibit commercial or industrial enterprises to purchase coverage against environmental pollution." | 8 |
| N.Y. Senate Debate on S. 7042, L. 1971, ch. 766, at 1-2. | "Senator Gordon: . . . [T]his is a chapter amendment to the law and this exempts nuclear plants from the prohibition against them having insurance, one of the reasons, of course, being that the nuclear plants are supervised by the [Atomic Energy Commission] and various State agencies, and the Power Authority has no capital as a State agency as far as their bonds are concerned so they have to have this insurance as part of their protection for the plants themselves. This is a necessary exception to the bill we passed earlier . . . . Well, there are also ships that are in the State here that come into the State that must carry insurance and there was some fear that those kind of vessels would be excluded from having insurance, and therefore the wording as far as 'satisfying the financial responsibility requirements of any Federal law' has been inserted to cover that kind of a situation also . . . . This is an exception allowing insurance to be written for the nuclear plants." | 9 |

# EXHIBIT 3

ORIGINAL

6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

| | |
|---|---|
| THE TRAVELERS INDEMNITY COMPANY, Plaintiff, | Index No: 603601/02 |
| v. | Hon. Eileen Bransten |
| ORANGE AND ROCKLAND UTILITIES, INC. and JOHN DOE CORPORATIONS 1-100, Defendants. | Motion Sequence 013 |
| | **ORAL ARGUMENT REQUESTED** |

**ORANGE & ROCKLAND'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE POLLUTION EXCLUSION**

FILED
AUG 19 2009
COUNTY CLERK'S OFFICE
NEW YORK

NYS SUPREME COURT - CIVIL
PART 3
DEC 03 2008
RECEIVED

DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY 10036-2714
(212) 277-6500

Attorneys for Defendant
Orange & Rockland Utilities Inc.

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 3

A. The Claims and Policies at Issue ........ 3

B. The Adoption, Terms, and Repeal of the Statute ........ 3

C. The Nyack Site ........ 5

ARGUMENT ........ 7

I. THE STANDARD OF REVIEW ........ 7

II. THE STATUTE DOES NOT APPLY TO TRAVELERS POLICY NO. TRK-SLG-910302 BECAUSE THAT POLICY WAS ISSUED PRIOR TO THE EFFECTIVE DATE OF THE STATUTE ........ 7

III. TRAVELERS IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW, BECAUSE ITS POLICIES CONTAIN A NON-CONFORMING POLLUTION EXCLUSION INTENDED TO COVER LIABILITIES ARISING FROM UNINTENTIONAL BUT GRADUAL POLLUTION ........ 8

A. Black Letter New York Law Requires That Travelers' Insurance Policies Be Enforced As Written ........ 8

B. The Non-Repealed Statute Provides No Basis for Rewriting the Pollution Exclusion Contained in the Travelers Policies ........ 9

C. Existing Case Law Does Not Support the Rewriting of Travelers' Pollution Exclusion ........ 11

IV. TRAVELERS' MOTION MUST BE DENIED BECAUSE MATERIAL ISSUES OF FACT EXIST AS TO THE CAUSE AND NATURE OF THE ENVIRONMENTAL PROPERTY DAMAGE AT ISSUE ........ 13

CONCLUSION ........ 15




DSMDB-2524929v01

**TABLE OF AUTHORITIES**

Page

Cases

*Agway, Inc. v. Travelers Indemnity Co.*, No. 93-CV-557, 1993 U.S. Dist. LEXIS 21092 (N.D.N.Y. Dec. 6, 1993) ..... 14

*Avondale Ind., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200 (2d Cir. 1989) ..... 14

*Borg-Warner Corp. v. Ins. Co. of N. Am.*, 174 A.D.2d 24, 577 N.Y.S.2d 953 (3d Dep't 1992) ..... 15

*Bral v. City of New York*, 221 A.D.2d 283, 634 N.Y.S.2d 98 (1st Dep't 1995) ..... 7

*Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352 (1978) ..... 9

*Colonial Tanning Corp. v. Travelers Indem. Co.*, 780 F. Supp. 906 (N.D.N.Y. 1991) ..... 14

*Consol. Edison Co. of New York, Inc. v Am. Home Assurance Co.*, No. 600527/01 (Sup. Ct. New york County Nov. 6, 2003) (Cahn., J.) ..... 13

*Conte v. Yorkshire Insurance Co. of New York*, 5 Misc. 2d 670, 163 N.Y.S.2d 28 (Sup. Ct. New York County 1957) ..... 10, 11

*Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506 (S.D.N.Y., 1997) ..... 12

*Inc. Village of Cedarhurst v. Hanover Ins. Co.*, 160 Misc. 2d 795, 611 N.Y.S.2d 417 (Sup. Ct. Nassau County, 1994), *aff'd*, 223 A.D.2d 527, 636 N.Y.S.2d. 1017, *aff'd as modified*, 89 N.Y.2d 293, 653 N.Y.S.2d 68 (1996) ..... 6

*Maryland Casualty Co. v. Continental Casualty Co.*, 332 F.3d 145 (2d Cir. 2003) ..... 13

*Med. Facilities, Inc. v. Pryke*, 95 A.D.2d 692, 463 N.Y.S.2d 804. (1st Dep't 1983) ("*Pryke*") ..... 10, 12

*New York v. AMRO Realty Corp.*, 936 F.2d 1420 (2d Cir. 1991) ..... 15

*New York v. Ludlow's Sanitary Landfill, Inc.*, 814 F. Supp. 248 (N.D.N.Y. 1993) ..... 8

*Niagara County v. Utica Mut. Ins. Co.*, 80 A.D.2d 415, 439 N.Y.S.2d 538 (4th Dep't 1981) ..... 5

*Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburbh, Pa.*, 89 N.Y.2d 621, 657 N.Y.S.2d 564 (1997) ..... 15

*Occidental Chem. Corp. v. Hartford Accident & Indem. Co.*, No. 41009/80, Vol. 10 Mealey's Litig. Rep. ....................13

*Pirrelli v. Long Island R.R.*, 226 A.D.2d 166, 641 N.Y.S.2d 240 (1st Dep't 1996)....................7

*Posner v. New York Mut. Underwriters*, 16 A.D.2d 1013, 229 N.Y.S.2d 160 (3d Dep't 1962) *aff'd. sub nom* ....................12

*Posner v. U.S. Fed. & Guar. Co.*, 33 Misc. 2d 653, 226 N.Y.S.2d 1011 (Sup. Ct. Sullivan County) ....................12

*Powers Chemco, Inc. v. Federal Ins. Co.*, 74 N.Y.2d 910, 549 N.Y.S.2d 650 (1989)....................4

*Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 486 N.Y.S.2d 873 (1984) ....................9

*Technicon Elecs. Corp. v. Am. Home Assurance Co.*, 74 N.Y.2d 66, 544 N.Y.S.2d 531 (1989)....................15

*Teitelbaum v. New York Property Insurance Underwriting Assn.*, 126 Misc. 2d 240, 481 N.Y.S.2d 855 (Sup. Ct. Queens County 1984) ....................11

*Timbone v. Stuyvesant Ins. Co.*, 51 Misc. 2d 916, 274 N.Y.S.2d 489 (Sup. Ct. Kings County 1966) ....................11

*Winegrad v. New York Univ. Med. Ctr.*, 64 N.Y.2d 851, 487 N.Y.S.2d 316 (1985)....................7

<u>Statutes</u>

CPLR 3212(b)....................7

New York Insurance Law § 168 ....................10, 11

New York Insurance Law § 1113 ....................1, 2, 4

New York Insurance Law § 3103 ....................12

New York Insurance Law § 3103(a)....................12

New York Insurance Law § 3404 ....................1

N.Y. Statutes L., § 411....................2

## Preliminary Statement

Defendant Orange & Rockland Utilities, Inc. ("Orange & Rockland") submits this memorandum of law, along with the affirmation of David L. Elkind, in opposition to Travelers Indemnity Company's ("Travelers") motion for partial summary judgment with respect to its policies numbered TRK-SLG-910302-70 (policy period January 1, 1970 – January 1, 1973); TRK-SLG-910302-73 (policy period January 1, 1973 – January 1, 1976); TRK-SLG-136T478-3-76 (policy period January 1, 1976 – February 15, 1977); and TRK-SLG-144T739-2-77 (policy period February 15, 1977 – February 15, 1978) (the "Policies").

In its attempt to avoid the plain language of its Policies, Travelers relies on the now-repealed former New York Insurance Law § 1113 (the "Statute"), which Travelers consciously chose to violate when it wrote the Policies. Travelers intentionally flouted the Statute when it (1) chose to include a non-conforming pollution exclusion in the Policies it sold to Orange & Rockland; and (2) collected premiums for coverage that it now disavows. Facing increased liability as a result of its business decision, Travelers is asking this Court to alter the language of its own Policies to bar Orange & Rockland's claims for coverage under those Policies. Travelers' request should be denied for several reasons.

First, the Statute does not apply to policies written before New York Insurance Law § 1113 went into effect on September 1, 1971. Therefore, Travelers Policy No: TRK-SLG 910302-70, which has a policy period of January 1, 1970 -- January 1, 1973, is not affected by the Statute and Travelers' motion should be denied as to that policy.

Second, black letter New York law, including controlling First Department authority, will not permit Travelers to rewrite its own policies after it violated the law. The Statute did not require Orange & Rockland to do anything. Instead, it directed Travelers to include such an exclusion in policies sold in this State. Travelers violated the Statute and collected premiums

accordingly. Contrary to Travelers' arguments, nothing in the Statute requires or permits a court to reward an insurance company that deliberately violated its terms and collected premiums for insurance policies that included a non-conforming pollution exclusion that failed to bar coverage for gradual pollution. Travelers' non-compliant language clearly provided coverage for gradual pollution that was unintentional and Orange & Rockland paid premiums to Travelers for this coverage. There is no appellate case law supporting Travelers' argument that its non-conforming pollution exclusion should be rewritten by the Court to deny coverage that is clearly covered by the insurance contract.

Finally, Travelers' motion should be denied because there are material issues of fact regarding the causes of contamination at the sites in issue. Even if the statutory pollution exclusion were read into the Travelers Policies, Orange & Rockland still is entitled to coverage for liabilities arising from property damage caused by the sudden and accidental discharge of pollutants. The record here contains ample evidence from which a finder of fact could conclude that some of the environmental property damage at issue resulted from abrupt spills and other similar discharges. Experts hired by both parties believe that some contamination could have been caused by sudden spills and there is witness testimony to the same effect. Hence, questions of fact as to whether and to what extent the property damage that underlies Orange & Rockland's claims resulted from the sudden and accidental release of contaminants versus gradual pollution preclude the entry of summary judgment for Travelers, and its motion must be denied.

Travelers' motion is not a neutral event. Travelers' motion wrongly seeks a windfall by seeking to avoid its coverage obligations under insurance policies that it sold in violation of New York law.

## STATEMENT OF FACTS

### A. The Claims and Policies at Issue

Travelers seeks a declaratory judgment that it has no duty to indemnify its policyholder, Orange & Rockland, for costs incurred for remediation at seven former manufactured gas plants ("MGPs") that Orange & Rockland's predecessors owned or operated in New York State. One of the former MGP sites at issue in this litigation is located in Nyack, New York and this is the site that both Orange & Rockland and Travelers have agreed will be the first trial site.[1]

None of the Policies contains a pollution exclusion that comports with the Statute. Instead, Travelers chose to include in its post-1973 policies a pollution exclusion that focuses on whether or not the pollution was intentional, instead of whether or not it was sudden and accidental.[2] The non-conforming Travelers pollution exclusion excludes coverage for "property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant . . . if such emission, discharge, seepage, release or escape is either *expected or intended* from the standpoint of any *insured*." *See* Travelers Policy Nos. TRK-SLG-910302-73, TRK-SLG-136T478-3-76, and TRK-SLG-144T739-2-77 (Elkind Aff. Exs. 3, 4, and 5).

### B. The Adoption, Terms, and Repeal of the Statute

In 1971, the New York State Legislature enacted what eventually became New York Insurance Law § 1113, which required insurance companies to include in their insurance policies

[1] The Court agreed in its June 2, 2008 status conference that summary judgment would be limited to the trial sites selected by the parties. *See* Elkind Aff. Ex. 1 at 42:4-44:9. ("Elkind Aff." refers to the Affirmation of David L. Elkind, Esq., dated November 10, 2008, submitted herewith.) Thus, in this Opposition, Orange & Rockland specifically addresses questions of fact regarding the Nyack site.

[2] Policy No. TRK-SLG-910302 (January 1, 1970 – January 1, 1973) does not contain a pollution exclusion. *See* Elkind Aff. Ex. 2.

a standard-form "sudden and accidental" pollution exclusion. Significantly, the Statute did not provide that insurance policies sold during the effective period of the Statute should automatically be deemed to include such an exclusion by operation of the Statute itself. Rather, it directed insurance companies to include express language excluding all but sudden and accidental pollution-related liabilities:

> Policies issued to commercial or industrial enterprises providing insurance against the legal liabilities specified in this subdivision shall expressly exclude therefrom liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutants, irritants or contaminants into or upon land, the atmosphere or any water course or body of water unless such discharge, dispersal, release or escape is sudden and accidental.

Affirmation of Jonathan P. McHenry, dated October 7, 2008 ("McHenry Aff") Ex. 4.

The history of the Statute clearly shows that it was intended to deter *active* polluters and not to apply to situations in which pollution had occurred years or even decades previously. As the Fourth Department recognized:

> "For example, a polluting corporation might continue to pollute the environment if it could buy protection from potential liability for only the small cost of an annual insurance premium, whereas, it might stop polluting, if it had to risk bearing itself the full penalty for violating the law." The conclusion thus becomes compelling that the pollution exclusion clause, mandated by statute, was intended to apply *only to actual polluters*.

*Niagara County v. Utica Mut. Ins. Co.*, 80 A.D.2d 415, 418, 439 N.Y.S.2d 538, 540 (4th Dep't 1981) (emphasis added) (quoting N.Y. Legis. Ann., 1971, pp. 353-354).

In 1982, the Legislature determined that it had erred when it concluded in 1971 that the public interest in preventing pollution damage would be fostered by requiring the insurance industry to exclude pollution liabilities from coverage. Accordingly, it passed L. 1982 Ch. 856 (the "Repeal Act"), which repealed the requirement that insurance companies include in their policies language excluding coverage for pollution liabilities. *See* McHenry Aff. Ex. 7. The

Governor's Memorandum approving the Repeal Act highlighted the ameliorative purpose of the Repeal Act, and the specific legislative recognition that the public interest would be served best by ensuring the availability of insurance for pollution liabilities:

> As we increasingly rely on the private sector to treat, store and dispose of hazardous wastes in a safe and environmentally sound manner, we must insure that the public health is safe-guarded from the adverse consequences of failures and accidents for which insufficient funds are available to remedy.

McHenry Aff. Ex. 6.

### C. <u>The Nyack Site</u>

From approximately 1852 until 1964, Orange & Rockland's predecessor companies manufactured gas at the Nyack site. *See* Elkind Aff. Ex. 6 at 13. Nyack produced coal gas (1952-1885), carbureted water gas (CWG) (1886-1947), and high British thermal units (BTU) oil gas (1948-1964). *See Id.* at 13 (Shifrin Report). The former MGP was demolished in 1964. *See Id.* at 17.

There is both expert and witness testimony indicating that some of the contamination at the Nyack site was sudden and accidental. Dr. Neil S. Shifrin, Orange & Rockland's expert on historic and current environmental conditions at the MGP sites, stated that some of the contamination at the Nyack site was caused by sudden and accidental occurrences such as spills:

> Nyack was a very old plant, dating back to 1852. So old, in fact that there are no surviving records for its first few decades of operations; even the original gas holders are undocumented. Nevertheless, later surviving records indicate the plant was well run, relative to the MGP industry, and there is evidence confirming that the plant recovered its tar. *In my opinion, all the tar in the subsurface at this plant, with the exception of some NAPL in the jetty area, is from inadvertent leaks and spills during operations.*

*Id.* at 3 (emphasis added).

Travelers' own expert on historic MGP operations, Dr. Brian Murphy, also testified that some of the contamination at the Nyack site may have been caused by spills:

> Elkind: Any other areas of significant contamination or substantial contamination at the site that you're aware of?
>
> Murphy: Well, there's a whole area here that includes both LNAPL and DNAPL (indicating). The LNAPL is --
>
> . . . .
>
> Murphy: -- is associated with petroleum storage in that area, and again it could be tank bottom water discharge, it could be sludge burial, it could be routine leaks and ***spills***.
>
> . . . .
>
> Elkind: Okay. Is there any other area of contamination that you believe significant?
>
> Murphy: Well, I mean, there's contamination virtually every location on this site. It's just widespread. I guess I'd draw a big circle here that encompasses the gashouse area (indicating) and note that there's both DNAPL and LNAPL in that location.
>
> Elkind: That's area 10?
>
> Murphy: Yes.
>
> Elkind: And the cause of that would have been leaks or seepage from the equipment?
>
> Murphy: It could be. It could be routine *operating spills*. The LNAPL could be tank bottom water discharge. It could be sludge burial. It's so widespread that *it's just hard to isolate a source*.

Elkind Aff. Ex. 7 at 422:17-422:22, 423:4-423:7, 425-426, 425:11-426:7 (emphasis added).

Fact testimony also shows that accidental spills took place at Orange & Rockland's MGP sites. Floyd Cole, a former Orange & Rockland employee who was familiar with the Nyack plant and with Orange & Rockland's MGP operations in general, testified that unintentional spills occurred at the plants:

> McHenry: Do you know whether *spillage of wastes* at the former manufactured gas plant sites was routine?
>
> Cole: It would occur occasionally during our operations, certainly.

Elkind Aff. Ex. 8 (June 7, 2005 Cole Dep. Tr.) at 128:9-128:13 (emphasis added).

## ARGUMENT

### I. THE STANDARD OF REVIEW

A party seeking summary judgment must make a "'prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case.'" *Pirrelli v. Long Island R.R.*, 226 A.D.2d 166, 641 N.Y.S.2d 240 (1st Dep't 1996) (quoting *Winegrad v. New York Univ. Med. Ctr.*, 64 N.Y.2d 851, 853487 N.Y.S.2d 316, 317 (1985)). A motion for summary judgment also "shall be denied if any party shall show facts sufficient to require a trial of any issue of fact." CPLR 3212(b). New York courts caution that "[t]he drastic remedy of summary judgment may not be granted if there is *any doubt whatever as to the existence of an unresolved issue of fact.*" *Bral v. City of New York*, 221 A.D.2d 283, 634 N.Y.S.2d 98, 99 (1st Dep't 1995) (emphasis added).

### II. THE STATUTE DOES NOT APPLY TO TRAVELERS POLICY NO. TRK-SLG-910302 BECAUSE THAT POLICY WAS ISSUED PRIOR TO THE EFFECTIVE DATE OF THE STATUTE

Travelers' motion for partial summary judgment improperly includes Policy No. TRK-SLG-910302, which was sold to Orange & Rockland for the policy period January 1, 1970 to January 1, 1973. *See* Elkind Aff. Ex. 2 at OR 034-695. The New York Statute, however, did not go into effect until September 1, 1971, and thus does not apply to policies sold prior to its effective date.

The Statute clearly states: "This act shall take effect on the first day of September next succeeding the date on which it shall have become law and shall be applicable to policies *issued or renewed thereafter.*" McHenry Aff. Ex. 4. (emphasis added). The Statute is not retroactive. As the court in *New York v. Ludlow's Sanitary Landfill, Inc.* explained, "[the Statute] was approved on June 25, 1971, and consequently was effective September 1, 1971.

Therefore, as a matter of law the statutory mandate cannot apply to [a] policy unless it was issued or renewed after September 1, 1971." 814 F. Supp. 248, 250 (N.D.N.Y. 1993).

Given the clear language of the Statute and the case law supporting the prospective nature of the Statute, New York law mandates that even if the Court were to agree with Travelers and rewrite the Policies, the relief sought by Travelers in its motion for partial summary judgment must be denied insofar as it extends to Policy No. TRK-SLG-910302 (policy period January 1, 1970 to January 1, 1973).

## III. TRAVELERS IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW, BECAUSE ITS POLICIES CONTAIN A NON-CONFORMING POLLUTION EXCLUSION INTENDED TO COVER LIABILITIES ARISING FROM UNINTENTIONAL BUT GRADUAL POLLUTION

### A. Black Letter New York Law Requires That Travelers' Insurance Policies Be Enforced As Written

Under well-established and long-standing New York law, a court must enforce the terms of an insurance policy as written. "[A] contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed" in the policy. *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355 (1978).

In particular, New York will not allow an insurance company to avoid its coverage obligations on the basis of an exclusion unless that exclusion is set forth clearly and explicitly in the policy language. "[W]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so 'in clear and unmistakable' language." *Seaboard Sure. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 876 (1984). "[I]f exclusion of liability is intended, which is not apparent from the language employed, it is the insurer's responsibility to make such intention clearly known." *Inc. Village of Cedarhurst v. Hanover Ins. Co.*, 160 Misc. 2d 795, 797, 611 N.Y.S.2d 417, 419 (Sup. Ct. Nassau County, 1994), *aff'd*, 223 A.D.2d 527, 636 N.Y.S.2d. 1017 (2d Dep't), *aff'd as modified*, 89 N.Y.2d 293, 653 N.Y.S.2d 68 (1996).

Travelers does not dispute that none of the Policies it sold to Orange & Rockland contain exclusions that deny coverage for gradual pollution. Absent such an express exclusion of coverage, Orange & Rockland purchased policies that provided coverage for gradual pollution liabilities, and the clear mandate of New York law is that no exclusion of such coverage may be implied or inserted into the policies after the fact. Hence, Travelers is not entitled to a judgment of no coverage as a matter of law, and its motion must be denied.

### B. The Now-Repealed Statute Provides No Basis for Rewriting the Pollution Exclusion Contained in the Travelers Policies

Having violated the requirement that it include an exclusion for gradual pollution in its Policies, Travelers now attempts to avoid coverage under the Policies by arguing that the Statute requires the Court to rewrite the Policies to bar coverage for pollution that was not sudden and accidental. That argument is belied by more than three decades of New York insurance decisions holding that an insurer that fails to include in its policies statutorily mandated limitations on coverage may not rely on those provisions to avoid its coverage obligations. Those decisions require that Travelers' reliance on the Statute to alter its express policy language be rejected, and that Travelers' motion be denied.

The New York insurance statutes contain numerous provisions that require that insurance companies include in their policies specific language or standard form provisions. Insurers, however, do not always comply with those provisions – and when they do not, courts in this State will not allow them to profit from that fact. In a controlling decision, the First Department has held that the failure to include a statutorily-mandated provision setting a one-year statute of limitations for coverage claims resulted in an inability on the part of the insurer to argue the statute of limitations as a defense: "Since the policy did not include the statutory language set forth in §168 of the Insurance Law, or indeed any reference to the one-year period of limitations, Special Term was clearly correct in concluding that the one-year period was

inapplicable." *See Med. Facilities, Inc. v. Pryke*, 95 A.D.2d 692, 693, 463 N.Y.S.2d 804, 805. (1st Dep't 1983) ("*Pryke*").

In *Conte v. Yorkshire Insurance Co. of New York*, 5 Misc. 2d 670, 163 N.Y.S.2d 28 (Sup. Ct. New York County 1957), the insurer also failed to include in its policy the shortened statutory period of limitation. When the policyholder failed to bring its coverage action within one year of the loss, the insurer argued that the limitations period required by the statute must be deemed to be part of the policy, barring the insured's claim. The court disagreed, and held that the insurer could not be allowed to rely on a coverage limitation that it failed to include in its policy – even when that language was required by statute to be included:

> [T]he statute makes it incumbent upon the company to deliver to the policyholder a printed form of fire insurance which embodies the standard provisions stipulated in the statute, including the proviso limiting the commencement of an action to a twelve-month period. (§ 168 of the Insurance Law). The insured has no duty or responsibility in this respect, and speaking realistically, has no reason to know of such a limitation. *If the company, as in the case at bar, fails to provide him with a proper policy, one which complies with the statute, it should suffer the consequences of its neglect and not suddenly pull a trapdoor on the innocent insured who parted with the premiums.*

*Id.* at 672, 163 N.Y.S.2d at 30 (emphasis added); *see also Timbone v. Stuyvesant Ins. Co.*, 51 Misc. 2d 916, 920, 274 N.Y.S.2d 489, 493 (Sup. Ct. Kings County 1966) (holding that *Conte* "stands for the proposition that even where the term of an insurance policy is prescribed and identified in a statute, if such provision is omitted from a policy the insured is not bound by it").

More recently, in *Teitelbaum v. New York Property Insurance Underwriting Assn.*, 126 Misc. 2d 240, 481 N.Y.S.2d 855 (Sup. Ct. Queens County 1984), the court held that statutes that mandate the inclusion of specific policy terms are binding only on the insurer that issues the policy. It accordingly refused to allow an insurer to deny coverage on the basis of a statutorily mandated limitations provision when it had failed to include that provision in the contract of insurance:

> Section 3404 of the Insurance Law makes it incumbent on the insurance company to deliver to the policy holder a printed form of fire insurance which embodies the [two-year limitations] provisions of the statute. *The insured has no duty or responsibility in this respect and, in the absence of any provision in the policy or the binder as to the period of limitations, the insured may rely upon the general six-year statute of limitations.*

*Id.* at 242, 481 N.Y.S.2d at 857 (emphasis added).

Under the rules set forth in these cases, New York Insurance Law § 3103 does not justify implication of the statutorily mandated pollution exclusion into a non-compliant insurance policy to the detriment of a policyholder. Rather, that section acts only to preclude *an insurance company* from challenging the validity or altering the terms of a policy issued in violation of statute. *See Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 538 (S.D.N.Y., 1997) ("By [its] terms, § 3103(a)…prohibit[s]…the *insurer* from challenging the validity of a policy….") (emphasis added); *see also Posner v. U.S. Fed. & Guar. Co.*, 33 Misc. 2d 653, 657, 226 N.Y.S.2d 1011, 1016 (Sup. Ct. Sullivan County), *Posner v. New York Mut. Underwriters*, 16 A.D.2d 1013, 229 N.Y.S.2d 160 (3d Dep't 1962) *aff'd. sub nom* (interpreting the statutory precursor to § 3103 and holding that despite the terms of that section, "he who brought the agreement into existence and thus is primarily responsible for its inadequacy should justly suffer for its shortcomings").[3]

### C. Existing Case Law Does Not Support the Rewriting of Travelers' Pollution Exclusion

Having failed to include an exclusion for gradual pollution in its Policies, Travelers now attempts to avoid coverage by arguing that the Statute requires the Court to rewrite the non-conforming pollution exclusion in Travelers' Policies to comport with the Statute and bar coverage for pollution that was not sudden and accidental. Travelers cites various cases to

[3] The repeal of the Statute precludes Travelers' reliance on it to alter the terms of its pollution exclusion. When the Statute was repealed, it was voided *ab initio*. N.Y. Statutes L., § 411. Under §411, "[i]n the absence of a savings clause, the repeal of a statute wipes it out as though it never existed." Thus, Travelers' never accrued or acquired any rights or privileged afforded by the Statute.

support its argument, but all of these cases are distinguishable from the current dispute, and none of them override the First Department's rule in *Pryke*.

The majority of cases cited by Travelers involve policies that did not contain pollution exclusions, and the courts in those instances chose to read the exclusion into the policies. Here, in contrast, Travelers consciously chose to include a non-conforming pollution exclusion that provided Orange & Rockland coverage for which it paid premiums. Travelers' non-compliant language clearly provided coverage for gradual pollution that was unintentional and premiums were based on this coverage.

Travelers cites three cases where courts allegedly "overwrote" an existing non-compliant pollution exclusion to conform to the Statute. In fact, the only appellate case cited by Travelers on this point did *not* involve a non-conforming pollution exclusion. Rather, *Maryland Casualty Co. v. Continental Casualty Co.*, 332 F.3d 145, 148 (2d Cir. 2003), involved a policy that covered gradual pollution, but also contained a pollution exclusion that conformed to the New York Statute. The conforming exclusion, however, only applied to one of the subsidiaries covered by the policy. *Id.* The court relied on the Statute to apply the conforming pollution exclusion to the remainder of the insured entities on the policy. *Id.* at 156-157.

Contrary to Travelers' assertions, the policies at issue in *Consolidated Edison* contained no pollution exclusions. *Consol. Edison Co. of New York, Inc. Am. Home Assurance Co.*, No. 600527/01 (Sup.Ct., New York County, Nov. 6, 2003, Cahn) (McHenry Aff. Ex. 12).[4] The Court did read pollution exclusions into the policies.[5]

[4] *See* Elkind Aff. ¶2.

[5] Travelers cites only one case in which the policies at issue contained a non-conforming exclusion. In this non-appellate case, the trial court believed that a "sudden or accidental" pollution exclusion in several policies should be interpreted as a "sudden and accidental" pollution exclusion based on the New York Statute. *Occidental Chem. Corp. v. Hartford Accident & Indem. Co.*, No. 41009/80, Vol. 10 Mealey's Litig. Rep.: Ins. #46 at F-1 (Oct. 8, 1996) (N.Y. Sup. Ct. Erie County Sept. 25, 1996). That decision was dicta and did not affect the

None of the cases cited by Travelers involves an appellate court holding that a non-conforming pollution exclusion such as the one contained in Travelers' Policies should be rewritten by the Court to deny coverage that is clearly covered by the insurance contract. This Court should not allow Travelers to benefit from its conscious decision to flout the New York Statute and collect premiums for coverage for gradual pollution liabilities that it now argues it never had a duty to pay.

## IV. TRAVELERS' MOTION MUST BE DENIED BECAUSE MATERIAL ISSUES OF FACT EXIST AS TO THE CAUSE AND NATURE OF THE ENVIRONMENTAL PROPERTY DAMAGE AT ISSUE

Even if this Court were to read the statutory "sudden and accidental" pollution exclusion into the Policies, Travelers' motion must be denied because material issues of fact exist as to whether and to what extent the environmental property damage at issue resulted from spills or other sudden and accidental discharges. The record in this case would allow a finder of fact to conclude that a significant portion of the liabilities for which Orange & Rockland seeks coverage would not be barred under the statutory pollution exclusion – even if Travelers had, in fact, included such an exclusion in its policies.

Numerous New York courts have recognized that the "sudden and accidental" pollution exclusion does not bar coverage for environmental liabilities that arise as a result of abrupt discharges that are not expected or intended by the policyholder, such as spills. For example, in *Agway, Inc. v. Travelers Indemnity Co.*, No. 93-CV-557, 1993 U.S. Dist. LEXIS 21092 (N.D.N.Y. Dec. 6, 1993), the court held that coverage for environmental liabilities was not barred under the "sudden and accidental" pollution exclusion where the environmental property damage at issue was alleged to have been caused in part by unintentional spills. *Id.* at *56-*63. *See also Avondale Ind., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1204-06 (2d Cir.

---

outcome of the case because the court held that no coverage would have existed even if the "sudden or accidental" language was used. *Id.*

1989); *Colonial Tanning Corp. v. Travelers Indem. Co.*, 780 F. Supp. 906, 920-22 (N.D.N.Y. 1991).[6] Moreover, as the cases upon which Travelers itself relies hold, the element of "suddenness" focuses on the initial discharge; the exclusion will not bar coverage for progressive damage taking place over years as long as the initial release was abrupt:

> The focus in determining whether the temporally sudden *discharge* requirement is met, for the purpose of nullifying the pollution coverage exclusion, is on the initial release of the pollutant, not on the length of time the discharge remains undiscovered, nor the length of time that damage to the environment continued as a result of the discharge, nor on the timespan of the eventual dispersal of the discharged pollutant in the environment.

*Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 633, 657 N.Y.S.2d 564, 568 (1997).

There are genuine questions of fact regarding the extent to which the discharges at issue at the Nyack site were both sudden and accidental. In particular, the record contains evidence that significant environmental damage at the Nyack site could have resulted from temporally sudden spills.

Dr. Neil S. Shifrin, Orange & Rockland's expert on historical and current environmental conditions at Orange & Rockland's former MGP sites, has opined that some of the contamination at the Nyack site was caused by sudden and accidental occurrences. His examination of materials related to the Nyack site indicates a strong likelihood that there were

---

[6] In contrast to the cases cited above, which found coverage to exist where the environmental property damage was alleged to result at least in part from sudden spills, all of the cases cited by Travelers on this point related solely to discharges that were either intentional or temporally gradual. *See, e.g., Powers Chemco, Inc. v. Federal Ins. Co.*, 74 N.Y.2d 910, 549 N.Y.S.2d 650 (1989) (policyholder admitted that discharges were intentional); *Technicon Elecs. Corp. v. Am. Home Assurance Co.*, 74 N.Y.2d 66, 544 N.Y.S.2d 531 (1989) (long-term admittedly intentional discharges into creek); *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburbh, Pa.*, 89 N.Y.2d 621, 657 N.Y.S.2d 564 (1997) (gradual underground petroleum leaks); *New York v. AMRO Realty Corp.*, 936 F.2d 1420 (2d Cir. 1991) (long-term intentional disposal into a drain); *Borg-Warner Corp. v. Ins. Co. of N. Am.*, 174 A.D.2d 24, 577 N.Y.S.2d 953 (3d Dep't 1992) (intentional deposit of wastes into landfill).

inadvertent spills from the MGP and wastewater treatment equipment throughout the course of operations at the plant. *See* Elkind Aff., Ex. 6 at 3-4. Travelers' own expert on historic MGP operations, Dr. Brian Murphy, also has conceded that some of the contamination at the Nyack site may have been caused by spills. In his depositions, he testified that spills were a possible source of contamination at several different areas of the Nyack site and that it would be difficult to isolate a single source of the contamination. *See* Elkind Aff. Ex. 7 at 422:17-422:22, 423:4-423:7, 425:11-426:7.

In addition to the expert testimony and opinions regarding accidental spills at the MGP sites, Floyd Cole, a former gas engineer at Orange & Rockland[7] who was familiar with the Nyack plant and with Orange & Rockland's MGP operations in general, testified that he was aware of unintentional spills occurring at the MGPs during their operations. *See* Elkind Aff. Ex. 8 (June 7, 2005 Cole Dep. Tr.) at 128:9-128:13.

At the very least, the testimony from fact witnesses and both Travelers' and Orange & Rockland's expert witnesses raises material issues of fact regarding the source and causes of contamination at the Nyack site. As long as some contamination at the Nyack site is found to have been caused by "sudden and accidental" occurrences, then the statutory pollution exclusion would not bar coverage for that property damage. Such material facts are in dispute, and this Court must deny Travelers' motion.

## CONCLUSION

For all the foregoing reasons and the authorities cited in their support, Travelers' motion for partial summary judgment should be denied in all respects.

[7] Mr. Cole rose to the position of Senior Vice-President of Operations before he retired from Orange & Rockland in 1984. *See* Elkind Aff. Ex. 8 (June 7, 2005 Cole Dep. Tr.) at 92:12-93:6.

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

Dated: November 11, 2008

By: ______________________________

David L. Elkind
1177 Avenue of the Americas
New York, New York 10036-2714
(212) 277-6500 telephone
(212) 277-6501 facsimile

Selena J. Linde
Kristi Singleton
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200 telephone
(202) 420-2201 facsimile

Attorneys for Defendant Orange & Rockland Utilities, Inc.

# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 49

-----------------------------------------------------------------X

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC.,

Plaintiff,

-against-

Index No. 600527/01

AMERICAN HOME ASSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, AMERICAN REINSURANCE COMPANY, CENTURY INDEMNITY COMPANY, CERTAIN UNDERWRITERS OF LLOYD'S LONDON AND LONDON MARKET INSURANCE COMPANIES, CONTINENTAL CASUALTY COMPANY, DAIRYLAND INSURANCE COMPANY, EMPLOYERS INSURANCE OF WAUSAU, FIREMEN'S FUND INSURANCE COMPANY, HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, INTERNATIONAL INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, NEW ENGLAND RE-INSURANCE COMPANY, PROTECTIVE NATIONAL INSURANCE COMPANY OF OMAHA, ST. PAUL FIRE & MARINE INSURANCE COMPANY, TIG INSURANCE, TWIN CITY FIRE INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

-----------------------------------------------------------------X

HERMAN CAHN, J.:

Motions bearing sequence numbers 010, 011 and 012 are consolidated for disposition.

In motion sequence number 010, defendant New England Insurance Company (incorrectly named herein as New England Re-Insurance Company) (New England) moves for partial summary judgment dismissing the amended complaint as to New England policy nos. 791169 and 791896 on the grounds that such policies contain a pollution exclusion, pursuant to New York Insurance Law § 1113, and that such exclusion bars coverage for the claims at issue,

(12)

CPLR 3212(e). In motion sequence 012, defendant New England, in an amended notice of motion, seeks the same relief.[1]

Defendants Employers Insurance of Wausau (Employers), Dairyland Insurance Company(Dairyland) and Allstate Insurance Company cross-move for summary judgment on their respective policies, based upon the same statutory exclusion.

In motion sequence 011, defendant St. Paul Fire and Marine Insurance Company (St. Paul) also moves for partial summary judgment dismissing the complaint as to St. Paul policy nos. 966VA0024 and 966VA0025 on the ground that these policies should be deemed to contain a pollution exclusion barring the claim of coverage asserted by plaintiff.

Plaintiff Consolidated Edison Company of New York, Inc. (Con Ed) seeks a declaratory judgment against defendant insurance carriers, who allegedly issued it primary and excess comprehensive general liability policies during the period from 1938 to 1986. Plaintiff seeks a declaration that under their respective policies the insurers have a duty to defend and indemnify Con Ed with respect to liability for remediation and remediation-related costs and expenses at four former manufactured gas plants (MGP's) that it owned or operated in New York State. Currently Con Edison owns only one of these MGP sites, the Astoria site. This site also has PCB contamination that must be remediated.

In April 1982, Wausau issued a policy to Con Ed which became the lead policy for other

[1]It appears that New England has brought the same application for relief under two motion sequence numbers, 010 and 012. The only difference between them was the return date of the motion, the original motion was a month earlier, than the date on the amended notice.

policies issued by it, St. Paul and New England.[2]

Plaintiff alleges that all of the policies were to conform to the exact terms and conditions of Wausau policy number 5733-00-200330, and the Wausau policy was to conform to the excess policy from the prior period written by Associated Electric & Gas Insurance Service, Ltd. (AEGIS). Both the AEGIS and the Wausau policies are silent as to the statutory pollution exclusion mandated by Insurance Law § 46(14), later recodified as Insurance Law § 1113 (a) (14). All policies appear to define "occurrence" to encompass property damage claims based upon gradual pollution.

However, the Dairyland and Allstate policies submitted do not strictly conform to the AEGIS and Wausau policies, as alleged by plaintiff. The Dairyland policy provides that it

> is subject to the same terms, definitions, exclusions, and conditions (Except as otherwise provided herein) as are contained in the immediate underlying policy; but this policy shall not be subject to the terms and conditions of the immediate underlying policy in respect of the premium, the policy period, the renewal or extension (if any), the amount and limits of liability, or any other term, definition, exclusion, or condition which may be inconsistent with this policy.

[2]Wausau issued policy number 5733-00-200330 to Con Ed, covering the period from April 28, 1982 to April 28, 1983. The policy was for coverage of $2,250,000 per occurrence, part of $5,000,000 excess of $500,000 self-insured retention. It served as lead policy for the policies issued in its layer of coverage, including St. Paul policy 966VA0024, and New England policy 791169. The St. Paul policy also covered the same period and had a limit of liability of $1,250,000 in excess of $500,000 self-insured retention. The New England policy also covered this period and had a limit of liability of $250,000 "each occurrence and aggregate." Both the New England and St. Paul policies were warranted to follow the exact terms and conditions of Wausau policy number 5733-00-200330, except with respect to the limit of liability and premium. Wausau policy number 5733-00-200330 also served as underlying insurance for the next layer of coverage. In this next layer of coverage was Wausau policy number 5733-00-200331, issued in April 1982 to Con Ed covering the same one year period. Also in this layer were St. Paul policy number 966VA0025, Dairyland policy number XL 17166, and Allstate policy number 900-097(actually issued by Northbrook Insurance, Allstate's predecessor).

Likewise, the Allstate policy provides as follows:

> This policy is subject to the same terms, definitions (except for those terms defined in paragraph III), exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies listed in Section I, Coverage, prior to the happening of an occurrence for which claim is made under this policy. Any exclusion or restriction of coverage applicable to any Underlying Umbrella Policy shall also apply to this policy regardless of whether such exclusion or restriction applies to all underlying policies.

There is a limited following as to form of the underlying Wausau and AEGIS policies, with respect to these two policies of Allstate and Dairyland. According to these policies, if there is a divergence in terms between either Allstate or Dairyland policy and the underlying Wausau and AEGIS policies to which they are to conform as to form, then the inconsistency in terms will be determined by the Allstate and Dairyland policies provisions. In the case of inconsistent terms, the policy itself will control over the terms contained in the underlying insurance. Both the Dairyland and the Allstate policies include New York State Amendatory Endorsements, not found in the underlying policies. The Dairyland endorsement provides as follows:

> It is hereby understood and agreed that, notwithstanding anything in this policy to the contrary, with respect to such insurance as is afforded by this policy, the terms of this policy as respects coverage for operations in the State of New York shall conform to the coverage requirements of the applicable insurance laws of the State of New York or the applicable regulations of the New York Insurance Department; provided however, that the Company's limit of liability as stated in this policy shall be excess of the limits of liability of any underlying insurance or self-insurance as stated in the Declarations or in any endorsement attached hereto.

The Allstate policy contains the same endorsement with identical language.

Insurance Law § 46 (14), in effect at the time of the issuance of the subject Dairyland and

Allstate policies provides:

> Policies issued to commercial or industrial enterprises providing insurance against the legal liabilities specified in this subdivision shall expressly exclude therefrom liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutants, irritants or contamination into or upon the land, the atmosphere or any other water course or body of water unless such discharge, dispersal, release or escape is sudden or accidental.

Thus, by the terms of the amendatory New York endorsement in the Dairyland and Allstate policies, the policies must be read to conform to Insurance Law Section 46 (14) that restricts coverage to only that pollution which is "sudden and accidental." The pollution exclusion embodied in the statute is included in these particular policies by way of the amendatory endorsement.

With respect to the New England, Wausau and St. Paul policies, the statutory exclusionary language should be read into the policies, otherwise the express purpose of the statute would be impaired. Consolidated Edison Co. of New York v Allstate Ins. Co., Sup Ct., NY County, May 30, 2000, Gammerman, J., Index No. 600142/99. The decision of Justice Gammerman involved the very same parties and policies that are presently before the court. While the decision was appealed, the appellate courts declined to consider the issues raised by the statutory exclusion. Thus, all issues decided in Justice Gammerman's decision will be followed herein. The legislative history of Section 46 (14) indicates that to promote the effectiveness of New York's environmental protection laws it was the intent of the legislature and the governor to require that "corporate polluters bear the full burden of their own actions spoiling the environment" by prohibiting "any insurance company from undermining public policy by offering this type of insurance protection." (Governor's Memorandum approving L

1971, ch 765, 1971 Legis Ann, at 585). In view of this policy, which was in effect when the subject policies were written, to read them as plaintiff argues, i.e., to provide coverage, would conflict with the legislative intent and the language of the statute, and create coverage where the legislature mandated that none be permitted. Maryland Casualty Co. v Continental Casualty Co., 332 F3d 145 (2d Cir 2003).

Plaintiff's argument, that the repeal of the statutory limitation on coverage found in Insurance Law § 46(14) removes the pollution exclusion from the subject policies and creates coverage as of its effective date, was previously considered and rejected by Justice Gammerman in the first Con Edison matter, involving the very same policies. The terms of an insurance policy are set at the time of its issuance, and those terms remain in effect throughout the coverage period. The repeal of the statutory prohibition has no effect on existing policies. Id.

Since the pollution exclusion, read in from Insurance Law § 46 (14) or incorporated by reference in the policies of Dairyland and Allstate, requires that for there to be coverage of pollution damage during the policy period it must be both "accidental and "sudden." Plaintiff must establish that the pollution damage was "accidental" and "sudden." Northville Industries Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 89 NY2d 621 (1997). The amended complaint alleges as to each of the sites that the environmental contamination was ongoing for decades and in some instances for a century. While there may have been accidental events at the time the pollution first occurred, the gradual migration of pollutants already dispersed on the various properties during the policy periods in question is anything but sudden, having been ongoing for a large number of years. Id.; Borg-Warner Corp. v Insurance Co. of North America, 174 AD2d 24 (3d Dept), lv app denied 80 NY2d 753 (1992).

Under these circumstances, the pollution exclusion applies for the entire term of the subject policies and bars coverage of Con Ed's claims as to all sites under these policies. Defendants New England, Wausau, St. Paul, Dairyland and Allstate are entitled to a declaration that they are not obligated to defend and indemnify Con Ed under the subject excess policies.

Settle order.

Dated: October 3, 2003

ENTER:

J.S.C.

FILED
NOV - 6 2003
COUNTY CLERK'S OFFICE
NEW YORK

# EXHIBIT 5

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

# CHENANGO INDUSTRIES, INC.

At a Term of the Supreme Court of the State of New York, Sixth Judicial District, held in the County of Broome at the Court House in the City of Binghamton, N.Y. on September 10, 1993.

PRESENT: HON. ROBERT E. FISCHER,
Justice Presiding.

STATE OF NEW YORK
SUPREME COURT :: BROOME COUNTY

HARTFORD ACCIDENT AND INDEMNITY COMPANY,

Plaintiff

v.

CHENANGO INDUSTRIES, INC.; GREAT AMERICAN INDUSTRIES, INC.; ROYAL INSURANCE COMPANY OF NEW YORK; COMMERCIAL UNION INSURANCE COMPANY; INSURANCE COMPANY OF NORTH AMERICA and CNA INSURANCE COMPANY,

Defendants.

Broome Index No. 90-1462
RJI No.

DECISION-ORDER

APPEARANCES:

ROSEN & PARKER, P.C.,
Attorneys for Plaintiff HARTFORD,
233 Broadway,
New York, N.Y. 10279.
(ROBERT F. WALSH, ESQ., of Counsel)

BEVERIDGE & DIAMOND, P.C.,
Attorneys for Defendants
CHENANGO INDUSTRIES, INC.
and
GREAT AMERICAN INDUSTRIES, INC.,
437 Madison Ave., 40th Floor,
New York, N.Y. 10022-7380.
(SY GRUZA, ESQ., of Counsel)

CHERNIN & GOLD,
Attorneys for Defendant
ROYAL INSURANCE CO. OF NEW YORK,
P.O. Box 1653,
Bache Bldg., 71 State St.,
Binghamton, N.Y. 13902.
(JOHN P. RITTINGER, ESQ., of Counsel)

COUGHLIN & GERHART,
Attorneys for Defendant
COMMERCIAL UNION INSURANCE CO.,
P.O. Box 2039,
Marine Midland Plaza,
Binghamton, N.Y. 13902.
(TODD D. KILPATRICK, ESQ., of Counsel)

MUDGE, ROSE, GUTHRIE, ALEXANDER & FERDON,
Attorneys for Defendant
INSURANCE COMPANY OF NORTH AMERICA,
180 Maiden Lane,
New York, N.Y. 10038.
(ROSEMARY BOLLER, ESQ., of Counsel)

FORD, MARRIN, ESPOSITO & WHITMEYER,
Attorneys for Defendant CNA INSURANCE CO.,
120 Wall St.,
New York, N.Y. 10005.
(HENRY BURNETT, ESQ., of Counsel)

MEALEY'S LITIGATION REPORTS INSURANCE



VOL. 8, #12, 1/25/94 - #03-940125-102

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

FISCHER, J.

This action was commenced by plaintiff, Hartford Accident and Indemnity Company (Hartford), in May, 1985. In its original complaint Hartford sought a declaratory judgment determining the obligations of Hartford and other liability insurance carriers with respect to the defense and indemnification of Chenango Industries, Inc. (Chenango) for underlying claims arising from the alleged release of hazardous industrial wastes into the environment by Chenango beginning in or about 1972 and continuing for a number of years thereafter (the "underlying claims").* At the time of its original complaint Hartford had apparently agreed to reimburse Chenango for its attorney fees and costs in connection with the underlying claims subject to a reservation of its rights to deny coverage. Joined as defendants in the original complaint were Chenango, Royal Insurance Company of New York (Royal)**, Commercial Union Insurance Company (Commercial Union) and Insurance Company of North America (INA).

In or about June, 1990, Hartford apparently determined that it was not obligated to provide defense and indemnification to Chenango, and so advised Chenango asserting its previously reserved right to deny coverage. Thereafter, in September, 1990, Hartford moved for leave to serve an Amended Complaint seeking a declaration that it was not obligated to defend or indemnify Chenango for the underlying claims. In addition, Hartford sought to add Great American Industries, Inc. (GAI) and CNA Insurance (CNA)* as defendants. This court (Harlem, J.) granted Hartford's motion and it is Hartford's Amended Complaint that now serves as the basis of this action.

---

*It appears that the time period covered by the underlying claims runs from 1972 to 1984.

**So named in plaintiff's Complaint and Amended Complaint. It appears, based upon the affidavit of defendant'scounsel, that defendant's proper name is Royal Globe Insurance Company. For the sake of consistency this defendant will be referred to simply as "Royal."

*So named in plaintiff's Amended Complaint. It appears, based upon the affidavit of defendant's counsel, that the proper name of defendant is Continental Casualty Company. For the sake of brevity and consistence this defendant will be referred to as "CCC."

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

## THE PARTIES AND COVERAGE

Defendant Chenango Industries, Inc. (Chenango) is a Delaware corporation and the alleged successor in interest to Chenango Graphics, Inc., and Chenango Industries, Inc., a New York corporation. Great American Industries, Inc. (GAI) apparently acquired Chenango Industries, Inc. (New York) and merged it into a wholly-owned subsidiary of GAI of the same name – Chenango Industries, Inc. (Delaware) – in October, 1979.* During the period of time relevant to the underlying claims Chenango owned and operated a plant at 200 Stage Road in Vestal, New York (the "Stage Road site") used in the manufacture of printed circuit boards. It appears that the manufacturing process involved, inter alia, imaging patterns, etching circuity, and plating copper, tin/lead and nickel/gold on fiberglass panels. Chenango and GAI have answered Hartford's Amended Complaint and have counterclaimed against Hartford, and cross-claimed against the defendant liability insurers, seeking a declaration that each insurer is obligated to provide defense and indemnification with respect to the underlying claims in accordance with their policies of insurance.

*It appears that on or about December 7, 1987, Chenango sold all of its assets to a third party, C.I. Liquidators of New York (C.I.) which is itself wholly owned by GAI.



Defendant Royal Globe Insurance Company (Royal) allegedly issued liability insurance policies to Chenango for the period July 1, 1973 to July 1, 1975. (Amended Complaint, para. 12.) Defendants Chenango and GAI assert that Chenango purchased comprehensive general liability (CGL) insurance from Royal for the period from July 1, 1972 to July 1, 1975. (Gruza Aff., para. 55 and Ex. E.) Royal denies that it ever issued a liability insurance policy to Chenango based upon Chenango's failure to produce such a policy and Royal's assertion that it has been unable to document the existence of such a policy. (Rittenger Aff., para. 5.) In any event, for the limited purpose of the motions now before us Royal is apparently willing to concede the existence of a Royal policy for the period July 1, 1973 to July 1, 1975, conditioned upon certain assumptions as to the content of the policy. (See Rittenger Aff., para. 6 & 7.) Royal has answered Hartford's Amended Complaint denying the existence of any Royal policy as noted and asserting a number of affirmative defenses which assume the existence of such a policy. In addition Royal seeks declaratory relief that it has no obligation to defend or indemnify Chenango with respect to the underlying claims.

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA



Defendant Commercial Union Insurance Company (Commercial Union) allegedly issued liabilty insurance policies to Chenango for the period October, 1978, to July 1, 1981. (Amended Complaint, para. 11.) Defendants Chenango and GAI assert that Chenango purchased CGL policies from Commercial Union for the period from July, 1975 to July, 1978 (Policy No. W203889) and from July, 1978 to October, 1980 (Policy No. W367555). (Gruza Aff., para. 56.) Commercial Union concedes that it issued two CGL policies to Chenango: Policy No. CJW2038-89 which was in effect from July 1, 1975 to July 1, 1978, and Policy No. FJW3675-55 which was in effect from July 1, 1978 to October 1, 1980, at which time it was cancelled. (Dalton Aff., para. 4.) Commercial Union has answered Hartford's Amended Complaint denying that it has an obligation to defend or indemnify Chenango and asserting a number of affirmative defenses in that regard. In addition, Commercial Union seeks affirmative declaratory relief that it has no obligation to defend or indemnify Chenango with respect to the underlying claims.

5.

Defendant Insurance Company of North America (INA) allegedly issued a liability insurance policy to Chenango for the period March 1, 1983 to March 1, 1984. (Amended Complaint, para. 13.) Defendants Chenango and GAI also assert that GAI purchased a CGL policy (Policy No. 209782) for itself and its subsidiaries for the period March 1, 1983 to March 1, 1984 (Gruza Aff., para. 61.) INA concedes that it issued a policy to GAI (Policy No. GLP 209782) which was in effect from March 1, 1983 to March 1, 1984. (Koepff Aff., para. 68.) INA has answered Hartford' Amended Complaint denying that it has an obligation to defend or indemnify GAI or Chenango and asserting a number of affirmative defenses in that regard. In addition, INA seeks affirmative declaratory relief that it has no obligation to defend or indemnify GAI or Chenango with respect to the underlying claims.

6.

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

Defendant Continental Casualty Company (CCC) allegedly issued liability insurance policies to Chenango during the period 1975 to 1980. (Amended Complaint, para. 14.) Defendants Chenango and GAI assert that Chenango purchased CGL policies from CCC for the periods July 1, 1975 to July 1, 1976 (Policy No. CCP 2463209); July 1, 1976 to July 1, 1977 (Policy No. CCP 3023401), and July 1, 1977 to July 1, 1978 (Policy No. CCP 3800742). (Gruza Aff., para. 57 and Ex. D.) Chenango and GAI assert that, although CCC has been unable to find copies of the policies it has acknowledged that the policy numbers noted refer to CCC policies. (Gruza Aff., para. 57.) CCC asserts that Chenango and GAI have not offered sufficient evidence to establish that CCC issued liability insurance policies to Chenango, and that it would not be obligated to provide defense and indemnification for the underlying claims even assuming the existence of such a policy. (Adrian Aff., para. 2 and 3.) CCC has answered Hartford's Amended Complaint denying the existence of any CCC policy as noted and asserting a number of defenses which assume the existence of such a policy. In addition CCC seeks declaratory relief that it has no obligation to defend or indemnify Chenango with respect to the underlying claims.



Plaintiff, Hartford Insurance Company (Hartford), affirmatively alleges that it provided general liability insurance to GAI for the period March 1, 1977 to March 1, 1983, and that Chenango was added as a named insured to GAI's policy effective September 1, 1980 upon its acquisition by GAI. Specifically, Hartford alleges that it provided general liability coverage to Chenango for the period September 1, 1980 to March 1, 1981, under Policy No. 10-C-B47828E for the period March 1, 1981 to March 1, 1982 under Policy No. 10-C-LR846736E, and for the period March 1, 1982 to March 1, 1983, under Policy No. 10-C-LRP 25104 E. (Amended Complaint, para. 8-10.)

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

THE UNDERLYING CLAIMS

As we previously noted, from approximately 1967 to 1984 Chenango owned and operated a plant for the manufacture of printed circuit boards located at 200 Stage Road in the Town of Vestal, Broome Count, New York (the "Stage Road site"). The Stage Road site was located near Vestal Well 1-1 which was a major source of drinking water for the Town of Vestal. In 1980, apparently for reasons unrelated to this action or the underlying claims, Vestal Well 1-1 was tested for contamination and was found to contain, inter alia, high concentration of chlorinated volatile organic compounds (Truettner Aff., para. 7 & 8). The resulting investigation by the Town of Vestal and others pointed to the Stage Road site as a possible source of the contamination, and ultimately led to the proceedings which constitute the underlying claims asserted against Chenango and GAI.



THE TOWN OF VESTAL ACTION

On December 5, 1983, the Town of Vestal and Water District No. 1 commenced an action against, inter alia, Chenango Industries, Inc., in the United States District Court for the Northern District of New York.* The action was brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"); 42 USC §9601, et seq.; Article 17 of the New York Environmental Conservation Law ("ECL"); Section 841 of the New York Real Property Actions and Proceedings Law ("RPAPL"); Chapters 28 and 29 of the Town Code of the Town of Vestal, and New York's common law of public nuisance. Plaintiffs sought a judgment requiring defendants to assess, abate and remediate the pollution allegedly emanating from the Chenango Industries site; to reimburse plaintiffs for their costs in responding to the pollution; for damages to the natural resources of the Town of Vestal pursuant to CERCLA, the RPAL and the common law of nuisance; for damages pursuant to the ECL and Vestal Town Code; and for attorneys' fees. (Vestal Complaint, para. 2.)

*The Town of Vestal and Water District No. 1 by and through the Board of Water Commissioners of said District v. Chenango Industries, Inc., Minack Investment Co., a Partnership, and Broome County Industrial Development Agency. (83-CV-1597 (N.D.N.Y.)





VOL. 8, #12, 1/25/94 - #03-940125-102

MEALEY'S LITIGATION REPORTS INSURANCE

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA



The allegations forming the factual basis for the Town of Vestal action are contained in paragraphs 13 through 22 of the Complaint as follows:

"13. The Chenango Industries site is located at 200 State Road in the Town of Vestal. The property is designated as Tax Map No. 15-1-22SS and consists of approximately 3.9 acres. The Chenango Industries site is approximately 1,500 feet from the well field of Well 1-1. Chenango Industries manufactures multi-flare interconnection boards; metal finishing processes include preparation, stripping, etching, developing, and prelamination as well as other processes. Water is obtained from the Town of Vestal.

14. Chenango Industries, Inc., at the Chenango Industries site discharged industrial waste to the surface of the ground, to nearby ditches, and to an underground septic system which was unlined during the period of time that Chenango Industries, Inc., has been at the site. The industrial waste referred to herein refers to all industrial waste from the Chenango Industries site. The major pollutants are synthetic chemicals, metals, and solutions with a high degree of acidity and C.O.D. Among the volatile organics discharged, include 1.1 trichloroethane and trichloroethylene and tetracholroethylene. The presence of these volatile organics in drinking water at the levels found in Well 1-1 preclude the use of this well for a public water supply. Additionally, the other industrial waste has caused other damages to natural resources.

15. As early as 1972, Chenango Industries was discharging industrial waste in a manner so as to cause damage to natural resources. In response to a complaint that industrial waste was being discharged in a manner that would create a serious hazard to water supply of the Town of Vestal, officials from the Broome County Health Department met with representatives of Chenango Industries. Thereafter, a history of periodic sudden and unexpected spills, a history of discharge into an ill conceived, ill operated, an inadequately designed septic system and other discharges, caused industrial waste to perculate [sic] into the deep and shallow acquifers and pollute natural resources, and a history of mismanaged and inadequately designed and operated waste disposal system ensued.

16. Repeated violations were cited by the Broome County Health Department, delays followed delays but the pollution never abated. Low ph corroded through cast iron pipe which was part of the sewer system in the Town of Vestal. Discharges occurred through the corroded out cast iron pipe. Direct discharge from pipes without any treatment whatsoever occurred through most of the decade of the 70s.

17. In 1980 Well 1-1 was found to have been contaminated by industrial waste, the water was unfit for human consumption. The natural resource of the glacial acquifer was destroyed. The industrial waste was generated from the Chenango Industries site.



18. The Town of Vestal has a population of approximately 27,000. The densely populated areas are served by water districts. A copy of the districts is attached hereto as Exhibit A. In 1954 Well 1-1 was established and has been a major source of water supply for the Town. However, in 1980 independent testing done by the New York State Department of Environmental Conservation found that Well 1-1 was polluted by industrial waste and at that time was one of the most polluted public water supplies in the State of New York. The well has been shut down and pumped to waste since. Pumping procedures have been implemented to prevent further damages to other natural water supplies. Additionally, high acidity of the discharge has caused deterioration of the sewer system of the Town of Vestal so that waste has corroded new pipe within 1/20 of its ordinary expectancy and waste has entered into natural resources before going to the waste treatment plant. Additionally, industrial waste has been pumped directly onto the surface of the ground further causing additional damages to natural resources.

19. The industrial waste which is being discharged from the site also constitutes hazardous substances which are being released or threatened to be released from the site within the meaning of 'release' as defined in CERCLA 42, U.S.C., Section 9601 (22).

20. Many of the waste chemicals and toxic metals presently being releasel from the site are considered 'hazardous substances' as a term defined in CERCLA, 32 U.S.C., Section 9601(14).

21. The site constitutes a 'facility' as that term is defined in CERCLA, 42 U.S.C., Section 960(9).

22. Hazardous substances released from the site have damaged and continue to damage the air, soil and groundwater resources of the State of New York, the Town of Vestal, in the County of Broome, a natural resource. all within the meaning and definition of 'natural resource' under CERCLA, 42 U.S.C., Section 9601(16) and otherwise damaging natural resources."

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

In further support of the allegations contained in their Complaint the plaintiffs in the Town of Vestal action set forth a detailed "History of Pollution and Spills" describing the activities of various public agencies, and the response of Chenango, over a period of years from 1972 to 1979. (Vestal Complaint, para. 23-35.)

HISTORY OF POLLUTION AND SPILLS

"23. On or about April 18, 1972, or shortly thereafter members of the Broome County Health Department met with representatives of Chenango Industries concerning the holes which had been dug which chemicals were draining into. At that time employees of Chenango Industries knew, or should have known, of the serious hazard to the water supply of the Town of Vestal.

24. That numerous inspections were made by governmental agencies, including the Broome County Department of Health which evidenced an industrial waste problem; as a result of these inspections by the Broome County Health Department, Chenango Industries was requested to take remedial action. The inspection included:

(a) Record of inspection dated June 20, 1973, observing industrial waste originating from Chenango Industries were being discharged onto the surface of the ground and into an adjoining stream which goes into the Susquehanna River, an interstate waterway.

(b) Record of inspection dated February 20, 1974, indicating industrial waste originating from Chenango Industries reaching the Choconut Creek.

(c) Record of inspection dated March 5, 1974, noting industrial waste being discharged onto the surface of the ground.

(d) Record of inspection dated March 13, 1974, measuring distances from industrial waste to discharge.

(e) Record of inspection reporting sewerage as being discharged into the stream from plating waste.

(f) Record of inspection dated April 1, 1975, inspecting waste originating from Chenango Industries and noting that it was still being discharged into the stream.

(g) Record of inspection dated February 20, 1973, showing discharge into the adjoining property from Chenango Industries.

(h) That on or about May 23, 1979, the Broome County Health Department found greed liquid waste coming to the surface of the ground near Chenango Industries.



25. Because of the numerous violations and lack of sufficient responses, Chenango Industries was notified on or about July 29, 1974, and on many other occasions that they should respond to the pollution problem.

26. That in partial response to the problem, Chenango Industries, Inc., retained the services of a local consulting engineer, R.J. Martin, who on August 23, 1974, acknowledged that there were a number of problems with the affluent.

27. That prior to that time on September 5, 1973, Chenango Industries had written to the Broome County Health Department in response to the problems that had been brought to its attention and had admitted awareness of the industrial waste problem and were seeking to solve the problem in the most economical manner. Chenango Industries at that time also admitted spillage of industrial waste.

28. That additionally, there are a number of tests taken by Chenango Industries which indicated high C.O.D. and inadequately controlled ph. The resulting acidity caused cast iron pipes in the Town of Vestal sewerage system to burn out in a matter of months of their original installation.

29. That on or about April 2, 1979, Chenango Industries notified the New York State Department of Environmental Conservation that the failure of two pumps which caused chemicals to spill onto the ground.

30. That on or about May 29, 1980, a major industrial pollution spill occurred at the Chenango Industries site when a large holding tank opened up at its seams and discharged its contents onto the surface of the ground.

31. That on or about April 15, 1980, Chenango Industries had a chemical spill and approximately 1,700 gallons of spent cuprichloride, this spill happened from a storage tank at the rear of their building.

32. That on or about April 20, 1979, Chenango Industries, Inc. and the Town of Vestal entered into an agreement, a copy of which is attached hereto as Exhibit B.

33. That pursuant to said agreement, Chenango Industries agreed to provide to install a new permanent treatment facility on or about October 1, 1979.

34. That Chenango Industries, Inc., did not install a facility on or about October 1, 1979, and there were numerous delays in the installation of the system which eventually was installed.

35. That although the industrial discharge from the Chenango Industries site and current manufacturing processes are much improved, the ground upon which the site currently is operating, is so saturated with industrial waste that it poses an immediate danger and continued danger to the water supply of the Town of Vestal...."

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

THE EPA CLAIMS

It appears that Vestal Well 1-1 was tested for contamination in 1980 following the discharge of 41,000 gallons of 1,1,1-Trichloroethane at an IBM facility in Endicott, New York. The test disclosed that Well 1-1 was contaminated by chlorinated volatile organic compounds. A report prepared for the Town of Vestal by a local engineering firm in 1983 concluded that the IBM discharge was not the source of contamination of Well 1-1, and recommended further study of the Stage Road area as the possible source of contamination.

In May, 1986, a Remedial Investigation and Feasibility Study (RI/FS) was prepared for the New York Department of Environmental Conservation (DEC) and the EPA. The study identified four potential source areas for further investigation with regard to the continued contamination of Well 1-1, all located in the Stage Road area. The potential source areas identified included an area adjacent to the Vestal Asphalt premises (Area 1), a truck parking area (Area 2), a leach field belonging to Chenango Industries (Area 3) and other property adjacent to the Chenango Industries plant (Area 4). For reference purposes, a map illustrating the potential source areas is included herein. (Ibid., par. 13, 13.)

(Copy of map on following page)










VOL. 8, #12, 1/25/94 - #03-940125-102

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

In June, 1986, EPA issued a Report of Decision (ROD) which called for construction of a packed column air stripping system on Well 1-1 as a cost effective means of removing the organic chemical contamination from the well water and returning the well to serve as Vestal Water District No. 1's primary water supply. In addition, the ROD called for a supplemental RI/FS to further investigate source areas and to evaluate possible source control measures. (Ibid., par. 14, 15, Ex. D). Apparently, at this time, the Vestal Well 1-1 Superfund Site was segmented into two remedial units which enabled the remediation of Well 1-1 through construction of an air stripping system to proceed, while a further investigation was conducted to determine the specific sources of contamination. (Ibid., par. 16)

By letter dated May 27, 1988, the EPA notified Chenango that it was a Potentially Responsible Party (PRP), within the meaning of CERCLA, as to the contamination of Vestal Well 1-1. In June, 1989, a draft supplemented RI prepared for EPA concluded that the Chenango facility was one of the source areas of the contamination of Well 1-1. Accordingly, by letter dated September 14, 1989, EPA demanded that Chenango reimburse the Hazardous Substance Response Fund in the amount of $1,078,590.50, plus interest, for costs incurred by EPA in remediating Well-1. (Ibid. par. 17-19)

In May, 1990, EPA issued the final supplemental Remedial Investigation, Public Health Evaluation and Feasibility Study, together with a proposed plan that evaluated the identified source areas in the vicinity of Stage Road and identified its preferred plan to reduce the level of soil contamination. In its proposed plan EPA estimated the cost of its implementation at $1,720,000. In September, 1990, EPA issued a Record of Decision which confirmed the selection of a method for soil remediation. (Ibid., par. 20, 21, 23, 24)

On July 31, 1990, Chenango apparently received a "Special Notice" from EPA permitting Chenango an opportunity to submit a proposal to finance or undertake the remedial action outlined in EPA's ROD. Chenango submitted a proposal in September, 1990, which resulted in a draft consent decree prepared by EPA. In the event, EPA ultimately refused to enter into the consent decree and, instead, on March 29, 1991, issued a Section 106 Administrative Order to GAI and Chenango requiring them to implement the remediation provided in the EPA's ROD. By letter dated April 23, 1991, Chenango advised EPA that it intended to comply with the Administrative Order. (Ibid., par. 25-31)

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

THE MOTIONS BEFORE US

On April 29, 1991, defendant INA filed its motion for summary judgment, followed by Hartford's motion seeking the same relief, filed May 1, 1991. Both motions were nominally returnable at our regular Motion Term on June 7, 1991. Argument on these motions was stayed, however, pending decision of a prior motion to compel discovery made by defendants Chenango and GAI pursuant to our Order of March 6, 1991, establishing a schedule for disclosure. The motion to compel discovery resulted in a lengthy Decision dated October 23, 1991, and Order dated December 5, 1991, addressing interrogatories propounded by Chenango and GAI, and the claims of privilege and other objections raised by the insurers. This was followed by the submission of documents for in camera review, and resulted in a further Decision-Order dated March 3, 1992. After submission of further documents and memoranda, we advised counsel by letter dated May 5, 1993, that we deemed discovery complete for the purpose of addressing the motions for summary judgment. In the interim the remaining insurers moved for summary judgment and defendants Chenango and GAI cross-moved for summary judgment. Those motions are now before us.



Insurance Company of North America (INA) was the first insurer in this action to move for summary judgment declaring that it has no obligation to defend or indemnify Chenango or GAI. Although INA concedes that it provided CGL coverage to Chenango from March 1, 1983 to March 1, 1984, it asserts that the events which gave rise to the underlying claims occurred prior to the inception of INA's coverage. Accordingly, INA argues that the underlying claims constitute a pre-existing loss, a loss in progress or a known loss not insured under the INA policy. Alternatively INA asserts that the underlying claims fall within the so-called "pollution exclusion" contained in the INA policy and that the underlying claims do not constitute an "occurrence" as defined in the policy. With respect to the EPA claims, INA argues that the EPA proceedings do not constitute a "suit" within the meaning of the policy and that the costs of remediation are not "damages" as that term is used in the policy.





VOL. 8, #12, 1/25/94 - #03-940125-102

MEALEY'S LITIGATION REPORTS INSURANCE

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA



Hartford acknowledges that it provided CGL coverage to GAI from March 1, 1977 to March 1, 1983, and that Chenango was added to GAI's policy as a named insured by endorsement effective September 1, 1980. Like INA, Hartford asserts that the underlying claims were a known loss at the inception of its coverage of Chenango. Hartford also argues that the underlying claims fall within the pollution exclusion contained in its policies, and that they do not constitute "occurrences" as defined in those policies. As to the EPA proceedings, Hartford also argues that they do not constitute a "suit" within the meaning of its policy and that the costs of remediation are not "damages." In addition, Hartford asserts that even assuming that the underlying claims may have been covered occurrences, Chenango failed to provide timely notice of those claims thereby negating any such coverage.

21.

Commercial Union filed its motion for summary judgment in August, 1992. It acknowledges that it provided CGL coverage to Chenango from July 1, 1975 to October 1, 1980, but like INA, Commercial Union asserts that the underlying claims were a pre-existing loss, a loss in progress and a known loss at the inception of its coverage. In addition, Commercial Union maintains that the underlying claims do not constitute an "occurrence" as defined in its policies, and that any event which may have constituted an "occurrence" predated its coverage. Notwithstanding the foregoing, Commercial Union argues with INA and Hartford that the underlying claims fall within the pollution exclusion contained in its policies. As to the EPA claims, Commercial Union also asserts that they do not constitute a "suit" within the meaning of its policies and that the costs of remediation are not "damages."

22.

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

Defendants Royal Globe Insurance (Royal) and Continental Casualty Company (CCC) are in a similar position in that each has denied the existence of any policy of insurance issued to Chenango or GAI, and argue that Chenango and GAI have been unable to meet their burden of proof in establishing that the policies were, in fact, issued. Notwithstanding these assertions, the record before us contains certain indicia that policies may have been issued by both Royal and CCC, and there may exist an issue of fact as to the existence of such coverage. However, both Royal and CCC have also moved for summary judgment joining in certain of the arguments raised by INA, Hartford and Commercial Union. Thus, both Royal and CCC assert that, had they issued CGL policies to Chenango as alleged, their policies would have contained the same pollution exclusion and definition of "occurrence" relied upon by the other insurers.



In reviewing the arguments raised by the insurers in support of their respective motions for summary judgment, it is apparent that each insurer makes certain arguments unique to its circumstances. However, it is equally apparent that there are three significant arguments common to all of the insurers. First, each insurer asserts that the underlying claims fall within the standard pollution exclusion contained, or presumed to be contained, in their respective policies. Second, each insurer asserts that the underlying claims do not constitute an "occurrence" as that term is typically defined in their respective policies. Third, each insurer argues that the EPA claims are not a "suit" within the meaning of that term as it appears in their policies, and that costs of remediation are not "damages." The primacy of these three arguments is reflected in the responding papers of Chenango and GAI and was the major focus of oral argument.

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

Before turning to the response of Chenango and GAI to the arguments raised by the insurers, it is appropriate to examine further the principal argument common to all of the insurers, viz., that the underlying claims fall within the so-called "pollution exclusion."

The Insurance Law of this state was amended in 1971 to prohibit coverage against environmental pollution. In addition to personal injury liability insurance, property damage liability insurance (Ins. Law §46 [14]) was amended effective September 1, 1971, and applicable to policies issued or renewed thereafter:

> "§2. Subdivision fourteen of section forty-six of such law is hereby amended to read as follows:
>
> 14. 'Property damage liability insurance,' meaning insurance against legal liability of the insured, and against loss, damage or expense incident to a claim of such liability, arising out of the loss or destruction of, or damage to, the property of any other person, but not including any kind of unsurance specified in paragraph thirteen or fifteen. Policies issued to commercial or industrial enterprises providing insurance against the legal liabilities specified in this subdivision shall expressly exclude therefrom liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutants, irritants or contaminants into or upon land, the atmosphere or any water course or body of water unless such discharge, dispersal, release or escape is sudden and accidental."
>
> (L.1971, Ch.765; emphasis added)



In approving this, and an allied measure addressing nuclear facilities (Ch. 766), then Governor Rockefeller commented:

> "These bills, part of my environmental program, will prohibit commercial and industrial enterprises from purchasing insurance to protect themselves against liabilities arising out of their pollution of the environment where such prohibition is an appropriate measure for environmental protection.
>
> New York State has adopted stringent standards to prohibit despoiling our environment through the discharge of noxious substances into the water and air. These standards, which are the most comprehensive in the Nation, go far beyond merely strengthening and supplementing the common law rules against pollution.
>
> As strict as these laws are, however, their effectiveness would be substantially reduced if polluters were able to insure themselves against having to pay the fines and other liabilities that may be imposed upon them for polluting.
>
> Many insurance companies have voluntarily initiated action to protect the environment by refusing to insure against liability arising out of environmental pollution.
>
> The bill will help to assure that corporate polluters bear the full burden of their own actions spoiling the environment, and will preclude any insurance company from underminig public policy by offering this type of insurance protection.
>
> Excepted only from this measure are insurance necessary to meet Federal financial responsibility standards and insurance covering certain nuclear risks in cases where stringent regulation provides adequate environmental protection.
>
> The bills are approved." (1971 McK. Sessions Law, p. 2633)

For the next eleven years this was declared public policy of the state, as a result of which, if Royal or Continental had issued policies during the period of time at issue the exclusion language mandated by the statute would have been included in the policies or applied to the coverage by operation of law.

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

This exclusion requirement was stricken from the Insurance Law effective September 1, 1982 (L. 1982, Ch. 856) as part of a series of legislative enactments addressing hazardous waste sites (Ch. 853-858). The approval message of then Governor Carey stated in part:

> "The bills direct the Commissioner of Environmental Conservation to prescribe by rule and regulation a system of financial assurance requirements to be included as conditions of permits granted to hazardous waste treatment, storage and disposal facilities, and authorize the writing of insurance policies to cover liabilities arising from the gradual release or discharge of pollution and contamination."
>
> (1982 McK. Session Laws, p. 2628)



Although the amendment of Section 46 of the Insurance Law appears to reflect a significant change in public policy on its face, examination reveals that certain underlying principles remain unchanged. Permitting insurance carriers to write CGL policies providing "pollution coverage", coupled with the permit system and attendant financial responsibility requirements simultaneously enacted, represents only an alternative method to compel industries generating hazard waste to recognize the so-called "external costs" of doing so. Thus, prior to the amendment, the external costs of hazardous waste generation as measured by the cost of remediation were assessed directly to those generating the waste. After the amendment, the external costs of hazardous waste generation continued to be measured by the cost of remediation, but the recognition of those costs was prospectively spread over all generators of hazardous waste through the permit system and its associated financial responsibility requirements. Accordingly, these underlying principles remain the same:

- The external costs of hazardous waste generation continue to be measured by the cost of remediation; and

- The external costs of hazardous waste generation must be recognized by those generating hazardous waste.

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

In responding to the arguments raised by the insurer, Chenango and GAI focus on the "Final Supplemental Remedial Investigation Report" prepared by the EPA in May, 1990. (See Truettner Aff., Ex. A) Citing that report, Chenango and GAI assert that, of the four suspected source areas of ground water contamination selected for further study, the EPA "ultimately concluded that the soils in Areas 2 and 4 contained the highest levels of volatile organics...and were the source of the contamination of Well 1-1." (Truettner Aff., par. 33) Accordingly, Chenango and GAI assert that "EPA dismissed areas 1 and 3 as the sources for the volatile organic contamination in Well 1-1...but determined that it was necessary to remediate the soil contamination in Areas 2 and 4." (Truettner Aff., par. 44) As to Area 4 Chenango and GAI observe that "EPA has acknowledged that there is no evidence of any 'bulk disposal of wastes' in the State Road area" and that the cause of contamination is "small spills, discharges into the leach field and waste material stockpiling on the surface." (Truettner Aff., par. 49) Accordingly, Chenango and GAI assert that "with respect to Area 4, EPA appears to have concluded that the cause of the contamination is related to leaks from stockpiled material or small spills in Area 4 "and that 'it is generally understood...that 'spills' and 'leaks' refer to accidental releases of materials rather than to intentional releases of materials. (Truettner Aff., par. 55, 54)



Simply stated, Chenango and GAI argue that the gravamen of the Town of Vestal action is the contamination of Vestal Well 1-1; that the source of contamination was traced by the EPA to Areas 2 and 4; that the EPA concluded the soil in Area 4, adjacent to and south of the Chenango facility, became contaminated due to small spills and leaks from stored materials; and that the small spills and leaks were accidental and not included or reasonably to be anticipated by Chenango. Accordingly, Chenango and GAI assert that they are entitled to defense and indemnification because the events causing the contamination of Vestal Well 1-1, as identified by the EPA, fall within the "sudden and accidental" exception to the pollution exclusion,

With regard to the EPA claims, Chenango and GAI argue that the insurers misapprehend the coercive and adversarial nature of the proceedings. Chenango and GAI point to the EPA "demand letter" of September 15, 1989, and its threat to "commence preparations for civil litigation" if Chenango refused to reimburse EPA for the costs of remediating Vestal Well 1-1. In addition, Chenango and GAI assert that the "Section 106 Order", requiring Chenango and GAI to undertake decontamination of the soil in Area 4 or face statutory penalties or treble damages, raises the level of the EPA proceedings to that of a "suit" within the meaning of the insurance policies at issue.

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA



THE POLLUTION EXCLUSION

The CGL policies admittedly issued by INA, Hartford and Commercial Union each contained a standard pollution exclusion clause based upon the statutory language of Insurance Law §46(14) prior to its 1982 amendment. With respect to Royal and CCC, although each denies the existence of any policy issued to Chenango or GAI, it has been conceded for the purposes of the motion before us that, had coverage been provided as alleged in the Hartford complaint, the policies issued by Royal and CCC would have contained the standard pollution exclusion clause found in the INA, Hartford and Commercial Union policies. Accordingly, the exclusionary clause common to all of the policies at issue provides as follows:

"This insurance does not apply:

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; <u>but this exclusion does not apply if such discharge, dispersal, release or escape is</u> sudden and accidental."

(Source: Hartford Policy No.10-CLR-846736E. (Emphasis added)

Where an exclusion contained in a policy of liability insurance is relied upon to deny coverage with respect to an underlying complaint, it is the insurer's burden to establish that the "allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations <u>in toto</u>, are subject to no other interpretation." (<u>International Paper Co. v Continental Casualty Co.</u>, 35 NY2d 322 [1974); <u>Technicon Electronics Corporation v American Home Assurance Company</u>, 74 NY2d 66 [1989]). However, where the exclusion contains an exception, as it does here, and the insurer meets its initial burden, the insured must then establish that the complaint falls within the exception. (<u>Borg-Warner Corporation v Insurance Company of North America</u>, 174 NY2d 24 [3d Dept., 1992], lv denied 80 NY2d 753; <u>County of Fulton v United States Fidelity and Guarantee Company</u>, Memorandum Opinion, No.67681, 3d Dept., July 22, 1993.) Thus, Hartford and the other insurers must establish that the underlying claims arise out of the "discharge, dispersal, release or escape of...toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water." Chenango and GAI bear the burden of establishing that any such discharge, dispersal, release or escape was "sudden and accidental."

COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

We previously reviewed in detail the specific allegations contained in the Town of Vestal complaint. In our Decision of October 23, 1991, we recognized the fundamental principal that "an insurer's duty to defend its insured arises whenever the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy." (Fitzpatrick v American Honda Motor Co., Inc., 78 NY 61 [1991]. We have, therefore, permitted the parties to go beyond the "four corners of the complaint" to clarify its allegations and to determine whether any insurer had "actual knowledge of facts establishing a reasonable possibility of coverage." (Ibid, p. 67) Pursuant to our Decision the parties engaged in extensive discovery and have produced a record characterized as "consisting of almost every public record available about the history of releases at the site on Stage Road." (Transcript of oral argument, September 10, 1993, p. 3.)



On the record before us it is apparent that the underlying claims fall within the pollution exclusion unless Chenango and GAI can establish that the discharges complained of were "sudden and accidental." In Technicon the Court of Appeals made it clear that discharges must be both sudden and accidental to fall within the exception. That is, "discharges that are either non-sudden or non-accidental block the exception from nullifying the pollution exclusion." (Technicon, supra, at p. 75) The word "sudden" emphasizes the "temporal nature of the activity" in that, "for a release to be 'sudden' within the meaning of the pollution exclusion, it must occur abruptly or quickly or 'over a short period of time.'" (Borg-Warner Corp. v Insurance Co. of North America, 174 AD2d 24, 31, [3d Dept., 1992]) The word "accidental" emphasizes the nature of the conduct which resulted in the discharge, the relevant factor being "whether the toxic material was discharged into the environment unexpectedly and unintentionally or knowingly and intelligently." (County of Broome v Aetna Casualty & Surety Co., 146 AD2d 337, 342 [3d Dept., 1989])

© COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

Chenango and GAI attempt to bring the underlying claims within the sudden and accidental exception to the pollution exclusion by focusing on the EPA remedial investigation, and we have reviewed their argument in that regard. However, our determination must be guided by a "reasonable reading of the underlying complaint considered in toto. (Technicon, supra, at pp.73 & 74; Ogden Corporation v Traders Indemnity Co., 924 F.2d 39 [2d Cir., 1991]; State of New York v Amro Realty Corp., 936 F.2d 1420 [2d Cir., 1991]). We observe that the contamination of Vestal Well 1-1 is only one aspect of the underlying Town of Vestal complaint. In addition to complaining of the contamination of Well 1-1 the Town of Vestal alleges that discharges from the Chenango facility "have damaged and continue to damage the air, soil and ground water resources" of the Town of Vestal (Vestal complaint, par. 22).

37.

The "History of Pollution and Spills" set forth in paragraph 23 through 35 of the Town of Vestal complaint is supported by the documentary evidence submitted by the insurers in support of their motion for summary judgment. That evidence discloses a history of repeated inspections by public health officials, repeated observations of the discharge of sewage and industrial waste at the Chenango facility, and repeated but unfulfilled promises by Chenango to take remedial action over a period of approximately ten years. In view of the length of time over which the discharges occurred and Chenango's knowledge of the continuing problem, it is apparent that the discharges were neither "sudden" nor "accidental." (County of Broome v Aetna Casualty & Surety Co., 146 AD2d 337 [3d Dept. 1989]; Technicon Electronics Corp. v American Home Assurance Co., 74 NY2d 66 [1989]; Borg-Warner Corp. v Insurance Co. of North America, 174 AD2d 24 [3d Dept. 1992]; County of Fulton v United States Fidelity & Guarantee Co., Memorandum Opinion, No. 67681, 3d Dept. July 22, 1993]).

38.

With respect to the EPA claims we observe that EPA concluded, inter alia, that the contamination of Vestal Well 1-1 and the soils in the four suspected source areas "is believed to be historical waste handling and disposal practices associated with the Chenango and Vestal Asphalt businesses." In addition, EPA concluded that "there probably was a slow but steady release of hazardous constituents from small spills, discharges into the leach fields, and waste or materials stockpiling on the surface. The result is a highly contaminated soil that appears to be the principal source of ground water contamination at the site." (Truettner Aff., Ex. A at p. 5-1) Thus, the conclusions reached by EPA as to the cause of contamination of Vestal Well 1-1 are entirely consistent with the "History of Pollution and Spills" relied upon in the Town of Vestal complaint. EPA's ultimate decision to remediate the soils only in areas 2 and 4 merely reflects the fact that EPA's primary concern is the prospective solution to an existing problem rather than an analysis of the causation in order to establish liability. Accordingly, we conclude that the basis for the administrative proceeding was the same as the Town of Vestal action and our Decision is equally applicable, therefore, to the EPA claims. See County of Broome, supra, at p. 342; Technicon, supra, at p. 76.



COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

# EXHIBIT 6

# OCCIDENTAL CHEMICAL CORPORATION

**STATE OF NEW YORK**
**SUPREME COURT : COUNTY OF ERIE**

********************************************************

**OCCIDENTAL CHEMICAL CORPORATION**
**OCCIDENTAL PETROLEUM CORPORATION**
**OCCIDENTAL PETROLEUM INVESTMENT COMPANY**
**OCCIDENTAL CHEMICAL HOLDING CORPORATION**
**OXY CHEMICAL INTERNATIONAL, INC.,**

Plaintiffs

VS **INDEX NO. 41009/80**

**HARTFORD ACCIDENT & INDEMNITY COMPANY**
**THE CONTINENTAL INSURANCE COMPANY**
**HIGHLANDS INSURANCE COMPANY**
**NATIONAL UNION FIRE INSURANCE COMPANY OF**
**PITTSBURGH, PA., ETAL,**

Defendants

***********************************************************

**A P P E A R A N C E S**

**STENGER & FINNERTY**
(John H. Stenger, Esq., of Counsel)
Attorneys for Plaintiffs
1800 Main Place Tower
Buffalo, New York 14202

**JONES, DAY, REAVIS & POGUE**
(J. W. MONTGOMERY, III, ESQ., OF COUNSEL)
Attorneys for Plaintiffs
500 Grant Street - 31st Floor
Pittsburgh, Pennsylvania 15219

**MARK ROMNESS, ESQ.**
Attorney for Plaintiffs
Occidental Chemical Corporation
Occidental Tower
5005 LBJ Freeway - 23rd Floor
Dallas, Texas 75244

**WHITE & WILLIAMS**
(Richard M. Shusterman, Esq., of Counsel)
(John F. Glowacki, Jr., Esq.)
Attorneys for Defendants Central National Insurance Company of Omaha, CIGNA Property and Casualty Insurance Company (formerly known as Aetna Insurance Company) Century Indemnity Company, as Successor to CIGNA Specialty Insurance Company (formerly known as California Union Insurance Company) and Century Indemnity Company, as Successor to CCI Insurance Company, as Successor to Insurance Company of North America
One Liberty Place, Suite 1800
1650 Market Street
Philadelphia, Pennsylvania 19103-7395

**ROACH, BROWN McCARTHY, GRUBER & CHIARI**
(Edmund S. Brown, Jr., Esq., of Counsel)
Attorneys for Defendants Central National Insurance Company of Omaha, CIGNA Property and Casualty Insurance Company (formerly known as Aetna Insurance Company) Century Indemnity Company, As Successor to CIGNA Specialty Insurance Company (formerly known as California Union Insurance Company) and Century Indemnity Company, as Successor to CCI Insurance Company, as Successor to Insurance Company of North America
1620 Liberty Building
Buffalo, New York 14202

**OPPENHEIMER, WOLFF & DONNELLY**
(Philip D. Pakula, Esq., of Counsel)
Attorneys for Defendants The Home Insurance Company and City Insurance Company
One CAF Corp Center - 153 East 53rd Street
New York, New York 10022

**ALBRECHT, MAGUIRE, HEFFERN & GREGG**
(Charles H. Daugherty, Esq., of Counsel)
Attorneys for Defendants International Insurance Company and Associated International Insurance Company
2100 Main Place Tower
Buffalo, New York 14202

**NEWMAN & COMPANY, P.C.**
(Martin P. Lavelle, Esq., of Counsel)
Attorneys for Defendants International Insurance Company and Associated International Insurance Company
425 Lexington Avenue
New York, New York 10007

**HODGSON, RUSS, ANDREWS, WOODS & GOODYEAR**
(Hugh M. Russ, Esq., of Counsel)
Attorneys for Defendants Commercial
Union Insurance Company and Commercial
Union Surplus Lines Insurance Company
1800 One M & T Plaza
Buffalo, New York 14203-2391

**PAULEY, FORREST, O'CONNELL, BEAUMONT & PELERSI, P.C.**
(John H. Beaumont, Esq., of Counsel)
Attorneys for Defendants
Continental Casualty Company, Continental
Insurance Company and Harbor Insurance
Company
90 State Street
Albany, New York 12207-1715

************************************************************

**MEMORANDUM OF DECISION**

This is an action which seeks defense and indemnification by defendant insurers for plaintiffs' liability for damages to person and property caused by chemical contamination of the area known as the Love Canal in the City of Niagara Falls, New York. These motions are based on language contained in the defendant insurers' excess policies, or in policies which they follow, which excludes from coverage damages caused by pollution. Certain defendants have moved herein for summary judgment dismissing plaintiffs' second and third causes of action.

**BACKGROUND**

Plaintiffs' third amended complaint, dated April 21, 1995, which addressed a number of sites in the Niagara Falls, New York area, follows three earlier complaints in this action, which began in 1980 and realigned the parties from earlier lawsuits filed both here and in California seeking similar relief.

This lawsuit was inactive for the first eight years, the parties having executed various moratorium and standstill agreements, and revived in late 1987. Since that time, the parties have engaged in lengthy document discovery, exchanged answers to interrogatories and deposed hundreds of witnesses, all pursuant to case management orders governing, <u>inter alia</u>, discovery and the making of "dispositive" motions.

Pursuant to Case Management Order No. 2, allowing such dispositive motions, in November, 1995 a majority of affected defendant insurers sought summary judgment, based upon the "pollution exclusion", dismissing plaintiffs' causes of action concerning the S-Area, one of the seven sites which had been addressed in the complaint herein. Instead of directly responding to such motions, plaintiffs unexpectedly moved for an order discontinuing certain causes of action. This order, granted by this Court on February 29, 1996 left remaining in this action only issues relating to the area known as Love Canal.

Subsequently, many of the original defendants have settled this action, some after the submission of motion papers on this issue and in the case of three defendants, after argument of the motions herein.

However, by agreement of the parties, all papers submitted on the motion may be considered by the Court, regardless of the current status of the party.

**SECOND AND THIRD CAUSES OF ACTION**

Due to the voluntary discontinuance and the settlemetns herein, only the second and thrif causes of actions remain. The second cause of action herein demands that defendants "undertake the full and unconditional defense of plaintiffs in connection with the Love Canal Individual Actions and the Love Canal Governmental Lawsuits now brought and any other actions which may be brought relating to the Love Canal Landfill".

The third cause of action demands indemnification for all sums expended in settlement or for payment of judgments expended for the Governmental Law suits or the Individual Actions.

**GOVERNMENTAL LAWSUITS**

The actions brought by the various governmental bodies referred to in the complaint were eventually joined in one case, originally known as the United States v. Hooker Chemical and Plastics Corporation, filed under Number Civ-79-990C in the United States District Court for the Western District of New York. In the Second Amended Complaint in the Federal Action, served as part of a motion for leave to file it on December 7, 1983 Occidental, as successor to Hooker Chemical and Plastics, is alleged to be liable to the Federal and New York Governments as a consequence of dumping and discharging 21,000 tons of various chemical wastes including solid wastes and hazardous substances as well as pollutants and contaminants in Love Canal from 1943-1953. Occidental was alleged to be liable: for response costs incurred and to be incurred "including costs of removal, relocation and remedial action and other costs to respond to the release or threatened release of hazardous substances from the Love Canal site ( Section 107 (a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 [hereinafter "CERCLA"] (42 U.S.C. $ 9607 (a)); for "remedying release or threatened release of chemical wastes" at Love Canal and the consequences thereof (Section 106 (a) of CERCLA (42 U.S.C. $ 9606 (a)) for equitable relief, including restitution, due to the disposal of solid waste and hazardous waste at Love Canal which endangered the health or environment (Section 7003 of the Resource Conservation and Recovery Act (42 U.S.C. $ 6973)) to abate the consequences of depositing waste "where such wastes were likely to reach, did reach and continue to reach navigable waters and tributaries thereof"; and for equitable relief, including restitution, resulting from the Love Canal's status as a "pollution source which endangers the health or welfare of persons" (Section 504 of the Clean Water Act. (33 U.S.C. $ 1364).

In the First Amended and Supplemental Complaint of the State of New York and UDC - Love Canal, Inc., dated January 17, 1984, the other two plaintiffs in the federal action brought an action sounding in public and private nuisance caused by Occidental's use of Love Canal as a dump

site during the years 1942 - 1953. The allegations stated that state intervention to was needed to monitor, assess and evaluate migration of wastes, prevent migration of wastes, and to remove the chemical waste, relocate persons whose property was contaminated in chemical waste, and other measures necessary to abate the nuisance. The state demanded that Occidental abate the nuisance caused by the presence and migration of hazardous chemical wastes, repay the state for the measures it had taken in Love Canal, and pay damages for injury to private and public property including punitive damages.

Plaintiffs were held liable under CERCLA § 107 for the governments' response costs when Judge Curtin granted partial summary judgment in favor of the Unites States and State of New York. United States v. Hooker, 680 F. Supp 546 (WDNY, 1988). This decision was based upon the Court's finding that Hooker's disposed of 42,000,000 pounds of chemical wastes, including numerous hazardous substances, into Love Canal over a period of 11 years.

In 1989 Judge Curtin refused to relieve Occidental of its responsibility for Love Canal response and abatement costs incurred by the State, finding Occidental jointly and severely liable therefore under the New York Common law nuisance principles (United States v. Hooker, 722 F Supp 960 (WDNY, 1989)) and later rejected Occidental's motion for contribution from Niagara County (United States v. Hooker, 739 F Supp 125 (WDNY, 1990).

Most recently, Judge Curtin refused to assess punitive damages against Hooker, 850 F Supp 993 (1994).

**PRIVATE LAWSUITS**

The private lawsuits were in the main brought in State Court by either of two local firms, Grossman, Levine & Civiletto and Moriarty, Allen, Lippes & Hoffman. Examples of the form complaints have been provided to the Court. The complaints alleged damage with respect to Hooker's disposal of chemical wastes between 1930 and 1953, enumerated the types and quantities of chemical wastes totaling some 21,000 tons and allege, inter alia: improper disposal of hazardous wastes resulting in fumes, escape and migration thereof; latent defect of the disposed chemicals; dumping of ultra hazardous chemicals; and fraud, all resulting in injuries to plaintiffs.

It is this Court's understanding that the vast majority of these suits have been settled prior to trial.

**DEFENDANTS' POLICIES**

All of the policies at issue on this motion, (in a couple of cases in the policies which they follow) contain a form of the "pollution exclusion".

An example of such exclusion provides:

"This policy does not apply:

. . .

to Bodily Injury or Property Damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water supply or body

of water;

. . .

However, this exclusion has an exception, the paragraph continues:

"but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

Certain policies have a different exception "this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental."

The parties, with respect to approximately twelve of the policies at issue here can not agree whether the policies at issue have the "and" language on the "or" language.

**PARTIES' CONTENTIONS**

Defendants assert that, as a matter of law, the exclusions in their policies preclude their defense or coverage of plaintiffs in the afore-mentioned governmental or private lawsuits, since plaintiff intentionally disposed of their chemicals in Love Canal over at least a decade and hence, such disposal was neither sudden nor accidental.

Plaintiffs contend that defendants focus on the wrong "escape" and that questions of fact preclude the resolution of this issue in their favor.

Plaintiffs first allege that the carriers herein are liable for defense costs and damages arising out of escape of chemicals from a "secure place of confinement", which is how they characterize the Love Canal.

Claiming that the affidavits of Joseph R. Kolmer, as well as the decisions of Judge Curtin in U.S.V. Hooker support their position that it was a subsequent release from containment which caused the environmental damage for which Occidental has been sued, plaintiffs seek to blame construction contractors and municipal agencies who breached this secure place of confinement releasing chemicals and causing the environmental damages complained of herein.

However, they argue, the pertinent escapes were sudden and accidental, thus falling within the exception to the pollution exclusion.

**ANALYSIS**

**Question of Fact**

It is this Court's opinion that plaintiffs have not succeeded in raising a question of fact which would preclude summary judgment herein.

The New York Courts have recognized that principles of collateral estoppel are applicable to coverage questions. D'Aratd v. New York Central Mutual Fire Insurance company, 76 NY2d 659 (1990); Allstate Insurance Company v.. Zuk, 78 NY2d 41 (1991); Town of Moreau v. Orrin Exterminating Company, 165 AD2d 415 (3rd Dept., 1991). It is clear that the issues of fact identified by plaintiffs either were decided against them by Judge Curtin or are unsupported by his decision, despite plaintiffs' citation of his opinions.

Judge Curtin has rejected the secure place of containment argument.

In his punitive damages decision, Judge Curtin found that Hooker's belief that the waste had been buried in a secure clay vault was incorrect, and after the early 1950's, unwarranted. (850 F Supp 993, 1066). He found that chemicals had been buried "too shallowly to sit securely inside the 'clay bathtub'" (id., at 1062) and that Hooker had deposited vaults and wastes above the clay level where they rested in a mixture of silt sand and clay (id., at 1065) Further, he found that these barrels had minimum cover (id., at 1065) which in many places was only one-half foot deep and not seeded (id., at 1009)

Second, the district court found that the outmigration of chemicals from Love Canal could not be blamed on third parties. In the decision with respect to OCC's responsibility for creating a public nuisance, the Court held that OCC had created the toxic condition and also quoted its previous decision on CERCLA liability:

> "OCC contributed to the horizontal migration of chemicals from the Love Canal site toward nearly residential properties by allowing a leachate flow to exit the southerly end of the Love Canal landfill. Were it not for this release and threatened release of chemical ... there never could have been horizontal migration of chemicals from the site and contamination of surrounding neighborhoods. "U.S.V. Hooker, 722 F Supp 960, 968 quoting U.S.V. Hooker 680 F Supp 558, 559.

As an additional point, the Court notes that Mr. Kolmer, whose affidavit is offered here as proof of plaintiffs containment and third party intervention arguments, supported two other experts' testified at the punitive damages trial. Judge Curtin found that Mr. Kolmer agreed with the State's expert that creation of a large reservoir of liquid waste in clay soil, rather than construction of homes, sewers and streets initiated the movement of such liquid waste off site". (850 F. Supp 993, 1045)

**Precedent**

There is no genuine issue of material fact here.

It is this Court's determination that even if the issues of secondary escapes had been resolved in plaintiff's favor, this case falls squarely within Court of Appeals and Appellate Division, Fourth Department precedent.

Specifically, the Court of Appeals decision in Powers Chemco, Inc. v. Federal Insurance Co. (74 NY2d 910) affirming 144 AD2d 445, is controlling here.

In that case, plaintiff chemical company sought insurance coverage for damages incurred by it in decontaminating and restoring its property. The decontamination and restoration were necessary because hazardous wastes, disposed of by its predecessor in title by burying same in trenches and pits, (144 AD2d 445, 446) leached out of the trenches and pits (74 NY2d 910).

The methods of disposal used at the Powers site were identical to those used in Love Canal-burying drums containing hazardous wastes and dumping chemical liquids into open pits which methods are not contested by plaintiffs.

MEALEY PUBLICATIONS, INC., WAYNE, PA

In Powers, the Court of Appeals found the issue as follows: "In other words, plaintiff seeks to be indemnified for intentional discharges of wastes, leading to the ultimate pollution of the environment." (74 NY2d 910, 911)

The Court held that the occurrence, i.e. leaching of materials leading to the necessity to decontaminate and restore the property, resulted from purposeful conduct and could not be considered accidental.

Similarly, the Appellate Division, Fourth Department, found in Rosen v. CNA Insurance Company, 182 AD2d 1090, that where hazardous wastes were discharged into the ground, as here, and perforated drums buried at the site, as here, the discharges were not sudden and accidental. Similarly, Hitchings v. Industrial Oil Tank and Line Cleaning Service, 190 AD2d 1030 (4th Dept., 1993); Rochester Smelting and Refining Co., Inc. v. Merchants Mutual Insurance Co., 188 AD2d 1055 (4th Dept., 1992)

Therefore, it is this Court's opinion that defendants whose policies contain the "sudden and accidental language fall within the rule in Powers and the Fourth Department cases. Intentional conduct defeats the exception to the exclusion.

With respect to those policies whose language is (or may be ) "sudden or accidental", it is this Court's belief that former Insurance Law § 46 (13) and (14), in effect from 1971 - 1982, would apply and the word "and" would be supplied instead of "or" by Statute. (See, New York General Constitution Law § 93; People v. Lynch, 85 AD2d, 1982)

However, even if that former provision is deemed never to have existed as argued by plaintiff, the weight of authority in New York is that a discharge occurring over a long period or discharges which are a "concomitant of normal business activities "are not sudden" (Redding - Hunter v. Aetna CAsualty and Surety Company, 2061 AD2d 805, 807 - 808 (3rd Dept., 1994). In Borg-Warner Corporation v. Insurance Company of North America, 174 AD2d 24, (3rd Dept. 1992) the Court found that the "sudden" portion of the pollution exclusion was applicable because the discharge continued "over a long period of time", (id., at 32) citing Town of Moreau v. Orkin Extermination, supra, 165 AD2d 415, 419 and County of Broome v. Aetna Casualty & Surety Company, 146 AD2d 337, 419.

Plaintiffs claim that the Fourth Department adheres to a different, non-temporal rule with respect to the "sudden" requirement, citing Allstate Insurance Co. v. Klock Oil Co., 73 AD2d 486 (4th Dept., 1980) and Petr-All Petroleum Corp. v. Fireman's Insurance Co., of Newark, N.J., 188 AD2d 139 (4th Dept. 1993) for that proposition as well as the interpretation of the Fourth Department rule set forth in Northville Industries Corporation vs National Union Fire Insurance Company, 218 AD2d 19. Plaintiffs

allege that in this department sudden means unexpected.

The Court notes that the cases cited by plaintiffs dealt with the "and" pollution exclusion, Klock Oil was weakened by Technician Electronics Corporation v. American Home Assurance Company, 74 NY2d 66 (1989). A single occurrence was admitted by the insurer in Petr-All. Northville is soon to be reviewed by the Court of Appeals.

More importantly, as stated earlier neither the first, nor plaintiffs' theoretical second discharge, can be said to be unexpected.

**Third Party Intervention**

Plaintiffs argument here, that some one else caused the discharge, has been rejected by the Court in Powers where the policy holders second argument was that the predecessor in title had dumped the chemicals and caused the liability.

The Court held "...there is nothing in the language of the pollution exclusion to suggest that it is not applicable where it is premised on the conduct of someone other than the insured." Powers, supra, 74 NY2d 910, 911.

Also, Technicon, supra hold that the pollution exclusion excludes all intentional discharges of waste.

**CONCLUSION**

For the above-captioned reasons, it is this Court's judgment that none of the policies of the excess carriers before the Court are applicable herein.

However, the Court agrees with plaintiff that this motion and record are neither appropriate nor sufficient to determine whether and to what extent defense costs advanced by the carriers may be recouped. This is not the usual case where the duty to defend is brought before the Court as an initial issue. Further, the parties had a number of agreements between themselves concerning defense costs and reservations of rights. Also no specific costs have been presented to the Court by defendants. Finally, the Court has been unable to find a New York case directly on point.

For those reasons, the matter of reimbursement will be deferred until an appropriate time.

Submit Order Accordingly.

JAMES B. KANE
Supreme Court Justice

DATED: September 25, 1996
Buffalo, New York

# EXHIBIT 7

# NYLS'
# GOVERNOR'S
# BILL JACKET

---

## 1971
## CHAPTER 765

### 33 PAGES

---

**NYLS has added the Senate debate transcript.**
**Assembly debate was not transcribed in 1971.**
**Also see, Chapter 766 of 1971.**

Terms and Conditions

This legislative history has been furnished by New York Legislative Service, Inc. It consists of the official New York Governor's Bill Jacket, with enhancements consisting of any other relevant material that we can supply such as Committee Reports, Commission Reports, Senate and Assembly debate transcripts, public hearing transcripts, memoranda, and news clippings. It *may* be specifically tailored to a section of the Statutes which you requested, and may also be updated from time to time. These additional pages are clearly marked and are copyrighted as a compilation.

**Legislative histories purchased on behalf of your client may not be copied for archiving in your library, nor for distribution. This compiled legislative history may not be loaned or copied, nor submitted for inclusion on a union list for loan or copy.**

New York Legislative Service is a completely self-supporting, not-for-profit organization which operates as a service to the community. Essentially, our expert services are provided at cost, and we keep our fees as low as possible. These document fees are based upon a one-time usage by our clients and are our main source of income. Thank you for supporting our organization and helping us to maintain our services!

**© Copyrighted as a compilation by**

**NEW YORK LEGISLATIVE SERVICE, INC.**

The Research Specialists on Legislative Intent and Current Legislation.

A NEW YORK NOT-FOR-PROFIT CORPORATION. ESTABLISHED 1932.

15 Maiden Lane, New York, NY 10038 (212) 962-2826 www.nyls.org

Multiple memorandum received from the State Comptroller dated MAY 26 1971 stating the following bill is of "No Interest" to the Department of Audit and Control.

| Intro. No. | Print No. |
| --- | --- |
| A-6952 | |

The original memorandum filed with:

A-6666-A

Chap. 765

A 6952

STATE OF NEW YORK
INSURANCE DEPARTMENT
123 WILLIAM STREET
NEW YORK 10038

BENJAMIN R. SCHENCK
SUPERINTENDENT OF INSURANCE

MEMORANDUM TO THE GOVERNOR

RE TWO BILLS

AN ACT TO AMEND THE INSURANCE LAW, IN RELATION TO PROHIBITING COVERAGE AGAINST ENVIRONMENTAL POLLUTION

INSURANCE DEPARTMENT

Assembly
6952

Introduced by:
Mr. Harris

RECOMMENDATION: Approval

STATUTES INVOLVED: Insurance Law

EFFECTIVE DATE: September 1, 1971

AN ACT TO AMEND THE INSURANCE LAW, IN RELATION TO NUCLEAR FACILITIES AND FEDERAL FINANCIAL RESPONSIBILITY REQUIREMENTS

Senate
7042

Introduced by:
Rules

RECOMMENDATION: Approval

STATUTES INVOLVED: Insurance Law

EFFECTIVE DATE: September 1, 1971

DISCUSSION:

These are a Governor's Program Bill (A. 6952) and the chapter amendment thereto (S. 7042). The bills are intended to prohibit commercial or industrial enterprises from purchasing insurance to protect themselves against liability arising out of their pollution of the environment, other than through sudden and accidental circumstances. These objectives are accomplished through amendment of subdivision 13 and 14 of Section 46 of the Insurance Law, which define personal injury liability insurance and property damage insurance, respectively.

The amendments provide that policies issued to commercial or industrial enterprises specifically exclude liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutant, irritant or contaminant into or upon the land, the atmoshpere or any water course or body of water unless such

discharge, dispersal, release or escape is sudden and accidental. Excepted from the flat proscription, by the chapter amendment, are policies covering nuclear facilities licensed by the Atomic Energy Commission of the United States as meeting federal standards of radiological health and safety and nuclear facilities licensed by the state as meeting such federal standards, and policies purchased to satisfy the financial responsibility requirements of any federal law. The exceptions were added to make it clear that the law is not to be read in contravension of such federal laws as the Water Quality Improvement Act of 1970 (P.L. 91-224). Thus The Nuclear Energy Liability Insurance Association and The Mutual Atomic Energy Liability Underwriters will be able to continue the sale of insurance on facilities meeting prescribed standards, a practical necessity for the financing of such operations.

While New York State has enacted perhaps the most stringent laws in the nation to discourage the despoiling of our environment through discharge of noxious substances into the air and water, the effect of these laws may be substantially reduced if pollutors may purchase insurance to protect themselves from having to pay fines and other liabilities that may be imposed upon them for their actions. A statement by the Governor on October 2, 1970 urged that legislation of this type be enacted.

Many, but by no means all insurance companies have voluntarily initiated action to protect the environment by refusing to insure against liability arising out of environmental pollution. This legislation should serve to further motivate all commercial and industrial enterprises to preserve and protect the environment.

Accordingly, the Department recommends approval of these bills.

Respectfully submitted,

June 15, 1971

Benjamin R. Schenck
Superintendent of Insurance

By: Roger W. Tompkins

Roger W. Tompkins
Deputy Superintendent
and General Counsel

MLF:dd

Department of Environmental Conservation May 28, 1971

ASSEMBLY

6952 Introduced by Mr. Harris

RECOMMENDATION: Approval

STATUTE INVOLVED: Subdivisions 13 and 14 of section 46 of the Insurance Law.

EFFECTIVE DATE: The first day of September next succeeding the date on which it shall have become a law.

DISCUSSION:

1. Purpose of bill: To make it illegal for a commercial or industrial enterprise to obtain insurance coverage against environmental pollution unless it is sudden and accidental.

2. Summary of provisions of bill: This bill amends Subdivisions 13 and 14 of section 46 of the Insurance Law to prohibit insurance coverage against environmental pollution except if it is sudden and accidental.

3. Prior legislative history of bill and similar proposals: None

4. Known position of others respecting bill: Unknown

5. Budget implications: None

6. Arguments in support of bill: This bill will prohibit industrial and commercial enterprises from buying insurance to protect themselves against liabilities arising out of their pollution of the environment. This Department has adopted and is now enforcing stringent standards to prohibit the dispoiling of the State's environment. The effectiveness of this Departmental effort could be substantially reduced if polluters were allowed to purchase insurance to protect themselves against paying fines and other liabilities imposed on them for such pollution. This legislation is necessary for the Department's program to be effective.

7. Arguments in opposition to bill: None

8. Reasons for recommendation: See #6 above.

Henry L. Diamond
Commissioner
Environmental Conservation

MEMORANDUM

Department of Commerce

June 24, 1971

ASSEMBLY
6952

Introduced by
Assemblyman Harris

RECOMMENDATION: The Department of Commerce does not oppose approval of this bill, provided S. 7042 is passed at the same time. We oppose A. 6952 if S. 7042 is not enacted.

STATUTE INVOLVED: Insurance Law.

EFFECTIVE DATE: September 1, 1971.

DISCUSSION:

1. Purpose of bill: To prohibit the sale by New York State insurers of liability insurance covering liability arising out of "pollution".

2. Summary of provisions: The bill amends subdivisions 13 and 14 of Section 46 of the Insurance Law (which describe "personal injury liability insurance" and "property damage liability insurance" which may be authorized in New York) to exclude from the coverage of such liability insurance, liability arising out of pollution or contamination caused by the discharge or dispersal, etc., of pollutants, unless such discharge and dispersal is "sudden and accidental".

3. Prior legislative history: None.

4. Known position of others: The Insurance Department prepared the bill in cooperation with liability insurers. Associated Industries does not oppose this bill.

5. Budget implications: Unknown.

6. Arguments in support: Polluters should not be allowed to "hide" behind their insurance.

   Insurance companies are presently using a standard exception which excludes such coverage, so that the bill does not cause much change in the present situation.

7. Arguments in opposition: The bill is based upon some oversimplified concepts which are in fact unsound.

First, "polluters" cannot hide behind liability insurance in any event. A broadly written liability protection provision might be construed to provide liability insurance protection against an act of pollution, thereby transferring the economic impact of damages for such act of pollution from the polluter to the insurer. However, this cannot continue beyond a single renewal since the insurers have the power to redetermine the "rating" applicable to the policy covering the polluter and adjust such rates on the basis of experience. Consequently, after experience of a "polluter" trying to utilize his policy to pay for an act of pollution, the polluter will "pay" for his act via an increase in premium within the power of the insurers to reasonably determine.

Nonetheless, it may be that for a single period before a renewal, a "polluter" may be able to shift the economic burden from himself to his liability policy. It is for this reason that insurers have instituted the use of a pollution exclusion, to assure that policyholders cannot shift an unintended burden to the insurers under a broadly written liability protection provision. However, with such burden excluded from standard commercial liability policies, it is our understanding that insurers are available that would write "pollution protection policies" for an additional premium. Said additional premium would be such as to preclude "hiding" behind such insurance policies. This bill, however, not only precludes the coverage of pollution insurance as part of a standard liability policy, it precludes sale of such insurance as a separate item of liability protection. In short, it makes insurance against pollution an unlawful type of act for New York State insurers.

Notwithstanding the above points, there could be some argument that people violating the law (the pollution laws) should not be allowed to insure against such violations. However, this bill prohibits protection not only for the law violator but also the man who diligently observes the pollution laws. If such person observes the laws and rules scrupulously and discharges materials from his facility only in strict conformity with the concentrations, quantities or conditions set forth in the laws, regulations and permits, he is nonetheless "discharging" a "pollutant" or "contaminant"*, he is still subject to allegation and suit for causing damage to someone. Such man is stripped by this bill of his ability to insure against this event. For such a person, whose

* See e.g., Article 12-A, Public Health Law.

act of discharging materials is in full compliance with State laws, there appears no justification for penalizing him by excluding him from the opportunity to insure.

This bill is based upon a concept that regularly arises in various fields of insurance but is regularly rejected in such other fields. The concept is that a person may be effectively forced to accomplish a desired act if the economic burden of failure cannot be in part shifted by insurance. It is sometimes suggested that if theft insurance were not available, people would be more careful with property, and theft would be reduced. It has been suggested that if people who have had an auto accident were required to self-insure against at least smaller accidents, they may be more careful to avoid a second accident.

We do not feel that this concept has any special validity in the area of environmental protection and do not feel that denial of insurance will contribute substantially to protection of the environment. It only results in a misuse of the insurance laws for purposes of law enforcement of other laws.

The bill seriously adversely affects nuclear energy liability protection. However, this severe defect would be rectified by passage of S. 7042. (See our letter dated June 24, 1971.)

CONCLUSION: While A. 6952 is a bill which we feel is unwise and would have adverse consequences, it is not opposed by the industrial groups. The Department of Commerce defers to their judgment as to the seriousness of the potential impact and does not oppose A. 6952. However, A. 6952 so severely adversely affects nuclear energy protection that we do oppose its passage unless S. 7042, which rectifies the problem of A. 6952, is passed at the same time.

Harry J. O'Donnell
First Deputy Commissioner

A. 6952

NEW YORK STATE
ATOMIC AND SPACE DEVELOPMENT AUTHORITY
230 PARK AVENUE • NEW YORK, N. Y. 10017 • (212) MU 9-5070

MAURICE AXELRAD
SECRETARY AND ASSOCIATE COUNSEL

June 16, 1971

Michael T. Whiteman, Esq.
Counsel to the Governor
Executive Chamber
State Capitol
Albany, New York 12224

Re: 30-day bill, A. 6952

Dear Mr. Whiteman:

For the reasons set forth in the comments being concurrently submitted by the Authority with respect to S. 7042, the Authority recommends that A. 6952 not be approved unless S. 7042 is also approved.

Sincerely yours,
Maurice Axelrad

MA:mp

Chap. 765 — Boneyard

POWER AUTHORITY OF THE STATE OF NEW YORK
10 COLUMBUS CIRCLE NEW YORK, N.Y. 10019
212 – CO 5-6510

TRUSTEES
JAMES A. FITZPATRICK, CHAIRMAN
EDMUND H. BROWN, VICE CHAIRMAN
ARTHUR M. RICHARDSON
GEORGE L. INGALLS
DOUGLAS C. MacCALLUM

WILLIAM S. CHAPIN, GENERAL MANAGER
THOMAS F. MOORE, JR., GENERAL COUNSEL
ASA GEORGE, CHIEF ENGINEER
LUTHER E. CLIFFE, ASSISTANT GENERAL MANAGER
GEORGE T. BERRY, DIRECTOR OF POWER UTILIZATION
THOMAS F. McCRANN, JR., CONTROLLER

June 21, 1971

MEMORANDUM

to the

COUNSEL TO THE GOVERNOR

IN SUPPORT OF

An Act

---

: To amend the insurance law, :
in relation to nuclear facili-
: ties and federal financial :
responsibility requirements

---

S. 7042, by Committee on Rules

This bill would amend another bill (A. 6952) which passed the Legislature and also is before the Governor for executive action.

A. 6952 - the bill which S. 7042 would amend if both became law - would amend the insurance law by providing that every personal injury liability insurance policy and every property damage liability insurance policy issued to commercial or industrial enterprises exclude from coverage liability arising from pollution caused by any means other than sudden and accidental release.

A. 6952 would conflict with the Atomic Energy Act of 1954 which requires that all licensees of nuclear plants carry insurance without any exclusion for release of pollutants to the air or water by means not sudden or accidental. The Nuclear Energy Liability Insurance Association (NELIA) and the Mutual Atomic Energy Liability Underwriters (MAELU) have agreed to issue such coverage to the Authority for the nuclear plant the Authority

is now constructing near Oswego, New York. The insurance provided from these sources will be in the amount of $82 million. The balance of $478 million to meet the requirements of the Atomic Energy Commission of total insurance of $560 million to protect the public will be provided by an indemnity agreement with the Federal Government. Owners and operators of nuclear power plants would not be able to obtain the Government insurance without the underlying coverage provided by NELIA and MAELU. If this bill became law in its present form it would prohibit NELIA and MAELU from issuing policies in a form satisfactory to the Atomic Energy Commission. Without such insurance which is now available they could not operate the nuclear facilities they are presently constructing.

A. 6952 would also preclude efforts to obtain additional insurance from Lloyds of London. Efforts to interest Lloyds have been made and will continue to be made to supply insurance over and above that obtained from other sources.

S. 7042 was introduced to cure the defects of A. 6952.

S. 7042 would exclude from the provisions of A. 6952 policies "covering nuclear facilities licensed by the Atomic Energy Commission of the United States as meeting federal standards of radiological health and safety and nuclear facilities licensed by the state as meeting such federal standards, and except those purchased to satisfy the financial responsibility requirements of any federal law."

Thus this bill would permit owners and operators of facilities licensed by the Atomic Energy Commission to purchase insurance which will enable them to operate nuclear facilities.

We recommend that this bill be approved if A. 6952 is approved.

James A. FitzPatrick
Chairman

TEN-DAY BILL

A-61

FORM B-201(a) (4/69) BUDGET REPORT ON BILLS Session Year 1971

SENATE
No.

Introduced by:
Mr. Harris

ASSEMBLY
No. 6952

Law: Insurance

Subject and Purpose (Brief Recapitulation): To prohibit the issuance of property or personal liability insurance policies for the legal liabilities which arise from contamination of the environment by an industrial or commercial enterprise.

Division of the Budget recommendation on the above bill:

Approve: X Veto: ___ No Objection: ___ No Recommendation: ___

This bill is identical to ( ) very similar to (X)

(Governor's Program bill)
Insurance Department No. 18 which
(department or agency)

was submitted as a departmental bill this year. The points made in our earlier analysis of the departmental bill are still valid and our recommendation is unchanged.

(If the very similar category is checked, list below the changes contained in the bill as passed and discuss them to the required extent.)

This version of the bill:

(1) Deletes the restriction on the applicability of the amendment to firms employing more than 100 persons, per Division of the Budget recommendation; and

(2) Deletes the wording "and is not reasonably foreseeable" as redundant.

11

Date: May 25, 1971 Examiner: Charles W. Palmer
Lee Vaughan
LV:hw

NIAGARA MOHAWK POWER CORPORATION

NIAGARA MOHAWK

300 ERIE BOULEVARD WEST
SYRACUSE, N.Y. 13202

June 17, 1971

Hon. Michael Whiteman
Executive Chamber
State Capitol
Albany, New York 12224

Dear Mr. Whiteman:

Re: A. 6952 - S. 6080, as amended by S. 7035 - "To amend the insurance law, in relation to prohibiting coverage against environmental pollution"

Many governmental spokesmen have expressed the need for a cooperative relationship between government and industry in the solution of existing problems of environmental control and the concurrent preservation of New York State's industrial potential. We suggest that the subject bill reflects a punitive intent not calculated to foster such a cooperative relationship.

To deprive industry of such opportunities as it may have to insure itself against liability for damages due to air or water pollution unless such pollution is the result of "sudden and accidental" discharge is, in our view, an imprudent and inequitable imposition of penalty at a time when the financial resources of many industries may be seriously taxed in accomplishing required environmental controls.

We further submit that the limitation of insurance coverage to pollution damage from "sudden and accidental" discharges fails to accomplish what may be an intended limitation of the prohibition in the bill. There appears to be an implication that discharges which are not "sudden and accidental" are thereby necessarily willful or reckless. Such is not the case. A discharge or release may be, in some cases, accidental but gradual and not immediately detectable. The rigid language of the bill would seem to render such occurrences uninsurable.

Hon. Michael Whiteman
Page 2

June 17, 1971

We further suggest that the bill raises constitutional questions with respect to the impairment of contractual rights.

For the above reasons we urge that the bill should not receive favorable action by the Governor.

We thank you for the opportunity to comment on the subject bill.

Very truly yours,

Niagara Mohawk Power Corporation

By: Walter J. Barrett
Walter J. Barrett, Attorney

Chap. 765 Boneyard

LILCO LONG ISLAND LIGHTING

# LONG ISLAND LIGHTING COMPANY

EXECUTIVE OFFICES: 250 OLD COUNTRY ROAD · MINEOLA, NEW YORK 11501

EDWARD M. BARRETT
GENERAL COUNSEL
EDWARD J. WALSH, JR.
GENERAL ATTORNEY
FRANCIS M. WALSH
GENERAL CLAIMS ATTORNEY

(516) 747-1000

IRA L. FREILICHER
HERBERT M. LEIMAN
ROY E. MONACO
JAMES J. STOKER, III
JONATHAN BLANK
ATTORNEYS

June 18, 1971

Hon. Michael Whiteman
Counsel to the Governor
The Capitol
Albany, New York 12224

Re: AN ACT to amend the insurance law, in relation to prohibiting coverage against environmental pollution (Assembly 6952, Mr. Harris)

AN ACT to amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements (Senate 7042, Rules Committee)

Dear Mr. Whiteman:

We are enclosing two copies of our memorandum requesting the disapproval of the above entitled bills.

Yours very truly,

Edward J. Walsh

Edward J. Walsh, Jr.

EJW:lb
Encls.

AN ACT to amend the insurance law, in relation to prohibiting coverage against environmental pollution (Assembly 6952, Mr. Harris)

AN ACT to amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements (Senate 7042, Rules Committee)

These two bills would preclude any commercial or industrial enterprise from obtaining insurance to protect itself from liability arising out of the discharge of a pollutant unless that discharge is sudden and accidental. The underlying reason for these bills appears to be that "a corporation might continue to pollute the environment if it could buy protection from potential liability for only the small cost of an annual insurance premium, whereas, it might stop polluting if it had to risk bearing itself the full penalty for violating the law."

We believe the bills should be disapproved because the reasoning underlying the bills is fallacious. The bills erroneously assume that insurance companies will provide a polluter with insurance against liability for continuous acts of pollution at a small annual premium cost. We submit that experience demonstrates that this is not the fact. The insurance companies will either refuse to insure where frequent claims are made or will increase the premiums to reflect claims paid for acts of pollution. Thus, at present, the continuous polluter will be faced with the possibility of being unable to obtain any insurance or with the requirement that he pay prohibitive insurance premiums. Under these circumstances, the bills are actually unnecessary if their sole purpose is to penalize polluters.

However, we submit that the proposed bills may, in fact, be detrimental to the public interest. This is because the proposed bills may have the effect of leaving the public and individual members of the public who suffer serious personal or property damage as a result of acts of pollution unprotected where the polluting enterprise is financially irresponsible. Thus, for instance, where a member of the public suffers serious personal injury or death through an act of pollution by a small enterprise there may be no recovery because the enterprise has insufficient worth.

We think it also worth noting that the bills could force many small enterprises into bankruptcy as a result of one act of ordinary negligence by an employee, which under the broad language of these bills would be classified as an act of pollution.

It is respectfully submitted that the purpose of legislation in this area should be to protect the public. This protection could be more readily accomplished by requiring compulsory insurance against pollution rather than prohibiting insurance. In this way, continuous polluters will be deterred because the insurance premium rates will reflect the insurance companies' experience with each individual polluter.

June 18, 1971

Long Island Lighting Company
250 Old Country Road
Mineola, New York 11501

THE ASSEMBLY
STATE OF NEW YORK
ALBANY

GLENN H. HARRIS
109TH DISTRICT
FULTON-HAMILTON
AND FRANKLIN COUNTIES
CANADA LAKE, NEW YORK 12030

#6592
p. 95

May 20, 1971

Hon..Nelson A. Rockefeller
Governor, State of New York
Executive Chamber
State Capitol
Albany, New York

Attention: Hon. Michael Whiteman
Counsel to the Governor

My dear Governor Rockefeller:

You have before you for executive action my Assembly bill no. A-6592, a copy of which is attached together with a memorandum.

I respectfully request that this bill be signed into law.

Sincerely,

Glenn Harris

GLENN H. HARRIS
Member of Assembly

GHH:jlt
Enc. 2

Introduce

PROGRAM BILL # 42

410

GOVERNOR'S PROGRAM BILL
1971

Harris
Ins.

S. Int.________

A. Int.________

6952

MEMORANDUM

RE: AN ACT to amend the insurance law, in relation to prohibiting coverage against environmental pollution

Purpose of the Bill:

To prohibit commercial or industrial enterprises from buying insurance to protect themselves against liabilities arising out of their pollution of the environment.

Summary of Provisions of the Bill:

Sections 1 and 2 of the bill would amend Subdivisions 13 and 14 of Section 46 of the Insurance Law, which define personal injury liability insurance and property damage liability insurance, to require that all such policies issued to commercial or industrial enterprises expressly exclude liability arising out of pollution or contamination resulting from the discharge, dispersal, release or escape of any pollutant, irritant or contaminant into or upon land, air or water other than through sudden, accidental circumstances.

Statements in Support of the Bill:

New York State has adopted stringent standards to prohibit despoiling the environment through the discharge of noxious substances into the water and air. These standards, which are the most comprehensive in the Nation, go far beyond merely strengthening and supplementing the common law rules against pollution.

As strict as these laws are, however, their effectiveness could be substantially reduced if polluters were to purchase insurance to protect themselves from having to pay the fines and other liabilities that may be imposed upon them for polluting the environment.

For example, a polluting corporation might continue to pollute the environment if it could buy protection from potential liability for only the small cost of an annual insurance premium, whereas, it might stop polluting if it had to risk bearing itself the full penalty for violating the law.

Many insurance companies have voluntarily initiated action to protect the environment by refusing to insure against liability arising out of environment pollution.

The bill would help to assure that corporate polluters bear the full burden of their own actions spoiling the environment, and would preclude any insurance company from undermining public policy by offering this type of insurance protection.

PROGRAM BILL # 42

AN ACT to amend the insurance law, in relation to prohibiting coverage against environmental pollution

The People of the State of New York, represented in Senate and Assembly, do enact as follows:

Section 1. Subdivision thirteen of section forty-six of the insurance law, as last amended by chapter two hundred ninety-eight of the laws of nineteen hundred fifty-two, is hereby amended to read as follows:

13. "Personal injury liability insurance," meaning insurance against legal liability of the insured, and against loss, damage or expense incident to a claim of such liability, and including an obligation of the insurer to pay medical, hospital, surgical and disability benefits to injured persons, and funeral and death benefits to dependents, beneficiaries or personal representatives of persons who are killed, irrespective of legal liability of the insured, arising out of the death or injury of any person, or arising out of injury to the economic interests of any person as the result of negligence in rendering expert, fiduciary or professional service, but not including any kind of insurance specified in paragraph fifteen. Policies issued to commercial or industrial enterprises providing insurance against the legal liabilities specified in this subdivision shall expressly exclude therefrom liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutants, irritants or contaminants into or upon land, the atmosphere or any water course or body of water unless such discharge, dispersal, release or escape is sudden and accidental.

§2. Subdivision fourteen of section forty-six of such law is hereby amended to read as follows:

14. "Property damage liability insurance," meaning insurance against legal liability of the insured, and against loss, damage or expense incident to a claim of such liability, arising out of the loss or destruction of, or damage to, the property of any other person, but not including any kind of

30

insurance specified in paragraph thirteen or fifteen. Policies issued to commercial or industrial enterprises providing insurance against the legal liabilities specified in this subdivision shall expressly exclude therefrom liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutants, irritants or contaminants into or upon land, the atmosphere or any water course or body of water unless such discharge, dispersal, release or escape is sudden and accidental.

§3. This act shall take effect on the first day of September next succeeding the date on which it shall have become a law and shall be applicable to policies issued or renewed thereafter.

western union mailgram

VIA MU ISC? (AC 1690G110134006?18?71)
FROM: WUMGMFH NYK
1971 JUN 18 PM 6 24
ZCZC 196 MS TDFH MINEOLA NY 18
ZIP 12224

HONORABLE MICHAEL WHITEMAN
COUNSEL TO THE GOVERNOR
THE CAPITOL
ALBANY NY 12224

BT

RE: AN ACT TO AMEND THE INSURANCE LAW, IN RELATION TO PROHIBITING COVERAGE AGAINST ENVIRONMENTAL POLLUTION (ASSEMBLY ... IS) AN ACT TO AMEND THE INSURANCE LAW IN RELATION TO NUCLEAR FACILITI AND FEDERAL FINANCIL RESPONSIBILITY REQUIREMENTS (SENATE 7...5, RULES COMMITEE)

THESE TWO BILLS WOULD PRECLUDE ANY COMMERCIAL OR INDUSTRIAL ENTERPRIS FROM OBTAINING INSURANCE TO PROTECT ITSELF FROM LIABILITY ARISING OUT OF THE DISCHARGE OF A POLLUTANT UNLESS THAT DISCHARGE IS SUDDEN AND ACCIDENTAL. THE UNDERLYING REASON FOR THESE BILLS APPEARS TO BE THAT "A CORPORATION MIGHT CONTINUE TO POLLUTE THE ENVIRONMENT IF IT COULD BE PROTECTION FROM POTENTIAL LIABILITY FOR ONLY THE SMALL COST OF AN ANNUAL INSURANCE PREMIUM, WHEREAS IT MIGHT STOP POLLUTING IF IT HAD TO RISK BEARING ITSELF THE FULL PENALTY FOR VIOLATING THE LAW."

WE BELIEVE THE BILLS SHOULD BE DISAPPROVED BECAUSE THE REASONING UNDERLYING THE BILLS IS FALLACIOUS. THE BILLS ERRONEOUSLY ASSUME THAT INSURANCE COMPANIES WILL PROVIDE A POLLUTOR WITH INSURANCE AGAINST LIABILITY FOR CONTINUOUS ACTS OF POLLUTION AT A SMALL ANNUAL PREMIUM COST. WE SUBMIT THAT EXPERIENCE DEMONSTRATES THAT THIS IS NOT THE FACT. THE INSURANCE COMPANIES WILL EITHER REFUSE TO INSURE WHERE FREQUENT CLAIMS ARE MADE OR WILL INCREASE THE PREMIUMS TO REFLECT CLAIMS PAID FOR ACTS OF POLLUTUION. THUS, AT PRESENT, THE CONTINOUS POLLUTOR WILL BE FACED WITH THE POSSIBILITY OF BEING UNABLE TO OBTAIN ANY INSURANCE OR WITH THE REQUIREMENT THAT HE PAY PROHIBITIVE INSURANCE PREMIUMS. UNDER THESE CIRCUMSTANCES, THE BILLS ARE ACTUALLY UNNECESSARY OF THEIR SOLE PURPOSE IS TO PENALIZA POLLUTORS. HOWEVER, WE SUBMIT THAT THE PROPOSED BILLS MAY, IN FACT, BE DETRIMENTAL TO THEPUBLICK INEREST. THIS IS BECAUSE THE PROPOSED BILLS MAY HAVE THE EFFECT OF LEAVING THEPUBLIC AND INDIVIDUAL MEMBERS OF THE PUBLIC, WHO SUFFER SERIOUS PERSONAL OR PROPERTY DAMAGE AS A RESULT OF POLLUTION UNPROTECTED WHERE THE POLLUTING ENTERPRISES FINANCIALLY IRRESPONSIBLE. THURS. FOR INSTANCE, WHERE MEMBER OF THE PUBLIC SUFFRS SERIOUS PERSONAL INJURY OR DEATH THROUGH AN ACT OF POLLUTION BY A SMALL ENTERPRISE THERE MAY BE NO RECOVERY BECAUSE THE ENTERPRISE HAS INSUFFICIENT WORTH.

WE THINK IT ALSO WORTH NOTING THAT THE BILLS COULD FORCE MANY SMALL ENTERPRISES INTO BANCRUPCY AS AS RESULT OF ONE ACT OF ORDINARY NEGLIGENCE BY AN EMPLOYEE, WHICH UNDER THE BROAD LANGUAGE OF POOF THESE BILLS WOULD BE CLASSIFIED AS AN ACT OF POLLUTION.

IT IS RESPECTFULLY SUBMITTED THAT THE PURPOSE OF LEGISLATION IN THE AREA SHOULD BE THE PROTECT THE PUBLIC. THIS PROTECTION COULD BE MORE READILY ACCOMPLISHED BY REQUIRING COMPULSORY INSURANCE AGAINST POLLUTION RATHER THAN PROHIBITING INSURANCE. IN THIS WAY, CONTINUOUS POLLUTORS WILL BE DETERRED BECAUSE THE INSURANCE PREMIUM RATES WILL REFLECT THE INSURANCE COMPANIES XPERIENCE WITH EACH INDIVIDUAL POLLUTOR.

EDWARD J WALSH JR GENERL ATTORNEY
LONG ISLAND LIGHTING CO
250 OLD COUNTRY RD
MINEOLA NY

232

NNNN(0338P EDT)

MAILGRAM ALA

STATE OF NEW YORK
EXECUTIVE CHAMBER
ALBANY 12224

JUN 25 1971

MEMORANDUM filed with the following bills:

Assembly Bill Number 6952, entitled:

#52 "AN ACT to amend the insurance law, in relation to prohibiting coverage against environmental pollution"

Senate Bill Number 7042, entitled:

#53 "AN ACT to amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements"

A P P R O V E D

These bills, part of my environmental program, will prohibit commercial and industrial enterprises from purchasing insurance to protect themselves against liabilities arising out of their pollution of the environment where such prohibition is an appropriate measure for environmental protection.

New York State has adopted stringent standards to prohibit despoiling our environment through the discharge of noxious substances into the water and air. These standards, which are the most comprehensive in the Nation, go far beyond merely strengthening and supplementing the common law rules against pollution.

As strict as these laws are, however, their effectiveness would be substantially reduced if polluters were able to insure themselves against having to pay the fines and other liabilities that may be imposed upon them for polluting.

Many insurance companies have voluntarily initiated action to protect the environment by refusing to insure against liability arising out of environmental pollution.

The bill will help to assure that corporate polluters bear the full burden of their own actions spoiling the environment, and will preclude any insurance company from undermining public policy by offering this type of insurance protection.

Excepted only from this measure are insurance necessary to meet Federal financial responsibility standards and insurance covering certain nuclear risks in cases where stringent regulation provides adequate environmental protection.

The bills are approved.

(signed) NELSON A. ROCKEFELLER

New York State

# LEGISLATIVE ANNUAL

# 1971

*Published by*

NEW YORK LEGISLATIVE SERVICE, INC.

299 Broadway, New York, N. Y. 10007

2. Preventive Education

I recommend the expansion of existing drug education and guidance programs, and have asked the Narcotic Addiction Control Commission and the Education Department to develop drug education programs for parents.

We will also establish a review of drug education programs to assure effective implementation in all schools and to measure their impact.

3. Law Enforcement

In my Executive Budget I will recommend funds for expansion of the Special Narcotics Unit within the Division of State Police so it can cooperate more effectively with the Special State-wide Prosecutor.

I will also recommend the establishment of a special part in the courts in the City of New York, and elsewhere, where needed, to speed the handling of cases involving professional trafficking in narcotics and dangerous drugs,[53] and, in addition, I have directed the Statewide Prosecutor to establish as his first priority the detection and prosecution of organized narcotic rings.

V. Environment

Last year marked a milestone in the State's quest to restore a more livable environment. I refer to the creation of the new State Department of Environmental Conservation.[54]

This action, added to the other initiatives put forth by this Administration and approved by the Legislature, have placed New York in the forefront of the Nation in the continuing quest to restore the environment—our waters, air, and land.

A. Firm Enforcement

Over the past six years, we have developed the tools for financing the basic costs of dealing with pollution problems. We have matched these financial tools with reasonable legal standards to be used in enforcing environmental protection. These standards cover the pollution of water and air. In enforcing these standards, we will continue to be fair. But we will be firm.

The pollution laws have been in force long enough for polluters to comply. Consequently, those polluters with a "public be damned" attitude will be dealt with sternly.

I am requesting the Commissioner of Environmental Conservation and the Attorney General to conduct a searching review of all outstanding anti-pollution orders:

—to determine which industries and communities are complying with their timetables for halting pollution and which are not; and,

—to take prompt action against those failing to do so, including the assessment of appropriately heavy fines.[55]

---

[53]Enacted as Ch. 426.
[54]See N. Y. S. Legislative Annual, 1970, p. 474.
[55]See Chs. 765, 766 (Approval Memos #s 52, 53, p. 583).



THIS DOCUMENT HAS BEEN ADDED BY
NY LEGISLATIVE SERVICE, INC.
IT IS NOT CONTAINED IN THE
GOVERNMENT FILE, HOWEVER, WE
FEEL THAT IT MAY BE HELPFUL.

Further, I will request these State officials to move swiftly against new sources of pollution.

This State offers more help, financial, technical and otherwise, to municipalities and industries with pollution problems than any other in the Nation. Consequently, where the protection of our environment is concerned there can be no justification or tolerance for foot-dragging.

The administration will also explore the possible value of dealing with environmental polluters by administrative action rather than through the courts. We are already faced with the problem of court congestion. Also, the resolution of environmental issues often requires a technical expertise that is not always available in a general court of law.

B. Pure Waters

The State's Pure Waters Program enacted in 1965, has moved steadily toward its goal.[56] So far, 363 sewage treatment projects have been built or are under construction or design. Virtually all pollution from municipal sources will be ended when these plants are completed. All remaining industrial polluters are under legal orders to end pollution by fixed deadlines.

In brief, New York State's Pure Waters Program involves a total of $4.2 billion in government and industry expenditure. It ranks today as the largest, most comprehensive, anti-pollution effort ever undertaken—anywhere in the world.

Our continuing priority must be to keep moving towards the completion of programs already initiated.

I will also propose other important measures meeting special water pollution problems.

1. Curtail Phosphates

I will propose legislation to curtail the sale in New York State of detergents and other cleaning products containing phosphates by 1972.[57]

2. Toxic, Hazardous Substances

I will propose an expanded program for sampling and testing our waters for toxic and hazardous substances in order to determine their immediate and cumulative adverse effects.

This information will be used to promulgate regulations banning the discharge of dangerous substances into the environment.

I will also require firms that use potentially hazardous substances to submit emergency safety plans in the event these substances are lost to the environment.

3. Thermal Pollution

The State already has adopted strict standards to prohibit thermal pollution of our waters from the discharge of excessively hot wastes.

---

[56]See N. Y. S. Legislative Annual, 1965, p. 504.
[57]Enacted as Ch. 716 (Approval Memo #49, p. 580).

STATE OF NEW YORK

# PUBLIC PAPERS

of

# NELSON A. ROCKEFELLER

## FIFTY-THIRD GOVERNOR

of the

STATE OF NEW YORK

1970




This document has been added to the Governor's Bill Jacket by **New York Legislative Service, Inc.** as part of our proprietary legislative history.

a highway. Highways have significant social and economic effects, and there is tremendous impact on the esthetics of the countryside and the city, as well as in the fields of outdoor recreation and conservation.

The Governor said highways should be safe and pleasant to drive and should be "a good neighbor" to the adjacent area. The new emphasis will serve that objective, he said. "Our rural roadsides should reflect the natural beauty of the land. In urban regions of the State the highway and its roadsides should enhance the area by appropriate development which may include provision for recreation and give important consideration to esthetics and landscaping. In some urban areas the landscaped highway is the only greenery to be seen," the Governor said.

Multiple use-joint development projects in both rural and urban areas will involve the Department of Transportation, other state agencies and local governmental units and will be used increasingly for esthetic purposes and to provide recreational facilities and open space-conservation areas.

More rural highways of all classes should have adequate land to insure a natural setting for the highway, provide for scenic views and have roadside parking areas for motorists to view the scenery or eat a picnic lunch, Governor Rockefeller said. Along certain urban and rural highways there may be a variety of types of multiple use-joint development projects.

The Department will work closely with other state departments, particularly Environmental Conservation, in this expanded program, the Governor said.

---

**Legislation Called for by Governor Rockefeller Would Prohibit Industrial Firms from Insuring Against Liabilities Arising from Environmental Pollution**

STATE OF NEW YORK—EXECUTIVE CHAMBER

ALBANY, *October* 22, 1970

Governor Rockefeller today called for new legislation to prohibit industrial corporations from buying insurance to protect themselves against liabilities arising out of their pollution of the environment.

"New York State," the Governor said, "has adopted stringent standards to prohibit the despoiling of our environment through the discharge of noxious substances into the water and air. These standards, which are the most comprehensive in the Nation, go far beyond merely strengthening and supplementing the common law rules against pollution.

"As strict as these laws are, however," the Governor said, "their effectiveness could be substantially reduced if polluters

were to purchase insurance to protect themselves from having to pay the fines and other liabilities which may be imposed upon them for polluting the environment.

"For example, a polluting corporation might continue to pollute the environment if it could buy protection from potential liability for only the small cost of an annual insurance premium, whereas, it might stop polluting if it had to risk bearing itself the full penalty for violating the law."

In making this recommendation, the Governor commended many insurance companies for having already initiated action themselves to protect the environment by refusing to insure against this type of liability.

"Legislation, however, is necessary," Governor Rockefeller said, "to make sure that corporate polluters will bear the full cost of dispoiling the environment, and to prevent any insurance company from undermining public policy by offering this type of insurance protection."

The Governor directed the Insurance Department, working with the Department of Environmental Conservation, to prepare the necessary legislation for early consideration by the 1971 Legislature. Pending legislative action, the Governor urged the insurance companies to continue their voluntary efforts to fight pollution.

---

**SUNY at Stony Brook Substantially Affects Economy of Suffolk County**

STATE OF NEW YORK—EXECUTIVE CHAMBER

ALBANY, *October* 22, 1970

Governor Rockefeller today released a report outlining the economic impact of the State University at Stony Brook on Suffolk County and the surrounding Long Island area.

Tracing the history and growth of Stony Brook the State University Report concludes that the institution has probably become the "most substantial single economic factor in Suffolk County, and through its rapid and continuing expansion, a factor having increasing economic impact on Long Island."

Although only ten years have passed since its establishment, Stony Brook's monetary impact has grown from less than $5 million in 1962–63, to more than $50 million in 1969–70.

During this same period, the campus operating budget increased from $2.4 million to $27 million.

In 1962–63, the University Center's first year of operation at the Stony Brook campus, full-time student enrollment stood at 777, while in 1970 this figure had risen to 7,640 students. This represents an increase of about 983 percent.

# SENATE DEBATE TRANSCRIPTS

## 1971
## CHAPTER 765

### 2 PAGES

INSURANCE LAW

This document has been added to the Governor's Bill Jacket by **New York Legislative Service, Inc.** as part of our proprietary legislative history.

**NEW YORK LEGISLATIVE SERVICE, INC.**
The Research Specialists on Legislative Intent and Current Legislation.
A NEW YORK NOT-FOR-PROFIT CORPORATION. ESTABLISHED 1932.
15 Maiden Lane, New York, NY 10038 (212) 962-2826 www.nyls.org

Third Reading No. 1411, Print No. A 6952.

An act to amend the insurance law, in relation to prohibiting coverage against environmental pollution.

ACTING PRESIDENT ROLISON: Any discussion on this bill?

Read the last section.

THE SECRETARY: Section 3. This act shall take effect September 1st.

ACTING PRESIDENT ROLISON: Call the roll.

SENATOR BRYDGES: Explanation is asked for.

ACTING PRESIDENT ROLISON: An explanation has been requested for Assemblyman Harris' bill.

Senator Gordon.

SENATOR BERNARD G. GORDON: This bill would prohibit commercial or industrial enterprises from buying protection by means of insurance to insure them against their own acts of polluting the rivers, the land, the air. We have enacted in this State a very strong, stringent set of regulations in reference to pollution, and I would say that most insurance companies now exclude this kind of coverage in their own policies. What we want to do is prohibit and make it impossible to obtain this kind of insurance anywhere so that a polluter can fall back on the insurance policy and say that he is insured and rely upon that protection instead of adhering to the provisions of the law, so what this is doing is knocking out the kind of

(Senator Gordon, continuing)

insurance of that nature.

ACTING PRESIDENT ROLISON: Senator Bookson.

SENATOR PAUL P. E. BOOKSON: Will the Senator yield to a question?

SENATOR GORDON: Yes, I will yield.

SENATOR BOOKSON: This would allow industrial polluters to insure themselves against their own acts?

SENATOR GORDON: No, would not allow them to insure against their own acts.

SENATOR BOOKSON: I see. Thank you.

ACTING PRESIDENT ROLISON: Any further discussion?

SENATOR DRYDGES: Last section.

ACTING PRESIDENT ROLISON: Read the last section.

THE SECRETARY: Section 3. This act shall take effect September 1st.

ACTING PRESIDENT ROLISON: Call the roll.

(The Secretary called the roll.)

ACTING PRESIDENT ROLISON: The Secretary will announce the result.

THE SECRETARY: Ayes 55, nays 1. Mr. Halperin recorded in the negative.

ACTING PRESIDENT ROLISON: The bill is passed.

# EXHIBIT 8

# NYLS' GOVERNOR'S BILL JACKET

---

# 1971
# CHAPTER 766

## 28 PAGES

---

**NYLS has added the Senate debate transcript.**
**Assembly debate was not transcribed in 1971.**
**Also see, Chapter 765 of 1971.**


## Terms and Conditions

This legislative history has been furnished by New York Legislative Service, Inc. It consists of the official New York Governor's Bill Jacket, with enhancements consisting of any other relevant material that we can supply such as Committee Reports, Commission Reports, Senate and Assembly debate transcripts, public hearing transcripts, memoranda, and news clippings. It *may* be specifically tailored to a section of the Statutes which you requested, and may also be updated from time to time. These additional pages are clearly marked and are copyrighted as a compilation.

**Legislative histories purchased on behalf of your client may not be copied for archiving in your library, nor for distribution. This compiled legislative history may not be loaned or copied, nor submitted for inclusion on a union list for loan or copy.**

New York Legislative Service is a completely self-supporting, not-for-profit organization which operates as a service to the community. Essentially, our expert services are provided at cost, and we keep our fees as low as possible. These document fees are based upon a one-time usage by our clients and are our main source of income. Thank you for supporting our organization and helping us to maintain our services!

**© Copyrighted as a compilation by**



**NEW YORK LEGISLATIVE SERVICE, INC.**

The Research Specialists on Legislative Intent and Current Legislation.

A NEW YORK NOT-FOR-PROFIT CORPORATION. ESTABLISHED 1932.

15 Maiden Lane, New York, NY 10038 (212) 962-2826 www.nyls.org

APPROVAL # 53

CHAPTER 766

7042

1971-1972 Regular Sessions

# IN SENATE

June 6, 1971

Introduced by COMMITTEE ON RULES—read twice and ordered printed, and when printed to be committed to the Committee on Insurance

## AN ACT

To amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements

Notes

Compared by Baumgar...

Multiple memorandum received from the State Comptroller dated 6-14-71 stating the following bill is of "No Interest" to the Department of Audit and Control.

| Intro. No. | Print No. |
| --- | --- |
| S-7042 | |

The original memorandum filed with:
S-1242-B

S-7042

NEW YORK STATE
ATOMIC AND SPACE DEVELOPMENT AUTHORITY
230 PARK AVENUE • NEW YORK, N. Y. 10017 • (212) MU 9-5070

MAURICE AXELRAD
SECRETARY AND ASSOCIATE COUNSEL

June 16, 1971

Michael T. Whiteman, Esq.
Counsel to the Governor
Executive Chamber
State Capitol
Albany, New York 12224

Re: 30-day bill, S. 7042

Dear Mr. Whiteman:

It is our understanding that the effect of the subject bill is to permit persons licensed by the U.S. Atomic Energy Commission (e.g. persons licensed to construct or operate a production or utilization facility under 10 CFR Part 50 or persons licensed to possess or use special nuclear material, source material or byproduct material under 10 CFR Parts 70, 40 or 30) and persons licensed by the State Departments of Labor or Health or by the New York City Department of Health under regulatory radiation control programs compatible with the Federal program to continue to obtain nuclear liability insurance (e.g., insurance of the type offered by Nuclear Energy Liability Insurance Association and Mutual Atomic Energy Liability Underwriters) without the addition to such insurance policies of the exclusion specified in the last sentence of subdivisions 13 and 14 of section 46 of the Insurance Law, as proposed to be amended by another bill (A. 6952) presently before the Governor entitled "An act to amend the insurance law, in relation to prohibiting coverage against environmental pollution."

If A. 6952 is approved, it is essential that the subject bill also be approved in order that:

(1) Persons licensed by the U.S. Atomic Energy Commission to operate production or utilization facilities (e.g., reactors and fuel reprocessing plants) can continue to utilize insurance policies issued by NELIA and MAELU as proof of financial protection under the Price-Anderson provisions of the Atomic Energy Act of 1954, as amended. Otherwise such licensees will be faced with substantial difficulties and may have to commit substantial sums of money in order to satisfy the financial protection requirements.

(2) Other persons licensed by the AEC and by State agencies under the State's compatible radiation control program can continue to obtain standard NELIA and MAELU policies to cover their activities. Otherwise even though these activities fully comply with stringent Federal or State requirements pertaining to effluents from their operations, such licensees will be faced with a potential gap in their insurance coverage. Such a gap would greatly discourage the expansion of atomic energy activities within the State and the location of new activities within the State, all in complete negation of the State's statutory public policy since 1959 of encouraging the maximum development and use of atomic energy for peaceful and productive purposes, consistent with the public health and safety. Moreover, there is no reason known to the Authority why such a gap should exist which would deprive both the licensee and any members of the affected public of the benefits of insurance protection even in situations where the licensee is conducting his activities in accordance with all pertinent requirements.

For the foregoing reasons, the Authority recommends that the subject bill be approved if A. 6952 is approved.

Sincerely yours,

Maurice Apelrod

MA:mp

POWER AUTHORITY OF THE STATE OF NEW YORK
10 COLUMBUS CIRCLE NEW YORK, N.Y. 10019
212 – CO 5-6510

TRUSTEES
JAMES A. FITZPATRICK, CHAIRMAN
EDMUND H. BROWN, VICE CHAIRMAN
ARTHUR M. RICHARDSON
GEORGE L. INGALLS
DOUGLAS C. MacCALLUM

WILLIAM S. CHAPIN, GENERAL MANAGER
THOMAS F. MOORE, JR., GENERAL COUNSEL
ASA GEORGE, CHIEF ENGINEER
LUTHER E. CLIFFE, ASSISTANT GENERAL MANAGER
GEORGE T. BERRY, DIRECTOR OF POWER UTILIZATION
THOMAS F. McCRANN, JR., CONTROLLER

June 21, 1971

MEMORANDUM

to the

COUNSEL TO THE GOVERNOR

IN SUPPORT OF

An Act

-------------------------------

: To amend the insurance law, :
in relation to nuclear facili-
: ties and federal financial :
responsibility requirements

-------------------------------

S. 7042, by Committee on Rules

This bill would amend another bill (A. 6952) which passed the Legislature and also is before the Governor for executive action.

A. 6952 - the bill which S. 7042 would amend if both became law - would amend the insurance law by providing that every personal injury liability insurance policy and every property damage liability insurance policy issued to commercial or industrial enterprises exclude from coverage liability arising from pollution caused by any means other than sudden and accidental release.

A. 6952 would conflict with the Atomic Energy Act of 1954 which requires that all licensees of nuclear plants carry insurance without any exclusion for release of pollutants to the air or water by means not sudden or accidental. The Nuclear Energy Liability Insurance Association (NELIA) and the Mutual Atomic Energy Liability Underwriters (MAELU) have agreed to issue such coverage to the Authority for the nuclear plant the Authority

is now constructing near Oswego, New York. The insurance provided from these sources will be in the amount of $82 million. The balance of $478 million to meet the requirements of the Atomic Energy Commission of total insurance of $560 million to protect the public will be provided by an indemnity agreement with the Federal Government. Owners and operators of nuclear power plants would not be able to obtain the Government insurance without the underlying coverage provided by NELIA and MAELU. If this bill became law in its present form it would prohibit NELIA and MAELU from issuing policies in a form satisfactory to the Atomic Energy Commission. Without such insurance which is now available they could not operate the nuclear facilities they are presently constructing.

A. 6952 would also preclude efforts to obtain additional insurance from Lloyds of London. Efforts to interest Lloyds have been made and will continue to be made to supply insurance over and above that obtained from other sources.

S. 7042 was introduced to cure the defects of A. 6952.

S. 7042 would exclude from the provisions of A. 6952 policies "covering nuclear facilities licensed by the Atomic Energy Commission of the United States as meeting federal standards of radiological health and safety and nuclear facilities licensed by the state as meeting such federal standards, and except those purchased to satisfy the financial responsibility requirements of any federal law."

Thus this bill would permit owners and operators of facilities licensed by the Atomic Energy Commission to purchase insurance which will enable them to operate nuclear facilities.

We recommend that this bill be approved if A. 6952 is approved.

James A. FitzPatrick
Chairman

Chap. 764

STATE OF NEW YORK
INSURANCE DEPARTMENT
123 WILLIAM STREET
NEW YORK 10038

BENJAMIN R. SCHENCK
SUPERINTENDENT OF INSURANCE

MEMORANDUM TO THE GOVERNOR

RE TWO BILLS

AN ACT TO AMEND THE INSURANCE LAW, IN RELATION TO PROHIBITING COVERAGE AGAINST ENVIRONMENTAL POLLUTION

INSURANCE DEPARTMENT

Assembly 6952 — Introduced by: Mr. Harris

RECOMMENDATION: Approval

STATUTES INVOLVED: Insurance Law

EFFECTIVE DATE: September 1, 1971

AN ACT TO AMEND THE INSURANCE LAW, IN RELATION TO NUCLEAR FACILITIES AND FEDERAL FINANCIAL RESPONSIBILITY REQUIREMENTS

Senate 7042 — Introduced by: Rules

RECOMMENDATION: Approval

STATUTES INVOLVED: Insurance Law

EFFECTIVE DATE: September 1, 1971

DISCUSSION:

These are a Governor's Program Bill (A. 6952) and the chapter amendment thereto (S. 7042). The bills are intended to prohibit commercial or industrial enterprises from purchasing insurance to protect themselves against liability arising out of their pollution of the environment, other than through sudden and accidental circumstances. These objectives are accomplished through amendment of subdivision 13 and 14 of Section 46 of the Insurance Law, which define personal injury liability insurance and property damage insurance, respectively.

The amendments provide that policies issued to commercial or industrial enterprises specifically exclude liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutant, irritant or contaminant into or upon the land, the atmoshpere or any water course or body of water unless such

Assembly 6952
Senate 7042



discharge, dispersal, release or escape is sudden and accidental. Excepted from the flat proscription, by the chapter amendment, are policies covering nuclear facilities licensed by the Atomic Energy Commission of the United States as meeting federal standards of radiological health and safety and nuclear facilities licensed by the state as meeting such federal standards, and policies purchased to satisfy the financial responsibility requirements of any federal law. The exceptions were added to make it clear that the law is not to be read in contravension of such federal laws as the Water Quality Improvement Act of 1970 (P.L. 91-224). Thus The Nuclear Energy Liability Insurance Association and The Mutual Atomic Energy Liability Underwriters will be able to continue the sale of insurance on facilities meeting prescribed standards, a practical necessity for the financing of such operations.

While New York State has enacted perhaps the most stringent laws in the nation to discourage the despoiling of our environment through discharge of noxious substances into the air and water, the effect of these laws may be substantially reduced if pollutors may purchase insurance to protect themselves from having to pay fines and other liabilities that may be imposed upon them for their actions. A statement by the Governor on October 2, 1970 urged that legislation of this type be enacted.

Many, but by no means all insurance companies have voluntarily initiated action to protect the environment by refusing to insure against liability arising out of environmental pollution. This legislation should serve to further motivate all commercial and industrial enterprises to preserve and protect the environment.

Accordingly, the Department recommends approval of these bills.

Respectfully submitted,

June 15, 1971

Benjamin R. Schenck
Superintendent of Insurance

By: Roger W. Tompkins

Roger W. Tompkins
Deputy Superintendent
and General Counsel

MLF:dd

Chap. 164

Bonuyard

R. BURDELL BIXBY
CHAIRMAN AND SECRETARY

EDWIN J. FEHRENBACH
VICE CHAIRMAN

ALTON G. MARSHALL
TREASURER

JOHN A. TIESLER
EXECUTIVE DIRECTOR

NEW YORK STATE THRUWAY AUTHORITY
DELAWARE PLAZA
ELSMERE, NEW YORK

MAILING ADDRESS: P.O. BOX 189, ALBANY, N. Y. 12201

LEGAL DEPARTMENT

THEODORE H. KLINE
COUNSEL

June 22, 1971

The Honorable Michael Whiteman
Counsel to the Governor
Executive Chamber
State Capitol
Albany, New York 12224

Re: Senate 7042 by Committee on Rules

Dear Mr. Whiteman:

The above bill is before the Governor for executive action and you have asked for our comments and recommendations with respect thereto.

This bill would amend subdivisions 13 and 14 of Section 46 of the Insurance Law, as amended by a chapter of the Laws of 1971. Section 46 of the Insurance Law lists the kinds of insurance which may be authorized in this State and subdivisions 13 and 14 refer respectively to personal injury liability insurance and property damage liability insurance.

The chapter of the Laws of 1971, to which this bill refers, is Assembly 6952, which has not yet been signed.

Assembly 6952 amends subdivisions 13 and 14 to provide that personal injury and property damage liability policies may not be written to protect commercial and industrial enterprises against their legal liabilities arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutants, irritants or contaminants into or upon land, the atmosphere or water unless such discharge, dispersal, release or escape is sudden and accidental. Senate 7042, the subject bill, would further amend these subdivisions to except from this prohibition, policies covering nuclear facilities

licensed by the Atomic Energy Commission of the United States, as meeting federal standards of radiological health and safety and nuclear facilities licensed by the State as meeting such federal standards, and also excepting such coverage which is purchased to satisfy the financial responsibility requirements of any federal law.

Accordingly, if both bills are signed, subdivisions 13 and 14 would provide that no personal injury or property damage liability insurance could be written protecting a commercial or industrial enterprise against legal liability from pollution, except where such discharge, dispersal, release or escape is sudden and accidental, unless it was a properly licensed nuclear facility or unless the insurance was purchased to satisfy the financial responsibility required by the federal law, as set forth above.

We offer no objection to the approval of this bill.

This act would take effect on September 1, 1971.

Sincerely,

Theodore H. Kline

THEODORE H. KLINE
Counsel

THK:mcs

Chap. 766

- 7042

NEW YORK STATE
DEPARTMENT OF TRANSPORTATION

T. W. PARKER, Commissioner

1220 Washington Avenue, State Campus, Albany, New York 12226

DEPARTMENT OF TRANSPORTATION

DATE: JUN 25 197

SENATE 7042

INTRODUCED BY: Committee on Rules

RECOMMENDATION: No objection.

STATUTES INVOLVED: Section 46 (13) of the Insurance Law.

EFFECTIVE DATE: The first day of September next succeeding the date on which it shall have become a law.

DISCUSSION:

Purpose of bill. To amend the Insurance Law, in relation to nuclear facilities and Federal financial responsibility requirements.

The subject bill would amend Section 46 of the Insurance Law, to except personal injury and property damage liability insurance policies covering nuclear facilities licensed by atomic energy commission of United States as meeting Federal standards of radiological health and safety and nuclear facilities licensed by State as meeting such standards, and those purchased to satisfy financial responsibility requirements of Federal Law, from provisions requiring that policies issued to commercial or industrial enterprises providing insurance against liability specified hereunder, expressly exclude liability arising out of pollution or contamination caused by discharge, release or escape of pollutants, irritants or contaminants.

The provisions of the subject bill do not affect the functions or responsibilities of this Department. We, therefore, have no objection to enactment of the bill.

T W Parker

T. W. PARKER
Commissioner

S. 7042

STATE OF NEW YORK
DEPARTMENT OF COMMERCE
112 STATE STREET
ALBANY 12207

HARRY J. O'DONNELL
DEPUTY COMMISSIONER

AREA CODE 518
474-7910

June 24, 1971

Honorable Michael Whiteman
Counsel to the Governor
Executive Chamber
The Capitol
Albany, New York

Dear Mike:

Re: S. 7042

The Department of Commerce strongly urges that this bill be approved if A. 6952 is approved. Senate 7042 rectifies a serious oversight in A. 6952.

As you know, A. 6952 prohibits the sale by New York State insurers of liability insurance covering liability arising out of "pollution or contamination..." unless the discharge is "sudden and accidental". We understand that the drafters of A. 6952 were not informed as to the availability of such coverage for special activities and were not informed as to the need for such coverage in the field of nuclear energy liability protection.

In the nuclear energy field it has been basic national policy, which New York State has endorsed repeatedly, that protection against potential damage be provided to the public, including protection against financial loss, whether that loss be due to dramatic "sudden" events or by events over a longer course of time, including leakage or slow discharge or release. Such protection is mandated by Federal statute for nuclear facilities (the Price-Anderson Act, 42 USC 2210).

Inadvertently, it appeared that A. 6952 would have resulted in denying such protection provided by Federally approved nuclear energy liability insurance policies for facilities in New York State.

Senate 7042 corrects this inadvertent oversight and provides for a continuation of such financial protection of the public in New York State against damage that might result from leakage or slow discharge of nuclear materials from nuclear facilities, including larger facilities such as those licensed by the U.S. Atomic Energy Commission and smaller facilities such as universities, hospitals, factories, etc., where atomic energy activities are authorized under State jurisdiction as meeting the same high standards of radiation protection as Federal standards, in a regulatory program compatible with the Federal regulatory program.

We repeat for clarity that S. 7042 must be considered together with A. 6952, if A. 6952 is not approved S. 7042 should not be approved since it is corrective of A. 6952. If A. 6952 is approved, S. 7042 must be approved in order to continue adequate financial protection to the people of New York State.

We note that the particular language used in this bill is not fully consistent with similar terminology used in the nuclear energy field (e.g., facilities). We would suggest that it would be extremely helpful for future interpretation if the Approval Message clarified the language used. Without being presumptuous, we would suggest language such as that used in the 5th paragraph of this letter.

Cordially,

Harry J. O'Donnell

Chap. 766 S-7042

Department of Environmental Conservation June 18, 1971

SENATE

7042 Introduced by Committee on Rules

RECOMMENDATION: The Department of Environmental Conservation has no objection to this bill.

STATUTE INVOLVED: Subdivisions 13 and 14 of section 46 of the Insurance Law as added by Assembly bill 6952 in this legislative session.

EFFECTIVE DATE: September 1, 1971

DISCUSSION:

1. Purpose of bill: To exclude nuclear facilities licensed by the Federal Atomic Energy Commission and the state from the provisions in A6952 which prohibit commercial or industrial enterprises to purchase coverage against environmental pollution.

2. Summary of provisions of bill: Subdivisions 13 and 14 of section 46 of the Insurance Law are amended to accomplish the purpose of the bill as described in item #1 above.

3. Prior legislative history of bill and similar proposals: None

4. Known position of others respecting bill: Unknown

5. Budget implications: None

6. Arguments in support of bill: It has been brought to the attention of this Department that to meet Federal financial responsibility requirements handlers of nuclear material must either be self-insured or insured through a pool against liabilities. Since these responsibility requirements are a prerequisite for any work in this area, the Department has no objection to the bill.

7. Arguments in opposition to bill: It is the belief of this Department that if polluters are allowed to purchase insurance to protect themselves from paying fines and other liabilities which will be imposed upon them for polluting the environment, that the effectiveness of a strengthened enforcement program will be diminished. To make a clean environment a reality, corporate polluters must bear the full cost of despoiling the environment.

8. Reasons for recommendation: The Department realizes that this Chapter amendment may be necessary because of Federal restrictions.

Henry L. Diamond
Commissioner
Environmental Conservation

B-201 Chap. 766

THIRTY-DAY BILL

BUDGET REPORT ON BILLS

Session Year: 1971

SENATE No. 7042

Introduced by: Committee on Rules

ASSEMBLY No.

Law: Insurance

Sections: 46 (13) and (14)

Division of the Budget recommendation on the above bill:

Approve: X Veto: No Objection: No Recommendation:
(but see recommendation)

1-2. Subject and purpose and summary of provisions: This bill, which would take effect September 1, 1971, would amend subsections 13 and 14 of section 46 of the Insurance Law to exempt from the provision forbidding the sale of policies to protect against the liability of commercial enterprises resulting from pollution of the environment, those policies issued to fulfill requirements of Federal law or on risks connected with atomic energy plants licensed, as meeting Federal standards of radiological health and safety, by the Atomic Energy Commission or by the State of New York.

3. Prior legislative history: The provision prohibiting the sale of all policies which would protect commercial enterprises from liability resulting from pollution of the environment was a 1971 Governor's program bill (A. 6952) and is currently awaiting his signature.

4. Arguments in support: This bill would provide that policies which must be purchased pursuant to Federal law by corporations engaged in certain regulated activities, including production of nuclear energy, would be available in New York. A. 6952, if approved, would have the effect of prohibiting issuance of all liability insurance that would insure against environmental pollution or contamination. The exemption for nuclear energy producers is necessary because of Federal requirements mandating such insurance.

5. Possible objections: None known.

6. Other State agencies interested: The Insurance Department and the Department of Environmental Conservation would be concerned with this bill.

7. Known position of others: None known.

8. Budget implications: None for the State.

9. Recommendation: The Division of the Budget recommends approval of this bill. Its enactment will prevent a conflict between State and Federal requirements with regard to liability insurance for industrial corporations. It is only necessary, however, if the Governor approves A. 6952.

Charles W. Calmer

Date June 22, 1971 Examiner: Lee Vaughan

Lee Vaughan

LV:fd

Disposition: Chapter No. Veto No.

JOM

t.f. Bonnyard S-7042

LILCO LONG ISLAND LIGHTING

# LONG ISLAND LIGHTING COMPANY

EXECUTIVE OFFICES: 250 OLD COUNTRY ROAD · MINEOLA, NEW YORK 11501

Chap. 766

EDWARD M. BARRETT
GENERAL COUNSEL
EDWARD J. WALSH, JR.
GENERAL ATTORNEY
FRANCIS M. WALSH
GENERAL CLAIMS ATTORNEY

(516) 747-1000

IRA L. FREILICHER
HERBERT M. LEIMAN
ROY E. MONACO
JAMES J. STOKER, III
JONATHAN BLANK
ATTORNEYS

June 18, 1971

Hon. Michael Whiteman
Counsel to the Governor
The Capitol
Albany, New York 12224

Re: AN ACT to amend the insurance law, in relation to prohibiting coverage against environmental pollution (Assembly 6952, Mr. Harris)

AN ACT to amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements (Senate 7042, Rules Committee)

Dear Mr. Whiteman:

We are enclosing two copies of our memorandum requesting the disapproval of the above entitled bills.

Yours very truly,

Edward J. Walsh, Jr.
Edward J. Walsh, Jr.

EJW:lb
Encls.

AN ACT to amend the insurance law, in relation to prohibiting coverage against environmental pollution (Assembly 6952, Mr. Harris)

AN ACT to amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements (Senate 7042, Rules Committee)

These two bills would preclude any commercial or industrial enterprise from obtaining insurance to protect itself from liability arising out of the discharge of a pollutant unless that discharge is sudden and accidental. The underlying reason for these bills appears to be that "a corporation might continue to pollute the environment if it could buy protection from potential liability for only the small cost of an annual insurance premium, whereas, it might stop polluting if it had to risk bearing itself the full penalty for violating the law."

We believe the bills should be disapproved because the reasoning underlying the bills is fallacious. The bills erroneously assume that insurance companies will provide a polluter with insurance against liability for continuous acts of pollution at a small annual premium cost. We submit that experience demonstrates that this is not the fact. The insurance companies will either refuse to insure where frequent claims are made or will increase the premiums to reflect claims paid for acts of pollution. Thus, at present, the continuous polluter will be faced with the possibility of being unable to obtain any insurance or with the requirement that he pay prohibitive insurance premiums. Under these circumstances, the bills are actually unnecessary if their sole purpose is to penalize polluters.

However, we submit that the proposed bills may, in fact, be detrimental to the public interest. This is because the proposed bills may have the effect of leaving the public and individual members of the public who suffer serious personal or property damage as a result of acts of pollution unprotected where the polluting enterprise is financially irresponsible. Thus, for instance, where a member of the public suffers serious personal injury or death through an act of pollution by a small enterprise there may be no recovery because the enterprise has insufficient worth.

We think it also worth noting that the bills could force many small enterprises into bankruptcy as a result of one act of ordinary negligence by an employee, which under the broad language of these bills would be classified as an act of pollution.

It is respectfully submitted that the purpose of legislation in this area should be to protect the public. This protection could be more readily accomplished by requiring compulsory insurance against pollution rather than prohibiting insurance. In this way, continuous polluters will be deterred because the insurance premium rates will reflect the insurance companies' experience with each individual polluter.

June 18, 1971

Long Island Lighting Company
250 Old Country Road
Mineola, New York 11501

S-7042

The City of New York

ALBANY OFFICE
SUITE 203 — 111 WASHINGTON AVENUE, ALBANY, N.Y. 12210
Telephone: Area Code 518-462-5611

RICHARD A. BROWN, *Legislative Representative*

June 25, 1971

M E M O R A N D U M

TO: MICHAEL WHITEMAN, Counsel to the Governor

FROM: RICHARD A. BROWN, Legislative Representative

RE: S.7042 - by Rules

AN ACT To amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements

You have requested the comments and recommendation of the Mayor concerning the above bill which is before the Governor for executive action.

Please be advised that the Mayor has no recommendation with respect to said legislation.

RICHARD A. BROWN
Legislative Representative

13

LEONARD FELDMAN
ATTORNEY AT LAW
TWO PENNSYLVANIA PLAZA
NEW YORK, N.Y. 10001

7 LINDEN BOULEVARD
GREAT NECK, N.Y. 11021

June 18, 1971

Hon. Michael Whiteman
Executive Chamber
State Capitol
Albany, N. Y. 12224

RE: Senate 6966
Assembly 7573
Senate 3682-D
Assembly 1781-B
Senate 3609 -- Assembly 4150
" 5677
" 6355
" 6445-A
" 6370-A
Assembly 124-B
Senate 7044
Assembly 5068-A
Senate 6792
Assembly 4444
" 7976
" 7608
" 7607
" 7605
" 7604
Senate 7042
Assembly 3108
Senate 7020
Assembly 7843
" 7984-A
Senate 4888

My dear Mr. Whiteman

Since none of the committees of the New York County Lawyers' Association reported on the above bills, it would be inappropriate for me to comment with regard thereto.

Sincerely,

Leonard Feldman

LF:e

TO COUNSEL TO THE GOVERNOR

RE: SENATE 7042

ASSEMBLY

Inasmuch as this bill does not appear to involve a legal problem nor to relate to the functions of the Department of Law, I am not commenting thereon. However, if there is a particular aspect of the bill upon which you wish comment, please advise me.

Dated: June 11, 1971

LOUIS J. LEFKOWITZ
Attorney General

1971 APR 18 PM 6 24

THIS IS THE BEST COPY AVAILABLE DUE TO THE POOR CONDITION OF ORIGINALS AND/OR THE POOR QUALITY OF MICROFILM

[illegible] ENVIRONMENTAL POLLUTION [illegible] INSURANCE [illegible] IN RELATION TO [illegible] FINANCIAL RESPONSIBILITY REQUIREMENTS [illegible]

[illegible] BILLS WOULD PRECLUDE ANY COMMERCIAL OR INDUSTRIAL [illegible] INSURANCE TO PROTECT [illegible] DISCHARGE OF A POLLUTANT UNLESS THAT [illegible] ACCIDENTAL. THE UNDERLYING REASON FOR [illegible] THAT "A CORPORATION [illegible] CONTINUE TO [illegible] IF IT COULD [illegible] POTENTIAL LIABILITY FOR [illegible] OF AN ANNUAL INSURANCE PREMIUM, WHEREAS [illegible] TO [illegible] ITSELF [illegible] LAW."

[illegible] OF BILLS SHOULD [illegible] DISAPPROVED BECAUSE THE [illegible] THE BILLS IS FALLACIOUS [illegible] BILLS [illegible] INSURANCE COMPANIES WILL PROVIDE A POLLUTOR WITH INSURANCE [illegible] LIABILITY FOR CONTINUOUS ACTS OF POLLUTION [illegible] ANNUAL PREMIUM COST. WE SUBMIT THAT EXPERIENCE [illegible] IS NOT THE FACT, THE INSURANCE COMPANIES [illegible] TO INSURE WHERE [illegible] ARE MADE [illegible] THE PREMIUMS TO REFLECT CLAIMS PAID FOR ACTS OF POLLUTION. THUS, AT PRESENT, THE CONTINUOUS POLLUTOR [illegible] WITH THE POSSIBILITY OF BEING UNABLE TO OBTAIN [illegible] INSURANCE OR WITH THE REQUIREMENT THAT HE PAY [illegible] UNDER THESE CIRCUMSTANCES, THE BILLS ARE [illegible] ANY OF THEIR SOLE PURPOSE IS TO PENALIZE POLLUTERS. [illegible] SUBMIT THAT THE PROPOSED BILLS MAY, IN FACT, [illegible] TO THE PUBLIC INTEREST. THIS IS [illegible] HAVE THE EFFECT OF LEAVING THE PUBLIC AND INDIVIDUAL [illegible] WHO SUFFER SERIOUS PERSONAL OR PROPERTY [illegible] A RESULT OF POLLUTION UNPROTECTED [illegible] THE [illegible]

[illegible] FINANCIALLY [illegible] SIBLE. [illegible] FOR [illegible] PUBLIC SUFFERS [illegible] ACT OF POLLUTION [illegible] BECAUSE THE [illegible] INSUFFICIENT [illegible] ALSO [illegible] NOTICE THAT THE BILLS COULD [illegible] WHICH UNDER [illegible] THESE BILLS [illegible]

[illegible]

[illegible] THE PUBLIC [illegible]

[illegible] INSURANCE [illegible] RATES WILL REFLECT THE [illegible] WITH [illegible] ATTORNEY [illegible]

STATE OF NEW YORK
EXECUTIVE CHAMBER
ALBANY 12224

JUN 25 1971

MEMORANDUM filed with the following bills:

Assembly Bill Number 6952, entitled:

#52

"AN ACT to amend the insurance law, in relation to prohibiting coverage against environmental pollution"

Senate Bill Number 7042, entitled:

#53

"AN ACT to amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements"

A P P R O V E D

These bills, part of my environmental program, will prohibit commercial and industrial enterprises from purchasing insurance to protect themselves against liabilities arising out of their pollution of the environment where such prohibition is an appropriate measure for environmental protection.

New York State has adopted stringent standards to prohibit despoiling our environment through the discharge of noxious substances into the water and air. These standards, which are the most comprehensive in the Nation, go far beyond merely strengthening and supplementing the common law rules against pollution.

As strict as these laws are, however, their effectiveness would be substantially reduced if polluters were able to insure themselves against having to pay the fines and other liabilities that may be imposed upon them for polluting.

Many insurance companies have voluntarily initiated action to protect the environment by refusing to insure against liability arising out of environmental pollution.

The bill will help to assure that corporate polluters bear the full burden of their own actions spoiling the environment, and will preclude any insurance company from undermining public policy by offering this type of insurance protection.

Excepted only from this measure are insurance necessary to meet Federal financial responsibility standards and insurance covering certain nuclear risks in cases where stringent regulation provides adequate environmental protection.

The bills are approved.

(signed) NELSON A. ROCKEFELLER

This document has been added by
New York Legislative Service, Inc.
The Governor's Bill Jacket does not contain these pages. However, we feel that they may be helpful.

# EXHIBIT 9

# SENATE DEBATE TRANSCRIPTS

## 1971
## CHAPTER 766

### 3 PAGES

INSURANCE LAW

This document has been added to the Governor's Bill Jacket by **New York Legislative Service, Inc.** as part of our proprietary legislative history.

**NEW YORK LEGISLATIVE SERVICE, INC.**
The Research Specialists on Legislative Intent and Current Legislation.
A NEW YORK NOT-FOR-PROFIT CORPORATION. ESTABLISHED 1932.
15 Maiden Lane, New York, NY 10038 (212) 962-2826 www.nyls.org

414 THIRD READING NO. 2410
PRINT NO. 7042

An act to amend the insurance law, in relation to nuclear facilities and federal financial responsibility requirements.

SENATOR SEYMOUR R. THALER: Explanation, please.

THE PRESIDENT: An explnation is sought.

Senator Gordon.

SENATOR BERNARD G. GORDON: Earlier this year, Mr. President, we had passed legislation affecting the issuance of insurance, and this is a chapter amendment which -- incidentally, the bill we passed had to do with pollution insurance and that type of thing that Senator Greenberg --

SENATOR GREENBERG: Has that bill been signed into law yet?

SENATOR GORDON: No, not yet, but this is a chapter amendment to the law and this exempts nuclear plants from the prohibition against them having insurance, one of the reasons, of course, being that the nuclear plants are supervised by the AEC and various State agencies, and the Power Authority has no capital as a State agency as far as their bonds are concerned so they have to have this insurance as part of their protection for the plants themselves. This is a necessary exception to the bill we passed earlier.

SENATOR JEREMIAH B. BLOOM: Will Senator Gordon yield to a question?

415 SENATOR GORDON: Yes.

THE PRESIDENT: Senator Bloom.

SENATOR BLOOM: Will you tell me what other facilities there are in this State that might possibly insure these people?

SENATOR GORDON: You are referring --

SENATOR BLOOM: Other than the nuclear plants.

SENATOR GORDON: Well, there are also ships that are in the State here that come into the State that must carry insurance and there was some fear that those kind of vessels would be excluded from having insurance, and therefore the wording as far as "satisfying the financial responsibility requirements of any Federal law" has been inserted to cover that kind of a situation also.

SENATOR BLOOM: What protection is there to the people from the plants that we exempt here, the utilities and --

SENATOR GORDON: Insurance cannot be written for them. This is an exception allowing insurance to be written for the nuclear plants.

SENATOR BLOOM: The way I read it they are exempt. "Policies except those covering" --

SENATOR GORDON: After the new material, Senator, on line 13 you have to read on and read the rest of the paragraph which is the all-inclusive paragraph which says that they cannot purchase this

4 1 6 (Senator Gordon, continuing)

kind of pollution insurance, except now for the nuclear plant situation.

THE PRESIDENT: With respect to this bill, the Governor has transmitted a message of necessity pursuant to the provisions of Article III, Section 14 of the Constitution. Read the last section.

THE SECRETARY: Section 3. This act shall take effect September 1st.

THE PRESIDENT: Call the roll.

THE SECRETARY: Ayes 50, nays 6. Those recorded in the negative are Senators Bookson, Ferraro, Griffin, Halperin, Powers and Schwartz.

THE PRESIDENT: The bill is passed.

THIRD READING NO. 2381
PRINT NO. 6928

An act to amend the election law, in relation to authorizing the county committee to adopt rules providing for the continuance in office without a primary of incumbent county committeemen and district leaders under certain circumstances.

SENATOR JOSEPH ZARETZKI: Lay it aside.

THE PRESIDENT: Senator Brydges, there is a request made to lay aside 2381. Senator Calandra has volunteered to explain it.

SENATOR ZARETZKI: No, I want to lay it aside.

SENATOR BRYDGES: Are we on