Originally filed under seal at Docket 395 on Nov 25, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVELERS INDEMNITY COMPANY, TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, formerly known as TRAVELERS INDEMNITY COMPANY OF RHODE ISLAND, TRAVELERS CASUALTY AND SURETY COMPANY, formerly known as THE AETNA CASUALTY AND SURETY COMPANY, and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, formerly known as TRAVELERS INDEMNITY COMPANY OF ILLINOIS,

Plaintiffs,

vs.

NORTHROP GRUMMAN CORPORATION, successor in interest to GRUMMAN CORPORATION, NORTHROP GRUMMAN SYSTEMS CORPORATION, successor in interest to GRUMMAN AEROSPACE CORPORATION,

Defendants,

*and*

CENTURY INDEMNITY COMPANY, eventual successor in interest to INSURANCE COMPANY OF NORTH AMERICA,

Nominal Defendant.

**CASE NO.: 1:12-cv-03040-KBF**

**AMENDED STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1 IN SUPPORT OF TRAVELERS' MOTION FOR SUMMARY JUDGMENT REGARDING THE BETHPAGE FACILITY**

**ORAL ARGUMENT REQUESTED**

**ECF CASE**

**AMENDED STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1 IN SUPPORT OF TRAVELERS' MOTION FOR SUMMARY JUDGMENT THAT THERE IS NO COVERAGE FOR THE BETHPAGE FACILITY BECAUSE (A) COVERAGE IS EXCLUDED BY THE POLLUTION EXCLUSIONS IN CERTAIN POLICIES AND (B) GRUMMAN VIOLATED THE POLICIES' NOTICE AND VOLUNTARY PAYMENTS PROVISIONS**

**(FILED UNDER SEAL PURSUANT TO STIPULATED PROTECTIVE ORDER)**

Pursuant to Local Civil Rule 56.1(a) of the Civil Rules of the United States District Court for the Southern District of New York, Plaintiffs and Counterclaim Defendants The Travelers Entities[1] (collectively, "Travelers") state that there is no genuine issue to be tried with respect to the following material facts:

1. From the 1930s to the 1990s, in connection with its manufacture of airplanes, weapons and satellites, Grumman generated, stored, and disposed of contaminants and manufacturing wastes at its Bethpage, New York facility (the "Bethpage Facility").[2]

2. As a result of Grumman's manufacturing activities and disposal practices, a contaminated 700-foot-deep groundwater plume estimated to span more than 2,000 acres now migrates from the Bethpage Facility.[3]

3. Volatile organic compounds ("VOCs"), including specifically TCE and its breakdown products, are the primary contaminants of concern in the plume.[4]

---

[1] The Travelers Entities include The Travelers Indemnity Company, The Travelers Indemnity Company of Connecticut, formerly known as The Travelers Indemnity Company of Rhode Island, Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company, and Travelers Property Casualty Company of America, formerly known as The Travelers Indemnity Company of Illinois. Northrop Grumman Corporation, Northrop Grumman Systems Corporation, and all predecessors in interest are referred to herein as "Grumman."

[2] Declaration of Meghan E. Cannella, Esq., dated October 21, 2013 ("Cannella Decl.") Ex. 59, Record of Decision, Northrop Grumman and Naval Weapons Industrial Reserve Plant Sites, Operable Unit Number: 02, State Superfund Project, Bethpage, Nassau County, Site No. 130003A & B, Prepared by Division of Environmental Remediation, New York State Department of Environmental Conservation, dated March 2001 ("2001 OU2 ROD"), at NGINS000010540.

[3] Cannella Decl. Ex. 90, Deposition Transcript of Larry L. Leskovjan, dated August 9, 2013 ("Leskovjan Depo. Tr."), at 71:16-72:3; Cannella Decl. Ex. 54, Memo from L.L. Leskovjan to M. D. Mroz, dated February 16, 1998, at NGINS000380485; Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010548.

[4] Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010547-48.

### A. Grumman's Long-Term Manufacturing And Waste Disposal Practices Caused Contamination At The Bethpage Facility

4. Grumman's 600-acre Bethpage Facility was established in the 1930s.[5]

5. Grumman used and stored TCE at the Bethpage Facility.[6]

6. A 105-acre sub-part of the Facility (called the Bethpage Naval Weapons Industrial Reserve Plant ("Bethpage NWIRP Site")), was owned by the United States Navy but operated by Grumman, beginning in 1933.[7]

7. Grumman's operations at the Bethpage NWIRP Site, like its activities at the remainder of the Bethpage Facility, involved the generation, storage, treatment, and disposal of hazardous materials, including volatile organic compounds ("VOCs"), perchloroethene ("PCE") and TCE; semi-volatile organic compounds ("SVOCs"); polychlorinated biphenyls ("PCBs"); and chromium and cadmium.[8]

### B. Grumman Intentionally Disposed Of Hazardous Wastes Directly On The Ground In The 1930s And 1940s

8. Grumman used TCE "all over the place" in its manufacturing operations at the Bethpage Facility, including particularly at Plants 1, 2, 3, 5, and 12.[9]

---

5 *Id.* at NGINS000010540; Cannella Decl. Ex. 76, Deposition Transcript of Jean-Pierre Cofman, dated May 23, 2013 ("Cofman Day 1 Depo. Tr."), at 99:6-8.

6 Cannella Decl. Ex. 59, 2001 OU2 ROD at NGINS000010540; Cannella Decl. Ex. 83, Deposition Transcript of Anthony Lucidi, dated June 21, 2013 ("Lucidi Depo. Tr."), at 34:2-11.

7 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010540-41.

8 *Id.* at NGINS000010540, NGINS000010547-48; Cannella Decl. Ex. 63, Record of Decision, Naval Weapons Industrial Reserve Plant, Bethpage, New York, Operable Unit 2, Groundwater, NYS Registry: 1-30-003B, prepared by Naval Facilities Engineering Command in consultation with the New York State Department of Environmental Conservation, dated January 2003 ("2003 ROD"), at NGINS000176749.

9 Cannella Decl. Ex. 83, Lucidi Depo. Tr., at 34:2-11; Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 79:11-22.

9. Grumman used TCE beginning in the late 1930s through at least 1994.[10]

10. It used the TCE at the Bethpage Facility primarily as a cleaning solvent for metal parts, and in particular, in its vapor degreasers.[11]

11. Grumman employees put metal parts into the degreasers, which used heated TCE to remove grease and/or oil from the metal parts.[12]

12. Plants 1, 2, and 3 each contained vapor degreasers that used TCE.[13] There was one vapor degreaser at Plant 1.[14] There were three to five vapor degreasers at Plant 2.[15] There were three vapor degreasers at Plant 3.[16]

13. The degreasers in Plant 2 had hand-held attachments, called "spray wands," which Grumman employees used to spray TCE onto large parts.[17]

14. There were no degreasers at Plant 5, but Grumman employees also used TCE to clean parts there.[18]

15. Grumman also used TCE and other VOCs in the "paint shop" in Plant 2, where airplanes were painted. Grumman's employees sprayed paint containing VOCs through hoses to

---

10 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 77:4-79:5.

11 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 79:6-8, 83:7-23.

12 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 84:12-85:17.

13 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 83:7-23, 108:20-109:4, 167:15-24.

14 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 83:7-23.

15 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 108:20-109:4; Cannella Decl. Ex. 77, Deposition Transcript of William Kovarik, dated May 24, 2013 ("Kovarik Depo. Tr."), at 51:16-21.

16 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr. at 167:15-24.

17 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 136:7-137:25.

18 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 178:20-22.

apply paint to planes.[19]

16. A "waterfall" in the paint shop was intended to keep sprayed paint from escaping.[20]

17. Water circulated through a closed system and cascaded down the sides of the paint shop to catch paint overspray. The water (and the captured paint overspray) circulated through troughs on the floor of the paint shop, and then back through the waterfalls.[21]

18. Sludges collected at the bottom of the paint shop, which Grumman cleaned up using rags.[22]

19. Grumman employees wiped down the "paint curtains" using rags and TCE.[23]

20. Grumman also cleaned smaller parts at Plant 2 with rags and TCE.[24]

21. Grumman dug "recharge basins" directly into the ground throughout the Bethpage Facility, which it used to dispose of wastewaters.[25]

---

19 Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 75:19-76:5; Cannella Decl. Ex. 76, Cofman Day 1 Depo Tr., at 145:8-16.

20 Cannella Decl. Ex. 52, Deposition Transcript of Robert Jasinkonis, dated October 5, 1995 in action captioned *Town of Oyster Bay v. Occidental Chemical Corp.*, *et al.*, 94-civ-1694 (FB) ("1995 Jasinkonis Depo. Tr."), at 129:3-18, 135:14-136:2; Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 72:18-74:4.

21 Cannella Decl. Ex. 52, 1995 Jasinkonis Depo. Tr., at 129:3-18; Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 72:18-74:4; Cannella Decl. Ex. 72, Deposition Transcript of Clyde Stover, dated May 1, 2013 ("Stover Depo. Tr."), at 79:15-80:21.

22 Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 73:6-74:4; Cannella Decl. Ex. 75, Deposition of Robert Jasinkonis, dated May 16, 2013 ("Jasinkonis Day 1 Depo. Tr."), at 110:12-111:19.

23 Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 110:12-111:19; Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 143:20-144:3; Cannella Decl. Ex. 90, Leskovjan Depo. Tr., at 175:6-12.

24 Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 70:6-20.

25 Cannella Decl. Ex. 76, Cofman Depo. Tr., at 182:6-13; 185:23-186:6; Cannella Decl. Ex. 62, Notes taken from Meeting with Robert Jasinkonis and John Ohlmann on November 20, 2002 ("Jasinkonis Meeting Notes"), at NGINS002996240.

22. Recharge basins are "excavation[s] in the ground that[] [are] used for conveying water, normally storm water or wastewater, in order that the water be allowed to infiltrate back into the ground. It's a way of getting rid of water, returning it back to the groundwater."[26]

23. There were at least a dozen recharge basins across the Facility, some as large as a football field. [27]

24. Until 1949, Grumman discharged storm water and wastewater from Plant 2 into six recharge basins southeast of Plant 2.[28]

25. Before 1984, Grumman discharged production-line rinse waters—approximately 7 million gallons per week—that had been directly exposed to chemicals from rinsing manufactured parts at Plant 3 into three recharge basins northeast of Plant 3.[29]

26. Grumman allowed storm and wastewater from Plant 5 to drain into two recharge basins southeast of Plant 5.[30]

27. Grumman's practice of discharging contaminated wastewaters into its recharge basins all around the Bethpage Facility continued throughout the 1940s.[31]

28. When the recharge basins became clogged and water could no longer percolate into

---

26 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 182:6-13; *see also* Cannella Decl. Ex. 82, Deposition Transcript of William Skinner, dated June 20, 2013 ("Skinner Depo. Tr."), at 104:5-13; Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 37:25-38:19.

27 Cannella Decl. Ex. 52, 1995 Jasinkonis Depo. Tr., at 61:12-23; *see also* Appendix A to Memo. of Law.

28 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 186:17-20, 191:12-192:9.

29 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010541; Cannella Decl. Ex. 43, Remedial Investigation/Feasibility Study Work Plan for Grumman Aerospace Corporation, Volume II, dated March 1990 ("RI/FS 1990"), at NGINS000210614; *see also* Appendix A to Memo. of Law.

30 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 186:7-25.

31 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010540; Cannella Decl. Ex. 62, Jasinkonis Meeting Notes, at NGINS002996240.

the ground, Grumman scraped the basins using bulldozers.[32]

29. Contaminated scrapings were used to fill in low lying areas on the Bethpage Facility.[33]

30. Between 1943 and 1949, Grumman disposed of its chromium-contaminated industrial wastes generated through manufacturing operations at the Bethpage Facility directly into open seepage bins on the property.[34]

31. By 1947, because a local municipal drinking water supply well was contaminated with chromium, the Nassau County Department of Health ("NCDOH") instructed Grumman to stop disposing wastewater from Plant 2 into recharge basins.[35]

32. Three other off-site wells were later closed for the same reason.[36]

33. In or around 1949, Grumman built an Industrial Wastewater Treatment Facility ("IWTF") outside of Plant 2, to remove chromic acid wastes from its industrial wastewater.[37]

34. The IWTF did not treat Grumman's wastewater for TCE contamination.[38]

35. The IWTF discharged chromium-treated water into the Plant 2 recharge basins.[39]

36. Sludges produced by the IWTF may have been contaminated with chromium and

---

32 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 187:2-18, 189:24-190:23.

33 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 187:24-188:6.

34 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010540; Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 99:17-100:16, 102:2-103:15.

35 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010543; Cannella Decl. Ex. 62, Jasinkonis Meeting Notes, at NGINS002996240.

36 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010543.

37 *Id.* at NGINS000010540, NGINS000010543.

38 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 192:25-193:10.

39 Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 91:4-92:9; Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 191:17-192:9.

other contaminants, including TCE and vinyl chloride.[40]

37. Grumman pumped these sludges into two 2,000 gallon holding tanks outside of Plant 2.[41]

38. Grumman employees took these sludges to "sludge drying beds" at the property now known as the Bethpage Community Park.[42]

39. The purpose of the sludge drying beds was to allow residual water in the sludge to seep into the ground, leaving dried sludge behind.[43]

40. In operation from the 1940s until the mid to late 1970s, the TCE recycling facility "cleaned" used TCE so it could be re-used.[44]

41. The "dirty" TCE was sent to the recycling facility from Plant 2 after Grumman employees pumped used TCE out of the degreasers into drums.[45]

42. Grumman maintained a large above-ground storage tank containing TCE to the northeast of Plant 2, near the TCE recycling facility.[46]

43. This tank stored TCE and was used to fill the degreasers with new TCE when dirty

---

40 Cannella Decl. Ex. 51, Responses of Defendants Grumman Corporation and Grumman Aerospace Corporation to Plaintiff's First Set of Interrogatories, Document Requests and Requests for Admission, dated July 26, 1995, in action captioned *Town of Oyster Bay v. Occidental Chemical Corp., et al.*, 94-Civ-0694 (FB) ("Grumman Responses"), at NGINS000404653.

41 Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 93:24-94:20.

42 Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 98:24-99:7.

43 Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 99:8-100:2.

44 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 135:18-136:6.

45 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 135:18-136:25.

46 Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 50:13-16; Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 209:4-11.

TCE was removed for cleaning.[47]

44. Grumman maintained its TCE storage tank until the mid-1990s.[48]

45. In the early 1970s, the meter on the TCE storage tank at Plant 2 indicated that the tank was "losing" TCE.[49]

46. Aware that it was losing TCE for two to three years, Grumman accused employees of overfilling the smaller degreaser tanks within Plant 2.[50]

47. Grumman determined that the bottom of the two-story and fifteen foot wide TCE storage tank had corroded and leaked TCE directly onto the sandy ground.[51]

48. Grumman replaced the tank after it leaked for years and discharged "a lot" of TCE.[52]

**C. Grumman Continued Intentionally Depositing Hazardous Waste On Its Property In The 1950s And 1960s**

49. Beginning in at least 1954 and through the 1960s, "once every couple of weeks," Grumman sprayed waste oil on the roads at the Bethpage Facility to control dust.[53]

50. The "waste oil" likely contained "any number of contaminants," including TCE.[54]

51. From the early 1950s through 1978, Grumman maintained a "Drum Marshaling

---

[47] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 57:11-58:19, 60:17-61:14.

[48] Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 209:12-15.

[49] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 62:11-63:16.

[50] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 62:11-63:16, 147:7-14.

[51] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 62:11-63:16, 148:8-15.

[52] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 62:11-63:16, 66:25-67:9, 146:11-19, 147:7-14.

[53] Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 20:18-22:9, 24:3-12; Cannella Decl. Ex. 88, Deposition Transcript of Robert Jasinkonis, dated July 23, 2013 ("Jasinkonis Day 2 Depo. Tr."), at 328:17-22.

[54] Cannella Decl. Ex. 86, Deposition Transcript of Jean-Pierre Cofman, dated July 17, 2013 ("Cofman Day 2 Depo. Tr."), at 404:25-405:7.

Area" north of Plant 3.[55]

52. From the early 1950s to 1978, Grumman stored drums of waste materials, including TCE, in this "cinder covered area over a cesspool leach field.[56]

53. In 1978, Grumman moved the Drum Marshaling Area a few yards to the south to a concrete pad that "did not have a cover or berm around it."[57]

54. In 1982, Grumman moved the Drum Marshaling Area to the northeast of Plant 3.[58]

55. Between 200 and 300 drums of waste were stored, without protection from rain or corrosion, at each area at any given time.[59]

56. The Drum Marshaling Area is an identified as a source of contamination.[60]

57. Grumman also stored fixtures, tools and metallic wastes, such as aluminum and titanium scraps at the "Salvage Storage Area" outside of Plant 3 beginning in the early 1950s.[61]

58. The scrap metals were contaminated with "cutting oil" that dripped from the metal or washed off with rain water.[62]

---

55 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010541.

56 *Id.*; Cannella Decl. Ex. 27, Initial Assessment Study of NWIRP Bethpage, NY and NWIRP Calverton, NY, Prepared by Rogers, Golden & Halpern, dated December 1986 ("IAS"), at NGINS000599999.

57 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010541; Cannella Decl. Ex. 27, IAS, at NGINS000599999-601.

58 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010541; Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 206:18-207:8; Cannella Decl. Ex. 27, IAS, at NGINS000600001.

59 Cannella Decl. Ex. 27, IAS, at NGINS000600001.

60 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010541.

61 *Id.* at NGINS000010541-42.

62 Cannella Decl. Ex. 43, RI/FS 1990, at NGINS000210617; Cannella Decl. 53, Record of Decision, Naval Weapons Industrial Reserve Plant, Bethpage, New York, Sites 1, 2, 3, NYS Registry: 1-30-003B, prepared by Northern Division Naval Facilities Engineering Command and

59. Within the Salvage Storage Area, Grumman store drummed waste in an area that was "covered with coal ash cinders."[63]

60. Paint waste, halogenated and non-halogenated waste solvents were stored at the Salvage Storage Area from the early 1950s through 1969.[64]

61. In or around 1960, Grumman installed three "honeycomb" autoclaves at Plant 3, for use in heating and hardening parts.[65]

62. Two of the Plant 3 autoclaves used a heat transfer fluid called Therminol, which consisted 97-98% of PCBs.[66] The two autoclaves were operational until the early 1980s.[67]

63. While the autoclaves were in operation, Grumman periodically released PCB-containing fluids from the autoclaves into the Plant 3 recharge basins through floor drains.[68]

64. In 1962, Grumman dug new sludge drying beds at Plant 3 because it had transferred Community Park property to the Town.[69]

65. The four new sludge drying beds were dug directly in the ground north of Plant 3.[70]

66. After 1962, Grumman disposed of TCE-contaminated sludges generated by the

---

New York State Department of Environmental Conservation, dated May 1995 ("May 1995 ROD"), at NGINS000126492.

63 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010541-42.

64 *Id.*

65 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 176:22-177:20, 293:13-25, 295:3-19.

66 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 294:2-295:2.

67 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 296:4-7.

68 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 302:4-20.

69 Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 103:12-106:8.

70 Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 103:12-104:2; Appendix A to Memo. of Law.

IWTF at these sludge drying beds at Plant 3.[71]

**D. Grumman Was Aware Of Contamination At The Bethpage Facility By The 1970s**

67. In the early to mid-1970s, Grumman employees complained that they tasted TCE in the water at the Bethpage Facility.[72]

68. Former Grumman employee William Kovarik testified that he knew TCE was in the water because drinking it would cause him to burp, and his burp smelled like TCE.[73]

69. Kovarik reported this to his boss in the early 1970s.[74]

70. Kovarik recalled that it was widely known at Grumman in the early 1970s that there was TCE in the drinking water.[75]

71. In approximately 1973, Grumman's manager of environmental protection, John Ohlmann learned of taste and odor problems at a newly-opened well at the Bethpage Facility.[76] Ohlmann reported the taste and odor problem to NCDOH.[77]

72. In 1974, Grumman tested its onsite wells and discovered that the water contained

---

[71] Cannella Decl. Ex. 75, Jasinkonis Day 1 Depo. Tr., at 104:16-106:8; Cannella Decl. Ex. 51, Grumman Responses, at NGINS000404653.

[72] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 62:11-65:11; Cannella Decl. Ex. 85, Deposition Transcript of Michael Alarcon, Rule 30(b)(6) witness for the Nassau County of Department of Health ("NCDOH"), dated July 12, 2013 ("NCDOH Depo. Tr."), at 42:14-43:22, 51:11-51:21; Cannella Decl. Ex. 6, compendium of news articles dated from November 27, 1976 to January 18, 1977, titled the "Water Story" (the "Water Story"), at NGINS000876096.

[73] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 144:24-145:14.

[74] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 64:9-25.

[75] Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 64:22-65:11.

[76] Cannella Decl. Ex. 79, Deposition Transcript of John Ohlmann, dated June 12, 2013 ("Ohlmann Depo. Tr."), at 125:15-126:16.

[77] *Id.*

various hydrocarbons.[78]

73. Grumman replaced certain wells "due to problems of deterioration and odor," and abandoned a number of other onsite wells due to peculiar tastes and a "sweet paint" odor.[79]

74. By 1975, results from Grumman's sampling of the groundwater at the Bethpage Facility revealed the presence of TCE, tetra-chloroethylene, di-chloroethlyene and vinyl chloride in its on-site well water.[80]

75. Grumman discovered TCE contamination in the soil and groundwater by 1976.[81]

76. NCDOH noted that the presence of these chemicals in Grumman's water indicated "direct contamination of water supplies by industrial wastes."[82]

77. NCDOH also noted that "[t]he discharge of sanitary and industrial wastes at and in the vicinity of the Grumman Corporation is considered responsible for the degradation in quality of Grumman Corporation wells."[83]

78. Grumman expressed "deep concern that immediate action be taken to determine the

---

78 Cannella Decl. Ex. 6, Water Story, at NGINS000876096; Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010543.

79 Cannella Decl. Ex. 43, RI/FS 1990, at NGINS000210671; Cannella Decl. Ex. 2, Nassau County Department of Health Memorandum, titled "Summary of Groundwater Quality – Grumman Aerospace Corporation," dated November 5, 1975, at NGINS000619195.

80 Cannella Decl. Ex. 43, RI/FS 1990, at NGINS000210678, NGINS000210680, NGINS000210681.

81 Cannella Decl. Ex. 60, Memorandum from J. Cofman to G. Ozima, dated June 15, 2001, at NGINS000401704.

82 Cannella Decl. Ex. 1, Preliminary Report, Groundwater Contamination, Grumman Aerospace Corporation, prepared by Nassau County Department of Health, dated May 1975, at NCDOH-0011455.

83 *Id.*

cause of the contamination problem and to take corrective action."[84]

79. In 1976, NCDOH noted the "possible implication of Grumman discharges" as the source of the contamination.[85]

80. In June 1976, Grumman's consultant advised of a "slug of contaminated ground water . . . underlying at least part of the plant."[86]

81. Grumman's consultant urged Grumman to "obtain their entire potable [water] supply from [the] Bethpage Water District" to "insure clean, uncontaminated drinking water and [to] eliminate the problem of potential adverse health effects."[87]

82. At a December 1976 meeting attended by at least 11 local, state and federal regulatory authorities, including the EPA, NYSDEC and NCDOH, the EPA advised Grumman: "don't drink the water" as it was "unsuitable for human consumption."[88]

83. This meeting was also attended by the New York State Department of Health ("NYSDOH"), the U.S. Geological Survey, the Nassau County Executive, the U.S. FDA, the Suffolk County Department of Health, the Long Island Waste Water Management Study, the Nassau County Department of Public Works, and the Nassau County Water Resources Board.[89]

---

84 Cannella Decl. Ex. 43, RI/FS 1990, at NGINS000210675.

85 Cannella Decl. Ex. 4, Synopsis of Well Contamination Problem at Grumman Aerospace Corporation Facilities in Bethpage, prepared by Nassau County Department of Health, dated November 30, 1976, at NCDOH-0002943.

86 Cannella Decl. Ex. 3, Letter from David Miller of Geraghty & Miller to John Ohlmann of Grumman Aerospace Engineering, dated June 25, 1976 ("June 25, 1976 letter"), at NGINS001899582.

87 *Id.* at NGINS001899585.

88 Cannella Decl. Ex. 5, Letter from David Miller to John Ohlmann, dated December 9, 1976, enclosing handwritten notes from a meeting on December 2, 1976 ("December 2, 1976 meeting notes"), at NGINS001899570, NGINS001899572.

89 *Id.* at NGINS001899567-68.

84. Newspapers reported on the contamination and on public concern about drinking water safety.[90]

85. Grumman then hooked up the town water supply.[91]

86. In 1977, NCDOH requested that Grumman institute a water monitoring program at the Bethpage Facility.[92]

87. NYSDEC specifically required Grumman to analyze for certain VOCs, including TCE.[93]

88. The testing results demonstrated that in at least one instance, concentrations of TCE in the water being recharged to the ground by Grumman were greater than those in the water Grumman was pumping out of the ground.[94]

89. In every case, the water Grumman recharged into the ground showed TCE contamination.[95]

90. The study concluded that the instance where TCE was being recharged in amounts greater than amounts Grumman pumped was "derived from housekeeping practices" and recommended that the "[s]olution to the problem of excess concentrations of certain compounds in the recharge water lies in modifying selected housekeeping procedures."[96]

---

90 Cannella Decl. Ex. 6, Water Story, at NGINS000876095-43.

91 Cannella Decl. Ex. 77, Kovarik Depo. Tr., at 66:2-5.

92 Cannella Decl. Ex. 8, Report to Grumman Aerospace Corporation, Bethpage, New York, Results of October, 1977 Ground Water/Recharge Monitoring Program, dated January 5, 1978 ("1977 Monitoring Results"), at NGINS000768959.

93 *Id.*

94 *Id.* at NGINS000768972-75.

95 *Id.* at NGINS00768972-75, NGINS000769014-16.

96 *Id.* at NGINS00768972, NGINS000768975, NGINS000768958.

91. By 1979, Grumman admitted to NYSDEC that "a housekeeping problem within [its] production plants" caused contamination, and recognized a need "to correct this problem and prevent future discharges."[97]

92. In 1977, NYSDEC conducted a Hazardous Waste Survey at Grumman, recording each "waste stream" on the property.[98]

93. It noted the Bethpage Facility's sludge drying beds at Plant 3 during the visit and recorded information about it in the 1980 Hazardous Waste Registry.[99]

94. Throughout the late 1970s and early 1980s, NYSDEC, NYSDOH, and NCDOH investigated Grumman's sludge drying beds.[100]

95. In January 1979, NYSDOH visited Grumman on a mandate from the EPA to assess the "pollution potential" of Grumman's "surface impoundments (e.g. pits, ponds and lagoons)."[101]

---

97 Cannella Decl. Ex. 11, Letter from John Ohlmann to the New York State Department of Environmental Conservation, dated January 30, 1979, enclosing a special report titled, "Grumman Aerospace Corporation, Report of Effluent Levels Attainable by Economically Control Technologies" ("Special Report"), at NGINS000619275-76.

98 Cannella Decl. Ex. 7, New York State Hazardous Waste Survey, Department of Environmental Conservation, Division of Solid Waste Management, dated October 1977, at NGINS002908360-81.

99 *Id.* at NGINS002908371; Cannella Decl. Ex. 15, Document titled, "Hazardous Waste Disposal Sites in New York State, First Annual Report," prepared by Division of Solid Waste, New York State Department of Environmental Conservation, dated June 1980, at NGINS002895607-08.

100 Cannella Decl. Ex. 23, Letter from Arthur J. Gibson to Robert Hallman, dated April 10, 1984, attaching a document titled, "GAC (Bethpage) Site 130003 Correspondence" ("Gibson 1984 Letter"), at NGINS002912226; Cannella Decl. Ex. 14, Document titled, "Chronological Occurrences, Sludge Drying Beds, June – December 1979," dated December 19, 1979, at NGINS002907743.

101 Cannella Decl. Ex. 9, Letter from Bruce W. Burke to Grumman Aerospace Corporation, dated January 3, 1979, enclosing report titled, "Surface Impoundment Assessment, Evaluation Worksheet" ("Surface Impoundment Assessment"), at NGINS002912196; Cannella Decl. Ex. 10, Letter from Daniel E. Serrell to John Ohlmann, dated January 17, 1979 ("January 1979 NYSDOH letter"), at NGINS002912187.

96. Grumman recognized NYSDOH was conducting a "visual assessment of our . . . sludge beds."[102]

97. NYSDOH thereafter concluded that Grumman's "ground-water pollution potential" was above average.[103]

98. In June 1979, NCDOH asked to test sludge samples from Grumman.[104]

99. NYSDEC followed up this request with a June 27 meeting, at which NYSDEC asked Grumman to perform a large scale "Sludge Leachability Test" at the Bethpage Facility.[105]

100. Grumman agreed to perform the "Sludge Leachability Test" on July 5, 1979.[106]

101. In 1982, the EPA and the State asserted claims against Grumman based on damage caused by its disposal of sludge from the Bethpage Facility at the Old Bethpage Landfill.[107]

102. In 1983, NYSDEC sued Grumman and others based on these claims.[108]

103. In 1983, NYSDEC listed Grumman's sludge drying bed at Plant 3 on the Hazardous

---

102 Cannella Decl. Ex. 9, Surface Impoundment Assessment, at NGINS002912196; Cannella Decl. Ex. 10, January 1979 NYSDOH letter, at NGINS002912187.

103 Cannella Decl. Ex. 12, Letter from Bruce W. Burke of the New York State Department of Health to John Ohlmann of Grumman Aerospace Corporation, dated March 26, 1979, at NGINS002912199.

104 Cannella Decl. Ex. 14, Letter from Marvin B. Fleisher to Grumman Aircraft Corp., dated June 8, 1979, at NGINS002907746.

105 Cannella Decl. Ex. 13, Letter from J. H. Ohlmann to the N.Y. State Dept. of Environmental Conservation, dated July 5, 1979, ("July 5, 1979 Ohlmann letter"), at NGINS002745527-29.

106 *Id.* at NGINS002745528.

107 Cannella Decl. Ex. 17, Letter from William Sullivan to Robert Bradshaw, dated March 18, 1982, at NGINS000369041-42; Cannella Decl. Ex. 18, Letter from Marcia Cleveland to Grumman Corporation, dated November 16, 1982, at NGINS000368958-60.

108 Cannella Decl. Ex. 19, Letter from Robert Osar to Thomas Genovese, dated December 9, 1983, enclosing Summons and Complaint in action captioned *State of New York v. Town of Oyster Bay*, *et al.*, 83-cv-5357 (E.D.N.Y.) ("Old Bethpage Landfill Complaint"), at NGINS002909699-726.

Waste Registry as "Site 130003."[109]

### E. NYSDEC Asserted A Claim For Groundwater Contamination At The Bethpage Facility By 1987 At The Latest

104. In October 1986, NYSDEC requested a meeting with Grumman and, for the first time, requested a site-wide investigation at the Bethpage Facility, beyond the sludge drying beds.[110]

105. John Ohlmann, John Ball (a Grumman lawyer), and David Miller (Grumman's environmental consultant), attended the December 11, 1986 meeting.[111]

106. Ohlmann and Ball informed Grumman management that NYSDEC required "a field investigation to determine whether Grumman had contaminated the Long Island water supply as a result of its past practices."[112]

107. Ohlmann and Ball warned Grumman management that NYSDEC's request "could be the first step leading to a very serious and expensive liability for Grumman for possible cleanup costs" and that "NYSDEC has the authority to make the investigation . . . and charge Grumman for the cost."[113]

108. They noted "[t]he possible cleanup costs, which could also be assessed against Grumman, could be enormous, i.e., conceivably in the 10-20 million dollar range" and that "this

---

109 Cannella Decl. Ex. 22, Letter from Magda Preisz addressed to William Bright of Travelers, dated January 30, 1984, enclosing December 6, 1983 letter from NYSDEC to Grumman Corporation, ("1984 letter") at CEN 00001112.

110 Cannella Decl. Ex. 26, Letter from Rocky J. Piaggione to Grumman Corporation, dated October 22, 1986 ("October 22, 1986 Letter"), at NGINS002362210; Cannella Decl. Ex. 91, Deposition Transcript of Steven Scharf, Rule 30(b)(6) witness for the New York State Department of Environmental Conservation, dated August 20, 2013 ("NYSDEC Depo. Tr."), at 140:10-24.

111 Cannella Decl. Ex. 29, Memorandum from John Ohlmann and John Ball to Dean Cassell, dated December 12, 1986 ("December 12, 1986 Memo"), at NGINS002362206-09.

112 *Id.* at NGINS002362206.

113 *Id.*

rather informal request could be the opening gun in a long drawn-out controversy about the matter."[114]

109. Beginning in 1986, the U.S. Geological Survey and NCDOH conducted a cooperative study of the groundwater near Bethpage.[115]

110. By 1987, the study revealed a massive plume of groundwater contamination beneath the Facility.[116]

111. By 1987, Grumman recognized that Plant 2 was a primary source of the contamination.[117]

112. As a result, by September 1987, NYSDEC expanded the Site 130003 listing on its Registry to include the entire Bethpage Facility.[118]

113. On December 16, 1987, NYSDEC reclassified the Bethpage Facility as a Class 2 Site—a site posing a "[s]ignificant threat to the public health or environment" and requiring remedial action—and noted that groundwater standards had been contravened.[119]

---

114 *Id.* at NGINS002362206-07.

115 Cannella Decl. Ex. 45, Report titled, "Ground-Water Quality in the Bethpage-Hicksville-Levittown Area, Long Island, New York, with Emphasis on Volatile Organic Compounds," prepared by the United States Geological Survey and the Nassau County Department of Health, dated 1992 ("USGS Study"), at NGINS000724073; Cannella Decl. Ex. 33, document titled, "Additions/Changes to Registry of Inactive Hazardous Waste Disposal Sites," dated December 18, 1987 ("NYSDEC Reclassification"), at NYSDEC 002617.

116 Cannella Decl. Ex. 33, NYSDEC Reclassification, at NYSDEC 002617; Cannella Decl. Ex. 45, USGS Study, at NGINS000724073.

117 Cannella Decl. Ex. 93, Declaration of Arthur Gibson, dated August 28, 2013 ("Gibson Decl."), at ¶¶ 24, 25.

118 Cannella Decl. Ex. 31, Letter from Dean Cassell of Grumman Corporation to Thomas Jorling of the New York State Department of Environmental Conservation, dated September 2, 1987, at NGINS000404383.

119 Cannella Decl. Ex. 33, NYSDEC Reclassification, at NYSDEC 002617; Cannella Decl. 36, Letter from Frank Ricotta of NYSDEC to Grumman Aerospace-Bethpage Facility, received by J.

114. On the same day, NYSDEC informed Grumman that a "full scale RI/FS is required at the Grumman Bethpage Site."[120]

115. Ohlmann acknowledged this letter and the change of "classification from Class 2A to Class 2" as "[b]ad news."[121]

116. Grumman disclosed the Site reclassification and the RI/FS to its shareholders in its 1987 10-K.[122]

117. The 10-K stated that by the end of 1987, Grumman had "agreed in principle" with NYSDEC to conduct an RI/FS at the Bethpage Facility.[123]

118. Grumman admits the RI/FS was required pursuant to CERCLA's strict liability provisions.[124]

119. Grumman estimated that "work plans and negotiations" related to the RI/FS would cost $100,000, that "on-site drilling and sampling; report preparation; review" would cost $500,000, and that "off-site drilling and testing; reports and review; feasibility study; engineering" would cost $400,000.[125]

120. On January 20, 1988, Grumman received official notification from NYSDEC that the

---

Ohlmann on January 20, 1988 ("January 20, 1988 NYSDEC Letter"), at NGINS000398059, NGINS000398063.

[120] Cannella Decl. Ex. 32, Letter from Rocky J. Piaggione to John Ohlmann, dated December 16, 1987 ("December 16, 1987 NYSDEC Letter"), at NGINS002401664.

[121] *Id.*

[122] Cannella Decl. Ex. 34, Excerpt of Form 10-K, prepared by Grumman Corporation, filed with the Securities and Exchange Commission on or about March 28, 1988 ("1987 10-K"), at 9.

[123] *Id.*

[124] Cannella Decl. Ex. 93, Gibson Decl. at ¶ 24.

[125] Cannella Decl. Ex. 35, Grumman Presentation titled, "Ground Water Investigation Grumman Bethpage Facility," at NGINS002401650.

Bethpage Facility was now a Class 2 Site.[126]

121. In April 1988, Grumman worked with its consultant to prepare a proposal for the RI/FS.[127]

122. By July 1988, Grumman submitted an "RI/FS Study Work Plan" to NYSDEC.[128]

123. In December 1988, NYSDEC prepared comments to the draft RI/FS Work Plan.[129]

124. Grumman did not tell Travelers about its negotiations with NYSDEC while they were ongoing.

125. In October 1990, Grumman entered into a consent order with NYSDEC (the "Consent Order"), which formalized Grumman's agreement in 1987.[130]

126. Pursuant to the Consent Order, Grumman agreed to provide information and data concerning the environmental conditions at the Bethpage Facility and to hire consultants to assist NYSDEC to identify the appropriate remedial plan, including performing the RI/FS.[131]

---

[126] Cannella Decl. Ex. 36, January 20, 1988 NYSDEC Letter, at NGINS000398059.

[127] Cannella Decl. Ex. 37, Facsimile from Geraghty & Miller to John Ohlmann, attaching proposal for Remedial Investigation/Feasibility, dated April 25, 1988, at NGINS001899725-33.

[128] Cannella Decl. Ex. 38, Remedial Investigation/Feasibility Study Work Plan for Grumman Aerospace Corporation, Bethpage, New York, Volume I, dated July 1988 ("RI/FS 1988").

[129] Cannella Decl. Ex. 39, Memorandum from Richard Dana to Alice McCarthy with enclosures, dated December 1, 1988.

[130] Cannella Decl. Ex. 44, Letter from Alice M. McCarthy to John Ohlmann, dated November 1, 1990, enclosing Order on Consent, Index # W1-0018-81-01, Site # 1-30-003 ("1990 Consent Order"), at NGINS000627314-38; Cannella Decl. Ex. 50, Record of Decision, Grumman Aerospace, Bethpage Facility, Operable Unit 1, Inactive Hazardous Waste Site, Site Number 130003A, issued by the New York State Department of Environmental Conservation, dated March 1995 ("March 1995 OU1 ROD"), at NGINS000010502.

[131] Cannella Decl. Ex. 44, 1990 Consent Order, at NGINS000627314-38.

## F. NYSDEC Issued Records Of Decision Chronicling The Widespread Contamination At The Bethpage Facility

127. NYSDEC issued Records of Decision ("RODs") concerning soil and groundwater contamination at the Bethpage Facility and the Bethpage NWIRP Site in March 1995 and March 2001 and the Navy and NYSDEC issued RODs in May 1995 and January 2003.[132]

128. NYSDEC found that chlorinated VOCs and their breakdown products, including TCE, were the primary contaminants and that the plume of contaminated groundwater was more than 2,000 acres in area and more than 700 feet deep in places.[133]

129. The RODs identified the following sources of contamination: the area surrounding the TCE storage tank outside of Plant 2;[134] the Plant 2 recharge basins;[135] the Former Drum Marshaling Area at Plant 3;[136] the Plant 3 recharge basins;[137] and the Salvage Storage Area at Plant 3.[138]

130. Grumman admits it is a substantial source of the plume contamination and that the "[g]roundwater problem is due to" its "discharge of Trichloroethylene (TCE) during the '40s, '50s, '60s, and '70s."[139]

---

132 Cannella Decl. Ex. 50, March 1995 OU1 ROD; Cannella Ex. 53, May 1995 ROD; Cannella Ex. 59, 2001 OU2 ROD; Cannella Ex. 63, 2003 ROD.

133 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010547-48.

134 Cannella Decl. Ex. 50, March 1995 OU1 ROD, at NGINS000010504-05; Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010540-41.

135 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010541.

136 Cannella Decl. Ex. 53, May 1995 ROD, at NGINS000126491-92.

137 *Id.* at NGINS000126492.

138 *Id.*

139 Cannella Decl. Ex. 61, Presentation titled, "Environmental Remediation – Groundwater," dated February 2002, at NGINS002826527.

131. Grumman discharged enormous amounts of TCE into the groundwater over the years: as of 2011, Grumman had removed 20,000 gallons of TCE from the groundwater, indicating that Grumman injected a substantially higher amount of TCE into the groundwater—Grumman estimates as much as "three to four entire 10,000 gallon storage tanks of TCE."[140]

132. Grumman's corporate representative, John Cofman, could not identify a single fire, explosion or rupture resulting in the release of TCE at the Bethpage Facility.[141]

133. Cofman identified "fires" at Plant 3, but confirmed they "were very local, and it wasn't a big deal." He also confirmed they did not result in any "spillage."[142]

134. Grumman never reported any accidents, fires, explosions or abrupt releases of TCE at the Bethpage Facility to NYSDEC.[143]

135. In connection with its RI/FS, Grumman disclosed "Information on Reported Spills, Leaks and Releases at the Grumman Aerospace Corporation and U.S. Naval Weapons Industrial Reserve Plant, Bethpage, New York" to NYSDEC.[144]

136. Grumman certified "under the penalty of law that . . . the information is true, accurate and complete."[145]

---

140 Cannella Decl. Ex. 67, Email chain between John Cofman to Kent Smith, dated March 16, 2011, at NGINS000780509.

141 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 115:19-117:4, 164:8-165:18, 169:14-171:9, 179:6-17, 210:8-211:7, 299:20-301:3.

142 Cannella Decl. Ex. 76, Cofman Day 1 Depo. Tr., at 168:17-169:17.

143 Cannella Decl. Ex. 91, NYSDEC Depo. Tr., at 161:14-162:6.

144 Cannella Decl. Ex. 43, RI/FS 1990, at NGINS000210735.

145 *Id.* at NGINS000210736.

137. None of these "spills," which all occurred in the 1980s, were TCE spills.[146]

138. Two of the "spills" occurred after Travelers no longer provided coverage, in 1985.[147]

139. Grumman certified that these spills were onto "concrete" or "pavement" and were "contained and treated."[148]

## G. Grumman Spent More Than $40 Million To Remediate The Bethpage Facility Without Seeking Travelers' Consent

140. As of 2012, Grumman claimed to have spent approximately $41 million in past costs for investigation and remediation at the Bethpage Facility.[149]

141. After agreeing with NYSDEC in 1987 to conduct the RI/FS, and negotiating the terms of that RI/FS for the next two years, Grumman entered into the Consent Order. As a result, it undertook various costly Interim Remedial Measures ("IRMs") at the Bethpage Facility.[150]

142. Grumman installed a soil vapor extraction system to remediate contaminated soil in 1994.[151]

143. Grumman installed an on-site containment system ("ONCT") to contain the portion of the groundwater plume that was still beneath the Facility in 1997 and continues to operate it

---

146 *Id.* at NGINS000210740-41, NGINS000210742-43, NGINS000210744-45, NGINS000210746-47.

147 *Id.* at NGINS000210748, NGINS000210749-50.

148 *Id.* at NGINS000210740, NGINS000210742, NGINS000210744; NGINS000210746, NGINS000210748, NGINS000210749.

149 Cannella Decl. Ex. 70, Letter from Jonathan Sokol to Gail Dalton and Brittany Lehr, dated February 1, 2012 ("Feb. 1, 2012 letter"), at NGINS000010319-20.

150 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010549-50.

151 Cannella Decl. Ex. 46, Notice of Public Meeting for Grumman Aerospace – Bethpage Facility Inactive Hazardous Wates Site #130003A, Operable Unit 01, Bethpage Nassau County, received by John Ohlmann October 14, 1994 ("Meeting Notice"), at NGINS000115569.

today.[152]

144. By the mid-1990s, Grumman entered into an informal "Handshake Agreement" with the Navy "to address groundwater contamination at and from" the Bethpage Facility.[153]

145. Pursuant to the Handshake Agreement, Grumman agreed to pay for all "onsite" remediation efforts at the Bethpage Facility, including the operation of the ONCT and certain issues related to claims asserted by the Bethpage Water District.[154]

146. The Navy agreed to pay for all "offsite" remediation.[155]

## H. Grumman's Demanded Coverage From Travelers 25 Years Too Late

147. In 1999, after its merger with Northrop Corporation, Grumman decided to attempt to obtain insurance coverage from its historical insurance carriers.[156]

148. Grumman hired Arthur Andersen to assist.[157]

149. Grumman provided Arthur Andersen with information about its environmental liabilities and prior insurance dealings.[158]

150. In March 2000, Grumman's insurance manager provided Arthur Andersen with

---

152 Cannella Decl. Ex. 59, 2001 OU2 ROD, at NGINS000010549.

153 Cannella Decl. Ex. 68, Presentation titled, "Bethpage Environmental Remediation Projects Briefing to Frank Sanchez," dated March 17, 2011 ("Environmental Remediation Projects Briefing Presentation"), at NGINS002787040.

154 *Id.*

155 *Id.*

156 Cannella Decl. Ex. 64, Email from David Wong to Linda Olic, dated June 14, 2006 ("June 14, 2006 email"), at NGINS002939813-15.

157 *Id.*; Cannella Decl. Ex. 58, Fax from John R. Cadarette to Dolores Cranston, dated April 4, 2000, at TRAV007679.

158 Cannella Decl. Ex. 64, June 14, 2006 email, at NGINS002939813-15; Cannella Decl. Ex. 56, Fax from Steve Lanou to John Cadarette enclosing notes from William Zielinski, dated March 23, 2000 ("Zielinski Notes re: Notice") at NGINS002991947-58.

information about prior notices of environmental claims to insurers.[159] There is no reference to notice for the Bethpage Facility.[160]

151. At this time, Grumman had spent approximately $30 million cleaning up its pollution at the Bethpage Facility.[161]

152. Arthur Andersen determined that Grumman should expect to get $4-8 million at most from Travelers.[162] It set a goal of a $6 million settlement.[163]

153. Nine years later, in 2009, Grumman initiated another effort at insurance recovery from Grumman's historical insurance carriers.[164]

154. Grumman termed its revived effort "Money opportunity – Environmental Claims."[165]

155. Meanwhile, Grumman was being reimbursed for 100% of its remediation costs at the Bethpage Facility by the Navy through overhead rates.[166]

156. In 2011, when government auditors asked Grumman if there was "any insurance recovery for contamination clean-up" at the Bethpage Facility, Grumman recognized it had "not

---

159 Cannella Decl. Ex. 56, Zielinski Notes re: Notice, at NGINS002991947-58; Cannella Decl. Ex. 95, Deposition Transcript of John Cadarette, dated September 20, 2013 ("Cadarette Depo. Tr.") at 49:4-50:15, 86:20-87:2.

160 Cannella Decl. Ex. 56, Zielinski Notes re: Notices, at NGINS002991947-58.

161 Cannella Decl. Ex. 55, Email from David Wong to Gary Serio and others, dated October 8, 1999, with attachments, at p. 3.

162 Cannella Decl. Ex. 57, Handwritten Notes of John Cadarette, dated March 31, 2000, at NGINS002991964.

163 *Id.*

164 Cannella Decl. Ex. 71, Declaration of Jonathan Sokol, dated March 20, 2013, at ¶ 4.

165 Cannella Decl. Ex. 65, Email chain including email from Dean Reynolds to James Sanford, dated August 21, 2006, at NGINS002939833-34.

166 Cannella Decl. Ex. 69, Email from John DeBois to Ed Hannon, Heidi Hohmann, and Salvatore Rosato, dated September 19, 2011, at NGINS002049389.

been successful, nor did [it] expect to be, in obtaining any insurance recovery" for these liabilities at the Bethpage Facility.[167]

157. In a letter dated February 1, 2012, Grumman demanded coverage for the Bethpage Facility from Travelers.[168]

158. Grumman told Travelers it had remediated for soil and groundwater contamination at the Bethpage Facility at the direction of NYSDEC.[169]

159. Grumman asked Travelers to "defend and indemnify Northrop Grumman with respect to the NYSDEC actions."[170]

160. Grumman demanded Travelers pay a pro rata share of a total of more than $41 million in past costs for the Bethpage Facility.[171]

161. Grumman demanded that Travelers pay a pro rata share of nearly $52 million in estimated future costs for the Bethpage Facility.[172]

## I. There Is No Proof That Travelers Received The 1984 Letter

162. The January 30, 1984 letter (the "1984 letter") Grumman now claims was first notice to Travelers of the Bethpage Facility claim was sent to an address that did not belong to Travelers.[173]

163. Travelers did not have an office at 339 Seventh Avenue, the address to which the

---

167 Cannella Decl. Ex. 66, Email from John DeBois to Lisa Lofaro, dated February 21, 2011, at NGINS002958621.

168 Cannella Decl. Ex. 70, Feb. 1, 2012 letter, at NGINS000010314-21.

169 *Id.* at NGINS000010317.

170 *Id.* at NGINS000010318.

171 *Id.* at NGINS000010319-21.

172 *Id.* at NGINS000010320-21.

173 Cannella Decl. Ex. 22, 1984 letter, at CEN 00001110.

1984 letter was allegedly sent.[174]

164. The 1984 letter does not appear in Travelers' files.

165. The 1984 letter does not appear in Grumman's files.

166. Only Century produced the 1984 letter in this litigation.[175]

167. Not a single Travelers witness has any recollection of seeing the 1984 letter or its enclosures.[176]

168. None of the Grumman employees who Grumman now claims notified Travelers of a Bethpage Facility claim had ever seen the 1984 letter.[177]

169. Grumman's counsel, who demanded coverage from Travelers in 2012, admitted he had never seen the 1984 letter before he wrote to Travelers in February 2012.[178]

**J. The 1984 Letter Did Not Provide Notice Of The NYSDEC Claim**

170. The 1984 letter is captioned "Grumman Corporation, New York State v. Town of

---

174 *Id.*; Cannella Decl. Ex. 24, Excerpts of Travelers 1983 & 1984 Home Office Telephone & Field Directories, at TRAV077499, TRAV077564.

175 Cannella Decl. Ex. 22, 1984 letter.

176 Cannella Decl. Ex. 84, Deposition Transcript of Diane Reilly Butler, dated June 21, 2013 ("Reilly Depo. Tr."), at 165:3-166:20; Cannella Decl. Ex. 73, Deposition Transcript of Christina O'Brien, dated May 3, 2013 ("O'Brien Depo. Tr."), at 88:16-24; Cannella Decl. Ex. 74, Deposition Transcript of William Corbett, dated May 15, 2013 ("Corbett Depo. Tr."), at 81:23-82:13; Cannella Decl. Ex. 81, Deposition Transcript of Dolores Cranston, dated June 19, 2013 ("Cranston Depo. Tr."), at 113:23-115:2.

177 Cannella Decl. Ex. 87, Deposition Transcript of William Zielinski, dated July 23, 2013 ("Zielinski Depo. Tr."), at 229:5-20; Cannella Decl. Ex. 78, Deposition Transcript of Andrew Shipley, dated June 11, 2013 ("Shipley Depo. Tr."), at 79:10-80:11; Cannella Decl. Ex. 94, Deposition Transcript of Jill Palmer, dated August 30, 2013 ("Palmer Depo. Prep."), at 324:2-15; Cannella Decl. Ex. 89, Deposition Transcript of Richard Grieves, dated July 26, 2013 ("Grieves Depo. Tr."), at 190:24-191:14; Cannella Decl. Ex. 92, Deposition Transcript of Arthur Gibson, dated August 28, 2013 ("Gibson Depo. Tr."), at 283:17-284:10.

178 Cannella Decl. Ex. 80, Deposition Transcript of Jonathan Sokol, dated June 13, 2013 ("Sokol Depo. Tr."), at 69:8-70:10.

Oyster Bay, et al.," a lawsuit related to the Old Bethpage Landfill.[179]

171. The 1984 letter stated "enclosed is additional information on the above captioned for your file."[180]

172. The December 6, 1983 letter purportedly enclosed with the 1984 letter related only to contamination resulting from the sludge drying bed at Plant 3.[181]

173. In a January 11, 1984 memorandum Grumman purported to enclose with the December 6 letter, Grumman wrote that the December 6 letter was intended to cover damage "attributable to GAC's on-site sludge drying bed, identified as site #130003."[182]

174. A January 24, 1984 letter authored by Grumman's insurance manager states that the "site in question is no longer in use."[183]

175. In its Board of Directors' meeting minutes and its 10-K, Grumman described the December 6 letter as "related to a disposal site which was located within the property boundaries of [the] . . . facility in Bethpage, New York."[184]

176. Notes produced by Grumman from the December 11, 1986 meeting with NYSDEC

---

179 Cannella Decl. Ex. 22, 1984 letter, at CEN00001110; Cannella Decl. Ex. 19, Old Bethpage Landfill Complaint, at NGINS002909699-26.

180 Cannella Decl. Ex. 22, 1984 letter, at CEN00001110.

181 Cannella Decl. Ex. 27, IAS, at NGINS000600015, NGINS000600021; Cannella Decl. Ex. 22, 1984 letter, at CEN00001112.

182 Cannella Decl. Ex. 22, 1984 Letter, at CEN00001112.

183 *Id.* at CEN00001111.

184 Cannella Decl. Ex. 21, Excerpt of Grumman Corporation Board of Directors meeting materials, including the Report of Current Litigation, dated January 19, 1984, at NGINS001892998; Cannella Decl. Ex. 25, Excerpt of Form 10-K for the fiscal year ending December 31, 1984, prepared by Grumman Corporation, filed with the Securities and Exchange Commission on or about March 29, 1985, at 9.

acknowledge that, at that time, "Registry #1300[0]3 = only the sludge drying beds."[185]

177. Other handwritten notes produced by Grumman connect the December 1983 letter to the sludge bed, stating: "Dec 1983 – on-site sludge bed."[186]

178. A letter from Arthur Gibson dated April 10, 1984 describes Site 130003 as "the GAC sludge beds."[187]

179. The Initial Assessment Study performed in 1986 also states that the December 6, 1983 letter purportedly enclosed with the 1984 letter related to Grumman's "sludge drying beds."[188]

## K. Nothing That Allegedly Occurred At A 1989 Meeting Cures Grumman's Breach

180. The contemporaneous notes taken at an August 1989 meeting attended by representatives from Travelers and Grumman demonstrate that Grumman did not tender a new claim related to the Bethpage Facility at that meeting.[189]

## L. The Policies In Effect From 1972 Through 1985 Contain Pollution Exclusions

181. The Travelers policies in effect from January 1, 1972 through January 1, 1983, with the exception of Policy No. TREE-SLG-107T519-8-82, incorporate New York's statutory pollution

---

185 Cannella Decl. Ex. 28, Handwritten notes, dated December 11, 1986, at NGINS002401296.

186 Cannella Decl. Ex. 30, Handwritten notes, including notes regarding "presentation April 1987," at NGINS002401515.

187 Cannella Decl. Ex. 23, Gibson 1984 Letter, at NGINS002912225.

188 Cannella Decl. Ex. 27, IAS, NGINS000600021.

189 Cannella Decl. Ex. 42, Notes authored by Diane Reilly of Travelers from meeting with Grumman Corp., dated August 16, 1989 ("Travelers 1989 Meeting Notes"), at TRAV050327-32; Cannella Decl. Ex. 40, Handwritten notes of Marilyn Marlek of Grumman Corporation from Travelers' meeting with Grumman Corp., dated August 16, 1989 ("Marlek 1989 Meeting Notes"), at NGINS002133965-68; Cannella Decl. Ex. 41, Handwritten notes of Arthur Gibson of Travelers' meeting with Grumman Corp. on August 16, 1989 ("Gibson 1989 Meeting Notes"), at NGINS002133973.

exclusion, as this Court found in its July 3, 2013 Order.[190] The statute prohibits insurance policies from covering discharges of pollutants or contaminants unless the discharges are both "sudden and accidental":

> Policies . . . issued to commercial or industrial enterprises providing insurance against the legal liabilities specified in this subdivision shall expressly exclude therefrom liability arising out of pollution or contamination caused by the discharge, dispersal, release or escape of any pollutants, irritants or contaminants into or upon land, the atmosphere or any water course or body of water unless such discharge, dispersal, release or escape is sudden and accidental.[191]

182. The Travelers policies in effect from January 1, 1983 to January 1, 1985 contain a different form of pollution exclusion known as the "Travelers pollution exclusion." It excludes from coverage damages caused by discharges or releases of pollutants that are "expected or intended" by the insured:

> This insurance does not apply to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omission any insured is liable.[192]

183. Travelers Policy No. TREE-SLG-107T519-8-82 likewise contains the Travelers

---

190 ECF No. 234, July 3, 2013 Opinion and Order ("July 3 Order"); N.Y. Ins. Law § 46(13)&(14) (emphasis added); *see also* Appendix B to Memo. of Law; Appendix C to Memo. of Law.

191 ECF No. 234, July 3, 2013 Opinion and Order ("July 3 Order"); N.Y. Ins. Law § 46(13)-(14) (emphasis added); *see also* Appendix B to Memo. of Law.

192 Declaration of Rita K. Maxwell, Esq., dated July 18, 2013 ("July 18 Maxwell Decl.") Ex. 16 (Policy No. TR-NSL-181T215-4-80) at TRAV002317; July 18 Maxwell Decl. Ex. 20 (Policy No. TREE-SLG-107T519-8-83) at TRAV001785; Maxwell Decl. Ex. 21 (Policy No. TREE-SLG-107T519-8-83) at TRAV001877; *see also* Appendix C to Memo. of Law.

pollution exclusion.[193]

## M. All Travelers' Primary Policies Require Immediate Notice Of A Claim

184. All of the Travelers primary policies provide: "If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."[194]

185. All of the Travelers primary policies provide: "No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy."[195]

---

[193] July 18 Maxwell Decl. Ex. 19 (Policy No. TREE-SLG-107T519-8-82) at TRAV001690; *see also* Appendix C to Memo. of Law.

[194] July 18 Maxwell Decl. Ex. 1 (Policy No. TR-NSL-932208-68) at TRAV000441-42; July 18 Maxwell Decl. Ex. 2 (Policy No. TRKSLG-932206-68) at TRAV000084); July 18 Maxwell Decl. Ex. 4 (Policy No. TR-NSL-932208-69) at TRAV000466-67; July 18 Maxwell Decl. Ex. 5 (Policy No. TRKSLG-932206-69) at TRAV000167; July 18 Maxwell Decl. Ex. 7 (Policy No. TRKSLG-932206-70) at TRAV000248; July 18 Maxwell Decl. Ex. 8 (Policy No. T40SLG-932207-70) at TRAV000339; July 18 Maxwell Decl. Ex. 9 (Policy No. TRNSL-932231-71) at TRAV000503; July 18 Maxwell Decl. Ex. 10 (Policy No. TR-NSL-107T510-1-74) at TRAV000771; July 18 Maxwell Decl. Ex. 11 (Policy No. TR-NSL-107T519-8-74) at TRAV000836; July 18 Maxwell Decl. Ex. 12 (Policy No. TR-NSL-107T519-8-77) at TRAV001040; July 18 Maxwell Decl. Ex. 13 (Policy No. TR-NSL-162T582-2-78) at TRAV002276; July 18 Maxwell Decl. Ex. 14 (Policy No. TR-NSL-107T519-8-78) at TRAV001215; July 18 Maxwell Decl. Ex. 15 (TR-SLG-107T519-8-79) at TRAV001403; July 18 Maxwell Decl. Ex. 16 (TR-NSL-181T215-4-80) at TRAV002329; July 18 Maxwell Decl. Ex. 17 (TR-SLG-107T519-8-80) at TRAV001499; July 18 Maxwell Decl. Ex. 18 (TREE-SLG-107T519-8-81) at TRAV001590; July 18 Maxwell Decl. Ex. 19 (TREE-SLG-107T519-8-82) at TRAV001688; July 18 Maxwell Decl. Ex. 20 (TREE-SLG-107T519-8-83) at TRAV001783; July 18 Maxwell Decl. Ex. 21 (TREE-SLG-107T519-8-84) at TRAV00187); *see also* Appendix D to Memo. of Law.

[195] July 18 Maxwell Decl. Ex. 1 (Policy No. TRNSL-932208-68) at TRAV000442; July 18 Maxwell Decl. Ex. 2 (Policy No. TRKSLG-932206-68) at TRAV000084; July 18 Maxwell Decl. Ex. 4 (Policy No. TRNSL-932208-69) at TRAV000467; July 18 Maxwell Decl. Ex. 5 (Policy No. TRKSLG-932206-69) at TRAV000167; July 18 Maxwell Decl. Ex. 7 (Policy No. TRKSLG-932206-70) at TRAV000248; July 18 Maxwell Decl. Ex. 8 (Policy No. T40SLG-932207-70) at TRAV000339; July 18 Maxwell Decl. Ex. 9 (Policy No. TRNSL-932231-71) at TRAV000503; July 18 Maxwell Decl. Ex. 10 (Policy No. TR-NSL-107T510-1-74) at TRAV000772; July 18 Maxwell Decl. Ex. 11 (Policy No. TR-NSL-107T519-8-74) at TRAV000836; July 18 Maxwell Decl. Ex. 12 (Policy No. TR-NSL-107T519-8-77) at TRAV001040; July 18 Maxwell Decl. Ex. 13 (Policy No. TR-NSL-162T582-2-78) at TRAV002276; July 18 Maxwell Decl. Ex. 14 (Policy No. TR-NSL-

186. The Travelers Catastrophic Umbrella policies provide: "Written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable whenever (a) bodily injury or property damage takes place, or (b) an act or omission takes place resulting in other injury or damage, which appears reasonable likely to involve this policy."[196]

187. These conditions cannot be waived or changed except through written endorsement to the policies.[197]

---

107T519-8-78) at TRAV001215; July 18 Maxwell Decl. Ex. 15 (TR-SLG-107T519-8-79) at TRAV001403; July 18 Maxwell Decl. Ex. 16 (TR-NSL-181T215-4-80) at TRAV002329; July 18 Maxwell Decl. Ex. 17 (TR-SLG-107T519-8-80) at TRAV001500; July 18 Maxwell Decl. Ex. 18 (TREE-SLG-107T519-8-81) at TRAV001591; July 18 Maxwell Decl. Ex. 19 (TREE-SLG-107T519-8-82) at TRAV001689; July 18 Maxwell Decl. Ex. 20 (TREE-SLG-107T519-8-83) at TRAV001784; July 18 Maxwell Decl. Ex. 21 (TREE-SLG-107T519-8-84) at TRAV001876.

[196] July 18 Maxwell Decl. Ex. 3 (Policy No. T-CUP-932209-68) at NGINS0001109886-87; July 18 Maxwell Decl. Ex. 6 (Policy No. T-CUP-932209-69) at TRAV002737-38; *see also* Appendix D to Memo. of Law.

[197] July 18 Maxwell Decl. Ex. 1 (Policy No. TRNSL-932208-68) at TRAV000443; July 18 Maxwell Decl. Ex. 2 (Policy No. TRKSLG-932206-68) at TRAV000084; July 18 Maxwell Decl. Ex. 3 (Policy No. T-CUP-932209-68) at NGINS001109888; July 18 Maxwell Decl. Ex. 4 (Policy No. TRNSL-932208-69) at TRAV000468; July 18 Maxwell Decl. Ex. 5 (Policy No. TRKSLG-932206-69) at TRAV000167; July 18 Maxwell Decl. Ex. 6 (Policy No. T-CUP-932209-69) at TRAV002739; July 18 Maxwell Decl. Ex. 6 (Policy No. T-CUP-932209-70) at TRAV002739; July 18 Maxwell Decl. Ex. 7 (Policy No. TRKSLG-932206-70) at TRAV000248; July 18 Maxwell Decl. Ex. 8 (Policy No. T40SLG-932207-70) at TRAV000339; July 18 Maxwell Decl. Ex. 9 (Policy No. TRNSL-932231-71) at TRAV000503; July 18 Maxwell Decl. Ex. 10 (Policy No. TR-NSL-107T510-1-74) at TRAV000772; July 18 Maxwell Decl. Ex. 11 (Policy No. TR-NSL-107T519-8-74) at TRAV000836; July 18 Maxwell Decl. Ex. 12 (Policy No. TR-NSL-107T519-8-77) at TRAV001040; July 18 Maxwell Decl. Ex. 13 (Policy No. TR-NSL-162T582-2-78) at TRAV002276; July 18 Maxwell Decl. Ex. 14 (Policy No. TR-NSL-107T519-8-78) at TRAV001215; July 18 Maxwell Decl. Ex. 15 (TR-SLG-107T519-8-79) at TRAV001403; July 18 Maxwell Decl. Ex. 16 (TR-NSL-181T215-4-80) at TRAV002330; July 18 Maxwell Decl. Ex. 17 (TR-SLG-107T519-8-80) at TRAV001500; July 18 Maxwell Decl. Ex. 18 (TREE-SLG-107T519-8-81) at TRAV001591; July 18 Maxwell Decl. Ex. 19 (TREE-SLG-107T519-8-82) at TRAV001689; July 18 Maxwell Decl. Ex. 20 (TREE-SLG-107T519-8-83) at TRAV001784; July 18 Maxwell Decl. Ex. 21 (TREE-SLG-107T519-8-84) at TRAV001876; *see also* Appendix E to Memo. of Law.

## N. The Travelers Primary Policies Prohibit Voluntary Payments

188. The Travelers primary policies at issue prohibit the insured from voluntarily assuming obligations or expenses without Travelers' consent: "[t]he insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident."[198]

189. This policy term cannot be waived or changed except by endorsement.[199]

---

198 July 18 Maxwell Decl. Ex. 1 (Policy No. TRNSL-932208-68) at TRAV000442; July 18 Maxwell Decl. Ex. 2 (Policy No. TRKSLG-932206-68) at TRAV000084; July 18 Maxwell Decl. Ex. 4 (Policy No. TRNSL-932208-69) at TRAV000467; July 18 Maxwell Decl. Ex. 5 (Policy No. TRKSLG-932206-69) at TRAV000167; July 18 Maxwell Decl. Ex. 7 (Policy No. TRKSLG-932206-70) at TRAV000248; July 18 Maxwell Decl. Ex. 8 (Policy No. T40SLG-932207-70) at TRAV000339; July 18 Maxwell Decl. Ex. 9 (Policy No. TRNSL-932231-71) at TRAV000503; July 18 Maxwell Decl. Ex. 10 (Policy No. TR-NSL-107T510-1-74) at TRAV000772; July 18 Maxwell Decl. Ex. 11 (Policy No. TR-NSL-107T519-8-74) at TRAV000836; July 18 Maxwell Decl. Ex. 12 (Policy No. TR-NSL-107T519-8-77) at TRAV001040; July 18 Maxwell Decl. Ex. 13 (Policy No. TR-NSL-162T582-2-78) at TRAV002275; July 18 Maxwell Decl. Ex. 14 (Policy No. TR-NSL-107T519-8-78) at TRAV001215; July 18 Maxwell Decl. Ex. 15 (TR-SLG-107T519-8-79) at TRAV001403; July 18 Maxwell Decl. Ex. 16 (TR-NSL-181T215-4-80) at TRAV002329; July 18 Maxwell Decl. Ex. 17 (TR-SLG-107T519-8-80) at TRAV001500; July 18 Maxwell Decl. Ex. 18 (TREE-SLG-107T519-8-81) at TRAV001591; July 18 Maxwell Decl. Ex. 19 (TREE-SLG-107T519-8-82) at TRAV001689; July 18 Maxwell Decl. Ex. 20 (TREE-SLG-107T519-8-83) at TRAV001784; July 18 Maxwell Decl. Ex. 21 (TREE-SLG-107T519-8-84) at TRAV001876; *see also* Appendix F to Memo. of Law.

199 July 18 Maxwell Decl. Ex. 1 (Policy No. TRNSL-932208-68) at TRAV000443; July 18 Maxwell Decl. Ex. 2 (Policy No. TRKSLG-932206-68) at TRAV000084; July 18 Maxwell Decl. Ex. 3 (Policy No. T-CUP-932209-68) at NGINS001109888; July 18 Maxwell Decl. Ex. 4 (Policy No. TRNSL-932208-69) at TRAV000468; July 18 Maxwell Decl. Ex. 5 (Policy No. TRKSLG-932206-69) at TRAV000167; July 18 Maxwell Decl. Ex. 6 (Policy No. T-CUP-932209-69) at TRAV002739; July 18 Maxwell Decl. Ex. 6 (Policy No. T-CUP-932209-70) at TRAV002739; July 18 Maxwell Decl. Ex. 7 (Policy No. TRKSLG-932206-70) at TRAV000248; July 18 Maxwell Decl. Ex. 8 (Policy No. T40SLG-932207-70) at TRAV000339; July 18 Maxwell Decl. Ex. 9 (Policy No. TRNSL-932231-71) at TRAV000503; July 18 Maxwell Decl. Ex. 10 (Policy No. TR-NSL-107T510-1-74) at TRAV000772; July 18 Maxwell Decl. Ex. 11 (Policy No. TR-NSL-107T519-8-74) at TRAV000836; July 18 Maxwell Decl. Ex. 12 (Policy No. TR-NSL-107T519-8-77) at TRAV001040; July 18 Maxwell Decl. Ex. 13 (Policy No. TR-NSL-162T582-2-78) at TRAV002276; July 18 Maxwell Decl. Ex. 14 (Policy No. TR-NSL-107T519-8-78) at TRAV001215; July 18 Maxwell Decl. Ex. 15 (TR-SLG-107T519-8-79) at TRAV001403; July 18 Maxwell Decl. Ex. 16 (TR-NSL-181T215-4-80) at TRAV002330; July 18 Maxwell Decl. Ex. 17 (TR-SLG-107T519-8-80) at TRAV001500; July 18 Maxwell Decl. Ex. 18 (TREE-SLG-107T519-8-81) at TRAV001591; July 18 Maxwell Decl. Ex. 19 (TREE-SLG-107T519-8-82) at TRAV001689;

Respectfully submitted:

By: ______________________

Dated: November 25, 2013
New York, New York

Mary Beth Forshaw
Lynn K. Neuner
Meghan E. Cannella
Medora M. Akers

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, N.Y. 10017-3954

Telephone: (212) 455-2000
Facsimile: (212) 455-2502
mforshaw@stblaw.com
lneuner@stblaw.com
mcannella@stblaw.com
medora.akers@stblaw.com

*Attorneys for Plaintiffs The Travelers Indemnity Company, The Travelers Indemnity Company of Connecticut, Travelers Casualty and Surety Company, and Travelers Property Casualty Company of America*

---

July 18 Maxwell Decl. Ex. 20 (TREE-SLG-107T519-8-83) at TRAV001784; July 18 Maxwell Decl. Ex. 21 (TREE-SLG-107T519-8-84) at TRAV001876; *see also* Appendix E to Memo. of Law.