Originally Filed at Docket No. 436

# Exhibit 105a

THE TRAVELERS MEMORANDUM

DATE 1-24-77

TO Reg Dir Stanek, CP Claim

Grumman Water Pollution

Attached, please find the following:

1. Memorandum from Associate Manager Christian dated 1-19-77.
2. Memo from District Manager Close dated 1-6-77.
3. Letter of 1-13-77 from County of Nassau to Grumman.
4. Two news articles.
5. Memorandum from me to Associate Manager Christian.

The problem at Grumman is being corrected, and may not have been serious enough to generate any claims. I will continue to correspond with Associate Manager Christian and develop my file on the subject.

My new concern is over the hazard to the general public. County officials are testing wells all over the island, and finding problems. As you can see from the attachment, we have the liability coverage on many of these water districts. If Mr. Christian is correct, and it takes 10 to 20 years for the chemicals to get into the water supply, we may never know who the responsible parties are. I will carbon this memo to Regional Assistant Paul and he may wish to develop a file of his own.

Thank you.

Richard Schultz, Reg Asst
CP Claim, 8 PB

RS:MAM
Enc.

BSRV
Bennett
26
Date: 4-11-13 VG

cc: VP Bright, Zone 5, 8 PB
Secretary Hatch, Zone 15, 8 PB
Examiner Maier, Zone 19, 8 PB
Leonard Churnetski, Corp Accts, 10 GS
Robert Erickson, CP Com Lines Eng, 6 - 250 - CP

P.S. Attached, additional memo from Mgr O'Connell dated 1/21/77.

M-9148 REV. 2-75 PRINTED IN U.S.A.

TC4152698

THE TRAVELERS MEMORANDUM

DATE January 19, 1977

TO Regional Asst Richard Schultz, CP Claim, HO

WATER POLLUTION - GRUMMAN

I attended a meeting at Grumman on 1-17-77 with Manager O'Connell and Ed Richmond of our Engineering Department. Those present from Grumman were Thomas Cunniffe, Director Engineering Department; John Ohlmann, Manager Environmental Control; John McNamara, Manager Maintenance; Dr. Robert Jessup, Medical Director and Dr. Fagan, Associate Medical Director.

This meeting was very informative and the Grumman personnel were extremely cooperative.

I had previously sent you a list of the wells, their capacity, Date of Construction, location and depth, along with a map of Grumman Corporation in Bethpage. You may make reference to these as you read this memo.

There are a total of 17 wells, but #7, 12 and A are not part of the system. In other words, they are there but have not been used in years and are not involved in this problem in any way.

Five wells are closed - #5 closed 10-8-76 at the request of Nassau County Health Department; #6 closed 9-1-75 voluntarily by GAC because of taste and odor;#8 closed 1-74 by GAC voluntarily because of taste and odor; #9 closed 12-21-74 voluntarily by GAC because of taste and odor; #14 closed 1-74 by GAC voluntarily because of taste and odor. No well was ordered closed by any organization for any reason.

Grumman owns wells # 1, 2, 3, 4, 16. The Navy owns 5, 6, 8, 9, 10, 11, 13, 14, 15. The lease agreement between the Navy and Grumman holds the Navy harmless and Grumman has complete maintenance of all wells.

Grumman initially became aware of a problem in January 1974 because of complaints of taste and odor in the drinking water. Grumman immediately did some testing on their own and discovered vinyl chloride. They immediately contacted Nassau County Health Department who also conducted tests and two wells were closed.

The testing of the water was done in accordance with Chapter II " Administrative Rules and Regulations" Part 72 Drinking Water Standards. This was and is the law, and it was adhered to by Grumman. I was left with a feeling that since vinyl chloride, trichloroethylene, tetrachloroethylene and dichloroethylene were not tested for (because they were not specifically indicated in Chapter II) that they were probably there but went undetected - see exhibit I.

The Navy has never conducted any tests and they have never given any guarantee of the quality of the water.

(cont'd)

TE4152702

M-9148 REV. 2-75 PRINTED IN U.S.A.

RE: WATER POLLUTION - GRUMMAN January 19, 1977

The agencies involved so far in this problem are the Federal Environmental Protection Agency and Nassau County Health Department. Copies of tests made by the Nassau County Health Department will be sent to me and I will forward them to you. Grumman is extremely reluctant to submit results of tests they made in their laboratories because they feel it will just confuse the issues. They claim that the County tests are the official ones and any other test results would differ because of the way it was tested and the equipment used is different.

No agency or individual has indicated that Grumman is in violation of any safety or health codes. One big reason for this is that no levels have as yet been established for these pollutants consequently no violation!

All laws and regulations were and are complied with regarding the testing of drinking water. There are no hearings or corrective actions or penalties being considered by anyone against Grumman.

The action being taken at present to correct this problem are: Between March 1 and May 1, all plants at Bethpage will be converted to a municipal water supply for drinking water. Plants 1 and 4 have been on municipal water since 1938. Plant 2 is being converted. Plant 5 will not be finished until 8-1-77 but an alternate plan is being worked on to get proper drinking water by April.

They may use bottled water in Plant 5 until it is converted. Grumman is cooperating completely with Nassau County health Department.

The cause of this pollution of course is still conjecture but it was explained to us that it takes 10 - 20 years for chemicals to be absorbed into the ground and get into the water supply. The Hooker Chemical Company was in the area 20 years ago and were dumping vinyl chloride in the area (It was legal to do that at that time). Pittsburgh Glass was also in this area at one time and produced some of these elements.

I asked if Grumman could be the source of this problem and they gave me the following statistics:

| Element | When Used |
|---|---|
| Vinyl Chloride | Never |
| Dichloroethylene | Never |
| 112 Trichloroethelene | Used as vapor degreaser solvent |
| Tetrachloroethelyne | Limited Use |
| 122 Trichloroethelene | 1 Quart used 1½ years ago |
| 111 Trichloroethane | General Shop use |
| Chloroform | Laboratory Use Only |
| Bromodichloroethane | Never |
| Carbon Tetrachloride | Never in 15 years |
| Methalyne Chloride | Used as a stripper solvent |
| Ether | Never |

BTU4152703

(cont'd)

Re: WATER POLLUTION - GRUMMAN                January 19, 1977

I am attaching a letter from Dr. Dowling, Commissioner of Health - Exhibit 2. An article by Frank Goldsmith on Vinyl Chloride Exhibit 3 and an article about the closing of 2 wells - exhibit 4. I will also attach the test results if I receive them by the time I send this - if I do not have them I will forward them to you. I will also forward a copy of the Navy lease when received.

I believe I have answered all the questions you asked. I would suppose these answers will generate more questions and Grumman personnel has assured me of their complete cooperation in this matter. This will be an on going situation with more testing etc. until some standard is established. Once they are established I would feel they will be incorporated into the "Regulations for Drinking Water Standards".

Grumman has not received any claims as of this date. I am also sending you a copy of an article which appeared in Newsday on 1-18-77.

I believe I previously mentioned to you that Nassau County Health Department is reviewing all deaths due to cancer of the liver (which apparently is caused by vinyl chloride). So far they have come across 4 liver deaths. None of these 4 people were connected with Grumman in any way. Dr. Jessup also pointed out that if an autopsy were not performed at the time of death, the death certificate would be of no value.

I received some test information from Ed.Jacobs and the Navy lease agreement today and they are attached.

James A. Christian, Associate Manager
CP Claim, Garden City

JAC/sl

cc: Manager O'Connell
CP Claim, Garden City

ITM4152704

Rich - please note photo of memo from Dist Mgr Close Commercial lines indicating several water districts we insure in this area. We have a liability exposure in these areas also.

when you get this - please contact Chmetski in special accounts as he wants to correspond with Ed Jacobs on this. I did not send Jacobs a copy

Regards
Jim C.

To: JIM CHRISTAIN
C.P CLAIM DEPT
GARDEN CITY

cc: E/S Richmond

January 6, 1977

Regional Supervisor Welch - 80 John St.

Long Island Water Well Contamination

Larry:

Enclosed are copies of recent articles from NEWSDAY pertaining to organic groundwater pollutants discovered in some Long Island wells. Since the initial discovery at the Grumman Corp., additional well contamination has been found.

As I indicated yesterday, we do insure several water districts, including the Product Liability exposure. The following outlines our current commitments:

1. Village of Farmingdale 650-422A397-4-IND-76 (6-7-76/77)
   Producer: Wharton B. Allen
   Sect. II Limits: 1,000,000/1,000,000 B.I. 100,000/100,000 P.D.

2. Woodbury Triangle 650-570B141-5-IND-76 (11-7-76/77)
   Producer: Wharton B. Allen
   Sect. II Limits: 500,000/500,000 single limit

3. Roslyn Water District 650-511B327-A-COF-76 (12-1-76/77)
   Producer: Mott & Remsen
   Sect. II Limits 300,000/300,000 B.I. 100,000/100,00 P.D.

4. Glenwood Water District 650-511B059-0-COF-77 (1-4-77/78)
   Producer: Mott & Remsen
   Sec. II Limits: 500,000/500,000 B.I. 100,000/100,000 P.D.

Woodbury Triangle and Glenwood are both very small districts. Roslyn Water District is fairly sizeable as the account produces a $10,614 annual premium. The Village of Farmingdale seems to be of most concern as it is located in the known area of contamination, and the map in the December 17th article indicates a recommended well closing.

At this point I really don't know what liability, if any, our insureds might be faced with. The tone of the articles and other media comments tend to incriminate industrial waste and land fills. Since the water districts all comply with state monitoring requirements what legal liability would be imposed?

Obviously, I don't plan to initiate any underwriting action at this time — other than to be certain no additional water district exposures are written. Let me know if you have any additional thoughts.

District Manager Close
C-2 —— Garden City

WTB4152715

Ed: Larry intends to pursue this with Stan Hansen so I thought you should know exactly what has been transmitted.

Ray Cuffe

RALPH G. CASO
COUNTY EXECUTIVE

JOHN J. DOWLING, M.D., M.P.H.
COMMISSIONER
ROBERT H. NIEBLING, M.D., M.P.H.
EXECUTIVE DEPUTY COMMISSIONER

COUNTY OF NASSAU
DEPARTMENT OF HEALTH
240 OLD COUNTRY ROAD, MINEOLA, N.Y. 11501

RECEIVED JAN 1977 JOHN O'BRIEN

January 13, 1977

Mr. John O'Brien
Senior Vice President
Grumman Aerospace Corporation
Plant 5
Bethpage, New York 11714

Dear Mr. O'Brien:

Our meeting of January 4, 1977, relating to the presence and the implications of organic compounds in the water supply at your Bethpage facility, is confirmed herewith and made a matter of record. Your courtesy in accommodating the meeting on short notice is appreciated.

The meeting was requested by this Department to describe actions we considered necessary to maximize public health protection, to identify areas where further information is needed in order to properly investigate the cause and extent of the problem, and to request the cooperation of the Grumman Aerospace Corporation in performing tasks, as well as collecting and supplying information and data.

The actions requested by the Department and key points of discussion are summarized below. More detailed descriptions of these and related matters have now been prepared by the Department as we agreed at the meeting and are attached to this letter.

1. Additional sampling and analyses by the Corporation of their water supply wells to establish a reliable assessment of the presence and concentrations in the water of specific organic compounds. Copies of the original laboratory reports of samples previously tested by commercial laboratories for the Corporation to be provided to the Department.

   The Corporation agreed to consider assumption of further sampling and advise the Department of their decision. They agreed to provide historical data pending legal interpretation of the present confidential status of the reports. They requested data developed by the Department. The Department agreed to forward such information on a continuing basis and supplied a copy of the total data available to date at the meeting.

TG4152708

EXHIBIT 2

NASSAU COUNTY BOARD OF HEALTH

RICHARD D. HAUSMAN, Chairman
JACK W. McELWAIN, M.D.
JEFF J. COLETTI, M.D.
LILLIAN A. HEIDELBERGER
BRUCE A. LISTER

2. Plan and implement in cooperation with the Department a selective operation of wells now and in the future, in response to latest water quality data, to minimize ingestion by plant personnel of organic compounds which are potential carcinogens in drinking water.

   The Corporation demonstrated that they already exercise such precautions and agreed to continue the procedure.

3. Complete, at the earliest practicable date, the installation - already in process - of a separate water supply system for drinking and culinary use using water from sources free of organic compounds.

   The Corporation indicated that such actions are already in process.

4. Collect, consolidate, and provide to the Department more detailed information regarding the industrial chemicals stored, used, and present in the wastes discharged to on-site recharge basins. Information is to include historical as well as present conditions consistent with demonstrated need,

   The Corporation agreed to collect and provide additional information to supplement that already forwarded on December 10, 1976.

A briefing was provided in the Action Room of the Facilities plant in which were posted the status of all water supply and waste disposal systems in the form of color-coded charts and plans. The Corporation indicated the availability of all data and records to the Department. The Department requested the opportunity to review the information in more detail by staff members expert in specific areas and to inspect the facilities. This was acceptable to the Corporation.

The Department provided copies to the Corporation of a proposed plan for comprehensive testing of public water supplies for organic compounds as well as a guide for utilizing private laboratories for such analysis. These reports were provided for the information and guidance of the Corporation and were indicated to be in process of revision in response to new information and constructive comments by regulatory agencies and public water supply agencies.

There was general agreement that the best interests of both the Corporation and the Department would be served by full cooperation in addressing and resolving the problem of organic compounds in the water supply.

Very truly yours,

John J. Dowling, MD

John J. Dowling, M.D., M.P.H.
Commissioner

JJD:FVP;yk
Enclosures
- No. 1-Participants
- No. 2-Legal Responsibilities
- No. 3-Testing Program

1U4152709

Enclosure #1 January 13, 1977

Personnel Attending Meeting of January 4, 1977
at Grumman Aerospace Corporation Offices
in Bethpage Relative to
Organic Compounds in the Water Supply

Representatives of the Grumman Aerospace Corporation:

| | | |
|---|---|---|
| Mr. John O'Brien | - | Senior Vice President, Administration and Resources |
| *Dr. Robert Jessup | - | Medical Director |
| *Dr. Roy Fagan | - | Associate Medical Director |
| Mr. Raymond Mur | - | Secretary and General Counsel |
| Mr. John Ball | - | Assistant General Counsel |
| Mr. Thomas Cunniffe | - | Director of Facilities Engineering |

Representatives of the Nassau County Department of Health:

| | | |
|---|---|---|
| Dr. John J. Dowling | - | Commissioner |
| Mr. Francis V. Padar | - | Assistant Deputy Commissioner |

* Were present for only part of meeting.

JC4152710

Enclosure #2 January 13, 1977

Responsibility of Grumman Corporation for Protection of the Drinking Water Supply

The Grumman Aerospace Corporation has a basic responsibility under the law to protect sources of drinking water and to properly operate and supervise the water supply system under its control. While quality standards for drinking water are promulgated and are applicable, they do not presently contain specific reference to organic compounds of the types or the concentrations which have been found recently in Grumman wells. Unless and until the State Commissioner of Health establishes standards for these substances, the implied responsibility of the Corporation is to exercise such reasonable care and diligence as is necessary to minimize public health risk. The applicable law and identification of pertinent sections is provided herein.

The law governing the production, treatment, storage, distribution, and protection of quality of public drinking water is contained in Title 10 (Health) of New York Codes, Rules and Regulations. More specifically, the following references to the law apply:

(a) Part 5 (Drinking Water Supplies) of Chapter I, State Sanitary Code

(b) Part 72 (Drinking Water Standards) of Chapter II, (Administrative Rules and Regulations)

(c) Part 170 (Sources of Water Supply) of Subchapter C of Chapter III (Public Water Supplies)

Public Water Supplies

The water supply system operated by the Corporation meets the definition of a public water supply (Section 5-1.1 - Definitions - of Part 5, Chapter I, State Sanitary Code). The Corporation, as owner of the supply, is required to meet all existing provisions of the law in relation to public water supplies. Included are obtaining of approval for system modification (Sec. 5-1.2), protection and supervision of the supply (Sec. 5-1.10), quality control (Sec. 5-1.21), examination of samples of water (Sec. 5-1.30), and control of physical connections (Sec. 5-1.33).

Drinking Water Standards

The standards promulgated prescribe maximum permissable levels of substances and characteristics for bacteriological, physical, and chemical quality in the water delivered to the consumer (Sec. 72.3 thru 72.5) and number and frequency of analyses required. The

Enclosure #2

January 13, 1977
Page -2-

State Commissioner of Health is authorized moreover to restrict the presence and concentrations of impurities which, "may be hazardous to the health of the consumers." (Sec. 72.5(a))

Sources of Water Supply

This part addresses the quality of the raw water source of a public water supply and contains specific standards for physical, chemical, and microbiological substances and characteristics (Sec. 170.4). This section, in addition, specifies general standards for water sources including, in item 5 of Sec. 170.4, restricting of deleterious substances in sufficient amounts, ". . .as to make the waters unsafe or unsuitable as a source of water supply for drinking, culinary, or food processing purposes."

FVP:sp

TE4152712

Enclosure #3 January 13, 1977

Recommended Testing of Water Supply Wells of Grumman Aerospace Corporation for Organic Compounds

While all but one well of the 14 water supply wells of the Grumman Aerospace Corporation have been sampled and analzyed for organic compounds, further sampling is required because of the wide variation in results both as to the presence of specific organic compounds and their concentrations.

Current unavailability of a reliable assessment of the organic chemical profile of each well prevents a valid selection of wells to be operated such that public health risk will be minimized until alternate drinking water sources free of organic compounds are provided for consumptive use throughout the facility. The same rationale applies to use of wells subsequent to availability of municipal water to minimize discharge of organic compounds to the groundwater.

Further testing of the wells for organic compounds should be performed in a prioritized plan to most expeditiously establish the most reliable basis for selecting wells to be placed in service and the order in which they are operated when on-line. A testing plan developed by the Department of Health is described as follows:

1. Re-test all wells currently in use (Nos. 11, 13, 15, 16) by GC/MS methodology on a frequency consistent with minimum laboratory turn-around time until the presence of constituents and their concentrations can be reliably established. When GC/MS analysis establishes consistent presence of organic compounds, subsequent analyses can be performed by GC alone.

2. Concurrently with sequence 1 above, re-test all wells designated for summer use (Nos. 1, 2*, 3, 4) with methodology and frequency as in sequence 1 above until the presence of constituents and their concentrations can be reliably established. Sampling and testing in this sequence should be phased alternately with sequence 1 above. Completion of sequence 1 and 2 will enable selection of wells for operation from both groups and establish the proper order of their use starting with well with quality least impacted by organic compounds.

3. Re-test all wells other than those included in sequence 1 and 2 above which are otherwise suitable for service following methodologies and frequencies as in sequence 1 and 2 above until presence of organic constituents and their concentrations can be clearly established. Completion of this sequence will provide basis for substitution of one or more wells from this group for wells then on-line because of superior quality in terms of lower organic chemical contaminants.

*Well No. 2 to be included only if operational.

TW452713

4. Monitor, using GC analysis, all wells in service on a monthly frequency for organic constituents present and evaluate trends evident in concentrations of organic chemicals. Adjust sequence of wells on-line in response to data developed. This sequence follows sequence 2.

5. Monitor all operational wells not in service using GC analysis on a quarterly frequency. Evaluate trends evident in concentrations of organic chemicals. This testing sequence follows sequence 3.

FVP:no

ITB4152714

[illegible], January 14, 197[illegible]

Dr Jessup

# State closes 2 more wells on county line

By JOHN STOCKMAN
and LORI COOKE

Two more wells providing water for those living on the Nassau-Suffolk line have been ordered closed by the state. The action yesterday brings to six the number of wells shut in the two counties in a 24-hour period.

The state acted after tests showed the wells — both in the South Farmingdale Water District — contained the compound trichloroethylene, which is a suspected cancer-causing agent.

The wells are the 16th and 17th to be closed in Nassau in recent months. Four wells were ordered closed Wednesday in Suffolk after traces of the same compound were found in Amityville, North Amityville and East Farmingdale.

A spokesman for the Nassau Health Department, which recommended that the South Farmingdale wells be closed, said tests showed traces of compounds exceeding the suggested maximum levels contained in state guidelines.

One well, the spokesman said, contained 260 micrograms of trichloroethylene, a common cleaning compound, per liter of water, while the second contained 50 micrograms.

* * *

GUIDELINES ISSUED this week by the State Health Department recommend 50 micrograms as the acceptable limit of trichloroethylene, 10 micrograms for vinyl chloride and 100 micrograms for a combination of these or other compounds.

Residents served by the wells "should have no cause for alarm," State Health Commissioner Dr. Robert Whalen said, "because the closed wells provide only a small portion of the area's water supply."

Nassau officials, meanwhile, expect to test 14 more wells this week and forward the samples to the state for analysis. The wells include five on the Grumman Aircraft engineering Corp. property in Bethpage, two in Bethpage State Park, four more in South Farmingdale, two in Farmingdale and one in Wantagh.

"This is all part of an overall plan to sample areas around the Grumman-Bethpage industrial complex," the Nassau Health Department said.

The department said the two wells recommended to be closed are considered deep water wells. One is 650 feet deep; the other is 575 feet.

"Their closing does not mean there will be a shortage of water," a spokesman said. "South Farmingdale Water District officials have assured us they will have enough for their customers."

* * *

WHELAN SAID 81 wells in central Long Island have been tested so far for pollution by trichloroethylene, vinyl chloride and other compounds. The contaminants, he said, were unlike such long-lived pollutants as polychlorinated biphenyls, or PCBs.

"If we can pinpoint the source of contamination and stop it, then we can assume the contaminants now in the water will dissipate within a relatively short period of time and the wells can eventually be reopened," he said.

The commissioner said his department is working with the Department of Environmental Conservation to identify the sources of the pollution in wells in both Nassau and Suffolk.

In Suffolk, 36 more wells from Greenport to Huntington are being tested by the state at the insistence of county health officials.

Tracing the cause of any pollution, however, will be a problem. There are from 50 to 100 establishments within two miles of each well that could be responsible for any pollutants.

* * *

THE FOUR wells ordered closed in Suffolk so far showed 210 parts of trichloroethylene per billion parts of water, according to Dr. David Harris, Deputy Suffolk Health Commissioner.

"That's a very, very minute quantity," said Harris, "so there's no need for people to be alarmed."

But because there are no federal standards for the pollutants, he said, health officials are "in the dark" as to possible effects on humans.

Two of the closed Suffolk wells are operated by the Suffolk Water Authority. One is at Warren and 45th Streets in North Amityville; the other on Green Avenue near the Amityville Railroad station.

The remaining two wells are at Broad Hollow Road and Sherwood Avenue in the East Farmingdale Water District and the Metropolitan Transportation Authority well on the grounds of Republic.

[illegible]4152705

EXHIBIT 4

CONFIDENTIAL

TRAV074493