# Exhibit 117

# REPORT ON SURVEY OF CONSUMER PRODUCTS CONTAINING OR SUSPECTED OF CONTAINING HARMFUL ORGANIC CHEMICALS AND HAVING THE POTENTIAL OF CONTAMINATING THE GROUNDWATER OF NASSAU COUNTY, NEW YORK

MAY 1979

JOHN J. DOWLING, M.D., M.P.H., COMMISSIONER
NASSAU COUNTY DEPARTMENT OF HEALTH

## FOREWORD

This report was prepared by Susanne L. Mackay, P.H. Sanitarian I, under the supervision of Marvin B. Fleisher, P.E., Chief, Industrial Wastewater Control Section and Robert D. Cusumano, P.E., Director of the Bureau of Wastewater Management, Nassau County Department of Health.

The field investigations and research were performed by Adam Tartell with the assistance of Cheryl Strober and Mark Feldman, personnel hired under a special project of the Federal Comprehensive Employment Training Act.

Sheldon O. Smith, P.E., Deputy Director of the Division of Environmental Quality, provided the guidance and review necessary for completion of the report.

This report is part of the continuing programs in Environmental Quality administered by Francis V. Padar, P.E., Assistant Deputy Commissioner and Director of the Division of Environmental Quality.

## Purpose

The Consumer Product Survey was conducted as part of a comprehensive program developed by the Nassau County Department of Health to identify and abate sources of organic compounds discharged to the groundwater of Nassau County. The objective of the survey was to identify products on the market which contain chemicals of known or suspected carcinogenic or otherwise harmful potential, determine the extent of use of these products in Nassau County, evaluate their disposition with regard to the groundwater and their impact on groundwater quality, and to recommend methods for their control.

## Introduction

Nassau County, with its population of almost 1.5 million, is solely dependent on groundwater for its drinking water supply. In recognition of this, the U.S. Environmental Protection Agency recently designated the Long Island aquifer system, comprised of Nassau and Suffolk Counties, as a "sole source aquifer." This designation has only been assigned to two locations in the entire nation and recognizes the unique degree of groundwater quality protection necessary to provide the public with a safe, adequate supply of drinking water.

The County's Department of Health began testing groundwater for the presence of organic chemicals in 1975 during investigations of taste and water problems of drinking water at the Grumman Aerospace Corporation in Bethpage. Chemical analyses revealed the presence of an array of organic chemicals, several of which are suspected or known carcinogens in man. These findings prompted the initiation of an extensive well testing program to determine the extent of groundwater contamination by organics and concurrent surveys to identify and abate sources of pollution, including surveys of industrial, commercial and municipal facilities, and the use of certain categories of consumer products.

## Inventory of Products Marketed

An inventory of consumer products possibly containing known or suspected carcinogenic or otherwise potentially harmful organic chemicals was prepared from information reported by a field survey team. Field investigators surveyed approximately 25 percent of the County's retail hardware stores, department stores, supermarkets, sanitary supply companies and automotive supply stores during the period from August, 1977 to January, 1978 as follows:

| Category | Approx. Number in County | Number Surveyed | (%) |
|---|---|---|---|
| Hardware Stores | 137 | 62 | (42%) |
| Department Stores | 107 | 24 | (22%) |
| Supermarkets | 188 | 34 | (18%) |
| Sanitary Supply Co. | 25 | 2 | ( 8%) |
| Automotive Supply Co. | 209 | 34 | (16%) |
| Total | 666 | 156 | (23%) |

The investigators recorded information found on labels regarding ingredients, the purpose and method of use of the product, its availability in aerosol form, the manufacturer's name and address and the retail outlet's name and address. Information was gathered for nearly 1,000 products.

Additional information concerning product ingredients was collected by consulting available literature and medical references at the Nassau County Medical Center. Letters of inquiry were also sent to the manufacturers of over 500 products of concern.

Product Evaluation

Based on the information available, each product was evaluated to determine whether or not its use potentially contributed significantly to groundwater contamination by organic chemicals, and therefore, its designation as a "product of concern". To be considered a product of concern, the product was required to meet each of the three following criteria:

1. The product contains or may contain known or suspected carcinogenic or otherwise potentially harmful organic chemicals,

2. The product has the potential of entering the groundwater via its usage, including the probability or possibility of improper disposal methods, and

3. The product is used in significant quantities in Nassau County.

The product evaluation system resulted in the identification of 12 categories of products of concern, comprised of 230 separate products. (See Table I)

Examples of product categories which were eliminated because they did not contain harmful organics were products of an exclusive inorganic nature, such as caustic or acid cleaning solutions, or those containing organics not presently considered harmful, such as found in anti-freezes and windshield deicers. Those products which contained organics, but would probably not enter the groundwater included such things as carburetor cleaners, sealers, deglossers and spot removers; products considered quantitatively insignificant included those sold in extremely small volumes and unusual items like chandelier cleaners and sneaker cleaners.

Product categories, as identified in Table I, are listed in order of relative importance, as established in accordance with a chemical priority classification system Consideration was also given to the products' directness of entry to the groundwater and volume consumption data. For example, products which directly entered the groundwater via household sewage disposal systems in large quantities, such as organic solvent cesspool cleaners, were assigned to a higher priority than products which indirectly entered the groundwater via surface water runoff, such as radiator flushes.

The chemical priority list (Table II), was developed based on information from the National Academy of Science's "Master List of Identified Contaminants in Drinking Water", January 6, 1976, the National Cancer Institute's position paper titled "Human Health Considerations of Carcinogenic Organic Chemical Contaminants in Drinking Water", April, 1978, and compounds found in Nassau County groundwater as identified by sampling.

Top priority was given to organic chemicals that were found in supply wells and listed as suspected carcinogens, suspected carcinogens or other harmful potential. Following these chemicals in priority were those organics not found in wells in measurable quantity but listed as possible carcinogens or otherwise harmful compounds.

Determination of Quantity Marketed

Several investigative approaches were attempted to determine the extent of use of those consumer products considered as potential contributors to groundwater contamination. As indicated in the product evaluation discussion, letters of inquiry were sent directly to the manufacturers of over 500 products of concern, requesting product ingredients and quantitative sales information. Many of the manufacturers responded that the sales information could not be provided. Several of those manufacturers that were able to provide quantitative sales data requested that the information be respected as confidential. The same results were experienced when letters of inquiry were sent to distributors.

The problem most frequently cited by manufacturers was that products were distributed in Nassau County by numerous companies and that each company most probably also distributed the product in areas other than Nassau. Therefore, it appeared that unless a manufacturer distributed his own products, he was unaware of their ultimate destination. Since there existed an alternate means of obtaining the quantitative information needed, i.e. surveying Nassau's retail establishments about their sales volumes, the manufacturer and distributor approach was not pursued further. The survey method also allowed for verification of data received from some manufacturers and distributors and enabled the Department to have non-confidential data to report.

Organic Solvent Cesspool Cleaners - Market Survey

Of the several categories of products chosen to be surveyed, priority was given to organic solvent cesspool cleaners and drain openers because of their almost direct discharge into the groundwater and the suspicion that they were sold in large volumes in unsewered areas of the County. The survey (2) indicated an estimated yearly sales volume of 76,500 gallons of organic solvent cesspool cleaning and drain opening products. A breakdown of the types of chemicals used in these products was as follows:

| Chemical | Quantity* (Gallons/Year) |
|---|---|
| Methylene Chloride | 17,400 |
| 1,1,1 Trichloroethane | 18,600 |
| Orthodichlorobenzene | 2,000 |
| Other aromatic and halogenated compounds | 21,750 |
| Total suspected carcinogenic or other harmful organics | 59,750 |
| Petroleum Distillates | 6,000 |
| Inert or undetermined chemicals | 10,750 |
| Total | 76,500 Gallons/Yr. |

Because of the concern over such large quantities of organic chemicals being discharged to the groundwater yearly from this product source and the realization that it would take about six years for all presently scheduled sewerage systems within the County to be completely operational, this information was evaluated and reported to the New York State Attorney General's Office for assistance in the development of control measures over the manufacture, sale and use of such products in the State.

Other Market Surveys

A survey on the sale of household cleansing agents was conducted in the same manner as the cesspool cleaner survey. Information regarding the sale of selected household disinfectants, laundry degreasers, solid toilet bowl deodorizers and oven cleaners was requested from all of the County's department stores, supermarkets, and sanitary supply companies. This mail survey was returned by 46 percent of the stores.

Due to time and manpower restrictions, it was necessary to limit the number and scope of the remaining market surveys. Products surveyed were limited to paint and varnish removers, solvents and cleaning agents, engine and metal degreasers, and driveway and garage degreasers. The field survey team visited and interviewed 84 establishments (18 percent) from the total number of hardware, department and automotive supply stores. Emphasis was placed on the stores located in unsewered areas of the County.

A summary of the quantities of harmful organic chemicals found in products used in Nassau County is given in Table III. Based on responses to market surveys- (approximately 32 percent), it was found that a minimum of 93,000 gallons of organic chemicals listed as carcinogens, suspected carcinogens or other harmful potential. (10, 11), are being sold yearly in the County. Extrapolation of this amount to include the entire County yields an estimated total of 288,000 gallons per year of these potentially harmful organic chemicals of concern being used by consumers in Nassau.

(* quantities updated to September 1978)

Evaluation of Deleterious Impact on Groundwater Quality

It is difficult to determine the quantity of chemicals actually being discharged into the groundwater from consumer product sources. Some types of products such as solvents and paint removers are not intended to be used in a manner which would result in chemical discharge into household sewerage systems, and other products such as driveway and garage degreasers or car cleaners only run off and evaporate or are being washed into storm drains. Considering these parameters and allowing for the operation of sewers in large areas of the County, it is somewhat arbitrarily estimated that 10 percent of the quantities of all product categories except cesspool cleaners are discharged to the ground.

Taking 10 percent of the quantities of chemicals of concern found in all major product categories and 100 percent of the chemical quantities from the cesspool cleaning products yields an estimate of nearly 83,000 gallons of organic chemicals of suspected carcinogenicity or other harmful potential being discharged yearly to the groundwaters of Nassau County.

A sample taken from cesspool waste scavengers represented domestic wastes collected from four separate residences. This sample had high levels of 1,1,1 trichloroethane (630 ppb) and a lesser amount of chloroform, (80 ppb). An attempt was made to identify which residence(s) contributed the high level of organics to the sample and what possible commercial substances were used by the homeowner(s) that might be responsible for the presence of organics. Only one of the homeowners could be reached for questioning and it was ascertained that a commercial cesspool cleaning compound had been used approximately one year prior to the cesspool pumpout.

From the information obtained, it could not be determined that the cesspool cleaning compound was responsible for the high level of organics detected in the residential sample. However, the presence of volatile organics in high levels confirms the premise that consumer products are being released to the domestic sewerage system and are not being consumed nor evaporated entirely by their usage.

Testing of Public Supply Wells

A comprehensive investigation of contamination of the County's groundwater by organic chemicals was initiated in November, 1976. Until recently, laboratory capabilities only allowed for analysis of approximately 15 volatile halogenated and non-halogenated organic constituents. County and State laboratories were unable to routinely test for several chemicals which are commonly found in many consumer products, such as methylene chloride, ortho and para-dichlorobenzene, methyl ethyl ketone, butyl cellosolve, napthenes and acetone, all of which are listed in the NIOSH registry of suspected carcinogens (11).

The present testing is being reviewed for modifications to accommodate analysis for these chemicals. This will enable the Department to monitor drinking water for their presence and determine whether the consumer products containing these chemicals pose a potential environmental hazard. Presently, the products containing these chemicals are only "suspected" of contributing to groundwater contamination, based on the volume of their usage.

## Degradation of Organic Chemicals in the Environment

The determination of the persistence and breakdown of a chemical contaminant in the environment is important in the evaluation of a chemical's potential environmental hazard. Many physical, chemical and biological factors influence the stability of a chemical in the environment such as temperature, light, soil composition, biological populations, availability of oxygen, moisture, adsorbtion and sedimentation.

The majority of aromatic and halogenated hydrocarbons found to be used in consumer products are often discharged to the home cesspool or septic tank where evaporation is inhibited and anaerobic conditions play a major role in sewage decomposition.

Most of the literature available on the subject of biodegration of organic chemicals refers to aerobic situations as is reflected by the testing procedures developed to determine a chemical's "biodegradability".[2] This is most probably because concern has been in the past, primarily with chemical wastes entering surface waters. Studies concerning anaerobic conditions have reported the actual inhibition of anaerobic digestion of sewage sludge by various chlorinated hydrocarbons.[3-8]

In general, it can be said that since high levels of organics are finding their way into Nassau's water supply wells (average depth of 400 feet), the numerous natural mechanisms available for the breakdown of those organic compounds are not adequate to rely upon from a public health standpoint.

## Public Health Significance

The Federal Environmental Protection Agency has addressed the public health significance of organic chemicals in drinking water. In the February 9, 1978 Federal Register, it was stated that the EPA had determined that the presence in drinking water of organic chemicals may have an adverse effect on the health of persons, and that human exposure to these chemicals should be reduced. It was further reported that organic chemical contaminants have been found to cause both acute and chronic adverse effects in humans at high exposure levels, and that lower concentrations of these chemicals posed a potential contribution to elevated cancer risks and other long-term risks such as mutagenicity and teratogenicity. Thus, the EPA proposed an amendment to the National Interim Primary Drinking Water Regulations in January, 1978, to protect the public health from organic chemical contaminants in drinking water, setting maximum contaminant levels for total trihalomethanes at 100 ppb and requiring public water systems that serve more than 75,000 people, to provide granular activated carbon treatment to reduce the level of synthetic organic chemicals.

Earlier 1977, the New York State Health Department developed "Interim Guidelines" for guiding local health commissioners re: limiting levels of organics in public drinking water. These guidelines have assisted the Nassau County Department of Health in evaluating data and restricting

well usage. The guidelines recommended limiting vinyl chloride to 10 ug/l (parts per billion), other synthetic organic chemicals to 50 ug/l, and the combined level of all constituents to 100 ug/l.

More recently, the State Department of Environmental Conservation has adopted "Ground Water Classifications Quality Standards and Effluent Standards and/or Limitations" (Title 6, Official Compilation of Codes, Rules and Regulations, Part 703), which are more stringent than the "Interim Guidelines." These standards, effective September 1, 1978, set maximum contaminant levels in Class GA waters (source of potable water supplies), for 83 separate chemical compounds. Examples of lowered acceptable limits are trichloroethylene - 10 ug/l, vinyl chloride - 5 ug/l, benzene - not detectable and orthodichlorobenzene - 4.7 ug/l. These standards are reported to be based on risk factors developed by the National Academy of Sciences.

<u>Evaluation of Existing Legislation Controlling Consumer Products</u>

<u>Federal Authority (Enforced by the Consumer Product Safety Commission</u>

In 1972, the Consumer Product Safety Act established the U.S. Consumer Product Safety Commission (CPSC), whose primary function is to protect the public against unreasonable risks of injury and illnesses associated with consumer products. In certain instances, the CPSC bans hazardous products or the use of certain chemicals in consumer products, such as the recent proposal to ban benzene in consumer products. The CPSC has authority under the Federal Hazardous Substances Act, Flammable Fabrics Act, Poison Prevention Packaging Act, and Refrigerator Safety Act. These laws protect the consumer from being harmed directly by a product and do not consider the indirect personal harm a product may exert by adversely affecting his environment.

The Hazardous Substances Control Act requires that when a product contains certain hazardous substances, certain statements of hazard are labeled, such as "Poison", "Vapor Harmful", "Harmful or Fatal if Swallowed", and "Danger." Because these are the only types of requirements, the labeling practices which result from the compliance with the law are often inadequate for the consumer and in some instances could be considered misleading. Examples of such practices include the identification of a small percentage of the product's ingredients as "active" and a statement that the remaining ingredients are "inert." Consumers could expect that the inert material is water or dyes, etc. Ingredients labeled "inert" by the manufacturer are not necessarily inert from the viewpoint of the toxicologist, physician or public health official. This was found to be the case with certain household disinfectant products, where methylene chloride was considered to be "inert" and labeled as such.

Other types of labeling practices which could be considered misleading include instances where there is a complete lack of identification of ingredients on the product label, or just a generalized category chemicals is mentioned, such as "petroleum distillates" and "halogenated or aromatic hydrocarbons", or the listing of ingredients not found in the product. For example, some products may be labeled as containing "no carbon tetrachloride", without indicating what chemicals are contained in the product. The labeling of "no phosphorous" or "no carbon tetrachloride" is a result of these ingredients being specifically restricted by law. Another practice which could be considered misleading is the use of phrases such as "environmentally safe" or "biodegradable."

In addition, special precautionary warnings are in many instances inadequate. This includes the absence from product labels of instructions for the safe use and disposal of the product and the failure to indicate the hazard of mixing one product with another which may produce an extremely dangerous reaction.

All of these labeling practices imply to the consumer that the product is safe (or safer than it actually is) to use, from an environmental and personal health standpoint. Also, the consumer is not given the complete or accurate information needed to compare and select the safest product for the purpose intended.

<u>Federal Authority Given to the Environmental Protection Agency</u>

The Environmental Protection Agency regulates the manufacture and use of pesticides in the U.S.. Their registration and evaluation program includes all products which claim to destroy some form of living organisms, such as mildewcides, algacides, pesticides and certain household disinfectants. The criteria used in product evaluation have not been explored within the scope of this study, however, it is generally understood that the effectiveness and environmental safety of products are considered.

The Toxic Substances Control Act, Public Law 94-469, requires the Environmental Protection Agency to compile, keep current, and publish a list of each chemical substance which is manufactured, imported, or processed in the United States for commercial purposes. This inventory will be useful in determining the ultimate disposition of all chemicals in the country and pinpoint any major chemical losses in the manufacturer to consumer pathways.

State Control

There is little legislation applicable to consumer product control on the State level. Article 35 of the New York State Environmental Conservation was adopted in 1970 to regulate and control the labeling and ingredients of "household cleansing products" sold in the State. This Article is restricted to products containing surfactants (primarily soaps and detergents), used for domestic or commercial cleaning purposes, and sets allowable limits on the amount of phosphorous compounds contained in such products.

Groundwater quality classifications and standards were established by the Department of Environmental Conservation, pursuant to Section 17-0301 of the Environmental Conservation Law. These classifications and standards, as set forth in Title 6, NYCRR 703.4 require that toxic wastes and deleterious matter shall not be deposited in the zone of aeration or saturation which may impair the quality of the groundwater and render it unsuitable for a potable water supply.

These standards have been applied by the New York State Attorney General's office in an attempt to prevent the manufacture, sale and use of organic solvent cesspool cleaners in Nassau and Suffolk Counties. In addition to specific legal actions which have been taken by the State against two manufacturers of organic solvent cesspool cleaners, legislation is presently being developed by the State Attorney General to control the use of such products.

Public Information Programs

The general public has not been adequately informed of the potential for environmental harm which may be incurred from the usage of various consumer products. Although some of this responsibility lies with the manufacturers of the products and with agencies involved with the improvement of present labeling laws, governmental agencies can develop education programs to identify harmful products, discourage their use, and suggest the use of less hazardous alternative products to the consumer, whenever available. When a potentially harmful product must be used, guidelines should be developed for the most acceptable methods of use and disposal.

Presently, many of the consumer products listed in the inventory are only "suspected" of contributing to groundwater contamination because their chemical ingredients have not yet been tested for or identified in the water supply. When specific chemicals are identified in Nassau County's underground reservoir, that are contained in certain consumer products, legislation or regulations for the control of the use, manufacture and sale of such products can be developed. This is presently being done by the New York State Attorney General with respect to certain cesspool cleaning chemicals. A public education program incorporating the purpose and requirements for compliance with such legislation will be both informative and effective.

## Conclusions

The product evaluation system identified 12 categories of products containing chemicals identified in the groundwater and/or of harmful potential (toxic, suspected carcinogenic or otherwise harmful). (See attached inventory)

Based on the actual results of product sales surveys, almost 300,000 gallons per year of chemicals of harmful potential, found in consumer products were identified. These products had the potential to contribute to groundwater contamination. Of this quantity, almost 60,000 gallons per year were attributable to organic solvent cesspool cleaners. An estimate was made that approximately 83,000 gallons of these 300,000 gallons are being discharged yearly to the groundwater of Nassau County.

## Recommendations

1. An in-depth study of legislative alternative for product controls should be performed by appropriate governmental authorities. Attention should be focused on determining the most effective type of product control which would have the least economic and social impact. Some legislative alternatives which exist are:

    - Specific bans or restricted usage of products and/or chemicals determined to have a detrimental environmental impact.

    - Requiring industry to perform more extensive environmental testing prior to product marketing, followed by gradual introduction onto the market.

    - Stricter labeling laws which are more informative as to the product's harmful potential.

## REFERENCES


1. "Review and Evaluation of Available Techniques for Determining Persistence and Routes of Degradation of Chemical Substances in the Environment", Environmental Protection Agency, May, 1975, NTIS Publication #PB-243-825.

2. "Assessment of the Impact of Organic Solvent Cesspool Cleaners And Drain Openers on Nassau County Drinking Water Supplies NCDH, December 8, 1977.

3. "Criteria and Assessment of Waste Treatability", R.L. Bunch, Ph.D., Municipal Environmental Research Laboratory, U.S.E.P.A., Cincinnati, Ohio.

4. "Inhibition of Anaerobic Digestion of Sewage Sludge by Chlorinated Hydrocarbons", J.D. Swanwick, Ph.D., and Margaret Foulkes, Water Pollution Research Laboratory, Stevenage, Water Pollution Control, 1971.

5. "Analysis and Characteristics of Trichloroethylene Wastes, Alfred G. Camisa, Journal Water Pollution Control Federation, Volume 47, No. 5, May 1975.

6. "Chlorinated Hydrocarbons and the Environment", G. McConnell, D.M. Ferguson, and C.R. Pearson, 1974.

7. "An Investigation into the Effects of Chlorinated Solvents on Sludge Digestion", K.A. Barrett, Exeter Sewage Treatment Works, Water Pollution Control, 1972.

8. "Biodegradability", H.A. Painter, Great Britain, Proc. R. Soc. Lond. B. 185, 149-158, 1974.

9. "Clinical Toxicology of Commercial Product", Gosselin, Hodge, Smith, Gleason, 4th Edition, Page 67.

10. "Harmful organics, carcinogens and/or teratogens;-non-pesticide organics of carcinogenic or other Harmful Potential"-National Academy of Sciences, January 6, 1976.

11. "Suspected Carcinogens - a subfile of the Registry of toxic effects chemical substances." National Institute of of Occupational Safety and Health, U.S. Dept. HEW, December, 1976.

TABLE I

Breakdown of Consumer Products Identified as
Potentially contributing to Groundwater Contamination

| Product Category | Number of Products |
|---|---|
| Organic Solvent Cesspool Cleaners | 12 |
| Paint and Varnish Removers | 39 |
| Household Cleansers, Disinfectants and Oven Cleaners | 40 |
| Laundry Degreasers | 6 |
| Driveway and Garage Degreasers | 12 |
| Solvents and Cleaning Fluids | 47 |
| Engine and Metal Degreasers | 16 |
| Solid Toilet Bowl Deodorizers | 14 |
| Floor Strippers, Cleaners and Dressings | 12 |
| Radiator Flushes | 10 |
| Car Waxes and Cleaners | 17 |
| Miscellaneous | 7 |
| Total | 232 |

TABLE II

Priority List of Chemicals
Nassau County Department of Health

Priority I - Found in wells and listed as:

A. Carcinogenic or harmful compound
B. Possible carcinogenic or harmful (NAS List)

1. A - Vinyl chloride (chloroethylene)
2. B - Dichloroethylene
3. B - Trichloroethylene
4. B - Chloroform
5. B - Toluene
6. B - Benzene
7. B - Bromodichloromethane
8. B - Carbon tetrachloride
9. B - Methylene chloride
10. B - Dibutylphthalate
11. B - Tetrachloroethylene

Priority II - Not Found in wells in measurable quantity but listed as possible carcinogenic or harmful compounds.

1. Benzopyrene
2. 2,4-Dichlorophenol
3. 2,4-Dimethy phenol
4. Bis (2-Chloroethyl) ether
5. Pentachlorobiphenyl
6. Tetrachlorobiphenyl
7. Trichlorobiphenyl
8. Carbon disulfide
9. Acetaldehyde
10. Bis-(2-Chloroisopropyl) ether
11. Diphenylhydrazine
12. 2,4,6-Trichlorphenol
13. Styrene
14. 2,4-dichloromethylphenol
15. Methyl methacrylate
16. Methyl stearate
17. Dichlorodifluoroethane
18. Bromoform
19. Chlorodibromomethane
20. 1,2,4-Trichlorobenzene
21. Pentachlorophenol
22. Chlorobenzene
23. Crotonaldehyde
24. Hexachloroethane
25. Isodecane
26. Nonane

TABLE II Cont'd.

27. Propylbenzene
28. 1,1,1,2-Tetrachloroethane
29. Trimethylbenzene
30. Xylene- (o,m,p dimethylbenzene)
31. Chloral
32. di-(2-ethyl hexyl) phthalate
33. Dichloroiodomethane
34. di-n-octyladipate
35. Nicotine
36. Phenylacetic acid
37. t-butyl alcohol
38. Bromobenzene
39. Bromochlorobenzene (o,m,p)
40. Butyl bromide
41. e-caprolactum
42. 1,2-bis(-chloroethoxy)ethane
43. Chloroethyl ethyl ether
44. 2-Chloroethyl methyl ether
45. Chlorohydroxybenzophenone (All substances in 1 ring)
46. Chloromethyl ethyl ether
47. m-chloronitrobenzene
48. 1-chloropropene
49. Cyanogen chloride
50. Dibromobenzene
51. Dibromodichloroethane
52. 1,3-Dichloropropene
53. 1,1-Dichloro 2-haxane
54. Dichloropropane (all isomers)
55. 1,2-Dimethoxybenzene
56. 4,6-Dinitro-2-aminophenol
57. Hexachloro-1,3-butadiene
58. Hexachlorophene
59. o-Methoxyphenol
60. Methyl chloride
61. Oxtyl chloride
62. Pentachlorophenyl methyl ether
63. Phthalic anhydride
64, 1,1,3,3-Tetrachloroacetone
65. Trichlorofluoromethane

Priority III - Found in wells but not listed as suspected carcinogenic compounds:

1. Napathalenes
2. Methyl Napthalene
3. Dimethyl Napthalene
4. Ethyltoluene
5. C Benzenes
6. Fluorene (diphenyl methane benzidene)
7. Octyl phenols
8. Trichlorotrifluoroethane
9. Ethyl ether

TABLE III

Summary of Quantities of Known or Suspected Carcinogenic or other harmful potential Organic Chemicals Found in Products used in Nassau County

| Product Category | Actual Quantities Indicated by Response to NCDH Market Surveys | | | Extrapolated Quantites to Include 100% of County | |
|---|---|---|---|---|---|
| | % Survey Response | Annual Usage (Gallons) | Quantity Chemicals of Concern (Gals.) | Annaul Usage (Gallons) | Quantity Chemicals of Concern (Gals.) |
| Organic Solvent Cesspool Cleaners, Drain Aids | 61 | 47,600 | 36,450 | 76,500 | 59,750 |
| Paint and Varnish Removers | 23 | 21,400 | 14,650 | 93,050 | 63,700 |
| Household Cleansers, Disinfectants and Oven Cleaners | 46 | 25,600 | * | 55,650 | * |
| Laundry Degreasers | 46 | 30,850 | 6,950 | 67,050 | 15,100 |
| Driveway - Garage Degreasers | 18 | 2,600 | 1,700 | 7,150 | 5,400 |
| Solvents and Cleaning Fluids | 23 | 79,800 | 33,100 | 346,950 | 143,900 |
| Engine and Metal Degreasers | 18 | 3,400 | * | 18,900 | * |
| Solid Toilet Bowl Deodorizers | 46 | (269,400 lbs.) | (266,700 lbs.) | (585,650 lbs.) | (579,800 lbs.) |
| Floor Strippers, Cleaners and Dressings | - | * | * | * | * |
| Radiator Flushes | - | * | * | * | * |
| Car Waxes and Cleaners | - | * | * | * | * |
| Miscellaneous | - | * | * | * | * |
| | TOTALS: | 211,250 Gal. and (269,400 lbs.) | 92,850 Gal. and (266,700 lbs.) | 665,250 and (585,650 lbs.) | 287,850 and (579,800 lbs.) |

* Quantities are undeterminable because either sales volumes of products were not surveyed or ingredient information was insufficient