Originally Filed at Docket No. 436

# Exhibit 118

STENOGRAPHIC MINUTES
Unrevised and Unedited
Not for Quotation or
Duplication

# HEARINGS
## Before The
## SUBCOMMITTEE
## on
## OVERSIGHT AND INVESTIGATIONS
## COMMITTEE ON INTERSTATE
## AND
## FOREIGN COMMERCE

# HOUSE OF REPRESENTATIVES

HAZARDOUS WASTE DISPOSAL

- - -

JUNE 1, 1979

MINEOLA, NEW YORK

COURT REPORTING SERVICES, INC.
1911 Jefferson Davis Hwy, Suite 1006
Arlington, Virginia 22202
(703) 920-6155

OCC 011483

TABLE OF CONTENTS

House of Representatives — June 1, 1979

Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce — Mineola, New York

\- - -


| TESTIMONY OF: | Page |
| --- | --- |
| Hon. Jerome A. Ambro<br>A Representative in Congress from the State of New York | 7 |
| Mr. John Cates and Mrs. Audrey Kennedy<br>East Meadow, New York | 23 |
| Hon. Vincent Suozzi<br>Mayor<br>Glen Cove, New York | 35 |
| Samuel McLendon<br>Consulting Engineer<br>Bethpage, New York, Water District | 45 |
| Francis V. Padar<br>Assistant Deputy Commissioner<br>Nassau County Department of Health | 70 |
| Dr. David Harris<br>Commissioner<br>Suffolk County Health Services | 78 |
| Eckard Beck<br>Regional Administrator<br>United States Environmental Protection Agency | 119 |
| Donald Middleton<br>Regional Director<br>New York State Department of Environmental Conservation | 132 |
| Richard C. Knowles<br>Manager, Northeastern Marketing Region<br>Exxon Corporation | 174 |


OCC 011484

TABLE OF CONTENTS
(continued)

House of Representatives June 1, 1979

Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce Mineola, New York

- - -


| TESTIMONY OF: | Page |
|---|---|
| John O'Brien, Executive Vice President, Grumman Aerospace Corporation | 180 |
| Raymond J. Abramowitz, Technical Director, Ruco Division, Hooker Chemical Company | 188 |


OCC 011485

TESTIMONY OF DAVID HARRIS, COMMISSIONER, DEPARTMENT OF HEALTH SERVICES, SUFFOLK COUNTY, NEW YORK

Dr. Harris. Thank you, Mr. Chairman.

I am David Harris, Commissioner of the Suffolk County Department of Health Services and the Chairman of the Suffolk County Board of Health.

My background briefly: I am a physician with specialty certification in preventive medicine and pediatrics. I am also the Professor of Community Medicine at the University at Stony Brook.

My presentation will touch on the following items: one, the status of our drinking water; two, the sources of organic contaminants; three, our own Department of Health action and efforts to control sources of contamination; four, current problems with the illegal disposal of hazardous materials in landfills; five, the cost of monitoring and protection of our groundwater; and, six, some brief recommendations.

First is the status of our drinking water.

The people of Suffolk and Nassau Counties share more than a common border; they share a dependence on groundwater as their sole source of potable water. Indeed, the United States Environmental Protection Agency, in recognition of this essential fact of life, has designated Suffolk and Nassau Counties as one of only

OCC C11486

three areas in the Continental United States with a sole-source aquifer. That means that the two counties depend entirely on one source of drinking water - in this instance, groundwater.

For decades the Suffolk County water supply, happily, has been bacteriologically and chemicall of superior quality. Of 1.3 million Suffolk residents, approximately 1,050,000 are served by public water; the remaining 250,000, by individual private wells.

In December of 1976, the Suffolk County Department of Health Services became aware of the identification of synthetic organic materials in wells in neighboring Nassau County. As a result, the department immediately initiated a monitoring program for the identification of synthetic organic contaminants in drinking water within our county. Although the initial efforts were directed toward community water systems, namely, municipal water supplies and private water purveyors which serve year-round residents, the program was expanded to cover noncommunity water systems and private wells.

The noncommunity water systems include schools, restaurants, office buildings, and other water supplies which have at least five service connections and serve more than 25 persons on a transient basis.

To date, almost 3,000 water samples from community

OCC 011487

and noncommunity water systems and private wells have been examined for the most commonly used halogenated hydrocarbons and on a few occasions for benzene, toluene and vinyl chloride. We have found that New York State recommended guidelines, namely 50 parts per billion for individual ingredients and 100 parts per billion for the aggregate, have been exceeded in 3.2 percent of the community water systems, in almost 4 percent of noncommunity water systems, and in almost 6 percent of private wells.

In addition, detectable concentrations -- and, mind you, the methods we use are extremely sensitive -- were found in 14.3, 12.3, and 24.4 percent of the samples from the above sources, respectively.

Second is the sources of organic contaminants.

Organic contaminants may originate from a variety of sources, including illegal industrial discharges or accidental spills and commercial and residential use of products containing the organic materials. Many of the organic substances eventually find their way into the groundwater via cesspools, leaching fields, recharge basins and direct percolation through the ground.

In our area, industrial wastes include the various heavy metals; organic photographic chemicals; cyanide compounds; organic solvents, including petroleum

distillates and halogenated hydrocarbons; corrosives of all types including acids; caustics; petroleum products; waste oils; gasoline; pesticides and herbicides -- because we are indeed an agricultural community as well -- laundry wastes; run-off from road deicing; accidental leaks and spills from fuel oil depots; and gasoline stations and industries with above or below ground holding tanks.

Next is health department action and efforts to control sources of contamination.

Whenever these contaminants are identified in a public water system, the water company is advised to refrain from using those contaminated wells and to switch to alternate uncontaminated ones. So far, fortunately, this has been practical only because of the presence of alternate wells in the same wellfields.

In the case of private wells, residents were asked not to use the water for drinking purposes and to try to find an alternate source such as bottled water or to connect to public systems. When a cluster of homes was found to have contaminated water and a public water system was available in the vicinity, an effort was made to have these homes connected to public water supplies. The combined efforts of the towns involved and the Suffolk County Water Authority were successful in achieving this objective in a few instances.

However, there are several areas in Suffolk County which are supplied almost exclusively by private wells and are distant from public water systems. When contamination is detected in these areas, their connection to public supplies is, in many instances, fiscally prohibitive.

The Suffolk County Board of Health is at present in the process of adopting a new article of the County Sanitary Code to regulate the storage and handling of hazardous materials. In addition, the augmentation of our current efforts in the control of industrial wastes will help reduce the contamination of groundwater.

The County Department of Health Services is also investigating the impact of certain organic cesspool additives on groundwater. There is a study in its early stages. Consequently, no conclusions can be drawn at present. But, just before leaving my office, my engineers tell me that they have indeed in the test situation found traces of the organic solvent which is commercially available for cesspools as an additive. They found it in the groundwater in our test situation. If these results hold up, they will be very important in the enforcement of standards.

Next is current problems with the illegal disposal of hazardous materials in landfills.

When we look at solid waste disposal in Suffolk

County, we realize that landfills have become the depository for all manner of contaminants, including the organics in question.

The department's position is that, once a landfill is constructed without adequate safeguards for the protection of groundwater, leachate will in time be formed and discharged from that landfill, contaminating groundwater downstream.

Landfills are required to install monitoring wells to determine the leachate leaving the facility. My department, in cooperation with the State Department of Environmental Conservation, is seeking to ensure that the towns and operators of existing landfill facilities move forward in this area so that potential contaminations are mitigated before they adversely affect downstream receptors. We have no estimate of the quantity of these contaminants reaching the landfills or the groundwater from the residential quarter or from illegal industrial discharges.

Furthermore, recent disclosures of the dumping at landfills and the widespread use of pesticides, paints and other chemicals represent a serious threat to groundwater. A local carting firm dumped waste oil contaminated with large quantities of perchloroethylene at the Town of Islip Landfill on Blydenburgh Road in

OCC 011491

Hauppauge, Suffolk County. It was estimated that from 50 to 70 fifty-five-gallon drums of this material were illegally dumped.

Subsequently, garbage was placed on top of these drums to a height of 100 to 120 feet, making retrieval impossible. A decision was made to place a five-acre impermeable cap over the area in question. This would minimize rainwater percolating through the area of the landfill and thus reduce the leaching of chemicals and their discharge to groundwater.

I mention this only to illustrate the methods that must be resorted to once a problem has occurred.

Another source of organic is in the form of spills and leaks from gasoline tanks. Suffolk County received 26 reports of such incidents in 1977 and 86 in 1978. We know that there are between 1,200 and 1,300 gasoline stations in Suffolk County with three tanks estimated at each site. There are hundreds more buried, partially buried, and surface tanks of other fuels and hazardous materials known to exist in the county.

The cost of gasoline recovery from the ground and groundwater is astronomical and, at best, can recover 25 to 35 percent of the amount spilled. The average cost of a spill cleanup has been in excess of $20,000, with some running over one-half million dollars.

Now for the cost of the monitoring and protection of our groundwater.

The monitoring of groundwater for organic contaminants and the handling of accidential spills imposes tremendous difficulties and financial burdens on the county government. In addition to the scarcity of laboratories qualified to perform tests for trace organics, the cost of testing one water sample for more than one group of synthetic organics may exceed $300 per sample. Although partial support has already been provided by our State Department of Health, the county will in no way be able to meet the prohibitive cost of testing the estimated 50,000 to 80,000 private wells in the county. In addition, the cost of connecting public water supplies to certain areas of the county is beyond the resources of local municipalities or the county government.

I have some recommendations.

Safeguarding the integrity of our drinking water is more than a serious public health concern; it is essential to our very existence. The problem is at once complex and vast, and the more we learn the more complicated and enormous the task appears. There is obviously much to do, but much that can be done.

I offer these recommendations:

OCC 011493

One, primary prevention is the most desirable approach in medicine, and so should it be in environmental health services. Potentially toxic materials must be kept out of our water supply in the first place. There must be an adequate legal and regulatory underpinning for any program designed to protect our drinking waters. This means intelligent but strict regulation of the handling, storage and disposal of materials which are potentially deleterious to the healthful quality of our drinking water. The proposed Suffolk County Sanitory Code changes -- which have been left back in my office, but which I will provide -- and the recent Town of Islip law are good examples of what ought to be done.

Recommendation two - our efforts at primary prevention must be matched be equally vigorous exertions to monitor our drinking water supply diligently. This is a costly undertaking, and any program designed to routinely examine the quality of our water supply must provide financial resources to health agencies like my own to carry out the task.

To give you some idea of the growing cost of the problem, in 1977, when we first got into this business, we spent $62,000 in that year on monitoring for organic contaminants. In 1978, $227,000 was the cost. The County of Suffolk will spent more than $350,000 this year on the

same task.

The third recommendation - when the private wells of communities are found to have unacceptably high levels of organic contaminants, the most prudent course of action is the provision of a clean and uncontaminated public water supply. Very often the implementation of this measure imposes a heavy burden on the individual householder. I suggest that some way be found to financially assist the residents of such affected communities to connect with public water systems. This could perhaps take the form of grants or long-term, low-interest loans.

This concludes my prepared statement. I would be delighted to answer any questions you may have.

Mr. Eckhardt. Mr. Lent?

Mr. Lent. Thank you, Mr. Chairman.

I want to thank the witnesses for their testimony here today.

I wonder if you, Mr. Padar, could comment on Mayor Suozzi's criticism of the county Department of Health during his testimony, when he seemed to object to the fact that the county either ordered or recommended -- I am not quite sure which -- that certain of the city's wells be closed.

Are you familiar with that dispute?

Mr. Padar. Yes, I am.

OCC C11495

Mr. Lent. Would you fill us in on it briefly?

Let me ask you this question. Did you order that the wells be closed? Or did you merely recommend that the wells be closed, leaving the actual ordering to the city government?

Mr. Padar. Initially, we requested the mayor, as we did to other municipal and water supply officials, to restrict the use of their well. We requested rather than ordered because the guidelines we were using were not official water standards. However, when there was an indication that the request rather than order would place a burden on the water supply official, the Commissioner of Health amended his approach and ordered the closing of wells in those situations on the basis of prudent public health need.

Mr. Lent. Turning now to Dr. Harris' testimony, where you discuss this question of landfill. You make a very important point in your testimony where you say that, once these landfills are constructed without adequate safeguards and protection of the groundwater, that leachate will in time be formed and discharged from that landfill, contaminating the downstream water.

You refer particularly to a situation in Hauppauge, where 50 to 70 fifty-five-gallon drums of waste oil were dumped. That comes out to about 3,850 gallons a year.

OCC 011496

Suppose, Mr. Padar, I were to tell you that a citizen of Nassau County was currently discharging 3,000 gallons of used lubricating oil into a sanitary landfill in Bethpage. Would the county health department have no recourse to stop that?

Mr. Padar. We would have recourse. The dumping of liquids at a landfill, to begin with, is prohibited by the State environmental control regulations, which we enforce as an agent of the State.

Mr. Lent. How would you go about stopping that?

Mr. Padar. Having knowledge of the situation, we would request that the activity be suspended. If not, we would request that the State Department of Environmental Conservation hold a compliance conference and, in that manner, enforce the provisions of the law.

Mr. Lent. And you have the same authority with respect to this dumper in Hauppauge?

Dr. Harris. Yes, indeed. We proceed in the same fashion.

However, if I may add, there are ways -- and I alluded to proposed changes in the Suffolk County Sanitary Code -- because there are some loopholes. It would be wise to supplement any existing State laws with the additional regulations - for example, construction standards for gasoline tanks: double wall, checking for

leaks, provision as to how one may abandon, under what circumstances and in what fashion abandon old gasoline storage tanks, and so on.

Mr. Lent. Mr. Padar, how would this spent lube oil have to be contained, this 3,000 gallons per year, before a citizen would be permitted to dump it in, say, the Hicksville landfill?

Mr. Padar. Normally, that type of waste would not be permitted because it would not be permitted to be discharged where it could contaminate the groundwater system because the characteristics of that waste violate the discharge standards of the Department of Environmental Conservation.

Mr. Lent. Now I am somewhat confused. I thought you said a moment ago that, if it was properly containerized, it could be put into the landfill. You are now saying that, even if it is in a drum or a barrel, it would be absolutely against the law to put as much as 3,000 gallons a year of spent lub oil into, say, the Hicksville landfill.

Mr. Padar. Yes. I did not mean to imply that containing the liquid was permissible. Liquids are not permitted to be disposed of in landfills.

Mr. Lent. All right. Now suppose I were to tell you that, with respect to the Old Bethpage Landfill, there is

OCC 011498

a citizen which is presently discharging 10,000 pounds a year of trimellitic anhydride; 27,000 pounds a year of adipic acid; 300 pounds a year of phthalic anhydride; 1,000 pounds a year of isophthalic anhydride; 1,000 pounds a year of maleic anhydride; 400 pounds a year of PVC; 7,000 pounds of Kane Ace; 240,000 pounds of plasticizer; 7,600 pounds of polyester; 16,000 pounds of Speedi-Dri mixed organics; 165,000 pounds of PVC compounds - 90 percent PVC by content; and 3,000 pounds of spent lube oil.

Is there any way that the State Health Department could prevent that from taking place?

Mr. Padar. The array of chemicals you have described, just by recognition, represent many which are banned from discharge to the groundwater, the waters of the State. In that kind of a situation, the identification of that kind of an action constitutes a very definite basis for regulation of that particular enforcement of the law in that particular kind of situation.

Mr. Lent. At this time I would like to have unanimous consent to put into the record two interoffice memoranda of the Hooker Chemical Company, both dated August, 1978; one is August 21, 1978, and the other dated August 29, 1978.

OCC 011499

Mr. Eckhardt. Without objection, the material referred to will be inserted into the record.

[Material follows:]

OCC 011500

Mr. Lent. The memos indicate by their own terms that the chemicals that I have just listed in the amounts and quantities that I have given were currently - at least as of that date less than a year ago - being dumped in the Bethpage Landfill.

Some of those chemicals, I think you indicated, Mr. Padar, are toxic chemicals or have been identified as cancer-producing or cancer-causing chemicals. Is that correct?

Mr. Padar. Probably animal carcinogens or perhaps potentially human carcinogens.

Mr. Lent. For example, trimellitic anhydride - is that a dangerous chemical?

Mr. Padar. I am not familiar with that particular compound.

Mr. Lent. How about adipic acid?

Mr. Padar. I am not familiar with that compound either.

Mr. Lent. As long as you do not have any familiarity with some of them, I do not want to -- perhaps, Dr. Harris, do you have any familiarity?

Dr. Harris. I am not familiar with all of them. But some of the ones you mentioned are indeed potential carcinogens for man.

Mr. Lent. Let's just go to phthalic anhydride.

OCC 011501

Dr. Harris. I am familiar with that one.

Mr. Lent. Isophthalic anhydride.

Maleic anhydride.

Dr. Harris. No.

Mr. Lent. PVC.

Are you shaking your head yes to this?.

Dr. Harris. Yes.

Mr. Lent. What is that?

Dr. Harris. That is a toxic chemical.

Mr. Lent. Kane Ace.

Dr. Harris. That I have no idea.

Mr. Lent. Then we have 240,000 pounds of plasticizers. I can give you a little detail on that. This comes from something called waste filter cake. The annual waste load from the Hooker Chemical Company of this filter cake is 400,000 pounds. All of this goes into the Bethpage dump. It contains 240,000 pounds of plasticizer, largely 26TM trimellitate plasticizer and DOA adipate plasticizer, and lesser amounts of phthalate and maleate plasticizer such as DIBM and DOM.

Does that mean anything to you?

Dr. Harris. I would like to submit that list to one of my chemists.

Mr. Lent. Please turn to page five of the document which has just been handed to you, dated August 21, 1978.

OCC 011502

This is a memorandum from J. B. Harrison of the Hooker Chemical Company to J. Wilkenfeld, D. Guthrie, and A. Katona, also of the Hooker Chemical Company, which details the present dumping status as of that date of that company.

. They indicate at the top of the page: "This trash" -- which is dumped in Old Bethpage Landfill -- "is comprised of the following materials: pallets, cardboard boxes and gaylords, damaged drums containing chemical residues, emptied bags of chemicals, emptied small containers of chemicals, waste filer cake containing plasticizer, spent filter cartridges filled with polyester, rags, paper and wipings containing urethane latex, Speedi-Dri containing chemical residues, waste paper, wood, floor sweeps, metal trash."

And then they spell out a little bit what some of the major constituents of that mixed trash are. They talk about, in the middle of the page, damaged drums. They say that a small number of damaged drums are sent to the Bethpage Landfill, about 300 a year. "They may contain organic residues such as polyester, polyurethane, solvents such as DMF" -- which I believe is a toxic. Dr. Harris, is DMF a toxic?

Dr. Harris. I do not know.

Mr. Lent. "Toluene" -- which is a toxic --

OCC 011503

Dr. Harris. Yes.

Mr. Lent. "MEK" -- which I believe is a suspected carcinogen -- "isopropanol, urethane latex, isocyanates."

Then they describe these emptied bags of raw materials, which we learn from this description are not really empty because they have an estimated four ounces of raw material per bag that goes out with the emptied bag in the trash.

Then they compute that, by the number of emptied bags, they are currently sending the following amount of chemicals to the dump. And this is just in the emptied bags: 10,000 pounds of trimellitic anhydride; 2,500 pounds of adipic acid; and so forth. I will not go into it; it stands for itself.

On page six is the total listing of current major chemical pollution to the Bethpage Landfill. There follows the complete totals that have been estimated by the Hooker people themselves to be currently disposed of in the Bethpage Landfill.

Mr. Padar, how did this document in hand, which is fairly explicit, I think, as to what is being put into Old Bethpage -- is there any authority that the Nassau County Department of Health would have to regulate or stop this?

Mr. Padar. Yes.

I would like to just qualify something I said

OCC 011504

earlier. The list on page six, the written list - Dr. Harris and I both apparently thought you had said PBC rather than PVC.

Polyvinyl chloride is not toxic. It is an inert substance. It is the precursor compound vinyl chloride monomer from which PVC is made that's the culprit.

As far as the list of chemicals on page six, I would say that some of these may be determined to be toxic. Some phthalates are considered to be toxic. Certainly the chemicals listed on page seven - MEK and toluene - are known toxic chemicals.

Mr. Lent. Just so we are accurate here, chemicals that are listed on page seven -- I was going to get to that in a minute -- are chemicals that are currently stored in some 800 drums on property in Hicksville of the Hooker Chemical Company which include polyester, solution urethanes containing solvents DMF, toluene, MEK, isopropyl alcohol, plasticizer strips including perchloroethylene, and other chemicals.

I would ask you if it is within the law or proper for a company to keep that sort of inventory on its property, 800 drums of chemical waste?

Mr. Padar. It is not good practice for the company to keep that quantity of materials stored in a manner in which the containers can be compromised and leak into the

groundwater. It is our basic concern that one of the problems that we have in terms of toxic waste control is the need to control hazardous substances as well as toxic wastes.

These happen to be waste products, but maybe at the other side of the plant they have drums of raw materials which are equally hazardous but they are not wastes.

I understand that the reason that the Hooker Chemical Company is storing all of these drums is because their recipient, Rollins, who takes their wastes and disposes of them for them has had a breakdown because of a fire in the plant; and therefore there has been a backlog. We have been assured that this backlog will be reduced expeditiously.

I agree with you that that is a problem because any one of those ruptured drums could contaminate the groundwater right there.

Mr. Lent. Is it not also a fact that came out during our hearing regarding the storage of drums at Elizabeth, New Jersey that one of the witnesses said this presented a very clear and imminent danger of possible explosion because various chemicals could commingle with each other and cause a chemical reaction. Is that correct?

Mr. Padar. Both the chemical itself and in reacting with other chemicals to cause an exothermal chemical

OCC 011506

reaction, an explosion.

Mr. Lent. I do not want to take too much time.

Just moving down to the next section of the report, there is the storage of mercury. That is a hazardous substance and a carcinogen, as I understand. Is that correct?

Dr. Harris. It is a neurotoxin basically.

Mr. Lent. Hooker indicates in this document that they have 37,414 pounds of old, obsolute product containing Metasol, which is 57 percent mercury by weight and that this material is now about five years old; and they have been unable to sell it.

Does it create a hazard to have this much material on hand stored, presumably, on the ground?

Mr. Padar. I would say that, if this is true that a toxic material -- I would like to verify that -- that, with haphazard storage, the container could rupture and get into the groundwater; that is certainly not desirable. However, if it is not a waste product, we really have no authority except for the general authority of the Commissioner of Health to cause this kind of a situation to be suspended.

The laws in terms of environmental control pertain to the disposal of wastes and discharge into waters of the State. They do not address materials which are not wastes.

Dr. Harris. Mr. Lent, I do not recognize all the items on the list on page seven under E and under F. But some of them are known to me, and some of them are toxic. The storage of these materials is precisely what I was alluding to when I talked about changes in the sanitary code. Except for general power that I have as Commissioner, there are no specific powers under which I can proceed.

What I am seeking to have in our county sanitary code -- and it may be an advisable kind of rule for the rest of the State -- would be that, when hazardous materials or potentially hazardous materials are stored, they are stored in containers with impermeable dikes made of concrete to prevent accidental rupture and leakage into the groundwater. And there is one other important aspect. Even if they are not of an explosive nature, if a building in which these materials are stored does catch fire, drums burst, carboys break, containers of solids are spewed around, and there can be a general problem to the groundwater.

Mr. Lent. I am going to yield to Chairman Eckhardt for a few moments. But, while that is in progress, I would hope that Dr. Harris would review the material on page eight having to do with the Syosset Municipal Landfill. Then I will ask some questions on that.

OCC 011508

Mr. Eckhardt. Would the gentleman yield?

Mr. Lent. Certainly.

Mr. Eckhardt. At this time I should like to ask unanimous consent to introduce in the record the document that I think the gentleman has already asked unanimous consent to introduce. It is a communication designated as Waste Disposal Sites - Hicksville. It is dated 8/18/78 and has a notation M/A 3846-8 JBH:sg from J.B. Harrison to J. Wilkenfeld, D. Guthrie, and A. Katona. That, I believe, is the document that the gentleman has been reading from.

In addition, there is a document dated 8/30/78, M/A 3867-8 JBH:sg from J.B. Harrison to K. Giannotti, captioned Identification of Environmental Problems.

I should like to ask unanimous consent that the two documents be introduced at this point in the record. Without objection, they will be so introduced.

In addition, I should like to point out that the second of the documents purports to treat the question of the nature and some of the potential dangers or effects of the various chemicals that are listed in the first document. I think Dr. Harris has indicated that some of these are familiar to him, and some are not.

In some of these cases the second document purports to deal with the question of hazards. In addition to

OCC 011509

that, I should like to ask unanimous consent that the record be held open immediately after the introduction of these two documents to insert an independent analysis of the toxicity of the list of chemicals.

Dr. Harris, perhaps we may count upon you to cooperate with the committee in ultimately obtaining such an independent analysis.

Dr. Harris. Mr. Chairman, would you like my staff to prepare such an analysis and have it sent to you?

Mr. Eckhardt. It would be very helpful to the committee. I think that that would afford the needed information.

Dr. Harris. I should be glad to do so.

Mr. Eckhardt. Without objection, all of the documents will be introduced. The place in the record will remain open for Dr. Harris to supply such document. Thank you.

[Material to be supplied follows:]

OCC 011510

Mr. Eckhardt. Thank you, Mr. Lent; you may proceed.

Mr. Lent. Thank you, Mr. Chairman.

Referring now to page eight of the document of August 16, 1978, regarding the Syosset Municipal Landfill, this document indicates that that dump was utilized by the Hooker Chemical Company for about ten years -- rather, it was discontinued ten years ago as a municipal dump. However, during the period 1946 through 1968, the Hooker Hicksville plant sent any and or solid and liquid wastes in drum quantities to this facility.

Reading from the document: "Also tank trucks of Ester Plant wastes from our concrete pits - alcohols, glycols, perchloroethylene, latex waste material and SBR" were disposed of at Syosset.

They indicate further, "Drummed waste would include alcohol/water/perchlor, purified latex, coagulated latex, alum, filter cake, PVC sludge, PVC floor scrapings, and reactor scrapings, vinyl chloride recovery still bottoms, spent lube oils, about 300 gallons a year, and waste PCB therminol waste."

Skipping down a little bit further: "Also drums of waste filter cake - mixture of celite, decolorizing carbon, spent toluene solfonic acid catalyst, bicarbonate, and trimellitate plasticizer. Also pallets, cardboard boxes, vinyl compound floor sweepings. Also PVC sump

OCC 011511

scrapings - combined PVC, vinyl chloride, vinyl acetate, trichloroethylene, barium and cadmium soap stabilizers. Also organic heels in drums."

Can you tell us, Mr. Padar, whether that kind of dumping would be permitted under today's rules and regulations of the county?

Mr. Padar. This type of dumping -- many of these products are known to be toxic and are prohibited in the State law from being authorized to be dumped in conventional landfill.

Mr. Lent. This document indicates that we are talking about 800,000 pounds per year total of this solid and liquid waste over the period of 1946 to 1968 and that the company discontinued using the Syosset dump in 1968. There was no segregation at the Syosset Landfill of Hooker wastes from other wastes and that the landfill personnel did segregate liquid from solid wastes in two general areas of the dump.

Dr. Harris, in your statement you indicated that, once a landfill is constructed without safeguards for the protection of groundwater, this leachate will in time be formed and discharge from that landfill, contaminating the water downstream.

Is this the kind of a landfill that you had in mind when you made that statement?

OCC 011512

Dr. Harris. Yes, this is the kind of problem.

By the way, you did give me a chance to look at the list on page eight. I can identify several things here that are undoubtedly on the list of potential carcinogens and toxic material.

Mr. Lent. From among the --

Dr. Harris. The perchloroethylene and the trichloroethylene, vinyl chloride -- now, the forms in which they take and their quantities are not precise from this; but certainly at first glance it appears that there are toxic substances in this list.

Mr. Lent. And you identify several of them as being toxic?

Dr. Harris. Yes.

Mr. Lent. Would you just read off the names for the record.

Dr. Harris. I have circled some that I am familiar with: perchloroethylene; the trichloroethylene; the vinyl chloride. What forms they are in and how much, it is hard to tell from this.

Also, whenever I see a list of drums with a variety of residues in them, it has become my experience that often not a very careful accounting is made of just what is in - part empty or waste drums, and so forth. One is never sure. One sometimes has many surprises.

OCC 011513

I can recall one day we were called to the scene of a problem in Suffolk County where old drums were being used as road markers. As you can see, for road construction these drums are cheap road markers. Somebody detected some sort of strange organic odor in the air, so my staff were sent to investigate. Indeed, it appears that a drum containing a certain amount of toxic organic chemical -- I do not remember the name -- was being marketed as a used drum. Of course, it was too heavy to roll around, so the workman decided the best thing to do would be to lighten it by puncturing it. Indeed he did and let out all the toxic material.

So, when one deals with used or partly used drums, I am never sure what they contain.

Mr. Lent. Are you familiar with the section in this report which deals with ester? Do you know what that means?

Dr. Harris. No, sir. This report is totally new to me, this document dated 8/21/78.

Mr. Lent. Are you familiar with Speedi-Dri? It is referred to at the bottom of page five of the report.

Dr. Harris. I am not familiar with it. It sounds like a trade name. But many of this "quick-drying" organic solvents contain halogenated hydrocarbons of the kind that we are finding in underground water supplies.

OCC 011514

Mr. Lent. Let me just read this for the record, this section at the bottom of page five:

"Speedi-Dri Containing Chemical Residues - We" -- meaning Hooker -- "currently buy 33,000 pounds per year of Speedi-Dri. This is used to soak up and clean up chemical spills - plasticizer, 2-ethylhexanol, and other alcohols, polyester, polyurethane, urethane latex, and oil spills. The Speedi-Dri, containing soaked up chemicals, is sent to the Bethpage landfill. We estimate that about one-half part of organic goes out with each one part of Speedi-Dri, meaning that we send about 16,000 pounds per year mixed organics to the landfill with the Speedi-Dri."

I am just a layman. Would that type of dumping be permitted under the current law? Is that considered hazardous?

Mr. Padar. I would believe that the Speedi-Dri itself is like a blotter material. It is the material that it soaks up that is the toxic material. If the process of dumping and the effect of rainfall and other factors cause the toxic chemicals to leach out of the Speedi-Dri and get into the groundwater, then the total combination would be a toxic substance and prohibited by part 360 of the State environmental conservation law.

Mr. Lent. Mr. Padar, were you aware of the fact, as an official of the Nassau County Health Department, that

over these years at Syosset that the Hooker Company was sending 800,000 pounds per year of total solid and liquid wastes and is currently sending 1,600,000 pounds per year of solid and liquid wastes to the Old Bethpage Landfill?

Mr. Padar. I was not aware of that operation whatsoever.

Mr. Lent. Will this document help you and the commissioner in carrying out your responsibilities under the statute?

Mr. Padar. Yes. We will investigate the circumstances and evaluate the toxicity of the materials and take whatever actions appropriate to identify and correct a violation of the law.

Mr. Lent. I think these two documents are almost a testament of pollution that ultimately, with time, is going to leach into our groundwater supply.

Looking just for a moment at the second memorandum, dated August 30, 1978, referring to page two, the Hooker people talk about a chemical called TMA, which is described as a hazardous chemical. The document says that it is recommended that TMA be handled as an extremely toxic agent in the workplace, that it may result in noncardiac pulmonary edema, immunological sensitization and irritation of the pulmonary tract.

Then it says, "To date we have not notified our union

OCC 011516

personnel of the NIOSH warning."

Is that something that the health department would be interested in with respect to the employees who might be handling this TMA?

Mr. Padar. The responsibility for industrial health is with the Occupational Safety and Health Administration, which has an office on Long Island. They would be responsible for any employee hazards.

Mr. Lent. All right. That would be inside the plant.

Further down the page, it is indicated that the waste TMA, an estimate 10,000 pounds per year goes to the Bethpage Landfill.

You would be interested in that; would you not?

Mr. Padar. Yes, sir. We would be interested in determining the toxicity of this material in relationship to the groundwater situation. We have experienced in the past a difficulty in relating hazard of a substance in the air such as vinyl chloride compared to the hazard in drinking water. However, in most instances where there is a known toxic property in any environment, the material would be prohibited from discharge into a landfill where it can reach groundwater or open surface water.

Mr. Lent. I would appreciate it if at least the Nassau County Department of Health as well as the Suffolk

OCC 011517

County Department of Health would go over this material very carefully. The plant is located in Nassau County, so I assume that its waste-dumping practices should be a subject of interest to Nassau County.

There is some evidence in there that some years back dumping from the Hooker Chemical Company did go out into Brentwood, one of the landfills out there. I am sure that Dr. Harris would be interested in that since that landfill is in his own county.

I want to thank these two gentlemen for their testimony today, Mr. Chairman.

Mr. Eckhardt. I have a few questions, but before I get into them I want to thank the County of Nassau for so carefully following the recommendations of the Federal Government in not overly cooling the room. We have not been as assiduous in the Longworth Building.

Doctor, you make three recommendations. One is that, with respect to prevention, you point out -- and I think correctly so -- that potentially toxic materials must be kept out of our water supply in the first place.

From a Federal standpoint, I think we probably have a structure of the law that would accomplish that objective in the Water Pollution Control Act, the Toxic Substances Control Act, and the Resource Conservation and Recovery Act, and the Safe Drinking Water Act.

OCC 011518

There is some question, though, as to the second matter you bring up here. That is the question of strict regulation. To some extent it seems to me that we have not sufficiently provided the personnel to enforce the act. I think 14 years happens to be about the period of time that the Water Pollution Control Act or the Air Pollution Control Act, I think, went into active effect.

Do you think that - under your item one, other than the question of strict regulation and enforcement of the law - there are additional laws needed?

Dr. Harris. There appear to me at the local level that there are some lagooning that might be filled. For example, the regulations that have to do with storage of materials, both liquid and dry bulk. They are not adequately covered yet in Federal or State statute. For example, there is no statute I am aware of that requires double-walled gasoline storage tanks. And that is becoming a serious problem.

Suffolk County is a relatively young county in terms of development; so, many of the gasoline tanks are relatively young. But, with the passage of time, they will deteriorate.

There are no regulations I am aware of now other than the ones we are proposing and have been passed by certain townships - at least one - which would require the

OCC 011519

periodic testing of the integrity of these tanks. As you noted, with energy being so short, there should be a double reason for doing so: one a health reason; another a conservation reason.

There are some gaps, I should think, in bulk storage of hazardous materials as well.

It is too bad I do not have our proposed regulations here. I will make them available to the committee by messenger.

Mr. Eckhardt. The committee would be very glad to receive them. The record will be held open at this point, without objection, for introduction of your more specific proposals with respect to these matters.

[Material to be supplied follows:]

OCC 011520

Mr. Eckhardt. Your third item deals with the situation of contaminated wells which are away from a public water system. You suggest that some way be found to financially assist the residents of such affected communities to connect with public water systems. As a Federal question, that disturbs me a bit. In the first place, this is not an unpopulated area, not like some parts of my State. It is not like Pecos, Texas, for instance and the surrounding country.

You do have a population that should be sufficient to generate sufficient tax base, it seems to me, to afford public water supplies without Federal assistance. I am not sure; you do not necessarily suggest Federal assistance here?

Dr. Harris. No, sir, although I did mention it, I was not specifically, because the assistance might come at other levels of government.

However, even though we have a relatively dense population in parts of Suffolk County, there are other parts of Suffolk County that are practically rural. There are small enclaves of people who are marginal in terms of socioeconomic standing. To them it is not so much the cost of the water itself but the cost of the hooking up, bringing in the pipes, and so forth. This has been a problem.

OCC 011521

Some of the communities have been helped out by our colleagues at the State level. The State Department of Environmental Conservation have been helpful to us. Sometimes town government is ready to help. But this is a problem.

As you can imagine, the householder says, "I didn't do anything here." Then, when it asks local government to find the source of pollution, it is often very difficult to do. So, there isn't any evil man or villain to sue to get the money for this improvement.

I do recognize that it is not really a Federal or a State responsibility for a community to have public water supply. That has not been the history of things. But what I was suggesting is that perhaps some relief be found when contamination is discovered; sometimes it was there for a long time, unknown to the residents, and they find themselves in financial difficulty. That is all I am suggesting.

Mr. Eckhardt. Your second recommendation is one that appeals to me most. It is a matter which we have not adequately addressed at the Federal level. That is the question of identifying the danger and maintaining a sufficient surveillance over the water supply over a period of time.

I think that is an area in which a central authority

is particularly appropriate to deal with the question.

You also, of course, are talking not only about the Federal Government affording its own laboratories, but you refer to grants. Of course, we already have some grants, I understand, under the Safe Drinking Water Act.

I think the question is a much larger one than had been envisaged either at the time of the passage of the act or has been adequately understood at the time of its implementation by appropriate.

I do feel that this is an extremely important area in which the Federal Government should move with the cooperation of State and local authorities.

Do you have further comment on this area?

Dr. Harris. Yes, sir. I am pleased that this area does interest you. I would like to make a further comment. In this State, only about 1 to 2 percent of the health budget is spent on preventive services. There has not been until lately great interest throughout the nation in prevention.

I understand that the Congress has awakened to this need and is considering additional funding for public health and preventive services in the budget.

I would want to say that, in a State like ours, with an area that is a sole-source aquifer, a good deal of the public health money has to be diverted to this kind of

OCC 011523

activity. In whatever form it arrives, in general preventive health - monies for general preventive services to the States or in some other form - it is very much needed. A larger and larger proportion of my budget is expended monitoring, and I do not nearly have enough money despite some generosity on the part of the State.

Mr. Eckhardt. In addition, of course, we are now identifying dangers which may exist when extremely small portions of a chemical may be involved, whereas your traditional means of identifying dangers were much more gross, as I understand.

Dr. Harris. Absolutely, sir.

The State guidelines, which have come under discussion by some previous speakers, are what I would consider to be guidelines, but prudent ones. They are based, of course, on animal experimentation and the extrapolation of findings on laboratory animals. What they really are saying are, waters that exceed these standards, if you drink them for a lifetime, carry with them a risk of anywhere from one additional cancer per 100,000 or 1,000,000 population. That may seem small, but we are dealing with very small quantities as well -- one part per billion. That is one part in ten to the ninth power; so, that is a very small number or very large dilution.

OCC 011524

I would say that, even though there is not clearcut proof that many of these contaminants -- with some of the exceptions we mentioned like benzene and vinyl chloride -- do pose an actual cancer risk for man. They are a potential cancer risk. I would not like to wait until the data are in which show that these substances, which are potential carcinogens, are indeed human carcinogens.

Mr. Eckhardt. I am very interested in your comment on that because it has always seemed to me that, when the environment is changed in any substantial way in a manner which has not existed at any time in the entire history of life on earth, that the burden must rest on those who change the environment to show that it is not dangerous rather than the burden falling in the opposite direction.

Frankly, I do not know how you, in a State or county operation, could possibly bear that burden. It may well be that the Federal Government must be the ultimate resource for the more exotic determination of pollutants which may reasonably be considered a change in the environment which may be dangerous.

I think we have very much the other side of the coin from a genetic change. In other words, a change in an organism or in human life by genetic change has many more chances of being harmful than favorable. The mutation, for instance, may be a million to one more likely to be

harmful because we have developed over a long period of time with the existing environment. When we change our being, we are somewhat in danger.

It seems to me the other side of the coin is that we have lived many millions of years on the earth in the present environment. So, a change of the environment may be dangerous.

Dr. Harris. This is the concept that needs to be more widely appreciated, namely that man's biological changes are quite slow and evolutionary; and he is now being exposed on an accelerate scale to compounds and substances which he would not ordinarily have faced during his biological development - absolutely.

Mr. Eckhardt. I want to thank you both for your very helpful and very knowledgeable testimony before this hearing.

Our next panel consists of Mr. Eckard Beck, Regional Administrator of the Environmental Protection Agency, and Mr. Donald Middleton.

Please come forward.

Do you swear to tell the truth, the whole truth, and nothing but the truth, so help you God?

Mr. Beck. I do.

Mr. Middleton. I do.

Mr. Eckhardt. Please proceed.

OCC 011526

TESTIMONY OF RAYMOND J. ABRAMOWITZ, TECHNICAL DIRECTOR, RUCO DIVISION, HOOKER CHEMICAL COMPANY

Mr. Abramowitz. Chairman Eckhardt, Congressman Lent, members of the subcommittee staff, good afternoon. I guess we are last but not least, Hooker Chemical.

My name is Raymond J. Abramowitz. I am Technical Director of the Ruco Division, which is a part of the plastics group of Hooker Chemical Company. In my position as Technical Director, I have divisional environmental coordination responsibilities for Hooker's facilities in Hicksville, Long Island and Burlington, New Jersey. Although my office is presently located at the Burlington plant, I spent 23 years working at the Hicksville facility.

I appreciate the opportunity to appear before the subcommittee and to discuss Long Island groundwater contamination problems that are of mutual concern to Hooker and the subcommittee's members. Although the principal focus of my remarks will be upon Hooker waste management activities at Hicksville, it may be useful to first briefly describe the history and current operations of our Hicksville plant.

The Hicksville plant site was developed by the Rubber Corporation of America, a small privately-held company. Operations began as far back as 1945. Those initial

operations included natural rubber latex storage, concentrating and compounding. Five years later, the plant began producing small volumes of plasticizers. Through the years, these activities were expanded, new product lines were added, and a few lines were discontinued or transferred to other plant sites. For example, in 1956, a polyvinyl chloride plant began operations which continued until 1975. I will return to a detailed discussion of our PVC operations in a few moments.

The Hicksville plant is now owned by Hooker Chemical, which purchased it from the Rubber Corporation of America in 1965. Today, the facility employs 125 individuals and annually manufactures nearly 50 million pounds of plastic products. These products and operations include the following:

One, we make polyesters for polyurethanes and specialty plasticizers for the vinyl industry. These products eventually become part of wire and cable insulation, panty-hose, shoe soles and numerous other consumer products.

Two, solution polyurethanes and a recently-developed line of polyurethane latexes.

Three, dryblends and pelletized plastic compounds for pipe fittings, bottles, vinyl records and specialty

extrusion and injection molding compounds.

Four, polyester, plasticizer and polyurethane products which are in a pilot plant development mode.

And, lastly, we do have an organic synthesis laboratory which also performs technical service functions.

With this background, I would like to address the subject of today's hearing: groundwater contamination on Long Island. We have been concerned about reports of the presence of vinyl chloride and chlorinated hydrocarbons in Long Island groundwater and equally concerned with allegations associating our Hicksville facility with this problem. To set the record straight, I will explain the nature and disposition of our vinyl chloride and chlorinated hydrocarbon wastes.

Polyvinyl chloride - or PVC, as it is more commonly known - was manufactured at our Hicksville plant from 1956 to 1975. During the 19-year period, production never reached name-plate capacity of the plant, and the average annual output was approximately eight million pounds per year - that is, of polyvinyl chloride.

In the suspension PVC process used at our Hicksville facility and by other leading manufacturers, vinyl chloride monomer was purchased in rail cars as a liquid under pressure, and was received into above-ground storage

OCC 011529

tanks. This monomer, under pressure with water, was charged to a reactor along with catalysts and other minor additives and converted to polyvinyl chloride by polymerization.

Unreacted monomer at the end of the reaction was steam-stripped from the batch with vacuum, was condensed and recovered for recycling in subsequent runs. The batch at this stage was essentially a slurry of granules of polymer in water. The slurry was then fed to a centrifuge which spun off the majority of the water from the PVC. The final drying was completed in a rotary dryer.

The water effluent from our PVC production process was discharged into an outdoor collection basin. Using samples from the collection basin, tests were performed for acidity, biological oxygen demand - BOD - chemical oxygen demand - COD - suspended solids and total solids. The test results were provided to the Bureau of Water Pollution Control of the Nassau County Department of Health.

Our PVC manufacturing process was essentially similar to those practices in dozens of other larger installations in the country and indeed throughout the world. The PVC facility was operated in compliance with all government regulations.

Among the wastes created by all PVC operations are

small amounts of vinyl chloride. Vinyl choride was first identified as a possible human carcinogen in 1974, one year prior to the closure of our PVC plant. Some have alleged that the vinyl chloride in the aqueous effluents from our former PVC operations was the source of contamination of certain wells of our neighbors, Grumman Aerospace Corporation and the Bethpage Water District. For reasons I will explain in detail, we cannot agree with these allegations.

We believe that extremely little, if any, vinyl chloride in our effluent ever reached the groundwater. According to our best information, our PVC wastewater contained vinyl chloride at levels less than three parts per million. This is equal to a maximum annual discharge of about 60 pounds per year. However, vinyl chloride has a low solubility in water and is a gas at normal temperatures. Because our PVC wastewater was placed in open-air lagoons, it appears that most, if not all, of the traces of vinyl chloride in our effluent were dissipated into the atmosphere.

Our conclusion in this regard is supported by the Environmental Protection Agency's document entitled _nvironmental Impact Statement on Vinyl Chloride. This [illegible] published in October, 1975. In that document the EPA sta[illegible] according to their own data, "essentially all"

OCC 011531

vinyl chloride in wastewater is released into the atmosphere.

To assure that our employees were not adversely affected by our PVC operations, we conducted several tests. In 1976, we tested our plant drinking water. We found no evidence of vinyl chloride with a test sensitivity of one part per billion. Likewise, prior to the time we closed our plant in 1975, each plant employee was given a NIOSH-recommended medical examination. No symptoms associated with excessive vinyl chloride exposure were found in the course of those examinations.

The question raised by our evidence is obvious and important: If reports that vinyl chloride was found in the neighboring wells are accurate and Hooker is not responsible, what is the source of this contamination? I regret, gentlemen, that we cannot provide your committee with a definite answer at this time because we have not had access to the reported test data. For example, over the last 18 months, we have repeatedly requested the Bethpage Water District to provide its well contamination data to us so that we could discuss the matter. To date, they have refused to do so.

Despite our lack of specific data, one fact is [illegible]wn. That is that vinyl chloride is often found un[illegible]untably in drinking water. Again according to an

Environmental Protection Agency study, the cities of Miami and Philadelphia have found vinyl chloride in their municipal water supply - in amounts of 5.6 parts per billion and 0.27 parts per billion, respectively - this despite the fact that there are no PVC or vinyl chloride plants anywhere in the vicinity of these two cities. The source of this information, gentlemen, is an EPA document entitled Scientific and Technical Assessment Report on Vinyl Choride and Polyvinyl Chloride, June, 1975.

To summarize with regard to vinyl chloride, our evidence does not point to Hooker as the source of vinyl chloride contamination. We are, however, concerned about the reported vinyl chloride contaminations in the Hicksville area and pledge our cooperation in helping to identify the source.

I would like now to turn to the question of the chlorinated hydrocarbons.

According to media reports, groundwater contamination by chlorinated hydrocarbons is widespread on Long Island. The specific chemicals identified in these reports have included chloroform; methylene chloride; carbon tetrachloride; 1,1,1-trichloroethylene; trichloroethylene; and tetrachloroethylene. Of these six compounds, only the [illegible]ter two - trichloroethylene and tetrachloroethylene - c[illegible] possibly have ever been present in any of the



CONFIDENTIAL

discharges from Hooker's Hicksville facility. As I will explain, our discharges of these two compounds were very small, ceased entirely by 1975, and, we believe, had no significant impact upon the quality of the groundwater.

First, let me discuss the chemical compound trichloroethylene. Until 1975, we used small quantities of trichloroethylene in the production process for some resins made in the PVC plant. We believe that most of this compound was consumed in the production process and therefore never entered the waste stream. It is possible that trace quantities of trichloroethylene were not entirely consumed and may have been discharged in our wastewater to the lagoons I have previously mentioned. Although we cannot quantify the amounts in question, I am confident that the amounts were minute and that they had no significant impact upon the groundwater quality.

Let me now turn to the other hydrocarbon which Hooker could possibly have discharged to the groundwater, the compound tetrachloroethylene. This compound, also known as perchloroethylene, was used in our ester operations. Tetrachloroethylene was first identified as a carcinogen in late 1977 and we have discontinued use of the product.

During the esterification process in which [illegible]achloroethylene was used, most of the compound was re[illegible]red and recycled in subsequent operations. Small



CONFIDENTIAL

amounts, however, were discharged into the waste stream. I estimate this amount to have been less than 40 pounds per year.

After the construction of our on-site incinerator in 1975, all of our wastewater containing tetrachloroethylene was incinerated. Prior to that time, this effluent was discharged to a settling basin and could have reached the groundwater. However, because the amounts in question were very small, we do not believe that they had any significant impact upon the groundwater.

To summarize about hydrocarbons, our Hicksville facility annually discharged trace amounts of trichloroethylene and less than 40 pounds of tetrachloroethylene. These discharges ceased entirely in 1975. Without minimizing our responsibilities, it is important to place these figures in perspective. Each year the groundwater of Nassau and Suffolk Counties, in our judgment, is contaminated by more than one million pounds of chlorinated hydrocarbons found in drain and cesspool cleaners.

Additionally, large quantities of chlorinated hydrocarbons are used in the Hicksville area and throughout Long Island for dry cleaning, metal degreasing, [illegible]d other commercial applications. We are unaware of any t[illegible]ment process that prevents most of these hydrocarbons

from reaching the groundwater. Since the national yearly usage of tetrachloroethylene, trichloroethylene and 1,1,1-trichloroethane exceeds 1.5 billion pounds, I suspect that millions of pounds of these chlorinated hydrocarbons may be contaminating Long Island's groundwater.

To repeat, however, we do not believe that our Hicksville facility is contributing to this problem. On the contrary, this facility has an active and responsible waste management program which includes the following five elements: one, the reduction of the rate of waste generation; two, recycling of wastes, wherever practical; three, segregation of the waste streams so that they can be handled more expeditiously than they would be if they were mixed; four, incineration of the combustibles; five, secure landfill containment for noncombustibles.

Our waste management program includes plans for the construction of a second on-site incinerator to incinerate certain solid and liquid wastes which our present incinerator cannot handle. We are presently talking with incinerator manufacturers and hope to place an order for the new equipment within the next few months.

In conclusion, gentlemen, we believe that the past, esent, and future waste disposal activities at the H. ville plant are environmentally responsible and have



CONFIDENTIAL 

reflected appropriate concern for Long Island's groundwater.

We stand ready to assist this subcommittee and other government agencies, which are justifiably concerned about Long Island's environmental well-being. I trust that this statement and the other information previously submitted to the subcommittee have been helpful and responsive to your concerns.

Thank you, Mr. Chairman, for the opportunity to present this statement.

Mr. Eckhardt. Mr. Lent?

Mr. Lent. Thank you, Mr. Chairman.

Thank you, Mr. Abramowitz, for your statement.

The thrust of your statement, as I understand it, is that your company, Hooker, although it was the only user of vinyl chloride in the Hicksville area and used that chemical rather extensively in its manufacturing process for some 19 years, is not guilty of the conditions that forced the closing of the nearby wells in the Bethpage Water District.

Is that correct?

Mr. Abramowitz. With regard to the vinyl chloride, allegation of that charge, yes, that is our contention.

Mr. Lent. The vinyl chloride -- I beg your pardon --

OCC 011537

as I understand it, is in the Grumman well.

Mr. Abramowitz. That is where -- we have not received, unfortunately, as a company any of these test results. All we know is, you might say, what we read in the media. We see tables. We hear people talking. No official agency has supplied us with analytical results showing vinyl chloride monomer in any of their wells.

Mr. Lent. Are you in doubt at all that there was vinyl chloride found in the Grumman wells?

Mr. Abramowitz. Honestly, there could be an honest doubt in my mind because we do not know what test methods were used. We were never asked to participate in taking samples. And this information --

Mr. Lent. You said in your statement that there was extremely little, if any, vinyl chloride that ever reached the groundwater, in your opinion. Is that correct?

Mr. Abramowitz. That is our correct opinion, sir.

Mr. Abramowitz. And you said you wanted to pledge your company's cooperation to help it to find the source.

Mr. Abramowitz. Certainly.

Mr. Lent. This is one of the reasons we are here today.

Mr. Abramowitz. We certainly will do that.

Mr. Lent. If you will refer to this internal memo -- I ume you have been provided a copy of it. If not, we

should have the clerk deliver it to you.

Refer to, first, page six at the top of the page.

Mr. Abramowitz. Yes.

Mr. Lent. Contrasting these statements with the statement that you gave to the committee that extremely little vinyl chloride ever reached the groundwater, you say in here --

Mr. Abramowitz. Page six.

Mr. Lent. Page six at the top: floor sweeps of polyvinyl chloride and PVC compounds.

Quote: "In our Plant 3 PVC dry blends operation, we accumulate about 500 pounds a day of waste PVC compound in the form of floor sweeps and ventilation dust collector material. This all goes into the trash hopper, and at our present operating mode, 330 days a year, amounts to 165,000 pounds a year of PVC compounds sent to the Bethpage landfill."

Now, if it goes into the Bethpage landfill -- and we heard the testimony of good health commissioner of Suffolk County who is presumably an expert -- there is going to come a time when eventually it is going to percolate down into the groundwater.

Is that not correct?

Do you consider 165,000 pounds "extremely little"?

Mr. Abramowitz. I think we are having a difficulty

here. We are mixing up vinyl chloride monomer with PVC. PVC, as already was testified to here today earlier, is an innocuous, inert material.

We indeed, Congressman Lent, have checked the residual vinyl chloride content of some of our PVC compounds representatively, and they range in the low parts per billion. So, we are not talking of 165,000 pounds of vinyl chloride monomer. We are talking about infinitesimal trace residual amounts of vinyl chloride in the order of fractions of a parts per billion.

Mr. Lent. Fractions of a parts per billion?

Mr. Abramowitz. Yes, sir.

Mr. Lent. Let's now turn to page 11.

Mr. Abramowitz. Did we clarify that, sir?

Mr. Lent. Beg pardon?

Mr. Abramowitz. Did we clarify that?

Mr. Lent. Well, I don't want to say; I am not a scientist. I accept your statement, and it will be checked by the committee.

Mr. Abramowitz. The point is they are two different materials.

Mr. Lent. PVC and VC. You are pointing that out, and I am aware of that.

Now turn to page 11, and we will get into the vinyl ch[illegible]de itself.

OCC 011540

There at item number seven, you say: "Commencing in 1956 Hicksville Plant went on-stream with a PVC resin facility making both vinyl chloride" -- now that is VC, right? That's the dangerous one?

Mr. Abramowitz. That is right.

Mr. Lent. -- "vinyl chloride homopolymer and vinyl chloride/vinyl acetate copolymer. Production rate of this suspension plant was ten million pounds a year. Waste water from the plant was discharged to sand sumps on the plant property. This disposal method was followed for 19 years until the plant shut down permanently in 1975.

"This waste water contained approximately 1 percent PVC" -- we are not so worried about that -- "resin solids, and 600 to 1,200 parts per million" -- not billion, million -- of "vinyl chloride."

Now, that is a very significant amount of parts per million of the vinyl chloride; is it not?

Mr. Abramowitz. Yes, it is, if it would be. Congressman, again we have to apologize for phraseology and the punctuation. We analyzed and studied this sentence in depth.

The meaning of it is, 600 to 1,200 parts per million of the following materials combined: vinyl chloride, [illegible]atin, Methocel, stabilizers, the trace of tri[illegible]loroethylene, and most of it we believe was probably

OCC 011541

vinyl acetate.

So, we apologize for the punctuation in that particular paragraph.

Mr. Lent. So, what you are saying is that the language "600 to 1,200 parts per million" does not refer simply to vinyl chloride but refers to .vinyl chloride, gelatin, and all of the other items that are listed there.

Mr. Abramowitz. That is correct.

Mr. Lent. That is your statement under oath to us here this afternoon.

Mr. Abramowitz. That is correct, sir. We apologize again for the punctuation.

Mr. Lent. All right. And will you be kind enough to provide for the record the breakdown of that 600 to 1,200 parts per million as between the various toxicants that are listed there?

Mr. Abramowitz. We will do our best to provide that information, sir.

Mr. Lent. Then the statement goes on to say along with, "and considerable vinyl acetate."

Is that toxic, vinyl acetate?

Mr. Abramowitz. We do not believe it is toxic in the sense that we are using it here.

We have a little problem with the terminology, as mo: people do. It refers to the concentrations, the

OCC 011542

exposures. We have a great deal of discomfort in calling something nontoxic or toxic unless it is accompanied by additional data having to do with exposures and concentrations and so forth.

Mr. Lent. You indicate as well in this memo that you were pumping out two million gallons a year, which over a period of 19 years would come to some 38 million gallons, a year of these chemicals in whatever proportion; but the total proportion being at the rate of 600 to 1,200 parts per million.

Mr. Abramowitz. That is correct, sir.

Mr. Lent. I understand that the well at Grumman came up with 50 parts per million of vinyl chloride. Is that --

Mr. Abramowitz. Parts per billion, I believe.

Mr. Lent. Fifty parts per billion.

Mr. Abramowitz. Fifty parts per million would be an atrocity.

Mr. Lent. Fifty parts per million would be an atrocity.

Well, over here we have in your statement 600 to 1,200 parts per million of one, two, three, four, five different chemicals. And you think the amount of vinyl chloride that would be included in that would be less than parts per million?

Mr. Abramowitz. Less than three, sir, as we

OCC 011543

testified in our statement.

Mr. Lent. Okay.

When you spoke earlier, you mentioned your ester plant operation. At page 12 you indicate that the waste water stream from plant one contains perchloroethylene. Is that a toxic substance?

Mr. Abramowitz. Perchloroethylene?

Mr. Lent. Yes.

Mr. Abramowitz. Yes, it has been identified as a carcinogen.

Mr. Lent. And also methanol. Is that a toxic?

Mr. Abramowitz. I would have to cop out on that, sir. I am not a toxicologist. My understanding of methanol or methyl alcohol is that you don't drink it, but it is wood alcohol and has many uses. I am not really qualified to say that it is toxic.

Mr. Lent. What would your description be of the other organic acids that are listed there?

Adipic?

Mr. Abramowitz. Yes.

Mr. Lent. Is that toxic?

Mr. Abramowitz. Adipic acid is a material that has been used as a food acidulant. So, we doubt whether that material, if one could use it as a food acidulant, would be toxic.

OCC 011544

Mr. Lent. How about trimellitic?

Mr. Abramowitz. Trimellitic is a material which has recently been identified by NIOSH as being a harmful material in the work environment. We have responded to that internally.

Mr. Lent. The next substance: phthalic, p-h-t-h-a-l-i-c?

Mr. Abramowitz. That is pronounced as if it were an "f," so it is phthalic and isophthalic acids.

Those materials are very substantial materials in commerce that are used not only in paints and varnishes -- again, with my previous comment about the nature of the exposure and the concentrations and so forth, they are common materials in commerce that are used in huge quantities. It is hard for me to indicate that they are dangerous materials or toxic.

Mr. Lent. So, you are not concerned with the statement in this memo that starts out, "Today we put out about 4,000 gallons waste water per day - 12,780,000 pounds a year of waste water. Based on an estimated average 2 percent organic content in the waste water, we today put out 250,000 pounds per year of organic wastes at today's 26 million pounds a year production rate."

You feel that that is insignificant?

Mr. Abramowitz. No, sir, we do not. Indeed, we are

OCC 011545

incinerating - and have been so - since 1975, this entire stream.

Mr. Lent. But for the period 1951 until 1974, the fact is that all of those wastes were fed directly into the ester plant sand sump.

Mr. Abramowitz. Yes, that is correct.

Mr. Lent. And you had some concrete storage facilities there on the premises as well; did you not?

Mr. Abramowitz. Yes.

It might be helpful if I spent a moment to describe that.

Mr. Lent. Okay.

Mr. Abramowitz. This stream coming out of the ester plant - we call it an organic aqueous steam - the first thing it saw was a concrete pit which had an arrangement whereby the heavy materials, the sludge and any rust or any other gunk, would sink to the bottom. The light material would overflow into a second concrete pit. That concrete pit was designed so that the light materials would float, and the heavier materials would go directly into a sand pit.

Mr. Lent. Well, is it not a fact that in this memorandum there is reference to the fact that these concrete pits were pumped out on an annual basis and that the contents of these pits were then placed into one of

the landfills?

Mr. Abramowitz. I believe in the early days our own documentation indicates that.

Mr. Lent. Well, in the early days. We are talking about from 1951 until 1974. Are we not?

Mr. Abramowitz. Rollins -- we have incinerated most of that material, I believe, by Rollins. Some of it -- when I say "some of it," occasionally there was sludge that appeared in that first concrete pit which would not go through the Rollins incinerator satisfactorily.

My recollection - if I can keep all these situations and facts in order here - my recollection is that that sludge from pit number one could have gone to the landfill.

Mr. Lent. Just refer to page eight of the first memo, of August 16. With reference to the Syosset Municipal Landfill --

Mr. Abramowitz. Yes.

Mr. Lent. You indicate in the fourth paragraph down, "Time of use of this municipal dump facility 1946 to 1968. Use was lower until 1952 to 1955 and then heavier thereafter. At maximum output we disposed of an estimated 800,000 pounds per year of total solid and liquid waste. This includes 10,000 gallons a year of liquid waste in bulk from our annual pumpout of our concrete pits."

Mr. Abramowitz. Yes, that is correct.

OCC 011547

Mr. Lent. So that you did pump these concrete pits out.

Mr. Abramowitz. That is correct.

Mr. Lent. Containing these various chemicals.

Mr. Abramowitz. That is correct.

Mr. Lent. And you took the contents to Syosset and dumped them in that landfill.

Mr. Abramowitz. Our waste truck hauler did do that; yes.

Mr. Lent. So, that is 10,000 gallons a year, roughly, for a period of 22 years. So, that could cause a serious problem of pollution. Could it not?

Mr. Abramowitz. If it wasn't contained. And, also, I think --

Mr. Lent. Wait a minute. "If it wasn't contained." This indicates it was not contained.

Was it barrelized? Or was it contained?

Mr. Abramowitz. No. The bulk portions that were dumped were not contained in our vessels, but it may have been contained in the landfill; we don't know.

Mr. Lent. Well, the Syosset landfill is an old landfill. I think you know as well as I know that there is no containerization at the Syosset landfill. It is just an old-fashioned dump; is it not?

Mr. Abramowitz. Yes. Again, I am having problems

with my understanding of containment. Containment does not necessarily mean putting it in a container, the way I think. It could mean that the landfill itself either had a clay bottom or something like that. The material could have been contained in the landfill. I don't know. But that is my problem, I guess.

Mr. Lent. Is it not a fact that Hooker used TMA or trimellitic anhydride in its process?

Mr. Abramowitz. Yes. That is trimellitic anhydride.

Mr. Lent. Is that a -- or are those a dangerous or toxic chemical?

Mr. Abramowitz. As we stated a few moments ago, a NIOSH criteria document recently issued which indicated that that material was hazardous in the workplace.

Now, this may be possibly the time for me to make some comments about the listing of materials that were sent to a landfill which were recited earlier today. As it reads in the document, 10,000 pounds of material a and 20,000 pounds of material b and 5,000 pounds of material c. We would like to clarify that those materials were not taken to the landfill as such. I think we have a nationwide problem here with regard to the use of chemicals in general in paper bags.

We buy millions of pounds of these organic acids, including trimellitic acid anhydride. We buy these

OCC 011549

materials in 50-pound bags, multi-wall paper bags. In the process, we attempt - because these materials do carry a reasonable price tag - we attempt to empty the bags as best we can.

It is unavoidable for us to antiseptically remove the entire contents of these paper sacks. The author of this document, I was told, used a maximum assumption of four ounces retained in each 50-pound bag which we attempted to empty into the process. It was on that assumption that he calculated the quantities that went to the landfill as dusty material clinging to the containers.

This might be a problem for the committee to address itself to. I think the RCRA act will eventually do this. But there are literally billions of pounds of chemicals that are supplied in these United States in 50-pound bags to users all over the country who then empty the bags to the best of their ability. Because of their inability to practically remove the residual dust, cumulatively the amount of residual chemicals that go to the landfill must be an astonishing total.

Our proposal here to cope with this problem is our second on-site incinerator, which we hope will accumulate all these bags, whether there is one ounce left in them or four ounces left in them. Rather than send this trash, this combustible trash, to the landfill, our intent is to

take these materials and incinerate them on-site in compliance, hopefully, with EPA emission standards on incinerators.

Mr. Lent. Well, you don't disagree with Mr. Harrison, the author of this memo, that roughly four ounces were left as residue in the bottom of these bags? Or do you disagree with his conclusion that this amount of 10,000 pounds a year of this TMA?

Mr. Abramowitz. If I had made the estimate myself, I probably would have estimated about half of that. It is a rather distressing realization to management to realize that we are taking stuff in that magnitude and converting it into trash.

I have seen some of the bag unloading operations. I would judge -- and this is my personal opinion -- that the number of bags that have four ounces of retained material in them would be in the minority. Most of them are shaken. Again I say, if I were to be shot at sunrise to make an estimate, I would say my figure would probably be about half of that.

Mr. Lent. The bottom paragraph on page four says -- and this is dated, of course, a year ago -- "A very recent development at Hicksville involves our going from all bulk adipic to a potential 6 million pounds a year of imported French adipic, because of favorable economics. If this

goes ahead as we believe, then the amount of adipic acid to the Bethpage landfill will increase to 27,000 pounds a year, based on bag residues."

My question is, did you ever go to the French adipic?

Mr. Abramowitz. We did temporarily. You will be glad to know that the economic differential no longer exists, and we are on U.S. material.

Mr. Lent. So that the statement then - or the summary on page six that there are 27,000 pounds per year of adipic acid going into the Bethpage landfill -- Is that valid today? Or is it invalid?

Mr. Abramowitz. Only with the comment that I made previously, sir. That is that I believe personally that these materials are outside maximums. My own estimate would have been, perhaps, something like maybe a half or, at the most, three-quarters of this quantity.

Mr. Lent. We can conclude probably very quickly at page nine, which indicates that this Bethpage Municipal Landfill has been used by Hooker since 1968. And then it details the various wastes that are going into that plant.

I think everyone has a copy of it. It includes toluene. It includes DMF, MEK, and some PCB therminol wastes, PVC floor sweeps, including PVC sump scrapings containing PVC and the vinyl chloride, vinyl acetate, trichloroethylene, et cetera; and also spent lube oils of

300 gallons a year.

My question is, is that dumping that was going on for years up until the date of this memo in 1968 - is that still going on today as we sit here?

Mr. Abramowitz. Yes, we are still bringing materials to the Bethpage Municipal Landfill - to my knowledge, not necessarily all of these materials. In fact, I could very readily pick out numbers of them which are no longer, haven't been used perhaps for seven years. Specifically, if you wish an example, the PCB therminol wastes, which were discontinued at our plant at about 1972.

Mr. Lent. How about the total figure of 1,600,000 pounds per year? Is that still a valid estimate of the amount of waste that Hooker is putting into the Bethpage Municipal Landfill?

Mr. Abramowitz. That is probably a good order of magnitude figure.

It is our intention, Congressman, to rapidly move to eliminate that entire level with the advent of this second on-site incinerator, which will take all the cardboard boxes, the emptied paper bags, the offspent materials, the filter cakes, and so forth. This is being engineered at the moment.

Mr. Lent. What are you going to do with all this mercury that you have on hand at the Hicksville plant that





CONFIDENTIAL

is referred to in this memorandum?

Mr. Abramowitz. That is page seven.

Mr. Lent. Page seven: 37,414 pounds of 57 percent mercury Metasol.

Mr. Abramowitz. May I comment on the nature of that material and the meaning of those two short paragraphs?

This obsolete product, the 37,000 pounds, is in the form of a polyester which is used or could be used in polyurethane.

The material referred to as Metasol, a mercury derivative, at the time this was produced was a material that was sold as a catalytic agent for producing polyesters. We produced this quantity of product with this mercury catalyst.

The form in which the 37,000 pounds exist today in no way contains the mercury as phenyl mercuric proprionate. It is tied up in that polymeric molecule. We are concerned about it. Nevertheless, because it is and has been identified as a harmful metal, even though it is in there in that form, it is our intention to track that material. Eventually, if we can sell it, we are trying to sell it, somebody may convert it into a useful product. If that cannot be done, I think the ultimate disposition of that will have to be incineration under proper circumstances.

OCC 011554

Mr. Lent. What about the 800 drums that are defined in your memo as "difficult chemical wastes stored at the Hicksville site"? Do you have any plans for that?

Mr. Abramowitz. Yes. Not only do we have plans, but, as we look at our chronometers, it is five to three. Probably about 100 of those drums left our site today for Rollins Environmental Services to be incinerated. That would leave, say, at the end of the day about 700. It is our intention to move as rapidly as we can to identify by analysis and by groupings to identify the rest of those drums so that as many of them as possible can be incinerated by Rollins.

My plant people tell us that they are already in the midst of preparing or staging the second load to go. Whatever if left, or if this thing dangles on for weeks or months, we hope to pick up the back end of that with our second on-site incinerator.

Hopefully, what will be left of all that will be antiseptic ash coming out of the incinerator plus, of course, the containers.

Mr. Lent. Mr. Chairman, I have no further question at this point.

Mr. Eckhardt. Mr. Abramowitz, you state in your testimony that, "According to our best information, our PVC waste water contained vinyl chloride at levels less

OCC 011555

than 3 parts per million."

Mr. Abramowitz. Yes, sir.

Mr. Eckhardt. The examination of the Nassau County Department of Health indicated that in Well 14 vinyl chloride was found at 50 parts per billion, which would be approximately one-sixtieth of the concentration that you have referred to before. Is that right?

As I calculate, three parts per million would be 3,000 parts per billion. And 500 parts per million would be a sixtieth of that amount in the well.

Mr. Abramowitz. Chairman Eckhardt, if I am following your reasoning -- I am sorry; perhaps I am preempting or misinterpreting what you are going to say.

Mr. Eckhardt. What I am saying is that your statement here is that you calculate that something less than three parts per million was contained in lagoons where you were disposing of wastewater, less than three parts per million of vinyl chloride was contained. I refer to page four of your testimony: three parts per million, which is 3,000 parts per billion.

Mr. Abramowitz. Yes.

Mr. Eckhardt. The amount of vinyl chloride found in Well 14 was only one-sixtieth of that amount, or 500 parts per million -- per billion; 500 parts per billion. Excuse me. Fifty parts per billion. I confused the figure.



CONFIDENTIAL

And 50 parts per billion would be one-sixtieth of what you said might be contained in your lagoon.

Let me state it again.

Three parts per million is 3,000 parts per billion. That is what you said might have been contained in your lagoon as the result of wastewater.

Is that correct?

Mr. Abramowitz. No. I think we have a little nuance here. I think it is significant to our contention --

Mr. Eckhardt. We read the language here. On page four it says, "According to our best information, our PVC waste water contained vinyl chloride at levels less than three parts per million."

Mr. Abramowitz. That is correct.

And I also, respectfully, sir, refer you to the EPA statement that three ppm in the effluents or in the wastewater coming from the PVC plant - the vinyl chloride content of that effluent is assumed to virtually dissipate into the atmosphere and not percolate into the ground.

Mr. Eckhardt. I am not asking that question. All I am asking you is whether or not contained in your wastewater there might have been vinyl chloride at levels of something less than three parts per million. That is what you said.

Mr. Abramowitz. That is absolutely correct.

OCC 011557

Mr. Eckhardt. And then I am pointing out that the New York State Department of Health found in Well 14 vinyl chloride at 50 parts per billion.

Now, I am not saying necessarily that all of that vinyl chloride came from your plant. I do not want to draw that conclusion.

All I am trying to say is that three parts per million is 3,000 parts per billion. And the amount of vinyl chloride found in the well was 50 parts per billion, or one-sixtieth of the amount which you state was the maximum that was contained in the wastewater at your plant.

Mr. Abramowitz. That is correct, sir; prior to the reported tendency of vinyl chloride to be a fugitive from water, that is absolutely correct.

Mr. Eckhardt. Your plant and its predecessor produced vinyl chloride for a period of some 19 years. Is that correct?

Mr. Abramowitz. We used vinyl chloride.

Mr. Eckhardt. You used vinyl chloride.

Mr. Abramowitz. That is correct.

Mr. Eckhardt. And I assume you used it -- I assume that both the predecessor and the present plant both could be characterized as having had wastewater which contained not more than three parts per million of vinyl chloride.

Mr. Abramowitz. Going into the lagoon, that is

OCC 011558

exactly correct.

Mr. Eckhardt. Is it not conceivable that, having used such processes which resulted in that amount of vinyl chloride, that one-sixtieth of that amount could have gotten into the groundwater in the area?

Mr. Abramowitz. It is hard for me to have to agree with that because of the known volatility of this material.

Chairman Eckhardt, if I have a container of vinyl chloride in a glass vessel capped -- and it is a gas normally -- it was under pressure in a gas, gas under pressure being a liquid. If I in this room took the cap off and put the material on the floor, spilled it on the floor, it would instantaneously begin boiling of its own volition on the floor, it having a boiling point of minus 13.8 degrees Centigrade. It would instantaneously flash off into the atmosphere.

When small quantities are in water, dissolved in these traces, that is an impediment; and it will not leave instantaneously, but it will leave.

Mr. Eckhardt. I do not mean to say that, if you poured vinyl chloride in a pure form on this floor or on the ground, that any of it other than a very small trace -- but, after all, 50 parts per million is a small trace; is it not?

OCC 011559

Mr. Abramowitz. Per billion?

Mr. Eckhardt. Per billion is a small trace.

I am not saying that vinyl chloride in its pure form would not be volatile. But, when you dissolve any chemical in that much solvent, you have an entirely different chemical character with respect to volatility; do you not?

Mr. Abramowitz. That is exactly correct, sir.

Again, I have to invoke the comments of our own Environmental Protection Agency. I will have to quote again. In their environmental impact statement on vinyl chloride published in 1975, they state that, according to their data, essentiall all of the vinyl chloride in wastewater is released into the atmosphere.

I have problems with that following the arithmetic that we have been --

Mr. Eckhardt. Can you not say essentially that all of it is dissipated if only, say, 3,000 parts per billion remains? Ultimately, by the time that 3,000 parts per billion may have seeped into the ground, due to its volatility, due to its going to other sources, et cetera, there is only one-sixtieth of that left so that you have got 50 parts per billion instead of 3,000 parts per billion. Is that an altogether unreasonable assumption, that some of that, levels of the type I have discussed

OCC 011560

here, might get to the groundwater?

Mind you, I am not contesting your proposition that there was not more than three parts per million in your wastewater when it was originally spread.

I am also not taking the position that you necessarily acted imprudently with respect to the then information concerning the danger of the product. I am merely suggesting the possibility that your disposing of wastewater containing a certain quantity of vinyl chloride might have resulted in one-sixtieth of that amount getting into the groundwater.

Mr. Abramowitz. Let me, if I may, indicate what some of my other discomfort with that scenario might be.

That is that water in a well is not in a vault. That is, that is not a hermetically sealed type of container. So, even if some VCM gets into the groundwater and starts working its way down, I could very reasonably imagine two possibilities. One is a continuation of the dissipation of the monomer into the soil. Another would be a continued fugitive emission or release of these traces, even after the water got down to a hundred feet or so.

But, honestly, I am not a hydraulics expert.

Mr. Eckhardt. But under my assumption I am only assuming that one-sixtieth of the total ever got to that destination. I also am taking into account the fact that

the soil has been permeated with some degree of vinyl chloride for a period of some 19 years.

Mr. Abramowitz. The persistence -- you know, I have been having some fits over this thing because these allegations have been going on for years now.

I would just like to tell you what some of my other problems are with it.

The plant has not been in operation for four years. We are asked -- if I understood what Mr. Middleton testified to today -- to believe that, after four years that he tested Well 6-1 and came up with the same figure that he did originally.

Mr. Eckhardt. Well, let me suggest --

Mr. Abramowitz. That's a tough one for me --

Mr. Eckhardt. -- the readings that he was reporting from were taken in 1975.

Let me ask you this. Was there any other plant to your knowledge that was producing a product which resulted in any vinyl chloride waste in this area?

Mr. Abramowitz. I do not know of any company in the area that used vinyl chloride monomer per se. There may have been but not to my knowledge.

On the other hand, there are numbers of other areas that -- and we shan't indulge in speculation.

If those results are confirmed in that Well 6-1, then

OCC 011562

there has to be some realistic accountability where that material came from.

Mr. Eckhardt. That's what nags me.

Mr. Abramowitz. Therefore --

Mr. Eckhardt. I don't know where it came from if it didn't come from Hooker. If we had discovered that there were several other plants in the area producing vinyl chloride or using substances that resulted in some vinyl chloride waste, it would be easier for me to see how --

Mr. Abramowitz. Chairman Eckhardt, as long as we are sharing discomforts, the data on Philadelphia and Miami are rather interesting. If you go to the source, the EPA document states that the feedwater, the water going into the Philadelphia municipal water treatment system, showed no detectable vinyl chloride monomer. Coming out of the municipal treatment system, they have reported a fraction of a part per billion.

In the case of Miami, the input to the municipal drinking water system -- if I recollect my figures, the input was something like one part per billion. Coming out of the other end, ready for drinking, is 5.6 parts per billion.

I have a lot of problems --

Mr. Eckhardt. I am not finding difficulty with that so much. That is a very, very small quantity.



CONFIDENTIAL

I understand that EPA in a national survey of drinking water supplies found in 1975 that the highest level of vinyl chloride in any water system surveyed was ten parts per billion. Now, that is one-fifth as much as was found in Nassau County in Well Number 14.

So, though 50 parts per billion is a mere trace, it is nevertheless five times as great as any of the tests that EPA made in a national survey for 1975.

It would seem to me that, when one finds vinyl chloride in five times the maximum over the country in this area, and when one knows that there was water in lagoons as wastewater from Hooker containing vinyl chloride at sixty times that amount, and when one also finds no other producer of vinyl chloride in Long Island or in the area, that there is at least some suspicion that the vinyl chloride in the drinking water, not having been explainably produced anywhere else and being five times as great as any found elsewhere in the United States, is likely to have got there through Hooker's lagoons.

That is all I am suggesting. I do not say that that can be finally determined. But I do say that I find no other explanation of it. And I must conclude that there is at least evidence that Hooker contributed to the vinyl chloride content of the drinking water of this area.

Mr. Lent. Mr. Chairman, if I could just add two

other factors to that.

Number one is the proximity of the Hooker plant to the Grumman well, which was about 1,500 feet.

Number two is the fact that the watertable in that area flows south-southeast from the Hooker plant toward Grumman.

The third factor is that the groundwater flow in that area, according to the hydraulic engineers, is at the rate of about a few hundred feet per year.

So, taking all these indicia and adding them all up together, it seems to flow as night from the day that the contamination, which was far greater than is present in either Philadelphia or Miami, had to come from Hooker.

Mr. Abramowitz. As I indicated, we have some reservations about it. We share, I think -- perhaps you share some of my confusion about it. I am hopeful that Hooker could be allowed to contribute to the resolution of this problem and be made a party to the data, to be allowed to sample the wells, to be allowed to look at the analytical procedures.

We had one helluva time with analytical procedures in the range of parts per billion. I cannot imagine that others - reportedly and admittedly with less resources .- are picking these things up with ease.

So, we sure would like to have an opportunity to help

in that regard.

Mr. Eckhardt. Let me say that I appreciate your saying that. We, of course, are not in a position to direct anyone else to deliver those materials to you; but we do hope that all persons involved or possibly involved and all agencies engaged in controls and observation in the matter will cooperate in determining that.

Let me get to one other point here.

You state in your statement here that, with respect to chlorinated hydrocarbons: "Although we cannot quantify the amounts in question, I am confident that the amounts were minute and that they had no significant impact upon the groundwater quality."

Well, again, let us take here the substance trichloroethylene. You produce that; do you not?

Mr. Abramowitz. We used the material.

Mr. Eckhardt. You use the material.

Mr. Abramowitz. We used. We no longer use it.

Mr. Eckhardt. How long did you use it?

Mr. Abramowitz. We have had some problems with reconstructing that. Let me indicate what they were.

Reconstructing the quantification of everything we used in the PVC plant for a period of 19 years, the difficulty essentially arose from the fact that we made both homopolymers and copolymers. Not all of our resins

contained trichloroethylene. Most of the homopolymers had no trichloroethylene in it at all. Well, to the extent that the resins that did require trichloroethylene, to the extent that we used it for those resins, the material was not used as a solvent; it was used as a chemically reactive material.

Every indication we have is that we put it in there to go into the resin. The resin properties that we got from that production indicated that chain transfer had taken place, and trichloroethylene was in the product.

Mr. Eckhardt. But there would be some trichloroethylene in some of your --

Mr. Abramowitz. We grant in the statement --

Mr. Eckhardt. -- lagoons, I assume.

Mr. Abramowitz. We grant in the statement; yes, sir.

Mr. Eckhardt. As a matter of fact, you say you cannot quantify the amounts; you are confident that it was minute amounts but not enough to affect groundwater.

You do not say how much. You do refer at a later time to tetrachloroethylene. You say: I estimate "small amounts, however, were discharged into the waste stream. I estimate this amount to have been less than 40 pounds per year."

Mr. Abramowitz. That is correct, sir.

Mr. Eckhardt. Would trichloroethylene be more or

less than that 40 --

Mr. Abramowitz. Significantly less, would be our judgment.

Mr. Eckhardt. Well, would you say that --

Mr. Abramowitz. I cannot quantify it; but, if you press us, again, to the wall, we would have to say that it could not have been, you know, more than maybe a part per million or some such --

Mr. Eckhardt. What about 30 parts per million? Would that be out of the ballpark?

Mr. Abramowitz. Probably would be; as I sit here in an armchair -- without an armchair -- and guess at it.

Mr. Eckhardt. Of course, if there was as much as 30 parts per million and one-sixtieth of it got in the water supply, that would be the 500 parts per billion that was found in groundwater.

Was anybody else using trichloroethylene during that time period?

Mr. Abramowitz. Grumman testified today -- and I think we had this from more than one testifier, Mr. Chairman -- that Grumman used significant quantities of trichloroethylene.

Their past practices, from what I have heard as recently as 45 minutes ago -- I did not hear too many comments about the details of their past practices. I

OCC 011568

heard that, up to 1977 or '78, they believed that they had the thing in tow, but --

Mr. Eckhardt. But, at any rate -- of course, if you were both using it, the cumulative effect would create at least some likelihood of leaching into the groundwater. Would it not?

Mr. Abramowitz. Yes, it would, sir.

Mr. Eckhardt. That is all I have. I thank you for your testimony here and your willingness to stay so late.

Mr. Abramowitz. We have appreciated the opportunity to throw some other zingers in there. I guess all we keep hearing is, you know, the Hooker plant did this and the Hooker plant did that. We welcome the opportunity to be invited and pledge our cooperation in any additional information you may require. Thank you.

Mr. Eckhardt. Thank you very much.

Mr. Lent?

Mr. Lent. I just wanted the record to note that we have received statements submitted by the Long Island Water Conference. They asked that it be made a part of our record.

Mr. Eckhardt. Without objection, the material referred to will be inserted into the record.

[Material follows:]

OCC 011569

Mr. Eckhardt. The subcommittee is now adjourned, subject to the call of the chair.

(Whereupon, at 3:20 p.m., the subcommittee was recessed, subject to the call of the chair.)

OCC 011570