**Originally Filed at Docket No. 436**

# Exhibit 122b

# I. Introduction

## A. OVERVIEW

The hazardous waste disposal problem may well be the single most significant environmental health issue of this decade. Millions of tons of toxic wastes are disposed of each year in an environmentally unsound manner resulting in what have been aptly labeled "ticking time bombs" which pose imminent and untold hazards to man and the environment.

In October of 1978, the Subcommittee on Oversight and Investigations of the Interstate and Foreign Commerce Committee, prompted by increasing hazardous waste disposal problems including events at Love Canal in Niagara Falls, New York, began an extensive investigation into the matter. The Subcommittee was interested in the magnitude of the problem and the adequacy of existing legislation to cope with it. In addition, the Subcommittee wanted to assess the U.S. Environmental Protection Agency's (EPA) progress in implementing a 1976 Congressional law—the Resource Conservation and Recovery Act (RCRA)[1]—which provided EPA with the authority to regulate hazardous waste disposal, and to determine if RCRA would (1) allow for appropriate public response to situations like Love Canal and (2) preclude the possibilities for such situations in the future.

The Subcommittee's inquiries disclosed that despite enactment of hazardous waste legislation in 1976, little was known about the true magnitude of the problem. No one knew how many millions of tons of hazardous waste were generated each year. And more importantly, while it was believed that hundreds of "ticking time bombs" existed across the country, no one knew exactly how many, where they were located, or who was responsible for them.

Believing that it was most important to secure such information, and since EPA was not acting with dispatch to collect it, the Subcommittee decided to conduct its own survey—the first national study of waste disposal sites—to begin to determine the magnitude of the problem.

The purpose of the survey was to initiate a systematic effort to identify the number, nature, and location of all waste disposal sites across the country, whether they currently pose health or environmental hazards or not. As a first step, the Subcommittee requested the participation of the 53 largest domestic chemical companies. This was not to suggest that the disposal practices of the chemical industry are particularly bad or that the chemical industry is primarily responsible for hazardous sites. But the very nature of the chemical industry is such that large quantities of potentially dangerous wastes are generated, and the national survey had to begin somewhere. The results are only a sampling of the situation. All of the companies cooperated voluntarily. They provided information about the waste disposal practices of the 1,605 chemical plant facilities that they own or operate including data on 3,383 disposal sites used by these facilities since

[1] Pub. L. 94-580, Oct. 21, 1976.

1950. This report describes the intent, conduct, and findings of that survey.

The methodology for selecting the companies participating in the survey, their identity, the Subcommittee's letter of invitation, and the standardized questionnaire and related instructions which were furnished to the companies are set forth in Appendices A, B, C and D, respectively.

Each of the 1,605 facilities was asked to provide information on every site or location used since 1950 (or earlier if records or employees' memories permitted) for the disposal of wastes from the plant's chemical processes. Information requested included: amount and content of waste disposed at a particular site, kinds of disposal methods used at the site, current status of the site (open or closed), ownership of the site, and the site's name and location. For any waste hauled from the plant and taken to a location unknown to the plant operators, information was requested on the name of the hauler and the amount and content of the waste hauled. Facilities were also asked to report the amount of process waste generated at their plants during 1978 that was not directly reprocessed or recycled at the plant or covered by a National Pollutant Discharge Elimination System (NPDES) permit, and the methods by which these wastes were disposed.

### B. FINDINGS AND CONCLUSIONS

1. The survey disclosed that approximately 66 million tons of chemical process wastes were generated in 1978 by the 1,605 chemical plants of the 53 largest domestic chemical companies. It is not known what percent of all chemical wastes this amount represents, nor is it known, in the absence of final federal definitions of what constitutes "hazardous" waste, what percent of the 66 million tons of chemical process waste would be classified as hazardous. It is noted EPA estimates that about 379 million tons of *industrial* wastes were generated in 1977 (by *all* industry), of which EPA estimates approximately 39 million tons were *hazardous*.[2] Thus, the 66 million tons of chemical process wastes generated in 1978 by the 1,605 facilities participating in the survey relates to about 17 percent of the 379 million tons of industrial wastes which EPA estimates were generated in 1977.

Because the actual amount of hazardous waste generated annually will profoundly affect the size and scope of federal and state waste regulation programs, the Subcommittee concludes that it is of paramount importance to obtain better estimates of proportions of all chemical and industrial wastes—including the 66 million tons identified in the Subcommittee's survey—that will need to be regulated, once federal definitions of hazardous waste are finalized.

2. The survey revealed that approximately 762 million tons of chemical wastes generated by the participating companies since 1950, or earlier, have been disposed in 3,383 locations known to the companies. These sites do not necessarily pose threats to the public health or the environment. Of those 762 million tons, 94 percent were disposed of on the immediate property of the chemical plants; 6 percent were sent off-site for disposal.

---

[2] 43 Fed. Reg. 58947 (12/18/78) and Feb. 1979 issue of *EPA Journal* (p. 12) (EPA estimates are given in *metric* tons which have been equated to tons for purposes of uniformity in this report.) It is noted that EPA expects the quantities of hazardous waste to increase by 3 percent annually.

Many of the current on-site disposal facilities will not qualify for permitted disposal under EPA's proposed hazardous waste regulations suggesting that, once the RCRA regulations are promulgated, the chemical industry may find it necessary, for financial reasons, to substantially reduce the amount of on-site disposal. Unfortunately, there is also a paucity of off-site disposal locations across the country that will qualify for permitted disposal under EPA's proposed rules. Consequently, the Subcommittee is concerned about the large amounts of wastes, including some previously disposed of on-site, which will be in search of final resting grounds.

3. Of the 3,383 sites used by the participating companies for disposal of their wastes since 1950, the survey disclosed that 1,099 (32 percent) are known to be closed, and an additional 319 (9 percent) may be closed. Over 100 million tons of waste were sent to the 1,099 sites now known to be closed. Of those 1,099 sites, 37 percent are on private lands, not owned by any of the participating companies. Many of these closed sites contain wastes with chemical components known to pose potentially serious hazards to the public health and the environment. Disposal methods used at many of these closed sites, given the chemical components of the waste, also suggest the possibility of imminent hazard. Unfortunately, these closed sites will not come under the purview of EPA's hazardous waste program because RCRA calls for regulation of existing and future sites only.

Since it is unlikely that these closed sites are currently being monitored for imminent hazards, the Subcommittee concludes it is of utmost importance that further data be collected on these sites. Further, should any of these closed sites, particularly those on private lands, pose imminent hazards, they may well require financial coverage under a central clean up fund, such as that proposed by the "super fund" legislation.

4. The survey also revealed that approximately 4.8 million tons of chemical process wastes generated by the 53 participating companies since 1950 were transported off-site for disposal by some 960 haulers to locations unknown to the facility operators. Those wastes contain a variety of chemical components known to be toxic or otherwise hazardous to the public health and the environment.

The Subcommittee concludes that it is essential to determine where and how those wastes were disposed.

### C. RECOMMENDATIONS

The Subcommittee is making available to EPA its survey findings including information on all disposal locations and haulers identified in the study. The Subcommittee recommends that EPA:

1. undertake, in conjunction with the states, a comprehensive national inventory of disposal sites utilized by principal waste-producing industry groups;
2. conduct appropriate investigation with respect to all haulers identified in the survey who transported wastes to locations unknown to the waste generators to determine where such wastes were taken and the manner in which they were disposed;
3. conduct, where warranted, a follow-up study of the disposal sites identified in the survey, particularly those known to be closed

and on private lands, to determine whether there is reason to suspect that any of those sites pose threats to the public health or the environment;

4. utilize the survey findings as a basis for better determining the size and scope of a clean up fund for hazardous waste disposal problems;

5. analyze the implications of the survey findings and reassess the scope and magnitude of the hazardous waste disposal problem relative to the implementation and management of both federal and state hazardous waste programs; and

6. reexamine, in conjunction with the chemical and other waste-producing industry groups, alternative disposal methods including reprocessing and recycling, incineration, and other technology to determine the most practical and safest means of disposal of those wastes judged to be hazardous under RCRA definitions, once EPA's regulations are promulgated.

## II. Background

When the Subcommittee initiated its investigation into hazardous waste disposal problems in the fall of 1978, the only information available concerning the volume of hazardous waste generated annually in the United States was EPA's estimate of 39 million tons. EPA further estimated that as much as 90 percent of this hazardous waste was being disposed of in a manner not in accordance with EPA's proposed regulations implementing the provisions of RCRA.[3]

The Subcommittee was concerned that EPA would be unable to propose a rational hazardous waste regulatory program without solid figures on the amount of hazardous waste generated annually. Moreover, the Subcommittee considered it essential that EPA know the location of sites posing imminent hazards.

When questioned by Congressman Albert Gore, Jr., at the Subcommittee's October 1978 hearing, EPA officials could not provide the number of hazardous waste disposal sites across the country nor the number or location of sites posing threats to public health or the environment. They informed the Subcommittee that EPA was in the process of collecting such information from its regional offices and the states.

In November 1978, EPA released a list of 103 potentially dangerous sites and estimated that 838 sites across the country contain significant amounts of hazardous waste and could pose threats to health and the environment. After a review of the methodology used to develop the list and the estimated number of sites, the Subcommittee concluded that the estimate was both inadequate and misleading.[4] Accordingly,

---

[3] *Id.*

[4] Acting upon a request by Congressman Gore to analyze EPA's site survey, the General Accounting Office arrived at the same conclusion. In testimony before the Subcommittee on June 4, 1979, GAO stated:

"We concluded that the 838 disposal site figure is not an accurate or complete estimate and does not correctly identify those sites that are most in need of corrective action. We found that EPA's regional offices developed the estimates on the basis of existing or easily obtainable information using various assumptions . . . Overall, we concluded that at the present time information available at the Federal and State level is inadequate to determine (1) the number of hazardous waste sites, (2) the number of sites posing a threat to public health or the environment, and (3) the costs that may be involved in correcting the problems."