**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TRAVELERS INDEMNITY COMPANY, TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, formerly known as TRAVELERS INDEMNITY COMPANY OF RHODE ISLAND, TRAVELERS CASUALTY AND SURETY COMPANY, formerly known as THE AETNA CASUALTY AND SURETY COMPANY, AND TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, formerly known as TRAVELERS INDEMNITY COMPANY OF ILLINOIS,

Plaintiffs,

v.

NORTHROP GRUMMAN CORPORATION, NORTHROP GRUMMAN SYSTEMS CORPORATION,

Defendants,

*and*

CENTURY INDEMNITY COMPANY, eventual successor in interest to INSURANCE COMPANY OF NORTH AMERICA,

Nominal Defendant.

12-CV-03040 (KBF)(FM)

**NORTHROP GRUMMAN SYSTEMS CORPORATION'S RESPONSE TO CENTURY'S "COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS" REGARDING ITS OPPOSITION TO NORTHROP GRUMMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND THE TOWN OF OYSTER BAY ACTION**

ECF CASE

In accordance with Local Civil Rule 56.1, Defendant and Counterclaim/Crossclaim-Plaintiff Northrop Grumman Systems Corporation ("NGSC") submits this response to Century's "Counter-Statement of Undisputed Material Facts" regarding its opposition to NGSC's Motion for Partial Summary Judgment on the Duty to Defend the Town of Oyster Bay Action. NGSC submits this response solely for purposes of NGSC's instant motion.

1. <u>Century Assertion 1</u>: The former Bethpage Facility is located on approximately 600 acres in Bethpage, Town of Oyster Bay. The initial plant opened by at least 1937 and was used by Grumman to develop and manufacture various aircraft, satellites and lunar modules for the government. Within this property, the Navy also owned a 105 acre Naval Weapons Industrial Reserve Plant ("NWIRP Site"), which was established by at least 1941. The Bethpage Community Park is located on the northeast boundary of the former Bethpage facility, to the east of the NWIRP Site, and was donated to the Town of Oyster Bay by Grumman in 1962. *See* Heskin Dec., Ex. 5 at NGINS000751761.

**<u>NGSC's Response to Century Assertion 1</u>: Not disputed that the Bethpage Facility was used to manufacture various aircraft, satellites, and lunar modules for the U.S. government, that a 105-acre Naval Weapons Industrial Reserve Plant ("Bethpage NWIRP") was situated on the Bethpage Facility site, that construction of the first of several Navy-owned plants that would later be known as the Bethpage NWIRP was completed in or around 1941, that the Bethpage Community Park abuts the northeast portion of the former Bethpage Facility, and that the land on which the Bethpage Community Park is situated was donated to the Town of Oyster Bay by Grumman Aircraft Engineering Corporation in 1962.**

**Disputed that the Bethpage Facility is currently located on approximately 600 acres, that the "initial plant" opened by "at least 1937" and was "used by Grumman to develop and manufacture various aircraft, satellites and lunar modules," and that the evidence cited by Century supports any of these assertions. The evidence cited by Century instead states that in 1983 the Bethpage Facility site consisted of "some 600 acres" but that since then, "many portions of the [site] were delisted as the investigation of areas was**

**completed." (Declaration of Shane R. Heskin dated February 1, 2013 ("Heskin Decl.") Ex. 5 at NGINS000751761.) The evidence cited by Century makes no mention of an "initial plant" opening at the Bethpage Facility in 1937 nor does it make any mention of what this "initial plant" was purportedly used for. (*See id.*)**

**NGSC further disputes that Century Assertion 1 is material to NGSC's motion for summary judgment; the date that the Bethpage Facility opened, its location, and the types of products that were developed and manufactured there are irrelevant to a determination of whether Century has a duty to defend NGSC in the litigation styled *Town of Oyster Bay v. Northrop Grumman Corp., et al.*, Case No. 05 CV 1945 (E.D.N.Y.) ("TOB Action").**

**NGSC further disputes that Century Assertion 1 is supported by admissible evidence. Exhibit 5 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c); the document consists of a collection of out-of-court statements that Century offers to prove the truth of the matters asserted therein, and the cited portions of the document do not fall within any exception to the rule against hearsay set forth in the Federal Rules of Evidence. *See* Fed. R. Evid. 803.**

**Exhibit 5 to the Heskin Declaration is a Proposed Remedial Action Plan ("PRAP") for Operable Unit 3 ("OU3") of the Bethpage Facility prepared by the New York State Department of Environmental Conservation ("NYSDEC") and dated May 2012. The first page of the PRAP states that it "is a summary of the information that can be found in the site-related reports and documents in the document repository" located at the Bethpage Public Library. (Heskin Decl. Ex. 5 at NGINS000751759.) The document therefore does not "set[] out . . . factual findings from a legally authorized investigation," as is required to**

**fall within the exception to the rule against hearsay set forth in Federal Rule of Evidence 803(8)(A)(iii). The document is instead hearsay as to the contents of the reports and documents it purportedly summarizes. The PRAP also falls outside the exception to the rule against hearsay set forth in Federal Rule of Evidence FRE 803(6) because, among other reasons, it was not "made at or near the time" of the acts and/or events set forth therein for which Century cites the document.**

2. Century Assertion 2: From at least 1943 to 1949, Grumman disposed of chromic acid wastes directly on the ground in open seepage bins. *See* Heskin Dec., Ex. 6 at NGINS000010540. Between 1950 and 1978, drums containing liquid cadmium were stored at the NWIRP Site on an unbermed, uncovered concrete pad. *See id.* at NIGNS000010541. In addition, by at least 1969, Grumman stored drummed waste from other facilities on a cinder covered surface over an onsite cesspool. A cover was eventually added in 1983. *See id.;* Heskin Dec., Ex. 7 at NGINS000434096, NGINS000434098. Surface water was also controlled through several onsite recharge basins (an unlined open pit). *See id.*

**NGSC's Response to Century Assertion 2: Disputed. The evidence cited by Century to support the first sentence of Assertion 2 makes no reference to the disposal of chromic acid wastes outside the 1943 to 1949 time period, and it specifically states that in 1949 a chromic acid treatment system was put on-line at the Bethpage Facility. (*See* Heskin Decl. Ex. 6 at NGINS000010540.) The evidence cited by Century to support the second sentence of Assertion 2 makes no mention of drums containing "liquid cadmium" being stored at the NWIRP, nor does it make any mention of any drums being stored on a concrete pad without a cover or berms in the 1950 to 1978 time period; in fact, the cited evidence refers to drummed waste being stored at the NWIRP on a concrete pad without a**

**cover or berms only during the 1978 to 1982 time period. (*See id.* Ex. 6 at NGINS000010541.) The evidence cited by Century to support the third and fourth sentences of Assertion 2 does not state that by 1969 drummed waste from other facilities was being stored on a cinder covered surface over an onsite cesspool that was not covered until 1983; in fact, the cited evidence makes no mention of drummed waste from other facilities being stored at the Bethpage Facility, and the evidence specifies that in 1982, a drum marshaling area was moved to a different location, and in 1983 a cover was added to that new location. (*See id.* Ex. 6 at NGINS000010541; *id.* Ex. 7 at NGINS000434096, NGINS000434098.) The evidence cited by Century to support the fifth sentence of Assertion 2 makes no mention of "an unlined open pit," nor does it state that "[s]urface water was also controlled through several onsite recharge basins;" the cited evidence states instead that "surface water drainage on Long Island is for the most part locally controlled, with numerous recharge basins used to channel this resource back to the groundwater," and that "there are several such recharge basins located at NWIRP Bethpage." (*See id.* Ex. 7 at NGINS000434096.)**

**NGSC further disputes that Century Assertion 2 is material to NGSC's motion for summary judgment; the alleged manner in which NGSC's predecessors disposed of chromic waste in the 1940s, the alleged location of drummed waste storage areas on the NWIRP, and the alleged manner in which surface water drainage occurred on Long Island are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that the first two sentences of Century Assertion 2 are supported by admissible evidence. Exhibit 6 to the Heskin Declaration cannot be presented**

**in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c); the document consists of a collection of out-of-court statements that Century offers to prove the truth of the matters asserted therein, and the cited portions of the document do not fall within any exception to the rule against hearsay set forth in the Federal Rules of Evidence. *See* Fed. R. Evid. 803.**

**Exhibit 6 to the Heskin Declaration is a Record of Decision ("ROD") for Operable Unit 2 ("OU2") of the Bethpage Facility and Bethpage NWIRP Sites prepared by NYSDEC and dated March 2001. The first page of the ROD states that it "presents the selected remedy for . . . Operable Unit 2 regional groundwater contamination plume" and that it "is based on the Administrative Record of . . . [NYSDEC] . . . and upon public input to the Proposed Remedial Action Plan (PRAP) presented by the NYSDEC." (Heskin Decl. Ex. 6 at NGINS000010534.) The document therefore does not "set[] out . . . factual findings from a legally authorized investigation," as is required to fall within the exception to the rule against hearsay set forth in Federal Rule of Evidence 803(8)(A)(iii). The document is instead hearsay as to the contents of and the facts set forth in the "Administrative Record," as well as the "public input," upon which the ROD is purportedly based. The ROD also falls outside the exception to the rule against hearsay set forth in Federal Rule of Evidence 803(6) because, among other reasons, it was not "made at or near the time" of the acts and/or events set forth therein for which Century cites the document.**

3. <u>Century Assertion 3</u>: Prior to 1984, certain plant production lines discharged their rinse waters directly into these recharge basins. These rinse waters were directly exposed to

chemicals used in the production processes, and as of 1976, approximately 1.8 million gallons per week of untreated wastewater were discharged directly into these recharge basins. *See id.* Adjacent to these recharge basins were sludge drying beds used to dewater various sludges generated from the Grumman facility. *See id.*

**NGSC's Response to Century Assertion 3: Disputed. The evidence cited by Century to support Assertion 3 makes no mention of plant production lines discharging their "untreated" rinse waters "directly" into recharge basins, and it does not state that "various sludges generated from the Grumman facility" were de-watered in sludge drying beds located adjacent to the recharge basins; the evidence cited by Century states instead that sludge "from the Plant 02 Industrial Waste Treatment Facility was dewatered in the drying beds [adjacent to the recharge basins on the NWIRP] before off-site disposal." (Heskin Decl. Ex. 7 at NGINS000434096-98.)**

**NGSC further disputes that Century Assertion 3 is material to NGSC's motion for summary judgment; the alleged manner in which certain rinse waters were handled on the Bethpage NWIRP is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

4. Century Assertion 4: Between the early 1950s and 1969, fixtures, tools and metallurgic wastes were stored on the NWIRP Site. Cutting oils dripped from these wastes, causing, among other things, superficial oil stains on the ground. *See id.* at NGINS000434098.

**NGSC's Response to Century Assertion 4: Disputed. The evidence cited by Century in support of Assertion 4 does not mention "metallurgic" wastes, nor does it state that cutting oil drippings at the NWIRP did anything other than create superficial oil**

**stains on the ground; the cited evidence instead states that "fixtures, tools, and *metallic* wastes [e.g., aluminum and titanium scraps and shavings] were stored [at the Salvage Storage Area of the Bethpage NWIRP] prior to recycling," and that oil-stains on the ground in this area "were superficial . . . oil residues were not detected below the top several inches of soil material." (Heskin Decl. Ex. 7 at NGINS000434098 (emphasis added).)**

**NGSC further disputes that Century Assertion 4 is material to NGSC's motion for summary judgment; the alleged storage of recyclable material at the NWIRP between the early 1950s and 1969 and any associated superficial oil stains on the ground are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

5. Century Assertion 5: Grumman used the Community Park Site to landfill its toxic waste sludges. *See* Heskin Dec., Ex. 8 at p. 62-63. After running out of space on its own property, Grumman donated the Community Park property to the Town of Oyster Bay and began sending its sludges to the Syosset and Old Bethpage landfills. *See id.* at p. 81. Grumman then represented to the State on May 24, 2002, July 25, 2002, and December 2003 that it believed that PCBs now found at the Community Park came from its autoclave operations. *See* Heskin Dec., Ex. 3; Ex. 25; Ex. 2. An area of the Community Park was also used as a fire training area where waste oil and jet fuel were ignited and extinguished. *See* Heskin Dec., Ex. 2 at NGINS000007372; Ex. 3.

**NGSC Response to Century Assertion 5: Disputed. The evidence cited by Century to support the first sentence of Assertion 5 makes no mention of "toxic waste sludges," nor does it specify that *any* sludge was "landfill[ed]" on the land where the Bethpage**

**Community Park is currently situated; the evidence instead states that sludge was placed in a field "near the Plant 3 building" and later excavated. (Heskin Decl. Ex. 8 at BETPARK00536-37.) The evidence cited by Century likewise does not support its statements in the second sentence of Assertion 5. The cited evidence makes no mention of Grumman donating the land on which the Bethpage Community Park is situated to the Town of Oyster Bay "[a]fter running out of space on its own property," nor does it state that Grumman "began sending its sludges to the Syosset and Old Bethpage landfills" at that time; in fact, the cited evidence makes no mention of the Old Bethpage Landfill at all, and states only that Grumman deposited sludge at the Syosset Landfill because it "had no place on Grumman property to put it." (*See id.* Ex. 8 at BETPARK00537-38, BETPARK00556.)**

**NGSC further disputes that it "represented to the State on May 24, 2002, July 25, 2002, and December 2003 that it believed that PCBs now found at the Community Park came from its autoclave operations," and that the evidence cited by Century supports this assertion. The evidence cited by Century dated December 2003 (a 72-page document for which Century provides no pin cite) makes no mention whatsoever of autoclave operations (*see id.* Ex. 2 at NGINS000007359-430). The evidence cited by Century dated May 24, 2002 is a letter from NGSC to the New York State Department of Environmental Conservation ("NYSDEC") requesting that NYSDEC require the U.S. Navy to participate in meetings regarding the Bethpage Community Park because "it appears that some of the PCBs and metals detected within the Park property . . . *may have originated* from Navy and Grumman property and production lines as a result of operations supporting military production contracts [including] autoclave operations in Plant 3;" such PCBs may have**

**been contained in what would have been "considered clean fill at that time (prior to 1962) [that] *may have been placed* at various locations on the NWIRP-Grumman property, including shallow areas of the property on which the Park is presently located." (*Id.* Ex. 3 at NGINS000284883-85 (emphasis added).) The evidence cited by Century dated July 25, 2002 -- another NGSC letter to NYSDEC regarding the U.S. Navy's potential participation in Bethpage Community Park environmental issues -- likewise stated that "[o]ne *possible scenario* for explaining *a component of* the subsurface presence of PCBs detected within the Park property is that they *may have originated* from the autoclave/heating press operations in the NWIRP Building 3." (*Id.* Ex. 25 at BETPARK01822, BETPARK01825 (emphasis added).)**

**NGSC further disputes that the final sentence of Assertion 5 is supported by the evidence cited by Century; the cited evidence (a five-page letter dated May 24, 2002 for which Century provides no pin cite, and a page Bates-labeled NGINS000007372 from a larger document dated December 2003) makes no mention of an area of the Bethpage Community Park being used as a fire training area where waste oil and jet fuel were ignited and extinguished. (*See id.* Ex. 2 at NGINS000007372; *id.* Ex. 3.) A page Bates-labeled NGINS000007370 from the document dated December 2003 does mention that "[t]he southeastern portion of the current park property was utilized as a fire training area where waste oil and jet fuel were ignited and extinguished. The requirement to develop, operate and maintain an on-site fire fighting force ("Crash Crew"), including a fire training program, was imposed on Grumman Aircraft Engineering Corporation by the U.S. Navy." (*See id.* Ex. 2 at NGINS000007372.)**

**NGSC further disputes that Century Assertion 5 is material to NGSC's motion for summary judgment; NGSC's speculation as to the possible origin of PCB's found in soils on the Bethpage Community Park property is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that the first two sentences of Century Assertion 5 are supported by admissible evidence. Exhibit 8 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). The document consists of excerpts from the transcript of a deposition taken in a previous case of an individual who, at the time of the deposition, was a former employee of Grumman. (Declaration of Shelli L. Calland dated February 22, 2012 ("Calland Decl.") Ex. 8 at BETPARK00480; *see* Heskin Decl. Ex. 8.) Century offers the out-of-court statements made therein to prove the truth of the matters asserted, and the cited portions of the document do not fall within any exception or exclusion to the rule against hearsay set forth in the Federal Rules of Evidence. *See* Fed. R. Evid. 801, 803, 804. In particular, Century has provided no evidence that the declarant is unavailable, as is required by Federal Rule of Evidence 804.**

6. Century Assertion 6: By at least 1956, hexavalent chromium was detected in the wastewater contained in onsite recharge basins at concentrations above allowable limits. *See* Heskin Dec., Ex. 6 NGINS000010541.

**NGSC's Response to Century Assertion 6: Disputed. The evidence cited by Century does not support Assertion 6; the cited evidence states instead that on a single occasion in 1956, hexavalent chromium was detected in excess of allowable limits in certain**

**recharge basins on the Bethpage NWIRP, and that "[t]his matter was discovered and handled by the Nassau County Department of Health." (Heskin Decl. Ex. 6 at NGINS000010541.)**

**NGSC further disputes that Assertion 6 is material to NGSC's motion for summary judgment; the alleged 1956 discovery of hexavalent chromium in recharge basins located on the NWIRP and the Nassau County's handling of the matter are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 6 is supported by admissible evidence. Exhibit 6 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 2.**

7. Century Assertion 7: Grumman began regularly sampling its onsite wells in 1962, and as early as 1970, the Nassau County Department of Health had met with Grumman to "discuss procedures for routine water quality surveillance." *See* Heskin Dec., Ex. 9 at NGINS000619195; Heskin Dec., Ex. 1 at NGINS000674402.

**NGSC's Response to Century Assertion 7: Disputed. The evidence cited by Century does not support Assertion 7; the evidence states instead that Nassau County Department of Health ("NCDOH") "water quality data exists for many wells dating to 1962" but that routine annual sampling of all Grumman Corporation wells did not begin until 1972. (Heskin Decl. Ex. 9 at NGINS000619195.)**

**NGSC further disputes that Assertion 7 is material to NGSC's motion for summary judgment; the alleged sampling of well water at the Bethpage Facility in the 1962 to 1970**

**time period is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that certain of the evidence cited in support of Century Assertion 7 is admissible. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c); the document consists of collections of out-of-court statements that Century offers to prove the truth of the matters asserted therein, and the cited portions of the document do not fall within any exception or exclusion to the rule against hearsay set forth in the Federal Rules of Evidence. *See* Fed. R. Evid. 801, 803.**

**Exhibit 1 to the Heskin Declaration is a compilation of two chronologies entitled "Chronological Record of the Bureau of Water Pollution Control Relating to the Regulation of Industrial Wastes of the Grumman Aerospace Corporation Plant at Bethpage, New York" and "Chronological Record of the Bureau of Water Resources' Investigation of Groundwater Contamination East Central Nassau County." (*See* Heskin Decl. Ex. 1 at NGINS000674399, NGINS000674402.) These chronologies do not set out the "activities" of a "public office," as is required to fall within the exception to the rule against hearsay set forth in Federal Rule of Evidence 803(8)(A)(i). The chronologies instead characterize various meetings, letters, memoranda, discussions, test results and other documents or events involving NCDOH personnel and/or various outside parties that occurred over an approximately 34-year period (1943 - 1977). (*See id.* Ex. 1 at NGINS000674399-467; *see also id.* at NGINS000674422-23 (August 23, 1976 entry describing events and documents involving only the Navy and Grumman).) The**

**chronologies likewise do not "set[] out . . . factual findings from a legally authorized investigation," as is required to fall within the exception to the rule against hearsay set forth in Federal Rule of Evidence 803(8)(A)(iii). As discussed above, the document instead comments on numerous events that allegedly took place over an approximately 34-year period. (*See id.* Ex. 1.)**

**Exhibit 1 to the Heskin Declaration likewise does not fall within the exception to the rule against hearsay set forth in Federal Rule of Evidence 803(6) because the document was not made at or near the time of the events that it purports to record. *See* Fed. R. Evid. 803(6)(A). To the contrary, the first chronology -- which purports to record events that occurred from 1943 to 1976 -- is dated February 7, 1977, (*see id.* Ex. 1 at NGINS000674401), and the second chronology -- which purports to record events that occurred from August 1970 to January 1977 -- has no date of creation, consists of numerous entries that are similar in style, and is set forth on 66 continuously paginated sheets, (*see id.* Ex. 1 at NGINS000674402-67.) The chronologies are inadmissible under Federal Rule of Evidence 803(6) & (8) for the additional reason that no evidence has been submitted demonstrating that the unknown individual(s) who drafted the document possessed personal knowledge of the facts set forth therein.**

**Exhibit 1 to the Heskin Declaration also does not fall within the exclusion from the definition of hearsay set forth in Federal Rule of Evidence 801(d)(2)(B) because NGSC did not manifest that it adopted the statements set forth in the document or believed them to be true. Although the document was attached as an appendix to a report submitted by a Grumman to NYSDEC, the report specified that the chronology was simply a document that Grumman had originally obtained from NYSDEC, not a truthful rendition of the facts**

**stated therein. (*See* Calland Decl. Ex. 9 at NGINS000674258, NGINS000674263, NGINS000674276-77.)**

8. Century Assertion 8: Between 1964 and 1975, Grumman had replaced thirteen wells "due to problems of deterioration and odor," and abandoned a number of other onsite wells due to peculiar tastes and a "sweet paint" odor in groundwater. *See id* at NGINS000674405; Heskin Dec., Ex. 9 at NGINS000619195.

**NGSC's Response to Century Assertion 8: Disputed. Grumman replaced approximately thirteen wells between 1964 and 1975, but not all due to "problems of deterioration and odor;" in fact, Grumman replaced several wells between 1964 and 1975 solely due to a need for increased capacity or deterioration of older wells, *i.e.* because the wells "had deteriorated to the point that it [was] no longer practical to attempt to repair them." (*See* Calland Decl. Ex. 29 at NGINS000990027 (impractical to repair two wells); *id.* Ex. 28 at NGINS000925528 (four wells replaced due to "deterioration and loss of yield"); *id.* Ex. 30 at NGINS000925068 ("replacing a 27-year-old 800 GPM, 150' deep well with a new 1200 GPM, 400' deep well").) NGSC further disputes that the evidence cited by Century supports the assertion that "a number of other onsite wells" were abandoned due to "peculiar tastes and a 'sweet paint' odor;" the cited evidence instead states that "well #8 . . . was subsequently removed from service," and that the wells that allegedly developed "a peculiar taste and 'sweet paint' odor" were tested for phenols, but the results came back negative. (*See* Heskin Decl. Ex. 1 at NGINS000674405.)**

**NGSC further disputes that Assertion 8 is material to NGSC's motion for summary judgment; the alleged replacement of wells on the Bethpage Facility during the 1964 to**

**1975 time period is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that certain of the evidence cited in support of Assertion 8 is admissible. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7.**

9. Century Assertion 9: Although it abandoned certain contaminated wells, Grumman continued to blend and use in its system other wells that it knew were contaminated. *See* Heskin Dec., Ex. 1 at NGINS000674405.

**NGSC's Response to Century Assertion 9: Disputed. The evidence cited by Century to support Assertion 9 makes no mention of Grumman "contin[uing] to blend and use . . . wells that it knew were contaminated;" the cited evidence instead states that a well where a peculiar taste and odor had been detected was still blended and used in the system after it was tested for phenols on two occasions, and the test results were negative. (*See* Heskin Decl. Ex. 1 at NGINS000674405.)**

**NGSC further disputes that Assertion 9 is material to NGSC's motion for summary judgment; Grumman's alleged continued use of a well on the Bethpage Facility in 1974 that had tested negative for phenols is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 9 is supported by admissible evidence. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible**

**in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c).** ***See*** **NGSC's Response to Century Assertion 7.**

10. Century Assertion 10: As early as 1975, the Department of Health noted that the "large amount of pumping at Grumman might be drawing contaminated water into the [M]agothy [A]quifer as evidenced by the sewage and/or industrial waste pollution now apparent in most of the wells." *See id* at NGINS000674406.

**NGSC's Response to Century Assertion 10: Not disputed that Assertion 10 contains an accurate partial quotation from a document by an unknown author that purports to be a chronology of past events attached as Exhibit 1 to the Heskin Declaration. Immediately after the quotation set forth in Assertion 10, the cited evidence states that the problem of well contamination at the Bethpage Facility could also be explained by "[t]he fact that Grumman was also in an area of high nitrates." (Heskin Decl. Ex. 1 at NGINS000674406.)**

**NGSC disputes that Assertion 10 is material to NGSC's motion for summary judgment; speculation by the NCDOH regarding the alleged effect of Grumman's groundwater pumping in 1975 is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 10 is supported by admissible evidence. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c).** ***See*** **NGSC's Response to Century Assertion 7.**

11. Century Assertion 11: By at least 1975, Grumman's own sampling results had "determined the presence of three hydrocarbons in their well water. The hydrocarbons detected were methane, ethylene and either methyl propane or propadiene." *See id* at NGINS000674408.

**NGSC's Response to Century Assertion 11: Disputed that the evidence cited by Century to support Assertion 11 can be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7. As explained in NGSC's Response to Century Assertion 7, Exhibit 1 to the Heskin Declaration consists of a collection of hearsay statements that do not fall within any exception to the rule against hearsay set forth in the Federal Rules of Evidence. Indeed, the evidence cited by Century to support Assertion 11 consists of an out-of-court statement made in a chronology of past events, that was itself based on an out-of-court statement made in a memorandum, that was in turn based on groundwater sampling results that were allegedly obtained from Grumman Aerospace Corporation ("GAC") in 1975. (*See* Heskin Decl. Ex. 1 at NGINS000674408.)**

**NGSC further disputes that Assertion 11 is material to NGSC's motion for summary judgment; alleged detection by Grumman of trace amounts of hydrocarbons in well water in 1975 is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

12. Century Assertion 12: In addition, Grumman had detected tri-chlorethlylene, tetra-chloroethylene, di-chloroethlyene and vinyl chloride. *See id* at NGINS000674412, NGINS000674414-15. These primary contaminants can be collectively described as

"chlorinated VOCs or their breakdown products, including PCE, TCE and DCE." *See* Heskin Dec., Ex. 10 at CEN00000695. The Health department noted that the presence of these chemicals indicated "direct contamination of water supplies by industrial wastes." *See* Heskin Dec., Ex. 9 at NGINS000619195.

**<u>NGSC's Response to Century Assertion 12</u>: Not disputed that Grumman obtained analytical results of certain samples of water taken from four of its wells that showed the presence of trace amounts of tri-chloroethylene, tetra-chloroethylene, di-chloroethylene, and/or vinyl chloride. Disputed that the evidence cited by Century to support the first sentence of Assertion 12 makes any mention of tests conducted by Grumman that detected tri-chlorethylene, tetra-chloroethylene, or di-chloroethylene. (See Heskin Decl. Ex. 1 at NGINS000674412, NGINS000674414-15.) NGSC further disputes that the evidence cited by Century to support the first sentence of Assertion 12 can be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7. As explained in NGSC's Response to Century Assertion 7, Exhibit 1 to the Heskin Declaration consists of a collection of hearsay statements that do not fall within any exception to the rule against hearsay set forth in the Federal Rules of Evidence. Indeed, the evidence cited by Century to support the first sentence of Assertion 12 consists of an out-of-court statement made in a chronology of past events, that was itself based on an out-of-court statement allegedly made in a report, that was in turn based on groundwater sampling results that were allegedly obtained from GAC in 1975. (*See id.* Ex. 1 at NGINS000674412.)**

**NGSC further disputes that the evidence cited in support of the second sentence of the Assertion 12 states that "tri-chlorethlylene, tetra-chloroethylene, di-chloroethlyene and vinyl chloride" are all "primary contaminants" and can be described collectively as "chlorinated VOCs." (*See id.* Ex. 10 at CEN00000695.)**

**Not disputed that the third sentence of Assertion 12 contains an accurate partial quotation from a document on NCDOH letterhead identified as "Summary of Groundwater Quality - Grumman Aerospace Corporation." Immediately after the quotation set forth in Assertion 12, the cited evidence states that "[t]he discharge of sanitary wastes *in the vicinity of the Grumman Corporation* and the discharge of industrial wastes, *particularly those previously discharged by the Hooker Chemical Corporation*, is considered responsible for the degradation in quality of Grumman Corporation wells." (*Id.* Ex. 9 at NGINS000619195 (emphasis added).)**

**NGSC further disputes that Assertion 12 is material to NGSC's motion for summary judgment; alleged detection by Grumman of certain chemicals in well water in 1975 is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

13. Century Assertion 13: The problems of groundwater contamination were so severe in 1975 that Grumman expressed "deep concern that immediate action be taken to determine the cause of the contamination problem and to take corrective action." *See* Heskin Dec., Ex. 1 at NGINS000674405. The Department of Health was also urged to make the groundwater problem at Grumman a "high priority project" and to seek public funding. *See id.* at NGINS000674409. Intensive investigation was also urged to determine "the extent of future

implications of contamination in the Grumman Area," and that "the problem of industrial waste contamination might be spreading." *See id.* at NGINS000674416.

<u>NGSC's Response to Century Assertion 13</u>: **Disputed. The evidence cited by Century to support the first sentence of Assertion 13 does not support the statements contained therein. The cited evidence (a page Bates-labeled NGINS000674405 in a larger document) does not contain the quoted text, nor does it make any mention of groundwater contamination being "severe" or of Grumman stating in 1975 that immediate action needed to be taken. (*See* Heskin Decl. Ex. 1 at NGINS000674405.) The quoted text does appear on a page Bates-labeled NGINS000674409 in the document cited by Century to support the first sentence of Assertion 13, but NGSC disputes that the cited document supports the assertion that the representative of Grumman allegedly expressed concern because "[t]he problems of groundwater contamination were so severe." NGSC further disputes that the evidence cited in support of Assertion 13 supports the assertion that the NCDOH was "urged to make the groundwater problem at Grumman a 'high priority project' and to seek public funding;" the cited evidence instead states that "a draft of [a] preliminary report . . . indicated that determination of the significance of sources of contamination in affecting the presence of groundwater quality in the area of Grumman Aerospace Corporation should become a high priority project . . . and be considered for 208 funding." (*Id.* Ex. 1 at NGINS000674409.) NGSC further disputes that the evidence cited by Century to support the third sentence of Assertion 13 supports the statements contained therein. The cited evidence makes no mention of urging "[i]ntensive investigation . . . to determine 'the extent of future implications of contamination in the Grumman Area,'" nor does it contain the quoted text; the cited evidence instead states that in November 1975, a representative of the**

**U.S. Geological Survey purportedly "indicated that the problems outlined in [an earlier letter] warranted more intensive investigation and suggested that the problem of industrial waste contamination may be spreading." (*Id.* Ex. 1 at NGINS000674416.)**

**NGSC further disputes that Assertion 13 is material to NGSC's motion for summary judgment; the actions allegedly contemplated by the NCDOH in connection with the investigation of groundwater contamination in 1975 are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 13 is supported by admissible evidence. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7.**

14. Century Assertion 14: By at least 1976, the "apparent spread of contamination" had grown "from the south thereby indicating a more immediate threat to the use of adjacent municipal sources." *See id.* at NGINS000674415. As a result, numerous federal, state and local governmental agencies had been alerted that a "serious problem of industrial waste contamination was evident at the Grumman Aerospace Corporation." *See id.* at NGINS000674418. Among the agencies involved were the U.S. Geological Survey, New York Department of Environmental Conservation, Bureau of Public Water Supply, Bureau of Water Pollution Control, the New York Attorney General, and the U.S. Environmental Protection Agency. *See id.* at NGINS000674405, NGINS000674418, NGINS000674457, NGINS000674463. The EPA flew in by helicopter and took samples to Edison, New Jersey for

testing, and told Grumman "don't drink the water." *See id.* at NGINS000674421, NGINS000674431; Heskin Dec., Ex. 10 at CEN00000696.

__NGSC's Response to Century Assertion 14__: **Disputed. The evidence cited by Century to support the first sentence of Assertion 14 does not support the statements contained therein. The cited evidence makes no mention of "'the apparent spread of contamination' [growing] from the south thereby indicating a more immediate threat to the use of adjacent municipal sources;" the cited evidence instead simply states that "[s]amples were collected . . . to determine if the contamination problem extended to other Grumman sources to the south." (Heskin Decl. Ex. 1 at NGINS000674415.) NGSC further disputes that the evidence cited by Century to support the second sentence of Assertion 14 supports the statements contained therein. The cited evidence makes no mention of "numerous federal, state and local governmental agencies [having] been alerted that a 'serious problem of industrial waste contamination was evident at the Grumman Aerospace Corporation;'" the cited evidence instead states that a 1976 NCDOH report was purportedly forwarded to NYSDEC and that this report purportedly "indicated that a serious problem of industrial waste contamination was evident at the Grumman Aerospace Corporation." (*Id.* Ex. 1 at NGINS000674418.) NGSC further disputes the statements contained in the third sentence of Assertion 14 on the ground that they are too vague to answer; the statements do not provide any indication of what the enumerated entities were "involved" in. NGSC further disputes that the evidence cited by Century to support the fourth sentence of Assertion 14 supports the statements contained therein; the cited evidence does not include the quotation "don't drink the water," and states only that on December 2, 1975, "several laboratory technicians from the EPA, arriving by helicopter,**

**were made available to collect 12 additional samples and transport them that night to their laboratory inn Edison, New Jersey." (*Id.* Ex. 1 at NGINS000674431; *see also id.* Ex. 1 at NGINS000674421; *id.* Ex. 10 at CEN00000696.)**

**NGSC further disputes that Assertion 14 is material to NGSC's motion for summary judgment; general comments allegedly made in the mid-1970s by government agencies about alleged groundwater pollution in the vicinity of the Bethpage Facility are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 14 is supported by admissible evidence. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7. In addition, Exhibit 10 to the Heskin Declaration appears to be completely unrelated to the facts asserted in Century Assertion 14.**

15. Century Assertion 15: The cost estimates to investigate the nature and extent of the pollution problem and to convert to public water were at least $500,000 by 1976. *See* Heskin Dec., Ex. 1 at NGINS000674421-22. It was also noted that abatement of the groundwater contamination might not be possible. *Id.*

**NGSC's Response to Century Assertion 15: Disputed. The evidence cited by Century does not support Assertion 15. The cited evidence instead states that a letter sent by the Naval Plant Representative at the Grumman Aerospace Corporation to the Director of Naval Weapons Engineering endorsed a change to a contract between the Navy and**

**Grumman whereby $200,000 would be provided for Grumman to connect to the local municipal water supply to obtain potable water. (*See* Heskin Decl. Ex. 1 at NGINS000674422-23.)**

**NGSC further disputes that Assertion 15 is material to NGSC's motion for summary judgment; alleged cost estimates of investigating groundwater conditions and for Grumman to connect to the municipal water supply in 1976 are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 15 is supported by admissible evidence. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7. Indeed, the evidence cited by Century to support Assertion 15 consists of out-of-court statements made in a chronology of past events, which purportedly summarized out-of-court statement contained in a letter exchanged between Navy personnel; the letter exchanged between Navy personnel was in turn based on out-of-court statements purportedly made in a prior letter from Grumman to the Navy. (*See* Heskin Decl. Ex. 1 at NGINS000674422.)**

16. Century Assertion 16: By 1977, health concerns prompted the Health Department to issue a press release alerting the local communities, and bottled water was supplied by Bethpage State Park. *See id* at NGINS000674464. In response to a letter to the Governor noting "the existence of highly dangerous chemicals in public and private water supplies serving the Bethpage and Hicksville Communities," a public hearing was held in early 1977. *See id* at

NGINS000674449. It was noted that "after approximately seven hours of testimony, it became disturbingly apparent that contaminants are present in public water supplies and that no conclusive testing program was in effect or planned." *Id.*

**NGSC's Response to Century Assertion 16: Disputed. The evidence cited by Century to support the first sentence of Assertion 16 does not support the statements contained therein; the cited evidence instead states that the County Executive, not the NCDOH, issued a press release, and that the press release stated, "[i]t is time to put the entire situation in perspective and attempt to allay some of the apprehension of County residents." (Heskin Decl. Ex. 1 at NGINS000674463.) NGSC further disputes Assertion 16 to the extent it suggests that the Bethpage State Park is the same as the Bethpage Community Park or is adjacent to or related to the Bethpage Facility. The Bethpage State Park is located adjacent to the Old Bethpage Landfill site and the Nassau County Fire Training Center site, not the Bethpage Facility.**

**NGSC further disputes that the evidence cited by Century supports the second and third sentences of Assertion 16. The cited evidence instead states that representatives of the NCDOH discussed "apparent errors in statements made" by a New York assemblyman in a letter to the Governor, as well as the possibility of the NCDOH providing clarification on those errors; the cited evidence further makes clear that the quoted text in Assertion 16 was allegedly contained in the assemblyman's letter to the Governor that purportedly contained "apparent errors." (*Id.* Ex. 1 at NGINS000674449.) In addition, the cited evidence states that a public meeting was held at the request of the assemblyman, not in response to any letter to the governor. (*Id.*)**

**NGSC further disputes that Assertion 16 is material to NGSC's motion for summary judgment; alleged statements regarding generalized groundwater issues in the Bethpage and Hicksville area made by governmental agencies and politicians in 1977 are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 16 is supported by admissible evidence. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7. Indeed, the evidence cited by Century to support Assertion 16 consists of (i) out-of-court statements made in a chronology of past events, which purportedly summarized out-of-court statement contained in a press release and made at a meeting, (*see id.* Ex. 1 at NGINS000674463-64); and (ii) out-of-court statements made in a chronology of past events, which purportedly quoted out-of-court statements allegedly made in a letter from a New York assemblyman to the governor, which were in turn based on information allegedly presented at a public hearing. (*See id.* Ex. 1 at NGINS000674449.)**

17. Century Assertion 17: In order to meet these needs, the required sampling soon outgrew the capacity of local agencies, and thus, the EPA and other federal and state agencies were urged to "intensify their laboratory support of the Department." *See id* at NGINS000674463.

**NGSC's Response to Century Assertion 17: Disputed. The evidence cited by Century does not support Assertion 17. The cited evidence makes no reference to any**

**"needs" outlined in the letter to the governor discussed in Assertion 16; the cited evidence instead states that "each municipal water supply in Nassau County" was asked to assist in "a sampling program for trace organics analysis . . . . since the magnitude of the investigation exceeded the laboratory capability currently available to" the NCDOH. (Heskin Decl. Ex. 1 at NGINS000674463.) NGSC further disputes that the cited evidence supports the assertion that "the EPA and other federal and state agencies were urged to 'intensify their laboratory support of the Department;'" the cited evidence instead states that at a January 1977 meeting, a representative of the NCDOH recommended that the "EPA take on the task of laboratory inspection," and that "Federal and State agencies intensify their laboratory support to the [NCDOH]." (*Id.*)**

**NGSC further disputes that Assertion 17 is material to NGSC's motion for summary judgment; alleged statements regarding generalized groundwater issues in Nassau County made in 1977 are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 17 is supported by admissible evidence. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7. Indeed, the evidence cited by Century to support Assertion 17 consists of out-of-court statements made by an unknown author in a chronology of past events, which purportedly summarized (a) out-of-court statement contained in a letter from the NCDOH to certain suppliers of drinking water and (b) out-of-court statements made at a meeting attended by various governmental and non-governmental entities. (*See id.* Ex. 1 at NGINS000674463.)**

18. Century Assertion 18: It was agreed that Grumman would "assume the cost for analysis of well samples using a commercial laboratory and the service of Geraghty & Miller, groundwater consultants would be offered to the Department." *See id* at NGINS000674460.

**NGSC's Response to Century Assertion 18: Disputed. The evidence cited by Century does not support Assertion 18. The cited evidence does not include the quoted text and does not state that Grumman would assume the cost of all analysis of well samples and the services of Geraghty & Miller. The evidence instead states that in 1977 GAC offered to assume certain costs for analysis of well samples and that GAC also offered the services of Geraghty & Miller to the NCDOH; the NCDOH responded by stating that "[t]he participation of Grumman in funding the further testing of Corporation wells and in offering the services of Geraghty & Miller to assist the Department in further development of our program was welcomed and appreciated." (Heskin Decl. Ex. 1 at NGINS000674460.)**

**NGSC further disputes that Assertion 18 is material to NGSC's motion for summary judgment; Grumman's alleged offer to assist in groundwater sampling in 1977 is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 18 is supported by admissible evidence. Exhibit 1 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 7. Indeed, the evidence cited by Century to support Assertion 18 consists of out-of-court**

**statements made by an unknown author in a chronology of past events, which purportedly summarized out-of-court statements made in two letters exchanged between GAC and the NCDOH. (*See* Heskin Decl. Ex. 1 at NGINS000674459.)**

19. Century Assertion 19: Prior to offering these services, Geraghty & Miller had already interpreted the available groundwater data and informed Grumman that, in a best-case scenario, contamination from "basins, lagoons, spills, etc. have created a slug of contaminated ground water in the shallow aquifer underlying at least part of the plant," which "probably also extends vertically a short but unknown distance into the Magothy Formation." *See* Heskin Dec., Ex. 12.

**NGSC's Response to Century Assertion 19: Disputed. The evidence cited by Century in support of Assertion 19 does not set forth a "best-case scenario"; the evidence instead states that the "ground-water quality situation at Grumman" may result "from one of two possibilities. The First, which would be more favorable from Grumman's standpoint [is that] sources of contamination consisting of basins, lagoons, spills, etc. have created a slug of contaminated ground water in the shallow aquifer underlying at least part of the plant. This slug . . . probably also extends vertically a short but unknown distance into the Magothy Formation . . . . The contaminated deep wells, under this condition, would actually be screened in uncontaminated ground water. However, because of either leaky casings or improper sealing of the annular space around the casings, contamination from the shallow zone is finding its way into the well." (*See* Heskin Decl. Ex. 12 at NGINS001899582.)**

**NGSC further disputes that Assertion 19 is material to NGSC's motion for summary judgment; Geraghty & Miller's statements regarding the possible pattern of groundwater contamination in the vicinity of the Bethpage Facility allegedly made in the mid-1970s are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

20. Century Assertion 20: Geraghty & Miller also advised that the "slug may spread both laterally and vertically beneath the property"; "potable water may further deteriorate"; "neighboring wells may become contaminated over the long term"; and "further contamination may take place from sources not presently detected." It further advised that even if Grumman took immediate action, it would be costly, the investigation may be inconclusive, abatement of existing groundwater conditions may not be possible, and the only course of action may remain converting to an offsite public water supply. *Id.*

**NGSC's Response to Century Assertion 20: Disputed. The evidence cited by Century does not support the assertion that Geraghty & Miller "advised" Grumman that the events described in the first sentence of Assertion 20 may happen in any situation; the cited evidence instead discusses "advantages" and "risks" of several courses of action, and the quoted text in the first sentence of Assertion 20 pertains to risks of only certain of those courses of action. (Heskin Decl. Ex. 12.) NGSC further disputes that the evidence cited by Century supports the assertion that Geraghty & Miller "advised" Grumman that the events described in the second sentence of Assertion 20 may happen "even if Grumman took immediate action"; the cited evidence instead discusses "advantages" and "risks" of**

**several courses of action, and the events set forth in the second sentence of Assertion 20 pertain to risks of only one of those courses of action. (*Id.*)**

**NGSC further disputes that Assertion 20 is material to NGSC's motion for summary judgment; Geraghty & Miller's statements regarding possible courses of action regarding groundwater contamination in the vicinity of the Bethpage Facility allegedly made in the mid-1970s are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

21. Century Assertion 21: The Bethpage Facility was identified by the State as an Active Hazardous Waste Site on January 18, 1980. *See* Heskin Dec., Ex. 13. In this report, it was noted that the Grumman Facility has "one sludge drying bed to handle 1300 tons/yr of waste water treatment plant sludge" and that "heavy metal sludges had been previously placed in 24 unlined lagoons." *Id.*

**NGSC's Response to Century Assertion 21: Not disputed that the Bethpage Facility, along with hundreds of other sites, was identified by NYSDEC as an active hazardous waste site in a June 1980 report titled "Hazardous Waste Disposal Sites in New York State," or that the second sentence of Assertion 21 contains an accurate partial quotation from that report. (Heskin Decl. Ex. 13 at CEN00001121; *id.* Ex. 39; Calland Decl. Ex. 24 at C-1-3 to C-1-4.) Disputed that NYSDEC's identification of the Bethpage Facility in the June 1980 report indicated that NYSDEC had made any determination that the Bethpage Facility posed a threat to the environment or human health. The June 1980 report cited by Century simply listed "all sites known or suspected of having received hazardous wastes" at any time (a total of 680 sites), and classified the Bethpage Facility as a**

**site where only preliminary data was available and more inspection was needed to determine whether it posed any risk to public health or the environment (Class A). (Calland Decl. Ex. 24 at vi, 2, 3, C-1-3.) In fact, the specific evidence cited by Century in support of Assertion 21 -- a filled-out form for the Bethpage Facility contained in the June 1980 report -- states: "Assessment of Environmental Problems: Additional sampling is needed of the various media in order to assess impacts upon the environment . . . . Assessment of Health Problems: None known . . . ." (*See* Heskin Decl. Ex. 13 at CEN00001122; Calland Decl. Ex. 24 at C-1-3 to C-1-4.)**

**NGSC further disputes that Assertion 21 is material to NGSC's motion for summary judgment; NYSDEC's identification of the Bethpage Facility, along with hundreds of other sites, in a June 1980 report titled "Hazardous Waste Disposal Sites in New York State," and the report's description of certain sludge drying beds on the Bethpage Facility are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

22. Century Assertion 22: The Bethpage Facility was also identified in the NYDEC's "first report 'Hazardous Waste Disposal Sites in New York State issued in June 1980." *Id.*

**NGSC's Response to Century Assertion 22: Not disputed that the Bethpage Facility, along with hundreds of other sites, was identified in a report titled "Hazardous Waste Disposal Sites in New York State" issued in June 1980. (*See* NGSC's Response to Assertion 21.) Disputed that NYSDEC's identification of the Bethpage Facility in the June 1980 report is different from NYSDEC's identification of the Bethpage Facility as an active hazardous waste site in 1980. The evidence cited by Century to support the assertion that**

**the Bethpage Facility was identified as an active hazardous waste site in 1980 is a filled-out form that was part of the June 1980 report. (*See* Heskin Decl. Ex. 13; Calland Decl. Ex. 24 at C-1-3 to C-1-4.) NGSC further disputes that NYSDEC's identification of the Bethpage Facility in the June 1980 report indicated that NYSDEC had made any determination that the Bethpage Facility posed a threat to the environmental or human health. (*See* NGSC's Response to Assertion 21.)**

**NGSC further disputes that Assertion 22 is material to NGSC's motion for summary judgment; NYSDEC's identification of the Bethpage Facility, along with hundreds of other sites, in a June 1980 report titled "Hazardous Waste Disposal Sites in New York State" is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

23. Century Assertion 23: On March 18, 1982, Grumman was place on notice by the EPA that it was a Potential Responsible Party concerning the release of hazardous waste at the Old Bethpage Landfill as a result of using the landfill for the disposal of hazardous waste sludge that it had previously allowed to dry in unlined lagoons at the Grumman Facility. *See* Heskin Dec., Ex. 14.

**NGSC's Response to Century Assertion 23: Disputed. The evidence cited by Century does not support Assertion 23. The cited evidence makes no mention of Grumman "using the [Old Bethpage] landfill for the disposal of hazardous waste sludge that [Grumman] had previously allowed to dry in unlined lagoons at the Grumman Facility," nor does it provide a reason why the EPA believed that Grumman may be a potentially responsible party at the Old Bethpage Landfill site; the cited evidence instead simply states**

**that "EPA believes that your company may be a responsible party." (Heskin Decl. Ex. 14 at TRAV005035.) In addition, the cited evidence bears a stamp indicating that it was received by Grumman Corporation on March 22, 1982. (*Id.*)**

**NGSC further disputes that Assertion 23 is material to NGSC's motion for summary judgment; Grumman's receipt of a letter in the 1980s stating that EPA believes Grumman "may be a responsible party" at the Old Bethpage Landfill is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

24. Century Assertion 24: On November 16, 1982, the State also filed a Notice of Claim against Grumman due to its discharging of "a variety of industrial wastes and sludges, including a variety of metal hydroxides" at the Old Bethpage landfill. *See* Heskin Dec., Ex. 15.

**NGSC's Response to Century Assertion 24: Not disputed that a letter dated November 16, 1982 stated that it was "a claim by the State of New York . . . with respect to the Old Bethpage Landfill" and that "[i]nformation obtained by the [EPA] and [NYSDEC]" shows that Grumman disposed of "a variety of industrial wastes and sludges, including a variety of metal hydroxides" at the Old Bethpage Landfill." (Heskin Decl. Ex. 15 at TRAV005037.)**

**NGSC disputes that Assertion 24 is material to NGSC's motion for summary judgment; Grumman's receipt of a letter in the 1980s stating that it was a "claim by the State of New York . . . with respect to the Old Bethpage Landfill" site is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

25. Century Assertion 25: The Bethpage Facility was eventually added to the New York State Department of Environmental Conservation's Registry of inactive Hazardous Waste Sites in 1983 "based on the integrated Bethpage Facility." *See* Heskin Dec., Ex. 6 at NGINS000010543; Heskin Dec., Ex. 10 at CEN00000694.

**NGSC's Response to Century Assertion 25: Disputed that in 1983 the Bethpage Facility was added to NYSDEC's Registry of Inactive Hazardous Waste Sites "'based on the integrated Bethpage Facility;'" the evidence cited by Century instead states that in 1983 the Bethpage NWIRP was considered part of the Bethpage Facility site, and that the Bethpage Facility was added to NYSDEC's Registry of Inactive Hazardous Waste Disposal Sites in New York "as a Class 2a site because there was insufficient data to assign it a classification." (Heskin Decl. Ex. 6 ay NGINS000010543.) NGSC further disputes Century's use of the term "eventually." The cited evidence contains no suggestion that the listing of the Bethpage Facility as a Class 2a site in 1983 was tardy; to the contrary, as noted above, the cited evidence states that "there was insufficient data to assign it a classification" at the time. (*Id.*)**

**NGSC further disputes that Assertion 25 is material to NGSC's motion for summary judgment; the listing of the Bethpage Facility as a Class 2a site on NYSDEC's Registry of Inactive Hazardous Waste Disposal Sites in 1983 is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

26. Century Assertion 26: On December 6, 1983, the State also filed a Notice of Claim for "the present and future costs of response, removal and remediation and for damages to the natural resources of the State of New York at and around the [Bethpage Facility]." Although

the Bethpage Facility was initially classified as a Class 2a site (based on insufficient data), the Bethpage Facility was reclassified as a Class 2 site in 1987, meaning the site posed a significant threat to human health and/or the environment, and that action was required. *See* Heskin Dec., Ex. 6 at NGINS000010543.

**<u>NGSC's Response to Century Assertion 26</u>: Disputed that the evidence cited by Century supports the first sentence of Assertion 26; the cited evidence makes no mention of a Notice of Claim relating to the Bethpage Facility being filed by the State of New York on December 6, 1983. (*See* Heskin Decl. Ex. 6.) NYSDEC did send Grumman a letter dated December 6, 1983 in which NYSDEC stated that it "ha[d] determined that [Grumman] may be responsible for the release or threatened release of hazardous substances" at the Bethpage Facility, that Grumman "may be liable for the present and future costs of response, removal and remediation and for damages to the natural resources of the State of New York at and around the" Bethpage Facility, and that the letter "constitutes a claim by the State of New York." (Calland Decl. Ex. 16 at CEN00001114.) By letter dated January 30, 1984, Grumman provided this letter from NYSDEC to Century's predecessor, Insurance Company of North America ("INA") and to Travelers. (*Id.* Ex. 16 at CEN00001110, 14)**

**NGSC further disputes that Assertion 26 is supported by admissible evidence. Exhibit 6 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 2.**

**NGSC further disputes that NYSDEC's sending Grumman a letter dated December 6, 1983 purporting to be a claim related to environmental property damage at the Bethpage**

**Facility in December 1983, NYSDEC's listing of the Bethpage Facility on its list of inactive hazardous waste sites in 1983, and NYSDEC's reclassification of the Bethpage Facility in 1987 are material to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

27. Century Assertion 27: In October 1990, Grumman entered into a Consent Order with the State, which required Grumman to conduct a remedial investigation and study. Based on investigations conducted between 1990 and September 1994, the State divided the remedial programs into two operable units, OU1 pertaining to contaminated soils, and OU2, pertaining to the regional contaminated groundwater plume. *See* Heskin Dec., Ex. 5 at NGINS000751762.

**NGSC's Response to Century Assertion 27: Not disputed that, in October 1990, Grumman entered into an Order on Consent with NYSDEC in which Grumman agreed to conduct a remedial investigation and feasibility study ("RI/FS") at the Bethpage Facility. Disputed that the evidence cited by Century supports the remaining statements in Assertion 27. The cited evidence makes no mention of why NYSDEC divided the Bethpage Facility into two operable units; the cited evidence instead states only that "[t]he former manufacturing plant area is designated as Operable Unit 1 (OU1) and Operable Unit 2 (OU2) consists of the groundwater contamination plume." (Heskin Decl. Ex. 5 at NGINS000751762.)**

**NGSC further disputes that Assertion 27 is material to NGSC's motion for summary judgment; Grumman's entry into a consent order with NYSDEC to perform an RI/FS at the Bethpage Facility and NYSDEC's division of the Bethpage Facility into**

**separate Operable Units is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

**NGSC further disputes that Assertion 27 is supported by admissible evidence. Exhibit 5 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 1.**

28. Century Assertion 28: By 1994, Grumman was aware that its environmental response costs at the Bethpage Facility would exceed $25 million. *See* Heskin Dec., Ex. 17.

NGSC's Response to Century Assertion 28: **Disputed. The evidence cited by Century does not support Assertion 28. The cited evidence makes no mention of "environmental response costs at the Bethpage Facility;" the cited evidence instead is identified as addressing "Environmental Closure Costs." (*See* Heskin Decl. Ex. 17.)**

**NGSC further disputes that Assertion 28 is material to NGSC's motion for summary judgment; Grumman's alleged estimation of its "environmental response costs" in 1994 is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

29. Century Assertion 29: In its own Environmental Closure Cost Summary Matrix for the Grumman Facilities, Grumman's consultant estimated that the environmental closure costs for the Bethpage facility would be $27.4 million, including $12.7 million for groundwater remediation. At the same time, the Navy's groundwater costs were estimated at $65 million. *Id.*

**<u>NGSC's Response to Century Assertion 29</u>: Disputed that the evidence cited by Century supports the assertion that "Grumman's consultant" estimated environmental closure costs for the Bethpage Facility in Grumman's "Environmental Closure Cost Summary Matrix for the Grumman Facilities." (*See* Heskin Decl. Ex. 17.) Not disputed that a spreadsheet entitled "Environmental Closure Costs - Grumman Facilities in New York" estimates that total environmental closure costs for all Grumman buildings in Bethpage, NY, would be approximately $27.4 million, including approximately $13 million in "Grwater costs," and that "Grwater Navy" costs for all Grumman buildings in Bethpage, NY, would be approximately $65 million. (*See id.*)**

**NGSC disputes that Assertion 29 is material to NGSC's motion for summary judgment; Grumman's alleged estimation of its environmental closure costs for the Bethpage Facility is irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

30. <u>Century Assertion 30</u>: Also in 1994, the annual payment to the Bethpage Water District was $170,000 for Well Number 1 and $110,000 for Well Number 2. *See* Heskin Dec., Ex. 18. In addition, Grumman evaluated options to coordinate the remediation of the Ruco vinyl chloride plume with the Grumman VOC plume. *See* Heskin Dec., Ex. 19 at NGINS000183201. The Grumman groundwater IRM was described as seven extraction wells (4 existing production wells and 3 new extraction wells). The estimated costs for this alternative (per discussions with Grumman and Geraghty & Miller personnel) were $17,205,400. *Id.* In March 1995, the State issued a Record of Decision for OU1, addressing the remedy for certain impacted on-site soils. *See* Heskin Dec., Ex. 20.

**<u>NGSC's Response to Century Assertion 30</u>: Disputed that in 1994 "the annual payment to the Bethpage Water District was $170,000 for Well Number 1 and $110,000 for Well Number 2," and that the evidence cited by Century supports the assertion; the cited evidence instead states that the figures are "Environmental Investigation and Remediation Cost Projections," and the items for which costs are being projected are identified as "BWD #1" and "BWD #2," not "Well Number 1" and "Well Number 2." (*See* Heskin Decl. Ex. 18.) NGSC further disputes that the evidence cited by Century to support the second sentence of Assertion 30 supports the statements contained therein. The cited evidence makes no reference to "Grumman evaluat[ing] options to coordinate the remediation of the Ruco vinyl chloride plume with the Grumman VOC plume;" the evidence instead purports to be a draft feasibility study prepared by NYSDEC "to evaluate remedial alternatives to address the vinyl chloride contamination in groundwater underneath and in the vicinity of the Grumman Aerospace-Bethpage Facility, Naval Weapons Industrial Reserve Plant, and RUCO Polymer (Hooker Chemical) inactive hazardous waste disposal sites." (Heskin Decl. Ex. 19 at NGINS000183193, NGINS000183199.) Not disputed that the evidence cited by Century to support the third and fourth sentences of Assertion 30 describes the Grumman Groundwater IRM as (i) consisting of seven extraction wells (4 existing production wells and 3 new extraction wells), and (ii) estimated to have a present worth of $17,205,400. (*Id.* Ex. 19 at NGINS000183201.) Not disputed that in March 1995 NYSDEC issued a Record of Decision for OU1 of the Bethpage Facility.**

**NGSC further disputes that Assertion 30 is material to NGSC's motion for summary judgment; the alleged environmental costs paid by Grumman to the Bethpage Water District, the alleged cost of environmental remediation at the RUCO Polymer site,**

**and NYSDEC's issuance of a ROD for OU1 of the Bethpage Facility are irrelevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

31. Century Assertion 31: By at least 1995, Grumman was also aware that PCBs were present in onsite soil immediately adjacent to the Community Park. *See* Heskin Dec., Ex. 21. It declined to further investigate the nature and extent of this PCB contamination because the levels did not exceed commercial use thresholds. *Id.*

**NGSC's Response to Century Assertion 31: Disputed. The evidence cited by Century does not support Assertion 31. The cited evidence makes no mention of the detection of PCBs "in onsite soil immediately adjacent to the Community Park," does not support the assertion that "Grumman declined to further investigate the nature and extent of this PCB contamination," and does not characterize the "low levels" of PCBs found in surface soils at the park as "contamination;" the cited evidence -- a letter from the New York State Department of Health ("NYSDOH") to Grumman -- instead states that the "letter is to clarify [NYSDOH]'s position" that the "Department does not see a need for additional sampling to be performed" in "the area of Building 24" where "low levels of PCBs in surface soils" had previously been detected. (Heskin Decl. Ex. 21.)**

**NGSC further disputes that Grumman's alleged detection of PCBs in soils outside the Community Park and at levels below applicable thresholds is material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

32. Century Assertion 32: In June 1999, Grumman considered selling portions of its property, and thus, initiated the first phase of a "PCB Investigation/Delineation Program" to "investigate the extent of PCB concentrations present in the surface and subsurface soil in the grass areas located north and south of the access road leading from Stewart Avenue to the former Plant 24 building." *See* Heskin Dec., Ex. 22 at NGINS000122411. This area is directly adjacent to the Community Park property, and would later become part of OU3.

**NGSC's Response to Century Assertion 32: Not disputed that, as a result of potential real estate transactions, NGSC (then known as Northrop Grumman Corporation) requested in June 1999 that Dvirka & Bartilucci initiate the first phase of the PCB Investigation/Delineation Program to investigate the extent of PCB concentrations present in the surface and subsurface soil in the grass areas located north and south of the access road leading from Stewart Avenue to the former Plant 24 building. Disputed that the last sentence of Assertion 32 is supported by admissible evidence. Exhibit 5 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c).**

**NGSC further disputes that NGSC's initiation of the first phase of the PCB Investigation/Delineation Program at the areas located north and south of the access road to the former Plant 24 building is material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

33. Century Assertion 33: As a result of this investigation, Grumman discovered PCB concentrations exceeding regulatory standards for commercial use, and thus, implemented further rounds of testing between October 1999 and April 2001. *See id.* at NGINS000122413.

**NGSC's Response to Century Assertion 33: Disputed. The evidence cited by Century does not support the assertion that Grumman discovered PCB concentrations exceeding "standards for commercial use, and thus, implemented further rounds of testing;" the cited evidence instead states that Grumman discovered PCB concentrations in excess of NYSDEC's Technical Administrative Guidance Memorandum ("TAGM") 4046 Recommended Soil Cleanup Objectives for subsurface soils (10 ppm), and for that reason implemented further rounds of testing between October 1999 and April 2001. (See Heskin Decl. Ex. 22 ay NGINS000122413-19.)**

**NGSC further disputes that NGSC's discovery of PCB concentrations in excess of NYDEC's TAGM 4046 objectives in soils outside the Bethpage Community Park is material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

34. Century Assertion 34: During this testing, Grumman "determined that some of the testing [Grumman had] done was on the Park property because the fence separating the two properties was located several feet into the Park property." *See* Heskin Dec., Ex. 23 at NGINS001905255. As a result, Grumman "notified the Town, [and] the State and requested their cooperation in doing investigations." *Id.*; Heskin Dec., Ex. 24.

**NGSC's Response to Century Assertion 34: Disputed. The evidence cited by Century does not support the assertion that it was during the PCB Investigation/**

**Delineation Program that NGSC "determined that some of the testing [NGSC had] done was on the Park property;" the cited evidence instead states that NGSC had found "contamination adjacent to the Park property, and *subsequently* determined that some of the testing [it had] done was on Park property." (Heskin Decl. Ex. 23 at NGINS001905255 (emphasis added).) NGSC further disputes that the evidence cited by Century supports the assertion that NGSC notified the Town of Oyster Bay and the State of New York only after discovering contamination on the Park; the cited evidence -- a letter from NGSC to NYSDEC -- instead states that "[a]s a result of detecting PCB concentrations above TAGM 4046 Recommended Soil Cleanup Objectives along the fence adjacent to the Town of Oyster Bay Park, [NGSC] has decided that investigation of the Park is warranted to determine whether PCBs are present at concentrations above the TAGM 4046 criteria." (*Id.* Ex. 24 at NGINS000122500.)**

**NGSC further disputes that NGSC's alleged discovery that certain of its testing for PCBs in soils occurred on the Bethpage Community Park is material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

35. Century Assertion 35: In March 2001, the State issued a Record of Decision addressing the remedy for OU2. In its decision, the State found that the contaminated "groundwater plumes emanating from the Bethpage Facility total more than 2,000 acres in an area over 700 feet deep in places." *See* Heskin Dec., Ex. 10 at CEN00000695. The primary groundwater contaminants "are chlorinated VOCs or their breakdown products, including PCE, TCE and DCE . . . . The highest concentrations of VOCs in groundwater were detected in

samples from on-site wells, where the most contaminated well was found to have concentrations of 58,000 ppb (the drinking water standard is 5 ppb)." *Id.*

**<u>NGSC's Response to Century Assertion 35</u>: Not disputed that in March 2001 NYSDEC issued a Record of Decision that presented the selected remedy for OU2, and that the ROD stated, among other things, (i) "groundwater plumes emanating from the [Bethpage Facility] total more than 2,000 acres in area and are over 700 feet deep in places," (ii) "[t]he primary groundwater contaminants are chlorinated VOCs . . . or . . . breakdown products of these chemicals," including PCE, TCE and DCE, (iii) "[t]he highest concentrations of VOCs in groundwater were detected in samples collected from on-site wells," and (iv) "[t]he most contaminated on-site well [had] a concentration of 58,000 ppb (the drinking water standard is 5 ppb)." (Heskin Decl. Ex. 6 at NGINS000010547-48.)**

**NGSC disputes that NYSDEC's issuance of a Record of Decision for OU2 of the Bethpage Facility or the contents of that Record of Decision are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

36. <u>Century Assertion 36</u>: The State also found that "the plumes emanating from the Bethpage Facility have impacted or threatened three public water supply well fields operated by the Bethpage Water District (BWD)." *Id.* Since this then [sic], "more affected and potentially affected water districts have been identified, including Aqua NY and South Farmingdale." *Id.* The constituents of concern also included PCBs. *See* Heskin Dec., Ex. 5 at NGINS000751778-80.

**<u>NGSC's Response to Century Assertion 36</u>: Not disputed that NYSDEC stated in its March 2001 Record of Decision for OU2 of the Bethpage Facility that "the plume(s)**

**emanating from the [Bethpage Facility] have impacted or threaten three public water supply wellfields operated by the Bethpage Water District." (Heskin Decl. Ex. 6 at NGINS000010548.) Not disputed that the Aqua NY Water District and South Farmingdale Water District have identified themselves as potentially affected by the OU2 groundwater plume. NGSC disputes that PCBs are a constituent of concern in the OU2 groundwater plume, and that the evidence cited by Century supports the assertion; the cited evidence addresses soil contamination, not groundwater contamination. (*See id.* Ex. 5 at NGINS000751777-80.)**

**NGSC further disputes that the final sentence of Assertion 36 is supported by admissible evidence. Exhibit 5 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 1.**

**NGSC further disputes that NYSDEC's findings set forth in its Record of Decision for OU2 of the Bethpage Facility are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

37. Century Assertion 37: In May 2005, Grumman entered into a consent order with the State agreeing to investigate and remediate the contaminated groundwater caused by sources from OU3. *See* Heskin Dec., Ex. 10 at CEN00000695. Operable Unit 3 "consists of the Former Grumman Settling Ponds, the Grumman Access Road, some adjacent property and impacted groundwater which is not addressed by OU2." *See* Heskin Dec., Ex. 5 at NGINS000751762.

**<u>NGSC Response to Century Assertion 37</u>: Disputed that the evidence cited by Century supports the assertion that in May 2005, NGSC entered into a consent order with the State agreeing to investigate and remediate the contaminated groundwater caused by sources from OU3; the cited evidence states instead that "in May 2005, [NGSC] entered into a Consent Order with the NYSDEC, under which [NGSC] agreed to conduct an RI/FS with respect to the contamination at and migrating from the Bethpage Community Park (now designated as OU3)." (Heskin Decl. Ex. 10 at CEN00000695.) Not disputed that OU3 consists of the Former Grumman Settling Ponds, the Grumman Access Road, some adjacent property and impacted groundwater which is not addressed by OU2.**

**NGSC further disputes that NGSC's entry into an Order on Consent with NYSDEC in 2005 to conduct an RI/FS at OU3 of the Bethpage Facility is relevant to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

38. <u>Century Assertion 38</u>: In May 2012, the State issued a proposed remedial action plan addressing the remedy for OU3. *Id.* The primary constituents of concern in soils are PCBs, TCE and its breakdown products, toluene, chromium, and cadmium, and the primary constituents of concern in groundwater are TCE and its breakdown products. *See* Heskin Dec., Ex. 10 at CEN00000695.

**<u>NGSC's Response to Century Assertion 38</u>: Not disputed that in May 2012, NYSDEC issued a PRAP addressing the proposed remedy for OU3. Disputed that the evidence cited by Century to support the second sentence of Assertion 38 supports all the statements contained therein; the cited evidence makes no mention of "primary constituents of concern in soils." (*See* Heskin Decl. Ex. 10.) Not disputed that the cited**

**evidence states that the primary groundwater contaminants include TCE and its breakdown products.**

**NGSC further disputes that NYSDEC's issuance of a PRAP for OU3 in May 2012 is relevant to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

39. Century Assertion 39: In the proposed remedial action plan, it is noted that "[g]roundwater migration from the OU3 area has resulted in a significant off-site groundwater plume which has impacted both the Upper Glacial and Magothy Formations. As the OU3 groundwater plume leaves the site, as a distinct plume, it becomes comingled with the larger OU2 Grumman/NWIRP groundwater plume." *See* Heskin Dec., Ex. 5 at NGINS000751766.

**NGSC's Response to Centruy Assertion 39: Not disputed that the PRAP for OU3 contains the quoted text. Disputed that the contents of the PRAP for OU3 are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

40. Century Assertion 40: In 1986, an initial assessment study of the NWIRP site concluded that a significant risk to human health and/or the environment existed in each of these areas: (1) the former storage area, (2) the recharge basins, and (3) the former scrap yard. *See* Heskin Dec., Ex. 7 at NGINS000434065.

**NGSC's Response to Century Assertion 40: Disputed that the initial assessment study of the Bethpage NWIRP conducted in 1986 concluded that a "significant" risk to human health and/or the environment existed in certain areas. The 1986 Initial Assessment**

**Study ("IAS") of the Bethpage NWIRP instead stated that its purpose was to identify "potential" threats to human health or to the environment; the IAS then specified that "none of the sites poses an immediate threat to human health or to the environment," including the "Former Drum Marshaling Areas," the "Recharge Basins," and the "Salvage Storage Area." (Heskin Decl. Ex. 7 at NGINS000434064-65.)**

**NGSC further disputes that the contents of the 1986 IAS of the Bethpage NWIRP are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

41. Century Assertion 41: As a result, a remedial investigation was initiated in 1991. This investigation revealed that contaminated groundwater had reached the residential neighborhoods to the east and a significant concentrations of TCE in an onsite well. In addition, high levels of PCBs were also discovered. *See* Heskin Dec., Ex. 40 at NGINS000433723.

**NGSC's Response to Century Assertion 41: Disputed that the evidence cited to support Assertion 41 is admissible. Exhibit 40 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c); the document consists of collections of out-of-court statements that Century offers to prove the truth of the matters asserted therein, and the cited portions of the document do not fall within any exception to the rule against hearsay set forth in the Federal Rules of Evidence.**

**Exhibit 40 to the Heskin Declaration is a ROD for Operable Unit 1 of the Bethpage NWIRP prepared by NYSDEC and the Navy dated May 1995. The first page of the ROD states that "[t]he selected remedial action for the NWIRP Bethpage . . . is presented in this**

**decision document" and that "[t]he documents in the Administrative Record provide the bases of this Record of Decision." (Haskin Decl. Ex. 40 at NGINS000433715.) The document therefore does not "set[] out . . . factual findings from a legally authorized investigation," as is required to fall within the exception to the rule against hearsay set forth in Federal Rule of Evidence 803(8)(A)(iii). The document is instead hearsay as to the contents of and the facts set forth in the "Administrative Record" upon which the ROD is purportedly based. Indeed, the portions of the ROD cited by Century appear to be nothing more than summaries of prior remedial investigation reports. The ROD also falls outside the exception to the rule against hearsay set forth in Federal Rule of Evidence FRE 803(6) because, among other reasons, it was not "made at or near the time" of the acts and/or events set forth therein for which Century cites the document.**

**NGSC further disputes that the results of the remedial investigation conducted at the Bethpage NWIRP beginning in 1991 are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

42. Century Assertion 42: After further investigation in 1992, it was determined that the levels of PCBs indicated "that PCB contamination is wide spread" over most of the former storage area. *Id* at NGINS000433725. Unacceptable levels of PCB concentrations were also found at various locations in the area of the recharge basins. The concentrations of PCBs were so severe in the former storage area that the Navy was required to take interim measures in July 1993 to protect onsite workers. *Id.*

**NGSC's Response to Century Assertion 42: Disputed. The evidence cited by Century does not support the assertion that "further investigation in 1992 . . . indicated**

**'that PCB contamination [was] wide spread' over most of the storage area;" the cited evidence instead restricts this observation to the Former Drum Marshaling Area of the Bethpage NWIRP, and does not provide a date when the "further investigation" allegedly occurred. (*See* Heskin Decl. Ex. 40 at NGINS000433725.) NGSC further disputes that the evidence cited by Century supports the assertion that "[u]nacceptable levels of PCB concentrations were also found at various location in the area of the recharge basins;" the cited evidence instead states that the Phase 1 RI of the recharge basin area detected PCB concentrations that were all below the acceptable PCB concentration limit for industrial-use scenarios. (*Id.* Ex. 40 at NGINS000433725.) NGSC further disputes that the evidence cited by Century supports the assertion that the Navy initiated an interim remedial action "in the former storage area" in July 1993; the evidence instead states that the interim remedial action was initiated at the Former Drum Marshaling Area of the Bethpage NWIRP. (*Id.* Ex. 40 at NGINS000433731.)**

**NGSC further disputes that Assertion 42 is supported by admissible evidence. Exhibit 40 to the Heskin Declaration cannot be presented in a form that would be admissible in evidence to support the facts asserted, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c). *See* NGSC's Response to Century Assertion 41. Indeed, the portions of Exhibit 40 cited by Century appear to be nothing more than summaries of prior remedial investigation reports.**

**NGSC further disputes that the results of the remedial investigation conducted at the Bethpage NWIRP beginning in 1991 are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

43. Century Assertion 43: A Record of Decision was entered for the remediation of OU1 for onsite soils in July 1995, and a Record of Decision for the remediation of OU2 for the contaminated groundwater plume was issued in March 2001. *See* Heskin Dec., Ex. 20; Heskin Dec., Ex. 6 at NGINS000010540.

**NGSC's Response to Century Assertion 43: Not disputed that a Record of Decision selecting remedial action for OU1 of the Bethpage NWIRP was issued in May 1995 and that a Record of Decision presenting the selected remedy for OU2 of the Bethpage Facility was issued in March 2001. A Record of Decision selecting remedial action for OU1 of the Bethpage Facility was issued in March 1995. Disputed that the issuance of such Records of Decision is material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

44. Century Assertion 44: In November 1994, the Navy performed an investigation to determine whether PCB contamination from the NWIRP Site had migrated and impacted downwind off-site locations. *See* Heskin Dec., Ex. 2 at NGINS000007370. Of the seventeen samples taken, only one sample was taken at the Bethpage Community Park. An additional five samples were taken on the Bethpage Community Park in 1998 by the Town of Oyster Bay. None of these few samples exceeded regulatory levels.

**NGSC's Response to Century Assertion 44: Disputed that the evidence cited by Century to support Assertion 44 states that "only" one sample was taken at the Bethpage Community Park in 1994 or that "few samples" were taken at the Park in 1998; the evidence instead states the facts without any characterization. (*See* Heskin Decl. Ex. 2 at NGINS000007370-71.) Not disputed that soil sampling on the Bethpage Community Park**

**was conducted on behalf of the Navy in 1996 and on behalf of the Town of Oyster Bay in 1998, and that the analytical results of these soil samples indicated that PCBs were not present at concentrations exceeding NYSDEC's TAGM 4046 Recommended Soil Cleanup Objectives.**

**NGSC disputes that soil sampling programs that were conducted on the Bethpage Community Park in 1994 and 1998 are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

45. Century Assertion 45: At least by July 2001, Grumman discovered high levels of PCBs when conducting an investigation at an adjacent property. *See* Heskin Dec., Ex. 24. As a result, Grumman reported its findings to the State and City of Oyster Bay, and initiated a site specific sampling program of the Community Park property. Grumman submitted this proposal in October 2001, and revised it in February 2002.

**NGSC's Response to Century Assertion 45: Disputed that by July 2001 Grumman had "discovered high levels of PCBs when conducting an investigation at an adjacent property," and that the evidence cited by Century supports the assertion; the cited evidence states instead that NGSC had "detect[ed] PCB concentrations above the TAGM 4046 Recommended Soil Cleanup Objectives along the fence adjacent to the Town of Oyster Bay Park." (*See* Heskin Decl. Ex. 24 at NGINS000122500.) NGSC further disputes that the second and third sentences of Assertion 45 are supported by admissible (or any) evidence, as required by Local Civil Rule 56.1(d) and Federal Rule of Civil Procedure 56(c).**

**NGSC further disputes that soil sampling programs allegedly conducted by NGSC within the Bethpage Community Park in the 2001 to 2002 time period are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

46. Century Assertion 46: This sampling program was completed in March/May 2002, and the Community Park was closed down in May 2002 due to the detection of PCB concentrations posing a danger to human health and/or the environment. *See* Heskin Dec., Ex. 2 at NGINS000007372.

**NGSC's Response to Century Assertion 46: Not disputed that Dvirka & Bartilucci conducted a soil sampling program within the Bethpage Community Park in March and May 2002, and that the results of the program were summarized in report dated June 2002. Disputed that the evidence cited by Century supports the assertion that "the Community Park was closed down in May 2002 due to the detection of PCB concentrations posing a danger to human health and/or the environment;" the cited evidence instead states only that "[s]ubsequent to this soil sampling program, in May 2002, the Town of Oyster Bay closed the Bethpage Community Park." (*See* Heskin Decl. Ex. 2 at NGINS000007372.) The Bethpage Community Park was partially reopened in November 2002. (*Id.*)**

**NGSC further disputes that soil sampling programs allegedly conducted by NGSC within the Bethpage Community Park in 2002 are material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

47. Century Assertion 47: A public meeting was held on June 19, 2002 to discuss the contamination of the Community Park. In advance of this public meeting, on May 24, 2002, Grumman sent a letter to the State demanding that the Navy be required to participate in all future meetings because it "remains a 'key player' for regulatory resolution of soil conditions at the Bethpage Community Park and the adjacent Northrop Grumman property." *See* Heskin Dec., Ex. 3.

**NGSC's Response to Century Assertion 47: Not disputed that a public meeting was held on June 19, 2002 regarding contamination at the Bethpage Community Park. Disputed that NGSC "demanded" that the Navy be required to participate in all future meetings," and that the evidence cited by Century supports the assertion; the cited evidence states instead that NGSC "believes appropriate steps must be taken to require Navy participation at all future meetings. The Navy remains the 'key player' for regulatory resolution of soil conditions at the Bethpage Community Park and the adjacent Northrop Grumman property." (*See* Heskin Decl. Ex. 3 at NGINS000284883.)**

**NGSC further disputes that a May 24, 2002 letter from NGSC to NYSDEC requesting that the Navy be required to attend a public meeting about the Bethpage Community Park is material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

48. Century Assertion 48: After the Community Park partially reopened in November 2002, additional sampling was proposed in April 2003 to further delineate the extent of both PCB and VOC contamination, and to determine whether groundwater was being adversely impacted by the site. In December 2003, it was confirmed that the Community Park was a

potential historical source of the VOCs found in groundwater. *See* Heskin Dec., Ex. 2 at NGINS000007428.

**NGSC's Response to Century Assertion 48: Disputed. The evidence cited by Century does not support Assertion 48. The cited evidence makes no reference to "additional sampling [that] was proposed in April 2003 to further delineate the extent of both PCB and VOC contamination, and to determine whether groundwater was being adversely impacted by the site." (*See* Heskin Decl. Ex. 2 at NGINS000007428.) In addition, the cited evidence does not "confirm that the Community Park was a potential historical source of the VOCs found in groundwater;" the cited evidence instead states that "the soil located within the park is not a continuing source of the six chlorinated VOCs detected in the groundwater samples," though certain analytical results and sampling "seem to indicate" that the park property "could have been an historic source of these six chlorinated VOCs," and that further investigation to determine the source of the six chlorinated VOCs detected in the downgradient groundwater samples is necessary." (*See id.*)**

**NGSC further disputes that a soil sampling program allegedly conducted by NGSC within the Bethpage Community Park in 2003 is material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

49. Century Assertion 49: Due to the apparent public outcry, the Town of Oyster Bay proposed a more aggressive remediation plan than required by the governing regulations. Accordingly, Grumman objected to the proposed remedial actions taken by the Town of Oyster Bay. *See* Heskin Dec., Ex. 26.

**<u>NGSC's Response to Century Assertion 49</u>: Disputed that the evidence cited by Century to support Assertion 49 makes any reference to "public outcry." (*See* Heskin Decl. Ex. 26.) Not disputed that the Town of Oyster Bay proposed a remediation plan that was far in excess of that which was required by governing regulations, and that NGSC objected to the remedial actions proposed by the Town.**

**NGSC disputes that the Town of Oyster Bay's proposed remediation plan for the Bethpage Community Park is material to NGSC's motion for summary judgment that Century has a duty to defend NGSC in the TOB Action.**

50. <u>Century Assertion 50</u>: On April 21, 2005, litigation ensued over whether Grumman could be held responsible for the alleged excessive remediation undertaken by the Town of Oyster Bay. Grumman ultimately prevailed on summary judgment in May 2009.

**<u>NGSC's Response to Century Assertion 50</u>: Not disputed that on April 21, 2005, the Town of Oyster Bay filed the TOB Action, and that in May 2009 the court granted NGSC's motion for summary judgment against the Town of Oyster Bay on the Town's federal claims against NGSC, and denied the Town of Oyster Bay's motion for summary judgment against NGSC on the Town's claims against NGSC. Disputed that the TOB Action dealt solely with the question of whether NGSC "could be held responsible for the alleged excessive remediation undertaken by the Town of Oyster Bay;" the allegations contained in the Complaint (and Amended Complaints) filed in the TOB Action that are material to NGSC's present motion for partial summary judgment are set forth in paragraphs 17 to 35 of NGSC's Rule 56.1 Statement of Undisputed Facts in Support of NGSC's Motion for Partial Summary Judgment filed in this litigation on January 4, 2013. NGSC further**

**disputes Assertion 50 to the extent that it suggests that the TOB Action has ended; the TOB Action is still pending. *See* NGSC's St. of Undisp. Facts Supp. Mot. for Partial Summ. J. ¶ 36 (January 4, 2013).**

51. Century Assertion 51: Grumman did not attempt to give notice to Century of the Community Park Claim until June 14, 2005 and November 21, 2005. *See* Heskin Dec., Ex. 4; Heskin Dec., Ex. 27.

**NGSC's Response to Century Assertion 51: NGSC disputes the statements contained in Assertion 51 on the ground that they are too vague to answer; Century uses the capitalized term "Community Park Claim" but nowhere provides a definition for the term. To the extent that the term "Community Park Claim" means the litigation styled *Town of Oyster Bay v. Northrop Grumman Corp., et al.*, Case No. 05 CV 1945 (E.D.N.Y.) (*i.e.*, the TOB Action) -- in which the Complaint was filed on April 21, 2005, and first served on Northrop Grumman on April 29, 2005, (Calland Decl. Ex. 10) -- NGSC does not dispute that it informed Century of the TOB Action on June 14, 2005, and again on November 21, 2005. (*See* Declaration of John F. Scanlon dated January 4, 2013 ("Scanlon Decl.")[1] Ex. 23; Heskin Decl. Exs. 4, 27.) NGSC further disputes Assertion 51 to the extent it suggests that NGSC had not previously provided information to Century regarding alleged environmental property damage related to operations at the Bethpage Facility. On January 30, 1984, Grumman, through its insurance broker, Frank B. Hall & Co. of New York, sent a letter to Century's predecessor, INA, enclosing a letter from NYSDEC in**

[1] The "Scanlon Declaration" refers to the declaration of John F. Scanlon dated January 4, 2013, which was submitted in support of NGSC's Motion for Partial Summary Judgment on Century's and Travelers' Duty to Defend the TOB Action.

**which NYSDEC stated that it "ha[d] determined that [Grumman] may be responsible for the release or threatened release of hazardous substances" at the Bethpage Facility, that Grumman "may be liable for the present and future costs of response, removal and remediation and for damages to the natural resources of the State of New York at and around the" Bethpage Facility, and that the letter "constitutes a claim by the State of New York." (Calland Decl. Ex. 16 at CEN00001110, CEN00001114.) In addition, Grumman provided a briefing to its liability insurers on water quality issues at the Bethpage Facility and surrounding areas in August 1989. (*Id.* Exs. 17, 18.) Century ignored the letter in 1984, declined to attend the 1989 briefing, and proceeded for the next 30 years to sit on its hands and provide no assistance to NGSC in its dealings with the regulators or other claimants**

52. Century Assertion 52: Century did not receive a copy of these notice letters because Grumman's broker sent them to the wrong address. *See* Heskin Dec., Ex. 41 at 65.

**NGSC's Response to Century Assertion 52: Disputed. The June 14, 2005 and November 21, 2005 letters were sent to a valid address that Century and its parent (ACE USA) were still using at the time the letters were sent, and the address is one that Century's claims administrator (Resolute) had also been using. (*See* Calland Decl. Ex. 11 at 63-64.) In addition, Century concedes that it received a March 8, 2007 letter from NGSC's broker that was sent to the same address as the June 14 and November 21, 2005 letters. (*See id.* Ex. 11 at 62; Scanlon Decl. Exs. 23, 25; Heskin Decl. Exs. 4, 27, 30.)**

**NGSC further disputes that the evidence cited by Century supports the assertion that "Century did not receive a copy of [the June 14 and November 21, 2005] letters;" the**

**cited evidence instead states only that the letters "went to the wrong address" and "aren't in our claim file." (*See* Heskin Decl. Ex. 41 at 65.) Century has failed to submit an affidavit, declaration, or any other admissible evidence from Robert Russell, the claims-handler to whom the 2005 letters were sent, (*see* Scanlon Decl. Ex. 23; Heskin Decl. Exs. 4, 27), stating that the 2005 letters were not in fact received.**

53. Century Assertion 53: But even if those letters were sent to the correct address (which they were not), they failed to apprise Century of material events indisputably known to Grumman at the time of the letters. In its 2005 letters, Grumman represented to its insurers that "we have no immediate knowledge of the specific involvement of the Grumman Corporation." *See* Heskin Dec., Ex. 4; Heskin Dec., Ex. 27.

**NGSC's Response to Century Assertion 53: NGSC disputes the statements contained in the first sentence of Assertion 51 on the ground that they are too vague to answer; Century provides no guidance whatsoever as to what "material events indisputably known to Grumman" NGSC allegedly should have, but did not, apprise Century of in the June 14 and November 21, 2005 letters. NGSC further disputes that the June 14 and November 21, 2005 letters failed to provide Century with material information regarding the TOB Action. The letters provided a copy of the summons and Complaint from the TOB Action, the identity of the court in which the TOB Action was pending, a brief summary of the allegations in the Complaint, and the policy number of at least one of the general liability insurance policies issued by Century's predecessor Indemnity Insurance Company of North America ("IINA") to NGSC's predecessor Grumman Aircraft Engineering Corp. (*See* Scanlon Decl. Ex. 23; *id.* Ex. 1 (IINA Policy No. 9 CGL**

**52305 M); Heskin Decl. Exs. 4, 27.) In addition, the June 14 and November 21, 2005 letters specifically state that "[i]f you need any further information, please feel free to contact me." (Scanlon Decl. Ex. 23; Heskin Decl. Exs. 4, 27.)**

**NGSC further disputes that the second sentence of Assertion 53 contains an accurate partial quotation of the letters; the portion of the document that Century appears to attempt to quote states, "The town of Oyster pay alleges pollution of the specified site from 1930 through 1962. From the complaint we have no immediate knowledge of the specific involvement of Northrop Corporation (now known as Northrop Grumman Corp[)]." (Scanlon Decl. Exs. 23; Heskin Decl. Exs. 4, 27.)**

54. Century Assertion 54: Yet on May 24, 2002, Grumman had represented to the State and federal government that it believed that numerous specific involvement by Grumman had resulted in the contamination at Bethpage Community Park. *See* Heskin Dec., Ex. 3. None of these activities was disclosed to its insurers. Nevertheless, Grumman continued to send numerous follow up correspondence to the incorrect address on June 8, 2006 and February 26, 2007. *See* Heskin Dec., Ex. 28; Heskin Dec., Ex. 29. None of these letters was received by Century. *See* Heskin Dec., Ex. 41 at 65.

**NGSC's Response to Century Assertion 54: Disputed that "Grumman had represented to the State and federal government that it believed that numerous specific involvement by Grumman had resulted in the contamination at Bethpage Community Park," and that the evidence cited by Century supports the assertion. The cited evidence -- a May 24, 2002 letter from Northrop Grumman to NYSDEC -- requested that NYSDEC require the U.S. Navy to participate in meetings regarding the Bethpage Community Park**

**because "it appears that some of the PCBs and metals detected within the Park property . . . *may have originated* from Navy and Grumman property and production lines as a result of operations supporting military production contracts [including] autoclave operations in Plant 3;" such PCBs may have been contained in what would have been "considered to be clean fill at that time (prior to 1962) [that] *may have been placed* at various locations on the NWIRP-Grumman property, including shallow areas of the property on which the Park is presently located." (Heskin Decl. Ex. 3 at NGINS000284883-85 (emphasis added).)**

**NGSC further disputes the assertion that "[n]one of these activities was disclosed to its insurers;" as just one example of NGSC providing information to its insurers about allegations against it relating to environmental issues at the Bethpage Community Park, NGSC sent to Century and to Travelers copies of the Complaint from the TOB Action, which set forth several allegations regarding NGSC's alleged involvement in environmental issues at the Bethpage Community Park. (*See* Heskin Decl. Exs. 4, 27; Scanlon Decl. Ex. 23; *id.* Ex. 19; NGSC's St. of Undisp. Facts Supp. Mot. for Partial Summ. J. ¶ 17-35 (January 4, 2013) (setting forth various allegations contained in the Complaint from the TOB Action).)**

**Not disputed that NGSC "continued to send numerous follow up correspondence to" Century regarding the TOB Action, including letters dated June 8, 2006 and February 26, 2007, (*see* Heskin Decl. Exs. 28, 29); disputed that these letters were sent to the wrong address and/or that they were not received by Century. *See* NGSC's Response to Century Assertion 52. Indeed, the letter dated February 26, 2007 is specifically referenced in a May 29, 2008 email from NGSC's broker that Century does not dispute it received. (*See* Heskin**

**Decl. Ex. 32 at CEN00000556 ("In follow up to our previous correspondence dated 02/26/07, attached please find an additional Order of Consent concerning [the Northrop Grumman Bethpage] location."); Century Assertion 58.)**

55. Century Assertion 55: The first letter that appears in Century's claims file is dated March 8, 2007, but no "date received" stamp appears on the letter, it appears to be an electronic imaged copy, and it was sent to the incorrect address. *See* Heskin Dec., Ex. 30.

**NGSC's Response to Century Assertion 55: Not disputed that follow-up correspondence sent from NGSC to Century regarding the TOB Action dated March 8, 2007 appears in Century's claims file. Not disputed that the copy of the follow-up correspondence dated March 8, 2007 produced by Century in this litigation does not bear a "date received" stamp. Disputed that the follow-up correspondence dated March 8, 2007 "appears to be an electronic imaged copy," and that the evidence cited by Century supports the assertion; the copy of the March 8, 2007 letter produced by Century in this litigation (and attached as Exhibit 30 to the Heskin Declaration) bears the following markings indicating that it existed in paper format prior to being produced to Northrop Grumman in electronic format: staple marks in the upper left-hand corner and the outline of the page that appears to have been made by photocopier. (*See* Heskin Decl. Ex. 30.) NGSC further disputes that the March 8, 2007 letter was sent to the wrong address. *See* NGSC's Response to Century Assertion 52.**

**NGSC further states that it presently lacks information necessary to determine whether the March 8, 2007 letter is the "first letter that appears in Century's claims file;" written discovery is ongoing, and NGSC has not yet had the opportunity to depose, among**

**others, Robert Russell, the individual to whom several letters regarding the TOB Action were addressed and who was involved in handling claims under the Century policies at issue in this motion. (*See* NGSC's St. of Undisp. Facts Supp. Mot. for Partial Summ. J. ¶ 43 (January 4, 2013).) To the extent a response to the assertion is needed, NGSC disputes it. NGSC further disputes that Century's decision to include (or not include) correspondence in its claims file is relevant to a determination of whether Century has a duty to defend NGSC in the TOB Action.**

56. Century Assertion 56: In this letter Grumman disclosed for the first time that it had already "spent $36,387,569 in costs associated with environmental claims for this site." *Id.*

**NGSC's Response to Century Assertion 56: Disputed. NGSC informed Century that it had already spent $36,387,569 in costs associated with environmental claims for the entire Bethpage Facility site on at least one prior occasion -- by letter dated February 26, 2007. (*See* Heskin Decl. Ex. 29 at NGINS000010304.)**

57. Century Assertion 57: Grumman then sent another hard copy letter to the wrong address on January 7, 2009 (which was never received), claiming that it had spent $5,224,603.01 in defense costs since 2006. *See* Heskin Dec., Ex. 41 at 93; Heskin Dec., Ex. 31.

**NGSC's Response to Century Assertion 57: Not disputed that on January 7, 2009 NGSC sent another follow-up letter to Century regarding, among other matters, the TOB Action. Disputed that the letter was sent to the wrong address and/or that Century did not receive the letter. *See* NGSC's Response to Century Assertion 52. NGSC further disputes that the letter states that NGSC "had spent $5,224,603.01 in defense costs since 2006;" the**

**letter instead stated that "we attach [as] copies some of the bills incurred by NGSC in response to the order of consent and/or other claims and suits filed. The bills included but are not limited to expenses incurred by NGSC between March of 2006 and June of 2007. The total of the billings attached is $5,224,603.01." (Heskin Decl. Ex. 31 at NGINS000010310.)**

58. Century Assertion 58: Grumman finally sent information by email on May 29, 2008, February 6, 2012, and March 19, 2012, but continued to send hard copies of the letters to the wrong address. *See* Heskin Dec., Ex. 32; Heskin Dec., Ex. 33; Heskin Dec., Ex. 34.

**NGSC's Response to Century Assertion 58: Not disputed that NGSC sent follow-up emails containing information about environmental matters at the Bethpage Facility, including matters related to the Bethpage Community Park, on May 29, 2008, February 6, 2012, and March 19, 2012. Disputed that NGSC "continues to send hard copies of the letters to the wrong address."** ***See*** **NGSC's Response to Century Assertion 52.**

59. Century Assertion 59: On March 26, 2012, Century responded to these letters noting that the claims were subject to a pending declaratory judgment action, and reserved all of its rights, including specifically late notice, on May 21, 2012. *See* Heskin Dec., Ex. 35; Heskin Dec., Ex. 36.

**NGSC's Response to Century Assertion 59: Not disputed that Century responded to NGSC's years of letters about the TOB Action and other environmental matters for the first time on March 26, 2012, and that in the March 26, 2012 letter, Century stated that "[i]t is our understanding that the claims you raise are the subject of a Declaratory**

**Judgment action recently filed against Grumman . . . . Century Indemnity Company, as eventual successor to INA, has been named as a nominal defendant in the New York action. As a result, the issues you raise regarding the alleged existence of insurance policies issued by INA to Grumman as well as any alleged claims Grumman has made with respect to this insurance are more properly addressed in the context of the New York action." (Heskin Decl. Ex. 35 at NGINS000010272.) Disputed that, in the March 26, 2012 letter, Century specifically reserved its rights with regard to allegedly late notice; Century instead stated that "various issues may act to limit and/or preclude coverage. Those will be fully set out in Century's responsive pleading in the New York Action." (*See id.* at NGINS000010273.)**

**Not disputed that by letter dated May 21, 2012, Century purported to reserve its rights with regard to several issues, including notice.**

66. Century Assertion 66: Century was not provided with a copy of any primary policy until April 19, 2012, and was not provided with a copy of certain other primary policies until after the commencement of this action. *See* Heskin Dec., Ex. 37. To date, Century still has not received a copy of the alleged primary policies covering the periods 1951-54, and 1962-68.

**NGSC's Response to Century Assertion 66: Disputed. Predecessors of Century issued the primary general liability policies that are the subject of NGSC's instant motion, and NGSC, its predecessors, and Travelers have all provided Century and/or its predecessors with the policy numbers of several of the those policies so that Century can retrieve them from its files. (*See, e.g.*, Calland Decl. Ex. 12 at CEN00003042; *id.* Ex. 13 at CEN00001003-04; *id.* Ex. 14 at CEN00001005-07.) In addition, Century has recently admitted in a letter to the Court that, in early 2005, NGSC, through its broker Aon,**

**provided Century with a copy of at least one of the primary policies that predecessors of Century issued to predecessors of NGSC. (*Id.* Ex. 15; *id.* Ex. 6 ("Enclosed please find two policies we have referred to previously: 9 CGL 52305 [and] XPL-3506").) That primary liability policy, which was admittedly received by Century, was sent to the same address that Century now claims is the "wrong address" for Century. (*See* Century Assertions 51, 52, 57; Heskin Decl. Exs. 4, 27, 31; Calland Decl. Ex. 6.)**

**NGSC further disputes that Century's assertion "[t]o date, Century still has not received a copy of the alleged primary policies covering the periods 1951-54, and 1962-68" is material to NGSC's motion for partial summary judgment; NGSC's motion for partial summary judgment is limited to seeking a declaration of Century's duties under the primary general liability insurance policies that its predecessors issued to predecessors of NGSC and that were in effect from January 1, 1955 to January 1, 1962. (NGSC's Mem. Supp. Mot. Partial Summ. J. at 2-3 (Jan. 4, 2013).)**

67. Century Assertion 67: It is undisputed that the primary policies found to date expressly require Grumman to provide "written notice" of an *accident* "as soon as practicable." *See* Heskin Dec., Ex. 38.

**NGSC's Response to Century Assertion 67: Not disputed that the primary general liability policies that were issued by Century's predecessors to NGSC's predecessors and that are at issue in NGSC's motion for partial summary judgment contain a provision that states: "Notice of Accident. When an accident occurs, written notice shall be given by or on behalf of the *insured* to the company or any of its authorized agents as soon as practicable . . . ." (Scanlon Decl. Ex. 1 CEN00000006; *id.* Ex 2 at CEN00000046; *id.* Ex. 3 at**

**CEN00000079; *id.* Ex. 4 at CEN00000119; *id.* Ex. 5 at NGINS000003734; *id.* Ex. 6 at NGINS000003973; *id.* Ex. 7 at NGINS000004213.)**

**NGSC disputes Assertion 67 to the extent that it purports to state a legal conclusion as to what NGSC's obligations are under the primary general liability policies that were issued by Century's predecessors and that are at issue in NGSC's motion for partial summary judgment.**

68. Century Assertion 68: Along with this prompt written notice, the Century policies require the insured to include "reasonably obtainable information respecting the time, place and circumstances of the accident," as well as "the names and addresses of the injured and of available witnesses." *Id.*

**NGSC's Response to Century Assertion 68: NGSC disputes Assertion 68 on the ground that Century's use of the term "prompt written notice" is too vague to permit a response; the term is not included in any of the primary general liability policies that were issued by Century's predecessors and that are at issue in NGSC's motion for partial summary judgment, and Century does not provide any definition for the term. Not disputed that the primary general liability policies that were issued by Century's predecessors to NGSC's predecessors and that are at issue in NGSC's motion for partial summary judgment contain a provision that states: "Notice of Accident . . . . Such notice shall contain particulars sufficient to identify the *insured* and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses." (Scanlon Decl. Ex. 1 CEN00000006;**

***id.* Ex 2 at CEN00000046; *id.* Ex. 3 at CEN00000079; *id.* Ex. 4 at CEN00000119; *id.* Ex. 5 at NGINS000003734; *id.* Ex. 6 at NGINS000003973; *id.* Ex. 7 at NGINS000004213.)**

**NGSC disputes Assertion 68 to the extent that it purports to state a legal conclusion as to what NGSC's obligations are under the primary general liability policies that were issued by Century's predecessors and that are at issue in NGSC's motion for partial summary judgment.**

69. Century Assertion 69: Each Century policy also requires Grumman to provide written notice of a claim or suit and to immediately forward to Century every demand, notice, summons or other process received by Grumman or its representatives. *Id.*

**NGSC's Response to Century Assertion 69: Not disputed that the primary general liability policies that were issued by Century's predecessors to NGSC's predecessors and that are at issue in NGSC's motion for partial summary judgment contain a provision that states: "Notice of Claim or Suit. If claim is made or suit is brought against the *insured*, the *insured* shall immediately forward to the *company* every demand, notice, summons or other process received by him or his representative." (Scanlon Decl. Ex. 1 CEN00000006; *id.* Ex 2 at CEN00000046; *id.* Ex. 3 at CEN00000079; *id.* Ex. 4 at CEN00000119; *id.* Ex. 5 at NGINS000003734; *id.* Ex. 6 at NGINS000003973; *id.* Ex. 7 at NGINS000004213.)**

**NGSC disputes Assertion 69 to the extent that it purports to state a legal conclusion as to what NGSC's obligations are under the primary general liability policies that were issued by Century's predecessors and that are at issue in NGSC's motion for partial summary judgment.**

Respectfully submitted,

COVINGTON & BURLING LLP

By: ______________________
John (Fritz) Scanlon

William F. Greaney
Georgia Kazakis
Laird Hart
Shelli L. Calland
John (Fritz) Scanlon
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
(202) 662-6000
fscanlon@cov.com

*Attorneys for Northrop Grumman Systems Corporation*